| | |
|---|---|
| **State of Connecticut** | **JUDICIAL DISTRICT OF** |
| | **ANSONIA-MILFORD** |
| V. | **AT MILFORD** |
| **STATE OF CONNECTICUT** | |
| Theodora F. Antar | |

A22M-CR23-0124387-S
A22M-CR23-0191150-T

**Date: FEBRUARY 26TH, 2024**

## NOTICE OF REMOVAL TO FEDERAL COURT

TO THE SUPERIOR COURT OF THE STATE OF CONNECTICUT FOR THE JUDICIAL DISTRICT OF ANSONIA-MILFORD AND AND TO ALL ATTORNEYS OF RECORD:

NOTICE IS HEREBY GIVEN that DEFENDANT THEODORA F. ANTAR has on FEBRUARY 26TH, 2024, filed a notice of removal, a copy of which is attached, in the Office of the Clerk of the United States District Court for the District of Connecticut.

In accordance with 28 U.S. Code §1443, a "criminal prosecution commenced in a State court may be removed by the defendant to the district court of the United States for the district and division embracing the place wherein it is pending: (1) against any person who is denied or cannot enforce in the courts of such State a right under any law providing for the equal civil rights of citizens of the United States, or of all persons within the jurisdiction thereof."

The Defendant Theodora F. Antar in the above-captioned matter respectfully moves that the Federal District Court for the District of Connecticut allow the matter to be removed to federal court due to substantial violations of the Defendant's federal and constitutional rights to

substantive and procedural due process, a speedy trial, denial of Americans with Disabilities Accommodations, and protection against violations of said rights.

In the last several days, there have been numerous violations of the defendant's constitutional rights by Judge Auden Grogens, the state of Connecticut, and the Milford Superior Court in regard to the above captioned dockets. The defendant has been subjected to severe violations of her constitutional right to equal protections and is unable to enforce her right to locomotion, free speech, right to bear arms, right to the care, control, and custody of her minor child, and several other constitutionally protected rights due to a heavily restrictive order of protection that is currently being enforced by the Milford Superior Court.

Furthermore, the defendant has attempted to disqualify Judge Auden Grogins from presiding over this matter as she is currently a defendant in a federal lawsuit that the defendant has filed in federal district court under Antar v. Grossman, et al. Since the filing of this lawsuit, Judge Grogins has retaliated and discriminated against the defendant based on her race, national origin, gender, and disabilities and has continued to oppress and violate the defendant's rights through the enforcement of an unconstitutional order of protection and the continued prosecution of two criminal cases in which there is no probable cause that any crime was committed or that there was any victim to any crime.

The Defendant has been denied the right to due process, the right to effective counsel, the right to an evidentiary hearing to determine the validity and necessity of a heavily restrictive order of protection which is causing irreparable harm, the right to a speedy trial, the right to see discovery and evidence, the right to a trial before a jury, and the right to be reasonably informed regarding the prosecution, among several other rights.

The defendant requested a Fernando A hearing as it is her legal right to have said hearing, and Judge Grogins stated on the record in December of 2023 that she would not be allowing the defendant to move forward with the Fernando A hearing. Judge Grogins has insisted that she is the only judge in the Milford-Ansonia JD handling criminal matters and stated that she will preside over her own disqualification hearing rather than disqualify herself due to the blaring conflicts of interest and her extreme bias and prejudice against the defendant which prevents the defendant from being able to enforce her rights as they are being actively and repeatedly infringed upon by this court and through the prosecution of these cases.

"[t]he Supreme Court has held that a notice of removal under 28 U.S.C. § 1443(1) must satisfy a two-pronged test... First, it must appear that the right allegedly denied the removing defendant arises under a federal law 'providing for specific civil rights stated in terms of racial equality.'"

The Defendant has been denied several rights under federal and constitutional law, and the entire prosecution is based on the Defendant's attempt to report a crime being committed while she was protected by a protective order as the protected party. The defendant has been discriminated against based on her religion, sex, race, gender, and disabilities through this court and the court, who is staffed by administrative assistants and administrative judges who do not have the authority to deny the defendant her rights under the United States Constitution have continued to consistently deny said rights and stated that the defendant can "take it up with the judge on the record" and that the judge is not going to disqualify herself from the matter.

The defendant will be denied due process of law through the prosecution of this matter in state court due to the state's blatant refusal to vacate or modify the restrictive and unnecessary order of protection which is currently unconstitutional and violating the defendant's rights.

In accordance with the provisions of Section 1443(1), The Defendant Theodora F. Antar hereby states that she is denied or cannot enforce the specified federal rights in the courts of the State of Connecticut and will continue to suffer irreparable harm if this case is not removed out of that jurisdiction.

The protective order states that "This order shall be enforced, even without registration, by the courts of any state, the District of Columbia, any US.Territory, and may be enforced by Tribal Land (18 U.S.C. §2265)

Connecticut General Statutes §53a-223 states that "The protected party can never be prosecuted for violating a protective order or conspiring with the accused to violate the order. Also the protected party can't give the accused permission to violate the order. Only the court can modify or terminate an order of protection."

At the time of the arrest, the Defendant Theodora Antar was the protected party under the order of protection under docket A05DCR230190622S and under Connecticut State law can not be prosecuted for any involvement in the violations of that order. The order is enforceable in any court in any jurisdiction in the United States, which also provides for federal question jurisdiction.

Although it has been more than 30 days since the Defendant was arraigned in this prosecution, good cause exists to show why removal should still be permitted since the Defendant filed an appearance for the first time in this case on August 31, 2023 and the Defendant only appeared once in court for the arraignment and never appeared in court again and has not received any information regarding this case other than it being perpetually continued indefinitely.

The Defendant was denied the opportunity for a hearing to remove the protective order which is now on her that has been in effect since May 16, 2023. Said protective order has been in effect for almost four months and the Defendant has been denied an evidentiary hearing to prove the necessity of the order remaining imposed upon her.

The order is heavily restrictive and prevents the Defendant from having access with her minor child and prevents her from being able to possess firearms which is a violation of her second amendment rights, and a violation of her due process and equal protection rights under the fourteenth amendment.

The grounds for removal are the Defendant's inability to enforce her procedural due process rights. The Defendant's procedural due process rights have been grossly and severely violated. The law requires the following: "Procedural due process refers to the constitutional requirement that when the federal government acts in such a way that denies a citizen of a life, liberty, or property interest, the person must be given notice, the opportunity to be heard, and a decision by a neutral decision-maker. Procedural due process is one of two of the components of due process, with the other being substantive due process. In the U.S. Constitution, the phrase "due process" appears twice: in the Fifth Amendment and in the Fourteenth Amendment . Both Amendments guarantee due process when someone is denied "life, liberty, or property."

Henry Friend,  in this article titled "Some Kind of Hearing." created a list of required procedures that due process requires. While this list is not mandatory, it remains highly influential, both in its content and relative priority of each item.

1.  An unbiased tribunal.

2.  Notice of the proposed action and the grounds asserted for it.

3.  Opportunity to present reasons why the proposed action should not be taken.

4. The right to present evidence, including the right to call witnesses.

5. The right to know opposing evidence.

6. The right to cross-examine adverse witnesses.

7. A decision based exclusively on the evidence presented.

8. Opportunity to be represented by counsel.

9. Requirement that the tribunal prepare a record of the evidence presented.

10. Requirement that the tribunal prepare written findings of fact and reasons for its decision.

In addition, "Federal criminal civil rights law prohibits law enforcement agents from conspiring to interfere with federally protected rights, depriving rights under color of law, or using or conspiring to use force, or threat of force, to interfere with the free exercise of your civil rights."

The Defendant's rights have been violated repeatedly and all of her rights under the United States Constitution, VAWA, and most of all violations of her procedural due process and violations of her 1st, 5 1116, th, and 14th amendment rights.

The Defendant demands a jury trial for this matter and hereby claims her right to a trial before a jury for the charges she is being accused of.

In Tennessee v. Davis, the court stated that "Cases arising under the laws of the United States are such as grow out of the legislation of Congress, [whether] they constitute th[e] right or privilege, or claim or protection, or defense of the party, in whole or in part."

The removal statute requires that a defendant must file their notice of removal within 30 days of the arraignment in a criminal action except for "good cause shown" and in this case, the Defendant Theodora F. Antar has good cause shown that her rights have been violated repeatedly and she is unable to defend herself against this prosecution in the state court because her rights

have been violated and can not be enforced in the state court because they are continuing to violate those rights. The state court, particularly the GAS Superior Court in Derby, Connecticut, has violated the Defendant's substantive and procedural due process rights.

The Defendant was told on September 06, 2023 by the chief clerk of the Derby, CT Clerk's office that she is not permitted to file an appeal on any interlocutory orders that have been entered in this case, including the order of protection which has been in effect now for a total of 113 days.

The Connecticut Rules of Appellate Procedure state that "there are statutes and Practice Book provisions that permit immediate appeals from some orders or decisions that are not final judgments in that they do not necessarily end the case."

The Defendant filed an emergency ex-parte motion for a "Fernando A. hearing" and motion to vacate the protective order on September 5, 2023. The clerk's office did not file it until September 6, 2023. Defendant asked the chief clerk at Derby Court on September 6, 2023 at 1:05PM to provide her with a fee waiver application to waive the cost to file an appeal online for the denial of her motion for continuance and the order of protection which was ordered on May 17, 2023.

The clerk gave legal advice to the Defendant in the Clerk's office which was inconsistent with the Connecticut Practice Book and rules of Criminal Procedure and Appellate Procedure as published in state law.

The clerk instructed Defendant that she can not appeal anything in the case and stated to Defendant that her only option was to "file a motion" asking for the court to reverse the decision. Defendant inquired about the "Emergency Ex-parte motion for a Fernando A. hearing" that she filed the day prior, and was told by the clerk that said motion would be in the file for the "next

court date" which is set for the end of October 2023. The clerk told Defendant that she had no option to appeal any interlocutory orders in the case, despite the rules of criminal and appellate procedure stating otherwise.

Defendant has experienced violations of her rights as a crime victim, rights under the 5th Amendment, 4th amendment due process clause, VAWA, and equal protection and ADA rights, all of which have been violated repeatedly by the Clerk's Office, Judge, victim advocate, prosecutors, and other state actors involved in this matter.

The Defendant's rights as a victim and a protected party under state and federal domestic violence laws were also violated when she was arrested for this criminal action.

Defendant is asking that her right to procedural due process, speedy trial, effective counsel, right to see what evidence she is being faced with, and right to be heard and for a hearing not be violated further.

Defendant was never given a chance to speak once since the arraignment. The Defendant did not say more than a few words on the day of the arraignment and was represented by counsel who has since stated that he intends to file a motion to withdraw his appearance.

Defendant's counsel did not file said motion to withdraw, and instead spoke privately with the prosecutor on September 6, 2023 before court opened without filing any motions and arranged for the case to be continued to October 24, 2023. Counsel did not ask Defendant if that day was acceptable, and that day is a day in which the Defendant is required to be in school for a total of 12 hours, making her unavailable at the date and time that it was continued to. The Defendant also filed a motion for continuance asking the case be continued to November 2, 20/23, which was denied by the court.

Counsel for the Defendant intentionally did not file a motion to withdraw appearance in an effort to cause unreasonable delay and interference on the Defendant in an effort to further sabotage her case as retaliation for Defendant putting on the record the Counsel's own admission of unethical past behavior involving the judge on the case who also presided over the case in which the Defendant was a victim which was dismissed at the end of July of 2023.

The Clerk's office has since shown the Defendant extreme violations of her rights under the ADA and equal protection rights under the constitution and federal law. Defendant was told she could go to the clerk's office on September 6, 2023 to retrieve copies of all process, pleadings, and motions served upon the Defendant since she had previously asked the attorney to provide that and was ignored. Since May 17, 2023 to now, the Counsel of the Defendant has ignored phone calls, text messages, emails, and calls to his office where messages were left with his legal staff.

Counsel has simultaneously had ex-parte communications and participated in judicial proceedings to help to get Matthew Lodice's charges fully dismissed, despite Matthew having no attorney of his own and despite there being extraordinary amounts of evidence to prove he was guilty beyond a reasonable doubt.

Defendant is currently protected by an order of protection which was granted against Matthew Lodice and the retaliation by the clerk's office has escalated. On September 6, 2023, after the clerk in Derby, CT attempted to tell Defendant that she had no right to appeal or ask for relief from the order of protection which violates her rights, the Defendant stated she would be recording the conversation.

The clerk then immediately began to scream at the Defendant stating angrily that Defendant is "not allowed to record her" and then she suddenly and without warning grabbed the

file of the Defendant and ripped the file out of the Defendant's hands and angrily took it and instructed the other clerks not to allow the Defendant access to the file and demanded that they order the marshals to come in and "remove" the defendant from the clerk's office.

This was minutes after she told the Defendant that the case was not continued to October 24, 2023 and told Defendant that she had to be back in court for 2:00PM and claimed the continued case was still on the docket, even though there was documentation showing that it was continued.

When Defendant attempted to record evidence of the illegal conduct of said clerk, she was denied the right to view her file for the criminal case, even though it is her legal right and the file is available to anyone in the public, including the Defendant, at any time that they wish to see it.

Defendant's rights are being violated in so many ways that it is nearly impossible for her to be able to enforce these rights when so many state actors are violating them on a regular basis. Furthermore, there is good cause that this should be permitted more than 30 days post arraignment, since Defendant has never had a subsequent court hearing after the arraignment, never had a consultation with counsel once since the arraignment, never saw or accessed any filings in the case other than the arrest warrant which was provided by the police station and not the court on the day of her arrest, and was denied the due process and right to a hearing, right to see evidence, right to discovery, right to a jury trial, right to a speedy trial, several of her rights under constitutional law such as the equal protection clause, due process clause, and rights as a victim which are defined by federal laws such as VAWA.

Defendant was denied access to a fee waiver, denied access to view her publicly available file to get copies to attach to this notice of removal, denied due process, and is regularly denied

equal protection based on her race, gender, socioeconomic status, religion, and other protected rights guaranteed to her under federal, state, and constitutional law as well as through acts of congress and U.S. treaties.

The Supreme court of the United States has held that parents have a fundamental right under the Constitution to the care, control, education, and visitation with their children. The order of protection that is imposed upon the Defendant raises a question of if it is constitutional for the state of Connecticut to deny the Defendant the right to an evidentiary hearing regarding the necessity or continuity of said order of protection which violates the Defendant's constitutional rights under the second amendment to bear arms, and also violates her rights under the due process clause and 14th amendment to be in the life of her minor child who she is unable to see due to the protective order that currently is in effect.

Defendant attempted to file for an emergency ex-parte hearing and asked that the order be vacated and was told that the motion for such would sit in her file for an additional 51 days before a judge will even entertain the possibility of looking at it.

Defendant is denied due process by being unable to freely access and view her file. Defendant has the right to record when she is in public for her own safety and evidence of violations of her rights by state actors such as those employed by the State of Connecticut that work in the GAS Clerks office at Derby, GA.

Twice in the past 6 months, the same Clerk has threatened the Defendant with forcible removal, arrest, and other penalties if she did not "leave" the clerk's office when the Defendant simply asked a procedural question or asked for something that is within her right to see, possess, or know.

Defendant, who is a 2L law student, was unaware that she has the right to file a removal within 30 days of arraignment and now, since rights violations have happened in the past 30 days, this constitutes a removable action and good cause is that the Defendant was unaware and received ineffective assistance of counsel in that the counsel that agreed to represent her in said criminal matter on a pro bono basis had many ex-parte communications with other individuals and ignored and refused to keep the Defendant informed about anything of the case, refused to file any motions regarding anything in the case, and therefore denied the Defendant her right to counsel by keeping her in the dark and shielded from legal advice.

Defendant also had to research and come to the realization of the severity of the situation in order to become aware of the fact that there were so many violations of her rights by many state actors in this case, that it is impossible for this case to proceed in the state court without the Defendant experience further violations of her rights, animosity, retaliation, and attacks from the state actors who are involved.

Defendant is innocent until proven guilty, has the right to a speedy trial in front of a jury where the state must prove beyond a reasonable doubt that she is guilty of the crimes they are alleging her to have done. Defendant demands said trial by jury to be scheduled immediately and is moving that the federal district court allow this case to be removed to the federal court so that the Defendant may preserve her liberties to access and see her minor child, and to be free from cruel and unusual punishment and violations of her procedural due process rights.

DEFENDANT

/s/ THEODORA F. ANTAR,

THEODORAANTAR@GMAIL.COM

12

PU BOX 3554, Milford, CT, 06460

## CERTIFICATE OF SERVICE

I certify that a copy of the above Notice of Removal to Federal Court was mailed or delivered electronically or non electronically on February 26th, 2024 to all counsel and self-represented parties of record and that written consent for electronic delivery was received from all counsel and self represented parties of record who were electronically served.

Parties and/or attorneys served:

Connecticut State Attorney
14 West River Street
Milford, CT 06460

Judicial District of Ansonia-Milford GA5
14 West River Street
Milford, CT 06460

Michael Hillis

DEFENDANT

/s/ THEODORA F. ANTAR,

THEODORAANTAR@GMAIL.COM

SEP 6 2023 PM4:06
FILED - USDC - BPT - CT

NO. **A05D-CR23-0191150-S**

| | |
|---|---|
| State of Connecticut | GA 5 |
| v. | STATE OF CONNECTICUT |
| Theodora F. Antar | AT DERBY |
| | Date: SEPTEMBER 6, 2023 |

## NOTICE OF REMOVAL TO FEDERAL COURT

TO THE SUPERIOR COURT OF THE STATE OF CONNECTICUT FOR THE JUDICIAL

DISTRICT OF ANSONIA-MILFORD AND GA5 AT DERBY AND TO ALL ATTORNEYS

OF RECORD:

NOTICE IS HEREBY GIVEN that DEFENDANT THEODORA F. ANTAR has on

SEPTEMBER 6TH, 2023, filed a notice of removal, a copy of which is attached, in the Office of

the Clerk of the United States District Court for the District of Connecticut.

In accordance with 28 U.S. Code §1443, a "criminal prosecution commenced in a State

court may be removed by the defendant to the district court of the United States for the district

and division embracing the place wherein it is pending: (1) against any person who is denied or

cannot enforce in the courts of such State a right under any law providing for the equal civil rights of citizens of the United States, or of all persons within the jurisdiction thereof."

The Defendant Theodora F. Antar in the above-captioned matter respectfully moves that the Federal District Court for the District of Connecticut allow the matter to be removed to federal court due to substantial violations of the Defendant's federal and constitutional rights to substantive and procedural due process, a speedy trial, and protection against violations of said rights.

The Defendant has been denied the right to due process, the right to effective counsel, the right to an evidentiary hearing to determine the validity and necessity of a heavily restrictive order of protection which is causing irreparable harm, the right to a speedy trial, the right to see discovery and evidence, the right to a trial before a jury, and the right to be reasonably informed regarding the prosecution, among several other rights.

"[t]he Supreme Court has held that a notice of removal under 28 U.S.C. § 1443(1) must satisfy a two-pronged test…First, it must appear that the right allegedly denied the removing defendant arises under a federal law 'providing for specific civil rights stated in terms of racial equality.'

The Defendant has been denied several rights under federal and constitutional law, and the entire prosecution is based on the Defendant's attempt to report a crime being committed while she was protected by a protective order as the protected party.

The defendant will be denied due process of law through the prosecution of this matter in state court due to the state's blatant refusal to comply with or enforce the order of protection which is and was the basis of said prosecution.

In accordance with the provisions of Section 1443(1), The Defendant Theodora F. Antar hereby states that she is denied or cannot enforce the specified federal rights in the courts of the State of Connecticut and will continue to suffer irreparable harm if this case is not removed out of that jurisdiction.

The protective order states that "This order shall be enforced, even without registration, by the courts of any state, the District of Columbia, any U.S.Territory, and may be enforced by Tribal Land (18 U.S.C. §2265)

Connecticut General Statutes §53a-223 states that "The protected party can never be prosecuted for violating a protective order or conspiring with the accused to violate the order. Also the protected party can't give the accused permission to violate the order. Only the court can modify or terminate an order of protection."

At the time of the arrest, the Defendant Theodora Antar was the protected party under the order of protection under docket A05DCR230190622S and under Connecticut State law can not be prosecuted for any involvement in the violations of that order. The order is enforceable in any court in any jurisdiction in the United States, which also provides for federal question jurisdiction.

Although it has been more than 30 days since the Defendant was arraigned in this prosecution, good cause exists to show why removal should still be permitted since the Defendant filed an appearance for the first time in this case on 8/31/23 and the Defendant only appeared once in court for the arraignment and never appeared in court again and has not received any information regarding this case other than it being perpetually continued indefinitely.

The Defendant was denied the opportunity for a hearing to remove the protective order which is now on her that has been in effect since 5/16/23. Said protective order has been in effect for almost four months and the Defendant has been denied an evidentiary hearing to prove the necessity of the order remaining imposed upon her.

The order is heavily restrictive and prevents the Defendant from having access with her minor child and prevents her from being able to possess firearms which is a violation of her second amendment rights, and a violation of her due process and equal protection rights under the fourteenth amendment.

The grounds for removal are the Plaintiff's inability to enforce her procedural due process rights. The Defendant's procedural due process rights have been grossly and severely violated. The law requires the following: "Procedural due process refers to the constitutional requirement that when the federal government acts in such a way that denies a citizen of a life, liberty, or property interest, the person must be given notice, the opportunity to be heard, and a decision by a neutral decision-maker.

Procedural due process is one of two of the components of due process, with the other being substantive due process.

Due Process Clause

In the U.S. Constitution, the phrase "due process" appears twice: in the Fifth Amendment and in the Fourteenth Amendment. Both Amendments guarantee due process when someone is denied "life, liberty, or property."

Possibly Guaranteed Procedures

Judge Henry Friendly, in this article titled "Some Kind of Hearing," created a list of required procedures that due process requires. While this list is not mandatory, it remains highly influential, both in its content and relative priority of each item.

1. An unbiased tribunal.

2. Notice of the proposed action and the grounds asserted for it.

3. Opportunity to present reasons why the proposed action should not be taken.

4. The right to present evidence, including the right to call witnesses.

5. The right to know opposing evidence.

6. The right to cross-examine adverse witnesses.

7. A decision based exclusively on the evidence presented.

8. Opportunity to be represented by counsel.

9. Requirement that the tribunal prepare a record of the evidence presented.

10. Requirement that the tribunal prepare written findings of fact and reasons for its decision."

In addition, "Federal criminal civil rights law prohibits law enforcement agents from conspiring to interfere with federally protected rights, depriving rights under color of law, or using or conspiring to use force, or threat of force, to interfere with the free exercise of your civil rights."

The Defendant's rights have been violated repeatedly and all of her rights under the United States Constitution, VAWA, and most of all violations of her procedural due process and violations of her 1st, 5th, 6th, and 14th amendment rights.

The Defendant demands a jury trial for this matter and hereby claims her right to a trial before a jury for the charges she is being accused of.

In *Tennessee v. Davis*, the court stated that "Cases arising under the laws of the United States are such as grow out of the legislation of Congress, [whether] they constitute th[e] right or privilege, or claim or protection, or defense of the party, in whole or in part."

The removal statute requires that a defendant must file their notice of removal within 30 days of the arraignment in a criminal action except for "good cause shown" and in this case, the Defendant Theodora F. Antar has good cause shown that her rights have been violated repeatedly and she is unable to defend herself against this prosecution in the state court because her rights have been violated and can not be enforced in the state court because they are continuing to violate those rights. The state court, particularly the GA5 Superior Court in Derby, Connecticut, has violated the Defendant's substantive and procedural due process rights.

The Defendant was told on 9/6/23 by the chief clerk of the Derby, CT Clerk's office that she is not permitted to file an appeal on any interlocutory orders that have been entered in this case, including the order of protection which has been in effect now for a total of 113 days.

The Connecticut Rules of Appellate Procedure state that "there are statutes and Practice Book provisions that permit immediate appeals from some orders or decisions that are not final judgments in that they do not necessarily end the case."

The Defendant filed an emergency ex-parte motion for a "Fernando A. hearing" and motion to vacate the protective order on 9/5/23. The clerk's office did not file it until 9/6/23. Defendant asked the chief clerk at Derby Court on 9/6/23 at 1:05PM to provide her with a fee waiver application to waive the cost to file an appeal online for the denial of her motion for continuance and the order of protection which was ordered on 5/17/23.

6

The clerk gave legal advice to the Defendant in the Clerk's office which was inconsistent with the Connecticut Practice Book and rules of Criminal Procedure and Appellate Procedure as published in state law.

The clerk instructed Defendant that she can not appeal anything in the case and stated to Defendant that her only option was to "file a motion" asking for the court to reverse the decision. Defendant inquired about the "Emergency Ex-parte motion for a Fernando A. hearing" that she filed the day prior, and was told by the clerk that said motion would be in the file for the "next court date" which is set for the end of October 2023. The clerk told Defendant that she had no option to appeal any interlocutory orders in the case, despite the rules of criminal and appellate procedure stating otherwise.

Defendant has experienced violations of her rights as a crime victim, rights under the 5th amendment, 4th amendment due process clause, VAWA, and equal protection and ADA rights, all of which have been violated repeatedly by the Clerk's Office, Judge, victim advocate, prosecutors, and other state actors involved in this matter.

The Defendant's rights as a victim and a protected party under state and federal domestic violence laws were also violated when she was arrested for this criminal action.

Defendant is asking that her right to procedural due process, speedy trial, effective counsel, right to see what evidence she is being faced with, and right to be heard and for a hearing not be violated further.

Defendant was never given a chance to speak once since the arraignment. The Defendant did not say more than a few words on the day of the arraignment and was represented by counsel who has since stated that he intends to file a motion to withdraw his appearance.

Defendant's counsel did not file said motion to withdraw, and instead spoke privately with the prosecutor on 9/6/23 before court opened without filing any motions and arranged for the case to be continued to 10/24/23. Counsel did not ask Defendant if that day was acceptable, and that day is a day in which the Defendant is required to be in school for a total of 12 hours, making her unavailable at the date and time that it was continued to. The Defendant also filed a motion for continuance asking the case be continued to 11/2/23, which was denied by the court.

Counsel for the Defendant intentionally did not file a motion to withdraw appearance in an effort to cause unreasonable delay and interference on the Defendant in an effort to further sabotage her case as retaliation for Defendant putting on the record the Counsel's own admission of unethical past behavior involving the judge on the case who also presided over the case in which the Defendant was a victim which was dismissed at the end of July of 2023.

The Clerk's office has since shown the Defendant extreme violations of her rights under the ADA and equal protection rights under the constitution and federal law. Defendant was told she could go to the clerk's office on 9/6/23 to retrieve copies of all process, pleadings, and motions served upon the Defendant since she had previously asked the attorney to provide that and was ignored. Since 5/17/23 to now, the Counsel of the Defendant has ignored phone calls, text messages, emails, and calls to his office where messages were left with his legal staff. Counsel has simultaneously had ex-parte communications and participated in judicial proceedings to help get Matthew Lodice's charges fully dismissed, despite Matthew having no attorney of his own and despite there being extraordinary amounts of evidence to prove he was guilty beyond a reasonable doubt.

Defendant is currently protected by an order of protection which was granted against Matthew Lodice and the retaliation by the clerk's office has escalated. On 9/6/23, after the clerk

in Derby, CT attempted to tell Defendant that she had no right to appeal or ask for relief from the order of protection which violates her rights, the Defendant stated she would be recording the conversation.

The clerk then immediately began to scream at the Defendant stating angrily that Defendant is "not allowed to record her" and then she suddenly and without warning grabbed the file of the Defendant and ripped the file out of the Defendant's hands and angrily took it and instructed the other clerks not to allow the Defendant access to the file and demanded that they order the marshals to come in and "remove" the defendant from the clerk's office.

This was minutes after she told the Defendant that the case was not continued to 10/24/23 and told Defendant that she had to be back in court for 2:00PM and claimed the continued case was still on the docket, even though there was documentation showing that it was continued.

When Defendant attempted to record evidence of the illegal conduct of said clerk, she was denied the right to view her file for the criminal case, even though it is her legal right and the file is available to anyone in the public, including the Defendant, at any time that they wish to see it.

Defendant's rights are being violated in so many ways that it is nearly impossible for her to be able to enforce these rights when so many state actors are violating them on a regular basis.

Furthermore, there is good cause that this should be permitted more than 30 days post arraignment, since Defendant has never had a subsequent court hearing after the arraignment, never had a consultation with counsel once since the arraignment, never saw or accessed any filings in the case other than the arrest warrant which was provided by the police station and not the court on the day of her arrest, and was denied the due process and right to a hearing, right to

see evidence, right to discovery, right to a jury trial, right to a speedy trial, several of her rights under constitutional law such as the equal protection clause, due process clause, and rights as a victim which are defined by federal laws such as VAWA.

Defendant was denied access to a fee waiver, denied access to view her publicly available file to get copies to attach to this notice of removal, denied due process, and is regularly denied equal protection based on her race, gender, socioeconomic status, religion, and other protected rights guaranteed to her under federal, state, and constitutional law as well as through acts of congress and U.S. treaties.

The Supreme court of the United States has held that parents have a fundamental right under the Constitution to the care, control, education, and visitation with their children. The order of protection that is imposed upon the Defendant raises a question of if it is constitutional for the state of Connecticut to deny the Defendant the right to an evidentiary hearing regarding the necessity or continuity of said order of protection which violates the Defendant's constitutional rights under the second amendment to bear arms, and also violates her rights under the due process clause and 14th amendment to be in the life of her minor child who she is unable to see due to the protective order that currently is in effect.

Defendant attempted to file for an emergency ex-parte hearing and asked that the order be vacated and was told that the motion for such would sit in her file for an additional 51 days before a judge will even entertain the possibility of looking at it.

Defendant is denied due process by being unable to freely access and view her file. Defendant has the right to record when she is in public for her own safety and evidence of violations of her rights by state actors such as those employed by the State of Connecticut that work in the GA5 Clerks office at Derby, GA.

Twice in the past 6 months, the same Clerk has threatened the Defendant with forcible removal, arrest, and other penalties if she did not "leave" the clerk's office when the Defendant simply asked a procedural question or asked for something that is within her right to see, possess, or know.

Defendant, who is a 2L law student, was unaware that she has the right to file a removal within 30 days of arraignment and now, since rights violations have happened in the past 30 days, this constitutes a removable action and good cause is that the Defendant was unaware and received ineffective assistance of counsel in that the counsel that agreed to represent her in said criminal matter on a pro bono basis had many ex-parte communications with other individuals and ignored and refused to keep the Defendant informed about anything of the case, refused to file any motions regarding anything in the case, and therefore denied the Defendant her right to counsel by keeping her in the dark and shielded from legal advice.

Defendant also had to research and come to the realization of the severity of the situation in order to become aware of the fact that there were so many violations of her rights by many state actors in this case, that it is impossible for this case to proceed in the state court without the Defendant experience further violations of her rights, animosity, retaliation, and attacks from the state actors who are involved.

Defendant is innocent until proven guilty, has the right to a speedy trial in front of a jury where the state must prove beyond a reasonable doubt that she is guilty of the crimes they are alleging her to have done. Defendant demands said trial by jury to be scheduled immediately and is moving that the federal district court allow this case to be removed to the federal court so that the Defendant may preserve her liberties to access and see her minor child, and to be free from cruel and unusual punishment and violations of her procedural due process rights.

DEFENDANT

THEODORA F. ANTAR, PRO SE



By:

THEODORA F. ANTAR, PRO SE

856 SHAGBARK DRIVE

ORANGE, CT, 06477

203-273-8419

THEODORAANTAR@GMAIL.COM

## CERTIFICATE OF SERVICE

I certify that a copy of the above Notice of Removal to Federal Court was mailed or delivered electronically or nonelectronically on 9/6/2023 to all counsel and self-represented parties of record and that written consent for electronic delivery was received from all counsel and self-represented parties of record who were electronically served.

Parties and/or attorneys served:


Michael Hillis

mHillis@dkh-law.com


Rebecca Barry

Rebecca.barry@ct.gov

THEODORA F. ANTAR, PRO SE

856 SHAGBARK DRIVE

ORANGE, CT, 06477

203-273-8419

THEODORAANTAR@GMAIL.COM

| STATE OF CONNECTICUT VS. | | | NAME OF ACCUSED | | DOCKET NO. | |
|---|---|---|---|---|---|---|
| ANTAR THEODORA F | | | | | A05DCR230191150S | |
| STREET ADDRESS | | | | | | |
| 856 SHAGBARK DR | | | | | | |
| CITY | | | STATE | ZIP CODE | COURT DATE | |
| ORANGE | | | CT | 06477 | 05/17/2023 | |

| 1. CONTINUED TO | PURPOSE | 6. CONTINUED TO | PURPOSE | 11. CONTINUED TO | PURPOSE |
|---|---|---|---|---|---|
| 6/29/23 | OF | 7. PO issued | | 12. | |
| -8/8/23 | OF | 8. | | 13. | |
| 9/6/23 | OF | 8. | | 13. | |
| 10/24/23 | DF | 9. | | 14. | |
| 5. | | 10. | | 15. | |

JD-CR-37  Rev. 7/94

**PROMISE TO APPEAR**
JD-CR-13  Rev. 10-17
C.G.S. §§ 53a-35b, 53a-36, 53a-40b, 53e-41,53a-42, 53a-172,
53a-173, 53a-222, 53a-222a, 54-63a to 54-63g, 54-64a to 54-64g;
P.B. §§ 35-1 to 38-6, 38-15, 38-16, 38-20, 38-21; P.A. 17-31 §§ 6, 7

**STATE OF CONNECTICUT**
**SUPERIOR COURT**
www.jud.ct.gov

**Instructions**
Use this form only for defendants released upon a written promise who are charged with a MISDEMEANOR,
A MOTOR VEHICLE VIOLATION FOR WHICH A TERM OF IMPRISONMENT MAY BE IMPOSED, or a FELONY.

**To: Any Proper Officer of the State of Connecticut**

| From (Name of defendant) | Address of defendant | | | Telephone number |
|---|---|---|---|---|
| THEODORA ANTAR | 856  SHAGBARK DR | ORANGE | CT | 203 273 8419 |

| Judicial District / Geographical Area Court | Address of court | Police case number |
|---|---|---|
| 05 | 106 Elizabeth Street, Derby, Ct. | 23-13466 |

| Crime(s) charged against defendant | Appearance date and time (Initial appearance not more than |
|---|---|
| 53a-182    53a-157b | 14 days after date of arrest) 05/17/23    9:30 AM |

**PROMISE TO APPEAR**

I, the defendant named above, promise to appear before (come to):
1. The Superior Court at the address listed above, on the Appearance date and the time listed above;
2. The court on any other date and time that the court continues my case to;
3. Any other court where my case may be transferred (sent to); and
4. The court on any other date and time at which there is a hearing on the conditions of my release.

I also promise to follow all of the Conditions of Release listed below, which were ordered by the court, a bail commissioner, or a police officer.

I have read, or have had read to me, the Notice to Defendant below, and I understand everything in that notice.

**A. Conditions of Release**
1. Do not commit a federal, state or local crime.

| Signed (Defendant) | Date and Time Signed |
|---|---|
| | 5 16 23  12.35 hrs |
| Signed (Parent or Guardian if minor) | Date and Time Signed |

Subscribed to before me. Defendant was advised of the requirements listed above, and was given a copy of this Promise to Appear and the Notice below.

| Signed (Police Officer, Asst. Clerk, Bail Comm'r., Prob. Officer) | Date and Time Signed | Job Title | Police Department (if applicable) |
|---|---|---|---|
| | 5/6/23  1235  .m. | Patrol Ofs. | Orange Police |

**NOTICE TO DEFENDANT**

1. You must come to court on the Appearance date and time listed above and at any other time and place that the court tells you.
2. If you do not come to court as required, you will be committing the crime of Failure to Appear, and:
   a. You may be criminally charged or the court may issue a capias (order for your arrest); and
   b. You may be subject to the following criminal penalties:
      If you were released on this Promise to Appear for one or more felonies, you may be charged with an additional Class D felony, and the court may sentence you to up to 5 years in prison, fine you up to $5,000, or both, for failing to appear.
      If you were released on this Promise to Appear for one or more misdemeanors or motor vehicle violations, you may be charged with an additional Class A misdemeanor, and the court may sentence you to up to 1 year in prison, fine you up to $2,000, or both, for failing to appear.
3. If you commit a crime after you have been released from this Promise to Appear, you may be subject to added criminal penalties in addition to the penalties for that crime.
4. If you violate the conditions of your release:
   a. If you violate the conditions of your release, you will be committing the crime of Violation of Conditions of Release, and:
   [remainder illegible]

**PROMISE TO APPEAR**

MOTION FOR CONTINUANCE/
CASE LOW REQUEST-

ADA NOTICE
The Judicial Branch of the State

STATE OF CONNECTICUT
SUPERIOR COURT

**INFORMATION**
JD-CR-71 Rev 1-17

STATE OF CONNECTICUT
**SUPERIOR COURT**

DISPOSITION DATE

| Police Case number 23-13466 | Agency name ORANGE POLICE DEPARTMENT | | Agency number CT0010700 |
|---|---|---|---|

## TITLE, ALLEGATION, AND COUNTS

State of Connecticut vs. *(Name of accused)*
Antar Theodora F

Residence *(Town)* of accused
Orange

Docket number
M05PCR23-19 1180 S

Address
856 Shagbark Dr Orange Ct

Date of birth
09/07/1991

The undersigned Prosecuting
Authority of the Superior Court
of the State of Connecticut
charges that:

To be held at *(Town)*
Derby

Geographical
area
number 05

Court date

Count One — Did commit the offense of
DISORDERLY CNDT

Continued to
10/29/23

Purpose

Reason

| At *(Town)* Orange | On or about *(Date)* 4/30/2023 | In violation of General Statute number 53a-182 | |

Count Two — Did commit the offense of
FLS STATEMENT

| At *(Town)* Orange | On or about *(Date)* 4/30/2023 | In violation of General Statute number 53a-157b | |

Count Three — Did commit the offense of

| At *(Town)* | On or about *(Date)* | In violation of General Statute number | |

☐ See other sheet for additional counts

Date 5/12/23

Signed *(Prosecuting Authority)*

## COURT ACTION

Defendant advised of rights before plea

☐ Attorney  ☐ Public defender  ☐ Guardian

(Judge) Bell J

(Date) 5-17-23

Bond

Surety

☐ 10%
☐ Cash

Election
☐ CT  ☐ JY

(Date)

Bond change

Seized property inventory number

| Count | Plea date | Plea | Plea withdrawn Date / New plea | Verdict finding | Fine | Remit | Additional disposition |
|---|---|---|---|---|---|---|---|
| 1 | | | | | $ | $ | |
| 2 | | | | | $ | $ | |
| 3 | | | | | $ | $ | |

Other Court Action
P.O. issued
A class motion for continuance and appearance motion
denied

Judge
Bell J

☐ Date  ☐ R/O  ☐ FTO  ☐ Bond forfeited  ☐ Forfeiture vacated  ☐ Forfeiture vacated and bond reinstated

Program fee  receipt number

Circle one
W I Q

Program fee  receipt number

Circle one
W I Q

**STATE OF CONNECTICUT**
**SUPERIOR COURT**

23-13466

Agency... ...Orange P.D

| | Disposition date |
| --- | --- |
| Warrant | Agency number
1600 0037 |

Geographical area number 5 | **State of Connecticut vs.** ~~_____~~ Antal, Theodore F.

**To: Any Proper Officer of the State of Connecticut**

By Authority of the State of Connecticut, you are hereby commanded to arrest the body of the within-named accused. ("X" all that apply)

☐ A. Accused is ordered to be brought before a clerk or assistant clerk of the Superior Court.

☐ B. Accused is not entitled to bail.

If A, B or both are checked above, you shall without undue delay bring the arrested person before the clerk or assistant clerk of the Superior Court for the geographical area where the offense is alleged to have been committed, or if the clerk's office is not open, to a community correctional center within said geographical area, or the nearest community correctional center if no such center exists in the geographical area, or to the Correctional Institution, as the case may be.

☐ C. Bail set at _____

☐ D. Non-financial conditions of release: _____

_____

Extradition boundaries established by prosecutor

☒ E. Conditions of release not determined by the court.

| By the Court | Signed (Judge of the Superior Court) | Date 5/12/23 | Name of the Judge (Print or type) SWJones |
| --- | --- | --- | --- |

**Return On Arrest Warrant**

| Geographical area number | Town of Orange CT | Date 5/16/23 | State of Connecticut |
| --- | --- | --- | --- |

Then and there, by virtue of the within and foregoing complaint and warrant, I arrested the body of the within-named accused and read the same in the hearing of said accused and have said accused here in court for examination.

Attest (Officer's signature and Department)

| Date | Other Court action | Judge |
| --- | --- | --- |
| | | |
| | | |
| | | |

This page 3 of a 3 page information

MOTION FOR CONTINUANCE/
CASEFLOW REQUEST
CRIMINAL MATTER

ADA NOTICE
Judicial Branch of the State
Complies with the Americans

STATE OF CONNECTICUT
SUPERIOR COURT

**STATE OF CONNECTICUT**
**SUPERIOR COURT**
www.jud.ct.gov

FOR COURT USE ONLY
Supporting Affidavits Sealed
☐ YES    ☐ NO

Agency name
Orange Police Department

*First, Middle Initial)*
, THEODORA F

Residence *(Town)* of accused
ORANGE

Court to be held at *(Town)*
Derby

Agency number

Geographical
Area number    05

**APPLICATION FOR ARREST WARRANT**
O: A Judge of the Superior Court
The undersigned hereby applies for a warrant for the arrest of the above-named accused on the basis of the facts
set forth in the :    ☒ **AFFIDAVIT BELOW**    ☐ **AFFIDAVIT(S) ATTACHED**

Date    5/12/23    Signed (Prosecuting authority)    Title (Prosecuting authority)

**AFFIDAVIT**
The undersigned affiant, being duly sworn, deposes and says:

1. That the undersigned, Ofc Kurt Correia 132, being duly sworn, does depose and state that he is a
member of the Orange Police Department and has been since 09/07/2021. At all times mentioned herein
he was acting as a member of said department. The following facts and circumstances are stated from
personal knowledge and observations as well as information received from other police officers acting in
their official capacity and from official police reports and statements made by prudent and credible
witnesses.

2. That on April 30, 2023 at approximately 12:45 the Orange Police Department was contacted by
THEODORA ANTAR (9-7-1991). Affiant and Officer Satkowski responded to 480 Racebrook Rd, St.
Barbara's Church where ANTAR claimed that a protective order was violated and that she was contacted
by the father of her child. ANTAR stated that she was being screamed at and that she had almost been
struck by the car door which was intentionally thrown at her.

3. A check of the most recent protective order that was received from Derby Superior court dated 1/30/23
has CT31 applied with the other comment stating the following "Mr. Lodice is allowed to contact the
protected party, regarding the visitation and affairs of their child via Family Wizard. Exchange of the
minor child must be pursuant to the most recent Civil Family order. Mr. Lodice is allowed to facilitate /
initiate contact with the protected party for the purpose of contact with their child in accordance with the
most recent Civil Family order". A copy of the order is included with this affidavit.

May 11, 2023    Signed (Affiant)    #132
May 11, 2023    Signed (Judge/Clerk, Commissioner of Superior Court, Notary Public)    #82

**FINDING**
The foregoing Application for an arrest warrant, and affidavit attached to said Application, having been submitted to and considered by the
undersigned, the undersigned finds from said affidavit(s) that there is probable cause to believe that an offense has been committed and that the
undersigned finds therefrom, and probable cause exists for the issuance of a warrant for the arrest of the above-named accused.

5/12/23    Signed (Judge, Trial Referee)    Name of Judge/Judge Trial Referee

MOTION FOR CONTINUANCE/
CASEFLOW REQUEST–
CRIMINAL MATTERS

ADA NOTICE

The   Judicial   Branch   of   the   State   STATE OF CONNECTICUT

STATE OF CONNECTICUT
SUPERIOR COURT
www.jud.ct.gov

J. 36-3

Residence (Town) of accused
ORANGE

Court to be held at (Town)
Derby

Geographical
Area number   05

VIT - CONTINUED

...at while investigating the incident it was learned that both ANTAR and the other involved individual had ...eo including audio of the incident that each person took on their personal cell phone. That upon review of ...the video the following observations were made. MATTHEW LODICE (5-11-1983) exits his truck, a 2000 F250 color white bearing CT REG C313554, from the driver side door after his daughter runs up to the truck. He goes to the rear passenger side and begins to buckle her into her car seat. As he was putting his daughter into the car seat in his truck ANTAR walked over to his truck. That ANTAR stepped into the area of the driver seat door, which had been left open when LODICE exited to put his daughter in the truck, ANTAR reached into the truck and took a receipt of a bank statement that belonged to LODICE.

5. That at this point he asked her to not take his things and to step away from his truck. ANTAR immediately began to shout that he violated the no contact order and that he was not supposed to talk to her. Lodice continued to set up his daughter in the car seat. He then walked around the front of the truck intending to enter the truck. However ANTAR did not move away from the area of the driver side door. ANTAR was standing directly in the path that he would need to walk to enter the truck saying nothing. When he asked her to please step away from the truck she would only scream that he should not be talking to her and that he was in violation of the order.

6. That ANTAR at no time attempted to tell Lodice why she had reached into the truck, nor why she was standing there saying nothing. That ANTAR was not moving away from the driver area of the truck and would only shout back to him that he was not supposed to be speaking to her.

7. That at no point while reviewing the video does Lodice raise his voice, at no point did Affiant hear any sort of hostility or anger in his tone of voice. There was absolutely no threat made towards ANTAR , either verbally or physically. That Lodice was even standing on the other side of the door as to have a clear separation from Antar. In no way did Lodice prevent Antar from walking away from the truck. He simply several times stated "please step away and let me get in the truck".

8. That at this point my attention was taken away from the video because Affiant heard ANTAR shouting at Officer Satkowski who was attempting to investigate what occurred with her. When Affiant was close to Officer Satkowski, ANTAR was on the phone with OPD HQ demanding that a supervisor respond to the scene because she was told by Officer Satkowski that Lodice had not violated the order.

9. That Affiant began to speak with ANTAR who needed to be redirected several times. ANTAR stated that she intended to provide Lodice a piece of paper with the school address and a code to enter for the new early elementary education school to drop off their daughter and that was the reason that she went to and took the bank statement out of the truck. Affiant asked ANTAR to provide a written statement.

May  11  2023

May 11, 2023

Date
5/12/23

Signed (Affiant)
#122

Signed (Judge Clerk, Commissioner of Superior Court, Notary Public)
H82

Reviewed (Judge, Clerk, Trial Referee)

Date
5/12/23

MOTION FOR CONTINUANCE/
CASEFLOW REQUEST-
CRIMINAL MATTERS

ADA NOTICE
The Judicial Branch of the State
of Connecticut complies with the Americans
with Disabilities Act (ADA). If you need a

STATE OF CONNECTICUT
SUPERIOR COURT
www.jud.ct.gov



...CATION

..., 36-3

STATE OF CONNECTICUT
SUPERIOR COURT
www.jud.ct.gov

...ddle Initial)

...HEODORA F

Residence (Town) of accused
ORANGE

Court to be held at (Town)
Derby

Geographical
Area number    05

...VIT - CONTINUED

...that Lodice asked that Affiant get back his bank statement which Antar took from his truck when she ...alked over. Affiant returned to Antar who did in fact have in her possession the bank statement of Lodice. ANTAR stated that she intended to write the address and school information on that paper. ANTAR then showed me the video that she took where she claimed Lodice attempted to hit her with the truck door.

11. That the video that ANTAR showed me was her walking to the truck. The video clearly shows that she walks up to the driver's side door and right up to the seating area standing directly in front of the side of the driver's seat. At no point while approaching does ANTAR attempt to tell Lodice what she was approaching for. In fact in the video you can clearly hear ANTAR, in an antagonistic voice say, "what's all this mess in here?".

12. That ANTAR then reaches into the vehicle picking up the bank statement. At that point Lodice is heard saying "can you not touch my stuff please". ANTAR immediately yells back "you're not supposed to be contacting me". ANTAR again makes no attempt to explain that she was trying to provide information pertaining to their daughter's schooling. ANTAR video then stops and she stated that was when she contacted the Orange Police.

13. That it should be noted that this timeline matches with the video that Lodice had showed and that in that video, ANTAR claims that Lodice had been yelling at her for 5 to 10 minutes which is not true.

14. That after contacting Orange Police ANTAR made no attempt to move away from the driver side area of the vehicle and that ANTAR was directly blocking Lodice from entering the vehicle. ANTAR does not attempt to provide Lodice with any information about their daughter. Lodice finishes buckling his daughter to the car seat and walks around the front of the vehicle. He stops on the outside of the driver door where several times he asks ANTAR to "please step away from the door please". Each time ANTAR only responds by saying he is not to be contacting her outside of the app, which the court ordered that all communication about the daughter should take place on, and that he is violating the order. At one point ANTAR claims she is attempting to provide him information but does not actually at any point ever attempt to provide that information.

15. That it is during this time that ANTAR claimed and provided a sworn written statement stating that Lodice tried multiple times to hit her with the car door. After reviewing the video from Lodice it is seen that at no point did he push the door towards her and at no point was there any aggression displayed from Lodice. ANTAR continued to block Lodice from entering the vehicle after a few minutes ANTAR takes a step back and Lodice without saying anything is able to pass by her and enter the truck.

Signed (Affiant)
[signature] #182

Signed (Judge/Clerk/Commissioner of the Superior Court, Notary Public)
[signature] #82

[signature]

Date
5/2/23

MOTION FOR CONTINUANCE/
CASEFLOW REQUEST-
CRIMINAL MATTERS

ADA NOTICE
The Judicial Branch of the State
of Connecticut complies with the Americans
with Disabilities Act (ADA). If you need a

STATE OF CONNECTICUT
SUPERIOR COURT

STATE OF CONNECTICUT
SUPERIOR COURT
www.jud.ct.gov

...A. 36-3

...HEODORA F

| Residence (Town) of accused | Court to be held at (Town) | Geographical Area Number |
| ORANGE | Derby | 05 |

...VIT - CONTINUED

...hat after he is finally able to get into the truck Lodice says "can you get out of the doorway so I can
...ose the door" ANTAR again refuses to leave the area and refuses to move away from the door and to wait
in her vehicle claiming that she is waiting for the police to arrive. Lodice then turns his attention to his son
who is in the vehicle, to calm him. ANTAR then begins to shout to the boy telling the child to "make sure he
gets a record for beating people like his dad". The video that ANTAR showed ends shortly after she yells
towards the child. That Affiant attempted to retrieve video from St. Barbara's Church located at 480
Racebrook Rd however due to unknown technical error the cameras that cover the south parking lot where
the incident took place had no recordings dating back to April 07, 2023.

17. Wherefore based upon the above information in this Affidavit, the undersigned Affiant has probable
cause to believe that on April 30, 2023 THEODORA ANTAR (9-7-1991) last known address of 856
SHAGBARK DR, Orange CT 06477, committed the following violations:
C.G.S 53a-182 Disorderly conduct
C.G.S 53a-157b False statement to police

| Signed (Affiant) | #182 |
| Signed (Judge/Clerk/Commissioner of Superior Court, Notary Public) | 482 |
| Date | 5/12/23 |

3/12/23

**MOTION FOR CONTINUANCE/ CASEFLOW REQUE... ...INAL MATTE...**

...DA NOTICE

STATE OF CONNECTICUT

## ...FORM ARREST REPORT
...CR-21(I) Rev. 3-21

Uniform Arrest Report number: ...07...0000862 — [X] CR [ ] MV

Companion Uniform Arrest Report number: [ ] CR [ ] MV

FOR COURT USE ONLY

Name of accused (Last, First, Middle): ANTAR, THEODORA E

Address of accused (Number, Street, PO box, City, State, Zip code): 556 SHAGBARK DR ORANGE, CT 06477

Docket number: A05D-CR23-191150-S

| Sex | Race | Hispanic | US Veteran | Date of birth | Social security number | Alien registration number | E-mail address of accused |
|---|---|---|---|---|---|---|---|
| F | W | [ ] Yes | [ ] Yes | 09071991 | 047884503 | | |

| Birth country | Birth state | Birth city | Alias / Maiden name | Court date |
|---|---|---|---|---|
| US | CT | | | 05172023 |

| Operator's license number / State | | MV / Boat / CDL | Vehicle registration number / State | MV / Dealer / CV | US DOT number / State | Court location |
|---|---|---|---|---|---|---|
| 098455329 | CT | [X] [ ] [ ] | | [ ] [ ] [ ] | [ ] US DOT (D) [ ] CT Only (C) | DERBY G.A. 5 |

| Arrest date and time | | | Arresting agency name | Arrest town | PD case number |
|---|---|---|---|---|---|
| 05162023 | 1125 | [ ] A.M. [ ] P.M. | 0107 | ORANGE | 2313466 |

| Arresting officer | Shield number | Incident involved (Select all that apply) | PD arrestee number |
|---|---|---|---|
| CORREIA | 132 | [ ] FV [ ] ALC [ ] NAR [ ] HAZ MAT | |

[ ] No bond set [X] Promise to appear [ ] Non-surety bond set (Amount) [ ] Bond NOT posted

[ ] Bond set (Amount) [ ] Surety / Cash [ ] Cash only [ ] 10% Cash [X] Bond posted

| Department / Troop ORI | SPBI number | Height | Weight | Hair | Eyes | Multi-Page UAR |
|---|---|---|---|---|---|---|
| CT0010700 | | 504 | 120 | BLK | BRO | Page 1 of 1 |

| Offense date(s) | Town of offense | C/A/X | Statute number / Description of charge | | Number of counts |
|---|---|---|---|---|---|
| 04302023 | ORANGE | | 53a-157b | FLS STATEMENT | 1 |
| 04302023 | ORANGE | | 53a-182 | DISORDERLY CONDUCT | 1 |

FAMILY VIOLENCE

MOTION FOR CONTINUANCE/



CONNECTICUT
ER COURT

UNIFORM ARREST REPORT CONTINUATION PAGE   1071L0000882

for Uniform Arrest Report Number 1071L0000882

Submitted by   ORANGE

For ANTAR, THEODORA F

## Charge(s)

| Offense date(s) | Town of offense | C/A/X | Statute number / Description of charge | Number of counts |
|---|---|---|---|---|

### Alias / Maiden name(s)

No additional alias / maiden name(s)

### Date(s) of birth

No additional date(s) of birth

### Social security number(s)

No additional date(s) of birth

MOTION FOR CONT'
CASEFLOW REQU
CRIMINAL MATTE



## ORANGE DEPARTMENT OF POLICE SERVICE

### Advisement of Rights

INCIDENT NO. 23-13466   DATE 5/16/2023   PLACE Orange Police Department

NAME THEODORA ANTAR

ADDRESS 856   SHAGBARK DR   DOB 09/07/91   PHONE 2032738419

LAST SCHOOL ATTENDED Southern CT State Uni   ORANGE   CT   LAST GRADE Bach.

#### ADVISEMENT OF CONSTITUTIONAL RIGHTS

Before I am interviewed or asked any questions I am aware that I must be advised of my rights and I must fully understand those rights _TA_

I have been advised and know that I have the right to remain silent _TA_

I have been advised and know that anything I say can be used against me in a court of law _TA_

I have been advised and know that I have a right to an attorney and I know the attorney can be with me while I am being questioned by the police _TA_

I have been advised and know that if I cannot afford an attorney, one can be appointed for me and I may have him with me before answering any questions _TA_

I have been advised and know that I can refuse to answer questions or I may stop answering questions at any time I wish

Signed _(signature)_   Date 5/16/23   Time 11:44

Officer _(signature)_   Date 5/16/23   Time 11:44

#### DWI SECTION

I was afforded a reasonable opportunity to telephone an attorney prior to the performance of a chemical test for blood alcohol ratio.

Signed ____   Date ____   Time ____

#### WAIVER OF RIGHTS

I am 16 years of age or older and have been advised of my rights and I fully understand what my rights are. I am willing to be interviewed and answer questions. I do not want a lawyer at this time. I am waiving my rights freely and voluntarily. No promise or threats have been made to me and no pressure or coercion of any kind have been used against me.

Signed ____   Date ____   Time ____

Witness ____   Witness ____

#### JUVENILE SECTION

I am 16 or 17 years old and have been advised and know that I may contact a parent or guardian and that I may have them with me during any interview ____

I the parent (guardian) of the minor child (15 and under) have read the above warnings (or it has been read to me). I agree to allow said child to waive his/her rights and the law enforcement officers may question the minor child. We do not wish an attorney. ____

Signed ____   Date ____   Time ____

Signed ____   Date ____   Time ____

Witness ____   Witness ____

rev 8/2018

MOTION FOR CONTINUANCE/
CASEFLOW REQUEST-

ADA NOTICE
The Judicial Branch of the State
of Connecticut complies with the Americans

STATE OF CONNECTICUT
SUPERIOR COURT

A05D-CR23-0191150-S                    :                    GA5

State of Connecticut

# FILED

DERBY

VS.                              SEP 0 6 2023

Theodora F. Antar            SUPERIOR COURT
                          GEOGRAPHICAL AREA NO. 5
                               AT DERBY

DEFENDANT                          :                    SEPTEMBER 5, 2023

### EMERGENCY EX-PARTE MOTION FOR IMMEDIATE FERNANDO A. HEARING & TO VACATE PROTECTIVE ORDER

The Defendant Theodora F. Antar in the above captioned matter moves that the court immediately schedule a "Fernando A. Hearing" in order to prove the necessity of the current full no-contact protective order that is in place against the Defendant.

The Defendant, who does not have any criminal convictions, is being denied federal, state, and constitutional rights and the existence of this protective order is, has, and will continue to cause irreparable harm unless it is vacated immediately.

There is no legal, factual, or otherwise justified reason for this protective order to remain in place. The protective order is a full no-contact protective order with a full residential stay-away order that prevents the Defendant from being able to see or exercise her fundamental right to visitation with her minor child A.L.

This order prevents the Defendant from being able to access her minor child, and does not allow the Defendant to do things that are court ordered and part of her rights as the mother of the young child.

1 | Page

The State of Connecticut has no legal basis to impose this heavily restrictive order of protection upon the Defendant, and the Defendant hereby demands an immediate Fernando A. Hearing be scheduled. The Defendant filed an appearance for the first time last week in this matter and is asking that the court allow her the constitutionally protected right of due process in being able to prove that this order is restrictive, unnecessary, and causing irreparable harm to both Defendant and her family.

Defendant is requesting an immediate "Fernando A. Hearing" to be scheduled immediately and filing this motion to vacate the protective order and requests that said matter be scheduled and heard immediately.

September 5th, 2023, Respectfully submitted,

/s/ Theodora F. Antar

The Defendant

856 Shagbark Drive, Orange, CT, 06477

theodoraantar@gmail.com

(203)273-8419

2 | Page



MOTION FOR CONTINUANCE/
CASEFLOW REQUEST-
CRIMINAL MATTERS

ADA NOTICE
The Judicial Branch of the State
of Connecticut complies with the Americans
with Disabilities Act (ADA). If you need a

STATE OF CONNECTICUT
SUPERIOR COURT

**Garcia, Natalia**

| | |
|---|---|
| From: | DCJ.DerbyGA.Reports <DCJ.DerbyGA.Reports@ct.gov> |
| Sent: | Thursday, August 31, 2023 10:58 AM |
| To: | GA5 Derby Incoming Matters Shared Mailbox |
| Subject: | Re: filing this in derby court |

Hi,

The State objects- this defendant has an Attorney.

Thank you!

*Kayla Curtis*

Derby State's Attorney's Office
106 Elizabeth Street
Derby, CT 06418
Phone: (203) 735-7487
DCJ.DERBYGA.REPORTS@CT.GOV

This e-mail and any attachments/links transmitted with it are for the sole use of the intended recipient(s) and may contain information that is confidential or legally protected. If you are not the intended recipient, you are hereby notified that any review, disclosure, copying, dissemination, distribution, use or action taken in reliance on the contents of this communication is STRICTLY PROHIBITED. Please notify the sender immediately by e-mail if you have received this in error and delete this e-mail and any attachments/links from your system. The State of Connecticut Division of Criminal Justice does not accept liability for any errors or omissions in the contents of this communication which arise as a result of e-mail transmission, or for any viruses that may be contained therein. If verification of the contents of this e-mail is required, please request a hard-copy version.

**if the recipient has difficulty opening the attachment, please refer to the state website (https://portal.ct.gov/DAS/BEST/Planning-and-Architecture/Enterprise-Messaging-Services/New-Secure-Email-Service). Thank you**

From: GA5 Derby Incoming Matters Shared Mailbox <GA5.Derby@jud.ct.gov>
Sent: Thursday, August 31, 2023 10:37 AM
To: DCJ.DerbyGA.Reports <DCJ.DerbyGA.Reports@ct.gov>
Subject: FW: filing this in derby court

From: Theodora Antar <theodoraantar@gmail.com>
Sent: Thursday, August 31, 2023 9:05 AM
To: GA5 Derby Incoming Matters Shared Mailbox <GA5.Derby@jud.ct.gov>; DCJ.DerbyGA.Reports@ct.gov; Barbara Bellucci <bellucci@bhcare.org>; Barry, Rebecca <Rebecca.Barry@ct.gov>
Subject: filing this in derby court

Instructions To Person Making Motion
*Fill out all sections of this form except the Order section and see the instructions on*

Name of case (State v. Full name of Defendant)

**State v. Theodore F. Antar**

| | | |
|---|---|---|
| ☐ Judicial District | ☐ Geographical Area Number | Address of court (Number, street, town and zip code) |

Docket number: A05D-CR23-0191150-S

| | |
|---|---|
| Date of motion 08/31/23 | Date of event to which Requested Action applies 09/06/2023 |

Address of court (Number, street, town and zip code)
**106 Elizabeth st, Derby, CT, 06418**

Name of Judge who scheduled the event (if known)
**Judge Scott Jones**

Person making motion is:
☐ State's Attorney   ☐ Defendant's Attorney   ☒ Defendant   ☐ Other

Firm name (if applicable)

Address
**856 Shagbark Drive, Orange, CT, 06477**

Phone number (with area code)
**203-273-8419**

## Requested Action: *(Select all that apply)*

☒ Motion for continuance to: **11/2/2023** *(date)* or ☐ at the court's discretion.
☐ Request that the defendant be excused from scheduled event.
☐ Motion for dismissal of case without appearance because of successful diversionary program completion.

## Event to which Requested Action applies: *(Select all that apply)*

☐ Arraignment   ☐ Court Trial   ☐ Motion   ☒ Pretrial   ☐ Other
☐ Plea   ☐ Jury Trial   ☐ Disposition   ☐ Sentencing

*State objects*

## Reason(s) for Requested Action: *(Select reason(s) and explain below)*

☒ Counsel not ready   ☐ Lay witness not available (provide name below)
☒ Discovery not complete   ☐ Expert witness not available (provide name below)   ☒ Other
☒ Counsel not available   ☐ Party not available (provide name below)

*Explain*

I was arraigned on 5/17/23 and Attorney Hillis promised me an opportunity to meet with him to discuss the case prior to moving forward. It is now 106 days later and I never got to meet with him once about the case. I asked on 8/23 and 8/30 when we can meet and he responded on 8/30 and stated that he would be withdrawing from the case instead. I need time to hire new counsel.

I have contacted all counsel and self-represented parties of record about my intention to seek this Requested Action.

All of the counsel and self-represented parties:   ☒ Consent   ☐ Do Not Consent   ☐ Have not responded

*Note: An agreement to this Requested Action does not mean that the court will automatically grant the motion.*

☐ I have   ☒ I Have Not   notified the Victim's Advocate and/or the victim(s) of the Requested Action.

I agree to be responsible for notifying my client, if applicable and all counsel of record and self-represented parties whether the Requested Action is granted or denied, and if granted, the specific ruling of the court.

## Certification

I certify that a copy of this document was or will immediately be mailed or delivered electronically or non-electronically on (date) **08/31/2023** to all attorneys and self-represented parties of record and that written consent for electronic delivery was received from all attorneys and self-represented parties of record who received or will immediately be receiving electronic delivery.

Name and address of each party and attorney that copy was or will be mailed or delivered to:

**Michael Hillis**
**129 whitney avenue**
**New Haven, CT, 06510**

*If necessary, attach additional sheet or sheets with name and address which the copy was or will be mailed or delivered to.*

Signed (Signature of Self-Represented Attorney)
▶

Print or type name of person signing
**Theodore Antar**

Date signed
**08/31/2023**

Mailing address (Number, street, town, state and zip code)
**856 Shagbark Drive, Orange, CT, 06477**

Telephone number
**2032738419**

## Order

Request is:   ☐ Granted   ☐ Denied

Continuance, event continued to:

Signed (Judge)

Date

Date signed
08/31/2023

**CONDITIONS OF RELEASE**
**FAMILY VIOLENCE**

(See back/page 2 for Spanish Translation)

STATE OF CONNECTICUT
SUPERIOR COURT
www.jud.ct.gov

JD-CR-146  Rev. 3-18
C.G.S § 54-63c

**Instructions To Police Officer**
Do not use this form if the defendant is a juvenile.
Immediately provide a copy to the defendant. Send original and a copy to the
clerk of court along with the original Appearance Bond (JD-CR-4) or Promise
to Appear (JD-CR-13).

**ADA NOTICE**
The Judicial Branch of the State of Connecticut complies with the Americans with
Disabilities Act (ADA). If you need a reasonable accommodation in accordance with
the ADA, contact a court clerk or an ADA contact person listed at www.jud.ct.gov/ADA.

| NAME OF DEFENDANT (Last, First, Middle) | DOB (mm/dd/yyyy) | SEX | Race | HISPANIC |
|---|---|---|---|---|
| Antar                    Theodora | 09/07/1991 | F | W | ☐ Yes  ☒ No |

| ADDRESS OF DEFENDANT (No., street, apt. no.) | (City) | | ( State ) | (Zip Code) |
|---|---|---|---|---|
| 866        Shagbark Drive | Orange | | CT | 06477 |

| FAMILY VIOLENCE CRIMES CHARGED | DEFENDANT'S RELATIONSHIP TO ALLEGED VICTIM (Either present or former) |
|---|---|
| 53a-182   Disorderly Conduct | ☐ Spouse      ☒ Parent of Common Child |
| 53a-157b  False Statement | ☐ Party to a Civil Union   ☐ Alleged Victim's Parent |
| | ☐ Intimate Cohabitant   ☐ Other |

| NAME OF ALLEGED VICTIM (Last, First, Middle) | DOB (mm/dd/yyyy) | SEX | Race | HISPANIC |
|---|---|---|---|---|
| Lodice      Matthew    J. | 05/11/1985 | M | W | ☐ Yes  ☒ No |

| ADDRESS OF ALLEGED VICTIM (No., street, apt. no.) | (City) | | ( State ) | (Zip Code) |
|---|---|---|---|---|
| 23   Lyman Street              Apt. 2 | New Britain | | CT | 06053 |

**The Following Conditions of Release that Directly Relate to the Protection of the Alleged Victim Are Imposed Against the Defendant:**
**(Financial conditions also apply)**

☒ Do not assault, threaten, abuse, harass, follow, interfere with, or stalk the protected person. (CT01)
☒ Stay away from the home of the protected person and wherever the protected person shall reside. (CT03)
☒ Do not contact the protected person in any manner, including by written, electronic or telephone contact, and do not
contact the protected person's home, workplace or others with whom the contact would be likely to cause annoyance
or alarm to the protected person. (CT05)
☐ Do not use or possess a dangerous weapon.
☐ Do not use or possess an intoxicant or controlled substance. (alcohol or drugs)
☒ Other nonfinancial conditions (specify, if applicable, e.g. restrictions on travel or place of abode):
Ms. Antar is allowed to contact the protected party regarding visitation, and affairs of their child via Family Wizard. Exchange of minor child must be *cont...*

| This order remains in effect until the defendant appears at the Superior Court on: | Hearing Date 05/17/2023 | but if court is cancelled on that date or I do not appear in court on that date then the order remains in effect until I appear in court for this arrest. |
|---|---|---|

I, the Defendant named above, understand that I am being released from custody under the Conditions of Release checked above, and I
promise to obey all the conditions checked above which were ordered by the police officer as a condition of my release. I understand that
if I do not obey any of these conditions, I may be arrested for violation of conditions of release. I also understand that I am entitled
to tell my story with respect to the issuance of a protective order on the hearing date given above or, if court is canceled on the above date
or if I do not appear in court on that date, these conditions remain in effect until I appear in court for this arrest.

| SIGNED (Defendant) | DATE AND TIME SIGNED 5-16-23 | SIGNED (Parent or Guardian if minor) | DATE AND TIME SIGNED |
|---|---|---|---|
| Subscribed and sworn to before me | SIGNED (Police Officer, Assistant Clerk) | DATE AND TIME SIGNED 5/16/23   12:38 | JOB TITLE AND POLICE DEPARTMENT Patrol ofc - Orange PD |

Reasonable efforts were made to contact the bail commissioner or a Judicial Branch intake, assessment and referral specialist (specify):
Derby Bail Commissioner's office contacted on 05/16/23 at 1215 hours.

Factual basis relied upon by the police officer to impose the nonfinancial conditions of release (specify):
Order - Per case report 23-13466, Other Conditions CONT - be pursuant to the most recent Civil Family order, Ms. Antar is allowed to facilitate / initiate
contact with the protected party for the purpose of contact with their child in accordance with the most recent Civil Family order.

If the defendant is hearing impaired requesting the services of a translation service or interpreter were used. The police officer
has checked the National Crime Information Center (NCIC) to determine if such defendant is listed in NCIC. The defendant
was advised of the above penalties and furnished with a copy of the conditions of release.

I certify that the above statements are true to the best of my knowledge and belief.

| SIGNED (Police Officer) | NAME OF POLICE OFFICER (Last, First) Esposito, Aliza | DATE AND TIME SIGNED 5/16/23  12:36 |
|---|---|---|
| | DATE AND TIME SIGNED 5/16/23  12:38 | CASE NUMBER (Police Department) 23-13466 |

Copy2 - Defendant          Copy3 - Police

**ORDER OF PROTECTION**
JD-CL-59   Rev. 10-21
C.G.S. §§ 29-28, 29-32, 29-33, 29-36i, 29-36k, 46b-15, 46b-16a,
46b-38c(d)(e), 46b-38nn, 53a-28(f), 53a-36, 53a-42, 53a-217,
53a-217c, 53a-223, 54-1k, 54-86e;
18 U.S.C. §§ 922(g)(8), 2265; P.A. 21-78 §§ 2, 6, 7

For information on ADA
accommodations,
contact a court clerk or go to:
www.jud.ct.gov/ADA

STATE OF CONNECTICUT
SUPERIOR COURT
www.jud.ct.gov

| Order type | Case type | Superior court location |
|---|---|---|
| **Protective Order - Family Violence** | Criminal | A05D Derby |
| Related court information (if applicable) | | Case number |
| | | **A05DCR230191150S** |

## Protected Person

| Last name | First name | Middle | Date of birth | Sex | Race |
|---|---|---|---|---|---|
| **LODICE** | **MATTHEW** | | 05 / 11 / 1983 | M | White |

| Home address | | City | State | Zip |
|---|---|---|---|---|
| 48 Quarry Hill Rd | | Waterbury | CT | 06706-2836 |
| Mailing address | ☐ Same as above | City | State | Zip |
| 48 Quarry Hill Rd | | Waterbury | CT | 06706-2836 |
| Work address | | City | State | Zip |

## Respondent (Defendant)

| Last name | First name | Middle | **Respondent Identifiers** |
|---|---|---|---|
| **ANTAR** | **THEODORA** | F | |

| | | | Date of birth | Sex | Race |
|---|---|---|---|---|---|
| | | | 09 / 07 / 1991 | F | White |

| Address | | Height | Weight | Eyes | Hair | Phone |
|---|---|---|---|---|---|---|
| 856 Shagbark Dr | | 5'4" | 120 | BRO | BLK | 203-273-8419 |
| City | State | Zip | Distinguishing features/other identifiers | | | |
| Orange | CT | 06477-1422 | | | | |

| Cautions/Weapons (if information is available) | Relationship to protected person (Present or former) |
|---|---|
| | ☐ Spouse or party to a civil union |
| | ☐ Protected person's parent |
| | ☐ Intimate cohabitant |
| | ☒ Parent of common child |
| | ☐ Other: |

## Terms and Conditions of Protection

**You, the Respondent, must follow all the orders and conditions selected below:**

☒ Surrender or transfer all firearms and ammunition.
☒ Do not assault, threaten, abuse, harass, follow, interfere with, or stalk the protected person. (CT01)
☒ Stay away from the home of the protected person and wherever the protected person shall reside. (CT03)
☒ Do not contact the protected person in any manner, including by written, electronic or telephone contact, and do not contact the protected person's home, workplace, or others with whom the contact would be likely to cause annoyance or alarm to the protected person. (CT05)

☐ Other: _____

Additional terms and conditions are on the following pages:

| This order remains in effect until: | ☒ Further order of the court. | Expiration date (if applicable) |
|---|---|---|

☒ The court had jurisdiction over the parties and the subject matter, and the respondent was provided with reasonable notice and opportunity to be heard. This order shall be enforced, even without registration, by the courts of any state, the District of Columbia, any U.S. Territory, and may be enforced by Tribal Lands (18 U.S.C. § 2265). Crossing state, territorial, or tribal boundaries to violate this order may result in federal imprisonment (18 U.S.C. § 2262).

☒ State and federal law prohibit unlawful possession of firearms, ammunition, or electronic defense weapons (General Statutes §§ 53a-217 and 53a-217c(a)(5)). Federal law also provides penalties for possessing, transporting, shipping, receiving, or buying ammunition while subject to a qualifying protection order (18 U.S.C. § 922(g)(8)).

| Signed (Judge, Assistant Clerk) | Date |
|---|---|
| | 5/17/23 |

☐ A restraining order, protective order, or standing criminal protective order has been issued on your behalf or on behalf of your minor child. To testify or appear in a family court proceeding remotely pursuant to 46b-15c. Notify the court in writing at least __ days in advance of the proceeding if you choose to give testimony or appear remotely, and your physical presence in the courtroom is not required. If you choose to participate in the court proceeding, you may use the Remote Testimony Request (form ____) in order to participate in the court proceeding. You may use the same form with two days' advance notice to request that your testimony in any proceeding or matter. You may use the same form with two days' advance notice to request that your testimony in any __ in advance of the respondent/subject to a restraining order, protective order, or standing criminal protective order on your behalf pursuant to 46b-15c.

JD-CL-100 (Rev. 7-15) 29-31,
46b-38(e)(k)e, 46b-38nn, 53a-38,
53a-42, 53a-217, 53a-217c, 53a-223, 54-1k,
18 U.S.C. §§ 922(g)(9), 2265; P.A. 21-78 §§ 2, 6, 7.

§§ 29-31, 53a-13, 2c-30l, 29-36k,

STATE OF CONNECTICUT
SUPERIOR COURT
www.jud.ct.gov

For assistance or to
contact a court clerk or go to:
www.jud.ct.gov/ADA.

**This form is available in other language(s).**

| Order type | Case type | Superior court location |
|---|---|---|
| Protective Order - Family Violence | Criminal | A05D Derby |
| Related court information (if applicable) | | Case number |
| | | A05DCR230191150S |

## Protected Person

| Last name | First name | Middle |
|---|---|---|
| LODICE | MATTHEW | |

## Respondent (Defendant)

| Last name | First name | Middle | Respondent Identifiers |
|---|---|---|---|
| ANTAR | THEODORA | F | |

| Date of birth | Sex | Race |
|---|---|---|
| 09 / 07 / 1991 | F | White |

**You, the Respondent, must follow all the orders and conditions selected below:**

☐ You may return to the protected person's home one time with police to retrieve belongings.
☐ If the protected person has moved out of the home of the respondent, the respondent shall permit the protected (CT14)
person to return to the respondent's home on one occasion, with police, to retrieve the protected person's (CT15)
belongings.
☐ Stay 100 yards away from the protected person.
☐ This order also protects the protected person's minor children. (CT16)
☐ This order protects animals owned or kept by the protected person. (CT19)
☒ Other: (CT31)
Ms. Antar is allowed to contact the protected party regarding visitation and affairs of their child, via Family Wizard.
Exchange of the minor child must be pursuant to the most recent Civil Family order. Ms. Antar is allowed to facilitate/
initiate contact with the protected party for the purpose of contact with their child in accordance with the most
recent Civil Family order.

Additional terms and conditions are on the following pages:
JDD-100AdditionalTermsAndConditions

NOTICE: If a restraining order, protective order, or standing criminal protective order has been issued on your behalf or on behalf of your
minor child, you may give live testimony or appear in a family court proceeding remotely, pursuant to 46b-15c. Notify the court in writing at
least five business days in advance of a proceeding if you choose to give testimony or appear remotely, and your physical presence in the
courtroom will not be required in order to participate in the court proceeding. You may use the Remote Testimony Request (form
JD-FM-291) to submit your written request. You may use the same form with two days' advance notice to request that your testimony in any
such proceeding be given outside the presence of the respondent/subject to a restraining order, protective order, or standing criminal
protective order. You may testify and/or a child's behalf pursuant to 46b-15c.

## ORDER OF PROTECTION

JD-CL-99   Rev. 10-21
C.G.S. §§ 29-28, 29-32, 29-33, 29-36i, 29-36k, 46b-15, 46b-16a, 46b-38c(d)(e), 46b-38m, 53a-28(f), 53a-38, 53a-42, 53a-217, 53a-217c, 53a-223, 54-1k, 54-86e, 18 U.S.C. §§ 922(g)(9), 2265; P.A 21-78 §§ 2, 6, 7

For information on ADA accommodations, contact a court clerk or go to: www.jud.ct.gov/ADA

STATE OF CONNECTICUT
SUPERIOR COURT
www.jud.ct.gov

| Order type | Case type | Superior court location |
|---|---|---|
| Protective Order - Family Violence | Criminal | A05D Derby |
| Related court information (If applicable) | | Case number |
| | | A05DCR230191150S |

### Protected Person

| Last name | First name | Middle | Date of birth | Sex | Race |
|---|---|---|---|---|---|
| LODICE | MATTHEW | | 05 / 11 / 1983 | M | White |

| Home address | City | State | Zip |
|---|---|---|---|
| 48 Quarry Hill Rd | Waterbury | CT | 06706-2836 |
| Mailing address | ☒ Same as above | City | State | Zip |
| 48 Quarry Hill Rd | | Waterbury | CT | 06706-2836 |
| Work address | City | State | Zip |

### Respondent (Defendant)                    Respondent Identifiers

| Last name | First name | Middle | Date of birth | Sex | Race |
|---|---|---|---|---|---|
| ANTAR | THEODORA | F | 09 / 07 / 1991 | F | White |

| Address | Height | Weight | Eyes | Hair | Phone |
|---|---|---|---|---|---|
| 856 Shagbark Dr | 5'4" | 120 | BRO | BLK | 203-273-8419 |

| City | State | Zip | Distinguishing features/other identifiers |
|---|---|---|---|
| Orange | CT | 06477-1422 | |

Cautions/Weapons (If information is available)

Relationship to protected person (Present or former)
- ☐ Spouse or party to a civil union
- ☐ Protected person's parent
- ☐ Intimate cohabitant
- ☒ Parent of common child
- ☐ Other:

### Terms and Conditions of Protection

You, the Respondent, must follow all the orders and conditions selected below:
- ☒ Surrender or transfer all firearms and ammunition. (CT01)
- ☒ Do not assault, threaten, abuse, harass, follow, interfere with, or stalk the protected person. (CT03)
- ☒ Stay away from the home of the protected person and wherever the protected person shall reside. (CT05)
- ☒ Do not contact the protected person in any manner, including by written, electronic or telephone contact, and do not contact the protected person's home, workplace, or others with whom the contact would be likely to cause annoyance or alarm to the protected person. (CT05)
- ☐ Other:

Additional terms and conditions are on the following pages:

| This order remains in effect until: | ☒ Further order of the court. | Expiration date (if applicable) |
|---|---|---|
| | | / / |

☒ This court had jurisdiction over the parties and the subject matter, and the respondent was provided with reasonable notice and opportunity to be heard. This order shall be enforced, even without registration, by the courts of any state, the District of Columbia, any U.S. territory, and may be enforced by Tribal Lands (18 U.S.C. § 2265). Crossing state, territorial, or tribal boundaries to violate this order may result in federal imprisonment (18 U.S.C. § 2262).

☒ State law provides penalties for unlawful possession of firearms, ammunition, or electronic defense weapons (General Statutes § 53a-217, 53a-217c) and 53a-217e(5)). Federal law also provides penalties for possessing, transporting, shipping, or receiving any firearm or ammunition while subject to a qualifying protective order (18 U.S.C. § 922(g)(8)).

| By the Court | Signed (Judge/Assistant Clerk) | Date signed |
|---|---|---|
| | | 5 / 19 / 23 |

... order or standing criminal protective order has been issued on your behalf or on behalf of your child ... pursuant to 46b-15c. Notify the court in writing at ... appear in a family court proceeding remotely, or appear remotely, and your physical presence in the court ... If you choose to give testimony or appear remotely. You may use the Remote Testimony Request (form ... participate in the court proceeding. ... provide the same form with two days' advance notice to request that your testimony in any ... may use the same form if the respondent is subject to a restraining order, protective order, or standing criminal ... the respondent pursuant to 46b-15c.

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| STATE OF CONNECTICUT ) | Civil No. 3:23-cv-01178-OAW |
| *Plaintiff* ) | |
| vs. ) | |
| Theodora F. Antar ) | |
| *Defendant* ) | |
| _____ ) | |

SEP 20 2023 PM 4:52
FILED-USDC-CT-NEW HAVEN

## <u>MOTION TO DISMISS PURSUANT TO FEDERAL RULE OF CRIMINAL</u>

## <u>PROCEDURE 12(b)(3)</u>

 The Defendant in the underlying criminal action, Theodora Antar, respectfully submits

this pro se Motion to Dismiss the above captioned criminal action filed against her, which was

removed to this Honorable Court, on the grounds of no probable cause and gross violations of

her rights. In support of this Motion, Ms. Antar cites binding decisions from the Second Circuit

Court of Appeals, the United States Supreme Court, and federal laws, which collectively

demonstrate that this prosecution is fatally flawed and should be dismissed with prejudice.


## II. LEGAL ARGUMENT

 *A.  Standard for Dismissal Under Federal Rule of Criminal Procedure 12(b)(3)*

Federal Rule of Criminal Procedure 12(b)(3) allows for the dismissal of an indictment or

information on the grounds that it fails to invoke the jurisdiction of the court or that it is

otherwise defective. In the above-captioned case, Ms. Antar contends that the State of

Connecticut not only lacks probable cause but also has repeatedly violated her constitutional

rights, including by initiating said criminal action against her. To support this assertion, the following legal authorities are presented.

### B. Lack of Probable Cause

The United States Supreme Court, in United States v. Aguilar, 515 U.S. 593 (1995), established that an indictment must be supported by probable cause. The Court ruled that an indictment is defective if it "fails to allege each essential element of the offense charged." In the present case, the action against Ms. Antar fails to provide any specific facts or material evidence supporting the charges brought against her, rendering it void of probable cause.

Moreover, the Second Circuit Court of Appeals, in United States v. Jaramillo, 967 F.2d 206 (2d Cir. 1992), held that an indictment should not merely recite the statutory language but should contain factual allegations supporting each element of the charged offense. The action against Ms. Antar falls short of this standard, further emphasizing the lack of probable cause.

### C. Violations of Constitutional Rights

Ms. Antar alleges that her constitutional rights have been egregiously violated in the course of this prosecution. The Supreme Court, in Strickland v. Washington, 466 U.S. 668 (1984), set forth the well-established principle that effective assistance of counsel is a constitutional right in criminal proceedings. Ms. Antar contends that she has been denied this right, as evidenced by the fact that the counsel that she retained on a pro-bono basis failed to inform her of her right to

request a full evidentiary hearing on the merits at the arraignment regarding the order of protection that was imposed upon her during said arraignment, failed to communicate and keep her reasonably informed throughout the process, had ex-parte communications with the prosecution in the complainant's own criminal action against the knowledge or consent of the defendant Ms. Antar, and that said counsel stated one month ago that he would be filing a motion to withdraw his appearance, yet he has failed to do so, while also has stopped all communication with Ms. Antar. Ms. Antar has the right to effective counsel and the right to counsel being appointed to her if she can not afford her own. Ms. Antar has not been given the opportunity to retain, consult with, or hire said counsel and it has been more than four months since the arrest occurred.

Furthermore, the Supreme Court, in Brady v. Maryland, 373 U.S. 83 (1963), held that prosecutors are obligated to disclose exculpatory evidence to the defense. Ms. Antar believes that the prosecution has failed in this regard by withholding evidence that could exonerate her. Any and all attempts that Ms. Antar has made to try to retrieve said evidence through the states attorneys office, her counsel's office, or the police department, have been unsuccessful and she has been denied access and has not seen any of the discovery or evidence, to date.

*D. Federal Laws and Rights*

In addition to Supreme Court and Second Circuit precedent, various federal laws establish the rights and procedures that must be adhered to in criminal cases. The Fourth Amendment to the United States Constitution, for instance, protects individuals from unreasonable searches and seizures. The violations of Ms. Antar's Fourth Amendment rights are apparent in this case, as

demonstrated by the fact that she was unreasonably arrested and charged with a warrant for charges based on nothing but the written statement of the individual she was being protected from though a criminal protective order that is enforceable in all 50 states and U.S. territories.

Moreover, the Due Process Clause of the Fourteenth Amendment guarantees that no person shall be deprived of life, liberty, or property without due process of law. The numerous violations of due process in this case, including the defendant being unreasonably restrained from visiting her minor daughter A.L. at the home of the complainant due to the heavily restrictive order of protection that imposes a full residential stay away upon her, as well as the fact that the defendant was never allowed a hearing on the merits for said order of protection demand that this prosecution be dismissed. Since the date of the defendant's arraignment on 5/17/23, the complainant in the underlying criminal action that was initiated in the State of Connecticut GA5 in Derby, CT, Matthew Lodice, has repeatedly demanded that the defendant come to his home, repeatedly demanded that the defendant speak to him on the phone, and repeatedly demanded that the defendant violate various terms of said protective order, and has encouraged the defendant to speak to him, go to his residence, and violate other terms of said order. This is evidence of the fact that if the complainant himself is demanding that the defendant violate the order, that the order is unnecessary and serves the sole purpose of being used as a tool by the complainant in order to entrap the defendant and coerce the defendant into violating the order and committing a felony in order to visit their minor daughter. The defendant has been given repeated ultimatums by the complainant who is the protected party in the order and has stated that the defendant can either violate the protective order or continue to be isolated from and alienated from their minor daughter A.L. who is only four years of age.

This has resulted in extreme psychological and emotional harm and trauma to the defendant, and her minor children.

Based on the foregoing legal arguments and authorities from the Second Circuit, the United States Supreme Court, and federal laws, the defendant Theodora Antar respectfully requests that this Honorable Court dismiss the criminal action against her with prejudice. The entire action lacks probable cause and has resulted in extreme, cruel, and unusual gross violations of her constitutional rights. Such defects warrant the immediate dismissal of this case to preserve the integrity of the criminal justice system and protect the rights of the accused and her minor children.

As such, The Defendant in the above-captioned criminal action moves that the court immediately dismiss the action that was initiated under docket number **A05D-CR23-0191150-S in GA5 of Derby, CT.**

The Defendant, Theodora F. Antar, appearing pro se, and pursuant to the Connecticut Practice Book § 41-8 and Rule 12(b)(6) of the Federal Rules of Criminal Procedure, and hereby moves this Court to dismiss the above-entitled criminal action against her for lack of probable cause to believe the Defendant committed the offenses charged, namely "False Statement to Police" and "Disorderly Conduct."

## BACKGROUND

1. The Defendant was arrested on 5/16/23, 16 days after she initiated a complaint against the complainant in this case due to his violation of a protective order. Despite being the protected party under a valid protective order, docket A05DCR230190622S, and despite

Matthew Lodice, the defendant in that docket, clearly violating multiple terms of said order of protection, Mr. Lodice was never charged or prosecuted for any of his violations of said order, and only the defendant Theodora Antar was prosecuted and charged, which is in line with the clear bias and prejudicial treatment that the defendant has experienced by this court.

2. The Defendant has been denied due process of law, effective counsel, an evidentiary hearing to challenge a heavily restrictive protective order, a speedy trial, access to discovery and evidence, and the right to a trial by jury.

3. The Defendant has been denied these rights both under the Constitution of the United States and the State of Connecticut.


## LEGAL ARGUMENTS

1. **Lack of Probable Cause**: Under both the Fourth Amendment of the U.S. Constitution and the Connecticut Constitution Article First, § 7, no warrants shall issue without probable cause. In this case, the State has failed to establish probable cause for either charge.

2. **Violations of Protective Order**: Pursuant to Connecticut General Statutes §53a-223, the protected party cannot be prosecuted for violations related to the protective order. The Defendant was the protected party under the said order.

3. **Violation of Due Process**: Both the Fourteenth Amendment of the U.S. Constitution and Article First, § 8 of the Connecticut Constitution guarantee due process of law. The Defendant has been denied procedural due process rights, including but not limited to an unbiased tribunal, notice of proposed actions, and the right to present evidence.

4. **Ineffective Counsel and Denial of Rights**: The Defendant has been denied effective counsel as guaranteed by the Sixth Amendment and has not ever been informed adequately about the case against her, contrary to Rule 5.1 of the Federal Rules of Criminal Procedure and Connecticut Practice Book § 37-1.

5. **Speedy Trial**: The Defendant's right to a speedy trial as guaranteed by the Sixth Amendment and the Connecticut Constitution, Article First, § 8, has been violated, rendering the proceedings against her unconstitutional.

## CONCLUSION

In light of the above legal and factual shortcomings, the Defendant respectfully requests this Court to dismiss the charges against her.

**WHEREFORE, Defendant respectfully requests that the Court:**

1. Grant a full dismissal of all charges currently filed against the Defendant

2. Immediately vacate the current protective order that was issued on 5/17/23 that has no expiration date.

## CERTIFICATE OF SERVICE

I certify that a copy of the above was mailed or delivered electronically or nonelectronically on

9/20/2023 to all counsel and self-represented parties of record and that written consent for

electronic delivery was received from all counsel and self-represented parties of record who were

electronically served.

Parties and/or attorneys served:


Michael Hillis

mHillis@dkh-law.com


State of Connecticut

State's Attorney Rebecca Barry

Rebecca.barry@ct.gov



i/s

_____

THEODORA F. ANTAR, PRO SE

856 SHAGBARK DRIVE

ORANGE, CT, 06477

203-273-8419

**CERTIFICATE OF SERVICE**

I certify that a copy of the above was mailed or delivered electronically or nonelectronically on 9/19/2023 to all counsel and self-represented parties of record and that written consent for electronic delivery was received from all counsel and self-represented parties of record who were electronically served.

Parties and/or attorneys served:

Michael Hillis

mHillis@dkh-law.com


State of Connecticut

State's Attorney Rebecca Barry

Rebecca.barry@ct.gov

i/s

_____

THEODORA F. ANTAR, PRO SE

856 SHAGBARK DRIVE

ORANGE, CT, 06477

203-273-8419

THEODORAANTAR@GMAIL.COM

| A22M-CR23-0124387-S | : | SUPERIOR COURT |
| STATE OF CONNECTICUT | : | GEOGRAPHICAL AREA #22 |
| V. | : | AT MILFORD, CONNECTICUT |
| THEODORA ANTAR | : | NOVEMBER 8, 2023 |

## NOTICE OF DISCOVERY

In furtherance of the state's continuing duty to fully and fairly disclose material pursuant to Practice Book §§ 40-7 and 40-13, and Brady v. Maryland, 373 U.S. 83 (1963), the state has provided the defense with copies of the following documents and media:

1. Flash drive containing eleven (11) bodyworn camera videos captured by Milford Police Department on October 18, 2023 (limited redactions made to obscure images of juveniles)
2. Incident report for MPD case # 2023-009055 – 6 pages
3. Incident report for MPD case # 2023-009055 with added supplement – 7 pages

If additional relevant material becomes available, the state will immediately provide it to the defense.

Respectfully submitted,

THE STATE OF CONNECTICUT

By: MATTHEW R. KALTHOFF
Supervisory Assistant State's Attorney

## CERTIFICATION

I certify that a copy of this notice of discovery will be hand-delivered to the *pro se* defendant, Theodora Antar, on November 8, 2023.

MATTHEW R. KALTHOFF
Supervisory Assistant State's Attorney

# INCIDENT/INVESTIGATION REPORT

| | |
|---|---|
| Case# | 2023-009055 |
| Date / Time Reported | 10/18/2023 11:41 Wed |
| Last Known Secure | 10/18/2023 11:41 Wed |
| At Found | 10/18/2023 11:41 Wed |

**INCIDENT DATA**

| Agency Name | Milford Police Department |
|---|---|
| ORI | CT0008400 |

| Location of Incident | Gang Relat | Premise Type | Area/ |
|---|---|---|---|
| 88 NOBLE AVE, Milford CT 06460 | NO | Drug Store/doctors | A3 |

| | Crime Incident(s) | (Com) | Weapon / Tools | | | Activity |
|---|---|---|---|---|---|---|
| #1 | Violation Of Protective Order | | | | | N |
| | VIOLATION OF PROT ORDER | | Entry | Exit | Security | |
| #2 | Crime Incident | ( ) | Weapon / Tools | | | Activity |
| | | | Entry | Exit | Security | |
| #3 | Crime Incident | ( ) | Weapon / Tools | | | Activity |
| | | | Entry | Exit | Security | |

**MO**

**VICTIM**

| # of Victims | 1 | Type: INDIVIDUAL | | Injury: None | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| V1 | Victim/Business Name (Last, First, Middle) | | Victim of Crime # | DOB | Race | Sex | Relationship To Offender | Resident Status | Military Branch/Status |
| | L‌██████, M‌███████ | | 1, | Age 40 | W | M | 1BG | Non-Resident | |

| Home Address | | Email | Home Phone |
|---|---|---|---|
| ████████████ | | | ████ |

| Employer Name/Address | Business Phone | Mobile Phone |
|---|---|---|
| | | |

| VYR | Make | Model | Style | Color | Lic/Lis | VIN |
|---|---|---|---|---|---|---|
| | | | | | | |

**OTHERS INVOLVED**

CODES: V- Victim (Denote V2, V3)   WI = Witness   IO = Involved Other   RP = Reporting Person (if other than victim)

| | Type: BUSINESS | | | Injury: | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Code | Name (Last, First, Middle) | | Victim of Crime # | DOB | Race | Sex | Relationship To Offender | Resident Status | Military Branch/Status |
| RP | PREFERRED PEDIATRICS | | | Age | | | | Resident | |

| Home Address | | Email | Home Phone |
|---|---|---|---|
| 88 NOBLE AVE - 101 MILFORD, CT 06460 | | | 203-874-2800 |

| Employer Name/Address | Business Phone | Mobile Phone |
|---|---|---|
| | | |

| | Type: INDIVIDUAL | | | Injury: | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Code | Name (Last, First, Middle) | | Victim of Crime # | DOB | Race | Sex | Relationship To Offender | Resident Status | Military Branch/Status |
| IO | UBIERA, VANESSA | | | 08/19/1991 Age 32 | B | F | | Non-Resident | |

| Home Address | | Email | Home Phone |
|---|---|---|---|
| ████████████ | | | ████ |

| Employer Name/Address | Business Phone | Mobile Phone |
|---|---|---|
| Preferred Pediatrics | | |

**PROPERTY**

1 = None   2 = Burned   3 = Counterfeit / Forged   4 = Damaged / Vandalized   5 = Recovered   6 = Seized   7 = Stolen   8 = Unknown
("OJ" = Recovered for Other Jurisdiction)

| VI # | Code | Status Frm/To | Value | OJ | QTY | Property Description | Make/Model | Serial Number |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

**Status**

| Officer/ID# | VAKOS, A. L. (2934) | | | |
|---|---|---|---|---|
| Invest ID# | (0) | | Supervisor | OKEEFE, E. (2089) |
| Complainant Signature | | Case Status Open   10/18/2023 | Case Disposition: | Page 1 |

*Milford Police Department*

Additional Name List

| | Name Code/# | Name (Last, First, Middle) | Victim of Crime # | DOB | Age | Race | Sex |
|---|---|---|---|---|---|---|---|
| **1)** | *IO    2* | *Juvenile* | | | | | |
| | Address | | | H: - - | | | |
| | Empl/Addr | | | B: - - | | | |
| | | | | Mobile #: - - | | | |

# INCIDENT/INVESTIGATION REPORT

Case # *2023-009055*

| Status Codes | 1 = None | 2 = Burned | 3 = Counterfeit / Forged | 4 = Damaged / Vandalized | 5 = Recovered | 6 = Seized | 7 = Stolen | 8 = Unknown |
|---|---|---|---|---|---|---|---|---|

| | IBR | Status | Quantity | Type Measure | Suspected Type | |
|---|---|---|---|---|---|---|
| D R U G S | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Assisting Officers
*LACEY, C.P. (2115),  SENATORE, V. (1720)*

Suspect Hate / Bias Motivated:

NARRATIVE

# REPORTING OFFICER NARRATIVE

*Milford Police Department*

| | | OCA |
|---|---|---|
| | | *2023-009055* |

| Victim | Offense | Date / Time Reported |
|---|---|---|
| L████ M████████ | *VIOLATION OF PROTECTIVE ORDER* | *Wed 10/18/2023 11:41* |

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

01 Report

My BWC was activated.

On 10/18/2023 at around 1141 hours, I along with Officer Senatore and Sergeant Lacey were dispatched to Preferred Pediatrics located at 88 Noble Ave. on report of a possible protective order violation.

Dispatch stated that the victim was parked on the street in his truck with his daughter in the vehicle and that his ex-girlfriend was inside Preferred Pediatrics.

Upon arrival, I met with the victim who stated that last year he booked his four year old daughter AL (DOB ████████) yearly physical for today. The victim stated that at around 1030 hours, he received a call from Preferred Pediatrics stating that AL`s mother Theodora Antar (DOB 09/07/1991) had called about their daughters doctor appointment today. The victim stated that he advised Preferred Pediatrics that he had a protective order against her and that she could not be at the appointment.

The victim stated that he was then advised prior to his arrival by Preferred Pediatrics that Theodora Antar was at the doctors office and to not come inside. The victim stated at this point he parked his vehicle on the side of the road down the street from Preferred Pediatrics and stayed inside his vehicle with his daughter until the police arrived. The victim stated that he has full custody of his daughter, AL, and that Theodora can have access to her daughter determined by him, in the presence of a third party designated by him. The victim stated these arrangements must be in writing text or email. The victim stated that he has a protective order with him being the protectee against Theodora Antar. The victim provided me with the protective order which showed he as the protectee and Theodora Antar as the subject. The conditions to the order are CT01 do not assault, threaten, abuse, harass, follow, interfere with, or stalk the protected person, CT03 stay away from the home of the protected person and wherever the protected person shall reside, and CT05 do not contact the protected person in any manner. Under the miscelleanous case information the order states Ms Antar is allowed to contact the protected party regarding visitation and affairs of their child, via family wizard exchange of the minor child must be pursuant to the most recent civil family order. The victim stated that Antar had contacted her through the family wizard after she was already at the doctors office in regards to seeing their daughter. This order was confirmed as active in the NCIC/COLLECT system.

After speaking with the victim, I spoke with Vanessa Ubiera (DOB 08/19/1991) who is the office manager at Preferred Pediatrics. Ubiera stated that the victim booked a visit for his daughter. Ubiera stated that Antar called the doctors office today inquiring about her daughters doctor appointment. Ubiera stated Antar asked if her daughter had a doctors appointment today, which she confirmed that she did. Ubiera stated that Antar was very hostile on the phone. Ubiera stated that shortly after the victim called inquiring about vaccines, which is when Ubiera stated she informed the victim of Antar stating she was going to be coming to the appointment. Ubiera stated the victim informed her that he had a protective order in place therefore, Antar could not come to the appointment and supplied her via email of the protective order. Ubiera stated that Antar arrived at the doctors office, which is when she contacted the victim via telephone to advised him to wait in the car due to Antar being at the doctors office. Ubiera had the victim check in to the doctors appointment over the phone. Ubiera stated Antar tried to barge into the business, but she advised her that was not allowed and closed/locked the doors.

I spoke with Theodora Antar who stated that at around 0947 hours she called Preferred Pediatrics in regards to inquiring about her daughters doctor appointment. Theodora Antar stated that the doctors office informed her that

# REPORTING OFFICER NARRATIVE

| | | OCA |
|---|---|---|
| | | *2023-009055* |
| *Milford Police Department* | | |
| Victim | Offense | Date / Time Reported |
| L_____, M_____ | *VIOLATION OF PROTECTIVE ORDER* | *Wed 10/18/2023 11:41* |

THE INFORMATION BELOW IS CONFIDENTIAL – FOR USE BY AUTHORIZED PERSONNEL ONLY

her daughter had a doctors appointment today at 1130 hours. Theodora stated that she came to Preferred Pediatrics to see her daughter and obtain her medical records. Theodora Antar stated she has not seen her daughter in two months and that she wanted to give her items. Theodora stated that the victim was arrested at the beginning of October for an incident involving their daughter. Theodora stated that she was allowed to see her daughter and that the victim was not allowing her to. Theodora stated Preferred Pediatrics would not supply her with her daughters medical records due to her not having custody her daughter.

I would like to note that due to Theodora Antar coming to her daughters doctors appointment without speaking with the daughters father, this interfered with their daughter being able to go to her appointment. Due to Antar coming to the doctors officer, their daughter was over an hour late to her appointment.

Based on the above, I had probable cause to believe that Theodora Antar was in violation of the protective order. Antar was placed under arrest at approximately 1300 hours. Theodora Antar was searched incident to arrest, placed in double locked handcuffs to the rear and transported to the booking area of Police Headquarters.

Theodora Antar was then processed per Milford Police booking procedure by the booking officers. Theodora Antar was charged on UAR 0841L0001939 with Criminal Violation Of A Civil Protection Order. She was left in the custody of the booking officer.

I would like to note we were able to obtain a copy of the civil family order on scene from the victim. We were able to read the civil family order on scene and there was nothing in there that made us believe, Antar could show up at the doctors office without discussing this with him prior to her arrival. I would also like to add that the protective order references the civil order, but we do not have access to the civil order in our system.

I would like to note that I completed a lethality assessment and also a family violence offense report. I supplied the victim with the domestic violence packet of paperwork. I also spoke with DCF and completed a DCF-136 form, which was faxed over to them.

There is nothing further to add, I request this case to be closed by arrest.

**Subscribed and sworn to before me**

Date __10/18/23__ Time __1527__

**Sergeant's Signature**

**Officer's Signature**

*Milford Police Department*

| 1 | Name (Last, First, Middle)<br>*ANTAR, THEODORA* | Also Known As | Home Address<br>*856 SHAGBARK DR*<br>*ORANGE, CT 00647-7*<br>*203-859-1812* |
|---|---|---|---|

Business Address

| DOB<br>*09/07/1991* | Age<br>*32* | Race<br>*W* | Sex<br>*F* | Eth<br>*N* | Hgt | Wgt | Hair<br>*BRO* | Eye<br>*BRO* | Skin | Driver's License / State<br>*098455329 CT* |

Scars, Marks, Tattoos, or other distinguishing features

| *Reported Suspect Detail* | Suspect Age | | Race | Sex | Eth | Height | | Weight | | SSN |
|---|---|---|---|---|---|---|---|---|---|---|

| Weapon, Type | Feature | | Make | | Model | | Color | | Caliber | Dir of Travel |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | Mode of Travel |

| Veh Yr / Make / Model | | Drs | Style | | Color | | Lic Plate / State | | VIN | |

Notes

Physical Char

# INCIDENT/INVESTIGATION REPORT

| | |
|---|---|
| **Agency Name** _Milford Police Department_ | **Case#** _2023-009055_ |
| | **Date / Time Reported** _10/18/2023  11:41  Wed_ |
| **ORI** _CT0008400_ | **Last Known Secure** _10/18/2023  11:41  Wed_ |

**INCIDENT DATA**

| Location of Incident _88 NOBLE AVE, Milford CT 06460_ | Gang Relat _NO_ | Premise Type _Drug Store/doctors_ | Area/ _A3_ | At Found _10/18/2023  11:41  Wed_ |
|---|---|---|---|---|

| #1 | Crime Incident(s) _Violation Of Protective Order_ _VIOLATION OF PROT ORDER_ | (Com ) | Weapon / Tools | | | Activity _N_ |
|---|---|---|---|---|---|---|
| | | | Entry | Exit | Security | |
| #2 | Crime Incident | ( ) | Weapon / Tools | | | Activity |
| | | | Entry | Exit | Security | |
| #3 | Crime Incident | ( ) | Weapon / Tools | | | Activity |
| | | | Entry | Exit | Security | |

**MO**

**VICTIM**

| # of Victims _1_ | Type: INDIVIDUAL | | | Injury: None | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **V1** | Victim/Business Name (Last, First, Middle) _L_____ M_____ | Victim of Crime # _1,_ | DOB Age 40 | Race _W_ | Sex _M_ | Relationship To Offender _1BG_ | Resident Status _Non-Resident_ | Military Branch/Status |
| Home Address | | Email | | | | | Home Phone | |
| Employer Name/Address | | | | | Business Phone | | Mobile Phone | |
| VYR | Make | Model | Style | Color | Lic/Lis | | VIN | |

**CODES:** V- Victim (Denote V2, V3)   WI = Witness   IO = Involved Other   RP = Reporting Person (if other than victim)

**OTHERS INVOLVED**

| Type: BUSINESS | | | | Injury: | | | | |
|---|---|---|---|---|---|---|---|---|
| Code _RP_ | Name (Last, First, Middle) _PREFERRED PEDIATRICS_ | Victim of Crime # | DOB Age | Race | Sex | Relationship To Offender | Resident Status _Resident_ | Military Branch/Status |
| Home Address _88 NOBLE AVE - 101 MILFORD, CT 06460_ | | Email | | | | | Home Phone _203-874-2800_ | |
| Employer Name/Address | | | | | Business Phone | | Mobile Phone | |

| Type: INDIVIDUAL | | | | Injury: | | | | |
|---|---|---|---|---|---|---|---|---|
| Code _IO_ | Name (Last, First, Middle) _UBIERA, VANESSA_ | Victim of Crime # | DOB _08/19/1991_ Age 32 | Race _B_ | Sex _F_ | Relationship To Offender | Resident Status _Non-Resident_ | Military Branch/Status |
| Home Address | | Email | | | | | Home Phone | |
| Employer Name/Address _Preferred Pediatrics_ | | | | | Business Phone | | Mobile Phone | |

**PROPERTY**

1 = None   2 = Burned   3 = Counterfeit / Forged   4 = Damaged / Vandalized   5 = Recovered   6 = Seized   7 = Stolen   8 = Unknown
("OJ" = Recovered for Other Jurisdiction)

| VI # | Code | Status Frm/To | Value | OJ | QTY | Property Description | Make/Model | Serial Number |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

| Officer/ID# _VAKOS, A. L. (2934)_ | | | |
|---|---|---|---|
| Invest ID# _VAKOS, A. L. (2934)_ | | Supervisor _OKEEFE, E. (2089)_ | |
| **Status** | Complainant Signature | Case Status _Cba_                 _10/25/2023_ | Case Disposition: | Page 1 |

*Milford Police Department*

Additional Name List

| | Name Code/# | Name (Last, First, Middle) | Victim of Crime # | DOB | Age | Race Sex |
|---|---|---|---|---|---|---|
| 1) | *IO    2* | *Juvenile* | | | | |
| | **Address** | | | **H:** | - | - |
| | **Empl/Addr** | | | **B:** | - | - |
| | | | | **Mobile #:** | - | - |

# INCIDENT/INVESTIGATION REPORT

*Milford Police Department*

Case # *2023-009055*

| Status Codes | 1 = None | 2 = Burned | 3 = Counterfeit / Forged | 4 = Damaged / Vandalized | 5 = Recovered | 6 = Seized | 7 = Stolen | 8 = Unknown |
|---|---|---|---|---|---|---|---|---|

| | IBR | Status | Quantity | Type Measure | Suspected Type | |
|---|---|---|---|---|---|---|
| D | | | | | | |
| R | | | | | | |
| U | | | | | | |
| G | | | | | | |
| S | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Assisting Officers
*LACEY, C.P. (2115),  SENATORE, V. (1720)*

Suspect Hate / Bias Motivated:

# INCIDENT/INVESTIGATION REPORT

Narr. (cont.) OCA: 2023-009055

*Milford Police Department*

N A R R A T I V E

# REPORTING OFFICER NARRATIVE

*Milford Police Department*

| | | OCA |
| --- | --- | --- |
| | | *2023-009055* |
| Victim | Offense | Date / Time Reported |
| L███████, M███████ | *VIOLATION OF PROTECTIVE ORDER* | *Wed 10/18/2023 11:41* |

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

01 Report

My BWC was activated.

On 10/18/2023 at around 1141 hours, I along with Officer Senatore and Sergeant Lacey were dispatched to Preferred Pediatrics located at 88 Noble Ave. on report of a possible protective order violation.

Dispatch stated that the victim was parked on the street in his truck with his daughter in the vehicle and that his ex-girlfriend was inside Preferred Pediatrics.

Upon arrival, I met with the victim who stated that last year he booked his four year old daughter AL (DOB ████████) yearly physical for today. The victim stated that at around 1030 hours, he received a call from Preferred Pediatrics stating that AL`s mother Theodora Antar (DOB 09/07/1991) had called about their daughters doctor appointment today. The victim stated that he advised Preferred Pediatrics that he had a protective order against her and that she could not be at the appointment.

The victim stated that he was then advised prior to his arrival by Preferred Pediatrics that Theodora Antar was at the doctors office and to not come inside. The victim stated at this point he parked his vehicle on the side of the road down the street from Preferred Pediatrics and stayed inside his vehicle with his daughter until the police arrived. The victim stated that he has full custody of his daughter, AL, and that Theodora can have access to her daughter determined by him, in the presence of a third party designated by him. The victim stated these arrangements must be in writing text or email. The victim stated that he has a protective order with him being the protectee against Theodora Antar. The victim provided me with the protective order which showed he as the protectee and Theodora Antar as the subject. The conditions to the order are CT01 do not assault, threaten, abuse, harass, follow, interfere with, or stalk the protected person, CT03 stay away from the home of the protected person and wherever the protected person shall reside, and CT05 do not contact the protected person in any manner. Under the miscelleanous case information the order states Ms Antar is allowed to contact the protected party regarding visitation and affairs of their child, via family wizard exchange of the minor child must be pursuant to the most recent civil family order. The victim stated that Antar had contacted her through the family wizard after she was already at the doctors office in regards to seeing their daughter. This order was confirmed as active in the NCIC/COLLECT system.

After speaking with the victim, I spoke with Vanessa Ubiera (DOB 08/19/1991) who is the office manager at Preferred Pediatrics. Ubiera stated that the victim booked a visit for his daughter. Ubiera stated that Antar called the doctors office today inquiring about her daughters doctor appointment. Ubiera stated Antar asked if her daughter had a doctors appointment today, which she confirmed that she did. Ubiera stated that Antar was very hostile on the phone. Ubiera stated that shortly after the victim called inquiring about vaccines, which is when Ubiera stated she informed the victim of Antar stating she was going to be coming to the appointment. Ubiera stated the victim informed her that he had a protective order in place therefore, Antar could not come to the appointment and supplied her via email of the protective order. Ubiera stated that Antar arrived at the doctors office, which is when she contacted the victim via telephone to advised him to wait in the car due to Antar being at the doctors office. Ubiera had the victim check in to the doctors appointment over the phone. Ubiera stated Antar tried to barge into the business, but she advised her that was not allowed and closed/locked the doors.

I spoke with Theodora Antar who stated that at around 0947 hours she called Preferred Pediatrics in regards to inquiring about her daughters doctor appointment. Theodora Antar stated that the doctors office informed her that her daughter had a doctors appointment today at 1130 hours. Theodora Antar stated that she came to Preferred Pediatrics to see her daughter and obtain her medical records. Theodora Antar stated she has not seen her daughter in two months and that she wanted to give her items. Theodora stated that the victim was arrested at the beginning of October for an

# REPORTING OFFICER NARRATIVE

*Milford Police Department*

| Victim | Offense | Date / Time Reported |
|---|---|---|
| L▓▓▓▓, M▓▓▓▓▓▓ | *VIOLATION OF PROTECTIVE ORDER* | *Wed 10/18/2023 11:41* |

OCA
*2023-009055*

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

incident involving their daughter. Theodora stated that she was allowed to see her daughter and that the victim was not allowing her to. Theodora stated Preferred Pediatrics would not supply her with her daughters medical records due to her not having custody her daughter.

I would like to note that due to Theodora Antar coming to her daughters doctors appointment without speaking with the daughters father, this interfered with their daughter being able to go to her appointment. Due to Antar coming to the doctors officer, their daughter was over an hour late to her appointment.

Based on the above, I had probable cause to believe that Theodora Antar was in violation of the protective order. Antar was placed under arrest at approximately 1300 hours. Theodora Antar was searched incident to arrest, placed in double locked handcuffs to the rear and transported to the booking area of Police Headquarters.

Theodora Antar was then processed per Milford Police booking procedure by the booking officers. Theodora Antar was charged on UAR 0841L0001939 with Criminal Violation Of A Civil Protection Order. She was left in the custody of the booking officer.

I would like to note we were able to obtain a copy of the civil family order on scene from the victim. We were able to read the civil family order on scene and there was nothing in there that made us believe, Antar could show up at the doctors office without discussing this with him prior to her arrival. I would also like to add that the protective order references the civil order, but we do not have access to the civil order in our system.

I would like to note that I completed a lethality assessment and also a family violence offense report. I supplied the victim with the domestic violence packet of paperwork. I also spoke with DCF and completed a DCF-136 form, which was faxed over to them.

There is nothing further to add, I request this case to be closed by arrest.

# Incident Report Suspect List

OCA: *2023-009055*

| 1 | Name (Last, First, Middle) | Also Known As | Home Address |
|---|---|---|---|
| | *ANTAR, THEODORA* | | *856 SHAGBARK DR* |
| | | | *ORANGE, CT 00647-7* |
| | Business Address | | *203-859-1812* |

| DOB | Age | Race | Sex | Eth | Hgt | Wgt | Hair | Eye | Skin | Driver's License / State |
|---|---|---|---|---|---|---|---|---|---|---|
| *09/07/1991* | *32* | *W* | *F* | *N* | | | *BRO* | *BRO* | | *098455329 CT* |

Scars, Marks, Tattoos, or other distinguishing features

| *Reported Suspect Detail* | Suspect Age | | Race | Sex | Eth | Height | | Weight | | SSN |
|---|---|---|---|---|---|---|---|---|---|---|
| Weapon, Type | Feature | Make | Model | | | Color | Caliber | Dir of Travel | | |
| | | | | | | | | Mode of Travel | | |
| Veh Yr / Make / Model | | Drs | Style | | Color | | Lic Plate / State | | VIN | |

| Notes | Physical Char |
|---|---|

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** _CBA_                **Case Mng Status:** _CLOSED BY ARREST_                **Occurred:** _10/18/2023_

**Offense:** _VIOLATION OF PROTECTIVE ORDER_

| | | |
|---|---|---|
| **Investigator:** _SENATORE, V. (1720)_ | **Date / Time:** | _10/18/2023 16:28:25, Wednesday_ |
| **Supervisor:** _OKEEFE, E. (2089)_ | **Supervisor Review Date / Time:** | _10/18/2023 17:49:43, Wednesday_ |
| **Contact:** | **Reference:** | _Supplemental Report_ |

On 10/18/23 I was dispatched to cover Officer Vakos on a possible violation of a protective order. While on scene, the arrestee, Theodora Antar stated that the nurse from the Preferred Pediatrics facility slammed the door on her hand. Staff at the facility stated that they had to force the door on her because she kept trying to come inside.

I next transported arrestee Theodora Antar to Booking at Headquarters for processing in car #23. Sgt. Lacy followed me. Upon arrival, Antar was removed from my vehicle and escorted into the Booking area. Antar was then patted down and removed from the double locked handcuffs by female Officer Kreitman. Antar was searched by Officer Kreitman, her property was inventoried and then placed into secured locker #32. A Prison Property form was completed and signed by Antar. Antar was then photographed and entered into the Booking computer by Officer Kreitman. Antar was then escorted into the fingerprinting room and fingerprinted by Officer Kreitman on UAR #0841L0001939. Antar was charged with violating CGS 53a-223c, Criminal Violation of a Civil Protection Order. A $2500 bond was placed on Antar.

Following processing, Antar posted $250 in cash. A Criminal Bond form was completed and signed by Antar. A full no contact conditions of release was completed including conditions CT01, CT03, CT05 and restricting Antar from possessing a dangerous weapons. Antar acknowledged understanding and signed the form. The conditions were set to be in place until Antar's court appearance. Antar's property was returned, and a Prisoner Property form releasing her property. Antar was released at approximately 1605.

The conditions were entered into Collect by MPD Dispatch. (OCA 02159 MSG 3311672).

Investigator Signature                                        Supervisor Signature

# Tennessee v. Davis, 100 U.S. 257 (1879)

Overview    Opinions

## Annotation

PRIMARY HOLDING

Congress can mandate by law that some types of criminal prosecutions should be removed from state to federal court.

**Read More**

## Syllabus

## U.S. Supreme Court

Tennessee v. Davis, 100 U.S. 257 (1879)

**Tennessee v. Davis**

**100 U.S. 257**

*Syllabus*

1. Sec. 643 of the Revised Statutes of the United States, which declares that

"When any civil suit or criminal prosecution is commenced in any court of a state against any officer appointed under or acting by authority of any revenue law of the United States now or hereafter enacted, or against any person acting under or by authority of any such officer, on account of any act done under color of his office or of any such law or on account of any right, title, or authority claimed by such officer or other person under any such law, . . . the said suit or prosecution may, at any time before the trial or final hearing thereof, be removed for trial into the circuit court next to be holden in the district where the same is pending, upon the petition of such defendant to said circuit court,"

**Read More**

## Opinions

**Opinions & Dissents**

# U.S. Supreme Court

**Tennessee v. Davis, 100 U.S. 257 (1879)**
**Tennessee v. Davis**

**100 U.S. 257**

*CERTIFICATE OF DIVISION IN THE OPINION BETWEEN THE JUDGES OF THE*

*CIRCUIT COURT OF THE UNITED STATES FOR THE MIDDLE DISTRICT OF TENNESSEE*

*Syllabus*

1. Sec. 643 of the Revised Statutes of the United States, which declares that

"When any civil suit or criminal prosecution is commenced in any court of a state against any officer appointed under or acting by authority of any revenue law of the United States now or hereafter enacted, or against any person acting under or by authority of any such officer, on account of any act done under color of his office or of any such law or on account of any right, title, or authority claimed by such officer or other person under any such law, . . . the said suit or prosecution may, at any time before the trial or final hearing thereof, be removed for trial into the circuit court next to be holden in the district where the same is pending, upon the petition of such defendant to said circuit court,"

&c., is not in conflict with the Constitution of the United States.

2. A. was, in a state court of Tennessee, indicted for murder. In his petition, duly verified, for removal of the prosecution to the circuit court of the United States, he stated that although indicted for murder, no murder was committed; that the killing was done in necessary self-defense, to save his own life; that at the time the alleged act for which he was indicted was committed he was and still is an officer of the United States, to-wit, a deputy collector of internal revenue; that the act for which he was indicted was performed in his own necessary self-defense while engaged in the discharge of his duties as deputy collector and while acting by and under the authority of the internal revenue laws of the United States; that what he did was done under and by right of his said office; that it was his duty to seize illicit distilleries and the apparatus used for the illicit and unlawful distillation of spirits; and that while so attempting to enforce said laws as deputy collector as aforesaid, he was assaulted and fired upon by a number of armed men, and that in defense of his life he returned the fire, which is the killing mentioned in the indictment. *Held* that the petition was in conformity with the statute, and, upon being filed, the prosecution was removed to the circuit court of the United States for that district.

3. The United States is a government with authority extending over the whole territory of the Union, acting upon the states and the people of the states. While limited in the number of its powers, it is, so far as its sovereignty

Page 100 U. S. 258

extends, supreme. No state can exclude it from exercising them, obstruct its authorized officers against its will, or withhold from it for a moment the cognizance of any subject which the Constitution has committed to it.

4. The general government must cease to exist whenever it cannot enforce the exercise of its constitutional powers within the states by the instrumentality of its officers and agents. If, when thus acting, within the scope of their authority, they can be arrested and brought to trial in a state court for an alleged offense against the law of the state, yet warranted by the federal authority they possess, and if the general government is powerless to interfere at once for their protection -- if their protection must be left to the action of the state court -- the operations of the general government may at any time be arrested at the will of one of the states. No such element of weakness is to be found in the Constitution.

5. The provision of the Constitution declaring that the judicial power of the United States extends "to all cases in law and equity arising under the Constitution, the laws of the United States, and treaties made or which shall be made under their authority," embraces alike civil and criminal cases. Both are equally within that power.

6. A case arises under that Constitution not merely where a party comes into court to demand something conferred upon him by the Constitution, a law of the United States, or a treaty, but wherever its correct decision as

to the right, privilege, claim, protection, or defense of a party in whole or in part depends upon the construction of either. It is in the power of Congress to give the circuit courts of the United States jurisdiction of such a case, although it may involve other questions of fact or of law.

7. If the case, whether civil or criminal, be one to which the judicial power of the United States extends, its removal to the federal court does not invade state jurisdiction. On the contrary, a denial of the right of the general government to remove, take charge of, and try any case arising under the Constitution and laws of the United States is a denial of its conceded sovereignty over a subject expressly committed to it. It is a denial of a doctrine necessary for the preservation of the acknowledged powers of the government. The exercise of the power to remove criminal prosecutions is seen in the Act of Feb. 4, 1815, 3 Stat. 198, again in the third section of the Act of March 2, 1833, 4 *id*. 633, and more recently in the Act of July 13, 1866. 14 *id*. 171.

James M. Davis, was, in the Circuit Court for Grundy County, in the State of Tennessee, indicted for murder. On the twenty-ninth day of August, 1878, before the trial of the indictment, he presented to the circuit court of the United States for the proper district the following petition, praying for a removal of the case into that court, and for a certiorari:

Page 100 U. S. 259

"Your petitioner, James M. Davis, would most respectfully show to the court that on the twenty-first day of May, 1878, at the May Term of the Circuit Court of Grundy County, Tennessee, the grand jurors for the State of Tennessee, at the instance of E. M. Haynes, as prosecutor, indicted your petitioner for willfully, premeditatedly, deliberately, and of his malice aforethought killing one J. B. Haynes, which indictment and criminal prosecution so instituted is still pending against your petitioner in the Circuit Court of Grundy County, within the Middle District of Tennessee."

"And he further shows that no murder was committed; but, on the other hand, the killing was committed in his own necessary self-defense, to save his own life; that at the time the alleged act for which he was indicted was committed, he was and still is an officer of the United States, to-wit, a deputy collector of internal revenue, and the act for which he was indicted was performed in his own necessary self-defense, while engaged in the discharge of the duties of his office as deputy collector of internal revenue; and he was acting by and under the authority of the internal revenue laws of the United States, and was done under and by right of his office, to-wit, as deputy collector of internal revenue. It is his duty to seize illicit distilleries and the apparatus that is being used for the illicit and unlawful distillation of spirits, and while so attempting to enforce the revenue laws of the United States, as deputy collector aforesaid, he was assaulted and fired upon by a number of armed men, and in defense of his life returned the fire."

"In view of these facts, your petitioner prays that said cause may be removed from the Circuit Court of Grundy County to the Circuit Court of the United States for the Middle District of Tennessee for trial, and that a certiorari issue. And as in duty bound he will ever pray."

"JAMES A. WARDER, *Attorney*"

"DISTRICT OF MIDDLE TENNESSEE,"

"*County of Davidson:*"

"James M. Davis, being duly sworn, deposes and says that he is the petitioner named in said petition; that he has heard the same read, and knows the contents thereof, and that the same is true of his own knowledge."

"JAMES M. DAVIS"

"Subscribed and sworn to before me this Aug. 13, 1878."

"J. W. CAMPBELL"

"*U. S. Com'r for Middle Tenn.*"

Page 100 U. S. 260

The record having been returned, in compliance with the writ, a motion was made to remand the case to the state court, and, on the hearing of the motion, the judges were divided in opinion upon the following questions, which

are certified here:

*First,* whether an indictment of a revenue officer (of the United States) for murder, found in a state court, under the facts alleged in the petition for removal in this case, is removable to the circuit court of the United States under sec. 643 of the Revised Statutes.

*Second,* whether, if removable from the state court, there is any mode and manner of procedure in the trial prescribed by the act of Congress.

*Third,* whether, if not, a trial of the guilt or innocence of the defendant can be had in the United States circuit court.

MR. JUSTICE STRONG delivered the opinion of the Court.

The first of the questions certified is one of great importance, bringing as it does into consideration the relation of the general government to the government of the states, and bringing also into view not merely the construction of an act of Congress, but its constitutionality. That in this case the defendant's petition for removal of the cause was in the form prescribed by the act of Congress admits of no doubt. It represented that he had been indicted for murder in the Circuit Court of Grundy County and that the indictment and criminal prosecution were still pending. It represented further that no murder was committed, but that, on the other hand, the killing was committed in the petitioner's own necessary self-defense, to save his own life; that at the time when the alleged act for which he was indicted was committed, he was and still is an officer of the United States, to-wit, a deputy collector of internal revenue, and that the act for which he was indicted was performed in his own necessary self-defense while engaged in the discharge of his duties as deputy collector; that he was

Page 100 U. S. 261

acting by and under the authority of the internal revenue laws of the United States; that what he did was done under and by right of his office, to-wit, as deputy collector of internal revenue; that it was his duty to seize illicit distilleries and the apparatus that is used for the illicit and unlawful distillation of spirits; and that while so attempting to enforce the revenue laws of the United States as deputy collector as aforesaid, he was assaulted and fired upon by a number of armed men, and that in defense of his life he returned the fire. The petition was verified by oath, and the certificate required by the act of Congress to be given by the petitioner's legal counsel was appended thereto. There is therefore no room for reasonable doubt that a case was made for the removal of the indictment into the circuit court of the United States if sec. 643 of the Revised Statutes embraces criminal prosecutions in a state court and makes them removable, and if that act of Congress was not unauthorized by the Constitution. The language of the statute (so far as it is necessary at present to refer to it) is as follows:

"When any civil suit or criminal prosecution is commenced in any court of a state against any officer appointed under, or acting by authority of, any revenue law of the United States now or hereafter enacted, or against any person acting by or under authority of any such officer, on account of any act done under color of his office or of any such law, or on account of any right, title, or authority claimed by such officer or other person under any such law,"

the case may be removed into the federal court. Now certainly the petition for the removal represented that the act for which the defendant was indicted was done not merely under color of his office as a revenue collector, or under color of the revenue laws, not merely while he was engaged in performing his duties as a revenue officer, but that it was done under and by right of his office, and while he was resisted by an armed force in his attempts to discharge his official duty. This is more than a claim of right and authority under the law of the United States for the act for which he has been indicted. It is a positive assertion of the existence of such authority. But the act of Congress authorizes the removal of any cause when the acts of the defendant complained of were done, or claimed to have

Page 100 U. S. 262

been done, in the discharge of his duty as a federal officer. It makes such a claim a basis for the assumption of federal jurisdiction of the case, and for retaining it at least until the claim proves unfounded.

That the act of Congress does provide for the removal of criminal prosecutions for offenses against the state laws when there arises in them the claim of the federal right or authority is too plain to admit of denial. Such is its

positive language, and it is not to be argued away by presenting the supposed incongruity of administering state criminal laws by other courts than those established by the state. It has been strenuously urged that murder within a state is not made a crime by any act of Congress, and that it is an offense against the peace and dignity of the state alone. Hence it is inferred that its trial and punishment can be conducted only in state tribunals, and it is argued that the act of Congress cannot mean what it says, but that it must intend only such prosecutions in state courts as are for offenses against the United States -- offenses against the revenue laws. But there can be no criminal prosecution initiated in any state court for that which is merely an offense against the general government. If, therefore, the statute is to be allowed any meaning when it speaks of criminal prosecutions in state courts, it must intend those that are instituted for alleged violations of state laws in which defenses are set up or claimed under United States laws or authority.

We come, then, to the inquiry, most discussed during the argument, whether sec. 643 is a constitutional exercise of the power vested in Congress. Has the Constitution conferred upon Congress the power to authorize the removal, from a state court to a federal court, of an indictment against a revenue officer for an alleged crime against the state, and to order its removal before trial, when it appears that a federal question or a claim to a federal right is raised in the case and must be decided therein? A more important question can hardly be imagined. Upon its answer may depend the possibility of the general government's preserving its own existence. As was said in *Martin v. Hunter,* 1 Wheat. 363, "The general government must cease to exist whenever it loses the

Page 100 U. S. 263

power of protecting itself in the exercise of its constitutional powers." It can act only through its officers and agents, and they must act within the states. If, when thus acting and within the scope of their authority, those officers can be arrested and brought to trial in a state court for an alleged offense against the law of the state, yet warranted by the federal authority they possess, and if the general government is powerless to interfere at once for their protection -- if their protection must be left to the action of the state court -- the operations of the general government may at any time be arrested at the will of one of its members. The legislation of a state may be unfriendly. It may affix penalties to acts done under the immediate direction of the national government and in obedience to its laws. It may deny the authority conferred by those laws. The state court may administer not only the laws of the state, but equally federal law, in such a manner as to paralyze the operations of the government. And even if, after trial and final judgment in the state court, the case can be brought into the United States court for review, the officer is withdrawn from the discharge of his duty during the pendency of the prosecution and the exercise of acknowledged federal power arrested.

We do not think such an element of weakness is to be found in the Constitution. The United States is a government with authority extending over the whole territory of the Union, acting upon the states and upon the people of the states. While it is limited in the number of its powers, so far as its sovereignty extends, it is supreme. No state government can exclude it from the exercise of any authority conferred upon it by the Constitution, obstruct its authorized officers against its will, or withhold from it for a moment the cognizance of any subject which that instrument has committed to it.

By the last clause of the eighth section of the first article of the Constitution, Congress is invested with power to make all laws necessary and proper for carrying into execution not only all the powers previously specified, but also all other powers vested by the Constitution in the government of the United States or in any department or officer thereof. Among these is the judicial power of the government. That is declared by

Page 100 U. S. 264

the second section of the third article to

"extend to all cases in law and equity arising under the Constitution, the laws of the United States, and treaties made or which shall be made under their authority,"

&c. This provision embraces alike civil and criminal cases arising under the Constitution and laws. *Cohens v. Virginia,* 6 Wheat. 264. Both are equally within the domain of the judicial powers of the United States, and there is nothing in the grant to justify an assertion that whatever power may be exerted over a civil case may not be exerted as fully over a criminal one. And a case arising under the Constitution and laws of the United States may as well arise in a criminal prosecution as in a civil suit. What constitutes a case thus arising was early defined in the case cited from 6 Wheaton. It is not merely one where a party comes into court to demand something conferred upon him by the Constitution or by a law or treaty. A case consists of the right of one party as well as the

other, and may truly be said to arise under the Constitution or a law or a treaty of the United States whenever its correct decision depends upon the construction of either. Cases arising under the laws of the United States are such as grow out of the legislation of Congress, whether they constitute the right or privilege or claim or protection or defense of the party, in whole or in part, by whom they are asserted. Story on the Constitution, sec. 1647; 6 Wheat. 19 U. S. 379. It was said in *Osborn v. The Bank of the United States,* 9 Wheat. 738,

"When a question to which the judicial power of the Union is extended by the Constitution forms an ingredient of the original cause, it is in the power of Congress to give the circuit courts jurisdiction of that cause, although other questions of fact or of law may be involved in it."

And a case arises under the laws of the United States when it arises out of the implication of the law. Mr. Chief Justice Marshall said, in the case last cited:

"It is not unusual for a legislative act to involve consequences which are not expressed. An officer, for example, is ordered to arrest an individual. It is not necessary nor is it usual to say that he shall not be punished for obeying this order. His security is implied in the order itself. It is no unusual thing for an act of Congress to imply, without expressing, this very exemption

Page 100 U. S. 265

from state control. . . . The collectors of the revenue, the carriers of the mail, the mint establishment, and all those institutions which are public in their nature are examples in point. It has never been doubted that all who are employed in them are protected while in the line of their duty, and yet this protection is not expressed in any act of Congress. It is incidental to and is implied in the several acts by which those institutions are created, and is secured to the individuals employed in them by the judicial power alone -- that is, the judicial power is the instrument employed by the government in administering this security."

The constitutional right of Congress to authorize the removal before trial of civil cases arising under the laws of the United States has long since passed beyond doubt. It was exercised almost contemporaneously with the adoption of the Constitution, and the power has been in constant use ever since. The Judiciary Act of Sept. 24, 1789, was passed by the first Congress, many members of which had assisted in framing the Constitution, and though some doubts were soon after suggested whether cases could be removed from state courts before trial, those doubts soon disappeared. Whether removal from a state to a federal court is an exercise of appellate jurisdiction, as laid down in Story's Commentaries on the Constitution, sec. 1745, or an indirect mode of exercising original jurisdiction, as intimated in *Railway Company v. Whitton,* 13 Wall. 270, we need not now inquire. Be it one or the other, it was ruled in the case last cited to be constitutional. But if there is power in Congress to direct a removal before trial of a civil case arising under the Constitution or laws of the United States and direct its removal because such a case has arisen, it is impossible to see why the same power may not order the removal of a criminal prosecution when a similar case has arisen in it. The judicial power is declared to extend to all cases of the character described, making no distinction between civil and criminal, and the reasons for conferring upon the courts of the national government superior jurisdiction over cases involving authority and rights under the laws of the United States are equally applicable to both. As we have already said, such a jurisdiction is necessary for the preservation

Page 100 U. S. 266

of the acknowledged powers of the government. It is essential also to a uniform and consistent administration of national laws. It is required for the preservation of that supremacy which the Constitution gives to the general government by declaring that the Constitution and laws of the United States made in pursuance thereof, and the treaties made or which shall be made under the authority of the United States, shall be the supreme laws of the land, and the judges in every state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding. The founders of the Constitution could never have intended to leave to the possibly varying decisions of the state courts what the laws of the government it established are, what rights they confer, and what protection shall be extended to those who execute them. If they did, where is the supremacy over those questions vested in the government by the Constitution? If, whenever and wherever a case arises under the Constitution and laws or treaties of the United States, the national government cannot take control of it, whether it be civil or criminal, in any stage of its progress, its judicial power is at least temporarily silenced, instead of being at all times supreme. In criminal as well as in civil proceedings in state courts, cases under the Constitution and laws of the United States might have been expected to arise, as in fact, they do. Indeed, the powers of the

general government and the lawfulness of authority exercised or claimed under it are quite as frequently in question in criminal cases in state courts as they are in civil cases, in proportion to their number.

The argument so much pressed upon us that it is an invasion of the sovereignty of a state to withdraw from its courts into the courts of the general government the trial of prosecutions for alleged offenses against the criminal laws of a state, even though the defense presents a case arising out of an act of Congress, ignores entirely the dual character of our government. It assumes that the states are completely and in all respects sovereign. But when the national government was formed, some of the attributes of state sovereignty were partially, and others wholly, surrendered and vested in the United States. Over the subjects thus surrendered the sovereignty

Page 100 U. S. 267

of the states ceased to extend. Before the adoption of the Constitution, each state had complete and exclusive authority to administer by its courts all the law, civil and criminal, which existed within its borders. Its judicial power extended over every legal question that could arise. But when the Constitution was adopted, a portion of that judicial power became vested in the new government created, and so far as thus vested it was withdrawn from the sovereignty of the state. Now the execution and enforcement of the laws of the United States, and the judicial determination of questions arising under them, are confided to another sovereign, and to that extent the sovereignty of the state is restricted. The removal of cases arising under those laws from state into federal courts is therefore no invasion of state domain. On the contrary, a denial of the right of the general government to remove them, to take charge of and try any case arising under the Constitution or laws of the United States, is a denial of the conceded sovereignty of that government over a subject expressly committed to it.

It is true, the act of 1789 authorized the removal of civil cases only. It did not attempt to confer upon the federal courts all the judicial power vested in the government. Additional grants have from time to time been made. Congress has authorized more and more fully, as occasion has required, the removal of civil cases from state courts into the circuit courts of the United States, and the constitutionality of such authorization has met with general acquiescence. It has been sustained by the decisions of this Court.

Nor has the removal of civil cases alone been authorized. On the 4th of February, 1815, an act was passed, 3 Stat. 198, providing that if any suit or prosecution should be commenced in any state court against any collector, naval officer, surveyor, inspector, or any other officer, civil or military, or any other person aiding or assisting, agreeably to the provisions of the act or under color thereof, for any act done or omitted to be done as an officer of the customs or for anything done by virtue of the act or under color thereof, it might be removed before trial into the circuit court of the United States, provided the act should not apply to any offenses involving corporal punishment. This act expressly applied to a criminal

Page 100 U. S. 268

action or prosecution. It was intended to be of short duration, but it was extended by the Act of March 3, 1815, 3 Stat. p. 233, sec. 6, and reenacted in 1817 for a period of four years.

So, in 1833, by the Act of March 2, 4 *id.* c. 57, sec. 3, it was enacted that in any case where suit or prosecution should be commenced in a state court of any state against any officer of the United States or other person for or on account of any act done under the revenue laws of the United States or under color thereof, or for or on account of any right, authority, or title set up or claimed by such officer or other person under any such law of the United States, the suit or prosecution might be removed, before trial, into the federal circuit court of the proper district. The history of this act is well known. It was passed in consequence of an attempt by one of the states of the Union to make penal the collection by United States officers within the state of duties under the tariff laws. It was recommended by President Jackson in a special message, and passed in the Senate by a vote of 32 to 1, and in the House by a majority of 92. It undoubtedly embraced both civil and criminal cases. It was so understood and intended when it was passed. The chairman of the Judiciary Committee which introduced the bill said:

"It gives the right to remove at any time before trial, but not after judgment has been given, and thus affects in no way the dignity of the state tribunals. Whether in criminal or civil cases, it gives this right of removal. Has Congress power in criminal cases? He would answer the question in the affirmative. Congress had the power to give the right in criminal as well as in civil cases, because the second section of the third article of the Constitution speaks of all cases in law and equity, and these comprehensive terms cover all. . . . It was more necessary that this jurisdiction should be extended over criminal than over civil cases. If it were not admitted that the federal judiciary had jurisdiction of criminal cases, then was nullification ratified and sealed forever, for a state would

have nothing more to do than to declare an act a felony or misdemeanor to nullify all the laws of the Union."

The provisions of the Act of July 13, 1866, 14 Stat. 171,

Page 100 U. S. 269

sec. 67, relative to the removal of suits or prosecutions in state courts against internal revenue officers, provisions reenacted in sec. 643 of the Revised Statutes, are almost identical with those of the act of 1833, the only noticeable difference being that in the latter act, the adjective "criminal" is inserted before the word "prosecution." This made no change in the meaning. The well understood legal signification of the word "prosecution" is a criminal proceeding at the suit of the government. Thus it appears that all along our history, the legislative understanding of the Constitution has been that it authorizes the removal from state courts to the circuit courts of the United States alike civil and criminal cases arising under the laws, the Constitution, or treaties.

The subject has more than once been before this Court, and it has been fully considered. In *Martin v. Hunter,* 1 Wheat. 304, it was admitted in argument by Messrs. Tucker and Dexter that there might be a removal before judgment, though it was contended there could not be after; but the contention was overruled, and it was declared that Congress might authorize a removal either before or after judgment; that the time, the process, and the manner must be subject to its absolute legislative control. In that case also it was said that the remedy of the removal of suits would be utterly inadequate to the purposes of the Constitution if it could act only upon the parties, and not upon the state courts, Judge Story, who delivered the opinion, adding:

"In respect to criminal prosecutions, the difficulty seems admitted to be insurmountable, and, in respect to civil suits, there would in many cases be rights without corresponding remedies. . . . In respect to criminal prosecutions, there would at once be an end of all control, and the state decisions would be paramount to the Constitution."

The expression that the difficulty in the way of the removal of criminal prosecutions seems admitted to be insurmountable has been laid hold of here, in argument, as a declaration of the court that criminal prosecutions cannot be removed. It is a very shortsighted and unwarranted inference. What the court said was that the remedy in such cases seems to be insurmountable if it could not act upon state courts as well as parties, and it was ruled that it does thus act. The expression must be read in its

Page 100 U. S. 270

connection. In *Martin v. Hunter,* the removal was by writ of error after final judgment in the state court, which certainly seems more an invasion of state jurisdiction than a removal before trial. The case was followed by *Cohens v. Virginia,* 6 Wheat. 264, a criminal case, in which the defendant set up against a criminal prosecution an authority under an act of Congress. There it was decided that cases might be removed in which a state was a party. This also was a writ of error after a final judgment, but as well as the former case recognized the right of Congress to authorize removals either before or after trial, and neither case made any distinction between civil and criminal proceedings.

In *The Mayor v. Cooper,* 6 Wall. 247, the validity of the removal acts of 1863, March 3, sec. 5 of c. 81, 12 Stat. 756, and its amendment of May 11, 1866, 14 *id.* 1866, which embraced not only civil cases but criminal prosecutions and authorized their removal before trial, came under consideration, and it was sustained. This Court then said the constitutional power is given in general terms.

"No limitation is imposed. The broadest language is used. 'All cases' so arising are embraced. How jurisdiction shall be acquired by the inferior court [of the United States], whether it shall be original or appellate, or original in part and appellate in part, and the manner of procedure in its exercise after it has been acquired, is not prescribed. This Constitution is silent upon these subjects. They are remitted without check or limitation to the wisdom of the legislature. . . . Jurisdiction, original or appellate, alike comprehensive in either case, may be given. The constitutional boundary line of both is the same. Every variety and form of appellate jurisdiction within the sphere of the power, extending as well to the courts of the states as to those of the nation, is permitted. There is no distinction in this respect between civil and criminal cases. Both are within its scope. Nor is it any objection that questions are involved which are not at all of a federal character. If one of the latter exist, if there be a single such ingredient in the mass, it is sufficient."

The Court added, "We entertain no doubt of the constitutionality of the jurisdiction given by the act under which

this case has arisen." *See also Com. v. Ashmun,*

Page 100 U. S. 271

3 Grant, Cas. 436; *id.* 416-418; *State v. Hoskins,* 77 N.C. 530, decided in 1877, where the constitutionality of sec. 643 of the Revised Statutes was affirmed after a full and instructive discussion.

It ought therefore to be considered as settled that the constitutional powers of Congress to authorize the removal of criminal cases for alleged offenses against state laws from state courts to the circuit courts of the United States, when there arises a federal question in them, is as ample as its power to authorize the removal of a civil case. Many of the cases referred to, and others, set out with great force the indispensability of such a power to the enforcement of federal law.

It follows that the first question certified to us from the circuit court of Tennessee must be answered in the affirmative.

The second question is "Whether, if the case be removable from the state court, there is any mode and manner of procedure in the trial prescribed by the act of Congress."

Whether there is or not is totally immaterial to the inquiry whether the case is removable, and this question can hardly have arisen on the motion to remand the case. The imaginary difficulties and incongruities supposed to be in the way of trying in the circuit court an indictment for an alleged offense against the peace and dignity of a state, if they were real, would be for the consideration of Congress. But they are unreal. While it is true there is neither in sec. 643 nor in the act of which it is a reenactment any mode of procedure in the trial of a removed case prescribed, except that it is ordered the cause when removed shall proceed as a cause originally commenced in that court, yet the mode of trial is sufficiently obvious. The circuit courts of the United States have all the appliances which are needed for the trial of any criminal case. They adopt and apply the laws of the state in civil cases, and there is no more difficulty in administering the state's criminal law. They are not foreign courts. The Constitution has made them courts within the states to administer the laws of the states in certain cases, and so long as they keep within the jurisdiction assigned to them, their general powers are adequate to the

Page 100 U. S. 272

trial of any case. The supposed anomaly of prosecuting offenders against the peace and dignity of a state in tribunals of the general government grows entirely out of the division of powers between that government and the government of a state -- that is, a division of sovereignty over certain matters. When this is understood (and it is time it should be), it will not appear strange that, even in cases of criminal prosecutions for alleged offenses against a state, in which arises a defense under United States law, the general government should take cognizance of the case and try it in its own courts, according to its own forms of proceeding.

The third question certified has been sufficiently answered in what we have said respecting the second. It must be answered in the affirmative.

The first question will be answered in the affirmative, and the second is answered as in the opinion.

MR. JUSTICE CLIFFORD, with whom concurred MR. JUSTICE FIELD, dissenting.

Civil suits or criminal prosecutions, commenced in a state court against a revenue officer of the United States, on account of any act done under color of his office or on account of any right, title, or authority claimed by such officer under such law may at any time before the trial or final hearing thereof be removed for trial into the circuit court next to be holden in the district where the same is pending in the manner prescribed in the section conferring the right. Rev.Stat., sec. 643.

Sufficient appears to show that the prisoner was formally indicted of murder in the first degree by the grand jury of the state, that the indictment was duly filed in the proper state court for trial, and that it was subsequently removed into the circuit court of the United States for the district on motion of the accused. Neither the indictment nor the order of removal is exhibited in the transcript. Instead of that, the statement is that the Attorney General of the state moved in the circuit court to remand the cause to the state court in which the indictment was found. Hearing was had, and it appears that the judges of the circuit court were divided in

Page 100 U. S. 273

opinion whether the motion of the Attorney General ought or ought not to be granted.

Appended to the first question certified by the judges of the court is a paper which purports to be the petition of the prisoner under which the order of removal was granted. From that it appears that the homicide charged is admitted, but that the defense is that the killing by the prisoner was in self-defense, to save his own life; that he was and still is a deputy collector of internal revenue; and that the act for which he is indicted, as he alleges, was performed in self-defense while he was engaged in the performance of the duties of his office. Speaking more specifically, he states that it is his duty to seize illicit distilleries and the apparatus that is being used for the illicit and unlawful distillation of spirits, and that while attempting to enforce the revenue laws, he was assaulted and fired upon by a number of armed men, and that in defense of his life, he returned the fire.

Three questions are certified, as follows:

1. Is an indictment in a state court for murder, under the facts set forth in the petition for removal in this case, removable to the circuit court under sec. 643 of the Revised Statutes?

2. If removable from the state court, is there any mode of procedure in the trial prescribed by an act of Congress?

3. And if not, can a trial of the guilt or innocence of the prisoner be had in the circuit court?

Questions of greater importance than those certified here by the circuit court could hardly be presented for discussion, as they involve the necessity of an inquiry into the nature, extent, and limitation of the judicial power both of the United States and of the circuit courts established by Congress. Judicial power, like other powers granted to the United States by the Constitution, is defined by the instrument making the grant. Governed by that rule, we find that the second section of the third article ordains that the judicial power shall extend to all cases in law and equity arising under the Constitution, the laws of the United States, and treaties made or which shall be made under their authority, which provision describes the whole extent of the judicial power of the United States conferred by the Constitution that it is necessary to examine in

Page 100 U. S. 274

the present case. Other clauses in the same section enumerate numerous other subject matters falling within the cognizance either of the Supreme Court or of the inferior courts created by Congress, but it will not be necessary to examine those clauses, as they have no bearing upon the questions to be answered.

Pursuant to the first section of the third article, the Congress passed the Judiciary Act, making provision for the organization of the Supreme Court and establishing the circuit and district courts. 1 Stat. 73.

Jurisdiction of crimes and offenses committed within their respective districts and cognizable under the authority of the United States to a limited extent was by that act conferred upon the district courts, but the eleventh section of the act provided that the circuit courts should have exclusive cognizance of all crimes and offenses cognizable under the authority of the United States except where the act otherwise provides, and concurrent jurisdiction with the district courts of the crimes and offenses cognizable in those courts. *Id., 78.*

Neither the district nor circuit courts have jurisdiction of any crimes or offenses by that act unless the same are cognizable under the authority of the United States. Criminal jurisdiction is not by the Constitution conferred upon any court, and it is settled law that Congress must in all cases make an act criminal and define the offense before either the district or circuit courts can take cognizance of an indictment charging the act as an offense against the authority of the United States. Obvious and undoubted as the proposition is, it admits of but little illustration, and needs nothing more.

Powers expressly enumerated are granted to Congress, and such as shall be necessary and proper for carrying the enumerated powers into execution, or in other words the powers of Congress are made up of concessions from the people of the several states, with such implied powers as are necessary and proper to carry the express concessions into effect, subject to the limitation that whatever is not expressly granted or necessarily or properly implied to carry the granted powers into effect is reserved to the states respectively or to the people. Like the other powers specified, the judicial power of the

Page 100 U. S. 275

United States is a constituent part of those concessions from the several states, and as was held by this Court at a

very early period, it is to be exercised by the Supreme Court or such inferior courts as the Congress may from time to time ordain and establish.

Of all the courts which the United States may, under their general powers, constitute, one only -- the Supreme Court -- possesses jurisdiction derived immediately from the Constitution and of which the legislative power cannot deprive it. All other courts organized by the general government possess no jurisdiction but what is given by the power that created them, and they can be vested with none except what the power ceded to the United States will authorize the Congress to confer. Certain implied powers, it is admitted, must necessarily result to courts of justice -- such as to fine for contempt or imprison for contumacy -- but the jurisdiction of crimes against the authority of the United States is not among such implied powers, the universal rule in the federal courts being that the legislative authority of the Union must first make an act a crime, affix a punishment to it, and prescribe what courts have jurisdiction of such an indictment, before any federal tribunal can determine the guilt or innocence of the supposed offender. *United States v. Hudson & Goodwin,* 7 Cranch 32; *United States v. Coolidge,* 1 Wheat. 415; 1 Whart.Crim.Law (7th ed.), sec. 163.

In accordance with that rule, it was held by the whole Court, Marshall, C.J., delivering the opinion, that the circuit court could not take cognizance of the crime of murder committed on board of one of our ships of war lying in a harbor within state jurisdiction, because the eighth section of the Crimes Act, by which alone any provision had been made for the punishment of such a crime on shipboard, only defines offenses perpetrated upon the high seas or in any river, haven, basin, or bay out of the jurisdiction of any particular state. *United States v. Bevans,* 3 Wheat. 336, 16 U. S. 387.

It was argued in behalf of the prosecution in that case that the jurisdiction existed because the homicide was committed on board a ship of war, but Mr. Webster denied the proposition, and contended that the jurisdiction of the circuit court

Page 100 U. S. 276

was only such as had been given to it by an act of Congress, and insisted that it was sufficient to maintain for the prisoner that no act of Congress authorized the circuit court to take cognizance of any offenses merely because they were committed on ships of war. Instead of that, he insisted that it was the nature of the place in which the ship lies, and not the character of the ship itself, that decides the question of jurisdiction, and added that if committed within the territorial jurisdiction of the state, it excluded the jurisdiction of the circuit court by express exception, the language of the act only giving authority to try and punish offenders for offenses committed upon the high seas or in any river, haven, basin, or bay out of the jurisdiction of any particular state.

Commenting upon that provision, the Chief Justice said it is not the offense, but the bay in which it is committed, which must be out of the jurisdiction of the state, adding that unless the place itself be out of the jurisdiction of the state, Congress has not given cognizance of the offense to the circuit courts. *United States v. Wiltberger,* 5 Wheat. 76, 18 U. S. 96.

Apply the conclusion reached in those two cases to the question under discussion and it is clear that, in order to ascertain the jurisdiction of the federal courts in criminal cases, resort must be had to the acts of Congress providing for the punishment of crimes, for although such courts are unquestionably to look to the common law, in the absence of statutory provision, for rules of guidance in the exercise of their functions in criminal as well as in civil cases, it is to the acts of Congress passed in pursuance of the Constitution alone that they must have recourse to determine what constitutes an offense against the authority of the United States, it being settled law that the United States have no unwritten code to which resort can be had as a source of jurisdiction. Conkling's Treatise (5th ed.) 181.

Courts of the United States derive no jurisdiction in criminal cases from the common law, nor can such tribunals take cognizance of any act of an individual as a public offense or declare it punishable as such until it has been defined as an offense by an act of Congress passed in pursuance of the Constitution. Argument to show that Congress has never

Page 100 U. S. 277

defined the act of murder at a place within the exclusive jurisdiction of a state as an offense against the authority of the United States is certainly unnecessary, as no sane man will venture to advance such a proposition; nor will anyone who ever looked into the record of this case deny that the place where the homicide which is the subject of

inquiry was committed is in the exclusive jurisdiction of the state whose laws were violated by the perpetrator of the felonious act. None of these matters can be denied consistent with the truth of the facts as judicially known to every member of the Court.

Offenses against the authority of the United States, defined by an act of Congress passed in pursuance of the Constitution, are cognizable in the circuit courts by virtue of the eleventh section of the Judiciary Act, whether committed upon the high seas or in any river, haven, basin, or bay out of the jurisdiction of any particular state or in any fort, dockyard, arsenal, armory, or magazine or any other place the exclusive jurisdiction of which is ceded to the United States. Cognizance in criminal cases may also be given to those courts of offenses against the national authority, if properly defined by an act of Congress, when they are committed in violation of such an act passed pursuant to the second section of the third article of the Constitution, which extends the judicial power to all cases in law and equity arising under the Constitution, the laws of Congress, and the treaties therein specified. 1 Whart.Cr.Law (7th ed.) 174-180, inclusive.

Exceptional cases undoubtedly arise where it may properly be said that the citizen owes allegiance to two sovereigns, and may be liable to punishment for an infraction of the laws of either where the same act is a transgression and defined offense under the laws of both. Thus, an assault on the marshal or hindering him in the execution of legal process is a high offense against the United States for which the perpetrator is liable to punishment, and the same act may also be a gross breach of the peace of the state if it results in a riot, assault, or murder, and may subject the same person to the punishment prescribed by the state laws. *Moore v. Illinois,* 14 How. 13.

Page 100 U. S. 278

Federal sovereignty as well as the sovereignty of the states is limited and restricted by the Constitution. Certain powers, legislative, executive, and judicial, are possessed by each, independent of the other, and in the exercise of such powers, all agree that they act as separately and independently of each other as if the line of division was traced by landmarks visible to the eye. *Ableman v. Booth,* 21 How. 506, 62 U. S. 516.

Both governments, though there be but one act, if the jurisdiction is dual and the act charged is defined by the laws of each as an offense, may subject the offender to punishment; nor can he plead the conviction and sentence in one forum in bar to an indictment in the other, as the act committed was an offense against the authority of each. *Fox v. The State of Ohio,* 5 How. 410; *United States v. Marigold,* 9 How. 560.

Passing and uttering counterfeit coin was the charge in the first case, and it appears that the defendant, having been convicted in the state court, removed the cause into this Court and assigned for error that the court below had no jurisdiction of the offense; but this Court held that the state law was valid, that offenders falling within the power of different sovereignties may be triable in each for the same act, and may properly be subjected to the penalties which each assigns to the perpetration of the act. When carefully examined, it will be found that the second case decides the same point in the same way -- that the same act may in certain cases constitute an offense against both the state and the United States, and that it may draw to its commission the penalties denounced by each for the commission of the act. *United States v. Amy,* 14 Md. 135, n., per Taney, C.J.; Cooley, Const.Lim. (4th ed.) 25.

Viewed in the light of these suggestions, it seems reasonable to conclude that Congress might define the malicious killing of a revenue collector with malice aforethought, while in the performance of his official duties, as murder, and might make provision for the trial and punishment of the offender even though the homicide was committed at a place within the exclusive jurisdiction of the state. Congress may provide for the appointment of officers to collect the public revenue, and, if so, they may pass constitutional laws for their protection,

Page 100 U. S. 279

but Congress has not defined the act charged in the state indictment as an offense against the authority of the United States, nor does any act of Congress prescribe the punishment to be inflicted for its commission or declare what court shall have jurisdiction of the offense.

Ample power, it was conceded, was vested in Congress to provide for the punishment of murder committed by a person serving on board a public ship of war, wherever the ship might be; but inasmuch as Congress had not defined the act of killing at that place as a crime, nor affixed a punishment to it, nor declared the court that should have jurisdiction of the offense, this Court unanimously decided, Marshall, C.J., giving the opinion, that a murder

committed on board a ship of war lying within the harbor of Boston was not cognizable in the Circuit Court of the District of Massachusetts, and the case was remanded with a certificate to that effect. *United States v. Bevans,* 3 Wheat. 336, 16 U. S. 391.

Since that decision, the law has been considered as settled that the circuit courts have no jurisdiction to try and sentence an offender unless it appears that the offense charged is defined by an act of Congress and that the act defining the offense, or some other act, prescribes the punishment to be imposed and specifies the court that shall have jurisdiction of the offense. *United States v. Wiltberger,* 5 Wheat. 76.

Homicide resulting from the acts of a party in opposing an officer, employed in the enrollment of men for the military service during the late rebellion, was defined by an act of Congress to be murder and punishable with death, and the same section enacted that the conviction of the party of that offense in the circuit court should not relieve him from liability for any crime committed by him against the laws of the state. 13 Stat., p. 8, sec. 12; *United States v. Gleason,* 1 Woolw. 75; *Same v. Same, id.,* 128.

Decided cases everywhere hold that unless Congress first defines the offense, affixes the punishment, and declares in some way the court that shall have jurisdiction of the accusation, the circuit court can neither try the accused nor sentence him to punishment. Even the power of Congress to define offenses and provide for the punishment of offenders is limited

Page 100 U. S. 280

to such subjects and circumstances as relate and are peculiar to the federal government. Money may be coined by that government, and therefore Congress may provide for the punishment of counterfeiting the national coin. Congress may establish post offices and post roads, and therefore the Legislative Department may pass laws providing for the punishment of persons robbing the mails; but the Congress cannot enact laws for punishing persons for counterfeiting state bank issues, or for robbing express companies established by state authority. *United States v. Ward, id.,* 17, 20.

Offices may be created by a law of Congress, and officers to execute the duties of the same may be appointed in the manner specified in the Constitution, and it is not doubted that Congress may pass laws for their protection, and for that purpose may define the offense of killing such an officer when in the discharge of his duties. Concede that and it follows that if the punishment for the offense is affixed, and the jurisdiction is given to the circuit courts, those courts may try the offender, if legally indicted, and if duly convicted may sentence him to the punishment which the act of Congress prescribes. Beyond all question, the jurisdiction of the circuit court over such an indictment would be complete, but the difficulty in the way of the prosecutor in this case is that there is no act of Congress defining the offense charged in the indictment, nor is there any provision in such law providing for the punishment of such an offense or which gives the circuit court or any other federal court jurisdiction to try or sentence the offender.

Enough appears in these observations to show that even if the indictment in this case had been found against a citizen of the state for murdering the revenue officer while engaged in the discharge of his official duties, the circuit court would not, under existing laws, have jurisdiction to try and sentence the offender, for the reason that the offense is not defined by any act of Congress, nor is there any act of Congress giving such jurisdiction to the circuit courts.

Judicial authorities to that effect are numerous and decisive, but the principal question in this case is of a very different character, as the indictment is against the officer of the revenue

Page 100 U. S. 281

for murdering a citizen of the state, having in no way any official connection with the collection of the public revenue. Neither the Constitution nor the acts of Congress give a revenue officer or any other officer of the United States an immunity to commit murder in a state or prohibit the state from executing its laws for the punishment of the offender.

Unquestionable jurisdiction to try and punish offenders against the authority of the United States is conferred upon the circuit and district courts, but the acts of Congress give those courts no jurisdiction whatever of offenses committed against the authority of a state. Criminal homicide committed in a state is an offense against the authority of the state unless it was committed in a place within the exclusive jurisdiction of the United States.

Congress has never defined such an offense when committed within the territorial limits of a state under the circumstances described in the transcript; nor is there any pretense for the suggestion either that the circuit or district courts have any jurisdiction of the case or that there is any conflict of jurisdiction between the judicial authorities of the state and those of the United States.

Matters of fact are not in dispute, and it appears by the record that the prisoner, at the time mentioned in the petition, was duly indicted of the crime of willful murder, with malice aforethought, by the grand jury of the county where the homicide was committed, and that the indictment is still pending in the proper court of the state where it was filed. Adjudged cases are not necessary to show that no federal court created by Congress had jurisdiction of the offense, as the homicide was committed on land within the state, and not within any place over which the United States had exclusive jurisdiction. None of these matters can be successfully controverted, and if not then it follows that the exclusive jurisdiction of the offense was vested in the state court, unless it can be held that the prisoner, merely because he was a deputy collector of the revenue, is privileged to remove the state indictment found by the grand jury of the state into the circuit court for trial.

Nobody before ever pretended that such an offense ever was or could be defined by an act of Congress as an offense against

Page 100 U. S. 282

the federal authority, or that the circuit court or any other federal court has or ever had any jurisdiction of such a case to try or sentence such an offender for such an offense. federal courts have no common law jurisdiction in criminal cases, nor can such courts proceed to try or punish any offender, except when authorized by an act of Congress, passed in pursuance of the Constitution. *State of Pennsylvania v. Wheeling Bridge Co.,* 13 How. 518, 54 U. S. 563; *United States v. Worral,* 2 Dall. 384, 2 U. S. 393; Cooley, Const.Lim. (4th ed.) 26; *Ex parte Bollman,* 4 Cranch 75, 8 U. S. 98.

Murder is defined by the law of the state as follows:

"If any person of sound memory and discretion unlawfully kill any reasonable creature, in being and under the peace of the state, with malice aforethought, either express or implied, such person shall be guilty of murder."

3 State Stat. 43. When perpetrated by means of poison, lying in wait, or by any other kind of willful, deliberate, malicious, and premeditated killing, or in the perpetration of or attempt to perpetrate certain other enumerated crimes, it is murder in the first degree, and the petition of the prisoner, in this case, shows that the charge against him is murder in the first degree as defined by the state statute.

Such an offense has never been defined by an act of Congress, when committed against the authority of the state, nor even when committed against the national authority, unless when the killing was perpetrated on navigable waters, out of the jurisdiction of any particular state, or in some place within the exclusive jurisdiction of the federal authority.

Crimes defined by an act of Congress and within the jurisdiction of the federal courts may be divided into two general classes:

1. Such as are committed on the high seas or on navigable waters out of the jurisdiction of any particular state, or within some place under the exclusive jurisdiction of the United States.

2. Such as relate to subjects committed to the charge of the nation, which are comprised within the grant of judicial power over all cases arising under the Constitution, laws, and treaties of the United States, and cases affecting ambassadors or other public ministers and consuls.

Under existing laws, the circuit courts have no jurisdiction

Page 100 U. S. 283

whatever to reexamine the judgments of the state courts in any case, civil or criminal, the power to exercise such a revision even in civil cases involving federal questions, being vested exclusively in the Supreme Court. Neither the Supreme Court nor the circuit courts can reexamine the conviction, sentence, or judgment of the district court in a criminal case in any form, either by writ of error or appeal. Final judgments or decrees of a state court falling within the condition specified in the twenty-fifth section of the Judiciary Act, or the second section of the act passed to amend the prior act upon the subject, may be reexamined and reversed or affirmed in the Supreme

passed to amend the prior act upon the subject, may be reexamined and reversed or affirmed in the Supreme Court upon a writ of error. 14 Stat. 386; Rev.Stat. sec. 709.

Appellate power in criminal cases decided in the district and circuit courts has not been vested in the Supreme Court by any act of Congress, and of course the power of the court in respect to such cases pending in those tribunals is confined to certificates of division of opinion. *United States v. More*, 3 Cranch 159; *Ex Parte Kearney*, 7 Wheat. 38; *Ex Parte Watkins*, 3 Pet. 193. Grant that, but federal judicial power extends to all cases in law or equity arising under the Constitution, the laws of the United States, and treaties made or which shall be made under their authority, and every such question may be reexamined by writ of error in the Supreme Court under the act of Congress passed as a substitute for the before-mentioned section of the Judiciary Act.

Cases which involve some one or more of those questions are often presented in the state courts, and where that occurs and the decision is adverse to the party setting up the title, right, or exemption, whether the suit be a civil or criminal one, he may, when the case is determined by the highest court of the state, sue out a writ of error and remove the cause into the Supreme Court for reexamination. *Murdock v. Memphis*, 20 Wall. 590, 87 U. S. 636.

Writs of error of the kind are within every day's experience, but the rule is universal that if the transcript when entered here does not present a federal question for reexamination, the case will be dismissed, which shows to a demonstration that it is only the questions which arise under the Constitution,

Page 100 U. S. 284

the laws of the United States, and treaties made under their authority which this Court is authorized to reexamine.

Convincing support to that proposition is found in the countless cases which this Court dismisses at every session for the want of jurisdiction, the invariable rule being that if the transcript does not exhibit some one of the questions specified in the section to which reference has been made, the case must be dismissed. 1 Stat. 85, sec. 25; 14 *id.* 386, sec. 2. Process to remove the judgment or decree from the state court to the Supreme Court is not allowed as matter of right. Instead of that, the practice is to submit the record of the state court to a Justice of the Supreme Court, whose duty it is to ascertain whether, in his opinion, any question cognizable in the appellate tribunal is involved and was decided by the proper state court in a way to justify the allowance of the writ, and if not to refuse to direct that it shall be issued.

Two other differences between the writ of error to the state court and the common law writ issued under the twenty-second section of the Judiciary Act deserve to be noticed. By the twenty-second section, no case is reexaminable unless the matter in dispute exceeds the sum or value of a prescribed amount, but the section granting the writ of error to the state court makes no reference to the value involved in the controversy, the condition being that some one of the questions specified in the section must have been raised and decided adversely to the applicant for the writ. They also differ in this, that the twenty-second section confines the appellate power to final judgments and decrees in civil cases, but the other provision, when the proper case is presented, extends to criminal as well as civil cases. *Twitchell v. The Commonwealth*, 7 Wall. 321; Phillip's Prac. (rev. ed.) 144.

Where the matter in dispute is sufficient in value, the common law writ of error to the circuit court will lie in every case, if the judgment is final in the court to which the writ of error is addressed; but the writ of error to the state court will not lie at all unless the construction of some clause of the Constitution, or some act of Congress or treaty is drawn in question and the decision was adverse to the party setting up such right or title. If those conditions concur, the writ will lie

Page 100 U. S. 285

irrespective of the amount in dispute, provided it appears that the right or title set up depends on the construction of the Constitution, an act of Congress, or some constitutional treaty. *Williams v. Norris*, 12 Wheat. 117.

Power to reexamine such cases arises under that clause of the Constitution which provides that the judicial power of the United States shall extend to all cases in law or equity arising under the Constitution, the laws of the United States, and treaties made or which shall be made under their authority. State courts have no jurisdiction whatever of cases affecting ambassadors, other public ministers, or consuls, nor of cases of admiralty and maritime cognizance. In all cases affecting ambassadors, other public ministers, and consuls, and those in which a state shall be a party, the Supreme Court, as the Constitution provides, "shall have original jurisdiction." In all other cases mentioned in the article of the Constitution granting judicial power, the provision is that "the Supreme

Court shall have appellate jurisdiction both as to law and fact, with such exceptions and under such regulations as the Congress shall make."

Early legislation of Congress gave the circuit courts original cognizance concurrent with the several states of all suits of a civil nature at common law or in equity where the matter in dispute exceeds, exclusive of costs, the sum or value of $500 and the United States are plaintiffs or petitioners, or an alien is a party, or the suit is between a citizen of a state where the suit is brought and a citizen of another state. 1 Stat. 78.

By the same section it is also provided to the effect, as before explained, that the circuit courts shall also have exclusive cognizance of all crimes and offenses *cognizable under the authority of the United States,* except as therein otherwise provided.

Jurisdiction both of civil and criminal cases is beyond doubt conferred upon the general government by several of the clauses of the third article of the Constitution describing the judicial power, entirely exclusive of that possessed by the tribunals of the states, but it is equally clear that none of them, except the introductory clause of sec. 2 of that article,

Page 100 U. S. 286

authorizes any federal court to reexamine the judgment of a state court in a criminal case or to supersede the power of a state court to exercise its lawful jurisdiction in such a case.

When the judicial system was organized under the Constitution, Congress provided, in the twenty-fifth section of the Judiciary Act, that cases falling within that clause of the judicial article of the Constitution might be reversed or affirmed upon a writ of error in the same manner and under the same regulations as if the judgment or decree had been rendered or passed in the circuit court. For eighty years that provision remained without any alteration, and the new provision, so far as respects the question before the Court, is exactly the same as the original enactment. 1 Stat. 85; 14 *id.* 386.

Earnest opposition was made to that provision when it first went into operation, and it continued to increase until it culminated in two important cases reported in the volumes containing the decisions of the Supreme Court of that period. *Martin v. Hunter's Lessee,* 1 Wheat. 304, 14 U. S. 323; *Cohens v. Virginia,* 6 Wheat. 264, 19 U. S. 375.

Attempt is made in argument to support the proceeding in this case by which the indictment was removed from the state court into the circuit court and the refusal of the circuit court to remand the same by the judgment of the Supreme Court in those two cases, but it is clear that those judgments do not afford any justification either for the proceeding or the refusal to remand, as both were transferred into the Supreme Court by writ of error under the twenty-fifth section of the Judiciary Act. Both of those cases were rightfully removed into the Supreme Court under that section of the Judiciary Act, as appears by the respective transcripts annexed to the writs of error and as appears by the countless cases since decided by this Court and a great number, probably more than one hundred, standing on the docket of the present term for reexamination.

Nor is it necessary to look beyond these cases to establish the proposition that they were reexamined under the twenty-fifth section of the Judiciary Act. Take the first case. It was an action of ejectment brought in a subordinate state court

Page 100 U. S. 287

for the recovery of a large parcel of land situated in that part of Virginia then called the Northern Neck. Service was made, and the defendant, Martin, appeared and pleaded the general issue upon the usual terms of confessing lease, entry, and ouster. Title was claimed by the defendant under a royal grant made prior to the Revolution, and he claimed that his title was protected by the treaty. Leave of court being obtained, the parties agreed as to the facts, and the subordinate court rendered judgment in favor of the plaintiff. Prompt appeal was taken by the defendant to the Court of Appeals, and the appellate court reversed the judgment of the court of original jurisdiction and rendered judgment for the defendant.

Dissatisfied with the judgment of the Court of Appeals, the plaintiff sued out a writ of error under the twenty-fifth section of the Judiciary Act, and removed the cause into this Court, where the judgment of the Court of Appeals was reversed. Pursuant to the usual course, this Court sent down its mandate to the Court of Appeals, which that court refused to execute. No new proceedings took place, but a new writ of error was sued out, and the opinion of the Court as reported is the one given in the case when brought here under the second writ of error.

the Court as reported is the one given in the case when brought here under the second writ of error.

Aid and comfort are attempted to be derived from certain remarks of the Court in that case, as warranting the proceedings in the case before the Court; but it is clear that they cannot have any such effect, as no such question was involved in the case, and of course the remarks of the Court must be understood as applicable only to the matter then in decision. Important federal questions were involved in the case, and we have the authority of the Justice who delivered the opinion for saying that the judgment drew in question and denied the validity of a statute of the United States, as appeared on the face of the record, and the Court also held that the principles and rules of decision to be applied under the second writ of error were the same as under the first, when the mandate was sent down.

Comment upon the opinion of the Court in the second case is hardly necessary, as it does not appear to contain anything relating to the present theory of the government, except that

Page 100 U. S. 288

it proves what everybody admits -- that a writ of error under the twenty-fifth section of the Judiciary Act will lie, in a proper case and when the question is properly presented, as well in a criminal as in a civil case, irrespective of the amount in controversy.

Cohens was prosecuted in a state court for vending and selling lottery tickets contrary to the statute of the state. Regular process issued and he was arrested, and the parties entered into an agreed statement of facts. Authority was given to the City of Washington under an act of Congress to permit the drawing of lotteries for effecting certain improvements in the city, and the defendant, besides pleading the general issue, pleaded a justification under the act of Congress. Extended hearing was had, and the state court rendered judgment against the defendant, and he sued out a writ of error under the twenty-fifth section of the Judiciary Act, and removed the cause into this Court.

Due appearance was entered for the state, and her counsel moved to dismiss the case for want of jurisdiction. Three causes were assigned in the motion for the dismissal of the writ of error:

1. That a state is the defendant.

2. That no writ of error lies from this Court to a state court.

3. That the Supreme Court had no right to review the judgment of the state court because neither the Constitution nor any law of the United States had been violated by the judgment of the state court.

Extreme views were advanced on behalf of the state, among which was the proposition that the Constitution did not provide any tribunal for its final construction, and that in the last resort, the courts of the respective states may exercise that power. Responding to that extraordinary proposition, Marshall, C.J., speaking for the Court, said that jurisdiction is given to the courts of the Union in two classes of cases. In the first, their jurisdiction depends on the *character of the cause,* whoever may be the parties, and comprehends "all cases in law and equity arising under the Constitution, the laws of the United States, and treaties made or which shall be made under their authority," and he added that that clause extends the jurisdiction to all the cases described, without making in its

Page 100 U. S. 289

terms any exception whatever, and without any regard to the condition of the party.

His description of the second class is that it comprehends controversies between two or more states, between a state and a citizen of another state, and between a state and foreign states, citizens, or subjects. Of course the second proposition of the Chief Justice must be subject to what is ordained in the Eleventh Amendment to the Constitution. 2 Story, Const., sec. 1724.

Original jurisdiction is vested in the Supreme Court in certain enumerated cases, and the Constitution also gives the same tribunal appellate jurisdiction in all other specified cases. Among those in which the jurisdiction must be exercised in the appellate form are cases arising under the first clause of the second section, including such as relate to the construction of the Constitution, the acts of Congress, and treaties. If a state is a party, the jurisdiction is original, except when the cases arise under the first clause of the second section, in which event the jurisdiction is appellate, as in such a case the jurisdiction can only be practically exercised in that form. Where a

state is a party and the case is such as to admit of its originating in the Supreme Court, in the opinion of the Chief Justice as there expressed, the case ought to originate in the Supreme Court; but where, from the nature of the case, it cannot originate here, he holds that the proper construction of the clause is that the jurisdiction is appellate.

When correctly understood, it is clear that the second case cannot have any tendency whatever to support the proposition that an indictment for willful and felonious murder with malice aforethought, pending in a state court and found by a grand jury of the state under a statute of the state, not involving any federal question, may be removed from the state court into the circuit court for trial merely because the prisoner at the time he committed the homicide was a deputy collector of the internal revenue.

Such a proposition, unsupported as it is by any respectable judicial authority, is only calculated to excite amazement, as the case cited is a direct and conclusive authority the other way, showing to a demonstration that the federal courts cannot exercise

Page 100 U. S. 290

any jurisdiction whatever in a criminal case properly pending in a state court unless it involves some question arising under the first clause of the second section of the article describing the judicial power conferred by the Constitution. 2 Story, Const., secs. 1721, 1740; 1 Kent, Com. (12th ed.) 299; Sergeant, Const., 59; Curtis, Com., sec. 9; Pomeroy, Const. (2d ed.), sec. 760.

Commentators on the Constitution seem to agree that Congress enacted the twenty-fifth section of the Judiciary Act in order to define the classes of cases originating in state tribunals to which the appellate power of the national courts might extend by means of the writ of error, to preserve the supremacy and to secure the uniform construction of the Constitution, acts of Congress, and international treaties. Curtis, Com., sec. 210.

All agree that the original jurisdiction of the Supreme Court is defined and limited by the Constitution, and that it can neither be extended nor restricted by an act of Congress, and it is equally undeniable that the appellate jurisdiction of that tribunal is granted subject to such exceptions and regulations as the Congress may make, from which it follows that appellate jurisdiction can only be exercised by the Supreme Court in such cases and to such extent as the acts of Congress authorize. *Wiscart v. Dauchy,* 3 Dall. 321, 327 [argument of counsel -- omitted]; 1 Kent, Com. (12th ed.) 324; *Clarke v. Bazadone,* 1 Cranch 212.

Acts of Congress having been passed providing for the exercise of appellate judicial power, the established rule is that the affirmative description of the cases in which the jurisdiction may be exercised implies a negative on the exercise of such power in all other cases. *Durousseau v. The United States,* 6 Cranch 307, 10 U. S. 314; *United States v. More,* 3 Cranch 159, 170 [argument of counsel -- omitted].

Legislative power is undoubtedly vested in Congress to pass laws to define and punish offenses against the authority of the United States, but it does not follow by any means that a prisoner charged with murder committed in violation of the laws of a state may claim to be tried in a federal circuit court, or that a state indictment for such an offense constitutes a case arising under the Constitution or the laws of the United States, or that it can in any way become cognizable in such

Page 100 U. S. 291

a tribunal, certainly not unless it can be removed there in pursuance of some act of Congress defining the offense and providing for the trial and punishment of the offender. Persons charged with offenses against the authority of the states find ample guaranties of a fair trial in the laws of the states and the usages of the state courts, and if the federal officers need more, it belongs to Congress to provide the remedy in some mode authorized by the Constitution. 1 Kent, Com. (12th ed.) 340.

Adjudged cases admit that the power of removal, instead of the writ of error, as prescribed in the twenty-fifth section of the Judiciary Act, may also be exerted when the subject matter of the suit is such as to bring the case within the first clause of the second section of the article describing the federal judicial power. Frequent cases of the kind of a civil nature arise, and if they could not be transferred to the circuit courts by removal under proper regulations, it might often happen that the object intended to be accomplished by the appellate tribunal would be defeated. Appellate power in the cases mentioned in the provision before referred to is given in the Constitution, and it is left to Congress to enact the manner of its exercise. Curtis, Com., sec. 148; *Martin v. Hunter's Lessee,* 1

Wheat. 304, 14 U. S. 349.

Whether the appellate power is employed by removal or writ of error, the right and extent of jurisdiction is the same, and in both the extent is limited by the constitutional grant, and cannot be extended beyond cases in law and equity arising under the Constitution, the acts of Congress, and such treaties as are therein described.

Legislative provision of a restricted character for the removal of civil causes from the state courts into the circuit courts was made by the Judiciary Act which was passed to organize our judicial system. 1 Stat. 79. Since that, many other acts of Congress have been passed upon the subject, by which the power in civil cases has been very much enlarged. Proceedings were also prescribed by a later act, not now in force, which authorized the officers appointed for the collection of the customs to remove any suit or prosecution commenced or pending against them in a state court, for acts done by them

Page 100 U. S. 292

as such officers or under color of their respective offices, into the circuit court for trial, but the Court is not furnished with any evidence that any such jurisdiction was ever exercised by the circuit court under that enactment in a criminal prosecution. 3 Stat. 198.

Special reference is also made to the second section in the still later act of Congress, usually denominated the Force Bill. 4 Stat. 632. Jurisdiction of the circuit courts was by that section extended to all cases in law and equity arising under the revenue laws for which other provisions are not already made by law, and provision was made to the effect that any revenue officer injured in his person or property on account of any act done by him for the protection of the revenue might maintain a suit for such damages in the circuit court for the district where the wrongdoer resided.

Property taken or detained by a revenue officer was declared to be irrepleviable, and that it should be deemed in the custody of the law and subject only to the orders and decrees of the federal court having jurisdiction of the same. Offenders who should dispossess or rescue or attempt to dispossess or rescue any property so taken or detained were to be deemed guilty of a misdemeanor and punished as therein directed.

Sec. 3 of the same act empowered any such revenue officer to remove any suit or prosecution commenced against him in a state court on account of any act done by him for the protection of the revenue into the proper circuit court for trial in the mode therein prescribed.

Properly construed, the act, as originally passed, was intended to furnish protection to the officers engaged in collecting import duties, and a subsequent act provided that it should not be so construed as to apply to cases arising under the internal revenue acts. Unlike that, the fiftieth section of the act to increase duties on imports extended the provisions of the act to cases arising under the laws for the collection of internal duties. Had legislation stopped there, it would be correct to say that the Force Bill is still in force; but the still later act, passed July 13, 1866, repealed that section altogether, subject to a proviso inapplicable to the present case. *Philadelphia v. Collector,* 5 Wall. 728; 13 Stat. 241; 14 *id.* 172;

Page 100 U. S. 293

*Hornthall v. Collector,* 9 Wall. 560, 76 U. S. 566; *Assessors v. Osborne,* 9 Wall. 567, 76 U. S. 573.

Much stress in the argument was laid upon the word "prosecution," found in the third section of the act, but neither the written nor the oral argument furnished any evidence to show that any indictment found in the state where the difficulty arose which induced Congress to pass the act was ever removed from the state court into the circuit court for trial, and it is well known as a historical fact that no such removal of an indictment in that state was ever made. Civil cases pending in the tribunals of other states were in several instances removed under that act into the circuit court and were there adjudicated to final judgment, but there is no authentic account that any state indictment for an offense against the authority of a state was ever removed under that act into the circuit court for trial or sentence.

Grave doubts are entertained whether the Congress, in the use of the word "prosecution," intended to extend the operation of the act to such an indictment, as ample provision existed at the time of its passage for the reexamination of every question of federal cognizance arising on the trial of such an indictment, by a writ of error sued out pursuant to the authority given in the twenty-fifth section of the Judiciary Act. 1 Kent, Com. (12th ed.) 219.

Litigations of a civil nature, even when the jurisdiction of the circuit court depends entirely upon the character of the parties, may, under regulations enacted by Congress, be removed from the state court into the circuit court for trial, but there is no just pretense that a state indictment for an offense against the authority of the state can be removed from the state court where found into the circuit court for trial in any form of proceeding, unless the case, whether a suit at law or in equity, involves some question arising under the Constitution, the laws of Congress, or treaties made or which shall be made under their authority. *Com. v. Casey*, 12 Allen 214, 217.

Nothing is contained in the section which has any tendency to support the opposite construction except the words "suit or prosecution," and it should not be overlooked that it employs

Page 100 U. S. 294

no words exclusively applicable to an indictment, and contains many expressions utterly repugnant to the theory that the proceedings to effect the removal of process were intended to extend to a criminal and indictable offense.

Every word of the section speaks a different intent, is as conclusively shown by the distinguished judge who gave the opinion of the court in the case last cited. Confirmation of that view is also derived from the fact that every reported case, where the removal was effected under that act, was a civil action, as appears from the following examples: *Wood v. Matthews*, 2 Blatch. 370; *Murray v. Patrie*, 3 *id.* 342; *Fisk v. The Union Pacific Railroad Co.*, 6 *id.* 362; *s.c.*, 8 *id.* 243; *Tod, Relator v. Fanfield Com. Pleas*, 15 Ohio St. 377, 387.

Formal application to the Supreme Court of Maine was made under that act of Congress to remove an indictment for an offense against the authority of the state into the circuit court of the district for trial, but the court unanimously denied the application for the same reasons as those given by the Supreme Court of Massachusetts in the case before cited. *State v. Elder*, 54 Me. 381.

Taken together, these two cases ought to be regarded as decisive that a state indictment for an offense against the authority of the state could not be removed from the state court, under that act of Congress, into the circuit court for trial. Subordinate federal courts find no other rules to guide them in the exercise of their functions than are to be found in the acts of Congress, and they can have no other recourse than to those enactments to determine what constitutes an offense against the authority of the United States. Conkling's Treatise (5th ed.) 181. Offenses against the nation are defined and their punishment prescribed by acts of Congress. Cooley, Const.Lim. (4th ed.) 26.

Like power was given to the defendant by the act relating to habeas corpus for the removal into the circuit courts after judgment of suits or prosecutions commenced in a state court against officers, civil or military, for acts done or committed by virtue of an order of the President or pursuant to an act of Congress. 12 Stat. 756.

Pending an action in a state court against a marshal in

Page 100 U. S. 295

which the verdict and judgment were in favor of the plaintiff, the defendant instituted proceedings in the state court for the removal of the cause into the circuit court, but the state court refused to send up the case. Thereupon the circuit court issued an alternative mandamus to the state court, which was followed by the peremptory process, when the plaintiff sued out a writ of error, and removed the cause into this Court. Due hearing was had here, and this Court unanimously held that so much of the act as provided for the removal of a judgment in a state court, in which the issue was tried by a jury, is not in pursuance of the Constitution, and is void. *The Justices v. Murray*, 9 Wall. 274; *McKee v. Rains*, 10 Wall. 22, 77 U. S. 25.

Governed by that rule of decision, it must be considered that the power of removal, when the facts have been found by a jury, cannot be exercised in such a case after judgment.

Statutory power to remove an action from a state court into the circuit, says Judge Story, if it exists before judgment because it is included in the appellate power, must exist after judgment for the same reason, as he held that the same objection exists as to the removal before judgment as after, and that both must stand or fall together. *Martin v. Hunter's Lessee*, 1 Wheat. 304, 14 U. S. 349; 2 Story, Const., sec. 1745.

None of the advocates of the power of removal as applied to criminal cases pretend that it may be exercised after judgment in any other mode than by a writ of error; from which it would seem to follow, if the authorities cited

are good law, that a state indictment for an offense against the authority of the state cannot be removed at all into the circuit court for trial, nor into the Supreme Court, except by writ of error.

Sec. 643 of the Revised Statutes, under which the removal in this case was made, is a revision of the sixty-seventh section of the Act to U.S. Reduce Internal Taxation. 14 Stat. 171. Officers appointed under that act may, before trial, in any case, civil or criminal, where suit or prosecution is commenced against them in a state court, remove the said suit or prosecution into the circuit court for trial. Rev.Stat. 643.

Further remarks in exposition of the enactment seem to be unnecessary, as it is clear that it is in all essential respects the

Page 100 U. S. 296

same as its predecessors, some of which were passed and went into operation even before the actual close of the second war of Independence.

Considering the long period the provision has been in operation, it would naturally be expected, if it was intended by its framers to include state indictments pending in state courts for offenses against the authority of the state, that the advocates of such a construction would be able to produce some authoritative exposition of the enactment to support such an improbable and extraordinary theory. Nothing of the kind is produced, and for the best possible reason -- that no removal of such an indictment from a state court into the circuit court for trial was ever before made in our judicial history.

Should it be suggested that a recent case, cited in the brief for the prisoner, is a precedent where a criminal case was removed from a state court into the circuit court for trial, the answer to the suggestion is that the case does not support the proposition, for several reasons:

1. Because the order of removal was never carried into effect.

2. Because nothing was done in the circuit court except to pass the order for removal.

3. Because the opinion of the court as reported admits that the circuit courts have no power to try offenses against the peace and dignity of the state, nor to control the state courts in any such case.

4. Because the court admits in that case that no man charged with an offense against the authority of the state can defend himself by the fact that he is a federal officer.

5. Because it does not appear that the state indictment was ever transferred into the circuit court for trial.

6. Because it appears that the court giving the opinion in that case entirely overlooked the settled rule that the circuit courts have no jurisdiction of any act of an individual as an offense unless the same is defined as such by an act of Congress nor unless some act of Congress prescribes the punishment annexed to the commission of the offense and designates the court to try and sentence the offender.

7. Because the indictment, for aught that appears to the contrary, is still pending in the state court, the report failing to show that it has ever been in fact transferred into the circuit court. *State v. Hoskins,* 77 N.C. 530, 546.

Page 100 U. S. 297

Viewed in any light, the proposition to remove a state indictment for felony from a state court having jurisdiction of the case into the circuit court, where it is substantially admitted that the prisoner cannot be tried until Congress shall enact some mode of procedure, approaches so near to what seems to me both absurd and ridiculous, that I fear I shall never be able to comprehend the practical wisdom which it doubtless contains. Were the object to give felons an immunity to commit crime and to provide a way for their escape from punishment, it seems to me that it would be difficult to devise any mode more effectual to that end than the theory embodied in that proposition.

Difficulties almost without number would arise if any attempt should be made to try such an indictment in a circuit court.

It was suggested at the argument that the attorney general of the state might appear in the circuit court as the public prosecutor, but he may not deem it any part of his duty to conduct criminal prosecutions in any other tribunals than those of the state from which he received his commission. Public prosecutions against the authority

294 Conn. 1
Supreme Court of Connecticut.

STATE of Connecticut
v.
FERNANDO A.*

Nos. 18045, 18103.
|
Argued March 12, 2008.
|
Decided Nov. 3, 2009.

**Synopsis**
**Background:** Defendant requested an evidentiary hearing to contest the continuation of domestic violence protective order that prevented him from entering family home and contacting wife. The Superior Court, Judicial District of Stamford–Norwalk, Bingham, J., denied request. Defendant appealed.

The Supreme Court, en banc, Norcott, J., held that defendant was not entitled to an initial evidentiary hearing on protective order at arraignment, but he was entitled to a subsequent evidentiary hearing regarding the continued necessity of the protective order.

Affirmed in part, reversed in part, and remanded.

Schaller, J., filed opinion concurring in part and dissenting in part.

Palmer, J., filed opinion dissenting in part.

**Attorneys and Law Firms**

**\*\*429** Steven D. Ecker, Hartford, with whom was Alinor C. Sterling, Branford, for the appellant (defendant).

Robert J. Scheinblum, senior assistant state's attorney, with whom, on the brief, were David I. Cohen, state's attorney, Kevin J. Dunn, assistant state's attorney, and David R. Applegate, deputy assistant state's attorney, for the appellee (state).

Richard Blumenthal, attorney general, and Jane R. Rosenberg and Susan Quinn Cobb, assistant attorneys general, filed a brief for the department of children and families as amicus curiae.

Hakima Bey–Coon filed a brief for the office of the victim advocate as amicus curiae.

Daniel J. Foster filed a brief for the American Civil Liberties Union Foundation of Connecticut as amicus curiae.

Anne C. Dranginis and Proloy K. Das, Hartford, filed a brief for the Connecticut Coalition Against Domestic Violence as amicus curiae.
ROGERS, C.J., and NORCOTT, PALMER, VERTEFEUILLE, ZARELLA, SCHALLER and McLACHLAN, Js.[1]

Opinion

NORCOTT, J.

*4 In this public interest appeal, we consider the nature of the hearing that a defendant must receive prior to the issuance of a criminal protective order in a family violence case (criminal protective order) pursuant to General Statutes § 54–63c(b).[2] The defendant, Fernando A., appeals, **430 upon the grant of his *5 application filed pursuant to General Statutes § 52–265a,[3] from the trial court's denial of his **431 request for an *6 evidentiary hearing prior to the issuance of a criminal protective order. We conclude that § 54–63c(b), and the cross-referenced General Statutes § 46b–38c,[4] permit *7 the trial court to issue **432 a criminal protective order at the defendant's arraignment after consideration of oral argument and the family violence intervention unit's report (family services report). We also conclude that the trial court is required to hold, at the defendant's request made at the initial hearing, a subsequent hearing within a reasonable period of time at which the state will be required to prove the continued necessity of that order by a fair preponderance of the evidence, *8 which may include reliable hearsay. Because the defendant did not receive this subsequent hearing as requested, we reverse the decision of the trial court.

The record reveals the following undisputed facts and procedural history. The defendant and his wife are involved in divorce proceedings. On October 14, 2007, the defendant was arrested on numerous family violence criminal charges arising from an incident wherein he allegedly had assaulted his wife.[5] Pursuant to § 54–63c(b), the police released the defendant that day on the conditions that he not enter the family home and that he avoid contact with his wife pending his first court appearance. At that appearance on October 15, 2007, the trial court, Pavia, J., reviewed the family services report, and issued a criminal protective order as a condition of his pretrial release. Judge Pavia denied the defendant's request for an evidentiary hearing at that time, reasoning that "immediate judicial review of this matter is necessary to protect the safety and well-being of the victim and the family," and that "the need for expeditious assumption of judicial control following a defendant's arrest outweighs the need to minimize risk of error through adversary procedures." Judge Pavia then continued the case to October 18, 2007, so that the defendant could request a hearing on that date.

**433 Subsequently, on October 18, 2007, the defendant appeared before the trial court, Bingham, J., to request an evidentiary hearing to contest the continuation of the criminal protective order. The defendant argued that he was entitled to a full evidentiary hearing under both § 54–63c and the due process clause of the fourteenth *9 amendment to the United States constitution[6] because the criminal protective order interfered with his "fundamental constitutional liberties to family integrity: his right to be in his home, and not to be subject to a restraining order issued by a court and law enforcement authorities without judicial imprimatur." Judge Bingham denied the defendant's request for an evidentiary hearing, reasoning that the procedure for issuing a domestic violence protective order in criminal cases "is similar to a bail hearing, and you're not entitled to a full trial on a bail hearing."[7] See also footnote 26 of this opinion. This certified and expedited appeal followed.[8] See footnote 3 of this opinion.

On appeal, the defendant contends, inter alia, that the trial court improperly failed to conduct an evidentiary hearing prior to issuing a criminal protective order because § 54–63c(b) "expressly require[d]" the trial court to hold such a hearing when he first appeared in court. The defendant argues that the word "hearing," as used in § 54–63c(b), means an adversarial and formal adjudicative proceeding at which issues of fact and law are tried, evidence is taken, and witnesses and parties are heard. The defendant further contends that the cross-reference in § 54–63c(b) to § 46b–38c, the family violence criminal procedure statute that authorizes courts to impose criminal protective orders at the defendant's *10 first court appearance; see footnote 4 of this opinion; requires that the criminal statute be applied consistently with the similarly worded General Statutes § 46b–15,[9] which, **434 he argues, contemplates a full evidentiary hearing within fourteen days of the ex parte issuance *11 of a civil domestic violence temporary restraining order. Finally, the defendant cites the legislative history of the statutes, and also relies on the rule of lenity, under which ambiguous criminal statutes are construed against the state.

In response, the state contends that criminal protective orders arise from bail or pretrial release proceedings that do not by themselves require an evidentiary hearing. The state also argues that, when the legislature enacted No. 07–123, § 1, of the 2007 Public Acts (P.A. 07–123), which amended § 54–63c (b), it presumptively *12 was aware of State v. Doe, 46 Conn.Supp. 598, 610, 765 A.2d 518

(2000), which **435 held that an evidentiary hearing is not constitutionally required prior to the issuance of a criminal protective order under § 46b–38c. Thus, had the legislature intended to require a full evidentiary hearing, it would have drafted § 54–63c(b) using language similar to that contained in the witness protective order statute, General Statutes § 54–82r.[10] Finally, the *13 state argues that the rule of lenity is inapplicable because it applies only when the statutory language, legislative history and underlying policies fail to resolve the ambiguity. Although we agree with the state that §§ 54–63c(b) and 46b–38c(d) permit the trial court to issue a criminal protective order at arraignment after consideration of oral argument and the family services report, we also conclude that those statutes require the trial court to hold, at the defendant's request made at the initial hearing, a subsequent hearing within a reasonable period of time wherein the state will be required to prove the continued necessity of that order by a fair preponderance of the evidence, which may include reliable hearsay.[11]

**436 "Issues of statutory construction raise questions of law, over which we exercise plenary review.... The process of statutory interpretation involves the determination of the meaning of the statutory language as applied to the facts of the case, including the question of whether the language does so apply....

"When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature.... In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, *14 including the question of whether the language actually does apply.... In seeking to determine that meaning, General Statutes § 1–2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered.... The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation." (Citation omitted; internal quotation marks omitted.) *Felician Sisters of St. Francis of Connecticut, Inc. v. Historic District Commission,* 284 Conn. 838, 847, 937 A.2d 39 (2008).

We begin with the text of § 54–63c(b), which authorizes police officers in "family violence crime" cases, after making "reasonable," but unsuccessful, attempts to reach a bail commissioner, to "order the release of such person upon the execution of a written promise to appear or the posting of such bond as may be set by the police officer and may impose nonfinancial conditions of release which may require that the arrested person do one or more of the following: (1) Avoid all contact with the alleged victim of the crime, (2) comply with specified restrictions on the person's travel, association or place of abode that are directly related to the protection of the alleged victim of the crime, or (3) not use or possess a dangerous weapon, intoxicant or controlled substance...."[12] **437 Section 54–63c(b) then *15 provides that: "Any nonfinancial conditions of release imposed pursuant to this subsection shall remain in effect until the arrested person is presented before the Superior Court pursuant to subsection (a) of section 54–1g.[13] *On such date, the court shall conduct a hearing pursuant to section 46b–38c at which the defendant is entitled to be heard with respect to the issuance of a protective order."* (Emphasis added.)

The text of § 54–63c(b) does not specify the nature of the hearing other than describing it as one held "pursuant to section 46b–38c," upon being presented to the trial court pursuant to General Statutes § 54–1g(a). Thus, § 54–63c (b) must be read in conjunction with § 46b–38c(a), which establishes "family violence *16 response and intervention units in the Connecticut judicial system to respond to cases involving family violence ... [which] shall be coordinated and governed by formal agreement between the Chief State's Attorney and the Judicial Department." Each geographical area of the Superior Court has a "local family violence intervention unit"; General Statutes § 46b–38c(b); that is required to: "(1) [a]ccept referrals of family violence cases from a judge or prosecutor, (2) prepare written or oral reports on each case for the court by the next court date to be presented at any time during the court session on that date, (3) provide or arrange for services to victims and offenders, (4) administer contracts to carry out such services, and (5) establish centralized reporting procedures...." General Statutes § 46b–38c(c); see also footnote 4 of this opinion.

Subsection (d) of § 46b–38c prescribes only certain limited aspects of the hearing process and provides: "In all cases of family violence, a written or oral report and recommendation of the local family violence intervention unit shall be available to a judge at the first court date appearance to be presented at any time during the court session on that date...." With the family services report

available to it, the trial court then is authorized to "consider and impose the following conditions to protect the parties, including, but not limited to: (1) Issuance of a protective order pursuant to subsection (e) of this section; (2) prohibition against subjecting the victim to further violence; (3) referral to a family violence education program for batterers; and (4) immediate referral for more extensive case assessment...." General Statutes § 46b–38c(d); see also footnote 4 of this opinion.

Similar to § 54–63c(b), the text of § 46b–38c(d) does not specify the precise nature of how the hearing shall be conducted, or what the defendant's rights are therein. Because the term "hearing" is "not defined in *17 the statute, General Statutes § 1–1(a) requires that we construe the term in accordance with the commonly approved usage of the language.... If a statute or regulation does not sufficiently define a term, it is appropriate to look to the common understanding of the term as **438 expressed in a dictionary." (Citation omitted; internal quotation marks omitted.) *Jim's Auto Body v. Commissioner of Motor Vehicles*, 285 Conn. 794, 808, 942 A.2d 305 (2008). The word "hearing" is defined alternatively as an "opportunity to be heard, to present one's side of a case, or to be generally known or appreciated," "a listening to arguments" or "a preliminary examination in criminal procedure...." Merriam–Webster's Collegiate Dictionary (10th Ed. 1993). Similarly, Black's Law Dictionary (7th Ed. 1999) defines "hearing" as a "judicial session, usu[ally] open to the public, held for the purpose of deciding issues of fact or of law, *sometimes with witnesses testifying* ...." (Emphasis added.) Resorting to these dictionary definitions does not answer conclusively the question of whether a hearing under § 54–63c(b) must be evidentiary in nature. The statute is, therefore, ambiguous, and we may consult extratextual sources in resolving this issue. See General Statutes § 1–2z.

The legislative history of both §§ 46b–38c and 54–63c(b) similarly does not disclose clearly the nature of the hearing required. The history of P.A. 07–123, codified in part at § 54–63c(b), indicates only that the statute was enacted to authorize police officers, in the event that "reasonable efforts" to locate a bail commissioner failed, to impose nonfinancial conditions of release pending the defendant's first appearance before the trial court. See 50 S. Proc., Pt. 11, 2007 Sess., p. 3390, remarks of Senator Andrew McDonald (noting "problem in our domestic violence laws and domestic family relations laws with the setting of bail conditions when an individual is arrested, most normally, over the weekend"); *18 see also 50 H.R. Proc., Pt. 12, 2007 Sess., pp. 3875–76, remarks of Representative Michael Lawlor (authority of police to impose nonfinancial conditions is limited to "between the time the person is actually arrested and released, and the time the courts actually open, which would typically be the next day, or in the case of a Friday night or Saturday arrest, on Monday morning"). In enacting P.A. 07–123, the legislature recognized that giving police officers this authority to impose release conditions would avoid the unnecessary detention of defendants, while providing additional and formal protection for complainants pending the defendant's first court appearance. See 50 H.R. Proc., supra, at pp. 3886–88; see also id., at p. 3895, remarks of Representative Kevin Witkos ("[o]ftentimes prior to this, the party was taken out of the home, brought down to the police station and the victim remained at home unknowing whether that person would return home to cause greater harm").

The legislative history of the cross-referenced § 46b–38c similarly fails to illuminate the nature of the required hearing. That statute was enacted in 1986 in response to the domestic abuse of Tracey Thurman, a woman whose local police department had failed to aid her after repeated beatings by her former husband. See 29 H.R. Proc., Pt. 14, 1986 Sess., pp. 5258–59, remarks of Representative Pauline Kezer. The legislature created family violence response and intervention units to accept referrals of family violence cases from judges or prosecutors, and prepare family services reports and recommendations for the court based on interviews of the complainant and the defendant. See General Statutes § 46b–38c(c) and (d). The legislative history of § 46b–38c does not, however, explain further the nature of the hearing that should be held before the trial court on the defendant's first court date.

*19 Other factors, however, lead us to conclude that the legislature did not **439 intend for a hearing held pursuant to §§ 54–63c(b) and 46b–38c(d) to be a full evidentiary proceeding akin to a minitrial. In particular, we note that "[t]he legislature is presumed to know the judicial interpretation placed upon a statute"; *Charles v. Charles*, 243 Conn. 255, 262, 701 A.2d 650 (1997), cert. denied, 523 U.S. 1136, 118 S.Ct. 1838, 140 L.Ed.2d 1089 (1998); and that the legislature "is presumed ... to be cognizant of judicial decisions relevant to the subject matter of a statute ... and to know the state of existing relevant law when it enacts a statute." (Citations omitted; internal quotation marks omitted.) *State v. Dabkowski*, 199 Conn. 193, 201, 506 A.2d 118 (1986).

Thus, it is significant that the language of § 54–63c(b) contemplates that the criminal protective order hearing held pursuant to § 46b–38c will be held in conjunction with an arraignment pursuant to § 54–1g(a). This is because the Superior Court, in the 2000 decision in *State v. Doe,* supra, 46 Conn.Supp. at 598, 765 A.2d 518, relied on *Gerstein v. Pugh,* 420 U.S. 103, 119, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), and concluded that a hearing held pursuant to § 46b–38c, at which the defendant did not have the opportunity to cross-examine the complainant prior to the issuance of a criminal protective order in a family violence case, did not violate the defendant's due process rights because it was a bail related hearing that required "the need for expeditious assumption of judicial control...." (Internal quotation marks omitted.) *State v. Doe,* supra, at 609, 765 A.2d 518. The court reasoned that "the defendant may at any time have the conditions of his release modified pursuant to General Statutes § 54–69.[14] **\*20** At that time, the defendant is entitled to have a full hearing." Id., at 610, 765 A.2d 518. Thus, when the legislature amended § 54–63c (b) by enacting P.A. 07–123, it presumably was aware of a published decision concluding that a full adversarial hearing was not constitutionally required for the initial issuance at arraignment of a criminal protective order pursuant to § 46b–38c. Accordingly, we find it significant that the legislature failed to amend the statute by imposing specific hearing requirements when it enacted P.A. 07–123.[15] **\*\*440** See, e.g., *Mahon v. B.V. Unitron Mfg., Inc.,* 284 Conn. 645, 665, 935 A.2d 1004 (2007) ("[a]lthough we are aware that legislative inaction is not necessarily legislative affirmation ... we also presume that the legislature is aware of [the court's] interpretation of a statute, and that its subsequent nonaction may be understood as a validation of that interpretation" [internal quotation marks omitted]).

**\*21** We also are "guided by the principle that the legislature is always presumed to have created a harmonious and consistent body of law.... [T]his tenet of statutory construction ... requires us to read statutes together when they relate to the same subject matter.... Accordingly, [i]n determining the meaning of a statute ... we look not only at the provision at issue, but also to the broader statutory scheme to ensure the coherency of our construction.... Where a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject ... is significant to show that a different intention existed.... That tenet of statutory construction is well grounded because [t]he General Assembly is always presumed to know all the existing statutes and the effect that its action or non-action will have upon any one of them." (Citations omitted; internal quotation marks omitted.) *Hatt v. Burlington Coat Factory,* 263 Conn. 279, 310, 819 A.2d 260 (2003).

A review of other criminal procedure statutes demonstrates that, when the legislature has desired to impose specific requirements on the conduct of a pretrial hearing, it has said so explicitly. For example, § 54–82r, which authorizes courts to impose protective orders prohibiting the harassment of witnesses in criminal cases; see footnote 10 of this opinion; is drafted similarly to § 54–63c. Unlike the family violence statute, however, the legislature specifically required in § 54–82r(a) that a judge considering the entry of a protective order for the benefit of a witness hold a "hearing at which hearsay evidence shall be admissible" and "[find] by a preponderance of the evidence that harassment of an identified witness in a criminal case exists or that such order is necessary to prevent and restrain the commission of a violation of section 53a–151 or 53a–151a. *Any adverse party named in the complaint has the right to present evidence and cross-examine witnesses* **\*23** *at such hearing* ...." (Emphasis added.) Similarly, General Statutes § 54–64f,[16] which authorizes trial **\*\*441** courts to impose different conditions or to revoke the bail of defendants who have violated the "reasonable conditions" of their releases, similarly requires an "evidentiary hearing at which hearsay or secondary evidence shall be admissible," along with a finding of the violation "by clear and convincing evidence...." General Statutes § 54–64f (b) and (c). Thus, the text of related criminal procedure statutes indicates that, had the legislature intended the initial criminal protective order hearing to be evidentiary in nature in every case, it easily could have so required.[17] See *In re Ralph M.,* 211 Conn. 289, 307, 559 A.2d 179 (1989) ("the absence of any language in [General Statutes] § 46b–127 confining the court to the rules of evidence in a hearing to determine probable cause at the transfer stage of [the juvenile court] proceedings is a compelling indication that strict evidentiary standards were not intended to apply in such a proceeding"). Indeed, this lack of procedural requirements, beyond the mandated availability of the family relations report, leads us to conclude that the legislature intended for trial courts to have some discretion to determine the scope of the hearing necessary prior to the initial issuance of a criminal protective order in a family violence case.

Moreover, our construction of § 46b–38c(d) necessarily is informed by the various exigencies faced by a trial court considering whether to grant a criminal protective order in a family violence case. Thus, we emphasize that the legislature did not intend for §§ 54–63c(b) and 46b–38c to entitle a defendant to an evidentiary hearing beyond consideration of the parties' arguments and the family

services report prior to the *initial* issuance of a criminal protective order at arraignment, which may well occur within hours of the alleged incident of family violence. See General Statutes § 54–63c(b) (stating only that "defendant is entitled to be heard" at § 46b–38c hearing held at arraignment); see also *State v. Doe,* supra, 46 Conn.Supp. at 609–10, 765 A.2d 518 (procedural due process does not require that defendant receive evidentiary *24 hearing prior to *initial* issuance of criminal protective order or similar condition of release at arraignment). This reflects the potential need for **442 immediate judicial intervention to restore order and safety in the home, as embodied in the legislature's enactment of P.A. 07–123, which allows police officers to impose temporary criminal protective orders as a release condition even prior to the defendant's arraignment. In our view, this limitation also reflects legislative recognition of the heavy flow of judicial business in the busy geographical area courts during arraignment sessions, the press of which is well described by Justice Schaller in his concurring and dissenting opinion. See *People v. Forman,* 145 Misc.2d 115, 128, 546 N.Y.S.2d 755 (1989) ("the emergency nature of the decision, as well as the practical difficulties inherent in convening an immediate evidentiary hearing, mitigate against the imposition of such hearings as constitutionally required before a [temporary order of protection] may first be issued at arraignment").

We agree, however, with the defendant's claims that the extended effects of that initial emergency order may well cause a defendant significant pretrial deprivations of family relations and/or property.[18] This concern, *25 and the legislature's desire to satisfy the defendant's due process rights under the fourteenth amendment to the United States constitution, is reflected in the comments of the sponsor of the bill enacted as P.A. 07–123, who viewed it as an attempt to "strike a very delicate balance here between the legitimate interests of law enforcement, and the important constitutional and civil liberty concerns that we would have [as] citizens...." 50 H.R. Proc., supra, at p. 3904, remarks of Representative Lawlor. Accommodation of this legislative desire to comply with the dictates of due process, and the statutes' silence as to the precise nature of the hearing required; see *Curry v. Allan S. Goodman, Inc.,* 286 Conn. 390, 407, 944 A.2d 925 (2008) (" '[w]hen ... a statutory provision is silent with respect to [the issue at hand], our analysis is not limited by ... § 1–2z' "); leads us to conclude also that, after a criminal protective order has been issued at arraignment, a defendant is entitled, upon his request made at that time, to a more extensive **443 hearing to be held within a reasonable period of time about the continued necessity of that order. At that second hearing, the state bears the burden of proving,[19] by a fair preponderance of the evidence, *26 the continued necessity of the criminal protective order in effect since the defendant's arraignment.[20] Cf. *Frizado v. Frizado,* 420 Mass. 592, 597, 651 N.E.2d 1206 (1995) (although not expressly provided for by statute, party seeking civil domestic violence protective order must make case for relief by preponderance of evidence); *In re Morrill,* 147 N.H. 116, 117–18, 784 A.2d 690 (2001) (same); *Steckler v. Steckler,* 492 N.W.2d 76, 80 (N.D.1992) (same); *Felton v. Felton,* 79 Ohio St.3d 34, 42, 679 N.E.2d 672 (1997) (same); accord General Statutes § 54–82r(a) (preponderance of evidence standard applies at hearing to determine whether protective order is necessary for witness); *State v. Doe,* supra, 46 Conn.Supp. at 610, 765 A.2d 518 (applying preponderance of evidence standard in criminal protective order case).

With respect to the type of proof required at this subsequent hearing, we further conclude that, inasmuch *27 as the legislature has not required the introduction of evidence that conforms strictly with the rules of evidence; see *In re Ralph M.,* supra, 211 Conn. at 307, 559 A.2d 179; the state may, consistent with the defendant's federal due process rights, proceed by proffer, supported by reliable hearsay evidence, and the trial court retains the discretion to determine whether testimony from the complainant or other witnesses is necessary for the order to continue.[21] Cf. **444 *28 *United States v. LaFontaine,* 210 F.3d 125, 130–32 (2d Cir.2000) (government may proceed by proffer, and defendant's right to call government witness at hearing to revoke bail based on witness intimidation lies within discretion of trial court); *United States v. Smith,* 79 F.3d 1208, 1210 (D.C.Cir.1996) (defendant's sixth amendment confrontation rights were not violated when government proceeded by proffer at preventive detention hearing, and defendant's due process rights were protected by right to counsel, to testify in his own behalf and to proffer testimony of others); **445 see also *State v. Doe,* supra, 46 Conn.Supp. at 610, 765 A.2d 518 (concluding that summons for disorderly conduct and police officer's report constituted sufficient evidence to meet preponderance of evidence standard in criminal protective order case).

Indeed, requiring the evidence admitted at this subsequent hearing to comply with the rigors of the rules *29 of evidence would be inconsistent with other relevant legislation governing pretrial hearings in criminal cases, including § 54–64f(b), which permits the admission of hearsay or secondary evidence at a hearing to determine whether the defendant has violated the conditions of his release,

and § 54–82r(a), which permits the admission of hearsay evidence at a hearing to consider entry of a protective order for benefit of a witness. See footnotes 16 and 10 of this opinion. The defendant may, however, upon the trial court's acceptance of his proffer of relevant evidence regarding the continued necessity of the protective order, testify or present witnesses on his own behalf, and may cross-examine any witnesses whom the state might elect to present against him.[22] This defense evidence, along with the comprehensive initial proffer and the submission of evidence by the state, further will ensure that there will be a record adequate to review, on an expedited basis under General Statutes § 54–63g,[23] the trial court's ruling with respect to the continued necessity of the criminal protective order.

Accordingly, we conclude that §§ 54–63c(b) and 46b–38c permit the trial court to issue a criminal protective *30 order at the defendant's arraignment after consideration of oral argument and the family services report.[24] We also conclude that the trial court is required to hold, at the defendant's request made at arraignment, a subsequent hearing within a reasonable period of time wherein the state will be required to prove the continued necessity of that order by a fair preponderance of the evidence, which may include reliable hearsay, and the defendant will have the opportunity to proffer relevant evidence to counter the state's case in support of the criminal protective order through his own **446 testimony or that of other witnesses.[25] On the record of the present consolidated appeal, Judge Pavia did not need to conduct an immediate evidentiary hearing when she issued the initial criminal protective order at the defendant's arraignment. Rather, Judge Pavia properly set the matter down for a hearing three days later. At that time, however, Judge Bingham improperly concluded, as a matter of law, and, we acknowledge, *31 without benefit of this opinion, that the defendant was not entitled to any kind of hearing beyond that which he already had received before either himself or Judge Pavia.[26] Accordingly, **448 on remand, the defendant is entitled *34 to the opportunity to request, and to receive, an evidentiary hearing as described in the preceding paragraph about the continued necessity of the criminal protective order.

The order in Docket No. SC 18103 is affirmed. The order in Docket No. SC 18045 is reversed and the case is remanded for further proceedings in accordance with the preceding paragraph.

In this opinion ROGERS, C.J., and VERTEFEUILLE, ZARELLA and McLACHLAN, Js., concurred.

SCHALLER, J., concurring and dissenting.

I disagree with the majority that General Statutes §§ 54–63c(b),[1] and 46b–38c,[2] require that the trial court hold, upon a defendant's request during the hearing to which he is statutorily entitled at his arraignment, **449 a second hearing at which the state must prove by a preponderance of the evidence the continued necessity of a criminal protective order issued pursuant to § 54–63c(b). Because I conclude that the defendant, Fernando A., has no statutory right to such a hearing, I also address the defendant's constitutional claim, and conclude that the defendant's right to procedural due process, as guaranteed by the fourteenth amendment to the United States constitution, is not violated by the current practice in the trial court, in accordance with §§ 54–63c(b) and 46b–38c, of issuing a protective order following a hearing at *35 the time of the defendant's arraignment, at which the trial court has available to it the report prepared by the family violence intervention unit and at which the defendant has the right to present oral argument.[3]

In accordance with existing practice pursuant to §§ 54–63c(b) and 46b–38c, the defendant, who stands charged with a family violence crime, and against whom a protective order had issued, was provided with a hearing at the time of his arraignment. That hearing was sufficient to satisfy both the requirements of our state statutes and federal procedural due process. In my view, the majority's interpretation of §§ 54–63c(b) and 46b–38c to require an expanded, *second* hearing for the benefit of defendants in family violence cases is not grounded in existing state or federal law. While, upon close examination, this expanded hearing requirement does not appear to make any dramatic changes to the existing state of the law, pursuant to which trial courts presumably have discretion to do—or decline to do—everything authorized by the majority decision, I believe that the new procedure will cause more problems than it will solve. I write separately to emphasize several aspects of my disagreement with the majority.[4]

**450 *36 Because the nature of the newly created right to some extent guides my analysis, I begin by outlining the contours of the hearing to which the majority concludes the defendant is entitled. The majority concludes that a defendant charged with a family violence crime has a statutory right under § 54–63c(b) to what I would characterize as a qualified or *conditional evidentiary hearing,* at his request, after the arraignment stage.[5] As I understand it, the expanded, second hearing consists of the following steps: (1) the defendant must request *37 the second hearing at the initial arraignment hearing that is provided for in § 54–63c(b); (2) the second hearing must be held within a reasonable time after the request and is to be "more extensive" than the arraignment hearing; (3) the state bears the burden of proving the continued necessity of the original order by a fair preponderance of the evidence; (4) the "evidence" proffered by the state may include reliable hearsay and need not "comply with the rigors of the rules of evidence"; (5) the trial court "retains"—as it presently does—discretion to determine whether testimony from the "complainant or other witnesses" is "necessary" for the order to issue; (6) if the state is permitted to present witnesses, the defendant may cross-examine them; and (7) the defendant has no unconditional right to present evidence but may "proffer relevant evidence" challenging the continued necessity of the protective order.

Depending on the trial court's discretion, the defendant may be allowed to testify and present witnesses. The defendant's only unconditional right, aside from cross-examining state's witnesses, is to proffer relevant evidence, not to present it. In sum, under the new rule created by the majority, the defendant has no federal constitutional or state statutory right to an evidentiary hearing. In other words, according to the majority, neither due process nor the relevant statutes— §§ 54–63c(b) and 46b–38c—require more than the expanded hearing that I have set forth, which allows for complete discretion on the part of the trial court as to whether and to what extent evidence may be presented by either party. The hearing is evidentiary only as to the right of the parties to make proffers of evidence and to call witnesses or submit other evidence to the extent permitted by the trial court.

Assuming that my understanding of the majority opinion is correct, my disagreement is limited to the following points. The decision to create a special hearing, to *38 which defendants who are charged with the commission of a family violence crime are entitled upon request, is: (1) inconsistent **451 with the statutory scheme set forth in §§ 54–63c (b) and 46b–38c; (2) not mandated by the federal due process clause; and (3) unwise and unnecessary because of various prudential and policy concerns. Such concerns include my view that the decision is: (1) unfair to defendants in other criminal cases, because it singles out family violence defendants for special treatment; (2) unwise, because it does not take into account the special vulnerability of victims of family violence and undermines the efforts that the legislature has made to protect these victims; (3) unworkable, because it burdens already busy trial courts and provides only conflicting and confusing guidance; and (4) unnecessary, because trial courts already have the discretion to order, on a case-by-case basis, what the majority now holds is the defendant's right upon request.

I

The only question raised in the defendant's statutory claim is the meaning of the word "hearing" as used in §§ 54–63c(b) and 46b–38c,[6] an issue that the majority acknowledges presents a question of statutory interpretation. The majority infers from the absence of express statutory language in §§ 54–63c(b) and 46b–38c specifying the nature and scope of the hearing to which the defendant is statutorily entitled that the statutes are ambiguous as to that issue. I disagree. The absence of express language, without more, is simply not sufficient to give rise to ambiguity. Instead, in interpreting the *39 term "hearing" in the statutes, and determining whether the statutory language is ambiguous, our question, as always, is whether there exists more than one reasonable interpretation of the language. *Bender v. Bender,* 292 Conn. 696, 708–709, 975 A.2d 636 (2009) ("[t]he test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation" [internal quotation marks omitted] ). We also must be mindful of the "basic tenet of statutory construction that [w]e construe a statute as a whole and read its subsections concurrently in order to reach a reasonable overall interpretation." (Internal quotation marks omitted.) *Barry v. Quality Steel Products, Inc.,* 280 Conn. 1, 9, 905 A.2d 55 (2006). Accordingly, the meaning of the word "hearing" properly must be understood by looking at the term in the context of the entire statutory scheme. I turn, therefore, to §§ 54–63(b) and 46b–38c.

Section 54–63c(b) provides in relevant part that "[a]ny nonfinancial conditions of release imposed pursuant to this subsection shall remain in effect until the arrested person is presented before the Superior Court pursuant to subsection (a) of section 54–1g. On such date, *the court shall conduct a hearing pursuant to section 46b–38c at which the defendant is entitled to be heard with respect to the issuance of a protective order.*" (Emphasis added.) What is clear from the face of the statute is that the hearing is intended to be held at the time of the defendant's arraignment; the nature of the hearing must be understood with reference to § 46b–38c; and, at the hearing, the defendant has the right "to be heard...." General Statutes § 54–63c(b). Section 46b–38c establishes family **452 violence response and intervention units to respond to complaints of family violence. In family violence cases, those units are responsible for "prepar[ing] written or oral reports on each case for the court by the next court date to be *40 presented at any time during the court session on that date...." General Statutes § 46b–38c(c)(2). These reports "shall be available to a judge at the first court date appearance to be presented at any time during the court session on that date," and upon considering the report at the hearing, the court may issue a protective order. General Statutes § 46b–38c(d). Section 46b–38c reveals that the hearing is intended to give the court the opportunity to review the report prepared by the family violence intervention unit, and to determine, on the basis of that report, whether to issue a protective order.

Sections 54–63c(b) and 46b–38c, read together, further reveal that the hearing guaranteed to the defendant in the statutory scheme cannot have been intended to be a full evidentiary hearing. The single most significant piece of information that leads to this conclusion is that the legislature contemplated that the hearing would take place at the time of the arraignment; see General Statutes § 54–1g;[7] which the majority acknowledges occurs very shortly after the arrest. At that point in the defendant's criminal case, there will have been scarcely any time to begin an investigation into the evidence, let alone prepare for a full evidentiary hearing. In some cases, a defendant is initially assigned counsel at the time of arraignment. Moreover, arraignments commonly take place during the daily criminal session of short matters, during which the court deals with a wide variety of matters, including new arrests and arraignments, continued cases that have been assigned for *41 plea, appointment of counsel, short motions and bail modifications, among others. In small geographical areas, one judge might handle the entire criminal docket, including these matters. In large geographical areas, one of several judges assigned to criminal matters may deal with the arraignment docket. At the opening of court, the arraignment judge advises the defendants who are scheduled to be arraigned that day of their rights and then arraigns each defendant individually. At some point during this busy session, which takes place so soon after the defendant's arrest, a defendant arrested on a family violence charge is given the hearing to which he is entitled under §§ 54–63c(b) and 46b–38c. These conditions hardly are conducive to holding a full evidentiary hearing. Rather, as the majority recognizes, the circumstances under which the legislature envisioned a hearing pursuant to §§ 54–63c(b) and 46b–38c to take place particularly require "the need for expeditious assumption of judicial control.... *State v. Doe,* [46 Conn.Supp. 598, 609, 765 A.2d 518 (2000)]." (Internal quotation marks omitted.) Surely, the legislature is aware of the nature of arraignment proceedings, and its provision of a right to a hearing *at arraignment* must be understood to provide the right to a hearing with an extent and scope appropriate for and possible in that context.

**453 Moreover, as I have noted, the purpose of the hearing provided for in § 54–63c(b) is set forth in § 46b–38c. That purpose supports the conclusion that the hearing is intended to be fairly limited in scope. Specifically, the hearing provides the court an opportunity to review the report prepared by the family violence intervention unit and, following oral argument if the defendant exercises his statutory right to be heard, to determine whether to issue a protective order. The legislative intent to provide a hearing of limited scope is further supported, as Justice Palmer points out in his dissent, *42 by the provision in § 46b–38c(e) that such protective orders "shall be made a condition of the bail or release of the defendant...." General Statutes § 46b–38c(e). I agree that this constitutes strong evidence that the legislature intended for hearings pursuant to § 54–63c(b) to have a similar scope and extent as a bail hearing.

The majority's own statutory analysis lends further support to this conclusion. The majority correctly points out that a defendant who wishes to challenge a protective order that is issued following a hearing pursuant to § 54–63c(b) is not without a remedy. Such a defendant is always free to seek a modification of the protective order pursuant to General Statutes § 54–69.[8] Additionally, even in the absence of any subsequent hearing on a motion for modification, the defendant will have the right to a full hearing if he elects to go to

trial. It is appropriate to view § 54–63c(b) as what it is—a temporary measure intended to protect the victim until the ultimate resolution of the charges brought against the defendant.

The majority makes two additional points that support the conclusion that the plain and unambiguous *43 meaning of §§ 54–63c(b) and 46b–38c is that the defendant is statutorily entitled only to a brief hearing to be held at arraignment, during which the defendant simply has the right to be heard, and not to present evidence. First, the majority relies on the principle that the legislature is presumed to be aware of a judicial interpretation that has been placed upon a statute. *Charles v. Charles,* 243 Conn. 255, 262, 701 A.2d 650 (1997), cert. denied, 523 U.S. 1136, 118 S.Ct. 1838, 140 L.Ed.2d 1089 (1998). The majority acknowledges that the Superior Court, in *State v. Doe,* supra, 46 Conn.Supp. at 598, 765 A.2d 518, "relied on *Gerstein v. Pugh,* 420 U.S. 103, 119, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), and concluded that a hearing held pursuant to § 46b–38c, at which the defendant did not have the opportunity to cross-examine the complainant prior to the issuance of a criminal protective order in a family violence case, did not violate the defendant's due process rights because it was a bail related hearing that required the need for **454 expeditious assumption of judicial control.... *State v. Doe,* supra, at 609, 765 A.2d 518." (Internal quotation marks omitted.) The majority reasons that the legislature presumably was aware of *Doe* when it amended § 54–63c(b) in 2007; Public Acts 2007, No. 07–123; yet the legislature did not amend the statute to require a full evidentiary hearing, or even an expanded hearing such as the majority now concludes is required.

Second, the majority points out that in other criminal statutes, when the legislature has intended to impose specific procedural requirements in the context of a pretrial hearing, it has done so explicitly. See, e.g., General Statutes § 54–82r (authorizing issuance of protective order prohibiting harassment of witness following hearing at which hearsay evidence is admissible; requiring finding of harassment and necessity of protective order supported by preponderance of evidence; and granting adverse party right to present evidence and cross-examine witnesses); General Statutes § 54–64f *44 upon finding of probable cause that defendant violated conditions of release, court may hold evidentiary hearing at which hearsay evidence is admissible; violation must be proven by clear and convincing evidence). The majority draws the proper inference from the comparison, reasoning that the lack of procedural requirements for the hearing provided for in § 54–63c(b) indicates that the legislature did not intend to impose such requirements. I agree. The majority's rational and thorough discussion of the statutory language and its ordered application of traditional statutory interpretation principles lead logically to the same conclusion that I arrive at—the legislature did not intend that the hearing provided for in § 54–63c(b) would be an evidentiary hearing. I emphasize that the majority does not state anywhere in its analysis that the legislature intended, through §§ 54–63c(b) and 46b–38c, to entitle family violence defendants to a second, expanded hearing. Nor does it state that the word "hearing" reasonably may be so interpreted. Indeed, the majority cannot, because it has acknowledged that the meaning of the word "hearing" in §§ 54–63c(b) and 46b–38c—which, as I stated earlier in this opinion, is the *only* issue presented by the defendant's statutory claim—is exactly as the trial court, *Bingham, J.,* interpreted it in denying the defendant's request for a full evidentiary hearing. That is, the word "hearing" in §§ 54–63c(b) and 46b–38c signifies a brief hearing held at the time of the defendant's arraignment, at which the court will review the report of the family violence intervention unit and hear oral argument from the defendant if he so desires, to assist the court in determining whether to issue a protective order. At this point, my analysis would end, as dictated by General Statutes § 1–2z, because the plain and unambiguous language of §§ 54–63c(b) and 46b–38c leads to the conclusion that the defendant was statutorily entitled to the hearing that he received—no more, no less.

*45 The majority, despite the dictates of § 1–2z, relies on legislative history to support its decision to create a new rule entitling family violence defendants to a second, expanded hearing. At this point in the majority opinion, it is difficult to discern precisely how the majority grounds its analysis on principles of statutory interpretation. The first problem, of course, is that the majority engages in this part of its analysis after acknowledging that the intent of the legislature with regard to the scope of the hearing to which the defendant is entitled at his arraignment is clear. In fact, the majority begins this portion of its analysis by acknowledging that a full evidentiary hearing would be impractical **455 at the defendant's arraignment. As I have stated in this concurring and dissenting opinion, this impracticality leads to the conclusion that the legislature intended the hearing to be brief and nonevidentiary in nature. The majority, however, reasons that the necessary brevity of the hearing intended by the legislature "may well cause a defendant significant pretrial deprivations of family relations and/or property." The potential of these deprivations is what underlies the majority's "statutory" analysis.

Specifically, in support of this entirely new rule, purportedly arrived at through the process of statutory interpretation—a process that, by the majority's own admission, when applied to the statutory language itself, yields the conclusion that the legislature intended to impose no procedural requirements on the arraignment hearing guaranteed by §§ 54–63c(b) and 46b–38c—the majority points only to a vague statement, made on the floor of the House of Representatives, that the statute attempts to " 'strike a very delicate balance here between the legitimate interests of law enforcement, and the important constitutional and civil liberty concerns that we would have [as] citizens....' 50 H.R. Proc. [Pt. 12, 2007 Sess., p. 3904], remarks of Representative [Michael P.] Lawlor." The majority asserts that *46 this statement reflects a "legislative desire to comply with the dictates of due process...." The legislature, however, is *always* assumed to desire, and to be obligated, to comply with due process. That statement, then, has no special significance in the sense that the majority relies on it.[9] In any case, the majority relies on the principle that a defendant's due process rights must be protected, and the fact that the statutes do not expressly define the parameters of the word hearing, to infer that the new rule creating the expanded, second hearing is justified. This reasoning requires that the reader completely ignore the majority's statutory analysis, which ably interpreted the plain language of the statutes to discern that the legislature made clear that the hearing at arraignment is intended to allow consideration of the report prepared by the family violence intervention unit and any oral argument the defendant may choose to offer. Those are the parameters of the hearing to which the defendant is entitled pursuant to §§ 54–63c(b) and 46b–38c. Nothing is unclear about the precise nature of this hearing. It is simply not the hearing that the majority believes the legislature should have provided.

Based on the majority's single justification for its statutory interpretation, I can conclude only that, without directly saying so, the majority, in actuality, grounds its conclusion not on a statutory analysis, but on an implicit determination that due process requires the creation of this new right to an expanded, second hearing. I therefore turn to the question of whether the *47 defendant is entitled pursuant to his right to procedural due process to more than is statutorily mandated by §§ 54–63c(b) and 46b–38c.

II

The United States Supreme Court, in determining whether an individual's right **456 to procedural due process has been violated by a state action, employs two distinct tests, depending on whether the claim arises in the civil or criminal context. In the civil context, the court applies the three part balancing test that it first set forth in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).[10] In the criminal context, as in the present case, a state rule of criminal procedure will be held to violate a defendant's right to due process *only if* the procedure "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." (Internal quotation marks omitted.) *Medina v. California,* 505 U.S. 437, 445, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992). In order to meet his burden of showing a violation of the right to procedural due process in the criminal context, a defendant must show that there is a "historical basis"[11] *48 for his claim that a state procedure violates a fundamental principle of justice. Id., at 448, 112 S.Ct. 2572.

Although this court has in the past unquestioningly applied the *Mathews* test in the criminal context; see, e.g., *State v. Patterson,* 236 Conn. 561, 572–76, 674 A.2d 416 (1996) (applying *Mathews* test to conclude that there is no federal due process right to presentence investigation report); *State v. Lopez,* 235 Conn. 487, 493–97, 668 A.2d 360 (1995) (applying *Mathews* factors in concluding no per se right to evidentiary hearing on state's motion to rectify transcript); *State v. Joyner,* 225 Conn. 450, 471, 625 A.2d 791 (1993) (*Mathews* test applicable to due process issues under state constitution); see also *State v. Kelly,* 256 Conn. 23, 85, 770 A.2d 908 (2001) (citing *Mathews,* but not applying balancing test to claim that trial court improperly denied defendant's parents and fianceé opportunity to speak at his sentencing in violation of his constitutional rights to due process and effective assistance of counsel); *State v. Misiorski,* 250 Conn. 280, 294–96, 738 A.2d 595 (1999) (*Berdon, J.,* dissenting) (applying *Mathews* factors in concluding that judicial hearing is required before probation officer may disclose defendant's criminal record to community pursuant to Megan's Law, General Statutes [Rev. to 1997] § 54–102s); I believe that this represents a mistaken application of federal constitutional law. To elucidate why *Medina*

rather than *Mathews* governs the defendant's due process claim, it is helpful to review the applicable United States Supreme Court and federal court precedent. In *Medina v. California,* supra, 505 U.S. at 442–43, 112 S.Ct. 2572, the United States Supreme Court expressly **457 disavowed the application of the balancing test it had set forth in *Mathews* to evaluate procedural due process claims in the criminal context, stating that *Mathews* does not provide the "appropriate analytical framework"; id., at 443, 112 S.Ct. 2572; to address a criminal defendant's procedural due process claim. The court explained the *49 reason for this departure from the *Mathews* test, which had, until that point, been understood to apply generally to all procedural due process claims: "In the field of criminal law, we have defined the category of infractions that violate fundamental fairness *very narrowly* based on the recognition that, [b]eyond the specific guarantees enumerated in the [b]ill of [r]ights, the [d]ue [p]rocess [c]lause has limited operation." (Emphasis added; internal quotation marks omitted.) Id. The court explained that "[t]he [b]ill of [r]ights speaks in explicit terms to many aspects of criminal procedure, and the expansion of those constitutional guarantees under the open-ended rubric of the [d]ue [p]rocess [c]lause [would invite] undue interference with both considered legislative judgments and the careful balance that the [c]onstitution strikes between liberty and order." Id. Moreover, the court recognized that its role in interpreting and upholding the due process clause does not "establish this [c]ourt as a rulemaking organ for the promulgation of state rules of criminal procedure." (Internal quotation marks omitted.) Id., at 443–44, 112 S.Ct. 2572. Additionally, the court was particularly aware of the fact that "because the [s]tates have considerable expertise in matters of criminal procedure and the criminal process is grounded in centuries of common-law tradition, it is appropriate to exercise substantial deference to legislative judgments in this area." Id., at 445–46, 112 S.Ct. 2572. Instead, in the criminal context, the "proper analytical approach ... is that set forth in *Patterson v. New York,* 432 U.S. 197 [97 S.Ct. 2319, 53 L.Ed.2d 281] (1977)." *Medina v. California,* supra, at 445, 112 S.Ct. 2572.

In *Patterson v. New York,* supra, 432 U.S. at 201, 97 S.Ct. 2319, the United States Supreme Court had rejected the claim that allocating to the defendant, who had been charged with murder, the burden of proving the affirmative defense of extreme emotional disturbance by a preponderance of the evidence, violated the defendant's right *50 to procedural due process as guaranteed by the fourteenth amendment. Id. In the arena of criminal law, the court observed, "[t]raditionally, due process has required that only the most basic procedural safeguards be observed; more subtle balancing of society's interests against those of the accused have been left to the legislative branch." Id., at 210, 97 S.Ct. 2319. In addressing the defendant's claim that the burden allocation violated his right to procedural due process, the court examined the historical origins and development of the rule, stating that a state's decision regarding how to "regulate procedures under which its laws are carried out ... is not subject to proscription under the [d]ue [p]rocess [c]lause unless it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."[12] **458 (Internal quotation marks omitted.) Id., at 201–202, 97 S.Ct. 2319. Based on that analysis of the claimed historical basis of the defendant's asserted right, the court concluded that the state procedural rule did not offend a traditional, fundamental principle of justice. Id., at 202–206, 97 S.Ct. 2319.

*51 Adopting the *Patterson* analytical framework in *Medina,* the court considered the defendant's claim that the allocation to him of the burden to prove his incompetence to stand trial, by a preponderance of the evidence, violated his right to due process. *Medina v. California,* supra, 505 U.S. at 439, 112 S.Ct. 2572. The court concluded, on the basis of its review of the "historical treatment of the burden of proof in competency proceedings," that the allocation of the burden to the defendant did not offend a fundamental principle of justice. Id., at 446, 112 S.Ct. 2572. In analyzing the historical basis of the claimed right, the court noted that there was, in fact, "no settled tradition on the proper allocation of the burden of proof in a proceeding to determine competence." Id.

The United States Supreme Court subsequently has reinforced its declaration in *Medina* that the applicable rule in the criminal context is not the *Mathews* balancing test, but rather the *Patterson* historical basis test. In *Montana v. Egelhoff,* 518 U.S. 37, 43, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996) (plurality opinion), the United States Supreme Court considered the defendant's claim that his "right to have a jury consider evidence of his voluntary intoxication in determining whether he possesse[d] the requisite mental state is a fundamental principle of justice." (Internal quotation marks omitted.) The court explained that in applying the *Patterson* test: "Our primary guide in determining whether the principle in question is fundamental is, of course, historical practice." Id. The court then looked to the historical roots of the asserted right, citing as far back as English common law. Id., at 44, 116 S.Ct. 2013. In the course of its analysis, the court clarified that "[i]t is not the [s]tate which bears the burden of demonstrating that its rule is deeply rooted, but

rather [the] respondent who must show that the principle of procedure *violated* by the rule (and allegedly required by due process) is so rooted in the traditions and conscience of our people as to be ranked *52 as fundamental." (Emphasis in original; internal quotation marks omitted.) Id., at 47, 116 S.Ct. 2013. The court considered the more modern permutation of the rule, which allows for an exception admitting evidence of intoxication with respect to an offense that requires a specific intent, but concluded, "[a]lthough the rule allowing a jury to consider evidence of a defendant's voluntary intoxication where relevant to mens rea has gained considerable acceptance, it is of too recent vintage, and has not received sufficiently uniform and permanent allegiance, to qualify as fundamental...." Id., at 51, 116 S.Ct. 2013. Significantly, and consistent with **459 *Medina* and *Patterson,* the court did not engage in *any* type of balancing inquiry in resolving the defendant's claim.

Federal courts consistently have applied the *Patterson* test to due process challenges of state rules of criminal procedure. See, e.g., *Bey v. Bagley,* 500 F.3d 514, 521–23 (6th Cir.2007) (denying defendant's due process challenge to state's procedural rule allowing evidence of other crimes under identity exception; defendant failed to show that claimed violation fell under narrow category of procedural rules that offended deeply rooted principle of justice); *Lannert v. Jones,* 321 F.3d 747, 754 (8th Cir.) (concluding that asserted right to have battered spouse syndrome evidence considered by jury in connection with defense of self-defense was not " 'fundamental principle of justice' " and finding no violation of procedural due process), cert. denied, 540 U.S. 917, 124 S.Ct. 307, 157 L.Ed.2d 212 (2003); *Hines v. Miller,* 318 F.3d 157, 161–62 (2d Cir.) (after noting that District Court improperly applied *Mathews* balancing test instead of *Patterson* test, finding no historical basis for claimed right to evidentiary hearing on motion to withdraw guilty plea, and, therefore, no constitutional right to evidentiary hearing), cert. denied, 538 U.S. 1040, 123 S.Ct. 2089, 155 L.Ed.2d 1075 (2003). The more narrow recognition *53 of rights in the criminal context is due to the fact that "[t]he [b]ill of [r]ights speaks in explicit terms to many aspects of criminal procedure, and the expansion of those constitutional guarantees under the open-ended rubric of the [d]ue [p]rocess [c]lause invites undue interference with both considered legislative judgments and *the careful balance that the [c]onstitution strikes between liberty and order."* (Emphasis added.) *Medina v. California,* supra, 505 U.S. at 443, 112 S.Ct. 2572.

The present statutory scheme challenged by the defendant, which entitles a family violence defendant only to notice and a hearing at the time of arraignment, at which the defendant has the right to be heard, reflects the very type of careful balancing of society's interests—in this context, the interest in protecting victims of family violence from further intimidation and abuse—against the rights of the accused that *Patterson* deemed to be appropriately the province of state legislatures. *Patterson v. New York,* supra, 432 U.S. at 210, 97 S.Ct. 2319. Section 46b–38c was passed as part of Public Acts 1986, No. 86–337, entitled, "An Act Concerning Family Violence Prevention and Response" (act).[13] The legislative history of the act makes clear that its primary purpose *54 was to implement a comprehensive system that would most effectively intervene in instances of domestic violence to protect victims from further harm, but not at the expense of the rights of defendants. The act effected a significant **460 change in the state's criminal law, creating many procedural safeguards and services, both for victims of family violence and offenders, that had not before been available in this state. Astrida Olds, the chair of the governor's task force on family violence, testified before the judiciary committee that the act was "intended to create an environment for effective intervention in cases that clearly have become official public matters." Conn. Joint Standing Committee Hearings, Judiciary, Pt. 2, 1986 Sess., p. 509. The act mandated "uniform procedure[s] for every police department to govern their responses to family violence incidents," created family violence intervention units that "would immediately take on each case, assess it and provide recommendations to judges on prosecution and victim services," required a defendant's court appearance take place at the next court date, and instituted, for the first time, "offender services in the form of a program of education for batterers." Id., at p. 511, remarks of Astrida Olds. In his summary of the proposed legislation, Representative William L. Wollenberg stated succinctly that "it's an attempt to prevent family violence." 29 H.R. Proc., Pt. 14, 1986 Sess., p. 5254. Speaking in support of the bill, Representative Pauline R. Kezer stated that the law would make "a meaningful change in public policy that will reduce and prevent domestic violence. It has been shown that similar measures in other states that have been taken have indeed reduced the rate of return visits by policemen to the homes in terms of domestic violence." Id., at p. 5259. Representative Patricia A. Dillon, also speaking in support of the bill, recognized that "[it is] a very, very delicate balance and I'm sure that we're doing this without *55 endangering the rights of the defendant...." Id., at p. 5269. The statutory scheme constructed by the legislature is an example of careful and subtle balancing in response to the peculiar difficulties presented to the state criminal justice system by victims and offenders who often live together, are married and intimately involved with each other. The solution crafted by the state

legislature evidences precisely the state expertise that persuaded the United States Supreme Court, in *Patterson* and *Medina,* that matters of criminal procedure, in the absence of a showing that those procedural rules offend some deeply rooted principle of justice, are properly the task of the state legislature, not the courts.

The defendant specifically seeks a full evidentiary hearing to allow him to challenge the imposition of nonfinancial conditions of release. The majority concludes that, although the defendant does not have a procedural due process right to a full evidentiary hearing, he is entitled to the newly defined, expanded, second hearing. The challenged procedural rule is the failure to require more than a brief hearing at which the defendant is not permitted to present evidence; the affected principle of justice is the right to pretrial release absent the imposition of nonfinancial conditions. The historical basis inquiry properly should examine whether the principle of justice that the defendant claims is "offended" by the state's procedural rule is so deeply rooted in our traditions that it is deemed a fundamental principle of justice. Not only does the defendant fail to make *any* showing that the state procedural rules—which do not require the trial court to hold a full evidentiary hearing following the issuance of a protective order as a condition of his release— violate a fundamental principle of justice, the defendant does not even cite to *Medina* or *Patterson*. The defendant instead relies on the *Mathews* balancing test, a test that, as I already have noted, is not even applicable in this *56 context. The defendant, therefore, fails **461 to meet his burden of establishing that the asserted principle of justice that is implicated by the state's criminal procedural rules, namely, the right to pretrial release without the imposition of any nonfinancial conditions, is so deeply rooted in our traditions that it is deemed to be fundamental. Moreover, the majority's analysis fares no better than the defendant's. In my view, by incorrectly characterizing its constitutional analysis as statutory construction, the majority completely foregoes the opportunity to engage in *any* constitutional analysis of the defendant's claim, and precludes itself from providing any reasoning to support its conclusion that due process requires the creation of this new right. As a result, there has been no showing whatsoever that procedural due process requires that the defendant be granted the right to the new, expanded hearing.

III

Finally, I explain the various prudential and policy reasons that persuade me to conclude that the majority's decision is both imprudent and unnecessary. Specifically, the new rule announced by the majority today is: (1) unfair to defendants in other criminal cases, because it singles out family violence defendants for special treatment; (2) unwise, because it does not take into account the special vulnerability of victims of family violence and undermines the efforts that the legislature has made to protect these victims; (3) unworkable, because it burdens already busy trial courts and provides only conflicting and confusing guidance; and (4) unnecessary, because trial courts already have the discretion to order, on a case-by-case basis, what the majority now holds is the defendant's right upon request.

A

The majority's decision is unfair to other criminal defendants because no such procedure is extended to *57 them in connection with bail, the denial of which is a more serious deprivation than that suffered by family violence defendants who are released subject to a protective order. Put another way, the effect of the majority's decision is to create a privileged status for family violence defendants, even though they may suffer deprivations far less severe than other criminal defendants. I cannot envision any reason why they should be given such privileged status. I see no reason, in fact, why all criminal defendants should not have the same right. Neither § 54–63c(b) nor § 46b–38c contains special language to indicate that family violence defendants should be accorded greater rights than those accorded to other criminal defendants with respect to conditions of bail or release. All defendants are at risk of being deprived of

liberty or other rights pending trial. There is no reason why all defendants should not have an expanded second hearing to determine the propriety of continuing bail.

B

The decision is unwise policy because the victims in these cases, who are recognized by our legislature as suffering a unique kind of vulnerability and as needing special protection, are now exposed to the likelihood of examination and cross-examination during an early stage of the proceedings, the net effect of which will be likely to intimidate them and even discourage prosecution of family violence cases.[14] **462 In light of the particular context *58 one in which abusers traditionally have intimidated their victims to prevent them from pursuing criminal complaints against the abusers—the legislature's decision not to subject victims to cross-examination at such an early stage in the criminal proceedings strikes the proper balance between protecting the constitutional rights of *both* defendants *and* victims, and at the same time gives due weight to the state's interest in enforcing its laws.

The threat that this careful balance may be undermined is not an insignificant one. If the state believes that the order protecting the victim is in jeopardy, and opts to put the victim on the stand, the compelling policy reason for protecting family violence victims will be severely compromised. Defendants may cross-examine the victims but are likely to choose not to testify. The procedure would then become simultaneously a means by which defendants could intimidate victims with the aim of preventing them from proceeding with the prosecution, a real risk in family violence cases, and a "discovery vehicle" for the benefit of defendants. Defendants could, in fact, proffer highly damaging challenges to victims' stories, thereby virtually compelling the state to call victims in order to prove the necessity of continuing the order. Ironically, no other crime victims are placed at such a risk that they may be compelled to take the witness stand and face cross-examination by the accused at such an early stage of a criminal case.

C

The creation of the second, expanded hearing encumbers the criminal justice system by imposing burdensome and confusing duties on busy trial judges, yet provides only confusing guidance to assist the trial judges in complying with the new rule. Specifically, the framework created by the majority consists of a *59 combination of specific instructions and general, unspecific requirements. For example, a specific fair preponderance standard is prescribed, but it is to be applied to a mix of proffers. Such proffers include "reliable hearsay," an undefined term, other material that may be beyond the rules of evidence, and, presumably, argument. In short, for every instruction given, new questions arise. In my view, little if anything is gained by the process of attempting to give a few structural details for governing a vague and unspecified discretionary procedure.

I provide a few, brief examples of some of the difficulties that may arise as a result of this new rule. At arraignment, the court must comply with the initial hearing requirement, but also must respond to a request by the defendant for a second hearing by providing such a hearing within a reasonable time. It is unclear whether the court must inform the defendant, during the first hearing, of his right to a second hearing. Also unclear is what constitutes a reasonable time. Presumably, that determination is left to the discretion of the trial court. Suppose the state is ready to make "proffers" based on its file at the time of arraignment—would the trial court have discretion to hold the expanded hearing then and there, or may the defendant demand time to prepare for his "proffers?"

**463 As for the applicable procedure during the second hearing, it is unclear from the majority opinion whether the "proffers" should be offers of proof, accompanied, or not, by any reports, statements or other material. "Reliable hearsay" also is unexplained and uncertain as well as the meaning of the term "rigors of … evidence." The court must make a finding as to whether the state has met its

burden of proof by a fair preponderance of the evidence. How the trial court is to make a finding by a fair preponderance of the evidence based on nothing more than "proffers" of information of varying levels *60 of reliability and value is not specified. Nor is it clear how this procedure, which may involve only "proffers," will create a record for purposes of appeal.

D

The decision is unnecessary because trial courts already have similar discretion in deciding whether to issue such orders. Under the new procedure, the trial court has complete discretion over reasonable scheduling, the scope of the expanded hearing, the information that may be submitted and the appropriate relief. This differs in small measure, if at all, from present procedure, except as to outlining some of the structural steps and areas of discretion. If the trial courts choose to apply this procedure in most cases based on no more than offers of proof, defendants will gain little that is not available with the present discretionary procedure, other than having a second hearing at which they can make proffers as well. In short, trial courts already appear to have the discretion to do all that is provided by the new hearing procedure with no more uncertainty than presently exists.

In summary, the newly created procedure in my view accomplishes little, risks a great deal for victims, and may significantly burden already overcrowded dockets. It singles out a particular class of criminal defendants for a special procedure that establishes a right of uncertain dimension. My hope is that the trial courts will exercise their discretion cautiously and wisely in weighing the proffers of "evidence" and in protecting the victims in these cases in the course of determining whether an order should be issued. I believe that the United States Supreme Court wisely recognized in *Patterson* that, in the area of criminal law, the legislature is in the best position to engage in the "subtle balancing" of society's interests in safety against the rights of defendants. *Patterson v. New York*, supra, 432 U.S. at 210, 97 S.Ct. 2319. The *61 majority's decision today changes the balance that the legislature deemed to be the appropriate one, and it is the duty of the trial courts—and I do not deem this to be an insurmountable task, by any means—to ensure that the delicate balance that had been arrived at by the legislature is not thereby disturbed.

For the foregoing reasons, I respectfully dissent.

PALMER, J., dissenting in part.

Under General Statutes § 54–63c(b),[1] a police officer who has arrested a person for a family violence crime[2] may release **464 that person with financial conditions or nonfinancial conditions or both. With respect to nonfinancial conditions, the officer may require, inter alia, that the arrestee comply with specified restrictions on his travel, association or residence for the protection of the alleged victim. General Statutes § 54–63c(b). Section 54–63c(b) also provides that any such nonfinancial conditions of release imposed by the police shall remain in effect until the arrestee's presentment in court in accordance with General Statutes § 54–1g(a).[3] Finally, § 54–63c(b) provides that, at the time of the presentment, the arrestee is entitled to a "hearing" pursuant to General Statutes § 46b–38c(e)[4] with regard to any protective order that the court may issue as a condition of bail or *62 release. As the majority acknowledges, the sole claim that the defendant, Fernando A., raised in the trial court, and the sole claim that he raises on appeal, is that the term "hearing," as used in § 54–63c(b) with reference to § 46b–38c(e), means a full evidentiary hearing, that is, an adversarial, trial-like proceeding. The defendant contends on appeal, as he did in the trial court, that he has a right to such a hearing under both the due process clause of the fourteenth amendment to the federal constitution and §§ 54–63c(b) and 46b–38c(e). Even though the majority agrees with the trial court that the defendant is not entitled to such a hearing, the majority nevertheless sees fit to reverse the trial court. The majority further concludes that the hearing to which the defendant is entitled under §§ 54–63c(b) and 46b–38c(e) is a bifurcated proceeding that affords him greater rights than those accorded at all other hearings concerning all other conditions of bail or release. Although I agree with the majority that the defendant had no right to a full evidentiary hearing, I believe that the majority's reversal of the trial court is unsupportable, and unfair to the trial court, because the majority is clearly *affirming* the trial court's denial

of the defendant's request for a full evidentiary hearing. More importantly, I also disagree with the majority's construction of the term "hearing" for purposes of §§ 54–63c(b) and 46b–38c(e) because that construction is utterly devoid of support in the pertinent statutory language, legislative history or elsewhere. Contrary to the determination of the majority, the trial court correctly concluded that a family violence arrestee enjoys the same rights under §§ 54–63c(b) and 46b–38c(e) that he would be entitled to at any other hearing involving a condition of bail or release. I therefore dissent in part.[5]

*63 I

Before addressing the merits of the defendant's claims, it is necessary to underscore certain aspects of the history and substance of the statutory scheme at issue in this case. In 1986, the legislature enacted Public Acts 1986, No. 86–337, entitled "An Act Concerning Family Violence Prevention and Response," § 3 of which is now codified as amended at § 46b–38c. As the majority has explained, § 46b–38c was enacted in response to the domestic abuse of Tracey Thurman and the inadequate **465 police response to that abuse. See 29 H.R. Proc., Pt. 14, 1986 Sess., pp. 5258–59, remarks of Representative Pauline R. Kezer. Subsections (a) and (b) of § 46b–38c provide for the creation of local family violence response and intervention units within the state judicial system to respond to cases of family violence. Subsection (c) provides that each such local family violence intervention unit shall, inter alia, "(1) [a]ccept referrals of family violence cases from a judge or prosecutor, (2) prepare written or oral reports on each case for the court by the next court date ... [and] (3) provide or arrange for services to victims and offenders...." General Statutes § 46b–38c(c). Subsection (d) of General Statutes § 46b–38c provides in relevant part: "In all cases of family violence, a written or oral report and recommendation of the local family violence intervention unit shall be available to a judge at the first court date.... A judge of the Superior court may consider and impose the following conditions to protect the parties, including, but not limited to: (1) Issuance of a protective order pursuant to subsection (e) of this section; (2) prohibition against subjecting the victim to further violence; (3) referral to a family violence education program for batterers; and (4) immediate referral for more extensive case assessment...." Finally, General Statutes § 46b–38c(e) in relevant part that "[a] protective order issued under this section may *64 include provisions necessary to protect the victim from threats, harassment, injury or intimidation by the defendant, including, but not limited to, an order enjoining the defendant from (1) imposing any restraint upon the person or liberty of the victim, (2) threatening, harassing, assaulting, molesting or sexually assaulting the victim, or (3) entering the family dwelling or the dwelling of the victim.... Such order shall be made a condition of the bail or release of the defendant...." Although subsection (e) of § 46b–38c also indicates that a defendant charged with a family violence crime shall be given notice and an opportunity to be heard prior to the issuance of an order under that statutory section, there is nothing in § 46b–38c or elsewhere in our statutes that describes the nature of the hearing to which the defendant is entitled. The pertinent legislative history also is silent with respect to the required hearing.

In 2007, the legislature passed Public Acts 2007, No. 07–123 (P.A. 07–123), entitled "An Act Concerning Domestic Violence," which amended, among other statutes, General Statutes (Rev. to 2007) § 54–63c. The primary purpose of the amendment to General Statutes (Rev. to 2007) § 54–63c was to protect the safety of victims of family violence by authorizing the police to order the release of a person charged with the commission of a family violence crime with nonfinancial conditions that "may require that the arrested person do one or more of the following: (1) Avoid all contact with the alleged victim of the crime, (2) comply with specified restrictions on the person's travel, association or place of abode that are directly related to the protection of the alleged victim of the crime, or (3) not use or possess a dangerous weapon, intoxicant or controlled substance." P.A. 07–123, § 1, codified at General Statutes § 54–63c(b). The legislature also added the following language to the statute: "Any nonfinancial conditions of release imposed pursuant to this subsection shall *65 remain in effect until the arrested person is presented before the Superior Court pursuant to subsection (a) of section 54–1g. On such date, the court shall conduct a hearing pursuant to section 46b–38c at which the defendant is entitled to be heard with respect to the issuance of a protective order." P.A. 07–123, § 1, codified at General Statutes § 54–63c(b). **466 Neither § 54–63c(b) nor its legislative history contains any other reference to the hearing to be conducted by the court in connection with the issuance of a protective order.

II

With this statutory background in mind, I now turn to the relevant undisputed facts and procedural history, some of which are set forth in the majority opinion. On August 8, 2007, the victim, who is the defendant's wife, filed an action seeking to dissolve her marriage to the defendant. At that time, the couple lived together with their two children, ages four and two. On August 27, the victim, in accordance with General Statutes § 46b–15,[6] sought and received an ex parte temporary protective order barring the defendant from, inter alia, entering the family dwelling. At two September, 2007 hearings conducted by the trial court, *Shay, J.,* in compliance with the requirements of § 46b–15, the victim testified that the defendant had threatened her and her parents, and that he had pushed her. She further testified that she was afraid of the defendant. With respect to the pushing incident, however, the victim acknowledged that she had not suffered any cuts or bruises as a result of the incident and that she had not sought medical attention.

At the conclusion of the hearings, the trial court declined to extend the protective order, concluding that the victim's allegations did not meet the stringent requirements of § 46b–15. The trial court did not discount or **\*66** discredit the victim's testimony but found that the incidents about which the victim had testified were primarily verbal in nature and did not rise to the level of "a continuous threat of present physical pain or physical injury" within the meaning of General Statutes § 46b–15(a).

Several weeks later, on October 14, 2007, the police were called to the home shared by the victim and the defendant. According to the victim, who exhibited "a large golf ball sized bump" on her forehead, she and the defendant had had an argument during which the defendant pushed her down a flight of stairs and kicked her in the head. The couple's two children witnessed the victim's fall. After the incident, the defendant left the residence in his vehicle. The police called an ambulance to take the victim to the hospital, where she was treated for contusions on her head and knee. After taking a sworn statement from the victim and interviewing the victim's treating physician, the police arrested the defendant and charged him with assault in the third degree, two counts of risk of injury to a child, reckless endangerment and disorderly conduct. In accordance with § 54–63c(b), the police released the defendant on the conditions that he not enter the family home and that he avoid all contact with the victim.

The defendant was arraigned the next day, October 15, 2007. At that time, he requested a full evidentiary hearing prior to the issuance of any protective order, claiming that such a hearing was mandated both by §§ 54–63c(b) and 46b–38c(e), and by the due process clause of the fourteenth amendment to the United States constitution. The defendant also maintained that he was entitled to that hearing at that time, on the day of his presentment, a claim predicated on the express language of § 54–63c(b). The state objected to the defendant's request and sought a protective order prohibiting the defendant from contacting the victim or the couple's **\*67** children, a request with which the victim's advocate and the family **\*\*467** services counselor concurred. The trial court, *Pavia, J.,* denied the defendant's request for a full evidentiary hearing but continued the case to October 18, 2007, at which time the defendant could renew his request for such a hearing. In the meantime, however, Judge Pavia issued a protective order barring the defendant from entering the family home and from having any contact with the victim. Because the local family violence intervention unit had informed the court that it was "concerned about the children in terms of their involvement and proximity to" their parents' situation, Judge Pavia also indicated that the protective order "extend[ed] to the [victim's] minor children, with the caveat that the defendant [could] have third-party visitation...."'

At the hearing on October 18, 2007, before the court, *Bingham, J.,* the defendant again claimed that he was entitled to a full evidentiary hearing—or what defense counsel referred to as a "trial-like" proceeding—for the purpose of challenging the issuance of the protective order. Judge Bingham denied the defendant's request for such a hearing, explaining that the defendant was "not entitled to a full hearing, with the right to subpoena witnesses and the right to call the [victim]. This puts an undue burden on [the victim] because she ... evidently ... is afraid of the [defendant].... And you're not entitled to a full trial here in this court." Thereafter, Judge Bingham explained that the hearing contemplated under §§ 54–63c(b) and 46b–38c(e) "is similar to a bail hearing, and you're not entitled to a full trial on a bail hearing." The court then stated: "So, your request, as stated by you, is denied." At no time did the defendant make any proffer or otherwise present any facts suggesting that the evidence or information **\*68** on which the court had relied in issuing the family violence protective order was inaccurate or incorrect. The sole claim that the defendant raised, rather, was

that he had a statutory and due process right to a full evidentiary hearing, at which (1) the state was required to establish the need for a protective order through the use of evidence that satisfied our evidentiary rules, and (2) the defendant had the right to cross-examine and call witnesses.

In these consolidated appeals from the decisions of the trial court, *Pavia, J.,* and *Bingham, J.,* the defendant claims that the court violated his right to due process and his rights under §§ 54–63c and 46b–38c by rejecting his request for a full evidentiary hearing. Thus, on appeal, the defendant raises the same claim of entitlement to a full evidentiary hearing that he raised in the trial court. According to the defendant, the term "hearing" in § 46b–38c(e) "plainly requires that the defendant be allowed to present evidence and test the state's evidence through cross-examination." In addition, the defendant claims that the state cannot rely on hearsay to establish the desirability of a family violence protective order. The defendant contends, rather, that §§ 54–63c(b) and 46b–38c(e) contemplate the same full-blown adversarial hearing that is provided in the context of a civil action brought under § 46b–15, including the right to subpoena the alleged victim and other witnesses to testify at the hearing.

The majority rejects the defendant's claim that he is entitled to a full evidentiary hearing. Specifically, the majority concludes that " § 54–63c (b), and the cross-referenced ... § 46b–38c, permit the trial court to issue a criminal protective order at the defendant's arraignment after consideration **468 of oral argument and the family violence intervention unit's report.... [Nevertheless] the trial court is required to hold, at the defendant's request made at the initial hearing, a *69 subsequent hearing within a reasonable period of time at which the state will be required to prove the continued necessity of that order by a fair preponderance of the evidence, which may include reliable hearsay." The majority also concludes, as a matter of statutory construction, that the defendant does not have the right at that hearing either to require the state to proceed by way of admissible evidence or to subpoena the victim or other witnesses; according to the majority, however, he does have a qualified right to testify himself and to adduce other testimony. Finally, the majority reverses the decision of the trial court "[b]ecause the defendant did not receive this subsequent hearing as requested...."

For the reasons that follow, I agree with the majority that the defendant is not constitutionally entitled to a full evidentiary hearing. Because there is nothing in the relevant statutes or legislative history to suggest that the defendant has a statutory right to a full evidentiary hearing, I also agree that the defendant has no such entitlement. I disagree, however, with the majority's conclusion that the hearing to which the defendant is entitled under our statutory scheme is different from a bail hearing.[8] Furthermore, because the majority agrees with the trial court's decision to reject the only claim *70 that the defendant raised, namely, that he has a statutory and constitutional right to a full evidentiary hearing, the majority's reversal of the decision of the trial court, *Bingham, J.,* is improper even under its own flawed conclusion regarding the nature of the hearing to which the defendant is entitled.

## III

As I have indicated, the defendant claims on appeal, as he claimed in the trial court, that whatever hearing rights he may be afforded under §§ 54–63c and 46b–38c, he has a due process right to a full evidentiary hearing before a court may issue a protective order under those provisions. Even though the defendant devotes the bulk of his brief to this contention, the majority disposes of the claim in a footnote. See footnote 21 of the majority opinion. Although I agree with the majority that the defendant cannot prevail on his constitutional claim, I do not believe that the majority's analysis of the claim is satisfactory. Therefore, before addressing the hearing rights to which the defendant is statutorily entitled, I turn to his claim of a constitutional violation.

Both the state and the defendant utilize the balancing test set forth by the United States Supreme Court in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), for determining whether a governmental practice or procedure **469 satisfies the requirements of due process. Neither the state nor the defendant, however, mentions the more recent, and more narrow, test adopted by the court in *Medina v. California,* 505 U.S. 437, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992), for evaluating whether such practices or procedures satisfy due process standards in the criminal context. For the reasons that follow, I am inclined to agree with the parties

that the *Mathews* test is the appropriate test for purposes of the present case. Nevertheless, as I also explain *71 more fully hereinafter, the defendant cannot prevail under either of the two tests.[9]

In *Mathews,* the court explained that "[d]ue process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.... [D]ue process is flexible and calls for such procedural protections as the particular situation demands.... Accordingly, resolution of the issue whether the administrative procedures provided ... are constitutionally sufficient requires analysis of the governmental and private interests that are affected.... More precisely, our prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the [g]overnment's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." (Citations omitted; internal quotation marks omitted.) *Mathews v. Eldridge,* supra, 424 U.S. at 334–35, 96 S.Ct. 893. Although *Mathews* arose out of a dispute concerning the adequacy of the administrative procedures afforded a recipient of social security disability benefit payments prior to the termination of those benefits; see id., at 323–26, 332–33, 96 S.Ct. 893; both this court and the Appellate Court have applied that test in criminal cases. See, e.g., *State v. Patterson,* 236 Conn. 561, 569–76, 674 A.2d 416 (1996) (applying *Mathews* test and concluding that criminal *72 defendant's federal constitutional right to procedural due process at sentencing does not include right to presentence investigation report); *State v. Lopez,* 235 Conn. 487, 492–93, 496–97, 668 A.2d 360 (1995) (applying *Mathews* test and concluding that trial court's order rectifying transcript without evidentiary hearing did not violate criminal defendant's federal constitutional right to procedural due process); *State v. Washburn,* 34 Conn.App. 557, 564–66, 642 A.2d 70 (applying *Mathews* test and concluding that requirements of federal due process are not violated by imposition of mandatory minimum thirty day jail sentence against criminal defendant who drove vehicle during summary twenty-four hour suspension period applicable to persons arrested for operating under influence of alcohol), cert. denied, 230 Conn. 912, 645 A.2d 1017 (1994); cf. *State v. Joyner,* 225 Conn. 450, 471, 625 A.2d 791 (1993) ("[b]orrowing the methodology of *Mathews*" in concluding that requiring criminal defendant to prove his insanity defense by preponderance of evidence does not violate state constitutional right to due process).

Following its decision in *Mathews,* however, the United States Supreme Court, in *Medina,* addressed a claim that principles **470 of procedural due process bar a state from imposing on a criminal defendant the burden of establishing his incompetence to stand trial. See *Medina v. California,* supra, 505 U.S. at 439, 112 S.Ct. 2572. In resolving the claim, the court held that the *Mathews* balancing test did not apply; id., at 443, 112 S.Ct. 2572; concluding, instead, that the standard first identified in *Patterson v. New York,* 432 U.S. 197, 201–202, 97 S.Ct. 2319, 53 L.Ed.2d 281(1977), was applicable. *Medina v. California,* supra, at 445, 112 S.Ct. 2572. The court explained: "[T]he *Mathews* balancing test does not provide the appropriate framework for assessing the validity of state procedural rules which ... are part of the criminal process. E.g., *People v. Fields,* 62 Cal.2d 538, 542, 399 P.2d 369 [42 Cal.Rptr. 833] (competency *73 hearing 'must be regarded as part of the proceedings in the criminal case') ... cert. denied, 382 U.S. 858 [86 S.Ct. 113, 15 L.Ed.2d 95] (1965).

"In the field of criminal law, we 'have defined the category of infractions that violate "fundamental fairness" very narrowly' based on the recognition that, '[b]eyond the specific guarantees enumerated in the [b]ill of [r]ights, the [d]ue [p]rocess [c]lause has limited operation.' ... The [b]ill of [r]ights speaks in explicit terms to many aspects of criminal procedure, and the expansion of those constitutional guarantees under the open-ended rubric of the [d]ue [p]rocess [c]lause invites undue interference with both considered legislative judgments and the careful balance that the [c]onstitution strikes between liberty and order." (Citations omitted.) *Medina v. California,* supra, 505 U.S. at 443, 112 S.Ct. 2572.

The court further explained that "[t]he proper analytical approach ... is that set forth in *Patterson v. New York,* [supra, 432 U.S. at 201–202, 97 S.Ct. 2319], which was decided one year after *Mathews.* In *Patterson,* [the court] rejected a due process challenge to a New York law [that] placed on a criminal defendant the burden of proving the affirmative defense of extreme emotional disturbance. Rather than relying [on] the *Mathews* balancing test, however, [the court] reasoned that a narrower inquiry was more appropriate: 'It goes

without saying that preventing and dealing with crime is much more the business of the [s]tates than it is of the [f]ederal [g]overnment ... and that we should not lightly construe the [c]onstitution so as to intrude [on] the administration of justice by the individual [s]tates. Among other things, it is normally "within the power of the [s]tate to regulate procedures under which its laws are carried out, including the burden of producing evidence and the burden of persuasion," and its decision in this regard is not subject to proscription under the [d]ue [p]rocess [c]lause unless "it offends some principle of justice so *74 rooted in the traditions and conscience of our people as to be ranked as fundamental." ' ... As *Patterson* suggests, because the [s]tates have considerable expertise in matters of criminal procedure and the criminal process is grounded in centuries of common-law tradition, it is appropriate to exercise substantial deference to legislative judgments in this area. The analytical approach endorsed in *Patterson* is thus far less intrusive than that approved in *Mathews*." (Citations omitted.) *Medina v. California,* supra, 505 U.S. at 445–46, 112 S.Ct. 2572.

A threshold issue, therefore, is whether the *Mathews* test or the *Medina* test applies to the determination of whether the trial court properly concluded that the defendant was not entitled to a full evidentiary hearing for the purpose of challenging the issuance of the protective order barring him from the family home during the pendency of his criminal case. The answer to this question hinges on whether **471 the procedures pursuant to which protective orders are issued in criminal cases involving family violence "are part of the criminal process"; id., at 443, 112 S.Ct. 2572; or, put differently, "part of the proceedings in the criminal case...." (Internal quotation marks omitted.) Id.

Although it is true, of course, that §§ 54–63c(b) and 46b–38c(e), the provisions at issue, implicate the procedures to be used in determining the conditions of release in certain criminal cases, I do not read *Medina* as necessarily requiring the application of the narrow test set forth therein to any criminal statute that may be characterized as procedural in nature. In fact, on the basis of the analysis employed by the United States Court of Appeals for the Second Circuit in a recent line of cases, a persuasive argument can be made that the *Mathews* balancing test, and not the *Medina* historical test, applies in the present case.

In the first of these cases, *Hines v. Miller,* 318 F.3d 157 (2d Cir.), cert. denied, *75 538 U.S. 1040, 123 S.Ct. 2089, 155 L.Ed.2d 1075 (2003), the court affirmed the judgment of the District Court, which denied the petition for a writ of habeas corpus of Jesse Hines, who had alleged, inter alia, that he was denied due process when the New York state trial court declined to order an evidentiary hearing on his motion to withdraw his guilty plea to second degree murder. Id., at 158–59, 164. The Court of Appeals concluded that, although the District Court properly had denied Hines' habeas petition, the District Court improperly had used the *Mathews* balancing test in doing so. Id., at 161. The Court of Appeals reached this conclusion with little analysis, however, stating only that "[t]he [United States] Supreme Court has stated that it is inappropriate to employ the *Mathews* balancing test in criminal cases"; id.; and that "[t]he proper analytical approach" to deciding the issue was the approach set forth in *Medina.* (Internal quotation marks omitted.) Id., at 161–62.

Soon after *Hines,* in *United States v. Abuhamra,* 389 F.3d 309 (2d Cir.2004), the court addressed a claim by the defendant, Mohammed Abuhamra, following his conviction on federal charges, that the District Court had violated his due process rights by considering certain ex parte, in camera submissions when it denied him bail pending a resolution of his appeal. See id., at 314. Applying the *Mathews* balancing test; id., at 318; the Court of Appeals concluded that, as a general matter, principles of due process prohibit a District Court from using materials submitted ex parte and in camera for the purpose of determining whether to grant postconviction bail but that an exception to the prohibition against the use of such materials exists in certain narrowly specified circumstances.[10] Id., at 328–29, 332. The court remanded the case to the District Court for reconsideration *76 of Abuhamra's application for bail in light of the exception to the general rule of exclusion that the court had carved out. See id., at 332.

In *Krimstock v. Kelly,* 464 F.3d 246 (2d Cir.2006), the court was required to decide whether the due process clause of the fourteenth amendment barred state prosecutors from unilaterally deciding to retain, as evidence in a criminal prosecution, motor vehicles that had been seized as instrumentalities of the crime of operating a vehicle under the influence of alcohol or drugs. Id., at 248. In determining what process was due the owner of such a vehicle before it could be impounded by the **472 state as evidence in a pending case, the court carefully considered whether to apply the *Mathews* balancing test or the historical approach approved by *Medina* and applied by

the court in *Hines.* See id., at 253–54. The court distinguished both *Hines* and *Medina,* stating that those cases "considered challenges to the process afforded during criminal proceedings themselves." Id., at 254. The court further observed that *Krimstock* "involve[d] no challenge to an underlying criminal proceeding or the procedural rights due the criminal defendant. Rather, it involve[d] the deprivation of property pending a criminal proceeding...." Id. The court then proceeded to apply the *Mathews* test, concluding that it "weigh[ed] in favor of having review by a neutral fact-finder of a prosecutor's decision to retain a vehicle as potential evidence ... although no adversarial hearing [was] required."[11] Id., at 255.

The final case is *McKithen v. Brown,* 481 F.3d 89 (2d Cir.2007), cert. denied, 552 U.S. 1179, 128 S.Ct. 1218, 170 L.Ed.2d 59 (2008), in which the court considered whether the plaintiff, Frank McKithen, had a due process right to postconviction DNA testing of certain evidence **\*77** in the possession of the government. Id., at 92. The court ultimately remanded the case to the District Court; id., at 108; which had dismissed McKithen's claim for lack of subject matter jurisdiction. Id., at 95. On remand, the District Court was required to decide whether McKithen's "post-conviction liberty interest encompasse[d] an interest in accessing or possessing potentially exonerative biological evidence"; id., at 106–107; and, if so, the "contours of that right...." Id., at 93. The Court of Appeals made it clear that, if the District Court decided the first issue in McKithen's favor, then the District Court was required to apply the *Mathews* test, rather than the *Medina* test, to determine whether McKithen was entitled to such testing in the particular circumstances presented. Id., at 107. In reaching its conclusion, the court expressly relied on the rationale of *Krimstock* with respect to the *Mathews/Medina* distinction, explaining that *Mathews* is applicable "because McKithen [was] not bringing a challenge to his underlying conviction or to 'the process afforded during criminal proceedings themselves' ... but instead [was] seeking post-conviction access to evidence."[12] (Citation omitted; emphasis in original.) Id., quoting *Krimstock v. Kelly,* supra, 464 F.3d at 254.

These cases, taken together, suggest that *Mathews,* and not *Medina,* represents the applicable due process test when, as in the present case, the challenged procedure **\*78** is not directly related either to the process by which the defendant's guilt or innocence is adjudicated or to the accuracy of that adjudication. Because the essential protections of the bill of rights relate primarily to rights associated with **\*\*473** the adjudicative process itself, and because the rationale of *Medina* is predicated on the fact that the specific guarantees of the bill of rights, in contrast to the "open-ended rubric" of the due process cause; *Medina v. California,* supra, 505 U.S. at 443, 112 S.Ct. 2572; "[speak] in explicit terms to many aspects of criminal procedure"; id.; a strong argument can be made that applying *Medina* to the present circumstances would be to read that case more expansively than its reasoning warrants. Indeed, as I previously noted, this court consistently has applied the *Mathews* balancing test in criminal cases, including cases decided after *Medina.* E.g., *State v. Patterson,* supra, 236 Conn. at 569, 674 A.2d 416; *State v. Lopez,* supra, 235 Conn. at 493, 668 A.2d 360. It is apparent, therefore, that this court does not view *Medina* as occupying the field with respect to due process challenges in the criminal arena.[13] Thus, although it would appear that the *Mathews* balancing test is the applicable test,[14] it need **\*79** not be decided definitively whether *Mathews* or *Medina* applies because, for the reasons set forth hereinafter, the defendant cannot prevail under either test.

A

I first consider the applicable standard under *Medina,* pursuant to which a defendant claiming a due process violation "must sustain the usual heavy burden that a due process challenge entails"; *Montana v. Egelhoff,* 518 U.S. 37, 43, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996) (plurality opinion); by establishing that the challenged procedural rule "offends some principle of justice **\*\*474** so rooted in the traditions and conscience of our people as to be ranked as fundamental." (Internal quotation marks omitted.) *Medina v. California,* supra, 505 U.S. at 445, 112 S.Ct. 2572. In other words, the defendant "must show that the principle of procedure *violated* by the rule (and allegedly required by due process) ... was so deeply rooted at the time of the [f]ourteenth [a]mendment (or perhaps has become so deeply rooted since) as to be a fundamental principle which that [a]mendment enshrined." (Citation omitted; emphasis in original.) *Montana v. Egelhoff,* supra, at 47–48, 116 S.Ct. 2013 (plurality opinion). "Our primary guide in determining whether the principle **\*80** in question is fundamental is, of course, historical practice." Id., at 43, 116 S.Ct. 2013. In the present case, the procedural provision at issue, General Statutes § 54–63c(b), provides in relevant part that "the court shall conduct a hearing ... at which the defendant is

entitled to be heard with respect to the issuance of a protective order." As the majority and I agree, however, the defendant's right to be heard under § 54–63c(b) does not include the right to call the alleged victim as a witness at the hearing on the protective order. Thus, for purposes of the defendant's due process claim, the issue that we must decide is whether the right to call the alleged victim as a witness at the hearing is so deeply rooted in our history as to be considered fundamental. The answer to that question is plainly no.

That answer is dictated by a review of the case law governing the procedural due process rights of defendants at pretrial proceedings and, in particular, at post-arrest bail and release hearings. In *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), the United States Supreme Court concluded that the state "must provide a fair and reliable determination of probable cause as a condition for any significant pretrial restraint of liberty, and this determination must be made by a judicial officer either before or promptly after arrest." Id., at 125, 95 S.Ct. 854. Most importantly for our purposes, however, the court also concluded that "the [c]onstitution does not require an adversary determination of probable cause." Id., at 123, 95 S.Ct. 854; see also id., at 120, 95 S.Ct. 854. The state is therefore free to establish a procedure for the determination of probable cause that is not accompanied by the "adversary safeguards ... [consisting of] counsel, confrontation, cross-examination, and compulsory process for witnesses." Id., at 119, 95 S.Ct. 854. Because these protections are not required, the probable cause determination may be made informally, without an adversarial hearing, on the basis of hearsay evidence and written testimony. *81 Id., at 120, 95 S.Ct. 854. Thus, although an arrestee cannot be held pending trial without a judicial determination of probable cause, the constitution does not require that the arrestee be afforded the right to challenge that determination in an adversarial setting. Because *Gerstein* permits the state to obtain an ex parte finding of probable cause by the court, it undermines the defendant's claim in the present case.

Furthermore, a protective order issued in a family violence case as a condition of bail or release in accordance with §§ 54–63c and 46b–38c is akin to other conditions of bail or release that may be set by the court in any other criminal case. See General Statutes § 54–64a (providing guidelines for release of defendants by judicial authority); Practice Book § 38–4 (same). In fact, a court may impose the very same condition of release that was imposed in the present case, namely, a bar against returning home, in virtually any other felony case. See General Statutes § 54–64a(c)(2) and (6) (upon determination that nonfinancial condition of release is appropriate, **475 court may order, inter alia, that defendant "comply with specified restrictions on [his or her] travel, association or place of abode" and "avoid all contact with an alleged victim of the crime and with a potential witness who may testify concerning the offense"); Practice Book § 38–4(d)(2) and (6) (same). Moreover, "[a]s in the case of other pretrial proceedings such as arraignments and 'probable cause' determinations for warrants, bail hearings are 'typically informal affairs, not substitutes for trial or even for discovery. Often the opposing parties simply describe to the judicial officer the nature of their evidence; they do not actually produce it.' *United States v. Acevedo–Ramos*, 755 F.2d 203, 206 (1st Cir.1985) (Breyer, J.); see also *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir.1986) (bail hearing cannot become a 'mini-trial' or 'a discovery tool for the defendant')." *82 United States v. LaFontaine*, 210 F.3d 125, 131 (2d Cir.2000). Thus, it is well established that an arrestee has no constitutional right to compulsory process in a bail hearing. See, e.g., *United States v. Edwards*, 430 A.2d 1321, 1336 (D.C.1981), cert. denied, 455 U.S. 1022, 102 S.Ct. 1721, 72 L.Ed.2d 141(1982); see also *Querubin v. Commonwealth*, 440 Mass. 108, 118, 795 N.E.2d 534 (2003) ("[a] full-blown evidentiary hearing that includes the right to present and cross-examine witnesses is not needed or required [at a bail proceeding]"); cf. *Mendez v. Robertson*, 202 Ariz. 128, 130, 42 P.3d 14 (Ct.App.2002) (no right to evidentiary hearing on defendant's request to modify conditions of release). Thus, the right of a defendant to call an adverse witness at a bail hearing is subject to approval by the court in the exercise of its sound discretion. In fact, I am aware of no case in which a court has concluded that a defendant has an unconditional right to present evidence for the purpose of challenging a condition of bail, and there is no reason why a family violence protective order that is imposed as a condition of release should be subject to any different procedural requirements.[15]

**476 *83 Finally, in *United States v. Salerno*, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), the United States Supreme Court upheld the constitutionality of certain provisions of the federal Bail Reform Act of 1984 (act), Pub.L. No. 98–473, § 203(a), 98 Stat. 1976 (1984), codified as amended at 18 U.S.C. § 3141 et seq., authorizing the preventive detention of a person charged with a federal offense on the ground that he poses a danger to any other person or the community. *Salerno* and its progeny also defeat the defendant's contention that he is entitled to a full evidentiary hearing for the purpose of challenging the issuance of a family violence protective order as a condition of release.

A brief explanation of the act is necessary to an understanding of the court's holding in *Salerno*. "The [a]ct represent[ed] the [n]ational [l]egislature's considered response to numerous perceived deficiencies in the federal bail process. By providing for sweeping changes in both the way federal courts consider bail applications and the circumstances under which bail is granted, Congress hoped to 'give the courts adequate authority to make release decisions that give appropriate recognition to the danger a person may pose to others if released.' ...

**\*84** "To this end, [18 U.S.C. § 3141(a)] requires a judicial officer to determine whether an arrestee shall be detained. Section 3142(e) [of title 18 of the United States Code] provides that '[i]f, after a hearing pursuant to the provisions of subsection (f), the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, he shall order the detention of the person prior to trial.' Section 3142(f) [of title 18 of the United States Code] provides the arrestee with a number of procedural safeguards. He may request the presence of counsel at the detention hearing, he may testify *and present witnesses in his behalf, as well as proffer evidence,* and he may cross-examine other witnesses appearing at the hearing. If the judicial officer finds that no conditions of pretrial release can reasonably assure the safety of other persons and the community, he must state his findings of fact in writing, [18 U.S.C.] § 3142(i), and support his conclusion with 'clear and convincing evidence,' [18 U.S.C.] § 3142(f).

"The judicial officer is not given unbridled discretion in making the detention determination. Congress has specified the considerations relevant to that decision. These factors include the nature and seriousness of the charges, the substantiality of the [g]overnment's evidence against the arrestee, the arrestee's background and characteristics, and the nature and seriousness of the danger posed by the suspect's release. [18 U.S.C.] § 3142(g). Should a judicial officer order detention, the detainee is entitled to expedited appellate review of the detention order. [18 U.S.C.] § 3145(b) and (c)]." (Citation omitted; emphasis added.) *United States v. Salerno,* supra, 481 U.S. at 742–43, 107 S.Ct. 2095.

The court in *Salerno* concluded that the act did not violate either substantive or procedural due process. Id., at 746, 751–52, 107 S.Ct. 2095. With respect to the latter, the court **\*85** rested its determination primarily on the fact that "the procedures by which a judicial officer evaluates the likelihood of future dangerousness are specifically designed to further the accuracy **\*\*477** of that determination." Id., at 751, 107 S.Ct. 2095. As the court explained, among the procedural safeguards contained in the act is the right of the defendant to "present information by proffer or otherwise...." Id.

Although the act contains certain procedural protections, including the right of the defendant to present evidence at a detention hearing; see 18 U.S.C. § 3142(f) (2006); courts uniformly have concluded that the right to call witnesses under the act is conditional and not absolute. In other words, whether a defendant will be permitted to call an adverse witness to testify at a detention hearing conducted under the act is a matter within the sound discretion of the trial court, with due consideration of the particular facts and circumstances of the case. See, e.g., *United States v. LaFontaine,* supra, 210 F.3d at 131 (District Court did not abuse its discretion in declining to permit defendant to call witness to testify at detention hearing); *United States v. Smith,* 79 F.3d 1208, 1210 (D.C.Cir.1996) (defendant has no right to confront nontestifying, adverse witnesses at detention hearings); *United States v. Gaviria,* 828 F.2d 667, 670 (11th Cir.1987) (defendant has only conditional right to call adverse witnesses in detention hearing); *United States v. Winsor,* 785 F.2d 755, 756 (9th Cir.1986) (defendant "has no right to cross-examine adverse witnesses who have not been called to testify" at detention hearing); *United States v. Accetturo,* 783 F.2d 382, 388 (3d Cir.1986) (District Court did not abuse its discretion in denying defendant's request to call witness, who was described as "the government's primary source of information," at detention hearing); *United States v. Delker,* 757 F.2d 1390, 1397–98 (3d Cir.1985) (District Court did not abuse its discretion in denying **\*86** defendant's request to subpoena material government witnesses to testify at detention hearing); *United States v. Sanchez,* 457 F. Supp.2d 90, 92 (D.Mass.2006) (defendant does not have absolute right to subpoena adverse witnesses at detention hearing); *United States v. Goba,* 240 F. Supp.2d 242, 247–49 (W.D.N.Y.2003) (court declined to exercise its discretion to require in-court testimony from government agents at detention hearing).

Of course, an order of preventive detention results in physical confinement, a condition aptly characterized as "the ultimate deprivation of liberty"; *United States v. Melendez–Carrion,* 790 F.2d 984, 998 (2d Cir.) (Newman, J.), cert. dismissed, 479 U.S. 978, 107 S.Ct. 562, 93 L.Ed.2d 568 (1986); see also *United States v. Perry,* 788 F.2d 100, 113 (3d Cir.) ("civil detention order results in the deprivation of the most fundamental of all personal liberties"), cert. denied, 479 U.S. 864, 107 S.Ct. 91, 93 L.Ed.2d 146 (1986); whereas the protective order issued in the present case merely barred the defendant from returning to his home. Without minimizing the nature of the deprivation that occurs when a person is ordered to stay away from his own home, such a restriction cannot compare to the loss of liberty that a person suffers upon being incarcerated without bail in advance of trial. Because a defendant has no absolute right to call witnesses or to require the government to present live testimony even at a detention hearing; see, e.g., *United States v. Acevedo–Ramos,* supra, 755 F.2d at 207–208;[16] a defendant **478 has no greater procedural *87 rights when, as in the present case, he remains at liberty pending trial.[17]

## B

The defendant also cannot prevail under the *Mathews* balancing test. As I previously noted, that test is fact bound and requires consideration of three factors: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of [that] interest" upon application of the challenged procedures, "and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the [state's] interest, including the function involved and the fiscal and administrative burdens" resulting from any additional or substitute procedural requirement. *Mathews v. Eldridge,* supra, 424 U.S. at 335, 96 S.Ct. 893. Analysis of these factors "requires balancing the [state's] interest in existing procedures against the risk of erroneous deprivation of a private interest inherent in those procedures." (Internal quotation marks omitted.) *State v. Long,* 268 Conn. 508, 524, 847 A.2d 862, cert. denied, 543 U.S. 969, 125 S.Ct. 424, 160 L.Ed.2d 340 (2004). Furthermore, "[t]here is *88 no per se rule that an evidentiary hearing is required whenever a liberty interest may be affected." *State v. Lopez,* supra, 235 Conn. at 492–93, 668 A.2d 360. "When determining what procedures are constitutionally required, we must bear in mind that [t]he essence of due process is the requirement that a person in jeopardy of a serious loss [be given] notice of the case against him and [an] opportunity to meet it.... The elements of notice and opportunity, however, do not require a judicial-type hearing in all circumstances.... [As] long as the procedure afforded adequately protects the individual interests at stake, there is no reason to impose substantially greater burdens on the state under the guise of due process." (Citations omitted; internal quotation marks omitted.) Id., at 493, 668 A.2d 360. With these principles in mind, I conclude that the hearing contemplated under §§ 54–63c(b) and 46b–38c(e), pursuant to which the trial court may, in its discretion, require the state to adduce non-hearsay testimony or permit the defendant to subpoena a particular witness or witnesses, fully complies with the dictates of due process.

With respect to the first factor, it cannot be disputed that the defendant's liberty **479 interest in residing at his home with his children is an extremely significant one. As the defendant maintains, courts have acknowledged that these interests are compelling. See, e.g., *United States v. James Daniel Good Real Property,* 510 U.S. 43, 53–54, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993) ("right to maintain control over [one's] home, and to be free from governmental interference, is a private interest of historic and continuing importance"); *Lehrer v. Davis,* 214 Conn. 232, 237, 571 A.2d 691(1990) ("right to family integrity includes the most essential and basic aspect of familial privacy—the right of the family to remain together without the coercive interference of the awesome power of the state" [internal quotation marks omitted]). It is important to underscore, however, that *89 the liberty deprivation at issue in the present case is both temporary in duration and limited in nature. The deprivation is temporary because the order is effective only until the defendant's criminal case is resolved, at which time the terms of the order will be revisited, depending, of course, on the outcome of the trial. The defendant, moreover, has both a constitutional and a statutory right to a speedy trial,[18] rights that guarantee that he will not be subjected to indefinite delay in the adjudication of his case. The deprivation is limited in the sense that the defendant retains the vast majority of the rights that he was free to exercise before his arrest. Aside from avoiding contact with the victim, he is free to go anywhere except the family home. Furthermore, under the terms of the modified protective order, the defendant apparently is entitled

to liberal visitation with his children. Thus, although the defendant's interests are substantial, the deprivation is limited, both in time and scope.

The second factor entails an evaluation of the risk of an erroneous deprivation of liberty under the existing statutory provisions, which include the right to be heard, the right to provide the court with any relevant evidence or information, and the right to rebut any evidence or information that the state may offer. Because the defendant does not have a statutory right to a full evidentiary hearing at which he is entitled to call the victim as a witness, this second *Mathews* factor **\*90** also requires consideration of the probable value that such a hearing would have in safeguarding the defendant's interests, with due regard for the fact that the defendant retains the right to seek the court's permission to subpoena and question the victim. In support of his contention that the risk of an erroneous deprivation of his significant liberty interests is sufficiently high to require such a hearing, the defendant points to an empirical study indicating that the substantiation rate for allegations of domestic abuse of the kind alleged in the present case is approximately 74 percent.[19]

**\*\*480** It is no doubt true that, at least in some instances, permitting the defendant in a case involving a family violence crime to adduce testimony from the victim of that crime would increase the likelihood of an accurate determination of the need for a protective order barring the defendant from returning to his home. This is so because the court would be able to evaluate the victim's credibility upon cross-examination by the defense. See *California v. Green,* 399 U.S. 149, 158, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970) (characterizing cross-examination as "the greatest legal engine ever invented for the discovery of truth" [internal quotation marks omitted]). Existing procedures, however, provide the defendant with significant safeguards. The defendant's arrest for a family violence offense necessarily is predicated on a judicial finding of probable cause; see *Gerstein v. Pugh,* supra, 420 U.S. at 114, 95 S.Ct. 854; and the defendant is entitled to notice and an opportunity to be heard with respect to the issuance of a protective order. See General Statutes § 46b–38c(e). As I have explained; see footnote 15 of **\*91** this opinion; the defendant is free to provide the trial court with reasons why it should decline to credit the evidence and information adduced by the state in support of the issuance of a protective order and why the victim's testimony is necessary to ensure a fair resolution of the issue. In addition, the report and recommendation of the local family violence intervention unit must be made available to the court when it makes its determination as to the propriety of a protective order. General Statutes § 46b–38c(d). The report and recommendation provide the court with valuable, neutral information and advice regarding the need for a protective order, and represent important procedural safeguards of the rights of those charged with family violence crimes. Furthermore, the defendant may obtain a modification or dissolution of the protective order at any time during the pendency of the criminal case if the defendant has adequate grounds for obtaining such relief. See Practice Book § 38–13 ("[t]he judicial authority shall have the power to modify or revoke at any time the terms and conditions of release as provided for in these rules"). Finally, the defendant is entitled to an expedited review procedure. See General Statutes § 54–63g ("Any accused person or the state, aggrieved by an order of the Superior Court concerning release, may petition the Appellate Court for review of such order. Any such petition shall have precedence over any other matter before said Appellate Court and any hearing shall be heard expeditiously with reasonable notice."). These existing procedural protections substantially reduce the risk of an unwarranted infringement on the defendant's rights.

Application of the third *Mathews* factor leads to the conclusion that the state has a strong interest in retaining the existing procedures. As the state has explained, "[a]llowing the government to establish both the factual predicate and need for a criminal protective **\*92** order by the use of police reports, victim affidavits and the report and recommendation of the local family services unit, without also requiring that the victim subject herself to cross-examination, greatly advances the government's compelling interest in protecting victims of domestic violence and their children before a defendant charged with a family violence crime is released into the community [or permitted to return to the family home] pending trial ... and, at the same time, serves to enhance the integrity of the criminal trial process itself by reducing the risk of witness intimidation."

**\*\*481** Because the state may take reasonable steps to ensure that a trial will take place, "[p]rocedures may ... be used both to secure the defendant's presence at trial and to prevent the defendant from aborting the trial by intimidating witnesses or physically harming them." *United States v. Melendez–Carrion,* supra, 790 F.2d at 1002. The concern of witness intimidation is especially great in

domestic violence cases. As one court has stated, due to the nature of the relationship between the victim and the abuser, "even a victim who reports an abusive family member to police may later protect the person by denying, minimizing, or recanting the report.... Thus, the prosecution of domestic violence cases presents particular difficulties. Unlike conventional cases ... [in which] prosecutors rely on the cooperation and participation of complaining witnesses to obtain convictions, in domestic violence cases prosecutors are often faced with exceptional challenges. Such challenges include victims who refuse to testify, who recant previous statements, or whose credibility is attacked by defense questions on why they remained in a battering relationship." (Citations omitted; internal quotation marks omitted.) *People v. Brown,* 33 Cal.4th 892, 899, 94 P.3d 574, 16 Cal.Rptr.3d 447 (2004); see also *State v. Borrelli,* 227 Conn. 153, 168–69, 629 A.2d 1105 (1993) (approving state's use of testimony concerning *93 "battered woman's syndrome" to explain why victims of domestic abuse sometimes remain in destructive relationships, do not report abuse in timely manner, and recant their complaint or testimony concerning abuse); *State v. Foreman,* 680 N.W.2d 536, 538 (Minn.2004) (same). Because victims of family violence are unusually susceptible to intimidation and frequently are fearful of confronting their abusers, I agree with the state that requiring a victim of such abuse to testify in a court proceeding, during which she is subject to examination by defense counsel, no more than a few days after reporting the crime, would be very likely to cause significant further trauma to the victim. Such a requirement also would deter some victims of family violence from reporting their abuse to the authorities. Because family violence "is a problem of immense proportions ... [that] has long been recognized as being at the core of other major social problems ... [including] [c]hild abuse, other crimes of violence against person or property, juvenile delinquency, and alcohol and drug abuse"; (internal quotation marks omitted) *State v. Karas,* 108 Wash.App. 692, 700, 32 P.3d 1016 (2001); the state has a compelling interest in encouraging victims of family violence to come forward. Granting to defendants in family violence cases the unconditional right to interrogate their alleged victims within days of their arrest would immeasurably undermine this important state interest.

It also would result in a serious administrative burden. Under the scheme advocated by the defendant, the trial court would be obligated to conduct a full evidentiary hearing, at the defendant's request, in any case in which the state seeks a family violence protective order that, if issued, would result in a significant deprivation of the defendant's liberty. Although the majority does not attempt to identify the kinds of liberty deprivations that would trigger the right to a full evidentiary *94 hearing, a defendant necessarily would be entitled to such a hearing in any case in which the court was considering a financial condition of release that the defendant could not make, thereby resulting in his pretrial confinement in lieu of bail.[20] **482 Nonfinancial conditions of release other than a condition that the defendant cannot return home, such as a curfew, home confinement, strict travel limitations and restrictions on child visitation, all involve significant liberty deprivations that implicate fundamental rights; consequently, they, too, presumably would give rise to a full evidentiary hearing.

Moreover, there is no reason why entitlement to a full evidentiary hearing would be restricted to defendants in family violence cases whose conditions of release have resulted in a significant liberty deprivation. In fact, the due process principle that the defendant advances would apply to any defendant who, as a result of a condition of bail or release, suffers a significant deprivation of liberty. Consequently, the administrative burden on our courts would not be limited to family violence cases but would extend to many other cases. This burden on the state and on the courts would be great.

In addition, the evidentiary hearing contemplated by the defendant would be a minitrial on the merits of the state's case against the defendant. This is the necessary result of the constitutional claim that the defendant raises because the propriety of an order barring the defendant from residing at his home will depend largely, if not entirely, on whether the trial court is persuaded by the state's evidence that the defendant, in fact, had committed the family violence offense with which he was charged. If so, then it is extremely likely that the *95 court will issue the protective order. The more questions that the defendant can raise about the state's case—for example, by casting doubt on the veracity of the state's witnesses, including, most importantly, the victim—the better the defendant's chances are that the court will not issue the order that the state has sought. Thus, a full evidentiary hearing regarding the issuance of the protective order would closely resemble, if not mirror, the criminal trial itself. The state "has an obvious interest in not conducting a full-blown criminal proceeding twice, once for [purposes of determining the conditions of release] and a second time for the trial on the charges." *United States v. Edwards,* supra, 430 A.2d at 1337. "[W]ith regard to the [state's] witnesses, and particularly the complaining witness,

the [state has] an interest in preventing premature discovery. It also has an interest in protecting the emotional and physical well-being of its witnesses." Id., at 1338.

Balancing the relevant factors, including, of course, the risk that use of the procedures now in place will result in an erroneous deprivation of the defendant's right to remain in his home pending trial, I believe that it is clear that the defendant has failed to establish that his interest in an unconditional right to cross-examine the victim at the hearing on the protective order outweighs the state's countervailing interest in a proceeding that does not necessarily involve such testimony. Although the defendant has a significant stake in the outcome of the hearing, his interests are protected by several important procedural safeguards, including the opportunity to persuade the trial court that live testimony, from the victim or anyone else, is necessary to a fair determination of whether the defendant should be barred from returning to his home.

This result, which is mandated by *Mathews,* also is dictated by the fact that the condition imposed on the defendant as a result of the protective order is no dif **\*483** ferent *\*96* than any other condition of bail or release, and no jurisdiction ever has held that the imposition of such a condition gives rise to an absolute right to a full evidentiary hearing. Indeed, as I explained previously, because a defendant is not entitled to call adverse witnesses at a pretrial detention hearing or at a bail hearing that results in the setting of a financial condition of release that the defendant cannot meet, thereby resulting in his pretrial incarceration, then, ipso facto, a defendant who is released into the community subject to one or more conditions has no absolute right to call adverse witnesses. I note, finally, that this conclusion also finds support in cases in which this court has determined that due process does not require an adversarial evidentiary hearing before a trial court may order a defendant to register as a sex offender; *State v. Arthur H.,* 288 Conn. 582, 609, 953 A.2d 630 (2008); that it is not a violation of due process for a trial court to rely on an unsworn statement in an arrest warrant to determine whether the defendant poses a risk to public safety, as long as the statement contains a minimum indicia of reliability; *State v. Bletsch,* 281 Conn. 5, 20–22, 912 A.2d 992 (2007); and that due process is not violated when a trial court's determination rests on reasonably reliable, unsworn or out-of-court information at the time of sentencing. *State v. Eric M.,* 271 Conn. 641, 649–50, 858 A.2d 767 (2004).

IV

My first and primary disagreement with the majority stems from its analysis and conclusion with respect to the nature of the hearing required under §§ 54–63c(b) and 46b–38c(e). The majority construes those provisions, first, as establishing a bifurcated hearing procedure and, second, as granting a defendant certain *\*97* procedural rights and denying him certain others.[21] Even a most cursory review **\*484** of the majority opinion, however, reveals that its interpretation of the term "hearing" in § 54–63c(b) is founded on nothing more than a series of bald assertions that are unsupported by analysis or evidence. Primarily because the legislature has elected to treat a protective order issued under those statutory provisions in the same manner as any *\*98* other condition of bail or release; see General Statutes § 46b–38c(e) (any order of protection issued thereunder "shall be made a condition of the bail or release of the defendant"); there is no reason to conclude that the hearing to which a defendant has a right under §§ 54–63c(b) and 46b–38c(e) is any different from any other hearing to which a defendant is entitled for purposes of challenging a condition of bail or release.

Recognizing that § 54–63c(b) expressly provides for a hearing at the time of presentment in accordance with § 54–1g(a), which in turn provides that a person arrested for a family violence crime shall be presented on the next day that court is in session, the majority first concludes that the hearing contemplated under §§ 54–63c(b) and 46b–38c(e) is a bifurcated one. Thus, under the construction that the majority advances, a person arrested for a family violence crime is entitled to a preliminary hearing on the protective order the day that he is presented pursuant to § 54–1g(a) and, upon the request of the defendant at that first proceeding, a second, more expansive hearing within a reasonable time thereafter.

The majority next identifies with specificity the parameters of the more expansive hearing under § 46b–38c(e). In particular, the majority concludes that the term "hearing" for purposes of that provision means that (1) the state may, if it wishes, establish the need for a protective order on the basis of "reliable hearsay,"[22] (2) if the state presents live witnesses, those witnesses are subject to cross-examination by the defendant, (3) the state must demonstrate the need for a family violence protective order by a preponderance of the evidence, (4) the defendant does not have a right to call the alleged victim, (5) the defendant also does not have the right to subpoena other adverse witnesses **99** to the hearing, (6) the defendant may, in the court's discretion, testify at the hearing, and (7) the defendant also may, in the court's discretion, call other witnesses who are willing to testify on his behalf. As I explain more fully hereinafter, the bifurcated hearing comprised of the foregoing multiple components is nowhere to be found in our statutory scheme; rather, it has been fashioned out of whole cloth by the majority.

The majority's determination that § 54–63c(b) contemplates a bifurcated hearing procedure is truly startling in light of the complete lack of support for that interpretation. There is absolutely nothing in the statutory language, the pertinent legislative history or anywhere else to substantiate the majority's interpretation. Indeed, it would appear that the majority's construction is barred by General Statutes § 1–2z,[23] which mandates application of **485** the plain language of a statute unless that language leads to a bizarre or unworkable result. The relevant statutory language is perfectly clear; General Statutes § 54–1g(a) provides that a person arrested for a family violence crime "*shall be promptly presented before the superior court sitting next regularly* for the geographical area where the offense is alleged to have been committed"; (emphasis added); and General Statutes § 54–63c(b) provides that, "*[o]n such date, the court shall conduct a hearing* pursuant to section 46b–38c *at which the defendant is entitled to be heard* with respect to the issuance of a protective order." (Emphasis added.) The majority's conclusion regarding the bifurcated nature of the hearing under § 46b–38c(e) contradicts the language of § 54–63a(b), which plainly and unambiguously provides that a person arrested for *100 a family violence crime is entitled to the hearing established under § 46b–38c(e) *at his presentment.* Under the majority's interpretation, however, the defendant is denied a meaningful opportunity to be heard at the time of presentment and, instead, must wait until the scheduling of a second hearing, to be held within some unspecified "reasonable period of time" in the future, and then only "[upon] the defendant's request made at [the time of the first hearing]...." The majority simply announces that this bifurcated procedure is statutorily mandated upon request but makes no attempt to explain the rationale, linguistic or otherwise, underlying its assertion.

The statutory construction that the majority adopts apparently is predicated on its belief that it would be impracticable for arraignment courts to hold the kind of hearing that the majority concludes is required by the statutory scheme. Putting aside the issue of whether that concern is justified in view of the relatively limited nature of the hearing that the majority asserts has been established under § 54–63c(b), a hearing that the majority itself states is likely to be "brief"; footnote 26 of the majority opinion; I submit that the majority's bifurcated hearing procedure is nothing more than a construct to accommodate the conclusion that the defendant is entitled to something more than a bail hearing. Thus, the majority, not the legislature, has created the two stage hearing; if the legislature had intended to create such a procedure, it easily could have manifested that intent expressly. E.g., *Windels v. Environmental Protection Commission,* 284 Conn. 268, 299, 933 A.2d 256 (2007) (legislature knows how to convey its intent expressly).

Of course, under our law, bail hearings routinely are conducted in arraignment court. It is far more likely, therefore, that the legislature, aware of that fact, fully expected that the hearing under § 54–63c(b) would be *101 conducted at the defendant's first court appearance and would be the same as a hearing on any other condition of bail or release.

This conclusion also finds strong support in the fact that, under General Statutes § 46b–38c(e), a protective order is expressly deemed a "condition of the bail or release of the defendant...." This language constitutes powerful evidence that the legislature intended to treat the issuance of a protective order under § 46b–38c(e) in the same manner as any other bail condition. Indeed, in the absence of any evidence of a contrary legislative intent—and the majority identifies none—the legislative decision to treat a protective order as a condition of release is alone sufficient to defeat the conclusion that the hearing contemplated by the legislature **486** for purposes of §§ 54–63c(b) and 46b–38c(e) differs in any way from a bail hearing.

The majority's construction suffers from other serious infirmities. First, as the majority has observed, "[a] review of other criminal procedure statutes demonstrates that, when the legislature has desired to impose specific requirements on the conduct of a pretrial hearing, it has said so explicitly." The majority offers as examples General Statutes § 54–82r, which authorizes courts to impose protective orders prohibiting the harassment of witnesses in criminal cases, and General Statutes § 54–64f, which authorizes courts to impose different conditions of release or to revoke the bail of defendants who have violated one or more release conditions. Each of these provisions delineates the general nature of the hearing established thereunder.[74] If **102** the legislature had intended to provide for a hearing under §§ 54–63c(b) and 46b–38c(e) that differs materially from the kind of hearing that our courts conduct routinely in setting all other conditions of bail and release, the legislature no doubt would have said so. E.g., *Windels v. Environmental Protection Commission,* supra, 284 Conn. at 299, 933 A.2d 256.

In addition, General Statutes § 54 63a(b) provides for a hearing "pursuant to [§ ]46b 38c...." As I previously noted, § 46b 38c(e) is silent with respect to the procedures to be followed at the hearing on the issuance of a family violence protective order. Under that statutory subsection, however, the court has broad discretion to impose conditions of release designed to protect the victim of the alleged family violence crime. Because there is no reason to conclude that the fundamental nature of the hearing required pursuant to § 46b–38c differs depending on the nature of the protective order at issue in any particular case, the hearing procedure that the majority adopts necessarily will be the same whether the court is contemplating an order that impinges on an important liberty interest of the defendant, such as the order in the present case, or one that falls at the other end of the spectrum, such as an order "enjoining the defendant from ... threatening, harassing, assaulting, molesting or sexually assaulting the victim...." General Statutes § 46b–38c(e). Aside from the fact that there is no evidence whatsoever to suggest that the legislature intended to adopt a "one size fits all" hearing formula, I see no reason why the legislature have intended to do so.

Furthermore, the majority's holding leads to an untenable, if not bizarre, result, namely, it creates one **103** set of procedures for bail hearings in nonfamily violence cases in which the court imposes an order of protection, and another set of procedures for such hearings in cases involving family violence crimes. As I previously have indicated; see part III A of this opinion; in most felony cases, a court may **487** impose, under § 54–64a(c), a nonfinancial condition of release such as requiring the defendant to "comply with specified restrictions on [his or her] travel, association or place of abode" for the express purpose of protecting the safety of the alleged victim. In those cases, the defendant is entitled to a hearing that is no different from any other bail hearing. In a case involving a crime of family violence, however, the majority asserts that a different hearing is required even when the very same condition is being imposed—for example, a condition, such as the one imposed in the present case, prohibiting the defendant from residing at his home—for the very same purpose. This is not a sensible or reasonable result, and the majority has identified nothing in our statutes or anywhere else to explain it.

A review of the majority opinion reveals that the majority's conclusion concerning the nature of the hearing established under §§ 54–63c(b) and 46b–38c(e) is based entirely on a single statement made on the floor of the House of Representatives by the sponsor of the bill that became P.A. 07–123 and on several *civil* cases from other states. Neither the legislative history nor the out-of-state precedent on which the majority relies bears even the slightest relevance to the issue presented by this case.

With respect to the majority's reliance on the legislative history of P.A. 07–123, the majority identifies what it characterizes as "the legislature's desire to satisfy the defendant's due process rights under the fourteenth amendment to the United States constitution ... [as] reflected in the comments of the sponsor of the bill **104** enacted as P.A. 07–123, who viewed it as an attempt to 'strike a very delicate balance here between the legitimate interests of law enforcement, and the important constitutional and civil liberty concerns that we would have [as] citizens....' 50 H.R. Proc., [Pt. 12, 2007 Sess.], p. 3904, remarks of Representative [Michael P.] Lawlor." Contrary to the conclusion of the majority, these remarks of Representative Lawlor in no way substantiate the elaborate gloss that the majority places on the statutory language at issue. First, the majority engages in no analysis as to why its statutory interpretation addresses any possible due process concerns; the majority's constitutional analysis is limited to a one paragraph footnote in which it dismisses the defendant's contention that he has a due process right to a full evidentiary hearing. See footnote 21 of the majority opinion. In fact, the reason that the majority gives for rejecting that claim, namely, that a defendant facing a protective order barring

him from his residence until the conclusion of his criminal case can have no constitutional entitlement to a full evidentiary hearing if a person who is incarcerated pending trial has no such right; see id.; defeats the majority's suggestion that due process considerations militate in favor of its interpretation of §§ 54–63c(b) and 46b–38c(e). In other words, it is illogical to assume that the legislature would intend that a person who, like the defendant, has been barred by the court from returning to his home pending the disposition of his family violence case is entitled to greater procedural rights than a person who is subject to an order that requires his incarceration prior to trial.

In addition, and perhaps more to the point, the majority takes Representative Lawlor's comment completely out of context. The comment was made in response to a proposed amendment to the bill that ultimately became P.A. 07–123 concerning the authority of the police to release a person arrested for a family violence crime *105 on a written promise to appear. See 50 H.R. Proc., supra, pp. at 3902–3903, remarks of Representative Kevin Witkos. **488 Representative Lawlor was expressing his support for the proposed amendment to its sponsor, Representative Witkos, and his comment had nothing at all to do with the nature of the hearing contemplated under the bill but, rather, with the bill's goal of balancing the rights of the family violence arrestee and the public in vesting the police with authority to impose conditions of release. Thus, the majority's reliance on Representative Lawlor's comment in an effort to rationalize its construction of §§ 54–63c(b) and 46b–38c(e) is entirely misplaced.

The only other authority on which the majority relies in support of its conclusion concerns its determination that the state must prove the need for a protective order by a preponderance of the evidence. Of course, with respect to other conditions of release, the trial court must exercise its sound discretion in determining whether a particular condition is appropriate in any given case. In the present case, however, the majority cites out-of-state precedent involving *civil* domestic violence protective orders as its primary basis for concluding that such a standard applies under § 46b–38c(e). In doing so, the majority fails to explain why the standard of proof applicable to an application for a protective order in a civil case should guide our interpretation of the *criminal* statutory scheme at issue. In particular, the majority makes no effort to explain why a condition of bail or release, such as the protective order issued in the present case, should be subject to the same standard of proof that governs the issuance of such an order when it is sought by a private litigant in a civil matter.[25] The majority's failure to articulate *106 even a plausible basis for equating the two is fatal to its conclusion that § 46b–38c(e), a criminal statute, embodies a civil standard of proof.[26]

**489 Finally, the majority, in holding that a defendant in a family violence case is somehow entitled to greater procedural safeguards than any other defendant before *107 a trial court may impose a protective order as a condition of bail or release, ignores the reason why the legislature included an express reference in P.A. 07–123, § 1, which is now codified at § 54–63c, to the hearing requirement of § 46b–38c. That reason is apparent: for the first time, the legislature, under P.A. 07–123, authorized the police to impose orders of protection as a condition of release, and the legislature wanted to ensure that a person who is subject to an order of protection imposed *by a police officer* would promptly be afforded a hearing before *a neutral and detached judicial officer* for a determination of whether that condition should be extended, modified or vacated. Instead of acknowledging this simple and obvious reason for the hearing mandated under §§ 54–63c(b) and 46b–38c(e), the majority tortures the statutory language and history to come up with an interpretation that is completely lacking in support and logic.[27]

## *108 V

I also disagree with the majority insofar as it reverses Judge Bingham's decision to reject the defendant's claim that he has a right to a full evidentiary hearing. Because the majority also concludes that the defendant was not entitled to such a hearing, the trial court's decision should be affirmed, not reversed. Of course, the defendant has a right under General Statutes § 54–69[28] to return to court for the purpose **490 of challenging the protective order, and any such hearing necessarily will accord with the new standards set forth by the majority in its decision. But even under its own resolution of the present appeal, the majority is wrong in reversing the trial court.

The majority itself correctly characterizes the claim that the defendant raised in the trial court as follows: "The defendant argued that he was entitled to a full evidentiary hearing under both § 54–63c and the due process clause of the fourteenth amendment to the United States constitution.... Judge Bingham denied the defendant's request for an evidentiary hearing, reasoning that the procedure for issuing a domestic *109 violence protective order in criminal cases 'is similar to a bail hearing, and you're not entitled to a full trial on a bail hearing.' "

This is the same claim that the defendant has raised in this court. The majority aptly characterizes that claim, as well, explaining that the defendant contends on appeal that "the trial court improperly failed to conduct an evidentiary hearing prior to issuing a criminal protective order because § 54–63c(b) 'expressly require[d]' the trial court to hold such a hearing when he first appeared in court. The defendant argues that the word 'hearing,' as used in § 54–63c(b), means an adversarial and formal adjudicative proceeding at which issues of fact and law are tried, evidence is taken, and witnesses and parties are heard. The defendant further contends that the cross-reference in § 54–63c(b) to § 46b–38c, the family violence criminal procedure statute that authorizes courts to impose criminal protective orders at the defendant's first court appearance ... requires that the criminal statute be applied consistently with the similarly worded ... § 46b–15, which, he argues, contemplates a full evidentiary hearing within fourteen days of the ex parte issuance of a civil domestic violence temporary restraining order." (Citation omitted.) The defendant also claims on appeal that he is entitled to the same right to a full evidentiary hearing under the due process clause of the fourteenth amendment.[29]

**491 *110 Thus, as the majority expressly recognizes, the defendant consistently has claimed that he is entitled, both statutorily and as a matter of due process, to nothing less than a full evidentiary hearing before the court may issue a family violence protective order under §§ 54–63c(b) and 46b–38c(e).[30] Although the majority, like the trial court, concludes that the defendant is not entitled to such a hearing—the only issue that the trial court was asked to resolve—the majority nevertheless deems it appropriate to render judgment reversing the trial court. It is axiomatic, however, that this court will affirm the judgment of a trial court when, as in the present case, we agree with the result reached by the trial court even if we disagree with its reasoning. The majority's refusal to affirm the trial court in the present case, therefore, is completely unsupportable.

Indeed, the trial court characterized the hearing to which the defendant is entitled as "similar to a bail hearing...." In fact, under the majority's interpretation of §§ 54–63c(b) and 46b–38c(e), the hearing to which a defendant is entitled thereunder *is* similar to a bail hearing. The majority agrees with the trial court that the defendant has no right to have the state prove its case with live testimony, no right to bar the state from using hearsay evidence, no right to call the alleged victim and no right to subpoena witnesses. The defendant, however, may, in the court's discretion, testify and call witnesses who are willing to testify on his behalf. These procedural rules are no different than the rules governing bail hearings, and the majority does not *111 contend otherwise. In any event, to the extent that the hearing contemplated by the majority differs at all from a bail hearing—at which the trial court must exercise its sound discretion in determining how to proceed under the particular circumstances presented—it certainly is *far* more akin to a bail hearing than the full evidentiary hearing that the defendant sought in the trial court and seeks on appeal to this court.

The majority asserts that, although Judge Pavia did afford the defendant the initial or preliminary hearing that, in the majority's view, is required under our statutory scheme, Judge Bingham must be reversed because the defendant "did not receive [the] subsequent hearing *as requested* ...." (Emphasis added.) This statement by the majority represents a mischaracterization of the record because *the defendant never requested the hearing to which the majority now concludes he was entitled;* indeed, he never even requested the opportunity to present any witnesses, evidence or other information. As I have explained, and as the majority expressly has acknowledged, the only hearing that the defendant sought was a full evidentiary hearing at which the state would be required to present testimony in compliance with the rules of evidence. The majority agrees that Judge Bingham properly denied the defendant's request for such a hearing. It is simply wrong, therefore, to assert that Judge Bingham must be reversed because he improperly declined to grant the defendant a hearing "as requested."

Unable to explain its reversal of Judge Bingham by reference to the facts and record of this case, the majority turns to another case, *Rowe v. Superior Court,* 289 Conn. 649, 960 A.2d 256 (2008), to support **492 its conclusion. In *Rowe,* this court concluded, inter alia, that the plaintiff in error had preserved his common-law claim challenging the propriety of the trial court's imposition of multiple contempt findings against him. Id., at 660, 663. *112 *Rowe* is wholly inapposite, however, because the defendant in the present case *never* has claimed that he is entitled to anything other than a full, trial-like hearing, let alone the hearing that the majority determines he is entitled to under the applicable statutory scheme. Nevertheless, the majority's sole argument is derived from *Rowe,* namely, that reversing Judge Bingham will not result in what the majority characterizes as a "judicial ambush...." Footnote 26 of the majority opinion. This assertion, however, has no basis in fact; reversing the trial court in the present case most certainly does achieve that unwarranted result because Judge Bingham, in rejecting the defendant's request for a full evidentiary hearing, *properly* resolved *the only claim before him.* In other words, in contrast to *Rowe,* in which this court concluded, by express reference to the trial court proceedings, that the court had been placed on notice of the claim that the plaintiff in error raised on appeal; see *Rowe v. Superior Court,* supra, at 662–63, 960 A.2d 256; the trial court in the present case had no such notice. In the present case, Judge Bingham was asked to decide only whether the defendant had a right to a full evidentiary hearing and not whether he had a right to the limited hearing that the majority has recognized today.[31]

Indeed, in characterizing the defendant's claim in the trial court and on appeal, the majority itself acknowledges that the defendant's claim is the same in both courts, namely, that he has a right to a full, trial-like hearing. Despite this express acknowledgment, the majority nonetheless asserts that it "represents a hyper-technical *113 and unduly restrictive application of the rules of preservation" to conclude that the "particular conclusion of law that [the majority] adopt[s]" was not preserved. Footnote 26 of the majority opinion. The majority, however, completely ignores the sine qua non of preservation, namely, *fair notice* of the claim to the trial court. See, e.g., *State v. Ross,* 269 Conn. 213, 335–36, 849 A.2d 648 (2004) ("the essence of the preservation requirement is that *fair notice* be given to the trial court of the party's view of the governing law" [emphasis in original]). Tellingly, the majority opinion makes no reference to the notice requirement and contains no discussion of how the defendant's arguments placed the trial court on fair notice of the statutory interpretation that the majority adopts today. Under settled principles of preservation, which the majority purports to apply, the majority would have to be satisfied that Judge Bingham was, in fact, accorded a fair opportunity to consider, for his acceptance or rejection, the interpretation of the statutory scheme that the majority has adopted. It simply is not possible to reach that conclusion, however, for as the majority expressly has acknowledged, the defendant "argued [in the trial court] *only* that he was entitled to a full, trial-like, evidentiary hearing." (Emphasis added.) Footnote 26 of the majority opinion. Undaunted by this logical flaw in its analysis, the majority nevertheless insists that it is appropriate **493 to reverse Judge Bingham's ruling.

The majority also seeks to justify its conclusion by reference to the fact that, after Judge Bingham had denied the defendant's request for a full evidentiary hearing, defense counsel questioned the court about the nature of the hearing to which the defendant was entitled. Id. (asserting that reversal "[did] not operate as a judicial ambush of Judge Bingham, as, after he denied the defendant a full, trial-like hearing, defense counsel questioned [Judge Bingham] about the nature *114 of the hearing to which the defendant was entitled"). Judge Bingham ultimately informed the defendant that he was entitled to a hearing similar to a bail hearing. It is impossible to see how defense counsel's question and Judge Bingham's response to it support a reversal, as our trial courts are responsible for resolving issues presented to them, not for advising parties on how best to proceed. Moreover, in characterizing the hearing as akin to a bail hearing, Judge Bingham said nothing to mislead the defendant, who at no time sought to challenge the state's evidence or introduce any evidence of his own, by way of proffer or otherwise. Simply put, the majority countenances an ambuscade of Judge Bingham by reversing him on the basis of a nonconstitutional claim that never was raised in the trial court and has not been raised on appeal.

More importantly, the majority's approach to preservation—an approach that effectively dispenses with the heretofore critical component of fair notice—is unprecedented and unwarranted. The majority embraces a methodology pursuant to which it is enough to preserve a claim for appeal if the "issue" raised on appeal implicates the same issue that was raised in the trial court. Id. For purposes of the present case, the majority identifies that issue as "what type of hearing is required under § 46b–38c"; id.; and concludes that, because this court is deciding the same "issue" on appeal as the defendant raised in the trial court, the preservation requirement has been satisfied. Heretofore, that requirement would be met only if the *claim* that the defendant raised in the trial court, namely, that he

is entitled to a full-blown evidentiary hearing, is also the claim to be decided on appeal. Under the new, issue-oriented approach that the majority invents, however, the preservation requirement is satisfied, irrespective of whether the claim raised on appeal mirrors the claim that had been raised in the trial court, as long as the latter can be characterized *115 as implicating the same general "issue"—or, as the majority puts it, the same general "subject of [the] dispute"—as the former. Id.

For very good reason, this court never before has adopted the expansive view of preservation that the majority employs in the present case. Under the majority's approach, if a party claims in the trial court that a statute means one thing (X), and the trial court rejects the party's construction on the ground that the statute means something entirely different (Y), and, then, on appeal, the party argues that the statute has yet a third meaning (Z), the party's claim has been preserved because the "issue" at trial and on appeal is the same, that is, the meaning of the statute. Until now, this has not been the mode of analysis used to determine whether a claim has been preserved for purposes of appeal, and it should not be because, under that methodology, fair notice to the trial court simply is irrelevant; the trial court never was afforded the opportunity to address the party's claim, raised for the first time on appeal, that the statute means Z. In this example, the only claim that the party has preserved is its claim that the statute means X; merely because the particular **494 statutory interpretation urged by the party in the trial court—that is, the party's *claim*—implicated the broader "issue" of the statute's meaning, the party is not entitled to raise *any and all other competing interpretations* of the statute on appeal. That, however, is precisely the approach to preservation that the majority takes in the present case; the statutory interpretation that the defendant advocated in the trial court bears no resemblance to the interpretation of the statute that the majority adopts in the present appeal, yet the majority concludes that the preservation requirement has been satisfied.

A second scenario also highlights the extent to which the majority has departed from settled principles of *116 preservation. Under present law, if a party objects to the admission of certain evidence on relevancy grounds, and the trial court overrules the objection, and, thereafter, the party claims on appeal that the evidence was inadmissible hearsay, the claim on appeal is not preserved. See, e.g., *State v. Cabral*, 275 Conn. 514, 531, 881 A.2d 247 (defendant's claim on appeal that evidence was inadmissible hearsay was not preserved and, thus, not reviewable because defendant raised different objection at trial), cert. denied, 546 U.S. 1048, 126 S.Ct. 773, 163 L.Ed.2d 600 (2005); see also *State v. Meehan*, 260 Conn. 372, 388–90, 796 A.2d 1191 (2002) (because defendant raised one claim at trial as to why witness' testimony was inadmissible and asserted another, different claim of inadmissibility on appeal, defendant's appellate claim was unpreserved and, therefore, not reviewable). In light of the majority's decision in the present case, however, a party seeking relief on appeal could claim that the "issue" raised by his objection at trial was the inadmissibility of the evidence and, further, that, because his hearsay claim, which he raised for the first time on appeal, implicates that same "issue," the claim would be preserved. Under the analytical model that the majority adopts, I see no reason why that party would not prevail on his preservation argument.[32]

*117 In sum, by focusing broadly on the *issue* raised in the trial court rather than the *claim* raised in that court, the majority approves of an approach to preservation that differs markedly from the methodology that this court consistently has employed for a very long time. If the majority does not believe that preservation requires fair notice of the claim to the trial court, then it should say so expressly and explain why it has reached that conclusion. **495 [33] It is unacceptable, however, for the majority to purport to apply settled preservation principles, on the one hand, and, on the other, to endorse a far broader and different standard that effectively eliminates the fair notice requirement.[34]

*118 Finally, although I disagree with the majority's determination as to the nature of the hearing contemplated under §§ 54–63c(b) and 46b–38c(e); see part IV of this opinion; I agree with the majority that we should take this opportunity to explicate the parameters of that hearing. We should do so, however, in the exercise of our supervisory authority over the administration of justice; see, e.g., *State v. Connor*, 292 Conn. 483, 518 n. 23, 973 A.2d 627 (2009); because the issue is sufficiently important to warrant such an explication, not because the trial court's ruling on the defendant's claim was in any way wrong or improper. Moreover, because § 54–69 entitles the defendant to a modification of the conditions of his release whenever such a modification is warranted, he will be entitled to a hearing of the kind that the majority adopts today merely upon filing an application to dissolve or modify the protective order that was issued in the present case. The majority's reversal of Judge Bingham, however, is both wrong as a matter of law and

manifestly unfair to Judge Bingham. "Unfortunately, the majority's conclusion also sends the wrong message to trial judges generally. It is one thing to hold our judges accountable for their decisions on claims that have been presented to them; it is another matter entirely to hold them responsible for **496 failing to decide claims that never were raised. I submit that that is precisely what the majority has done in the present *119 case."[35] *Rowe v. Superior Court,* supra, 289 Conn. at 685, 960 A.2d 256 (*Palmer, J.,* concurring).

<center>*120 VI</center>

A condition of bail or release that precludes a defendant from residing at his home during the pendency of his criminal case undoubtedly results in a significant liberty deprivation to that defendant. Consequently, our trial courts must carefully evaluate the particular circumstances of each case in deciding whether to impose such a condition. For obvious reasons, however, the imposition of such a condition will be prudent, if not absolutely necessary, in some cases involving family violence, **497 which aptly has been characterized as a "modern-day scourge." J. Kaye, "Delivering Justice Today: A Problem–Solving Approach," 22 Yale L. & Policy Rev. 125, 139 (2004).

Contrary to the conclusion of the majority, there is nothing in our statutory scheme to suggest that the legislature has devised a hearing specially designed for the purpose of determining whether an order of protection should issue in a family violence case. In fact, such orders are no different than other conditions of bail or release, and the legislature expressly has designated them as such. Thus, as I previously explained, the state generally will be able to make its case for the issuance of a protective order on the basis of evidence, such as the alleged victim's sworn statement, that otherwise might not be admissible at trial. And most often, the defendant will be unable to establish a sufficient basis for calling adverse or other witnesses for the purpose of challenging the issuance of such an order. Whether the existence of unusual circumstances may give rise to an exception to these general rules is a determination *121 that must be made by the trial court, in the exercise of its sound discretion, on a case-by-case basis, with due regard for the interests of all parties. In recognition of the fact that our trial courts are best situated to make such judgments and, thus, to strike the appropriate balance between the rights of the defendant and the legitimate interests of the state and the alleged victim, the legislature has manifested its intent that the desirability of an order of protection shall be determined in the same manner as any other condition of bail or release. The majority, however, disregards this evident legislative intent and, instead, substitutes its own view of what the law should be for what the legislature has decreed by creating a hearing procedure under § 46b–38c(e) in derogation of the procedure endorsed by the legislature. Judicial lawmaking of this sort is never acceptable, least of all with respect to a subject matter of such vital concern as family violence. Within constitutional limits, it is the prerogative of our elected officials, not this court, to determine how best to deal with such public safety issues. Unfortunately, the majority ignores that fundamental principle in the present case. Accordingly, I dissent in part.

## All Citations

294 Conn. 1, 981 A.2d 427

<center>Footnotes</center>

\*    In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to identify the victims or others through whom the victims' identities may be ascertained. See General Statutes § 54–86e.

1    This case originally was argued before a panel of this court consisting of Justices Norcott, Palmer, Vertefeuille, Zarella and Schaller. Thereafter, the court, pursuant to Practice Book § 70–7(b), sua sponte, ordered that the case be considered en banc. Accordingly, Chief Justice Rogers and Justice McLachlan were added to the panel, and they have read the record, briefs and transcript of oral argument.

The listing of justices reflects their seniority status as of the date of oral argument.

2    General Statutes § 54–63c(b) provides: "If the person is charged with the commission of a family violence crime, as defined in section 46b–38a, and the police officer does not intend to impose nonfinancial conditions of release pursuant to this subsection, the police officer shall, pursuant to the procedure set forth in subsection (a) of this section, promptly order the release of such person upon the execution of a written promise to appear or the posting of such bond as may be set by the police officer. If such person is not so released, the police officer shall make reasonable efforts to immediately contact a bail commissioner to set the conditions of such person's release pursuant to section 54–63d. If, after making such reasonable efforts, the police officer is unable to contact a bail commissioner or contacts a bail commissioner but such bail commissioner is unavailable to promptly perform such bail commissioner's duties pursuant to section 54–63d, the police officer shall, pursuant to the procedure set forth in subsection (a) of this section, order the release of such person upon the execution of a written promise to appear or the posting of such bond as may be set by the police officer and may impose nonfinancial conditions of release which may require that the arrested person do one or more of the following: (1) Avoid all contact with the alleged victim of the crime, (2) comply with specified restrictions on the person's travel, association or place of abode that are directly related to the protection of the alleged victim of the crime, or (3) not use or possess a dangerous weapon, intoxicant or controlled substance. Any such nonfinancial conditions of release shall be indicated on a form prescribed by the Judicial Branch and sworn to by the police officer. Such form shall articulate (A) the efforts that were made to contact a bail commissioner, (B) the specific factual basis relied upon by the police officer to impose the nonfinancial conditions of release, and (C) if the arrested person was non-English-speaking, that the services of a translation service or interpreter were used. A copy of that portion of the form that indicates the nonfinancial conditions of release shall immediately be provided to the arrested person. A copy of the entire form shall be provided to counsel for the arrested person at arraignment. Any nonfinancial conditions of release imposed pursuant to this subsection shall remain in effect until the arrested person is presented before the Superior Court pursuant to subsection (a) of section 54–1g. On such date, the court shall conduct a hearing pursuant to section 46b–38c at which the defendant is entitled to be heard with respect to the issuance of a protective order."

Section 54–63c was substantially amended by No. 07–123, § 1, of the 2007 Public Acts, which was effective at the time of the defendant's arrest. Hereafter, unless otherwise indicated, references to this statute in this opinion are to the current revision, which includes the changes effected by that amendment.

3    This appeal is the consolidation of two separate proceedings, Docket Nos. SC 18045 and SC 18103. Docket No. SC 18045 is an appeal from the October 18, 2007 order of the trial court, *Bingham, J.,* filed pursuant to General Statutes § 52–265a, which provides in relevant part: "(a) Notwithstanding the provisions of sections 52–264 and 52–265, any party to an action who is aggrieved by an order or decision of the Superior Court in an action which involves a matter of substantial public interest and in which delay may work a substantial injustice, may appeal under this section from the order or decision to the Supreme Court within two weeks from the date of the issuance of the order or decision. The appeal shall state the question of law on which it is based.

      "(b) The Chief Justice shall, within one week of receipt of the appeal, rule whether the issue involves a substantial public interest and whether delay may work a substantial injustice...."

Because Chief Justice Rogers was unavailable, Justice Norcott, as the senior available associate justice, considered and granted the defendant's application in SC 18045 pursuant to Practice Book § 83 4. In addition, we note that this interlocutory appeal properly is before this court because "the 'order or decision' referred to in § 52–265a from which an appeal may be taken need not be a final judgment." *Laurel Park, Inc. v. Pac,* 194 Conn. 677, 678 n. 1, 485 A.2d 1272 (1984).

Docket No. SC 18103 is an appeal from the October 15, 2007 order of the trial court, *Pavia, J.,* to the Appellate Court, and raises an issue identical to that of the certified appeal in SC 18045. Ordinarily, this appeal would not properly be before this court because a defendant's exclusive nondiscretionary remedy from an order concerning conditions of release is a petition to the Appellate Court pursuant to General Statutes § 54–63g. See *State v. Ayala,* 222 Conn. 331, 338–39, 610 A.2d 1162 (1992). Nevertheless, we will exercise our discretion and treat the defendant's appeal in SC 18103 as a properly filed bail review petition in the Appellate Court. Cf. id., at 341–42, 610 A.2d 1162 (dismissing defendant's petition for certification to appeal pursuant to General Statutes § 51–197f from Appellate Court's determination on bail review motion, but treating that petition as properly filed § 52–265a petition). Inasmuch as SC 18103 is related to SC 18045, which is properly before this court pursuant to § 52–265a, we have transferred SC 18103 from the Appellate Court to this court, and consolidated it with SC 18045 pursuant to Practice Book § 61–7 and Practice Book § 65–3, which permits the transfer of release review petitions from the Appellate Court to this court "*in any case on appeal to the supreme court ....*" (Emphasis added.)

4    General Statutes § 46b–38c provides in relevant part: "(a) There shall be family violence response and intervention units in the Connecticut judicial system to respond to cases involving family violence. The units shall be coordinated and governed by formal agreement between the Chief State's Attorney and the Judicial Department.

"(b) The Court Support Services Division, in accordance with the agreement between the Chief State's Attorney and the Judicial Department, shall establish within each geographical area of the Superior Court a local family violence intervention unit to implement sections 46b–1, 46b–15, 46b–38a to 46b–38f, inclusive, and 54–1g. The Court Support Services Division shall oversee direct operations of the local units.

"(c) Each such local family violence intervention unit shall: (1) Accept referrals of family violence cases from a judge or prosecutor, (2) prepare written or oral reports on each case for the court by the next court date to be presented at any time during the court session on that date, (3) provide or arrange for services to victims and offenders, (4) administer contracts to carry out such services, and (5) establish centralized reporting procedures. All information provided to a family relations officer in a local family violence intervention unit shall be solely for the purposes of preparation of the report and the protective order forms for each case and recommendation of services and shall otherwise be confidential and retained in the files of such unit and not be subject to subpoena or other court process for use in any other proceeding or for any other purpose, except that if the victim has indicated that the defendant holds a permit to carry a pistol or revolver or possesses one or more firearms, the family relations officer shall disclose such information to the court and the prosecuting authority for appropriate action.

"(d) In all cases of family violence, a written or oral report and recommendation of the local family violence intervention unit shall be available to a judge at the first court date appearance to be presented at any time during the court session on that date. A judge of the Superior Court may consider and impose the following conditions to protect the parties, including, but not limited to: (1) Issuance of a protective order pursuant to subsection (e) of this section; (2) prohibition against subjecting the victim to further violence; (3) referral to a family violence education program for batterers; and (4) immediate referral for more extensive case assessment. Such protective order shall be an order of the court, and the clerk of the court shall cause (A) a certified copy of such order to be sent to the victim, and (B) a copy of such order, or the information contained in such order, to be sent by facsimile or other means within forty-eight hours of its issuance to the law enforcement agency for the town in which the victim resides and, if the defendant resides in a town different from the town in which the victim resides, to the law enforcement agency for the town in which the defendant resides. If the victim is employed in a town different from the town in which the victim resides, the clerk of the court shall, upon the request of the victim, send, by facsimile or other means, a copy of such order, or the information contained in such order, to the law enforcement agency for the town in which the victim is employed within forty-eight hours of the issuance of such order.

"(e) A protective order issued under this section may include provisions necessary to protect the victim from threats, harassment, injury or intimidation by the defendant, including, but not limited to, an order enjoining the defendant from (1) imposing any restraint upon the person or liberty of the victim, (2) threatening, harassing, assaulting, molesting or sexually assaulting the victim, or (3) entering the family dwelling or the dwelling of the victim. A

protective order issued under this section may include provisions necessary to protect any animal owned or kept by the victim including, but not limited to, an order enjoining the defendant from injuring or threatening to injure such animal. Such order shall be made a condition of the bail or release of the defendant and shall contain the following language: 'In accordance with section 53a–223 of the Connecticut general statutes, any violation of this order constitutes criminal violation of a protective order which is punishable by a term of imprisonment of not more than five years, a fine of not more than five thousand dollars, or both. Additionally, in accordance with section 53a–107 of the Connecticut general statutes, entering or remaining in a building or any other premises in violation of this order constitutes criminal trespass in the first degree which is punishable by a term of imprisonment of not more than one year, a fine of not more than two thousand dollars, or both. Violation of this order also violates a condition of your bail or release, and may result in raising the amount of bail or revoking release.' Every order of the court made in accordance with this section after notice and hearing shall also contain the following language: 'This court had jurisdiction over the parties and the subject matter when it issued this protection order. Respondent was afforded both notice and opportunity to be heard in the hearing that gave rise to this order. Pursuant to the Violence Against Women Act of 1994, 18 USC 2265, this order is valid and enforceable in all fifty states, any territory or possession of the United States, the District of Columbia, the Commonwealth of Puerto Rico and tribal lands.' The information contained in and concerning the issuance of any protective order issued under this section shall be entered in the registry of protective orders pursuant to section 51–5c...."

[5]  The defendant was charged with one count each of the crimes of assault in the third degree in violation of General Statutes § 53a–61, disorderly conduct in violation of General Statutes § 53a–182, and reckless endangerment in the second degree in violation of General Statutes § 53a–64, and two counts of the crime of risk of injury to a child in violation of General Statutes (Rev. to 2007) § 53–21(a)(1).

[6]  The fourteenth amendment to the United States constitution, § 1, provides in relevant part: "No State shall ... deprive any person of life, liberty or property, without due process of law...."

[7]  Specifically, Judge Bingham concluded that giving the defendant a full evidentiary hearing with the right to examine and subpoena witnesses, including the complainant, would place an "undue burden" on the complainant, who had indicated her fear of the defendant. Judge Bingham also rejected the defendant's statutory argument, concluding that the language of the statute did not expressly mandate a "full evidentiary hearing," and required only notice and the opportunity to be heard. For a more complete discussion of Judge Bingham's ruling, see footnote 26 of this opinion.

[8]  We note that Judge Bingham subsequently modified the criminal protective order to permit the defendant some visitation with his children.

[9]  General Statutes § 46b–15 provides in relevant part: "(a) Any family or household member as defined in section 46b–38a who has been subjected to a continuous threat of present physical pain or physical injury by another family or household member or person in, or has recently been in, a dating relationship who has been subjected to a continuous threat of present physical pain or physical injury by the other person in such relationship may make an application to the Superior Court for relief under this section.

"(b) The application form shall allow the applicant, at the applicant's option, to indicate whether the respondent holds a permit to carry a pistol or revolver or possesses one or more firearms. The application shall be accompanied by an affidavit made under oath which includes a brief statement of the conditions from which relief is sought. Upon receipt of the application the court shall order that a hearing on the application be held not later than fourteen days from the date of the order. The court, in its discretion, may make such orders as it deems appropriate for the protection of the applicant and such dependent children or other persons as the court sees fit. Such order may include temporary child custody or visitation rights and such relief may include but is not limited to an order enjoining the respondent from (1) imposing any restraint upon the person or liberty of the applicant; (2) threatening, harassing, assaulting, molesting, sexually assaulting or attacking the applicant; or (3) entering the family dwelling or the dwelling of the applicant. The court, in its discretion, may make such orders as it deems appropriate for the

protection of any animal owned or kept by the applicant including, but not limited to, an order enjoining the respondent from injuring or threatening to injure such animal. If an applicant alleges an immediate and present physical danger to the applicant, the court may issue an ex parte order granting such relief as it deems appropriate. If a postponement of a hearing on the application is requested by either party and granted, the order shall not be continued except upon agreement of the parties or by order of the court for good cause shown.

"(c) Every order of the court made in accordance with this section shall contain the following language: 'This order may be extended by the court beyond six months. In accordance with section 53a–107, entering or remaining in a building or any other premises in violation of this order constitutes criminal trespass in the first degree. This is a criminal offense punishable by a term of imprisonment of not more than one year, a fine of not more than two thousand dollars or both.'

"(d) No order of the court shall exceed six months, except that an order may be extended by the court upon motion of the applicant for such additional time as the court deems necessary. If the respondent has not appeared upon the initial application, service of a motion to extend an order may be made by first-class mail directed to the respondent at his or her last known address.

"(e) The applicant shall cause notice of the hearing pursuant to subsection (b) of this section and a copy of the application and the applicant's affidavit and of any ex parte order issued pursuant to subsection (b) of this section to be served on the respondent not less than five days before the hearing. The cost of such service shall be paid for by the Judicial Branch. Upon the granting of an ex parte order, the clerk of the court shall provide two certified copies of the order to the applicant. Upon the granting of an order after notice and hearing, the clerk of the court shall provide two certified copies of the order to the applicant and a copy to the respondent. Every order of the court made in accordance with this section after notice and hearing shall contain the following language: 'This court had jurisdiction over the parties and the subject matter when it issued this protection order. Respondent was afforded both notice and opportunity to be heard in the hearing that gave rise to this order. Pursuant to the Violence Against Women Act of 1994, 18 USC 2265, this order is valid and enforceable in all fifty states, any territory or possession of the United States, the District of Columbia, the Commonwealth of Puerto Rico and tribal lands.' Immediately after making service on the respondent, the proper officer shall send or cause to be sent, by facsimile or other means, a copy of the application, or the information contained in such application, stating the date and time the respondent was served, to the law enforcement agency or agencies for the town in which the applicant resides, the town in which the applicant is employed and the town in which the respondent resides. The clerk of the court shall send, by facsimile or other means, a copy of any ex parte order and of any order after notice and hearing, or the information contained in any such order, to the law enforcement agency or agencies for the town in which the applicant resides, the town in which the applicant is employed and the town in which the respondent resides, within forty-eight hours of the issuance of such order...."

10    General Statutes § 54–82r provides in relevant part: "(a) Upon application of a prosecutorial official, a court may issue a protective order prohibiting the harassment of a witness in a criminal case if the court, after a hearing at which hearsay evidence shall be admissible, finds by a preponderance of the evidence that harassment of an identified witness in a criminal case exists or that such order is necessary to prevent and restrain the commission of a violation of section 53a–151 or 53a–151a. Any adverse party named in the complaint has the right to present evidence and cross-examine witnesses at such hearing. Such order shall be an order of the court, and the clerk of the court shall cause a certified copy of such order to be sent to the witness, and a copy of such order, or the information contained in such order, to be sent by facsimile or other means within forty-eight hours of its issuance to the appropriate law enforcement agency.

"(b) A protective order shall set forth the reasons for the issuance of such order, be specific in terms and describe in reasonable detail, and not by reference to the complaint or other document, the act or acts being restrained. A protective order issued under this section may include provisions necessary to protect the witness from threats, harassment, injury or intimidation by the adverse party including, but not limited to, enjoining the adverse party from (1) imposing any restraint upon the person or liberty of the witness, (2) threatening, harassing, assaulting, molesting

or sexually assaulting the witness, or (3) entering the dwelling of the witness. Such order shall contain the following language: 'In accordance with section 53a–223 of the Connecticut general statutes, any violation of this order constitutes criminal violation of a protective order which is punishable by a term of imprisonment of not more than five years, a fine of not more than five thousand dollars, or both. Additionally, in accordance with section 53a–107 of the Connecticut general statutes, entering or remaining in a building or any other premises in violation of this order constitutes criminal trespass in the first degree which is punishable by a term of imprisonment of not more than one year, a fine of not more than two thousand dollars, or both.' If the adverse party is the defendant in the criminal case, such order shall be made a condition of the bail or release of the defendant and shall also contain the following language: 'Violation of this order also violates a condition of your bail or release and may result in raising the amount of bail or revoking release.' ..."

[11]    On appeal, the defendant also renews his claim that the due process clauses of the United States and Connecticut constitutions; see U.S. Const., amend. XIV, § 1; Conn. Const., art. I, § 8; entitle him to an evidentiary hearing prior to the issuance of a criminal protective order. Because of our conclusion with respect to the defendant's statutory claims, and the fact that he notes that a civil protective order hearing under § 46b–15 (b) may be delayed for up to fourteen days, and concedes that "a short delay in the hearing date likely would not violate due process requirements," we do not reach these constitutional issues, except as necessary to delineate the contours of the hearing required by §§ 54–63c(b) and 46b–38c(d). See, e.g., Kelo v. New London, 268 Conn. 1, 12 n. 10, 843 A.2d 500 (2004), aff'd, 545 U.S. 469, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005); see also footnote 21 of this opinion.

[12]    The procedure for the release of an arrestee is set forth by General Statutes § 54–63c (a), which provides: "Except in cases of arrest pursuant to a bench warrant of arrest in which the court or a judge thereof has indicated that bail should be denied or ordered that the officer or indifferent person making such arrest shall, without undue delay, bring such person before the clerk or assistant clerk of the superior court for the geographical area under section 54–2a, when any person is arrested for a bailable offense, the chief of police, or the chief's authorized designee, of the police department having custody of the arrested person shall promptly advise such person of the person's rights under section 54–1b, and of the person's right to be interviewed concerning the terms and conditions of release. Unless the arrested person waives or refuses such interview, the police officer shall promptly interview the arrested person to obtain information relevant to the terms and conditions of the person's release from custody, and shall seek independent verification of such information where necessary. At the request of the arrested person, the person's counsel may be present during the interview. No statement made by the arrested person in response to any question during the interview related to the terms and conditions of release shall be admissible as evidence against the arrested person in any proceeding arising from the incident for which the conditions of release were set. After such a waiver, refusal or interview, the police officer shall promptly order release of the arrested person upon the execution of a written promise to appear or the posting of such bond as may be set by the police officer, except that no condition of release set by the court or a judge thereof may be modified by such officer and no person shall be released upon the execution of a written promise to appear or the posting of a bond without surety if the person is charged with the commission of a family violence crime, as defined in section 46b–38a, and in the commission of such crime the person used or threatened the use of a firearm."

[13]    General Statutes § 54–1g(a) provides: "Any arrested person who is not released sooner or who is charged with a family violence crime as defined in section 46b–38a or a violation of section 53a–181c, 53a–181d or 53a–181e shall be promptly presented before the superior court sitting next regularly for the geographical area where the offense is alleged to have been committed. If an arrested person is hospitalized, or has escaped or is otherwise incapacitated, the person shall be presented, if practicable, to the first regular sitting after return to police custody."

[14]    General Statutes § 54–69 provides in relevant part: "(a) Whenever in any criminal prosecution the state's attorney for any judicial district or the assistant state's attorney is of the opinion that the bond without or with surety given by any accused person is excessive or insufficient in amount or security, or that the written promise of such person to appear

is inadequate, or whenever any accused person alleges that the amount or security of the bond given by such accused person is excessive, such state's attorney or assistant state's attorney *or the accused person* may bring an application to the court in which the prosecution is pending or to any judge thereof, alleging such excess, insufficiency, or inadequacy, and, after notice as hereinafter provided and hearing, such judge shall in bailable offenses *continue, modify or set conditions of release* upon the first of the following conditions of release found sufficient to provide reasonable assurance of the appearance of the accused in court: (1) Upon such person's execution of a written promise to appear, (2) upon such person's execution of a bond without surety in no greater amount than necessary, (3) upon such person's execution of a bond with surety in no greater amount than necessary...." (Emphasis added.)

[15]  Although *State v. Doe*, supra, 46 Conn.Supp. at 598, 765 A.2d 518, is a Superior Court decision, rather than an opinion of this court or the Appellate Court, we may rely on the doctrine of legislative acquiescence because, as an officially published decision, it is part of a limited group of trial court opinions that are "useful as precedents or [whose publication] will serve the public interest...." General Statutes § 51–215a(a). Thus, we disagree with Justice Palmer's criticism in his dissent of our reliance on *Doe* as "stretch[ing] the doctrine of legislative acquiescence beyond its breaking point." Although we acknowledge, and presume that the legislature is aware of, the decisional hierarchy in the court system, the fact that *Doe* is a Superior Court decision not binding statewide does not detract from its status at that time as the only published authority construing § 46b–38c.

[16]  General Statutes § 54–64f provides in relevant part: "(a) Upon application by the prosecuting authority alleging that a defendant has violated the conditions of the defendant's release, the court may, if probable cause is found, order that the defendant appear in court for an evidentiary hearing upon such allegations. An order to appear shall be served upon the defendant by any law enforcement officer delivering a copy to the defendant personally, or by leaving it at the defendant's usual place of abode with a person of suitable age and discretion then residing therein, or mailing it by registered or certified mail to the last-known address of the defendant.

"(b) If the court, *after an evidentiary hearing at which hearsay or secondary evidence shall be admissible,* finds by clear and convincing evidence that the defendant has violated reasonable conditions imposed on the defendant's release it may impose different or additional conditions upon the defendant's release. If the defendant is on release with respect to an offense for which a term of imprisonment of ten or more years may be imposed and the court, after an evidentiary hearing at which hearsay or secondary evidence shall be admissible, finds by clear and convincing evidence that the defendant has violated reasonable conditions of the defendant's release and that the safety of any other person is endangered while the defendant is on release, it may revoke such release.

"(c) If the defendant is on release with respect to an offense for which a term of imprisonment of ten or more years may be imposed and the court, *after an evidentiary hearing at which hearsay or secondary evidence shall be admissible,* finds by clear and convincing evidence that the safety of any other person is endangered while the defendant is on release and that there is probable cause to believe that the defendant has committed a federal, state or local crime while on release, there shall be a rebuttable presumption that the defendant's release should be revoked...." (Emphasis added.)

[17]  Other statutes similarly are illustrative of the legislature's prerogative to require that the courts conduct a certain type of adversarial or evidentiary hearing. See, e.g., General Statutes § 17a–498(c) (At a Probate Court hearing on an application for a civil commitment of a mentally ill person to a psychiatric facility, the respondent or "his or her counsel shall have the right to present evidence and cross-examine witnesses who testify at any hearing on the application. If such respondent notifies the court not less than three days before the hearing that he or she wishes to cross-examine the examining physicians, the court shall order such physicians to appear."); General Statutes § 19a–343a(e) (action commenced by state to abate public nuisance shall have initial "show cause hearing" for court to "determine whether there is probable cause to believe that a public nuisance exists, and that the circumstances demand the temporary relief requested be ordered," followed by "evidentiary hearing within ninety days from the show cause hearing").

[18]   It is undisputed that criminal protective orders may have a significant impact on a defendant's fundamental constitutional rights. See *Williams v. State,* 151 P.3d 460, 465 (Alaska App.2006) (defendant subject to criminal protective order "has a liberty interest in choosing his family living arrangements"); *People v. Forman,* supra, 145 Misc.2d at 121, 546 N.Y.S.2d 755 ("Each of the temporary orders of protection restrict [the] defendant's liberty to go where he pleases—he may not go to the home, place of business or place of employment of his wife, as well as his associational liberty in relation to his wife.... The orders also exclude him from real property in which [the] defendant otherwise shares ownership and a right to possession." [Citations omitted.]); *Moore v. Moore,* 376 S.C. 467, 474–75, 657 S.E.2d 743 (2008) (subject of civil protective order faces, inter alia, "immediate loss of his children ... and possession of the marital residence," as well as "future ramifications" with "long-term impact" on marital litigation). Moreover, by imposing what some commentators have referred to as "de facto divorce," albeit without the benefit of property division and procedures attendant to the dissolution context, the protective order further compounds the financial difficulties attendant to being tried on criminal charges. See J. Suk, "Criminal Law Comes Home," 116 Yale L.J. 2, 42, 50 (2006) (criminal protective order "amounts in practice to state-imposed de facto divorce" and because it raises "the prospect of punishment for the proxy conduct of being present at home," it "shifts the very goal of pursuing criminal charges away from punishment to control over the intimate relationship in the home"); see also C. Frank, comment, "Criminal Protection Orders in Domestic Violence Cases: Getting Rid of Rats With Snakes," 50 U. Miami L.Rev. 919, 942–43 (1996) ("courts should take seriously the deprivation of the guaranteed right to enjoy property that will result from the issuance of a criminal protection order").

[19]   On June 27, 2008, after this case had been argued before the original panel of this court, we ordered the parties to file supplemental briefs addressing the following question: "If this court concludes that an evidentiary hearing is required for the imposition of a domestic violence protective order in a criminal case, should the state be required to prove the necessity of that order by a preponderance of the evidence or by clear and convincing evidence?" Thereafter, both the state and the defendant filed comprehensive supplemental briefs in support of the position that, consistent with the procedures followed in civil domestic violence cases in both Connecticut and in other states, the state should be required to prove the necessity of a domestic violence protective order in a criminal case by a preponderance of the evidence.

[20]   We emphasize that this subsequent hearing should not be a minitrial on the underlying criminal charges, or, put differently, the state is not required to prove the elements of those crimes charged by a preponderance of the evidence. Indeed, only those defendants charged with crimes punishable by death or life imprisonment have a right to a probable cause hearing in Connecticut. See, e.g., *State v. Mitchell,* 200 Conn. 323, 324–26, 512 A.2d 140 (1986) (discussing article first, § 8, of constitution of Connecticut, as amended by article seventeen of amendments); see also *Gerstein v. Pugh,* supra, 420 U.S. at 119–20, 95 S.Ct. 854 (federal constitution does not require adversary procedures at probable cause proceeding). Thus, once probable cause has been established for the defendant's arrest; see Practice Book § 37–12(a) (defendant is entitled to probable cause determination within forty-eight hours of warrantless arrest which "shall be made in a nonadversary proceeding, which may be ex parte based on affidavits"); the state's burden is limited to proving by a preponderance of the evidence the necessity of the criminal protective order as a regulatory means for protecting the complainant and other members of the defendant's household. The defendant remains free, however, to adduce his own evidence tending to negate the necessity for the criminal protective order or portions thereof, evidence that may well pertain to the merits of the underlying criminal charges.

[21]   We note that the defendant does not argue that the confrontation clause of the sixth amendment to the United States constitution requires that he be given the absolute right to examine the complainant at such this early stage in the proceedings, particularly if she does not appear to testify on the state's behalf. See *State v. Randolph,* 284 Conn. 328, 378–79 n. 15, 933 A.2d 1158 (2007) (declining to decide issue, but noting that "majority of states, however, have concluded that the sixth amendment right to confrontation 'is basically a trial right' ... that does not apply to preliminary hearings" [citation omitted] ). To the extent, however, that the defendant claims that his due process rights entitle him to procedural protections beyond those delineated in our interpretation of §§ 54–63c(b) and 46b–

38c, namely, a full minitrial, with the right to compel the testimony of and examine the complainant, we disagree. Specifically, we note that several federal courts of appeal have held, following *United States v. Salerno*, 481 U.S. 739, 742, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), which upheld the constitutionality of the federal Bail Reform Act, 18 U.S.C. § 3141 et seq., that a defendant facing the even greater liberty restriction of preventive *detention* on the basis of predicted dangerousness is not entitled to those rights as matter of due process. See, e.g., *United States v. LaFontaine*, 210 F.3d 125, 130–32 (2d Cir.2000); *United States v. Smith*, 79 F.3d 1208, 1210 (D.C.Cir.1996); see also *Harnish v. State*, 531 A.2d 1264, 1268 n. 8 (Me.1987) (For pretrial detention of those charged with "capital" offenses, court followed *Gerstein v. Pugh*, supra, 420 U.S. at 120, 95 S.Ct. 854, and concluded that "[t]he pretrial bail proceeding in which the [s]tate makes the required probable cause showing is not to be a mini-trial. The [s]tate may make that showing on affidavits and reliable hearsay as in other pretrial proceedings to determine probable cause."). Indeed, other courts have, consistent with these decisions, concluded that a defendant is not constitutionally entitled to an evidentiary hearing with the right to confront and to cross-examine the complainant prior to the issuance of a criminal protective order in a domestic violence case. See *Mendez v. Robertson*, 202 Ariz. 128, 130, 42 P.3d 14 (Ct.App.2002) (rejecting defendant's claim that "he was entitled to an evidentiary hearing on his motion for reexamination of his release conditions, that the respondent judge erred in accepting avowals by the prosecutor, and that [he] should have been permitted to call the victim as a witness so he could cross-examine her"); *People v. Koertge*, 182 Misc.2d 183, 189, 701 N.Y.S.2d 588 (1998) (defendant facing criminal protective order does not have "statutory or constitutional right to confront his accuser prior to trial" and due process protection is limited to right to present evidence at bail hearing, at which trial court has discretion to order further evidentiary hearing); *Ex parte Flores*, 130 S. W.3d 100, 107 (Tex.App.2003) (evidentiary hearing not required for issuance of emergency protective order despite lack of procedure for modification because "the availability of the writ of habeas corpus procedure affords one the opportunity to obtain an adversarial hearing to contest the emergency protective order"), review denied, 2004 Tex.Crim.App. Lexis 809 (Tex.Crim.App. April 28, 2004); see also *State v. Thompson*, 349 N.C. 483, 494, 508 S.E.2d 277 (1998) (discussing *Gerstein* and *Salerno* and stating that Supreme Court "has not required such [adversary hearing] procedures to defeat such a [procedural due process] challenge" in case rejecting facial challenge to statute allowing domestic violence arrestee to be detained for forty-eight hours prior to release conditions hearing before judge); but see *People v. Forman*, supra, 145 Misc.2d at 129, 546 N.Y.S.2d 755 ("The requirements of due process do entitle [the] defendant to a prompt evidentiary hearing after the temporary order of protection excluding [the] defendant from the home has been issued.... The importance of [the] defendant's interest in his home, the severity of the deprivation imposed through exclusion from the home, and, typically, the need to resolve conflicting issues of fact and credibility as to the underlying family conflict, require that a trial type hearing be provided. Presentation of witnesses and cross-examination are the most suitable means for assessment of veracity and credibility." [Citations omitted.] ). Thus, we conclude that the federal due process clause does not entitle the defendant to any procedural protections beyond those articulated in our interpretation of the relevant statutes.

22    Should the trial court, in the exercise of its sound discretion, deem it necessary for the complainant or children to testify, we note that such testimony may be taken and the witness cross-examined in a manner intended to address concerns, expressed herein by the state and the amici curiae, Connecticut Coalition Against Domestic Violence, office of the victim advocate and department of children and families, as well as both Justices Palmer and Schaller in their dissents, about the potential intimidation of testifying complainants and children. Cf. Public Acts 2008, No. 08–67, § 1, codified at General Statutes § 46b–15c (authorizing court to order sworn testimony in family relations matter by party or child who is subject of protective order, when other party is subject of protective order, to be taken via videoconference technology with witness either outside courtroom or in remote location).

23    General Statutes § 54–63g provides: "Any accused person or the state, aggrieved by an order of the Superior Court concerning release, may petition the Appellate Court for review of such order. Any such petition shall have precedence over any other matter before said Appellate Court and any hearing shall be heard expeditiously with reasonable notice."

24     Justice Schaller expresses concern about the uncertainties that might develop during the implementation of this procedure, namely, the definition of terms such as "reasonable time," and whether the arraignment court must inform the defendant of his right to the subsequent hearing. We acknowledge the impracticability of addressing in dicta every possible dispute that might arise during the implementation of this, or any other, judicial decision, and note that many such concerns are best addressed either through the rule-making process or the development of future case law.

25     Justice Schaller argues in his dissent that our conclusion is "unwise policy" because, given the "unique kind of vulnerability" of family violence victims, the likelihood of examination and cross-examination at an early stage in the proceedings will deter them from pursuing criminal complaints against their abusers. We acknowledge Justice Schaller's observations about the unique concerns of those involved in family violence cases, and emphasize that the state is not required to call a family violence complainant to testify at the subsequent hearing, and the trial court retains considerable discretion about whether to grant such a request by the defendant. To the extent that a defendant does "proffer [a] highly damaging [challenge]" to a complainant's account, "virtually compelling the state to call victims in order to prove the necessity of continuing the order," that concern is dependent solely on the trial court's assessment of the credibility of the defense. Moreover, should the trial court in its discretion deem the complainant's testimony necessary prior to the issuance of a criminal protective order, statutory mechanisms exist to facilitate that testimony in a manner that will mitigate intimidation concerns. See footnote 22 of this opinion.

26     In his dissent, Justice Palmer argues that we should affirm the judgment of the trial court because the defendant failed to argue before the trial court in support of the particular conclusion of law that we adopt herein, and argued only that he was entitled to a full, trial-like, evidentiary hearing. We agree, however, with Justice Schaller that Justice Palmer's position represents a hypertechnical and unduly restrictive application of the rules of preservation, which we acknowledge "generally limit this court's review to issues that are distinctly raised at trial." (Internal quotation marks omitted.) *Rowe v. Superior Court,* 289 Conn. 649, 660, 960 A.2d 256 (2008). On this point, like Justice Schaller, we find persuasive the analysis from our recent decision in *Rowe,* wherein we concluded that trial counsel had preserved for appellate review via writ of error his claim that a second finding of criminal contempt, based on a witness' refusal to answer subsequent and rephrased questions on the same topic, violated the common law. Id., at 662–63, 960 A.2d 256. We noted in *Rowe* that we were "mindful that [although] the plaintiff did not raise [before the trial court] all of the theories that he raises in his writ as to why his conduct should be deemed a single act of contempt, those theories are related to a single legal claim," and that there is "substantial overlap between these theories under the case law." Id., at 663, 960 A.2d 256. Accordingly, we concluded that "we [could not] conclude that the plaintiff has ambushed the trial court by seeking reversal of an issue that he had failed to raise at trial." Id., at 662–63, 960 A.2d 256; see also id., at 661 n. 6, 960 A.2d 256 (declining to construe ambiguity in record against plaintiff-in-error because of "summary nature of the proceedings and the fact that this issue is one of first impression"). Indeed, we also noted in *Rowe* that the concerns of judicial economy implicated by appeals by ambuscade, namely, that new trials would be required, were not implicated because "success on the writ would not require a new trial." Id., at 661 n. 6, 960 A.2d 256.

    A review of the applicable transcript reveals that a reversal in this interlocutory public interest appeal does not operate as a judicial ambush of Judge Bingham, as, after he denied the defendant a full, trial-like hearing, defense counsel questioned him about the nature of the hearing to which the defendant was entitled. Defense counsel also pointed out that the state had not shown him any supporting affidavits, notwithstanding the fact that the defendant himself did not make a proffer in support of his request to call witnesses. Finally, a reversal here would not frustrate judicial economy, as the case has not been tried, and no evidence has been admitted in this pretrial hearing; this appeal, therefore, concerns solely a proposition of law that requires the defendant to receive what likely will be a brief hearing.

    Indeed, for a more complete understanding of what took place before Judge Bingham, we note in detail that, during argument, the following exchange occurred between Judge Bingham and defense counsel.

    "The Court: Well ... you're not entitled to a full hearing, with the right to subpoena witnesses and the right to call the

wife. This puts an undue burden on the wife because she has—and the affidavits, evidently, indicate that the wife is afraid of the husband and that she requested a full protective order. And you're not entitled to a full trial here in this court....

"[Defense Counsel]: *If I may then, Your Honor, if we're doing it today, I would point out to the court that we've been shown no affidavits.*" (Emphasis added.)

After further argument on the legislature's intent, the following exchange occurred between the prosecutor, the court and defense counsel.

"[The Prosecutor]: ... [W]e don't do this arbitrarily and cavalierly. We have pictures; this is a documented case. This is not something that we're just saying it's a credibility issue, here. There's plenty of facts that substantiate probable cause that the police found to make an arrest, and certainly the issuance of a protective order. That's all I have to say, Your Honor. And, counsel, if the Appellate Court agrees with you, then the state will, in the future—will comply with any evidentiary hearing the court deems fit.

"The Court: Well—

"[The Prosecutor]: I'm going to ask for a continuance, Your Honor. We can put it on the regular docket. I think counsel's been heard in an argument. I think it's essentially a legal argument, Your Honor. The court would certainly be leaving—we issue, literally, hundreds and hundreds of these a week, Your Honor. And I'm not saying court efficiency or court economy is the determinant fact here, but the court understands the type of argument counsel is making. He's saying that, essentially, we have a little minitrial before we have another trial, to determine whether this happened. The court makes decisions like this all the time, and not just only domestic violence cases. The fact that she's a woman, believe me, plays no determination in this whatsoever for the state's opinion on this case. It has nothing to do with it.

"[Defense Counsel]: I can only act on the basis of what I've heard in this courtroom, counsel.

"The Court: Well, my ruling is that you are not entitled to a full trial, with the ability to subpoena witnesses and have a full trial.

"[Defense Counsel]: *May I know, then, Your Honor's interpretation of the nature of the hearing that we are, then, permitted under § 46b–38c, as referenced in Public Act 07–123?*

"The Court: *We gave you a right to be heard today.*

"[Defense Counsel]: *How, Your Honor, when I have heard no evidence against my client except statements which are not under oath? There [are] no facts before the court* when, in fact, the Public Act itself states that the ... protective order—issued by the police remains only in effect until the presentment under § 54–1g, the arraignment statute, which was Monday, at which time there has to be a hearing. Well, if the hearing is simply the state saying, 'we want a restraining order,' and they submit to the court the report of the family—or the domestic violence response unit, what hearing is that?

"[The Prosecutor]: That's the hearing you're entitled to, counsel.

"[Defense Counsel]: Oh.

"[The Prosecutor]: *And if counsel has to-wants to put in a hearing right now, say that he has reason to believe the credibility and the statements of the victim, or the Gerstein of the credibility of the police officers that responded, I'd like to hear that, myself, because the state's interest here is to do justice. If this was a situation where there was—you know, things that were manufactured—*

"[Defense Counsel]: *Well, that's—*

"[The Prosecutor]: I'd like to hear it.

"[Defense Counsel]:—*that's—*

"[The Prosecutor]: I'm certainly—my own eyes, I met with the victim today, Your Honor, and I see bruises all over her body; so based on the statements that the police officers gave me when they made the arrest, I have reason to believe that an assault took place, here. And that's what we do here on a daily basis, counsel. And I guess you're going to have to meet with your local legislat[ors] to maybe, you know, change the law....

"The Court: Well, *the argument of counsel for the defendant I don't accept,* and I am adopting the procedure which

has been—this is similar to a bail hearing, and you're not entitled to a full trial on a bail hearing. So, you may have an appeal....

"[Defense Counsel]: We filed the appeal already, Your Honor." (Emphasis added.)

Although we acknowledge the importance of preservation requirements to an orderly system of appellate review, it appears that Justice Palmer would conclude that a reviewing court may consider only those specific *arguments* made before the trial court on the given *issue*, namely, what type of hearing is required under § 46b–38c, or subject of a dispute, and also is required to accept an appellant's arguments in their entirety before granting any relief at all. Put differently, adopting Justice Palmer's restrictive application of those requirements would frustrate a reviewing court's ability to address claims on appeal appropriately and effectively because that court would be precluded from granting partial relief unless the appellant has elected to proceed in the alternative before the trial court and ask specifically for that partial relief before that court, prior to repeating those arguments verbatim on appeal. Thus, we disagree with Justice Palmer's view that we apply preservation principles in this case in an "expansive" manner "never before ... adopted." Expressed in the symbolic language that Justice Palmer uses to illustrate his misunderstanding of this opinion, we simply state that, if a defendant asks for relief at the trial court that encompasses elements A, B, C and D, that request is adequate to permit relief on appeal that only grants elements A and B, but not C and D. Under Justice Palmer's view, a defendant would need to argue explicitly that, "if I'm not entitled to A, I am still entitled to B, C and D," and "if I'm not entitled to A and B, then I am still entitled to C and D," and so on, in order to render that relief available on appeal. That strikes us as an unduly onerous burden on litigants. Moreover, we disagree with Justice Palmer's reliance on case law concluding that evidentiary claims were not properly preserved. See *State v. Cabral,* 275 Conn. 514, 530–31, 881 A.2d 247, cert. denied, 546 U.S. 1048, 126 S.Ct. 773, 163 L.Ed.2d 600 (2005); *State v. Meehan,* 260 Conn. 372, 388–89, 796 A.2d 1191 (2002). Evidentiary rulings are subject to a preservation and briefing standard under Practice Book §§ 5–5 and 67–4(d)(3) that reflects the discretionary nature of those decisions, as compared to questions of law such as that present in this case, which are subject to plenary review. See *State v. Cabral,* supra, at 530–31, 881 A.2d 247 ("[T]he standard for the preservation of a claim alleging an improper evidentiary ruling at trial is well settled. This court is not bound to consider claims of law not made at the trial.... In order to preserve an evidentiary ruling for review, trial counsel must object properly.... In objecting to evidence, counsel must properly articulate the basis of the objection so as to apprise the trial court of the precise nature of the objection and its real purpose, in order to form an adequate basis for a reviewable ruling.... Once counsel states the authority and ground of [the] objection, any appeal will be limited to the ground asserted." [Internal quotation marks omitted.]); *State v. Meehan,* supra, at 388, 796 A.2d 1191 (noting discretionary nature of evidentiary ruling).

In our view, a more functional approach to preservation acknowledges the tension that exists between decision making by busy trial courts, which, as Justice Schaller acknowledges, frequently must occur at a rapid pace, and decision making by appellate courts, which often have available to them the luxury of a more comprehensive briefing process, as well as ample time to engage in a more thorough argument, research and writing process prior to issuing an opinion.

[1]    For the text of § 54–63c(b), see footnote 2 of the majority opinion.

[2]    For the text of § 46b–38c, see footnote 4 of the majority opinion.

[3]    As the majority explains in footnote 3 of its opinion, this appeal is the consolidation of two separate proceedings. The appeal in Docket No. SC 18103 challenges the order of the trial court, *Pavia, J.,* on the day of the defendant's arraignment, denying the defendant's request for an immediate evidentiary hearing and continuing the case for three days so that the defendant could then request an evidentiary hearing. The majority affirms the order of the trial court in Docket No. SC 18103, and I concur in that result.

The appeal in Docket No. SC 18045 challenges the subsequent order of the trial court, *Bingham, J.,* denying the defendant's request for an evidentiary hearing. For the reasons discussed in this concurring and dissenting opinion, I disagree with the majority's decision to reverse the order of the trial court in Docket No. SC 18045.

4    I disagree with Justice Palmer's conclusions that the defendant failed to preserve his claim, that the trial judge should be affirmed rather than reversed, and that the majority is unfairly ambuscading the trial judge. *Rowe v. Superior Court,* 289 Conn. 649, 960 A.2d 256 (2008), is established law and I believe it is clear that the defendant preserved the claim that he pursues on appeal, which the majority resolves. I submit that the concept of preservation should be liberally interpreted to allow a claim to proceed to a decision on the merits. In the present case, the defendant notified the court and the state that he was seeking a second hearing—an expanded one, which he characterized as a "trial-like hearing...." Although no one could foresee the precise procedure that the majority would announce today, the state and the trial court were on notice that the defendant sought an expanded second hearing. The trial court's ruling certainly was not incorrect under the circumstances but, because it did not grant the second hearing outlined today, a reversal is in order. The majority has acknowledged that the trial court was not mistaken because it did not have the benefit of this decision. Clearly, the majority's decision has changed the law to a degree. Trial judges—like all participants in court proceedings—deserve to be treated respectfully and fairly by appellate courts, but trial judges need not be *sheltered* from reversal, when warranted. I suggest that the concept of *ambuscade of the trial judge* is often overemphasized generally and, certainly, it is misplaced under these circumstances. A far greater concern is *ambush* of a *party* when that party is deprived of a fair chance to defend a claim at the trial level and create a record for appeal. That did not happen in the present case.

5    It is unclear whether and, if so, by what analysis, the majority concludes that the defendant has a procedural due process right to an evidentiary hearing after the arraignment stage. The majority suggests that it bases its conclusion that the defendant is entitled to a second, expanded hearing on state statutory grounds, and further suggests that it has not considered whether the defendant's right to procedural due process under the federal constitution requires the new rule. The majority's statutory analysis, however, is based entirely on its reliance on the notion that the legislature desired to protect the due process rights of family violence defendants. As I observe in part I of this concurring and dissenting opinion, by concluding, in the context of its statutory analysis, that due process *impliedly* requires the second, expanded hearing, the majority foregoes the opportunity to explain the precise reasoning that apparently has led it to conclude that procedural due process requires this result.

6    Section 46b–38c(e) uses the word "hearing" with reference to the language that must be included in a protective order "made in accordance with [§ 46b–38c] after notice and hearing," and provides that such order must state: " 'This court had jurisdiction over the parties and the subject matter when it issued this protection order. Respondent was afforded both notice and opportunity to be heard in the hearing that gave rise to this order.' "

7    General Statutes § 54–1g(a) provides: "Any arrested person who is not released sooner or who is charged with a family violence crime as defined in section 46a–38a or a violation of section 53a–181c, 53a–181d or 53a–181e shall be promptly presented before the superior court sitting next regularly for the geographical area where the offense is alleged to have been committed. If an arrested person is hospitalized, or has escaped or is otherwise incapacitated, the person shall be presented, if practicable, to the first regular sitting after return to police custody."

8    General Statutes § 54–69(a) provides: "Whenever in any criminal prosecution the state's attorney for any judicial district or the assistant state's attorney is of the opinion that the bond without or with surety given by any accused person is excessive or insufficient in amount or security, or that the written promise of such person to appear is inadequate, or whenever any accused person alleges that the amount or security of the bond given by such accused person is excessive, such state's attorney or assistant state's attorney *or the accused person* may bring an application to the court in which the prosecution is pending or to any judge thereof, alleging such excess, insufficiency, or inadequacy, and, after notice as hereinafter provided and hearing, such judge shall in bailable offenses *continue, modify or set conditions of release* upon the first of the following conditions of release found sufficient to provide reasonable assurance of the appearance of the accused in court: (1) Upon such person's execution of a written promise to appear, (2) upon such person's execution of a bond without surety in no greater amount than necessary, (3) upon such person's execution of a bond with surety in no greater amount than necessary." (Emphasis added.)

[9]    Interestingly, the majority does not draw the more obvious inference from Lawlor's statement—that providing the defendant with the brief, nonevidentiary hearing to which he is entitled pursuant to §§ 54–63c(b) and 46b–38c at the time of his arraignment, strikes that "delicate balance...." 50 H.R. Proc., supra, at p. 3904. In other words, the logical inference to be drawn from Lawlor's words is that the statutes do not deprive the defendant of his right to due process and, on the contrary, properly balance those rights against the legitimate interests of law enforcement.

[10]   In *Mathews v. Eldridge,* supra, 424 U.S. at 334–35, 96 S.Ct. 893, the court adopted a three part balancing test for resolving procedural due process claims, explaining "that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the [g]overnment's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." The court considered this balancing test to be particularly well adapted to the concept of due process, which, the court stated, "is flexible and calls for such procedural protections as the particular situation demands." (Internal quotation marks omitted.) Id., at 334, 96 S.Ct. 893.

[11]   See S. Brauerman, comment, "Balancing the Burden: The Constitutional Justification for Requiring the Government to Prove the Absence of Mental Retardation Before Imposing the Death Penalty," 54 Am. U.L.Rev. 401, 425–26 (2004) ("[o]nce the [c]ourt recognizes a due process right, it applies either the *Patterson* ... 'historical basis' test *or* the *Mathews* ... 'balancing test' " [emphasis added]).

[12]   I note that the Supreme Court has not interpreted the concept of a fundamental principle of justice as synonymous with the concept of a fundamental right, a concept central to a substantive due process analysis. See, e.g., *Washington v. Glucksberg,* 521 U.S. 702, 719–21, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997). Instead, the court has understood fundamental principles of justice to be confined to procedural rights. See *Montana v. Egelhoff,* 518 U.S. 37, 47, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996) (defendant bears burden in procedural due process challenge to show that "the *principle of procedure* violated by the rule ... is so rooted in the traditions and conscience of our people as to be ranked as fundamental" [emphasis altered; internal quotation marks omitted] ). Thus, although the allegations of the defendant in the present case that the protective order affects rights that have been deemed to be fundamental would be relevant to a substantive due process inquiry, and would also be relevant to the consideration of a civil procedural due process claim—because the fundamental nature of the individual right would be relevant to the balancing test— the fact that the defendant's access to his home and children is affected by the criminal protective order is not relevant to the procedural due process inquiry under *Medina* and *Patterson.* It is the nature of the asserted procedural right that is determinative.

[13]   The legislation was enacted following a successful civil rights action brought by Tracey Thurman and her son, Charles Thurman, Jr., against the defendants, the city of Torrington and police officers employed by the city. See *Thurman v. Torrington,* 595 F.Supp. 1521 (D.Conn.1984). The District Court refused to dismiss Tracey Thurman's claim alleging that the defendants had violated her right to equal protection under the law by impermissibly providing police protection to "persons abused by someone with whom the victim has no domestic relationship," but affording lesser protection "when the victim is (1) a woman abused or assaulted by a spouse or boyfriend, or (2) a child abused by a father or stepfather." Id., at 1527. A jury later awarded Tracey Thurman $2.3 million in compensatory damages. M. Hoctor, comment, "Domestic Violence as a Crime Against the State: The Need for Mandatory Arrest in California," 85 Calif. L.Rev. 643, 654 (1997). When the defendants challenged the award on appeal, Tracey Thurman settled out of court for $1.9 million in damages and her son was awarded an additional $300,000. Id., at 654 n. 83.

[14]   Legislative recognition of that unique vulnerability is evidenced both in the express language of §§ 54–63c and 46b–38c, as well as in the text and legislative history of Public Acts 1986, No. 86–337, which is detailed in part II of this concurring and dissenting opinion.
The unique difficulties of protecting victims of family violence from their abusers recently has been the focus of a

series in the Hartford Courant, entitled "Battered Lives." See http://www.courant.com/news/domestic-violence (last visited October 23, 2009). The series explores the severity of the problem of domestic violence in our society and examines the particular difficulties presented to law enforcement when victims and abusers are connected by complex familial ties. Id.

1  See footnote 2 of the majority opinion for the text of § 54–63c(b).

2  A "family violence crime" is defined as a misdemeanor or felony that "in addition to its other elements, contains as an element thereof an act of family violence to a family member...." General Statutes § 46b–38a(3).

"Family violence" is defined as "an incident resulting in physical harm, bodily injury or assault, or an act of threatened violence that constitutes fear of imminent physical harm, bodily injury or assault between family or household members." General Statutes § 46b–38a(1).

3  General Statutes § 54–1g(a) provides in relevant part: "Any arrested person ... who is charged with a family violence crime ... shall be promptly presented before the superior court sitting next regularly for the geographical area where the offense is alleged to have been committed...."

4  See footnote 4 of the majority opinion for the text of § 46b–38c(e).

5  I agree with the majority only to the extent that it determines that the defendant is not entitled to a full evidentiary hearing and affirms the decision of the court, *Pavia, J.*

6  See footnote 9 of the majority opinion for the relevant text of § 46b–15.

7  On November 8, 2007, the court, *Bingham, J.,* modified the protective order by facilitating the defendant's visitation with his children.

8  The majority does not articulate how the rights to which it asserts a defendant is entitled at a hearing under § 46b–38c(e) differ from the rights to which a defendant is entitled at any other bail hearing. One difference, of course, is that, in the case of bail hearings generally, the court must exercise its sound discretion in setting bail and imposing conditions of release; under the majority's interpretation of §§ 54–63c(b) and 46b–38c(e), however, the state must prove the need for a protective order by a preponderance of the evidence. Otherwise, however, it is not clear exactly how the hearing envisioned by the majority is different from a bail hearing. In view of the fact that the majority deems it appropriate to reverse the decision of the trial court, *Bingham, J.,* that the defendant was entitled to a hearing akin to a bail hearing, it must be presumed that, in the majority's view, the hearing rights afforded under §§ 54–63c(b) and 46b–38c(e) are greater than those ordinarily afforded at bail hearings.

9  Ordinarily, it might be appropriate simply to adopt the analytical approach advanced by the parties. Because, however, this is an appeal under General Statutes § 52–265a that implicates the public interest, and because the case involves a challenge to the constitutionality of one or more state statutes, it would not be proper to do so here.

10  Although the court in *Abuhamra* applied the *Mathews* test, it did not discuss the *Medina* standard or explain why the *Mathews* test was applicable.

11  The court in *Krimstock* also made it clear that prosecutors could seek a retention order ex parte. *Krimstock v. Kelly,* supra, 464 F.3d at 255.

12  In support of its determination that, on remand, the *Mathews* balancing test is applicable, the court also cited approvingly from the following analysis of Judge J. Michael Luttig, formerly of the Fourth Circuit Court of Appeals: "I believe that [*Mathews*], rather than [*Medina*], provides the proper analytical framework for determining whether there exists a procedural due process right to [postconviction] access [to evidence]. The asserted right of access does not entail a challenge to the underlying conviction, and neither (at least comfortably) is the state's denial of access equivalent to a state rule of criminal procedure governing the process by which one is tried and found guilty or

innocent of criminal offense." *Harvey v. Horan,* 285 F.3d 298, 315 n. 6 (4th Cir.2002).

[13] It is noteworthy that, in adopting a test for criminal cases that is "far less intrusive" than the *Mathews* balancing test; *Medina v. California,* supra, 505 U.S. at 446, 112 S.Ct. 2572; the court in *Medina* explained that "substantial deference to legislative judgments in this area"; id.; is appropriate because "the [s]tates have considerable expertise in matters of criminal procedure and the criminal process is grounded in centuries of common-law tradition...." Id., at 445–46, 112 S.Ct. 2572. To some degree, therefore, the court in *Medina* was persuaded to adopt a far more narrow test for criminal cases on the basis of principles of federalism. To the extent that the *Medina* standard is predicated on such principles, that fact militates in favor of the application of the *Mathews* test when, as in the present case, a state procedural rule is subject to a due process challenge in state court. See *State v. Gonzales,* 130 N.M. 341, 356 n. 1, 24 P.3d 776 (2001) (Bustamante, J., concurring) ("[t]he ... [federalism] concerns [of the court in *Medina* ] do not cast doubt on a state court's adaptation and use of the *Mathews* factors to determine what procedures are due in its own courts" [internal quotation marks omitted]).

[14] As I previously noted, in adopting a narrow test for due process challenges involving the criminal process, the court in *Medina* relied heavily on the fact that, because procedure in criminal cases is governed expressly by the bill of rights, the use of the broad language of the due process clause in such cases would invite "undue interference with both considered legislative judgments and the careful balance that the [c]onstitution strikes between liberty and order." *Medina v. California,* supra, 505 U.S. at 443, 112 S.Ct. 2572. Because the eighth amendment to the United States constitution, which itself is a provision of the bill of rights, expressly bars "[e]xcessive bail," and because a protective order issued under § 46b–38c "shall be made a condition of the bail or release of the defendant"; General Statutes § 46b–38c (e); it may be argued that the rationale underlying *Medina* is, indeed, applicable to the issue presented by this case. See *United States v. Abuhamra,* supra, 389 F.3d at 323 ("[b]ail hearings fit comfortably within the sphere of adversarial proceedings closely related to trial"); cf. *Higazy v. Templeton,* 505 F.3d 161, 173 (2d Cir.2007) (bail hearing was "part of the criminal case against [the plaintiff]" for purpose of determining whether coerced statement that had been taken from plaintiff by federal agent and used against him in bail hearing gave rise to cognizable civil claim against that agent for violation of plaintiff's rights under fifth amendment).

[15] Thus, in the present case, the trial court could have permitted the defendant to call the victim as a witness if the court reasonably believed that unusual circumstances had warranted it. Before compelling the presence of an adverse witness such as the victim, however, the court should require a proffer from the defendant detailing why such testimony is truly necessary. As the court in *United States v. Edwards,* supra, 430 A.2d at 1321, explained, "with regard to [the defendant calling] the government's witnesses, and particularly the complaining witness, the government does have an interest in preventing premature discovery. It also has an interest in protecting the emotional and physical well-being of its witnesses.... [Thus] cross-examination for the limited purpose of impeaching the witness' credibility is an insufficient reason to compel a witness' presence. The requirement of a preliminary proffer [by the defendant], regarding the manner in which a witness' testimony will tend to [demonstrate the impropriety of the challenged financial or nonfinancial condition], is a reasonable limitation on the accused's right to call witnesses in his favor." (Citation omitted.) Id., at 1338; see also id., at 1334 ("If the court is dissatisfied with the nature of the proffer, it can always, within its discretion, insist on direct testimony. But the discretion should be left to the court without imposing on it the burden of limiting admissibility to [what] it would permit a jury to hear." [Internal quotation marks omitted.] ). Although it will be the rare case in which the court permits a defendant to subpoena the victim of a family violence crime to testify at the defendant's bail hearing, I believe that principles of due process militate strongly in favor of according the court that discretion. Thus, although bail hearings generally are relatively informal and brief, I agree with the statement of the Second Circuit Court of Appeals that, "while the informality of bail hearings serves the demands of speed, the [judicial officer] must also ensure the reliability of the evidence, 'by selectively insisting [on] the production of the underlying evidence or evidentiary sources [when] their accuracy is in question.' " *United States v. LaFontaine,* supra, 210 F.3d at 131. In the present case, however, the defendant failed to provide the court with any facts or information to suggest that the victim's testimony was

necessary; instead, he relied solely on his claimed unconditional right to call the victim as a witness.

[16] In *Acevedo–Ramos,* the court concluded that "the magistrate or judge possesses adequate power to reconcile the competing demands of speed and of reliability, by selectively insisting [on] the production of the underlying evidence or evidentiary sources [when] their accuracy is in question. Through sensible exercise of this power of selection, the judicial officer can make meaningful [the] defendant's right to cross-examine [and to compel the attendance of witnesses] without unnecessarily transforming the [detention] hearing into a full-fledged trial or [the] defendant's discovery expedition." *United States v. Acevedo–Ramos,* supra, 755 F.2d at 207–208.

[17] I note that, in addition to its historical analysis, the court in *Medina* also considered whether the challenged procedure "transgresses any recognized principle of fundamental fairness in operation." (Internal quotation marks omitted.) *Medina v. California,* supra, 505 U.S. at 448, 112 S.Ct. 2572. As the Oregon Court of Appeals has observed, "[t]he recognized principles of fundamental fairness, aside from those enumerated in the [b]ill of [r]ights, are narrow in scope. [*Dowling v. United States,* 493 U.S. 342, 352, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990)]. They concern matters that are basic to our conception of justice and that define the community sense of fair play, so that a failure to protect the principles in any given case would necessarily deprive a defendant of a fair [hearing]. Id., at 353, 110 S.Ct. 668.... They are also the sorts of principles about which there can be no reasonable disagreement." *State v. Amini,* 175 Or.App. 370, 379–80, 28 P.3d 1204, review denied, 333 Or. 73, 36 P.3d 974 (2001). No such established principle of fundamental fairness is violated by operation of the statutory scheme at issue in the present case. This aspect of the *Medina* test, therefore, provides no support for the defendant's claim that he is entitled to a full evidentiary hearing to challenge the protective order issued in this case.

[18] General Statutes § 54–82m provides in relevant part that, "in any case in which a plea of not guilty is entered, the trial of a defendant charged in an information or indictment with the commission of a criminal offense shall commence within twelve months from the filing date of the information or indictment or from the date of the arrest, whichever is later...." Practice Book § 43–39(c) provides for the same right. Of course, the defendant also has federal and state constitutional rights to a speedy trial; see U.S. Const., amends. VI and XIV; Conn. Const., art. I, § 8; but those rights do not carry any specific time requirements within which the trial must take place.

[19] The cited study used published judicial opinions in cases alleging family violence for the purpose of determining the substantiation rate of those claims. M. Shaffer & N. Bala, "Wife Abuse, Child Custody and Access in Canada," 3 J. Emotional Abuse 253, 257 (2003). Because of the difficulties associated with proving abuse, the authors of the study suggest a likelihood that the 74 percent figure represents an understatement of the actual percentage of well founded abuse claims. Id., at 259–61.

[20] This is so because a defendant who is incarcerated pending trial suffers a far greater liberty deprivation than a defendant who is banned from the family home until the conclusion of his criminal case but who nevertheless remains at liberty.

[21] As I previously indicated, I agree with the majority's conclusion that the defendant is not entitled to a full-blown evidentiary hearing under §§ 54–63c(b) and 46b–38c(e). I cannot agree with that portion of the majority's analysis, however, in which it relies on the doctrine of legislative acquiescence with respect to its construction of P.A. 07–123, which amended General Statutes (Rev. to 2007) § 54–63c(b) in 2007. Specifically, the majority contends that we may presume that when the legislature amended General Statutes (Rev. to 2007) § 54–63c(b), it was aware of *State v. Doe,* 46 Conn.Supp. 598, 609–10, 765 A.2d 518 (2000), a Superior Court case in which the court held that an evidentiary hearing is not constitutionally required under § 46b–38c, and that the legislature's failure "to amend [that] statute by imposing specific hearing requirements when it enacted P.A. 07–123" is "significant" in light of the holding of *Doe.* In my view, the majority stretches the doctrine of legislative acquiescence beyond its breaking point. Although we presume that the legislature is aware of this court's interpretation of statutes; see, e.g., *Hummel v. Marten Transport, Ltd.,* 282 Conn. 477, 494–95, 923 A.2d 657 (2007); we indulge in that presumption in large

measure because the construction of a statute by this court represents the definitive, legally binding interpretation of that statute for *all* future cases and purposes in this state, unless and until the legislature amends the statute. For the same reason, it may be appropriate to apply the doctrine of legislative acquiescence to Appellate Court cases involving the construction of a statute because the statutory interpretation adopted by the Appellate Court also is binding statewide unless and until this court overrules the Appellate Court's interpretation or the legislature amends the statute. A Superior Court decision, by contrast, is binding only on the parties to that particular case. I therefore see no basis for reading anything into the legislature's failure to act in response to one Superior Court decision— irrespective of whether that decision, like *Doe,* has been published in the Connecticut Supplement—because the legislature generally will have little, if any, incentive to do so in light of the fact that the case has no binding effect on any court in the state. It therefore is unreasonable to presume that the legislature's failure to act in response to *Doe* signals its agreement with that case. It is just as likely that the legislature either was not aware of the case at all or that it did not view the case, standing alone, as being sufficiently important to warrant any remedial legislative action.

22 The majority does not explain what it means by "reliable" hearsay.

23 General Statutes § 1–2z provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered."

24 Under General Statutes § 54–82r(a), "a court may issue a protective order prohibiting the harassment of a witness in a criminal case if the court, *after a hearing at which hearsay evidence shall be admissible, finds by a preponderance of the evidence* that harassment of an identified witness in a criminal case exists or that such order is necessary to prevent and restrain the commission of [the crime of tampering with a witness in] violation of section 53a–151 or [the crime of intimidating a witness in violation of § ] 53a–151a. *Any adverse party named in the complaint has the right to present evidence and cross-examine witnesses at such hearing.*" (Emphasis added.) Subsections (b) and (c) of General Statutes § 54–64f provide for "an evidentiary hearing *at which hearsay or secondary evidence shall be admissible*" and require proof of a violation of a condition of release "*by clear and convincing evidence....*" (Emphasis added.)

25 It is noteworthy that the majority dismisses the defendant's claim that §§ 54–63c (b) and 46b–38c (e) entitle him to the same trial-like proceeding to which a civil litigant is entitled in challenging an application for a family violence protective order but then relies on cases involving civil protective orders to support its conclusion that the state must establish the need for a criminal protective order by a preponderance of the evidence. The majority fails to explain this logical inconsistency.

The majority also relies on § 54–82r(a), which pertains to protective orders barring the harassment of a witness in a criminal case, to support its conclusion that §§ 54–63c(b) and 46b–38c(e) require the state to prove the necessity of a protective order by a preponderance of the evidence. The majority's reliance is entirely misplaced, however, because § 54–82r, in marked contrast to §§ 54–63c(b) and 46b–38c(e), expressly provides for that standard of proof. Thus, if the legislature had intended to impose such a requirement under §§ 54–63c(b) and 46b–38c (e), it no doubt would have done so in express terms. Indeed, the majority has acknowledged this principle in rejecting the defendant's claim that he is entitled to a full evidentiary hearing because, as the majority has explained, other related statutory provisions indicate that the legislature uses express statutory language to establish such a standard of proof when it intends to do so. In relying on § 54–82r, however, the majority simply ignores this principle without providing any justification for doing so.

26 The majority's holding that the state must prove the need for a family violence protective order by a preponderance of the evidence places an additional burden on the state, one that the state does not bear in any other context involving the imposition of conditions of bail or release. Indeed, the state bears no such burden when it seeks a financial or nonfinancial condition of release for purposes of any other case. In all other such cases, the state makes a request for

a condition of release and presents its reasons and supporting evidence or information. The defendant is entitled to respond, by way of proffer or, if appropriate, through the presentation of live testimony. The court then must exercise its sound discretion in determining what condition or conditions, if any, to impose. Indeed, even when the state seeks a financial condition of release that the defendant most likely will be unable to meet, the state carries no burden of proof with respect to the propriety of that condition. In such a case, the state merely must demonstrate to the court that the condition is reasonable under the circumstances. After hearing from the defendant, the court then is free to impose whatever financial condition it deems appropriate. In light of the new burden that the majority has placed on the state in family violence cases, the state may be prompted to—or even compelled to—present evidence at the hearing on the protective order that it would not have presented prior to the majority's decision in this case.

27    It may be that the statutory construction that the majority adopts stems from its own concern that the imposition of a criminal protective order in a family violence case "amounts in practice to state-imposed de facto divorce"; J. Suk, "Criminal Law Comes Home," 116 Yale L.J. 2, 42 (2006); because, it has been asserted, the issuance of such an order "shifts the very goal of pursuing criminal charges away from punishment to control over the intimate relationship in the home." Id., at 50; see footnote 18 of the majority opinion (quoting Suk). To whatever extent that consideration may have affected the majority's construction of the statutory scheme at issue, there is nothing in the statutory scheme or its history to suggest that the legislature had any such consideration in mind when it included a reference to the hearing requirement of § 46b–38c(e) in § 54–63c(b).

I note, in addition, my general agreement with the observation of Justice Schaller in his concurring and dissenting opinion that the "special" hearing created by the majority under §§ 54–63c(b) and 46b–38c(e) is "unwise," "unworkable" and "unnecessary...." I emphasize, however, that my disagreement with the majority stems from the fact that this court may not substitute its view of what is wise, workable or necessary for the considered judgment of the legislature, and the legislature has made it clear, contrary to the conclusion of the majority, that the hearing contemplated under §§ 54–63c(b) and 46b–38c(e) is to be held at the time of the defendant's presentment and is no different from the hearing that is routinely conducted at that time with respect to all other conditions of bail or release.

28    General Statutes § 54–69 provides in relevant part: "(a) Whenever in any criminal prosecution the state's attorney for any judicial district or the assistant state's attorney is of the opinion that the bond without or with surety given by any accused person is excessive or insufficient in amount or security, or that the written promise of such person to appear is inadequate, or whenever any accused person alleges that the amount or security of the bond given by such accused person is excessive, such state's attorney or assistant state's attorney or the accused person may bring an application to the court in which the prosecution is pending or to any judge thereof, alleging such excess, insufficiency, or inadequacy, and, after notice as hereinafter provided and hearing, such judge shall in bailable offenses continue, modify or set conditions of release upon the first of the following conditions of release found sufficient to provide reasonable assurance of the appearance of the accused in court: (1) Upon such person's execution of a written promise to appear, (2) upon such person's execution of a bond without surety in no greater amount than necessary, (3) upon such person's execution of a bond with surety in no greater amount than necessary...."

29    The majority asserts that the defendant does not claim that he is constitutionally entitled to call or question the victim at the hearing required under §§ 54–63c(b) and 46b–38c(e). See footnote 21 of the majority opinion. This assertion is erroneous. The defendant claims that he has a due process right to a full evidentiary hearing at which he is entitled to "present evidence and cross-examine witnesses." In setting forth his claim, the defendant makes no suggestion that his constitutionally protected right to such a hearing does not include the right to question the victim. On the contrary, the defendant contends that " 'written submissions [by the state] are a wholly unsatisfactory basis for [a] decision' " because such evidence does not provide an adequate opportunity to challenge the state's factual contentions. Indeed, the defendant maintains that, because cases involving the issuance of family violence protective orders should not be "decided without hearing both sides," principles of due process grant him the right to have the alleged victim "testify in an adversarial court hearing to ensure that [the] ... protective order is issued [on the basis of]

accurate information." Thus, at no time has the defendant conceded that he does not have a constitutional right to examine the victim at the hearing.

30    I note that the defendant's appellate counsel reiterated that position at oral argument before this court.

31    The majority predicts that the hearing to which the defendant will be entitled on remand will be "a brief hearing." Footnote 26 of the majority opinion. By contrast, the full, trial-like hearing to which the defendant consistently has claimed he is entitled—a hearing at which the state would be required to proceed on the basis of admissible, live testimony and the defendant would have the right to call the victim if the state failed to do so—is hardly comparable to the "brief" hearing that the majority contemplates.

32    The majority incorrectly asserts that I advocate a position pursuant to which a claim would not be preserved for appeal unless the party raising the claim on appeal also made the specific *argument* in support of that claim in the trial court that he relies on on appeal. See footnote 26 of the majority opinion. I take no such position. Indeed, the majority's contention appears to be based on a fundamental misunderstanding of the difference between an argument and a claim. Generally speaking, an argument is a point or line of reasoning made in support of a particular claim. Only claims are subject to our rules of preservation, not arguments. In the present case, the sole claim that the defendant raised in the trial court—and the sole claim he raises on appeal—is entitlement to a full evidentiary hearing. Contrary to the majority's assertion, I do not suggest that, on appeal, the defendant is barred from raising arguments in support of that claim that he did not raise in the trial court. Indeed, the defendant makes *many* more such arguments in his submissions to this court than he made in the trial court, and properly so; in light of the different circumstances under which claims are made at trial and on appeal, that will almost always be the case. It is settled law, however, that a defendant cannot raise a new *claim* on appeal. In the present case, the interpretation of the statute that the majority adopts never has been the subject of a claim by the defendant and, accordingly, it reasonably cannot be characterized as preserved.

33    Of course, for the reasons set forth previously, I do not believe that any modification of our preservation principles is either necessary or appropriate.

34    The majority responds to my analysis of its new approach to preservation as follows: "[W]e simply state that, if a defendant asks for relief [in] the trial court that encompasses elements A, B, C and D, that request is adequate to permit relief on appeal that only grants elements A and B, but not C and D. Under Justice Palmer's view, a defendant would need to argue explicitly that, 'if I'm not entitled to A, I am still entitled to B, C and D,' and 'if I'm not entitled to A and B, then I am still entitled to C and D,' and so on, in order to render that relief available on appeal.' That strikes us as an unduly onerous burden on litigants." Footnote 26 of the majority opinion. The problem with the majority's response is that it does not represent a fair characterization either of my position or of this case. It is true that, in a particular case, a defendant's claim may be broad enough to encompass several "elements" of relief, as the majority puts it, and yet specific enough to provide the trial court with *adequate notice* of *each* of those elements. The present case, however, manifestly is not such a case. The record is perfectly clear that the defendant raised one claim in the trial court and one claim in this court, namely, an entitlement to a full, trial-like proceeding. Of course, that claim necessarily encompasses other, more narrow claims, such as the statutory interpretation that the majority adopts today, but it most certainly did *not* place the state or the trial court *on fair notice* that the defendant was asserting any one or more of those more narrow claims. Indeed, the defendant rejected the opportunity to proceed as he would have proceeded at a bail hearing even though the trial court characterized the hearing as similar to a bail hearing, a characterization that fairly describes the hearing that the majority concludes is mandated under the statutory scheme. Because notice is the essence of preservation, and because the trial court had no notice of the claim that the majority decides in the present case, the majority simply is wrong that that claim is preserved. Indeed, I do not doubt that both parties to this appeal will be surprised by the statutory interpretation that the majority has adopted because neither party ever has claimed or even suggested that the majority's interpretation is the proper interpretation of §§ 54–63c(b) and 46b–38c(e). In other words, even the parties themselves are not on notice of the statutory

construction that the majority has announced. That is why we should decide this case under our supervisory authority, and not under the pretense of preservation.

35  Justice Schaller, in his concurring and dissenting opinion, also disagrees with my "conclusions that the defendant failed to preserve his claim, that [Judge Bingham's ruling] should be affirmed rather than reversed, and that the majority is unfairly ambuscading [Judge Bingham]." Footnote 4 of the concurring and dissenting opinion. To support his conclusion, Justice Schaller, invoking *Rowe v. Superior Court,* supra, 289 Conn. at 649, 960 A.2d 256; asserts that "the concept of preservation should be liberally interpreted to allow a claim to proceed to decision on the merits." Id. With all due respect to Justice Schaller, there simply is no possible way to conclude, no matter how liberally the record is construed, that Judge Bingham was on notice of the claim that the majority decides. Indeed, Justice Schaller himself acknowledges that "[t]he trial court's ruling certainly was not incorrect under the circumstances" and that "the trial court was not mistaken" in its ruling. Id. The trial court's ruling was correct, as Justice Schaller must concede, because that ruling properly resolved the only claim that the defendant raised, namely, that he was entitled to a full, trial-like hearing. Indeed, as I have explained, the defendant has never raised any other claim, even in this court. In such circumstances, it clearly is improper to reverse the ruling of Judge Bingham because, in doing so, the majority is reversing Judge Bingham with respect to a ruling that the majority *itself* agrees was correct. Although, as I have indicated, I agree that we should take this opportunity to go *beyond* the defendant's claim and explicate the contours of the hearing contemplated under §§ 54–63c(b) and 46b–38c(e), we do so not to resolve the claim that the defendant has raised. On the contrary, the majority, like the trial court, addressed and properly rejected the only claim that the defendant ever has raised, in the trial court or in this court, before setting out the contours of that hearing. It is appropriate to delineate the parameters of the hearing, rather, because this is a public interest appeal, not an appeal from a final judgment, and it is unlikely that we soon will have another opportunity to consider the statutory scheme at issue. As I previously observed, the defendant will benefit from the majority's decision with respect to the nature of that hearing because he is entitled to seek review of the protective order at any time under § 54–69, and he presumably would avail himself of the opportunity to do so under the new hearing protocol that the majority adopts. Nevertheless, the defendant most certainly is not entitled to a reversal of Judge Bingham's ruling on the basis of a nonconstitutional claim that he never has raised.

Moreover, although I agree with Justice Schaller that it should not lightly be asserted that a trial court has been ambushed by an appellate ruling, I can think of no clearer example of such an ambuscade than what the majority has done to the trial court in the present case, that is, reversing the trial court on the basis of a nonconstitutional claim that the court never was asked to resolve. Indeed, that is precisely the kind of appellate decision-making that this court—Justice Schaller included—repeatedly and consistently has refused to countenance. See, e.g., *Rowe v. Superior Court,* supra, 289 Conn. at 663, 960 A.2d 256 (*Schaller, J.*) (allowing party to seek reversal of issue on appeal that party had failed to raise at trial would amount to ambush of trial court); *Certain Underwriters at Lloyd's, London v. Cooperman,* 289 Conn. 383, 401, 957 A.2d 836 (2008) (*Schaller, J.*) (characterizing claim that was not raised at trial as "unreviewable" on appeal); *Smith v. Andrews,* 289 Conn. 61, 77, 959 A.2d 597 (2008) (*Schaller, J.*) (declining to review "unpreserved" claim not raised in trial court).

End of Document                                      © 2023 Thomson Reuters. No claim to original U.S. Government Works.

| *This form is available in other language(s).* |
| --- |



STATE OF CONNECTICUT
**SUPERIOR COURT**
*www.jud.ct.gov*

*There are instructions and important notices on page 2 (the back) of this form.*
*Read page 2 before filling out this form.*

| [x] | I am filing this appearance to let the court and all attorneys and self-represented parties of record know that I have changed my address. My new address is below. |
| --- | --- |

Return date *(For Civil/Family cases)*

Docket Number
**A05D-CR23-0191150-S**

**Name of case** *(Full name of first Plaintiff v. Full name of first Defendant)  Note: In Criminal/Motor Vehicles cases, the Plaintiff is The State of Connecticut*

**State v. Theodora F. Antar**

| ☐ Housing Session | ☐ Judicial District | [x] Geographic Area | 5 | Address of court *(Number, street, town and zip code)* **106 Elizabeth st, Derby, CT, 06418** | Scheduled court date *(Criminal/Motor Vehicle cases only)* **09/06/2023** |
| --- | --- | --- | --- | --- | --- |

## Enter the Appearance of

| Name *(Your name or name of official, firm, professional corporation, or individual attorney)* **Theodora F. Antar** | Juris number *(For attorney/law firm)* |
| --- | --- |

| Mailing address **856 Shagbark Drive** | Post Office box number | Telephone number *(Area code first)* **203-273-8419** |
| --- | --- | --- |

| City/town **Orange** | State **CT** | Zip code **06477** | Fax number **203-886-1008** | E-mail address **theodoraantar@gmail.com** |
| --- | --- | --- | --- | --- |

**in the case named above for:** *(Select one of the following parties. See descriptions/notes on page 2 of this form.)*

**PLAINTIFF**
- ☐ The Plaintiff.
- ☐ All Plaintiffs.
- ☐ The following Plaintiff(s) only:

**DEFENDANT**
- [x] The Defendant.
- ☐ All Defendants.
- ☐ The following Defendant(s) only:

☐ **Other** *(Specify):* _____

☐ This is a **Family Matters** case (such as divorce, custody, or child support). My appearance is for: *(Select one or both)*
  ☐ matters in the Family Division of the Superior Court   ☐ Title IV-D Child Support matters

☐ This is a **Criminal/Motor Vehicle** case, and I am filing this appearance as ☐ a Public Defender or ☐ Assigned Counsel *(Special Public Defender)*
☐ This appearance is for the purpose of a bail hearing only.
☐ This appearance is for the purpose of alternative arraignment proceedings only.

If an appearance by other counsel or self-represented party is on file for this party/parties, select one option below:

1. ☐ This appearance is in place of the appearance of: _____
   *Name and Juris Number (if applicable) to be replaced*

2. [x] This appearance is in addition to an appearance already on file.

**I agree that documents can be delivered (served) to me electronically in this case. (Practice Book Sec. 10-13)** [x] Yes  ☐ No

| Signed *(Individual attorney or self-represented party)* | Name of person signing at left *(Print or type)* **Theodora Antar** | Date signed **08/31/2023** |
| --- | --- | --- |

## Certification

I certify that a copy of this document was or will immediately be mailed or delivered electronically or non-electronically on *(date)* ___08/31/2023___ to all attorneys and self-represented parties of record and that written consent for electronic delivery was received from all attorneys and self-represented parties of record who received or will immediately be receiving electronic delivery.

*FOR COURT USE ONLY*

Name and address of each party and attorney that copy was or will be mailed or delivered to*

**Kayla Curtis**
**Derby State's Attorney's Office**
**106 Elizabeth Street**
**Derby, CT 06418**
**Phone: (203) 735-7487**
**DCJ.DERBYGA.REPORTS@CT.GOV   Attorney Michael Hillis; MHillis@dkh-law.com**

*If necessary, attach additional sheet or sheets with name and address which the copy was or will be mailed or delivered to.

| Signed *(Signature of filer)* | Print or type name of person signing **Theodora Antar** | Date signed **08/31/2023** |
| --- | --- | --- |

From: Theodora Antar theodoraantar@gmail.com
Subject: Re: no response from attorney hillis in over three weeks
Date: Sep 6, 2023 at 1:21:42 PM
To: Michael Hillis MHillis@dkh-law.com
Cc: Lizelle Martin lizellemartin1974@gmail.com, GA5.Derby@jud.ct.gov,
GA5.Derby@jud.ct.gov

The clerk just threatened me, ripped papers out of my hand, and said she would have me removed by the marshals after telling me that my case is on the docket for 2 PM and that if I don't come for 2 PM, it's a failure to appear. You stated you're removing your appearance, but they said that you never did that either. I feel that based on the extreme amount of hostility that I just experienced by the clerk, that I am not receiving fair treatment, especially because the clerk stated that you are lying and that my case is still on for today. If I don't show up now, I will get a failure to appear. I need something from the court confirming this since they are stating that what you were saying is not true, and if there's no record of that whatsoever.

I asked to see my file which is my legal right and it was ripped out of my hand and I was told that I am not allowed to see the file anymore. I need you to provide me with a copy of my complete file immediately since I was denied the right to access the file which is publicly available, I was told it is not available for me and threatened with arrest and removal from the courthouse if I did not leave. This is unacceptable and I will be filing a complaint about each of the individuals who were involved they also told me that there's no option to file an appeal and refused to help me with anything. They pick and choose when they want to give legal advice, and for my own safety and protection, I record every conversation and have all of the proof of all of this and I was screamed out and threatened when I said I was recording, and she screamed and said I'm not allowed to record her. Please show me where it says that I can't record the illegal actions of the clerks office.

Sincerely,

Theodora Antar
(203)273-8419

On Sep 6, 2023, at 1:15 PM, Michael Hillis <MHillis@dkh-law.com> wrote:

 Case was continued at my request by the prosecutor as I previously informed you I would do. Your next date is October 24, 2023

Sent from my iPhone

On Sep 6, 2023, at 1:10 PM, Theodora Antar <theodoraantar@gmail.com> wrote:

 I just went to the clerks office in Derby to inquire about what was happening in my case. He stated that Matthew received a full dismissal, and that he did not receive a conditional nolle like you proposed. They stated that they could not show me any of the record of your representation in the matter that was against Matthew since everything was dismissed. I asked to have my file, and they said I was allowed to look at it and the Main Clerk, then came down and ripped it out of my hand. When I told her I would be recording her after they tried to give me legal advice and advise me against filing an appeal.

She then threatened to have me removed by marshals and said they arent allowed to talk to me or give me any further information regarding the matter and took the file and ran away and instructed all clerks to withhold any help or answers from me.

She then stated that you lied about saying the case was continued, and said that my case was NOT continued. She said my case is on the docket for 2pm and that I must appear at 2pm. She said NO motion for continuance was filed or granted and said that I need to be in court for 2pm. Will you be there at 2 as well?

Sincerely,

Theodora Antar
(203)273-8419

On Sep 6, 2023, at 9:37 AM, Theodora Antar <theodoraantar@gmail.com> wrote:

I am not available on 10/24/23. Please see attached motion for disqualification of judicial authority to be filed immediately in Derby Court.

On Wed, Sep 6, 2023 at 8:52 AM Michael Hillis <MHillis@dkh-law.com> wrote:

Your court date has been continued to October 24, 2023.

Mike Hillis

Sent from my iPhone

On Sep 5, 2023, at 3:41 PM, Theodora Antar <theodoraantar@gmail.com> wrote:

See attached motion to be filed on an emergency basis in Derby GA 5.

On Thu, Aug 31, 2023 at 6:13 PM Theodora Antar
<theodoraantar@gmail.com> wrote:

I do not consent to you withdrawing. You did nothing but speak to me for a
few minutes at the arraignment and i was given no information about the case
since. You attended a court date for the defendant without my knowledge and
had several ex-parte communications with the judge and states attornies
without my knowledge. I asked you for copies of my file and you ignored me.
You selectively pick and choose what to respond to and you intentionally
ignore my questions and statements and concerns and it.

It is very evident that you are just trying to do a bad job and commit
malpractice in an effort to get me to fire you. This is precisely why you stated
that you would withdraw your appearance as a response when I simply
requested that we meet in person despite the fact that you promised me that
that meeting in person would take place. Is there a reason Why you waited
four months to tell me that you were not going to have my best interest in
mind? I would like full disclosure about everything, and as I stated if you file a
motion to withdraw, I plan to a oppose it and I will be at the Hearing to also
oppose it.

What legal basis do you have to commit malpractice?

If you have not done anything to help me, and in fact, you refused to
represent my interest in vacating the highly restrictive full, no contact,
maximum security protective order that is protecting somebody who I was

arrested for them violating their order.

Are you going to address any of this or are you just going to keep ignoring me like you've been doing the last 120 days straight?

You stated you would file a motion to withdraw today however, you never served with a copy of that. Please provide me with a copy of everything like I requested from you hours ago and you have no right to deny me my file and you have no right to deny me what is collected between you and the state in an effort to try to build a case against me.

Sincerely,

Theodora Antar

(203)273-8419

On Aug 31, 2023, at 6:04 PM, Michael Hillis <Mhillis@dkh-law.com> wrote:

Email from yesterday at approximately 7:21. Not a text

Sent from my iPhone

On Aug 31, 2023, at 5:57 PM, Theodora Antar <theodoraantar@gmail.com> wrote:

The last text I received from you was on 8/8/23. Not sure what text you are referring to.

See attached where you said nothing to me in response. You haven't texted me back at all and it has been 23 days.


<image0.png>
<image1.png>


Sincerely,

Theodora Antar
(203)273-8419


On Aug 31, 2023, at 5:41 PM, Michael Hillis <MHillis@dkh-law.com> wrote:

 Like I texted. Provide me with a time that is relatively convenient and i will do my best to get you that continuance date.

Mike

Sent from my iPhone

On Aug 31, 2023, at 12:33 PM, Theodora Antar <theodoraantar@gmail.com> wrote:

 Please provide me a copy of my entire case file and copies of everything to do with the case. I need a copy of all discovery, everything that was provided by the state's attorney, including the whole case-file, including all

motions, pleadings, and orders that have been served so far since I never received it. I never got anything from you. All I have is a copy of the warrant that I purchased from Orange PD the day I turned myself in. I don't even have the police report.

I have not been reasonably informed about anything in this case and you failed to tell me I could ask for a full evidentiary hearing and a Fernando T hearing based on the unjustified protective order that is preventing me from seeing my child.

I repeatedly asked if you could file a motion to modify or vacate the protective order and you ignored me. Why do you ignore me? You say you're a parent. You said you wanted to help me knowing im a single mom and law student, knowing I have been targeted and victimized by the system when all I did was ask for help. I trusted you to help and I deserve that assistance. I should not be kept in the dark.

I literally tried to contact you so many times and was ignored, and then you promise an "in-person meeting" and when I ask when we can do it your response is you will withdraw instead.

Leaving me hanging with no lawyer less than a week before the hearing just like Randi Calabrese. Saying you "run things" in Derby court and you just get what you want and demand what you want, sayin youre owed by scott Jones a favor for bailing him out for him doing misconduct at UConn.

Everything is all about favors for favors according to you and you betrayed me when all I did was ask for help and guidance.

Please have the decency to treat me like a human being. I have no idea how I can possibly get counsel in less than a week when I have no money.

Sincerely,

Theodora Antar
(203)273-8419


On Aug 30, 2023, at 9:12 PM, Theodora Antar <theodoraantar@gmail.com> wrote:

I want to know what you did in this case and why you intentionally ignored me for months just to then tell me you're going to withdraw? You also didn't give me any of the discovery or inform me of anything at all. In light of your response and the concerning corruption you told me you participated in I will be filing a grievance with both federal and state court and a lawsuit against you for your malpractice and ineffective assistance of counsel. This is extremely unethical and your intimidation and threats will also be duly noted.

Sincerely,

Theodora Antar
(203)273-8419


On Aug 30, 2023, at 7:21 PM, Michael Hillis <MHillis@dkh-law.com> wrote:

Theodora

In light of your email I am going to  withdraw from representing you in the Derby criminal matter. I have to motion the court to withdraw my representation of you and there are notice requirements to effectuate same. If you want me to get your court date of 9/6 moved prior to my motion to withdraw let me know a date that would be convenient for you and I will try to get that done.  I wish you the best in your future.

Mike Hillis

Sent from my iPhone

On Aug 30, 2023, at 8:28 AM, Theodora Antar <theodoraantar@gmail.com> wrote:

It has been almost four weeks and I still have not gotten a reply about when I can come in for my first meeting regarding my case. I had one arraignment and then not another word was spoken about the case and it has been almost four months. I was told that nothing further could be discussed in my case unless it was discussed in person. I never had one meeting regarding this case yet at all and am completely in the dark as to what has been occurring behind the scenes between everyone since I have not been informed of anything. I asked if we could have an in person appointment to be able to meet and discuss and was told yes on 8/8/23 and now it is almost a holiday weekend which ends with the next court date next week.

I attempted to reach out via text on 8/23/23 (7 days ago) and also attempted to call the office to schedule an appointment. My text was ignored and my attempts at calling the office resulted in me being told that the secretary would reach out to the attorney and have him call me. I gave a list of my potential availability on 8/8 and indicated that my school schedule resumed this week which makes it difficult for me to schedule an appointment and asked that we schedule something weeks ago and those texts were also ignored.

"a lawyer must keep his client reasonably informed about the status of his case (Rule 1.4);"

Will I be reasonably informed about the status of this case at any time between now an 9/6/23? If not, I will like a continuance because I have not had a chance to have a meeting with you at all since the day I was arrested, it has been four months, I have received zero status updates regarding this case, and I have absolutely no idea about what the state has and has not done in regard to this matter.

I am also concerned that the court had ex-parte communications with you and that they asked you to appear on Matthew's last court date but did not extend that same opportunity to me, despite me being the victim in that case. I was told by the victim advocate and the state's attorneys office that anything to do with the State v Lodice case I would have to handle on my own. They said anything to do with State v Antar case would need to go through you.

I represented myself as the victim, but Scott Jones asked you to come represent me as the victim without my knowledge or consent, they made a deal with you to dismiss Matthew's case completely which I still never received full information on despite being the victim, did not consent to, and did not even have my legal opportunity to speak.

Please let me know if we can schedule the in-person meeting that you mentioned prior to the 9/6/23 court date to discuss this. You stated you're unavailable on weekends, we're about to go into labor day weekend, and I have to be in class for 12 hours on Tuesday, and Wednesday is the court date. That means unless we meet

today, tomorrow, or during the holiday-weekend, which you already told me not to even attempt to email you on a weekend, then we won't be able to meet in person prior to 9/6/23 like you stated we could a month ago.

Please advise if you will be asking for another continuance because I have not been informed at all about the status of the case beyond the arraignment.

<motion to vacate protective order .pdf>
<motion for recusal jones .pdf>

| A05D-CR23-0191150-S | : | GA5 |
| State of Connecticut | | |
| | : | DERBY |
| VS. | : | |
| Theodora F. Antar | | |
| DEFENDANT | : | SEPTEMBER 5, 2023 |

## EMERGENCY EX-PARTE MOTION FOR IMMEDIATE FERNANDO A. HEARING & TO VACATE PROTECTIVE ORDER

The Defendant Theodora F. Antar in the above captioned matter moves that the court immediately schedule a "Fernando A. Hearing" in order to prove the necessity of the current full no-contact protective order that is in place against the Defendant.

The Defendant, who does not have any criminal convictions, is being denied federal, state, and constitutional rights and the existence of this protective order is, has, and will continue to cause irreparable harm unless it is vacated immediately.

There is no legal, factual, or otherwise justified reason for this protective order to remain in place. The protective order is a full no-contact protective order with a full residential stay-away order that prevents the Defendant from being able to see or exercise her fundamental right to visitation with her minor child A.L.

This order prevents the Defendant from being able to access her minor child, and does not allow the Defendant to do things that are court ordered and part of her rights as the mother of the young child.

The State of Connecticut has no legal basis to impose this heavily restrictive order of protection upon the Defendant, and the Defendant hereby demands an immediate Fernando A. Hearing be scheduled. The Defendant filed an appearance for the first time last week in this matter and is asking that the court allow her the constitutionally protected right of due process in being able to prove that this order is restrictive, unnecessary, and causing irreparable harm to both Defendant and her family.

Defendant is requesting an immediate "Fernando A. Hearing" to be scheduled immediately and filing this motion to vacate the protective order and requests that said matter be scheduled and heard immediately.

September 5th, 2023, Respectfully submitted,

/s/ Theodora F. Antar

*The Defendant*

856 Shagbark Drive, Orange, CT, 06477

theodoraantar@gmail.com

(203)273-8419

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that on September 5th, 2023, I served a copy of the foregoing Motion to vacate to all counsel and parties on record as listed below:

MHillis@dkh-law.com

September 5th, 2023 Respectfully submitted,

_____ /s/ Theodora F. Antar

*The Defendant*

856 Shagbark Drive, Orange, CT, 06477

theodoraantar@gmail.com

(203)273-8419

DOCKET NO.: **A05D-CR23-0191150-S** :     SUPERIOR COURT

STATE                                :     DERBY GA

V.                                   :     AT DERBY

THEODORA ANTAR            :     9/6/2023

## <u>MOTION FOR DISQUALIFICATION OF JUDICIAL AUTHORITY</u>

The Defendant Theodora F. Antar in the above captioned matter respectfully moves that The Honorable Judge Scott Jones be disqualified from presiding over the case for the remainder of its duration.

In accordance with Rule 2.11 of the Code of Judicial Conduct, "a judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned including, but not limited to, the following circumstances: (1) The judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of facts that are in dispute in the proceeding.

In this case, Judge Scott Jones has shown that he is unable to display impartiality toward the Defendant due to his substantial involvement in the recent case of State v. Matthew Lodice in which the Defendant Theodora F. Antar was the victim and complainant.

On numerous occasions in the matter of State v. Lodice, Judge Scott Jones displayed impartiality and on the record on numerous occasions he not only gave Matthew Lodice legal advice, but refused to give procedural information or other information to Ms. Antar as the victim and told her she would be required to hire her own

1

private attorney to explain to her what was and was not allowed on the full no-contact protective order which allegedly protected her from abuse.

Judge Jones also made it clear that he does not believe that psychological, emotional, or mental abuse constitutes domestic violence and has shown disregard and ignorance toward the law, specifically PA-2178 and has abused his discretion, authority, and power.

Honorable Judge Scott Jones has violated several state and federal judicial canons, state laws, federal laws, and constitutional laws in violation of his oath to uphold the duties of judicial office, as prescribed by Conn. Practice Book §1-22(a).

Judge Scott Jones must be disqualified in this matter for the following reasons:

Judge Scott Jones made several statements on the record in which he made it clear that he harbors negative feelings and bias against the concept of domestic violence. He also gave Matthew Lodice legal advice on several occasions on the record. Judge Scott Jones made sure to go above and beyond out of his way to accommodate Matthew John Lodice on the record, to make sure that any aspect of the criminal order of protection would cater to his needs.

On 1/30/23, Scott Jones stated that "we can't enter an order that's inconsistent with family" on the record, however on 5/17/23, he allowed the court to enter an order on my behalf that was inconsistent with family and has subsequently upheld said order which violates Ms. Antar's constitutional and federal and state rights.

Furthermore, he also has a substantial and longstanding relationship with the attorney Michael Hillis who was representing the Defendant in this matter and who has since stated that he plans to file a motion to withdraw as counsel in this case. Attorney

2

Michael Hillis stated that, not only did he go UConn School of Law with Judge Scott Jones, but also stated that he helped cover up an incidence of academic misconduct which occurred when Judge Jones was a student at the University of Connecticut School of Law.

Michael Hillis stated that, due to his extremely close bond and connection and affiliation with Judge Jones, that he would be able to sway and control the disposition of this case. He stated that when Scott Jones was faced with potential penalties for his prior academic misconduct while in law school, that Michael Hillis "did him a favor" and prevented the misconduct from having any negative impact on Judge Jones.

Michael Hillis cited this relationship as a reason why he felt that he could guarantee positive results for me in this matter, and sine he has now stated that he will not be providing me assistance and stated that he is going to be withdrawing his appearance, I feel that there is an extreme conflict of interest.

In addition, the law mandates that if a judge has substantial knowledge regarding facts that are in dispute in the matter that they must also recuse themselves. Not only did Judge Jones hear and learn substantial knowledge regarding the facts in dispute by listening to Ms. Antar testify about them on the record during proceedings in the State v. Lodice matter, but he also signed the warrant that was then issued for Ms. Antar's arrest, 2 weeks after hearing testimony about the facts that are now in dispute on 5/1/23.

During each of the hearings, both in the presence and absence of Ms. Antar, Judge Jones regularly provided legal advice to Matthew Lodice, stated he would be having ex-parte communications with Judge Jane Kupson Grossman in order to influence his

decisions regarding his handling of the State v Lodice matter, and showed animosity, prejudice, and bias against Ms. Antar.

Ms. Antar, the Defendant in the above captioned matter, respectfully moves that Judge Scott Jones immediately recuse himself from this matter and is putting the court on official notice that Ms. Antar intends to file a complaint against Judge Scott Jones with the Judicial Review Council, as well as a civil rights lawsuit for violations of her state, federal, and constitutional rights.

THE DEFENDANT,

By:

Theodora Antar

856 Shagbark Drive, Orange, CT, 06477

ORDER


The foregoing motion having been duly heard, it is hereby ordered:



GRANTED / Denied




BY THE COURT,




_____

JUDGE / CLERK

CERTIFICATION

This is to certify that on 9/6/2023, a copy of the foregoing was delivered to:

GA5.Derby@jud.ct.gov

DCJ.DerbyGA.Reports@ct.gov

By, The Defendant,

_____

Theodora Antar

856 Shagbark Drive

Orange, CT, 06477

theodoraantar@gmail.com

(203)273-8419

| A05D-CR23-0190622-S | : | SUPERIOR COURT |
| STATE OF CONNECTICUT | : | G.A. #5 |
| v. | : | AT DERBY, CONNECTICUT |
| MATTHEW LODICE | : | JANUARY 30, 2023 |

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE SCOTT M. JONES, JUDGE

A P P E A R A N C E S :

Representing the State:

ATTORNEY OWEN KIVELA
Office of the State's Attorney
106 Elizabeth Street
Derby, Connecticut 06418

Representing the Defendant:

MATTHEW LODICE
Self-Represented Party

Recorded and Transcribed By:

Jessica Reyes
Court Recording Monitor
106 Elizabeth Street
Derby, Connecticut 06418

```
 1        ATTY. KIVELA:  Eight on the arraignment docket,
 2   Matthew Lodice.  This is not referrable to family
 3   services, Your Honor, and a full no contact.  Mr.
 4   Lodice has an extensive DV history.  I advised him
 5   that he might want an attorney for this.
 6        THE DEFENDANT:  Your Honor, before you put that
 7   order in place, I do want to make it apparent that my
 8   ex, the person in this case, has filed for four
 9   restraining orders against me.  All four were denied
10   through court.
11        This last one that you guys are putting on, she
12   filed -- the same police report she filed with the
13   police, she used to file the restraining order and
14   the good judge threw it out and told her she wasn't
15   credible.
16        THE COURT:  The good judge, huh?
17        THE DEFENDANT:  She -- he threw it out and he
18   told her that she wasn't credible.  She's filed three
19   ex parte orders.  She's called the cops 36 times on
20   me.  And the only one who was arrested was her for
21   filing a false report.
22        We have a --
23        THE COURT:  Does the state know any of this?
24        THE DEFENDANT:  We have a custody case --
25        THE COURT:  No?
26        ATTY. KIVELA:  No.
27        THE DEFENDANT:  -- regarding OUR daughter,
```

1    coming Wednesday. And she's trying to muddy the

2    water up and trip me up before that custody case

3    comes.

4         THE COURT: I don't know anything about this

5    case. I haven't even read the police report. All I

6    know is the charges that -- before the Court. But

7    now you're causing me to want to look into that. So,

8    is there any reports inside of the --

9         THE DEFENDANT: And a lot of the things that I'm

10   -- that are in our court order regarding our daughter

11   get tripped up because of this protective order.

12   Like, I won't be able to follow through the Judge's

13   court order, too, because, like, I'm required to get

14   a 7:00 p.m. call -- give her a 7:00 p.m. call. I'm

15   also required to drop her off with her mother at

16   church on Sundays.

17        THE COURT: All right. Just give me a second.

18   Let me just read. I can't --

19        THE DEFENDANT: I'm sorry, Your Honor.

20        THE COURT: Yes. That's a lot of information

21   coming all at once.

22        Have you -- you're representing yourself right

23   now. Have you read the warrant?

24        THE DEFENDANT: I have not.

25        ATTY. KIVELA: There's -- without a pro se

26   appearance or -- does any --

27        THE COURT: No, I mean, the -- I'm just

1 wondering how a pro se would know what the

2 allegations are, and I don't want to read this into

3 the record. But --

4 THE DEFENDANT: I mean --

5 THE COURT: Are you going to apply for -- do you

6 --

7 THE DEFENDANT: I've -- I got a copy of the

8 police report the day we went in for the restraining

9 order that she filed through court. It was the exact

10 -- the Orange Police Department police report. She

11 just photocopied it and brought it in for that.

12 So, if it's that six or seven-page whatever

13 thing that is, I have seen that. I have seen

14 everything she claims because we already went to

15 court for it.

16 THE COURT: You are entitled technically, I

17 mean, what's in the clerk's file is public

18 information. And so, perhaps the clerk can make a

19 copy of this warrant that I signed. And all I have

20 to do is find probable cause, a really low standard,

21 is there a reasonable and articulable suspicion that

22 you're committing a criminal offense.

23 THE DEFENDANT: Of course.

24 THE COURT: And to -- this case was a harassment

25 in the second degree and based on the language, I

26 don't make credibility assessments. Somebody makes

27 these allegations under oath, then I have to make a

1   finding, and that finding was made. But you should

2   probably be aware of what this says.

3        But based on what I see here, there is a reason

4   -- I mean, do you have a reason to have contact with

5   her?

6        THE DEFENDANT: We have a daughter.

7        THE COURT: I'm sorry?

8        THE DEFENDANT: We have a three-year-old

9   daughter together.

10       THE COURT: Outside of having contact with her

11  through the Family Wizard regarding exchange of the

12  child.

13       THE DEFENDANT: Other than that, no. I don't

14  have to. No.

15       THE COURT: So, this protective order

16  essentially is going to say --

17       THE DEFENDANT: Well, I do have to see her to

18  drop off my daughter at church on Sundays, and I'm

19  court ordered to do that. Otherwise, I'm in

20  violation --

21       THE COURT: You're court ordered out of family

22  court? So then --

23       THE DEFENDANT: Out of family court out of New

24  Haven.

25       THE COURT: So, then we want to make sure that

26  this order is compliant with -- I need to speak with

27  family relations just to make sure that --

1    THE DEFENDANT:  That's fine.  I -- look, I don't

2    want to talk to her at all.  I don't need to talk to

3    her --

4    THE COURT:  Just hear me out.

5    THE DEFENDANT:  Okay.

6    THE COURT:  You're not hearing me out.  I just

7    want to make sure that this order that I'm going to

8    enter --

9    THE DEFENDANT:  Okay.

10    THE COURT:  -- that's going to tell you, you

11    can't assault, threaten, abuse, harass, follow,

12    interfere -- all that stuff --

13    THE COURT:  -- which you're not going to have a

14    problem with because you don't want to talk to her

15    anyway.

16    But that it allows contact that is permitted in

17    family court.  So, it parallels.  You have two

18    parallel orders.

19    THE DEFENDANT:  Okay.

20    THE COURT:  That's the only thing.

21    State have any input?

22    Right now, it just says you're allowed to

23    contact the protected party regarding their child

24    through the Family Wizard only and that might need to

25    be tweaked.  And exchange of child through a third-

26    party.  So, could the church exchange -- occur

27    through a third-party?

1       THE DEFENDANT: It's not a church. She wants me

2  to find someone to bring her there and I don't have

3  anyone to bring her there. That's the issue. She's

4  basically -- she's trying to make it so I can't keep

5  my end of, like, our agreement. So, this way, when

6  we go to court, I have contempt motions against me.

7       So, I'm trying to avoid getting contempt motions

8  against me. So, like, I'm court ordered to bring her

9  to her mother's church in Orange, I live in New

10  Britain, every Sunday.

11       THE COURT: So, can you do that?

12       THE DEFENDANT: I do that. I -- currently, yes.

13       THE COURT: And who do you drop the child off

14  with?

15       THE DEFENDANT: With her. With her or her

16  mother. See, the problem is she's there sometimes,

17  she not there sometimes. So, if she's there, I'm

18  going to be in violation.

19       And I know, the second she sees me there, she's

20  going to call the cops. She's going to do anything

21  she could to trip me up. So, I'm -- I want to avoid

22  that as best as possible.

23       THE COURT: I can't -- either I have to get off

24  the bench and call down to family relations or maybe

25  somebody from the state can call down to family

26  relations --

27       ATTY. KIVELA: Yes, Your Honor.

1        THE COURT: -- to tease these things out.

2        Because we can't enter -- we could enter an

3  order that's inconsistent with the family -- but then

4  it's going to -- as he's saying --

5        ATTY. KIVELA: Certainly, Your Honor. We just

6  weren't aware of any of this information. So --

7        THE COURT: Oh, me either -- neither. So, I'm

8  going to pass, so that maybe we can modify the

9  protective order language that won't contradict a

10  family court order.

11        THE DEFENDANT: Okay.

12        THE COURT: All right?

13        THE DEFENDANT: Thank you, Your Honor.

14        THE COURT: All right. But I'm going to enter

15  the protective order.

16        THE DEFENDANT: Do you need me to produce a copy

17  of the court orders? I have them probably stored in

18  my phone. I can print it for you, if that would

19  help.

20        THE COURT: I mean, what might be helpful is if

21  that is shared with family relations, so that they

22  could actually see it.

23        ATTY. KIVELA: Yes. If we're trying to mirror

24  --

25        THE COURT: Yes. We're trying to mirror --

26        ATTY. KIVELA: -- exactly what they're doing in

27  family court, I think that would be helpful. So --

1    THE COURT:  So, family relations, who drafts

2  these, and then just come upstairs and there's a

3  request to enter this order.  But this order might be

4  --

5    THE DEFENDANT:  Yeah.  They didn't ask me any

6  questions about that at all.  They just said, this is

7  what's happening, here you go, go upstairs.

8    THE COURT:  So then, I guess, is somebody going

9  to talk to --

10    ATTY. KIVELA:  I'll call down to family

11  services.  Of course, Your Honor.  I -- he would just

12  need to share this information with them and that --

13    THE COURT:  Yes.  Make sure you share it again.

14    THE DEFENDANT:  Okay.  So, you want me to go

15  down to them?  Talk to them?

16    ATTY. KIVELA:  Yes, because they're going to

17  have to draft a new protection --

18    THE COURT:   Yes, but the information they need

19  to hear is not going to happen for a few minutes.

20    THE DEFENDANT:  Okay.

21    THE COURT:  So, give them a few minutes to

22  receive the information.  Then we're going to modify

23  the protective order.  Hopefully, so that it

24  parallels any family or civil orders that you have in

25  place.

26    THE DEFENDANT:  Okay.

27    THE COURT:  And then I'm going to come -- I'm

1    going to enter it.  I'm just going to require you

2    stay away from her home, and wherever she shall

3    reside.

4        THE DEFENDANT:  I understand.

5        THE COURT:  That's not a problem.  You got to

6    stay -- you can't contact her in any manner,

7    including by written, electronic, telephone.  Don't

8    contact her home, workplace, school, or others with

9    whom contact would likely cause annoyance or alarm.

10        So, if contacting her mother for dropping off

11    the kids is going to cause her annoyance and alarm,

12    bring that to their attention.  I have to do that in

13    order to, you know --

14        THE DEFENDANT:  Okay.

15        THE COURT:  So, that contact is strictly for

16    exchange of the child and issues related to the

17    child.  Maybe health, that kind of thing.

18        THE DEFENDANT:  Okay.

19        THE COURT:  All right?

20        ATTY. KIVELA:  Yes.

21        THE DEFENDANT:  Thank you, Your Honor.

22        THE COURT:  All right.  And with respect to the

23    -- I mean, the warrant, there is -- you could ask the

24    clerk for a copy --

25        THE DEFENDANT:  Okay.

26        THE COURT:  -- of the warrant.  That's in the

27    clerks file because that's public information.  They

1      may charge you a fee for copying.  But --

2          ATTY. KIVELA:  He would need to file an -- a pro

3      se appearance, I think, Your Honor, in order to get a

4      copy of the warrant, at least from my understanding.

5      At the end of the day, he does need an attorney.

6          THE COURT:  Really?  To get -- I can't just go

7      to the clerk's office and ask for his -- not as a

8      judge --

9          ATTY. KIVELA:  No.

10         THE COURT:  -- but as a lay person?

11         THE DEFENDANT:  I can't be in the party?

12         THE COURT:  It's not public information?  Well,

13      we can sus that I am unaware of what you're saying,

14      but --

15         ATTY. CLERK:  I mean, usually the, like,

16      defendant, I mean, they have no problem, like --

17         THE COURT:  I am -- try it.  See what happens.

18         THE DEFENDANT:  Okay.

19         THE COURT:  All right.

20         THE DEFENDANT:  Am I good for now?

21         THE COURT:  For now.

22         THE DEFENDANT:  Okay.

23         THE COURT:  We're going to recall your case.

24      You got to see family relations so we can tweak the

25      --

26         THE DEFENDANT:  Okay.  So, go downstairs to

27      family relations?

1          THE COURT:  Please.

2          THE DEFENDANT:  Thank you, Your Honor.

3 (THE COURT PASSED THE MATTER AND CONTINUED WITH THE CASE AT

4 HAND)

5          THE COURT:  And I do have that updated --

6          ATTY. KIVELA:  Yes, Your Honor.

7          THE COURT:  -- protective order on Mr. Lodice.

8          ATTY. KIVELA:  Lodice.  Matthew Lodice, eight on

9     the arraignment docket.

10          THE DEFENDANT:  Good afternoon, Your Honor.

11     THE COURT:  Afternoon.  Let's see, arraignment docket

12     -- so, with respect to the protective order.  I'm

13     going to enter a protective order in favor of T. A.

14          THE DEFENDANT:  Okay.

15          THE COURT:  Okay.  You know that person.

16          THE DEFENDANT:  What's that?  Oh, yeah.  Person

17     -- okay.

18          THE COURT:  I can't say their name in criminal

19     court.

20          THE DEFENDANT:  No, I got -- I know.  There's a

21     -- all right.  Go ahead.

22          THE COURT:  Yes.  In family court, you probably

23     could say their names.  In criminal court, their

24     names are protected.

25          This protective order requires that you

26     surrender or transfer all firearms and ammunition to

27     your local police department within 48 hours to the

1     extent you have any. Okay?

2          THE DEFENDANT: Okay.

3          THE COURT: You may not assault, threaten,

4     abuse, harass, follow, interfere with, or stalk the

5     protected person.

6          You have to stay away from the home of the

7     protected person and wherever the protected person

8     shall reside.

9          You cannot contact the protected person in any

10     manner, including by written, electronic, or

11     telephone contact. Don't contact their home,

12     workplace, school, or others with whom contact will

13     likely cause annoyance or alarm to the protected

14     person.

15          However, you are allowed to contact the

16     protected party regarding visitation and affairs of

17     your child in common via Family Wizard. And exchange

18     of the minor child must be in accordance with -- it

19     says pursuant, but in accordance with the most recent

20     civil family order, whatever that most recent order

21     is. Okay?

22          THE DEFENDANT: Okay.

23          THE COURT: I signed this protective order.

24     You're receiving a copy of it. Were you to violate

25     it --

26 (ASIDE WITH MARSHAL)

27          -- you will be arrested and charged with a new

~~offense that carries up to 10 years in jail and/or a~~

~~$10,000 fine. Okay?~~

~~THE DEFENDANT: Okay. So, if I call her at 7:00~~

~~p.m., like I'm court ordered allowed to do, I'm not~~

~~going to have any issues calling my daughter at 7:00~~

~~p.m.? Because that's one of the things, like -- so,~~

~~I'm court ordered to allow a call in at 7:00 p.m. and~~

~~I'm court ordered --~~

```
 9        THE COURT:  Didn't I just send you away, so you
10   could talk to the guy, so that you could work out all
11   the --
12        THE DEFENDANT:  I said that.  I told the lady
13   downstairs.
14        THE COURT:  Look at it.  Read it.  Read the
15   second page.  You tell me --
16        THE DEFENDANT:  The second page?  Yeah.  It just
17   says in accordance with the court order.
18        THE COURT:  So, does the court order in family
19   allow you to make this 7:00 call?
```

~~THE DEFENDANT: Yes. Because I know she's going~~

~~to try to call the cops if I do, and that's -- I just~~

~~want to be able to protect myself.~~

```
23        THE COURT:  It says in accordance with, and so
24   as long as the language in the other order --
25        THE DEFENDANT:  Says that?  I'm good?
26        THE COURT:  -- allows for that --
27        THE DEFENDANT:  Okay.
```

1    THE COURT: -- then you're behaving -- let me --
2    just read it back to me what it says.
3    ~~THE DEFENDANT: Okay. It says you may return~~
4    ~~the protected -- Matthew Lodice is allowed to contact~~
5    ~~the protected party regarding visitation and affairs~~
6    ~~of the child via Family Wizard. Exchange of the~~
7    ~~minor child must be pursuant to the most recent civil~~
8    ~~family order.~~
9    ~~That just says exchange of the child. It~~
10   ~~doesn't say anything about the call.~~
11   ~~THE COURT: It doesn't. You're right. Are~~
12   ~~there any other issues that you're going to come up~~
13   ~~with if I send you back?~~
14   ~~THE DEFENDANT: Just the pickup~~
15   ~~and drop-off at the church on Sunday. I have to do~~
16   ~~in-person with her child.~~
17   ~~THE COURT: Well, does that cover that? The~~
18   ~~pickup and drop-off? Does that --~~
19   ~~THE DEFENDANT: Yeah, because it says exchange~~
20   of the minor child.
21   THE COURT: Pursuant to --
22   THE DEFENDANT: So, yes. That covers that.
23   ~~THE COURT: But this other one about the call, I~~
24   ~~believe you're right, and so --~~
25   ~~ATTY. KIVELA: Does Your Honor just want to~~
26   ~~write it in? I have no objection, if Your Honor~~
27   ~~wants to handwrite something.~~

1    THE DEFENDANT:  I have no objection to writing

2    it, either.

3        I can.  If you could pass that back up and you

4    can give me the other two.

5        THE DEFENDANT:  I'm sorry, Your Honor.

6        THE COURT:  Thank you.  And so, what is the

7    issue, again?

8        THE DEFENDANT:  We're required between 7:00-

9    7:15, we're required to allow and -- either call or

10   allow a call for our daughter's sake.  So, my

11   daughter can call her at 7:15.  She can call me, and

12   I can call my daughter vice versa.  But it's court

13   ordered that we have to have that call.

14       THE COURT:  So, then this is not through Family

15   Wizard?  This call --

16       THE DEFENDANT:  That's not through Family

17   Wizard.  That's why I'm -- I want to make sure that I

18   don't violate.

19       THE COURT:  So, if I put something like in

20   accordance with the civil family order --

21       THE DEFENDANT:  Okay.

22       THE COURT:  Does the civil family order speak to

23   this call?

24       THE DEFENDANT:  Yes.

25       THE COURT:  What does it say?

26       THE DEFENDANT:  It says very specifically we're

27   allowed a call -- we have to allow a call or call at

between 7:00-7:15. I think they used the word,

facilitate a call.

THE COURT: Do you have a copy of it?

THE DEFENDANT: I -- can I pull out my phone?

THE COURT: Yes.

THE DEFENDANT: Should -- that was an addendum.

THE COURT: So, Mr. Lodice is allowed to

initiate contact with the protected party for the

purposes of communication with the child in

accordance with the civil family order. How about

that?

THE DEFENDANT: Yes. That would be perfect

because then that covers --

THE COURT: And you're allowed to, not only

initiate but receive a call from the protected party

--

THE DEFENDANT: Yes, along with the --

THE COURT: -- to facilitate communication --

THE DEFENDANT: For the daughter -- for our

daughter. Yup.

THE COURT: -- with the child in accordance with

the -- let me just -- hopefully, I can remember that.

THE COURT: Facilitate. Initiate. So, I wrote,

Mr. Lodice is allowed to facilitate/initiate contact

with the protected party for the purposes of contact

with their child in common -- or their child, in

accordance with the most recent civil family order.

THE DEFENDANT: Perfect. Thank you, Your Honor.

THE COURT: All right. And if I didn't finish advising you, if you violate the terms of this protective order then you will be arrested and charged with a new offense that carries up to 10 years in jail and/or a $10,000 fine.

THE DEFENDANT: Yes, I understand.

THE COURT: I'm trying to think if there's anything else. It can't be modified or terminated by you or the protected party. Only the criminal court can do that.

THE DEFENDANT: Yup. I understand.

THE COURT: The protective order. The civil restraining orders and other orders out of other courts are done elsewhere.

THE DEFENDANT: I understand.

THE COURT: So, I hope that takes care of everything. Now, we need a date.

ATTY. KIVELA: He needs an attorney, Your Honor.

THE COURT: Oh, yes. Are you going to get an attorney or are you going apply for a public defender?

THE DEFENDANT: No. I don't plan on it.

THE COURT: Well, that was a two-part question. Your answer is two parts? You don't plan on getting an attorney and you don't plan --

THE DEFENDANT: No, I don't have an attorney,

1     and no I don't plan on getting one.

2         THE COURT:  Why?

3         THE DEFENDANT:  Because I don't believe I need

4     one.  I haven't done anything -- hurt -- to harass

5     her.  I have proof that we've been seeing each other,

6     talking to each other all along.  I --

7         THE COURT:  Do you think you'd qualify for a

8     public defender, or you don't want one?

9         THE DEFENDANT:  I don't want one.

10        THE COURT:  Date?

11        THE DEFENDANT:  Early as possible would be

12    ideal.

13        THE COURT:  Okay.  How about March 1st?

14        THE DEFENDANT:  Perfect.

15        THE COURT:  See you then.

16        THE DEFENDANT:  Thank you, Your Honor.

17           *THE MATTER IS CONCLUDED*

18

19

20

21

22

23

24

25

26

27

| A05D-CR23-0190622-S | : | SUPERIOR COURT |
| STATE OF CONNECTICUT | : | G.A. #5 |
| v. | : | AT DERBY, CONNECTICUT |
| MATTHEW LODICE | : | JANUARY 30, 2023 |

## E L E C T R O N I C

## C E R T I F I C A T I O N

I hereby certify the electronic version is a true and correct transcription of the audio recording of the above-referenced case, heard in Superior Court, G.A. #5, Derby Connecticut, before the Honorable Scott M. Jones, Judge, on the 30th day of January, 2023.

Dated this 5th day of June, 2023 in Derby, Connecticut.

Jessica Reyes
Court Recording Monitor

From: DCJ.DerbyGA.Reports DCJ.DerbyGA.Reports@ct.gov
Subject: Re: filing this in derby court
Date: Aug 31, 2023 at 9:13:43 AM
To: Theodora Antar theodoraantar@gmail.com

Hi,

Received. Thank you!


*Kayla Curtis*
Derby State's Attorney's Office
106 Elizabeth Street
Derby, CT 06418
Phone: (203) 735-7487
DCJ.DERBYGA.REPORTS@CT.GOV

This e-mail and any attachments/links transmitted with it are for the sole use of the intended recipient(s) and may contain information that is confidential or legally protected. If you are not the intended recipient, you are hereby notified that any review, disclosure, copying, dissemination, distribution, use or action taken in reliance on the contents of this communication is STRICTLY PROHIBITED. Please notify the sender immediately by e-mail if you have received this in error and delete this e-mail and any attachments/links from your system. The State of Connecticut Division of Criminal Justice does not accept liability for any errors or omissions in the contents of this communication which arise as a result of e-mail transmission, or for any viruses that may be contained therein. If verification of the contents of this e-mail is required, please request a hard-copy version.

**if the recipient has difficulty opening the attachment, please refer to the state website (https://portal.ct.gov/DAS/BEST/Planning-and-Architecture/Enterprise-Messaging-Services/New-Secure-Email-Service). Thank you**


**From:** Theodora Antar <theodoraantar@gmail.com>
**Sent:** Thursday, August 31, 2023 9:05 AM
**To:** GA5 Derby Incoming Matters Shared Mailbox <GA5.Derby@jud.ct.gov>; DCJ.DerbyGA.Reports <DCJ.DerbyGA.Reports@ct.gov>; Barbara Bellucci <bbellucci@bhcare.org>; Barry, Rebecca <Rebecca.Barry@ct.gov>
**Subject:** filing this in derby court

EXTERNAL EMAIL: This email originated from outside of the organization. Do not click any links or open any attachments unless you trust the sender and know the content is safe.

Please file the attached in derby court

**ADDITIONAL ORDERS OF PROTECTION**
JD-CL-100  Rev. 10-21
C.G.S. §§ 29-28, 29-32, 29-33, 29-35l, 29-36k,
46b-38c(d)(e), 46b-38nn, 53a-28(f), 53a-36,
53a-42, 53a-217, 53a-217c, 53a-223, 54-1k,
18 U.S.C. §§ 922(g)(X), 2265; P.A. 21-78 §§ 2, 6, 7

accommodations,
contact a court clerk or go to:
*www.jud.ct.gov/ADA.*

STATE OF CONNECTICUT
**SUPERIOR COURT**
*www.jud.ct.gov*

*This form is available in other language(s).*

| Order type | Case type | Superior court location |
|---|---|---|
| **Protective Order - Family Violence** | **Criminal** | **A05D Derby** |
| Related court information (if applicable) | | Case number |
| | | **A05DCR2301911505** |

## Protected Person

| Last name | First name | Middle |
|---|---|---|
| **LODICE** | **MATTHEW** | |

## Respondent *(Defendant)*                          Respondent Identifiers

| Last name | First name | Middle | Date of birth | Sex | Race |
|---|---|---|---|---|---|
| **ANTAR** | **THEODORA** | **F** | 09 / 07 / 1991 | F | White |

**You, the Respondent, must follow all the orders and conditions selected below:**

☐ You may return to the protected person's home one time with police to retrieve belongings

☐ If the protected person has moved out of the home of the respondent, the respondent shall permit the protected
person to return to the respondent's home on one occasion, with police, to retrieve the protected person's
belongings.

(CT14)
(CT15)

☐ Stay 100 yards away from the protected person.

☐ This order also protects the protected person's minor children.

(CT16)

☐ This order protects animals owned or kept by the protected person.

(CT19)

☒ Other:

(CT31)

Ms. Antar is allowed to contact the protected party, regarding visitation and affairs of their child via Family Wizard.
Exchange of the minor child must be pursuant to the most recent Civil Family order. Ms. Antar is allowed to facilitate/
initiate contact with the protected party for the purpose of contact with their child in accordance with the most
recent Civil Family order.

**Additional terms and conditions are on the following pages:**
JDCL100AdditionalTermsAndConditions

**NOTICE** If a restraining order, protective order, or standing criminal protective order has been issued on your behalf or on behalf of your
child, you may elect to give testimony or appear in a family court proceeding remotely, pursuant to 46b-15c. Notify the court in writing at
least two days in advance of the proceeding if you choose to give testimony or appear remotely, and your physical presence in the
courtroom will not be required. If your testimony is not remote, it is admissible in the court proceeding. You may use the Remote Testimony Request (form
JD-FM-296) to request that your testimony... You may use the same form with two days advance notice to request that your testimony in any
... proceeding ... in the presence of the respondent/subject to a restraining order, protective order, or standing criminal
... pursuant to 46b-15c.

123            XBS

10:44:42 a.m.    05-17-2023        2/2

**APPEARANCE**
JD-CL-12   Rev. 12-21
P.B. §§ 3-1 through 3-12, 10-13, 25-6A, 25a-2, 25a-3

This form is available
in other language(s).

STATE OF CONNECTICUT
SUPERIOR COURT
www.jud.ct.gov

There are instructions and important notices on page 2 (the back) of this form.
Read page 2 before filling out this form.

☐ I am filing this appearance to let the court and all attorneys and self-represented
parties of record know that I have changed my address. My new address is below.

Return date (For Civil/Family cases)

Docket Number
AAN-CR23-0191150-S

**Name of case** (Full name of first Plaintiff v. Full name of first Defendant) Note: In Criminal/Motor Vehicles cases, the Plaintiff is The State of Connecticut

State of Connecticut v Theodora Anter

| Housing Session | Judicial District | Geographic Area | 5 | Address of court (Number, street, town and zip code)  108 Elizabeth Street, Derby 06418 |

Scheduled court date (Criminal/Motor Vehicle cases only)
05/17/2023

**Enter the Appearance of**

Name (Your name or name of official, firm, professional corporation or individual attorney)
Dombroski Hillis

Juris number (For attorney/law firm)
409206

Mailing address
129 Whitney Avenue

Post Office box number

Telephone number (Area code first)
203-624-9096

| City/town  New Haven | State  CT | Zip code  06510 | Fax number  203-624-1308 | E-mail address  mhillis@dkh-law.com |

In the case named above for: (Select one of the following parties. See descriptions/notes on page 2 of this form.)

PLAINTIFF
☐ The Plaintiff.
☐ All Plaintiffs.
☐ The following Plaintiff(s) only:

DEFENDANT
☒ The Defendant.
☐ All Defendants.
☐ The following Defendant(s) only:

☐ **Other** (Specify)

☐ This is a **Family Matters** case (such as divorce, custody, or child support). My appearance is for: (Select one or both)
☐ matters in the Family Division of the Superior Court.   ☒ Title IV-D Child Support matters

☐ This is a **Criminal/Motor Vehicle** case, and I am filing this appearance as  ☒ a Public Defender or  ☐ Assigned Counsel
☐ This appearance is for the purpose of a bail hearing only.
☐ This appearance is for the purpose of alternative arraignment proceedings only.                    (Special Public Defender)

If an appearance by other counsel or self-represented party is on file for this party/parties, select one option below:

1. ☐ This appearance is in place of the appearance of: _____ Name and Juris Number (if applicable) to be replaced

2. ☐ This appearance is in addition to an appearance already on file.

I agree that documents can be delivered (served) to me electronically in this case. (Practice Book Sec. 10-13)   ☒ Yes   ☐ No

| Signed (Individual attorney or self-represented party) | Name of person signing at left (Print or type)  Michael S. Hillis | Date signed  05/17/2023 |

**Certification**

I certify that a copy of this document was or will immediately be mailed or delivered electronically or non-electronically on (date) ___05/17/2023___ to all attorneys and self-represented parties of record and that written consent for electronic delivery was received from all attorneys and self-represented parties of record who received or will immediately be receiving electronic delivery.

FOR COURT USE ONLY

Name and address of each party and attorney that copy was or will be mailed or delivered to:

State's Attorney 106 Elizabeth Street, Derby 06418

If necessary, attach additional sheet or sheets with name and address which the copy was or will be mailed or delivered to:

| Signed (Signature of filer) | Print or type name of person signing  Michael S. Hillis | Date signed  05/17/2023 |

Page 1 of 2

123          XBS                                                    10:44:42 a.m.   05-17-2023        2/2

**APPEARANCE**
JD-CL-12  Rev. 12-21
P.B. §§ 3-1 through 3-12, 10-13, 25-6A, 25a-2, 25a-3

This form is available
in other language(s).

STATE OF CONNECTICUT
SUPERIOR COURT
www.jud.ct.gov

*There are instructions and important notices on page 2 (the back) of this form.*
*Read page 2 before filling out this form.*

☐ I am filing this appearance to let the court and all attorneys and self-represented
parties of record know that I have changed my address. My new address is below.

Return date (For Civil/Family cases)

Docket Number
AAN-CR23-0191150-S

**Name of case** (Full name of first Plaintiff v. Full name of first Defendant) Note: In Criminal/Motor Vehicles cases, the Plaintiff is the State of Connecticut

State of Connecticut v Theodora Antar

| ☐ Housing Session | ☐ Judicial District | ☐ Geographic Area | Address of court (Number, street, town and zip code) | Scheduled court date (Criminal/Motor Vehicle cases only) |
|---|---|---|---|---|
| | | 5 | 106 Elizabeth Street, Derby 06418 | 05/17/2023 |

**Enter the Appearance of**

Name (Your name or name of official, firm, professional corporation, or individual attorney)

Dombroski Hillis

Juris number (For attorney/law firm)
409206

Mailing address

129 Whitney Avenue

Post Office box number

Telephone number (Area code first)
203-624-9096

| City/town | State | Zip code | Fax number | E-mail address |
|---|---|---|---|---|
| New Haven | CT | 06510 | 203-624-1308 | mhillis@dkh-law.com |

In the case named above, for: (Select one of the following parties. See descriptions/notes on page 2 of this form.)

**PLAINTIFF**
☐ The Plaintiff.
☐ All Plaintiffs.
☐ The following Plaintiff(s) only:

**DEFENDANT**
☒ The Defendant.
☐ All Defendants.
☐ The following Defendant(s) only:

☐ Other (Specify):

☐ This is a **Family Matters** case (such as divorce, custody, or child support). My appearance is for: (Select one or both)
☐ matters in the Family Division of the Superior Court     ☐ Title IV-D Child Support matters

☐ This is a **Criminal/Motor Vehicle** case, and I am filing this appearance as ☒ a Public Defender or ☐ Assigned Counsel
☐ This appearance is for the purpose of a bail hearing only.                                        (Special Public Defender)
☐ This appearance is for the purpose of alternative arraignment proceedings only.

If an appearance by other counsel or self-represented party is on file for this party/parties, select one option below:

1. ☐ This appearance is in place of the appearance of:
                                        Name and Juris Number (if applicable) to be replaced

2. ☐ This appearance is in addition to an appearance already on file

I agree that documents can be delivered (served) to me electronically in this case. (Practice Book Sec. 10-13) ☒ Yes   ☐ No

| Signed (Individual attorney or self-represented party) | Name of person signing at left (Print or type) | Date signed |
|---|---|---|
| [signature] | Michael S. Hillis | 05/17/2023 |

**Certification**

I certify that a copy of this document was or will immediately be mailed or delivered electronically or
non-electronically on (date) ___05/17/2023___ to all attorneys and self-represented parties of
record and that written consent for electronic delivery was received from all attorneys and self-
represented parties of record who received or will immediately be receiving electronic delivery.

FOR COURT USE ONLY

Name and address of each party and attorney that copy was or will be mailed or delivered to.

State's Attorney 106 Elizabeth Street, Derby, 06418

*If necessary, attach additional sheet or sheets with name and address which the copy was or will be mailed or delivered to.*

| Signed (Signature of filer) | Print or type name of each signing | Date signed |
|---|---|---|
| [signature] | Michael S. Hillis | 05/17/2023 |

Page 1 of 2

From: CMECF@ctd.uscourts.gov
Subject: Activity in Case 3:23-cv-01178 State of Connecticut v. Antar Notice of Removal
Date: Sep 7, 2023 at 10:40:27 AM
To: CMECF@ctd.uscourts.gov

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

## U.S. District Court

## District of Connecticut

**Notice of Electronic Filing**

The following transaction was entered on 9/7/2023 at 10:39 AM EDT and filed on 9/6/2023

**Case Name:**      State of Connecticut v. Antar

**Case Number:**    3:23-cv-01178

**Filer:**          Theodora F. Antar

**Document Number:** 1

**Docket Text:**
NOTICE OF REMOVAL by Theodora F. Antar from State of Connecticut Superior Court at Derby, case number A05D-CR23-0191150-S, filed by Theodora F. Antar. (Imbriani, Susan)

**3:23-cv-01178 Notice has been electronically mailed to:**

Theodora F. Antar      theodoraantar@gmail.com

**3:23-cv-01178 Notice has been delivered by other means to:**

State of Connecticut


The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1034868047 [Date=9/7/2023] [FileNumber=7601229-0]
[7783a3cec58e451687b54bfa8e843cc8ee1bd72864ac3e76357590fa88e17314e
cb8
aed267822cb3d6d4e814dcdc301cc5978acb59b7d0288c12d574468cc2aa]]

This is an automatic e-mail message generated by the CM/ECF system.
Please DO NOT RESPOND to this e-mail because the mail box is unattended.
***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

## U.S. District Court

## District of Connecticut

**Notice of Electronic Filing**

The following transaction was entered on 9/7/2023 at 10:40 AM EDT and filed on 9/6/2023

**Case Name:**     State of Connecticut v. Antar
**Case Number:**     3:23-cv-01178
**Filer:**     Theodora F. Antar
**Document Number:** 2

**Docket Text:**
MOTION for Leave to Proceed in forma pauperis by Theodora F. Antar. (Imbriani, Susan)

**3:23-cv-01178 Notice has been electronically mailed to:**

Theodora F. Antar     theodoraantar@gmail.com

**3:23-cv-01178 Notice has been delivered by other means to:**

State of Connecticut

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1034868047 [Date=9/7/2023] [FileNumber=7601236-0]
[c5bcadd711261ca3c6c3aeda45ab437b43280afdf5b9f8da9505899a66f0ee16a7
42
fe809df6e4cd799af4c1990312fb34f781324127c8ba757df8eb8cf8aed2]]

SEP 6 2023 PM 4:55
FILED - USDC

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

## MOTION FOR LEAVE TO PROCEED IN FORMA PAUPERIS
## PURSUANT TO 28 U.S.C. §1915

State

_____,

Plaintiff(s),

v.                                    Case No. _____

Theodora Antar

_____,

Defendant(s)

        I request leave to commence this civil action without prepayment of fees, costs,
or security therefor pursuant to 28 U.S.C. §1915. In support of my request, I submit the
attached financial affidavit and state that:
        (1)     I am unable to pay such fees, costs, or give security therefor.
        (2)     I am entitled to commence this action against the defendant(s).
        (3)     I request that the Court direct the United States Marshal's Service to serve
                process in this matter.

_____
Original Signature

Theodora Antar
Name (print or type)

826 Shagbark Drive
Street Address

Orange CT 06477
City        State        Zip Code

203-273-8419
Telephone Number

1

# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

## FINANCIAL AFFIDAVIT IN SUPPORT OF
## MOTION FOR LEAVE TO PROCEED IN FORMA PAUPERIS
## PURSUANT TO 28 U.S.C. §1915

_State_____,

Plaintiff(s),

v.                                    Case No. _____

_Theodora Antar_____,

Defendant(s).

I declare that:

    (1)    I am unable to pay such fees, costs, or give security therefor.

    (2)    I am entitled to commence this action against the defendant(s).

I further state that the responses I have made to the questions below relating to my ability to pay the cost of prosecuting this action and other matters are true.

## MARITAL STATUS
Single _____   Married _____   Separated _____   Divorced ✓
If separated or divorced, are you paying any support?  Yes ✓   No _____
Dependents:  Spouse _____   Children # _2_   Others # _____
Describe any others you support: _____
How many children **under the age of 18** do you support financially? _2_

## RESIDENCE
Street Address: 85e Shagbark drive
City: Oranje        State: Ct
Zip Code: 06477     Telephone: 2032738419

## EDUCATION
Please circle the highest level of formal education you have received:
Grammar School   K 1 2 3 4 5 6 7 8   High School   9 10 11 12
College   1 2 3 4   Post-Graduate   1 2 3 4

## INCOME

If <u>employed</u> at present, complete the following:
Name of employer: _____
Address of employer: _____
How long have you worked for this employer? _____  *N/a*
Gross weekly income before taxes or other deductions: _____

If <u>self-employed</u> state gross weekly income before taxes and deductions: _____*a*
What is the nature of your employment? _____

If <u>unemployed</u> at present, complete the following:
I have been unemployed since (DATE): *March 2023*
The name of my last employer: *Self*
Address: _____   Telephone #: ( )_____
Last gross weekly income received : _____

If <u>spouse</u> is employed, please complete the following:
Name of employer:_____
How long employed: _____   *N/a*
Gross weekly income before taxes or other deductions: _____
What is the nature of spouse's employment? _____

If receiving <u>government cash benefits (such as SAGA or AFDC)</u>, complete the following:
I have been receiving these benefits since: _____
I am receiving $_____ *N/a* per month for myself and the following family
members _____.

If receiving <u>social security</u>, <u>disability</u>, <u>workers' compensation</u> or <u>unemployment</u> benefits,
complete the following:
I have been receiving (TYPE) _____ *N/a* benefits since (DATE) _____.
I am receiving $_____ per month.

Do you receive <u>any other income</u>, of any kind?   Yes _____   No _____
If yes, how much? $_*47*_ per _*week*_ (week, month, or year)
What is the source of this income? _*child support*_.

## ASSETS

Do you own any real property, such as land or a house?   Yes _____   No _✓_
If yes, what kind of property is it?_____
Property Address: _____
Whose name is the property in? _____ *N/a*
Estimated value:_____

3

Amount owed: _____   Owed to: N/a
Total: _____   Monthly payment _____
Annual income from rental or other use of property: _____

Other property:
Automobile:  Make _____   Model N/a   Year _____
Registered owner(s) name(s): _____
Present value of automobile: _____   Amount Owed: _____

Do you own any other valuable property, such as boats, motorcycles, or machinery?
If yes, please describe the property and provide its estimated value: N/a
_____
_____
_____

Cash on hand:
Balance in savings, money market, and similar accounts: _____ 0
Balance in checking accounts: $272 _____
Stocks, bonds, mutual funds or other investments owned:
Total value of investments: _____ 0
Describe the nature of the investments: _____

**OBLIGATIONS:**

| | | |
|---|---|---|
| Monthly rental on house or apartment: | $ | 1650 |
| Monthly mortgage payment on house: | $ | 350 |
| Gas/heating oil bill per month: | $ | |
| Electric bill per month: | $ | 350 |
| Phone bill per month: | $ | 120 |
| Car payments per month: | $ | |
| Car insurance payments per month: | $ | 275 |
| Other types of insurance payments per month | $ | |
| Monthly payments on outstanding debts: | | |
| Please list: Credit Card | $ | 825.00 |
| Please list: Student loans | $ | 875 |
| Please list: | $ | |
| Please list: | $ | |
| Alimony or child support payments: | $ | 77 per week |
| Estimated monthly expenditure on food: | $ | 800 / month |
| Estimated monthly expenditure on clothing: | $ | |
| Other necessary expenditures: Medical expenses | $ | 350 per month |
| Total amount of monthly obligations: | $ | 4703 |

1650
350
2000

2120
1275
2395
825
3220

3595
3903
80r          800
_____        _____
3903         4703

2
77
4
_____
30 8

3220
375
_____
3595

4

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

STATE OF CONNECTICUT        )        Civil No. 3:23-cv-01178-OAW

*Plaintiff*        )

        vs.        )

Theodora F. Antar        )

*Defendant*        )

_____)

## Defendant's Statement re: removal of action pursuant to 28 U.S.C. §1441

The Defendant in the underlying criminal action involved in this action hereby files this notice to this Court pursuant to 28 U.S.C. § 1441 and sets forth the following information:

1. The Defendant first received a copy of the warrant in the state court action on 5/16/23.

2. The Defendant was served with a copy of the warrant which contained the information complaint on 5/16/23.

3. This action is not being filed on the basis of diversity jurisdiction.

4. This removal action takes place more than thirty (30) days after the defendant first received a copy of the summons and complaint, and the reasons why removal has taken place at this time is due to the extreme and extraordinary nature of violations of the defendant's state, federal, constitutional, and other rights as a crime victim, and those of her minor children as they relate to this action. The defendant was not given any opportunity to be heard or appear in the underlying state court action other than the arraignment, and the defendant has been denied right to a speedy trial, procedural and substantive due process, as well as rights guaranteed under acts of Congress and U.S. treaties.

5. Parties:

    1- Plaintiff in the underlying state action:

    State of Connecticut

    GA5 Derby, CT

    106 Elizabeth Street, Derby 06418

    Rebecca.barry@ct.gov


    2- Defendant in the underlying state action:

    Theodora Antar

    856 Shagbark Drive

    Orange, CT, 06477

    theodoraantar@gmail.com


    3- Former Counsel for the Defendant in the underlying state action that has yet to withdraw appearance

    Attorney Michael Stanton Hillis

    129 Whitney Ave, #201

    New Haven, CT, 06510

    mhillis@dkh-law.com

# JURISDICTION

The Defendant is removing this underlying state criminal action to federal court. The purported jurisdictional basis for this removal from state court to federal court is 28 U.S.C. §§ 1443 and 1446. 28 U.S.C. § 1443 Title 28 U.S.C. §1443 states in pertinent part: Any of the following civil actions or criminal prosecutions, commenced in a State court may be removed by the defendant to the district court of the United States for the district and division embracing the place wherein it is pending: (1) Against any person who is denied or cannot enforce in the courts of such State a right under any law providing for the equal civil rights of citizens of the United States, or of all persons within the jurisdiction thereof; (2) For any act under color of authority derived from any law proving for equal rights . . . ."

The Defendant contends that the matter is being removed to protect her fundamental and constitutional rights, making this action a potential civil rights removal of a criminal action. In order to remove an action under 28 U.S.C. § 1443, the movant must show that the right allegedly denied the removal petitioner arises under a federal law "providing for specific civil rights stated in terms of racial equality." Georgia v. Rachel, [384 U.S. 780, 792 (1966)].

Claims that prosecution and conviction will violate rights under constitutional or statutory provisions of general applicability or under statutes not protecting against racial discrimination, will not suffice. That a removal petitioner will be denied due process of law because the criminal law under which he is being prosecuted is allegedly vague or that the prosecution is assertedly a sham, corrupt, or without evidentiary basis does not, standing alone, satisfy the requirements of § 1442(1). City of Greenwood v. Peacock, [384 U.S. 808 ,825 (1966)]. Johnson v. Mississippi, 421 U.S. 213, 219 (1975).

In the present removal materials, the removal Defendant has asserted multiple violations of her federal, constitutional, and rights as a crime victim in accordance with section 1443. Additionally, the Defendant also is claiming that she is a member of a protected group as a woman, as a mother, as a bi-racial individual, and as an individual who has African American racial identity with more than 50% of her DNA originating from Africa. The Defendant is protected based on her sex, socioeconomic status, race, disabilities, and level of education, as well as her status as a crime victim, all of which have been violated as rights that the defendant is wholly entitled to.

As such, the Defendant cites section 1443 as one of the potential avenues of removal in this case where Defendant has no other legal remedy available due to the extreme nature of the violations of her rights and those of her minor children.

28 U.S.C. § 1446 Title 28 of U.S.C. §1446 outlines the procedure for removal. Section § 1446(c) states in pertinent part: (2)A notice of removal of a criminal prosecution shall include all grounds for such removal. A failure to state grounds which exist at the time of the filing shall constitute a waiver of such grounds, and a second notice may be filed only on grounds not existing at the time of the original notice.

Plaintiff has cited all grounds and is fully prepared to show that this underlying state court action must be dismissed entirely as there is no evidence that any crime was committed beyond a reasonable doubt that could result in a conviction on behalf of the Defendant.

Furthermore, the level of violations of the defendant's rights are extreme and unprecedented. The defendant has not been allowed any of her procedural due process rights, and her rights under the constitution, including the 5th amendment, 1st amendment, 6th amendment, 14th amendment, and other associated rights.

## CERTIFICATE OF SERVICE

I certify that a copy of the above was mailed or delivered electronically or nonelectronically on 9/19/2023 to all counsel and self-represented parties of record and that written consent for electronic delivery was received from all counsel and self-represented parties of record who were electronically served.

Parties and/or attorneys served:

Michael Hillis

mHillis@dkh-law.com

State of Connecticut

State's Attorney Rebecca Barry

Rebecca.barry@ct.gov

i/s

_____

THEODORA F. ANTAR, PRO SE

856 SHAGBARK DRIVE

ORANGE, CT, 06477

203-273-8419

THEODORAANTAR@GMAIL.COM

A22M-CR23-0124387-S : A22M-CR23-0191150-T

STATE OF CONNECTICUT : SUPERIOR COURT

: JD OF ANSONIA-MILFORD

VS. : AT MILFORD

THEODORA ANTAR : JANUARY 21st, 2024

## <u>DEFENDANT'S MOTION FOR A FRANKS HEARING</u>

The defendant, Theodora F. Antar, hereby moves this Honorable Court for a
Franks hearing, pursuant to the principles established in Franks v. Delaware, 438 U.S.
154 (1978). The defendant contends that ***the affidavit used to obtain her arrest***
***warrant contains false statements and material omissions.***

Furthermore, the police report that was written by PFC A. Vakos of the Milford
Police Department that explained her basis for alleging that there was probable cause
for an arrest on 10/18/23 consisted of conclusory assumptions and speculations and
***there is no evidence or probable cause to support any violation of the protective***
***order took place.*** The defendant violated no term of the protective order.

Most importantly, the defendant has NEVER had her parental rights terminated
and is the legal guardian of her minor child A.L. This false arrest took place 6 days after
the defendant filed a federal lawsuit in the Connecticut District Court against the State of
Connecticut and various state actors, agencies, and arms of the state.

The defendant's constitutional and inalienable rights to the "care, control, and
custody" as well as to "all medical and educational records for the minor child" give the
defendant the right to have contact with the pediatrician, the right to exchange records

1

with the pediatrician for the medical care of her minor child, and the right to being present at the location for the pediatrician at any given time that it is open to the public.

Additionally, it is imperative to note that there is not now, nor has there ever been any order of protection that would restrict the defendant from having contact or access to her minor child.

The defendant is allowed by law to obtain records regarding the educational and medical records for her minor children. The defendant also has another child who she has sole legal and sole physical custody of who is registered as a patient at the pediatrician's practice who now has no pediatrician as a result of this unlawful arrest and the subsequent warning that any return to the pediatrician would result in a trespassing charge for the defendant.

The defendant is now forced to find new medical providers for her minor child and is suffering violations of her rights under the color of law as retaliation due to the fact that she exposed levels of corruption within various state-run organizations and the story reached national media attention through publications such as *The Frank Report*. The defendant respectfully represents:

**Introduction**

Theodora F. Antar seeks a Franks hearing to challenge the truthfulness of the affidavit submitted by Officer Kurt Correia, along with the police report filed by PFC A. Vakos of the Milford Police Department, which led to the issuance of the arrest warrant and subsequent false arrest and false imprisonment of the defendant under Docket Nos. A22M-CR23-0124387-S and A22M-CR23-0191150-T.

**Statement of Facts**

A statement implicating Ms. Antar was made by the complainant M.L. on April 30, 2023 in response to the defendant's attempt as a crime victim to contact law enforcement to report M.L.'s violation of the no-contact provision of the criminal protective order issued against him in which the defendant was the protected party. M.L. not only violated the no-contact provision, but also violated the provision which said "no interfering" because he refused to comply with a prior court order that stated "the father is required to pay for the OurFamilyWizard application for both parties" by stating he would only pay for his own portion and removing the defendant from the app.

The defendant had no way to communicate with M.L. After she was removed from the app, and defendant simply was attempting to communicate the drop off location with M.L. For their minor daughter since he had also interfered with her and violated a court order not to make educational decisions without the defendant by removing their minor child from her school and forcing the defendant to find a new school for the child.

The defendant's attempt to simply write down the address of the new school for M.L. Turned into M.L. Violating multiple provisions of the protective order and the Orange Police being called by the defendant. The Orange Police Department and the Derby Court, in concert with one another, repeatedly refused to enforce the criminal protective order that had been issued against M.L. In which the defendant was the protected party.

On this particular occasion of 4/30/23, the Orange Police Department showed severe bias, hostility, intimidation, discrimination, and excessive force against the defendant by refusing to hold M.L. Accountable for his clear violation which was

captured on video and showed him repeatedly speaking to the defendant more than 18 times after the defendant repeatedly asked him to stop.

Furthermore, any allegation that the defendant was "blocking his way" from being able to enter his vehicle is also false, and Officer Correia committed perjury when he stated in his sworn affidavit that the defendant was blocking M.L.'s pathway to get into his vehicle.

The defendant provided Officer Correia with a video which shows M.L. Repeatedly speaking to the plaintiff in violation of the no-contact order and also shows him casually and easily walking right by the defendant without touching her in order to get into his vehicle. This proves that the defendant was not blocking his way and that he was continuing to speak to the defendant to antagonize and harass her as he had been previously warned repeatedly by the police that any contact outside of the OurFamilyWizard app would be subject to further arrest for harassment.

The protective order stated that "M.L. Is allowed to contact the protected party in the OurFamilyWizard app" to discuss the "visitation and affairs of the minor child" and that was the only provision that allowed for any contact between M.L. And the defendant.

The Orange Police Department have a history of showing bias and subjecting the defendant to gender discrimination as a result of bias throughout the department as a whole against women.

The Orange Police Department refused to apply for a warrant for M.L.'s arrest on countless occasions for him violating the no-contact order over 100 times, in spite of the fact that the defendant called the police and provided a sworn written statement with

evidence in the form of video evidence showing that M.L. clearly violated the no-contact provision of the protective order.

As such, Officer Correia's affidavit, filed on May 11, 2023, led to Ms. Antar's arrest. The defendant argues this affidavit contains numerous falsehoods and omissions critical to the probable cause determination.

There is no probable cause and there was never any probable cause for an arrest at any point in time.

**Legal Argument**

Franks v. Delaware Precedent:

*"Where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request."* See Franks v. Delaware, 438 U.S. 154

In accordance with the precedent of *Franks*, Ms. Antar presents a substantial claim that Officer Correia's affidavit and PFC A. Vakos' report both included false statements made knowingly, intentionally, or with reckless disregard for the truth.

As such, these inaccuracies and omissions are asserted to be material to the finding of probable cause.

Following *Franks*, if it is established that the affidavit was indeed flawed in such a critical manner, the resultant warrant should be voided, and the evidence obtained thereby excluded.

In accordance with *Franks v. Delaware,* the defendant hereby requests a hearing to be scheduled on an expedited basis to challenge the veracity of the warrant affidavit and to determine whether or not there was any probable cause to show that the defendant had violated the protective order.

Should this Court find the affidavit and/or the police report to have been materially false or misleading, it is respectfully requested that the charges against Ms. Antar be fully dismissed.

Respectfully submitted,

The Defendant

theodoraantar@gmail.com

PO BOX 3554

Milford, CT, 06460

Theodora Antar /s/

_____

January 21st, 2024

WHEREFORE, the defendant respectfully requests that this Court:

a. Conduct a Franks hearing.

b. Upon finding material falsehoods or omissions in the affidavit, dismiss the charges under Docket Nos. A22M-CR23-0124387-S and A22M-CR23-0191150-T.

c. Grant any other relief deemed just and proper.

Respectfully submitted,

The Defendant

theodoraantar@gmail.com

PO BOX 3554

Milford, CT, 06460

Theodora Antar /s/

_____

January 21st, 2024

## CERTIFICATION OF SERVICE

This is to certify that on January 21st, 2024, a copy of the foregoing was delivered to:

Office of the State's Attorney Judicial District of

Ansonia/Milford 14 West River Street

Milford, CT 06460

Phone: (203) 874-3361

Fax: (203) 283-8268

Email: conndcj@ct.gov

Respectfully submitted,

The Defendant

theodoraantar@gmail.com

PO BOX 3554

Milford, CT, 06460

Theodora Antar /s/

_____

January 21st, 2024

EXHIBIT ONE

STATE OF CONNECTICUT
SUPERIOR COURT

DISPOSITION DATE

| Police Case number | Agency name | | Agency number |
|---|---|---|---|
| 22-38591 | ORANGE POLICE DEPARTMENT | DOMESTIC VIOLENCE | CT0010700 |

## TITLE, ALLEGATION, AND COUNTS

| State of Connecticut vs. *(Name of accused)* | Residence *(Town)* of accused | Docket number |
|---|---|---|
| Lodice  Matthew J | Waterbury | |

| Address | Date of birth | The undersigned Prosecuting |
|---|---|---|
| 48 Quarry Hill Rd  Waterbury Ct | 05/11/1983 | Authority of the Superior Court |

| To be held at *(Town)* | Geographical area number | Court date | of the State of Connecticut |
|---|---|---|---|
| Derby | 05 | | charges that: |

| Count One — Did commit the offense of: | | Continued to | Purpose | Reason |
|---|---|---|---|---|
| HARASSMENT 2 | | | | |

| At *(Town)* | On or about *(Date)* | In violation of General Statute number | | | |
|---|---|---|---|---|---|
| Orange | 08/27/22-09/01/22 | 53a-183 | | | |

Count Two — Did commit the offense of:

| At *(Town)* | On or about *(Date)* | In violation of General Statute number |
|---|---|---|

Count Three — Did commit the offense of:

| At *(Town)* | On or about *(Date)* | In violation of General Statute number |
|---|---|---|

☐ See other sheet for additional counts

Date

Signed *(Prosecuting Authority)*

## COURT ACTION

Defendant advised of rights before plea

| (Judge) | (Date) | Bond | Surety | ☐ 10% | Election | *(Date)* |
|---|---|---|---|---|---|---|
| ☐ Attorney  ☐ Public defender | Guardian | Bond change | | ☐ Cash | ☐ CT  ☐ JY | |
| | | | | | Seized property inventory number | |

| Count | Plea date | Plea | Plea withdrawn Date | New plea | Verdict finding | Fine | Remit | Additional disposition |
|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | $ | $ | |
| 2 | | | | | | $ | $ | |
| 3 | | | | | | $ | $ | |

| Date | Other Court Action | Judge |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

| Receipt number | Cost | Bond information | | | |
|---|---|---|---|---|---|
| | ☐ IMP | ☐ NCI  ☐ Bond forfeited | ☐ Forfeiture vacated | ☐ Forfeiture vacated and bond reinstated | |

| Application fee - receipt number if paid | Circle one W I Q | Program fee - receipt number if paid | Circle one W I Q | Program fee - receipt number if paid | Circle one W I Q |
|---|---|---|---|---|---|
| Prosecutor on original disposition | Reporter/monitor on original disposition | Signed *(Clerk)* | | Signed *(Judge)* | |

STATE OF CONNECTICUT
**SUPERIOR COURT**

DISPOSITION DATE

| Police Case number | Agency name | Agency number |
|---|---|---|
| 22-38591 | ORANGE POLICE DEPARTMENT | CT0010700 |

## Arrest Warrant

Geographical area number 05    State of Connecticut vs. Lodice Matthew J

To: Any Proper Officer of the State of Connecticut

    By Authority of the State of Connecticut, you are hereby commanded to arrest the body of the within-named accused. *("X" all that apply)*

    ☐   A. Accused is ordered to be brought before a clerk or assistant clerk of the Superior Court.

    ☐   B. Accused is not entitled to bail.

    If A, B or both are checked above, you shall without undue delay bring the arrested person before the clerk or assistant clerk of the Superior Court for the geographical area where the offense is alleged to have been committed, or if the clerk's office is not open, to a community correctional center within said geographical area, or the nearest community correctional center if no such center exists in the geographical area, or to the Correctional Institution, as the case may be.

    ☐   C. Bail set at _____ .

    ☐   D. Non-financial conditions of release:

_____

_____

    ☒   E. Conditions of release not determined by court.

Extradition boundaries established by prosecutor

| By the Court | Signed *(Judge of the Superior Court)* | Date | Name of Judge-*(Print or type)* |
|---|---|---|---|
| | *(signature)* | 1-5-23 | *(signature)* |

## Return On Arrest Warrant

| Geographical area number 5 | Town of: ORANGE | Date 01/27/2023 | State of Connecticut |
|---|---|---|---|

Then and there, by virtue of the within and foregoing complaint and warrant, I arrested the body of the within-named accused and read the same in the hearing of said accused; and have said accused here in court for examination.

Attest *(Officer's signature and Department)*   Ofc. Fernandez #112

| Date | Other Court action | Judge |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

*This is page 2 of a 2 page Information*

ARREST WARRANT APPLICATION
JD-CR-64b Rev. 3-11
C.G.S. § 54-2a
Pr. Bk. Sec. 36-1, 36-2, 36-3

STATE OF CONNECTICUT
SUPERIOR COURT
www.jud.ct.gov

FOR COURT USE ONLY
Supporting Affidavits Sealed
YES          NO

| Police Case number 22-38591 | Agency name Orange Police Department | | Agency number |
| --- | --- | --- | --- |
| Name (Last, First, Middle Initial) LODICE , MATTHEW J | Residence (Town) of accused WATERBURY | Court to be held at (Town) Derby | Geographical Area number 05 |

## APPLICATION FOR ARREST WARRANT

TO: A Judge of the Superior Court

The undersigned hereby applies for a warrant for the arrest of the above-named accused on the basis of the facts set forth in the : [X] AFFIDAVIT BELOW    [ ] AFFIDAVIT(S) ATTACHED

| Date | Signed (Prosecuting authority) | Type/print name of prosecuting authority |
| --- | --- | --- |

## AFFIDAVIT

The undersigned affiant, being duly sworn, deposes and says:

1. The undersigned, Ofc Brian Petrucelli 101, being duly sworn, does depose and state that he is a member of the Orange Police Department and has been since 03/16/2001. At all times mentioned herein he was acting as a member of said department. The following facts and circumstances are stated from personal knowledge and observations as well as information received from other police officers acting in their official capacity and from official police reports and statements made by prudent and credible witnesses.

2. That on 11/10/2022 at approximately 1436 hours, Orange Police Officer Fernandes responded to the lobby of OPD HQ and met with TA (dob: 09/07/1991) who stated that the father of her child, Matthew Lodice (05/11/1983) has been contacting her and harassing her outside of the court prescribed Family Wizard App. TA stated she had advised Matthew not to contact her outside of this court mandated communication application and that the Orange Police had advised Matthew not to contact her outside of the application as well. A criminal history search returned no active File 20 protective or restraining orders between TA and Matthew. At this meeting, TA brought with her a pre typed ten page written statement she wished to share and have sworn out by Officer Fernandes regarding her complaint.

3. That an OPD in house search returned a long history of custody and harassment incidents between Matthew and TA, (ref OPD CN #22-13833) in which stated that Matthew was advised by Officer Fernandes not to contact TA outside of the OurFamilyWizard application. Matthew was advised that failure to comply with this request may result in a harassment complaint which Matthew stated he understood. In another incident on 10/16/22, Affiant and Officer Repice dealt with Matthew and TA, where he couldn't take his agreed custody of his daughter on Saturday night 10/15/22, but then he wanted to resume his agreed custody of his daughter on Sunday morning 10/16/22, causing undue

(This is page 1 of 3 page Affidavit.)

| Date | | Signed (Affiant) 101 |
| --- | --- | --- |
| JURAT | Subscribed and sworn to before me on (Date) 1/5/23 | Signed (Judge/Clerk, Commissioner of Superior Court, Notary Public) 96 |

Date 1/5/23

## FINDING

The foregoing Application for an arrest warrant, and affidavit(s) attached to said Application, having been submitted to and considered by the undersigned, the undersigned finds from said affidavit(s) that there is probable cause to believe that an offense has been committed and that the accused committed it and, therefore, that probable cause exists for the issuance of a warrant for the arrest of the above-named accused.

| Date and Signature | Signed at (City or town) Derby | On (Date) 1/5/23 | Signed (Judge/Judge Trial Referee) | Name of Judge/Judge Trial Referee |
| --- | --- | --- | --- | --- |

ARREST WARRANT APPLICATION
JD-CR-64a Rev. 3-11
C.G.S. § 54-2a
Pr. Bk. Sec. 36-1, 36-2, 36-3

STATE OF CONNECTICUT
SUPERIOR COURT
www.jud.ct.gov

| Name (Last, First, Middle Initial) | Residence (Town) of accused | Court to be held at (Town) | Geographical Area number |
|---|---|---|---|
| LODICE , MATTHEW J | WATERBURY | Derby | 05 |

## AFFIDAVIT - CONTINUED

stress and inconvenience to TA and their shared daughter, (ref OPD CN #22-35701).

4. That TA's written statement claimed Matthew has been sexually harassing her, using coercive control in an effort to cause intentional infliction of emotional distress, fear, and manipulation. TA claimed that Matthew has threatened not to pay child support unless TA has sex with him or agrees to a relationship. TA stated that Matthew told her he would make false reports/allegations against her in order to have her arrested and that he would do anything to gain sole custody of their child. TA stated she repeatedly told Matthew she was not interested in a sexual relationship with him or any type of relationship outside of co-parenting the child. TA also stated that Matthew has threatened to have the child taken away from her by making false reports to the IRS and Care4Kids in order to destroy her life.

5. That Officer Fernandes reviewed the statement with TA which included approximately 72 bullet points or instances where, according to TA, Matthew either contacted her outside of the OurFamilyWizard app, used disparaging language about her in front of their child, made attempts to get TA to meet up with him (presumably for sexual intercourse), used sexual language towards TA in front of their child, or accused TA of having a boyfriend.

6. That both TA and Matthew had agreed that every evening around 7 pm, a phone call is allowed to the other party who has their daughter. However, TA is claiming that during some of these phone calls, Matthew has sexually harassed her, intimidated her, and accused her of dating another male. Specifically in TA's sworn typed statement, amongst the more inappropriate incidents listed, TA is claiming that Matthew:
- 08/27/22, during a phone call Matthew asked TA "do you want me to come there and eat you out babe?"
- 08/28/22, during a phone call Matthew told TA that he wanted to see her (TA) naked
- 08/30/22, during a Facetime call Matthew asked both TA and their daughter if they wanted a baby brother, and that he loves TA and kept saying when will my long hair be all over his dick (in front of their daughter)
- 09/01/22, during a phone call Matthew asked TA to shower with him to save money
- 09/01/22, during the Facetime call Matthew told TA that he would not financially take care of her, unless she took care of him (implying sexual favors). Matthew asked TA to bring the Facetime in the shower, to let him see her naked and that Matthew said this in front of their daughter.

That throughout these 72 bullet points in her typed statement, it should be noted that there was no less than twenty times that TA claimed that Matthew asked her to come over, hang out or implied to have sexual intercourse/favors with him.

None of any of these accusations were recorded and in any manner.

(This is page 2 of a 3 page Affidavit )

| Date | | Signed (Affiant) |
|---|---|---|
| 1/5/23 | | # |
| Jurat | Subscribed and sworn to before me on (Date) 1/5/23 | Signed (Judge/Clerk, Commissioner of Superior Court, Notary Public) 96 |
| Reviewed (Prosecutorial Official) | Date | Reviewed (Judge/Judge Trial Referee) Date 1/5/23 |

ARREST WARRANT APPLICATION
JD-CR-64a Rev. 3-11
C.G.S. § 54-2a
Pr. Bk. Sec. 36-1, 36-2, 36-3

STATE OF CONNECTICUT
SUPERIOR COURT
www.jud.ct.gov

| Name (Last, First, Middle Initial) LODICE , MATTHEW J | Residence (Town) of accused WATERBURY | Court to be held at (Town) Derby | Geographical Area number 05 |
|---|---|---|---|

## AFFIDAVIT - CONTINUED

7. That Officer Fernandes asked TA if any of the inappropriate/sexual language used by Matthew were recorded which she stated no. TA stated the judge presiding over their custody hearings advised not to record the phone calls between the child and the other parent. TA stated when the court approved phone calls took place she would take notes on anything inappropriate Matthew had stated towards her.

8. That TA provided screen shots of received phone calls from (203) 919-9528 on 08/26/2022 and then two times on 08/30/2022, and number (860) 518-2388 on 09/29/2022. Officer Fernandes noted that an in house search shows both these numbers associated with Matthew for previous investigations and that Officer Fernandes has contacted Matthew in the past utilizing these numbers.

9. That on 11/20/2022, Officer Fernandes contacted Matthew and asked if he would be able to come down to discuss the allegations made in the statement. Matthew stated he was having vehicle issues and may not be able to meet until that is resolved. During this brief conversation Matthew stated that he and TA have gone to dinner together since he was originally advised no to contact her outside of the app application and that she herself has contacted him outside of the app as well even after being advised by Officer Fernandes not to do so. That Matthew stated TA is only making a complaint now due to the custody battle they are having with their child. Matthew stated he is going to gather his own documentation showing that TA contacted him outside of the Our Family Wizard app and that he may make a complaint against TA himself.

10. That on 12/07/2022, Officer Fernandes contacted Matthew via phone and left a message asking Matthew to set up a day where Matthew can meet with Officer Fernandes. That as of 01/01/2023, Affiant nor Officer Fernandes has not heard back from Matthew.

11. Wherefore based on the information in this affidavit, Affiant has probable cause to believe that Matthew Lodice (05/11/1983) with a last known address of 48 Quarry Hill Road, Waterbury, CT violated C.G.S. 53a -183 Harassment 2nd.

(This is page 3 of a 3 page Affidavit)

| Date 1/5/23 | | Signed (Affiant) |
|---|---|---|
| Jurat | Subscribed and sworn to before me on (Date) 1/5/23 | Signed (Judge/Clerk, Commissioner of Superior Court, Notary Public) |
| Reviewed (Prosecutorial Official) | Date 1/4/23 | Reviewed (Judge/Judge Trial Referee) | Date 1/5/23 |

EXHIBIT TWO

# ORDER OF PROTECTION

JD-CL-99   Rev. 10-21
C.G.S. §§ 29-28, 29-32, 29-33, 29-36i, 29-36k, 46b-15, 46b-16a,
46b-38c(d)(e), 46b-38nn, 53a-28(f), 53a-36, 53a-42, 53a-217,
53a-217c, 53a-223, 54-1k, 54-86e;
18 U.S.C. §§ 922(g)(9), 2265; P.A. 21-78 §§ 2, 6, 7

For information on ADA
accommodations,
contact a court clerk or go to:
www.jud.ct.gov/ADA.

STATE OF CONNECTICUT
**SUPERIOR COURT**
www.jud.ct.gov

| Order type | Case type | Superior court location |
|---|---|---|
| Protective Order - Family Violence | Criminal | A05D Derby |

| Related court information *(if applicable)* | Case number |
|---|---|
| | A05DCR230190622S |

## Protected Person

| Last name | First name | Middle | Date of birth | Sex | Race |
|---|---|---|---|---|---|
| ANTAR | THEODORA | | 09 / 07 / 1991 | F | White |

| Home address | City | State | Zip |
|---|---|---|---|
| 856 Shagbark Dr | Orange | CT | 06477-1422 |

| Mailing address ☐ Same as above | City | State | Zip |
|---|---|---|---|
| 856 Shagbark Dr | Orange | CT | 06477-1422 |

| Work address | City | State | Zip |
|---|---|---|---|
| | | | |

## Respondent *(Defendant)*                    ## Respondent Identifiers

| Last name | First name | Middle | Date of birth | Sex | Race |
|---|---|---|---|---|---|
| LODICE | MATTHEW | J | 05 / 11 / 1983 | M | White |

| Address | | | Height | Weight | Eyes | Hair | Phone |
|---|---|---|---|---|---|---|---|
| 23 Lyman St APT 2 | | | 5' 7" | 145 | BRO | BRO | 860-518-2388 |

| City | State | Zip | Distinguishing features/other identifiers |
|---|---|---|---|
| New Britain | CT | 06053-3747 | |

| Cautions/Weapons *(if information is available)*: | Relationship to protected person *(Present or former)* |
|---|---|
| | ☐ Spouse or party to a civil union |
| | ☐ Protected person's parent |
| | ☐ Intimate cohabitant |
| | ☒ Parent of common child |
| | ☐ Other: |

## Terms and Conditions of Protection

**You, the Respondent, must follow all the orders and conditions selected below:**

☒ Surrender or transfer all firearms and ammunition.

☒ Do not assault, threaten, abuse, harass, follow, interfere with, or stalk the protected person. (CT01)

☒ Stay away from the home of the protected person and wherever the protected person shall reside. (CT03)

☒ Do not contact the protected person in any manner, including by written, electronic or telephone contact, and do not contact the protected person's home, workplace, or others with whom the contact would be likely to cause annoyance or alarm to the protected person. (CT05)

☐ Other: _____

Additional terms and conditions are on the following pages:

| This order remains in effect until: | ☒ Further order of the court. | Expiration date *(if applicable)* / / |
|---|---|---|

☒ The court had jurisdiction over the parties and the subject matter, and the respondent was provided with reasonable notice and opportunity to be heard. This order shall be enforced, even without registration, by the courts of any state, the District of Columbia, any U.S. Territory, and may be enforced by Tribal Lands (18 U.S.C. § 2265). Crossing state, territorial, or tribal boundaries to violate this order may result in federal imprisonment (18 U.S.C. § 2262).

☒ State law provides penalties for unlawful possession of firearms, ammunition, or electronic defense weapons (General Statutes §§ 53a-217(a)(4) and 53a-217c(a)(5)). Federal law also provides penalties for possessing, transporting, shipping, or receiving any firearm or ammunition while subject to a qualifying protection order (18 U.S.C. § 922(g)(8)).

| By the Court | Name of Judge | Signed *(Judge, Assistant Clerk)* | Date signed |
|---|---|---|---|
| | | | |

**NOTICE:** If a restraining order, protective order, or standing criminal protective order has been issued on your behalf or on behalf of your child, you may elect to give testimony or appear in a family court proceeding remotely, pursuant to 46b-15c. Notify the court in writing at least two days in advance of a proceeding if you choose to give testimony or appear remotely, and your physical presence in the courthouse will not be required in order to participate in the court proceeding. You may use the Remote Testimony Request (form JD-FM-295) to make this written request. You may use the same form with two days' advance notice to request that your testimony in any family proceeding be taken outside the presence of the respondent/subject to a restraining order, protective order, or standing criminal protective order issued on your behalf and/or a child's behalf pursuant to 46b-15c.

# ADDITIONAL ORDERS OF PROTECTION

JD-CL-100   Rev. 10-21
C.G.S. §§ 29-28, 29-32, 29-33, 29-36i, 29-36k,
46b-38c(d)(e), 46b-38nn, 53a-28(f), 53a-36,
53a-42, 53a-217, 53a-217c, 53a-223, 54-1k;
18 U.S.C. §§ 922(g)(9), 2265;  P.A. 21-78 §§ 2, 6, 7

| For information on ADA accommodations, contact a court clerk or go to: *www.jud.ct.gov/ADA.* |
|---|

STATE OF CONNECTICUT
**SUPERIOR COURT**
*www.jud.ct.gov*

| This form is available in other language(s). |
|---|

| Order type | Case type | Superior court location |
|---|---|---|
| Protective Order – Family Violence | Criminal | A05D Derby |

| Related court information *(if applicable)* | Case number |
|---|---|
| | A05DCR230190622S |

## Protected Person

| Last name | First name | Middle |
|---|---|---|
| ANTAR | THEODORA | |

## Respondent *(Defendant)*          Respondent Identifiers

| Last name | First name | Middle | Date of birth | Sex | Race |
|---|---|---|---|---|---|
| LODICE | MATTHEW | J | 05 / 11 / 1983 | M | White |

You, the Respondent, must follow all the orders and conditions selected below:

- [ ] You may return to the protected person's home one time with police to retrieve belongings. (CT14)
- [ ] If the protected person has moved out of the home of the respondent, the respondent shall permit the protected person to return to the respondent's home on one occasion, with police, to retrieve the protected person's belongings. (CT15)
- [ ] Stay 100 yards away from the protected person. (CT16)
- [ ] This order also protects the protected person's minor children. (CT19)
- [ ] This order protects animals owned or kept by the protected person. (CT31)
- [x] Other:

    Mr. Lodice is allowed to contact the protected party, regarding visitation and affairs of their child, via Family Wizard. Exchange of the minor child must be pursuant to the most recent Civil Family order.

*[handwritten text, partially illegible:]* Mr. Lodice is allowed to contact the protected party, regarding visitation and affairs of their child... must be taken in accordance with... most recent Civil Family order.

**Additional terms and conditions are on the following pages:**

JDCL100AdditionalTermsAndConditions

**NOTICE:** If a restraining order, protective order, or standing criminal protective order has been issued on your behalf or on behalf of your child, you may elect to give testimony or appear in a family court proceeding remotely, pursuant to 46b-15c. Notify the court in writing at least two days in advance of a proceeding if you choose to give testimony or appear remotely, and your physical presence in the courthouse will not be required in order to participate in the court proceeding. You may use the Remote Testimony Request (form JD-FM-295) to make this written request. You may use the same form with two days' advance notice to request that your testimony in any family proceeding be taken outside the presence of the respondent/subject to a restraining order, protective order, or standing criminal protective order issued on your behalf and/or a child's behalf pursuant to 46b-15c.

EXHIBIT THREE



## ORANGE DEPARTMENT OF POLICE SERVICE

CASE NUMBER: 23-13466    DATE: 4/30/23    PAGE: 1 of 1

I Theodora Antar OF 856 shagbark drive, Orange, CT

CITY _____ STATE _____ MAKE THE FOLLOWING STATEMENT

I AM AWARE THAT MAKING A FALSE STATEMENT IS A VIOLATION OF CONNECTICUT
GENERAL STATUTES SECTION 53a-157B AND IS A CLASS A MISDEMEANOR.

On 4/30/23, I was at St. Barbara Greek Orthodox
church where I attend services with my family and
teach sunday school. Almost an hour after the service ended,
I went outside to look for Matthew Lodice to see if he
was there, since last sunday he never returned to pick up
Angelina after he dropped her off. I saw his truck was
there and I walked Angelina to my car to try and get
a paper and something to write with so that I could
communicate to Matthew via writing the name, location,
and address where Angelina needed to be dropped
off tomorrow, since Matthew canceled our subscription to
the Our Family Wizard app on 4/20/23, and effectively
left me with no way to communicate with him since
the app is mandated by the protective order to be the
only way he is to communicate with me. Matthew tried
to take Angelina and put her in his car, even after I
told him I was getting her back and trying to write
down the address for tomorrow. Matthew yelled at me
repeatedly, spoke to me directly and repeatedly, and tried
to slam me with his car door. He tried to hit me with
his car door by pushing it violently while I was standing near it.
He violated the no contact order by speaking to me and yelling at me

DATE 4-30-23    TIME 13:35    SIGNED _____

SUBSCRIBED AND SWORN TO BEFORE ME THIS 30 DAY OF April 2023

SIGNED _____

ORANGE POLICE DEPARTMENT

Rev. 12/2(



# CONDITIONS OF RELEASE
# FAMILY VIOLENCE

( *See back/page 2 for Spanish Translation* )

JD-CR-146 Rev. 3-18
C.G.S. § 54-63c

STATE OF CONNECTICUT
**SUPERIOR COURT**
*www.jud.ct.gov*



**Instructions To Police Officer**
*Do not use this form if the defendant is a juvenile.
Immediately provide a copy to the defendant. Send original and a copy to the clerk of court along with the original Appearance Bond (JD-CR-4) or Promise to Appear (JD-CR-13)*

**ADA NOTICE**
The Judicial Branch of the State of Connecticut complies with the Americans with Disabilities Act (ADA). If you need a reasonable accommodation in accordance with the ADA, contact a court clerk or an ADA contact person listed at *www.jud.ct.gov/ADA*.

| NAME OF DEFENDANT (Last, First, Middle) | DOB (mm/dd/yyyy) | SEX | Race | HISPANIC |
|---|---|---|---|---|
| Antar        Theodora | 09/07/1991 | F | W | ☐ Yes ☒ No |

| ADDRESS OF DEFENDANT (No. , street, apt. no.) | (City) | ( State ) | (Zip Code) |
|---|---|---|---|
| 856    Shagbark Drive | Orange | CT | 06477 |

FAMILY VIOLENCE CRIMES CHARGED

53a-182   Disorderly Conduct
53a-157b  False Statement

DEFENDANT'S RELATIONSHIP TO ALLEGED VICTIM (Either present or former)
☐ Spouse          ☒ Parent of Common Child
☐ Party to a Civil Union  ☐ Alleged Victim's Parent
☐ Intimate Cohabitant   ☐ Other _____

| NAME OF ALLEGED VICTIM (Last, First, Middle) | DOB (mm/dd/yyyy) | SEX | Race | HISPANIC |
|---|---|---|---|---|
| Lodice     Matthew    J | 05/11/1983 | M | W | ☐ Yes ☒ No |

| ADDRESS OF ALLEGED VICTIM (No. , street, apt. no.) | (City) | ( State ) | (Zip Code) |
|---|---|---|---|
| 23    Lyman Street | Apt. 2 | New Britain | CT | 06053 |

**The Following Conditions of Release that Directly Relate to the Protection of the Alleged Victim Are Imposed Against the Defendant:**
*(Financial conditions also apply)*

☒ Do not assault, threaten, abuse, harass, follow, interfere with, or stalk the protected person. (CT01)
☒ Stay away from the home of the protected person and wherever the protected person shall reside. (CT03)
☒ Do not contact the protected person in any manner, including by written, electronic or telephone contact, and do not contact the protected person's home, workplace or others with whom the contact would be likely to cause annoyance or alarm to the protected person. (CT05)
☐ Do not use or possess a dangerous weapon.
☐ Do not use or possess an intoxicant or controlled substance. (alcohol or drugs)
☒ Other nonfinancial conditions: (specify if applicable, e.g. restrictions on travel or place of abode)

Ms. Antar is allowed to contact the protected party, regarding visitation, and affairs of their child via Family Wizard. Exchange of minor child must be *cont*...

| This order remains in effect until the defendant appears at the Superior Court on: | Hearing Date 05/17/2023 | but if court is cancelled on that date or I do not appear in court on that date then the order remains in effect until I appear in court for this arrest. |
|---|---|---|

I, the Defendant named above, understand that I am being released from custody under the Conditions of Release checked above, and I promise to obey all the conditions checked above which were ordered by the police officer as a condition of my release. I understand that if I do not obey any of these conditions, I may be arrested for violation of conditions of release. I also understand that I am entitled to tell my story with respect to the issuance of protective order on the hearing date given above or, if court is canceled on the above date or if I do not appear in court on that date, these conditions remain in effect until I appear in court for this arrest.

| SIGNED (Defendant) | DATE AND TIME SIGNED 5-16-23 | SIGNED (Parent or Guardian if minor) | DATE AND TIME SIGNED |
|---|---|---|---|

| Subscribed and sworn to before me. | SIGNED (Police Officer, Assistant Clerk) | DATE AND TIME SIGNED 5/16/23 12:38 | JOB TITLE AND POLICE DEPARTMENT Patrol ofc   Orange PD |
|---|---|---|---|

Reasonable efforts were made to contact the bail commissioner or a Judicial Branch intake, assessment and referral specialist (specify):
Derby Bail Commissioner's office contacted on 05/16/23 at 1215 hours.

Factual basis relied upon by the police officer to impose the nonfinancial conditions of release (specify):
Orange Police case report 23-13466. Other Conditions CONT... be pursuant to the most recent Civil Family order. Ms. Antar is allowed to facilitate  / initiate contact with the protected party for the purpose of contact with their child in accordance with the most recent Civil Family order.

If the defendant is non-English speaking, the services of a translation service or interpreter were used. The police officer has checked the National Crime Information Center (NCIC) to determine if such defendant is listed in NCIC. The defendant was advised of the above penalties and furnished with a copy of the conditions of release.

| I certify that the above statements are true to the best of my knowledge and belief. | SIGNED (Police Officer) | NAME OF POLICE OFFICER (Last, First) Esposito, Aliza | DATE AND TIME SIGNED 5/16/23  17:36 |
|---|---|---|---|

| Subscribed and sworn to before me. | SIGNED (Police Officer) #82 | DATE AND TIME SIGNED 5/16/23 12:38 | CASE NUMBER (Police Department) 23-13466 |
|---|---|---|---|

DISTRIBUTON:   Original and Copy1 (for Defense Counsel) - Clerk of Court      Copy2 - Defendant      Copy3 - Police

# PROMISE TO APPEAR

JD-CR-13  Rev. 10-17
C.G.S. §§ 53a-35a, 53a-36, 53a-40b, 53a-41,53a-42, 53a-172,
53a-173, 53a-222, 53a-222a, 54-63a to 54-63g, 54-64a to 54-64g;
P.B. §§ 38-1 to 38-6, 38-15, 38-19, 38-20, 38-21; P.A. 17-31 §§ 6, 7



**STATE OF CONNECTICUT**
## SUPERIOR COURT
www.jud.ct.gov

### Instructions
Use this form only for defendants released upon a written promise who are charged with a MISDEMEANOR,
A MOTOR VEHICLE VIOLATION FOR WHICH A TERM OF IMPRISONMENT MAY BE IMPOSED, or a FELONY.

| | | Docket number |
|---|---|---|

### To: Any Proper Officer of the State of Connecticut

| From *(Name of defendant)* | Address of defendant | | | | Telephone number |
|---|---|---|---|---|---|
| THEODORA ANTAR | 856 SHAGBARK DR | ORANGE | | CT | 203 273 8419 |
| Judicial District / Geographical Area Court | Address of court | | | Police case number | |
| 05 | 106 Elizabeth Street, Derby, Ct. | | | 23-13466 | |
| Crime(s) charged against defendant | | | Appearance date and time *(initial appearance not more than 14 days after date of arrest)* 05/17/23 | | 9:30 AM |
| 53a-182   53a-157b | | | | | |

## PROMISE TO APPEAR

I, the defendant named above, **promise to appear** before (come to):
1. The Superior Court at the address listed above, on the **Appearance date and the time listed above;**
2. The court on any other date and time that the court continues my case to;
3. Any other court where my case may be transferred (sent to); and
4. The court on any other date and time at which there is a hearing on the conditions of my release.

I also promise to follow all of the Conditions of Release listed below, which were ordered by the court, a bail commissioner, or a police officer.

I have read, or have had read to me, the Notice to Defendant below, and I understand everything in that notice.

| A. Conditions of Release | Signed *(Defendant)* | Date and Time Signed 5 | 16 | 23 12. m. 38 |
|---|---|---|---|---|
| 1. Do not commit a federal, state or local crime. | Signed *(Parent or Guardian if minor)* | Date and Time Signed | | . m. |

Subscribed to before me. Defendant was advised of the requirements listed above, and was given a copy of this Promise to Appear and the Notice below.

| Signed *(Police Officer, Asst. Clerk, Bail Comm., Prob. Officer)* | Date and Time Signed 5/16/23 12:38 .m. | Job Title Patrol Ofc. | Police Department *(if applicable)* Orange Police |
|---|---|---|---|

## NOTICE TO DEFENDANT

1. You **must** come to court on the Appearance date and time listed above and at any other time and place that the court tells you.
2. If you **do not** come to court as required, you will be committing the crime of Failure to Appear, and:
   a. You may be arrested immediately, or the court may issue a capias (order for your arrest); and
   b. You may be subject to the following added criminal penalties:
      i. If you were released on this Promise to Appear for one or more felonies, you may be charged with an additional Class D felony, and the court may sentence you to up to 5 years in prison, fine you up to $5,000, or both, for failing to appear.
      ii. If you were released on this Promise to Appear for one or more misdemeanors or motor vehicle violations, you may be charged with an additional Class A misdemeanor, and the court may sentence you to up to 1 year in prison, fine you up to $2,000, or both, for failing to appear.
3. If you commit another crime after you have been released on this Promise to Appear, you may be subject to added criminal penalties in addition to any sentence that the court may give you for that crime:
   a. If the new crime is a felony, the court may sentence you to up to ten (10) additional years in prison; or
   b. If the new crime is a misdemeanor, the court may sentence you to up to one (1) additional year in prison.
4. You **must** follow all of the conditions of your release.
5. If you **do not** follow the conditions of your release, you will be committing the crime of Violation of Conditions of Release, and:
   a. The court may change or add to the conditions of your release;
   b. The court may revoke (take away) your Promise to Appear and release; and/or
   c. You may be subject to the following additional criminal penalties:
      i. If you were released on this Promise to Appear for one or more felonies:
         • Generally, you may be charged with an additional Class D felony, and the court may sentence you to up to 5 years in prison, fine you up to $5,000, or both, for violating your conditions of release.
         • BUT, if you violate the conditions of your release by (1) putting any restraint (restriction) on a person or the liberty (freedom) of a person; or (2) threatening, harassing, assaulting, molesting, sexually assaulting or attacking a person, you may be charged with an additional Class C felony, and the court may sentence you to between 1 and 10 years in prison, fine you up to $10,000, or both, for violating your conditions of release in this way.
      ii. If you were released on this Promise to Appear for one or more misdemeanors or motor vehicle violations:
         • Generally, you may be charged with an additional Class A misdemeanor, and the court may sentence you to up to 1 year in prison, fine you up to $2,000, or both, for violating your conditions of release.
         • BUT, if you violate the conditions of your release by (1) putting any restraint (restriction) on a person or the liberty (freedom) of a person; or (2) threatening, harassing, assaulting, molesting, sexually assaulting or attacking a person, you may be charged with an additional Class D felony, and the court may sentence you to up to 5 years in prison, fine you up to $5,000, or both, for violating your conditions of release in this way.
6. Your release may be revoked (taken away) if:
   a. You have been charged with a crime for which the term of imprisonment may be more than 10 years;
   b. The court finds that you have violated any condition of your release; and
   c. The court finds that the safety of any other person is endangered (put at risk) while you are on release.

| ADA NOTICE |
|---|
| The Judicial Branch of the State of Connecticut complies with the Americans with Disabilities Act (ADA). If you need a reasonable accommodation in accordance with the ADA, contact a court clerk or an ADA contact person listed at www.jud.ct.gov/ADA. |

| FOR COURT USE |
|---|

(Page 1 of 2)    **DISTRIBUTION:** Copies to Clerk of Court, Bail Commissioner, Defendant    PROMISE TO APPEAR

STATE OF CONNECTICUT
**SUPERIOR COURT**

DISPOSITION DATE

| Police Case number | Agency name | Agency number |
|---|---|---|
| 23-13466 | ORANGE POLICE DEPARTMENT | CT0010700 |

## TITLE, ALLEGATION, AND COUNTS

| State of Connecticut vs. *(Name of accused)* | Residence *(Town)* of accused | Docket number |
|---|---|---|
| Antar Theodora F | Orange | |

Address
856 Shagbark Dr  Orange  Ct

Date of birth
09/07/1991

To be held at *(Town)*
Derby

Geographical area number  05

Court date

The undersigned Prosecuting
Authority of the Superior Court
of the State of Connecticut
charges that:

| Count One — Did commit the offense of: | | Continued to | Purpose | Reason |
|---|---|---|---|---|
| DISORDERLY CNDT | | | | |

| At *(Town)* | On or about *(Date)* | In violation of General Statute number |
|---|---|---|
| Orange | 4/30/2023 | 53a-182 |

Count Two — Did commit the offense of:
FLS STATEMENT

| At *(Town)* | On or about *(Date)* | In violation of General Statute number |
|---|---|---|
| Orange | 4/30/2023 | 53a-157b |

Count Three — Did commit the offense of:

| At *(Town)* | On or about *(Date)* | In violation of General Statute number |
|---|---|---|
| | | |

☐ See other sheet for additional counts

Date 5/12/23  Signed *(Prosecuting Authority)*

## COURT ACTION

Defendant advised of rights before plea
(Judge)

(Date)

☐ Attorney  ☐ Public defender  Guardian

Bond    Surety    ☐ 10 %    ☐ Cash    Election  ☐ CT  ☐ JY    *(Date)*

Bond change

Seized property inventory number

| Count | Plea date | Plea | Plea withdrawn Date | New plea | Verdict finding | Fine | Remit | Additional disposition |
|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | $ | $ | |
| 2 | | | | | | $ | $ | |
| 3 | | | | | | $ | $ | |

| Date | Other Court Action | Judge |
|---|---|---|
| | | |
| | | |
| | | |

| Receipt number | Cost ☐ IMP ☐ NCI | Bond information ☐ Bond forfeited ☐ Forfeiture vacated ☐ Forfeiture vacated and bond reinstated |
|---|---|---|

| Application fee - receipt number if paid | Circle one W I Q | Program fee - receipt number if paid | Circle one W I Q | Program fee - receipt number if paid | Circle one W I Q |
|---|---|---|---|---|---|

| Prosecutor on original disposition | Reporter/monitor on original disposition | Signed *(Clerk)* | Signed *(Judge)* |
|---|---|---|---|

STATE OF CONNECTICUT
SUPERIOR COURT

Disposition date

Police Case number
~~1500307452~~ 03-13466

Agency code
~~ESP TROOP I~~ Orange P.D

Agency number
~~1500~~ 0037

## Arrest Warrant

Geographical area number  5

State of Connecticut vs. ~~Clela, David~~ Antar, Theodore F.

To: Any Proper Officer of the State of Connecticut

By Authority of the State of Connecticut, you are hereby commanded to arrest the body of the within-named accused. ("X" all that apply)

☐ A. Accused is ordered to be brought before a clerk or assistant clerk of the Superior Court.

☐ B. Accused is not entitled to bail.

If A, B or both are checked above, you shall without undue delay bring the arrested person before the clerk or assistant clerk of the Superior Court for the geographical area where the offense is alleged to have been committed, or if the clerk's office is not open, to a community correctional center within said geographical area, or the nearest community correctional center if no such center exists in the geographical area, or to the Correctional Institution, as the case may be.

Extradition boundaries established by prosecutor

☐ C. Bail set at _____

☐ D. Non-financial conditions of release:

_____

_____

☒ E. Conditions of release not determined by the court.

| By the Court | Signed (Judge of the Superior Court) | Date 5/12/23 | Name of the Judge (Print or type) Sh W Jones |
|---|---|---|---|

## Return On Arrest Warrant

Geographical area number

Town of Orange CT

Date 5/16/23

State of Connecticut

Then and there, by virtue of the within and foregoing complaint and warrant, I arrested the body of the within-named accused and read the same in the hearing of said accused; and have said accused here in court for examination.

Arrest Officer's signature and Department

| Date | Other Court action | Judge |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

ARREST WARRANT APPLICATION
JD-CR-64b Rev. 3-11
C.G.S. § 54-2a
Pr. Bk. Sec. 36-1, 36-2, 36-3

STATE OF CONNECTICUT
SUPERIOR COURT
www.jud.ct.gov

FOR COURT USE ONLY
Supporting Affidavits Sealed
YES    NO

| Police Case number | Agency name | | Agency number |
|---|---|---|---|
| 23-13466 | Orange Police Department | | |

| Name (Last, First, Middle Initial) | Residence (Town) of accused | Court to be held at (Town) | Geographical Area number |
|---|---|---|---|
| ANTAR , THEODORA F | ORANGE | Derby | 05 |

## APPLICATION FOR ARREST WARRANT

TO: A Judge of the Superior Court

The undersigned hereby applies for a warrant for the arrest of the above-named accused on the basis of the facts set forth in the :  [X] AFFIDAVIT BELOW    [ ] AFFIDAVIT(S) ATTACHED

| Date | Signed (Prosecuting authority) | Type/print name of prosecuting authority |
|---|---|---|
| 5/12/23 | | |

## AFFIDAVIT

The undersigned affiant, being duly sworn, deposes and says:

1. That the undersigned, Ofc Kurt Correia 132, being duly sworn, does depose and state that he is a member of the Orange Police Department and has been since 09/07/2021. At all times mentioned herein he was acting as a member of said department. The following facts and circumstances are stated from personal knowledge and observations as well as information received from other police officers acting in their official capacity and from official police reports and statements made by prudent and credible witnesses.

2. That on April 30, 2023 at approximately 12:45 the Orange Police Department was contacted by THEODORA ANTAR (9-7-1991). Affiant and Officer Satkowski responded to 480 Racebrook Rd, St. Barbara's Church where ANTAR claimed that a protective order was violated and that she was contacted by the father of her child. ANTAR stated that she was being screamed at and that she had almost been struck by the car door which was intentionally thrown at her.

3. A check of the most recent protective order that was received from Derby Superior court dated 1/30/23 has CT31 applied with the other comment stating the following "Mr. Lodice is allowed to contact the protected party, regarding the visitation and affairs of their child via Family Wizard. Exchange of the minor child must be pursuant to the most recent Civil Family order. Mr. Lodice is allowed to facilitate / initiate contact with the protected party for the purpose of contact with their child in accordance with the most recent Civil Family order". A copy of the order is included with this affidavit.

(This is page 1 of a 4 page Affidavit.)

| Date | Signed (Affiant) |
|---|---|
| May 11, 2023 | Kurt Correia #132 |
| JURAT  Subscribed and sworn to before me on (Date)  May 11, 2023 | Signed (Judge/Clerk, Commissioner of Superior Court, Notary Public)  # 82 |

## FINDING

The foregoing Application for an arrest warrant, and affidavit(s) attached to said Application, having been submitted to and considered by the undersigned, the undersigned finds from said affidavit(s) that there is probable cause to believe that an offense has been committed and that the accused committed it and, therefore, that probable cause exists for the issuance of a warrant for the arrest of the above-named accused.

| Date and Signature | Signed at (City or town)  Derby | On (Date)  5/12/23 | Signed (Judge/Judge Trial Referee) | Name of Judge/Judge Trial Referee |
|---|---|---|---|---|

ARREST WARRANT APPLICATION
JD-CR-64a Rev. 3-11
C.G.S. § 54-2a
Pr. Bk. Sec. 36-1, 36-2, 36-3

STATE OF CONNECTICUT
SUPERIOR COURT
www.jud.ct.gov

| Name *(Last, First, Middle Initial)*<br>ANTAR , THEODORA F | Residence *(Town)* of accused<br>ORANGE | Court to be held at *(Town)*<br>Derby | Geographical<br>Area number | 05 |

## AFFIDAVIT - CONTINUED

4. That while investigating the incident it was learned that both ANTAR and the other involved individual had video including audio of the incident that each person took on their personal cell phone. That upon review of the video the following observations were made. MATTHEW LODICE (5-11-1983) exits his truck, a 2000 F250 color white bearing CT REG C313554, from the driver side door after his daughter runs up to the truck. He goes to the rear passenger side and begins to buckle her into her car seat. As he was putting his daughter into the car seat in his truck ANTAR walked over to his truck. That ANTAR stepped into the area of the driver seat door, which had been left open when LODICE exited to put his daughter in the truck, ANTAR reached into the truck and took a receipt of a bank statement that belonged to LODICE.

5. That at this point he asked her to not take his things and to step away from his truck. ANTAR immediately began to shout that he violated the no contact order and that he was not supposed to talk to her. Lodice continued to set up his daughter in the car seat. He then walked around the front of the truck intending to enter the truck. However ANTAR did not move away from the area of the driver side door. ANTAR was standing directly in the path that he would need to walk to enter the truck saying nothing. When he asked her to please step away from the truck she would only scream that he should not be talking to her and that he was in violation of the order.

6. That ANTAR at no time attempted to tell Lodice why she had reached into the truck, nor why she was standing there saying nothing. That ANTAR was not moving away from the driver area of the truck and would only shout back to him that he was not supposed to be speaking to her.

7. That at no point while reviewing the video does Lodice raise his voice, at no point did Affiant hear any sort of hostility or anger in his tone of voice. There was absolutely no threat made towards ANTAR , either verbally or physically. That Lodice was even standing on the other side of the door as to have a clear separation from Antar. In no way did Lodice prevent Antar from walking away from the truck. He simply several times stated "please step away and let me get in the truck".

8. That at this point my attention was taken away from the video because Affiant heard ANTAR shouting at Officer Satkowski who was attempting to investigate what occurred with her. When Affiant was close to Officer Satkowski, ANTAR was on the phone with OPD HQ demanding that a supervisor respond to the scene because she was told by Officer Satkowski that Lodice had not violated the order.

9. That Affiant began to speak with ANTAR who needed to be redirected several times. ANTAR stated that she intended to provide Lodice a piece of paper with the school address and a code to enter for the new early elementary education school to drop off their daughter and that was the reason that she went to and took the bank statement out of the truck. Affiant asked ANTAR to provide a written statement.

*(This is page 2 of a 4 page Affidavit.)*

| Date<br>May 11, 2023 | | Signed *(Affiant)*<br>#132 |
|---|---|---|
| Jurat | Subscribed and sworn to before me on *(Date)*<br>May 11, 2023 | Signed *(Judge/Clerk, Commissioner of Superior Court, Notary Public)*<br>#8 |
| Reviewed *(Prosecutorial Official)* | Date<br>5/12/23 | Reviewed *(Judge/Judge Trial Referee)*<br>Date 5/12/23 |

ARREST WARRANT APPLICATION
JD-CR-64a Rev. 3-11
C.G.S. § 54-2a
Pr. Bk. Sec. 36-1, 36-2, 36-3

STATE OF CONNECTICUT
SUPERIOR COURT
www.jud.ct.gov

| Name (Last, First, Middle Initial) | Residence (Town) of accused | Court to be held at (Town) | Geographical Area number |
|---|---|---|---|
| ANTAR , THEODORA F | ORANGE | Derby | 05 |

## AFFIDAVIT - CONTINUED

10. That Lodice asked that Affiant get back his bank statement which Antar took from his truck when she walked over. Affiant returned to Antar who did in fact have in her possession the bank statement of Lodice. ANTAR stated that she intended to write the address and school information on that paper. ANTAR then showed me the video that she took where she claimed Lodice attempted to hit her with the truck door.

11. That the video that ANTAR showed me was her walking to the truck. The video clearly shows that she walks up to the driver's side door and right up to the seating area standing directly in front of the side of the driver's seat. At no point while approaching does ANTAR attempt to tell Lodice what she was approaching for. In fact in the video you can clearly hear ANTAR , in an antagonistic voice say, "what's all this mess in here?".

12. That ANTAR then reaches into the vehicle picking up the bank statement. At that point Lodice is heard saying "can you not touch my stuff please". ANTAR immediately yells back "you're not supposed to be contacting me". ANTAR again makes no attempt to explain that she was trying to provide information pertaining to their daughter's schooling. ANTAR video then stops and she stated that was when she contacted the Orange Police.

13. That it should be noted that this timeline matches with the video that Lodice had showed and that in that video, ANTAR claims that Lodice had been yelling at her for 5 to 10 minutes which is not true.

14. That after contacting Orange Police ANTAR made no attempt to move away from the driver side area of the vehicle and that ANTAR was directly blocking Lodice from entering the vehicle. ANTAR does not attempt to provide Lodice with any information about their daughter. Lodice finishes buckling his daughter to the car seat and walks around the front of the vehicle. He stops on the outside of the driver door where several times he asks ANTAR to "please step away from the door please". Each time ANTAR only responds by saying he is not to be contacting her outside of the app, which the court ordered that all communication about the daughter should take place on, and that he is violating the order. At one point ANTAR claims she is attempting to provide him information but does not actually at any point ever attempt to provide that information.

15. That it is during this time that ANTAR claimed and provided a sworn written statement stating that Lodice tried multiple times to hit her with the car door. After reviewing the video from Lodice it is seen that at no point did he push the door towards her and at no point was there any aggression displayed from Lodice. ANTAR continued to block Lodice from entering the vehicle after a few minutes ANTAR takes a step back and Lodice without saying anything is able to pass by her and enter the truck.

(This is page 3 of a 4 page Affidavit.)

| Date May 11, 2023 | Signed (Affiant) #132 |
|---|---|
| Jurat Subscribed and sworn to before me on (Date) May 11, 2023 | Signed (Judge/Clerk, Commissioner of Superior Court, Notary Public) #82 |
| Reviewed (Prosecutorial Official) | Date 5/8/23 | Reviewed (Judge/Judge Trial Referee) | Date 5/12/23 |

ARREST WARRANT APPLICATION
JD-CR-64a Rev. 3-11
C.G.S. § 54-2e
Pr. Bk. Sec. 36-1, 36-2, 36-3

STATE OF CONNECTICUT
SUPERIOR COURT
www.jud.ct.gov

| Name (Last, First, Middle Initial) ANTAR , THEODORA F | Residence (Town) of accused ORANGE | Court to be held at (Town) Derby | Geographical Area number 05 |
|---|---|---|---|

## AFFIDAVIT - CONTINUED

16. That after he is finally able to get into the truck Lodice says "can you get out of the doorway so I can close the door" ANTAR again refuses to leave the area and refuses to move away from the door and to wait in her vehicle claiming that she is waiting for the police to arrive. Lodice then turns his attention to his son who is in the vehicle, to calm him. ANTAR then begins to shout to the boy telling the child to "make sure he gets a record for beating people like his dad". The video that ANTAR showed ends shortly after she yells towards the child. That Affiant attempted to retrieve video from St. Barbara's Church located at 480 Racebrook Rd however due to unknown technical error the cameras that cover the south parking lot where the incident took place had no recordings dating back to April 07, 2023.

17. Wherefore based upon the above information in this Affidavit, the undersigned Affiant has probable cause to believe that on April 30, 2023 THEODORA ANTAR (9-7-1991) last known address of 856 SHAGBARK DR, Orange CT 06477, committed the following violations:
C.G.S 53a-182 Disorderly conduct
C.G.S 53a-157b False statement to police

(This is page 4 of a 4 page Affidavit.)

| Date May 11, 2023 | | Signed (Affiant) [signature] #132 |
|---|---|---|
| Jurat | Subscribed and sworn to before me on (Date) May 11, 2023 | Signed (Judge/Clerk, Commissioner of Superior Court, Notary Public) [signature] #82 |
| Reviewed (Prosecutorial Official) [signature] | Date 5/12/23 | Reviewed (Judge/Judge Trial Referee) [signature] | Date 5/12/23 |

EXHIBIT 5



**Topic:**
MEDICAL RECORDS; PARENTS; DIVORCE; FOSTER CARE; PATIENTS' RIGHTS;
**Location:**
PATIENTS' RIGHTS;
**Scope:**
Connecticut laws/regulations;



July 8, 1998 98-R-0886

FROM: Matthew Ranelli, Associate Attorney

RE: Non-custodial Parents' Right to Medical Records and Other Issues You asked if:

> 1. non-custodial parents and foster parents have a right to their child's medical records,
>
> 2. health care providers are required to disclose medical records to police, and
>
> 3. providers can fax medical records when requested.

You also asked:

> 1. when providers need parental consent to treat a minor (including both vaccines and contraceptives), and
>
> 2. whether the consent requirements are different for mental health treatment of minors.

The Office of Legislative Research is not authorized to give legal opinions and the following should not be construed as one.

## MEDICAL RECORDS

### *Non-Custodial Parent Access to Medical Records*

By law, a parent not granted custody of a minor child has the same right as the custodial parent to the child's academic, medical, hospital or other health records, unless otherwise ordered by the courts (CGS § 46b-56(e)).

### *Foster Parent Access to Medical Records*

The law does not specify whether foster parents have a right to the medical records of a child in their care.

By law, the state is a foster child's legal guardian not the foster parents (CGS § 17a-98). But foster parents are responsible for the health, welfare, and care of children in their care (CGS § 17a-93) and may need

medical records to fulfill this obligation. In addition, they have other rights similar to parents such as (1) family and medical leave eligibility (CGS § 31-51kk), (2) consenting to motor vehicle learner's permits and motorcycle licenses (CGS § 14-36, 40(a)), (3) standing to file habeas corpus writs (CGS § 52-466(f)), and (4) standing to file neglect petitions (CGS § 46b-129) and families with service needs complaints (CGS § 46b-149). Whether foster parents have a right to a child's medical records may turn on whether they stand *in loco parentis* (in place of the parent). This concept is a legal fiction, usually temporary, by which a person assumes the rights and duties of a parent for a child in his care and control. The courts have not ruled on whether foster parents stand in place of the parents, but their relationship with the child is statutorily defined and appears narrower.

According to Jeanne Milstein of the Department of Children and Families (DCF), foster parents have no independent right to the department's records on a child, including treatment plans. But DCF has discretion to release such records.

### Release of Medical Records to Police

By law, medical records are confidential and may not be disclosed without the patient's consent (CGS § 52-146o). The prohibition applies to disclosure in any civil action or related preliminary proceeding and to any probate, legislative, or administrative proceeding except (1) when required by statute, regulation, or court rule, (2) when needed to prepare a medical malpractice defense, (3) when required to report suspected child abuse, and (4) when requested by the Department of Public Health (DPH) as part of an investigation (see OLR Report 97-R-0697). The law specially requires providers to disclose subpoenaed records, except those related to mental health (CGS § 4-104).

The law does not require providers to disclose medical records to police without the patient's consent or a search warrant. According to Lieutenant Cliff M'Sadoques of the Department of Public Safety, police usually request a waiver from the patient (suspect). If he refuses, they may request a search warrant from the courts, but must demonstrate probable cause that a crime was committed.

### Faxing Medical Records

According to Donna Brewer of the DPH Legal Office, the department generally requires certified copies of medical record but may accept faxes in very limited circumstances if a copy is impractical. Faxing medical records may create privacy concerns if they are sent to an incorrect number or a common fax machine.

## PARENTAL CONSENT

### Medical (Non-Psychiatric) Treatment

Under the common law, a child cannot consent to medical treatment; parental consent is required except in emergency circumstances. In emergencies there is an assumption that the parents would have consented based on the necessity of the treatment.

The statutes carve out at least four situations where parental consent is not necessary to treat a minor: (1) treatment of venereal disease (CGS § 19a-216), (2) alcohol and drug treatment (CGS § 19a-126h), (3) human immunodeficiency virus testing (but not treatment)(CGS § 19a-582), and (4) abortion and abortion counseling (CGS § 19a-601) (see OLR Report 95-R-0617, attached, for a summary of the exceptions).

### Mental Health

By law, licensed psychiatrists, psychologists, and marital and family therapists and certified independent social workers can provide up to six outpatient mental health treatment sessions to a minor without parental consent if:

1. requiring consent would cause the child to reject the treatment;

2. the treatment is clinically indicated;

3. failure to provide treatment would be seriously detrimental to the child's well being;

4. the child has knowingly and voluntarily sought the treatment; and

5. the provider determines that the child is mature enough to participate in the treatment productively (CGS § 19a-14c).

Outpatient mental health treatments provide treatment of mental disorders, emotional problems, or maladjustments with the intent of (1) modifying or eliminating the symptom, (2) improving behavior, or (3) promoting personality growth and development.

MR:lc

No. 20-618

In the
Supreme Court of the United States

---

**KELLY GEORGENE ROUTTEN,**
*Petitioner,*

**v.**

**JOHN TYLER ROUTTEN,**
*Respondent.*

---

*On Petition for Writ of Certiorari to the Supreme
Court of North Carolina*

---

**BRIEF *AMICUS CURIAE* OF
THE JUSTICE FOUNDATION**
*in Support of the Petition*

---

Matthew D. Doane
Clinton J. Elliott
Doane & Elliott, PSC
120 E. Adams St., Suite 2
La Grange, KY 40031
(502) 602-0008

Allan E. Parker, Jr.
*Counsel of Record*
The Justice Foundation
8023 Vantage Dr., Suite 1275
San Antonio, TX 78230
(210) 614-7157
Parker4justice@gmail.com

i

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................... ii

INTEREST OF *AMICUS CURIAE* ......................... 1

SUMMARY OF THE ARGUMENT ........................ 2

ARGUMENT ................................................................ 4

I.    THE COURT SHOULD GRANT
THE PETITION TO CLARIFY
THE APPROPRIATE TEST
COURTS MUST USE IN
ADJUDICATING PARENTS'
FUNDAMENTAL RIGHTS OF
CARE, CUSTODY, AND
CONTROL OF THEIR CHILDREN ........... 4

II.   THE COURT SHOULD GRANT
THE PETITION TO CLARIFY
THE LEVEL OF SCRUTINY
COURTS MUST USE IN
ADJUDICATING PARENTS'
FUNDAMENTAL RIGHTS OF
CARE, CUSTODY, AND
CONTROL OF THEIR CHILDREN ........... 8

CONCLUSION ....................................................... 10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In Re: J.R.D. and R.C.D.*,
169 S.W.3d 740 (Tex.
App. 2005)..........................................................9

*Pierce v. Society of Sisters*,
268 U.S. 510 (1925) ......................................4, 9

*Routten v. Routten*,
843 S.E.2d 154 (2020) ...............................3, 5-6

*Stanley v. Illinois*, 405 U.S. 645 (1972).................4, 7

*Troxel v. Granville*, 530 U.S. 57 (2000)...........4-5, 7, 9

Washington *v. Glucksberg*, 521 U.S. 702 (1997).......4

*Wisconsin v. Yoder*, 406 U.S. 205 (1972)...............4, 5

**Other Authorities**

Eugene Volokh, *"Parent-Child Speech
and Child Custody Speech Restrictions,"*
81 N.Y.U. L. Rev. 631 (2006) ...........................6

House Resolution 547 (November 16, 2005) ..............5

Janet Weinstein, *And Never the Twain
Shall Meet: The Best Interest of Children
and the Adversary System*, 52 U. Miami
L. Rev. 79, 108 (1997)......................................6

## INTEREST OF *AMICUS CURIAE*

Pursuant to Supreme Court Rule 37, The Justice Foundation respectfully submits this brief *Amicus Curiae* in support of Petitioner Kelly Georgene Routten.[1]

The Justice Foundation is a 501(c)(3) charitable foundation that provides free legal representation in cases to protect individual and parental rights and to promote appropriate limited government. The following summarizes its position in this regard:

> *We believe in protecting children from those who would destroy their innocence and exploit them for their own purposes. On the whole, parents are the best protectors of children and have the natural right and duty for the care, custody, and control for their children. Children, in the main, are naturally*

---

[1] Pursuant to this Court's Rule 37.2, all Parties with Counsel listed on the docket have consented to the filing of this Brief. Counsel of Record for all listed Parties received notice at least 10 days prior to the due date of the *Amicus Curiae's* intention to file this Brief.

Pursuant to Rule 37.6, *Amicus Curiae* affirms that no Counsel for any Party authored this Brief in whole or in part, and no Counsel or Party made a monetary contribution intended to fund the preparation or submission of this Brief. No person other than *Amicus Curiae*, its members, or its counsel made a monetary contribution to its preparation or submission.

*incapable of exercising self-government until reaching the age of majority.*

The Justice Foundation was selected by the Texas State Board of Education to be one of the official evaluators of the State's open enrollment charter school program in which private operators are entitled to run public open enrollment charter schools as part of the public school system. The Justice Foundation's President, Allan E. Parker, Jr., in the past has represented public school districts for many years as an attorney and has taught Education Law at St. Mary's University School of Law in San Antonio, Texas.

This case is important to every parent who seeks to assert their right to determine the upbringing and education of their child as a state, federal, natural, and God-given right. The Justice Foundation submits that its experience and interest will provide a useful additional viewpoint to assist the Court in its consideration of Petitioner's petition.

## SUMMARY OF THE ARGUMENT

This case centers upon the very cornerstone of our society: *the family*. Deeper still, this case involves the intersection of the family and the law: *parents' fundamental rights* in directing the care, custody, and control of their children as a family and the State's power to affect, limit, or even terminate those rights.

This Court has determined that parents have a fundamental right to direct the care, custody, and control of their children. This Court also has

determined that the government shall not interfere with this right unless and until a parent is proven unfit. In contradiction to this determination, the North Carolina Supreme Court in the case below declared protection of that fundamental right *irrelevant* in a custody dispute between two natural parents. *Routten v. Routten*, 843 S.E.2d 154, 159 (2020). Instead, the North Carolina Supreme Court upheld the trial judge's denial of custody and reasonable visitation to the Petitioner based on the judge's findings related to the best interest of the child, even though the trial judge did not find the mother unfit. *Id*. at 159. The holding below directly contradicts this Court's recognition of parents' primary and fundamental rights in the care, custody, and control of their children.

No doubt contributing to this contradiction, this Court has not clearly articulated the appropriate test for adjudicating the protection of parents' right when involving both natural parents. This Court also has not clearly articulated the level of scrutiny in judicial review of parents' fundamental right in such cases. To safeguard against such government infringement and avoid such contradictions in state courts, this Court should explicitly adopt a national standard articulating both the appropriate test and the appropriate level of scrutiny consistent with the Constitution and this Court's precedent.

This case presents the opportunity for the Court to unequivocally articulate the *fitness of the parent* as that test and *strict scrutiny* as that level of scrutiny for judicial review. Indeed, this case presents the appropriate vehicle to do so because it involves the rights of two natural parents. Therefore,

this Court should grant the Petition for Writ of Certiorari.

## ARGUMENT

I.   **THE COURT SHOULD GRANT THE PETITION TO CLARIFY THE APPROPRIATE TEST COURTS MUST USE IN ADJUDICATING PARENTS' FUNDAMENTAL RIGHTS OF CARE, CUSTODY, AND CONTROL OF THEIR CHILDREN.**

Nearly one hundred years ago, this Court acknowledged that "the child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Pierce v. Society of Sisters*, 268 U.S. 510 (1925). Thereafter, in *Stanley v. Illinois*, 405 U.S. 645 (1972), this Court affirmed the fundamental rights of parents "in the companionship, care, custody, and management" of their children. *Id.* at 651. That same year, in *Wisconsin v. Yoder*, 406 U.S. 205 (1972), the Court declared that "[t]his primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition." *Id.* at 232.

More recently, this Court declared in *Washington v. Glucksberg*, 521 U.S. 702 (1997), that the Constitution, and specifically the Due Process Clause of the Fourteenth Amendment, protects the fundamental right of parents to direct the care, upbringing, and education of their children. *Id.* at 720. And in *Troxel v. Granville*, 530 U.S. 57 (2000),

this Court again unequivocally affirmed the fundamental right of parents to direct the care, custody, and control of their children.

In *Troxel*, this Court stated that "so long as a parent adequately cares for his or her children (*i.e., is fit*), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of the parent to make the best decisions concerning the rearing of that parent's child." 530 U.S. at 68-69 (emphasis added). Therefore, a failure to consider the fitness of the parent represents "an unconstitutional infringement on [that parent's] fundamental right to make decisions concerning the care, custody, and control" of her children. 530 U.S. at 72. In fact, so inviolable and sacred is this right that this Court declared a *presumption* that "a fit parent will act in the best interest of his or her child." *Id*. at 69. Yet, in the case below, the North Carolina Supreme Court expressly rejected allowing this presumption in favor of the natural mother of the children. *Routten*, 843 S.E.2d at 159.

In 2005, quoting *Yoder* and *Troxel* in response to a public school district's subjection of children to inappropriate and sexually explicit content, the United States House of Representatives affirmed that "the fundamental right of parents to direct the education of their children is firmly grounded in the Nation's Constitution and traditions." House Resolution 547 (November 16, 2005). Yet today, State courts of last resort throughout the United States are split, adjudicating children as "creatures of the State" by limiting or terminating parents' rights through using a subjective "best interest of the child"

test or by evaluating some level of "harm" to the child. In fact, in the case below, the North Carolina Supreme Court determined that, in a dispute between two natural parents, "the trial court must apply the 'best interest of the child' standard to determine custody and visitation questions." *Routten*, 843 S.E.2d at 159. Such a test blatantly violates the fundamental rights of natural parents, not only in custody and termination cases, but also in separation agreements where extra protection may be necessary due to inequality among spouses.

In that regard, scholars recognize that the "best interest of the child" standard provides "no standard at all because of its vagueness" and uncertainty. *See, e.g.,* Janet Weinstein, *And Never the Twain Shall Meet: The Best Interest of Children and the Adversary System*, 52 U. Miami L. Rev. 79, 108 (1997). As Notre Dame Law School Professor Eugene Volokh recognized, courts applying "the best interest of the child" test in parent custody cases violate sacred, fundamental, constitutional rights of those parents. *See* Volokh, *"Parent-Child Speech and Child Custody Speech Restrictions,"* 81 N.Y.U. L. Rev. 631 (2006). Professor Volokh also recognized that "harm" analyses have significant limits, foremost being their highly subjective nature and risk of the fact-finder's personal hostilities entering into the determination. Volokh, *supra* at 700. Essentially, both tests violate the due process rights of parents guaranteed by the Fourteenth Amendment to the Constitution if the fitness of the parents is disregarded. Yet today, some State courts still apply these inappropriate tests without first making the required constitutional finding of a parent's unfitness. As a result, these courts continue

to violate the fundamental right of parents to direct the care, custody, and control of their children.

While the Court has alluded to the *fitness of the parent* test in the past, the Court has not articulated the exact standard in these cases. *See Troxel*, 530 U.S. at 73 ("We do not, and need not, define today the precise scope of the parental due process right in the visitation context"). Given the complexities of the modern family dynamic and the high-stakes interest of the parties involved in these cases, *Amicus Curiae* submits that the time has come for the Court to adopt the *fitness of the parent test* as the appropriate standard moving forward for cases involving both natural parents.

This case presents the ideal vehicle for this Court to clearly articulate the *fitness of the parents* test as the appropriate test for all State courts because this case involves a lower court's review of the rights of both natural parents. *Troxel*, while providing cogent precedent, involved the rights of a natural parent and the rights of grandparents after the children's father died. *Stanley*, likewise, is analytically different because it involved the natural but unwed father of the children who had been declared wards of the state after their mother died. As demonstrated in Petitioner's Petition, App. 2a, this case involves two natural biological parents, both of whom have fundamental rights protected from unwarranted government interference by the Fourteenth Amendment and both of whom seek care, custody, and control of their children. Only the fitness test protects the constitutional rights of both natural parents in a custody case such as that presented in this Petition.

## II. THE COURT SHOULD GRANT THE PETITION TO CLARIFY THE LEVEL OF SCRUTINY COURTS MUST USE IN ADJUDICATING PARENTS' FUNDA-MENTAL RIGHTS OF CARE, CUSTODY, AND CONTROL OF THEIR CHILDREN.

In addition to articulating the appropriate test, this Court also has the opportunity to clearly articulate the appropriate level of scrutiny courts should use in adjudicating parents' constitutional rights of care, custody, and control of their children. As one State court judge explained regarding the failure of State courts and judges to follow what this Court has suggested as the appropriate standard:

> Despite the United States Supreme Court's determination to subject infringement upon such fundamental rights to strict scrutiny and of our own legislature's mandate to preserve and foster parent-child relationships . . . courts have developed a jurisprudence under which trial court decisions severely curtailing that relationship stand absent an abuse of discretion. Considering the importance of and the risk to the rights at issue and the legislature's clear mandates that courts take measures to protect this most sacred of relationships, I believe we need to carefully re-examine the standards by which decisions that limit a parent's access to or possession of a child are made and reviewed.

*In Re: J.R.D. and R.C.D.*, 169 S.W.3d 740, 752 (Tex. App. 2005) (Puryear, J., concurring) (internal citations omitted).

Because these cases involve such deeply grounded fundamental rights guaranteed under the Constitution to the parents, courts must consistently apply the appropriate level of judicial scrutiny. In this regard, just as the *fitness of the parent* test alone satisfies the constitutional requirements, only strict scrutiny will suffice for judicial review in these situations.

In his concurring opinion in *Troxel*, Justice Thomas summarized an important aspect of this Court's precedential opinion in *Pierce v. Society of Sisters*, 268 U.S. 510 (1925), writing that "parents have a fundamental constitutional right to rear their children, including the right to determine who shall educate and socialize them." *Troxel* at 80 (Thomas, J., concurring). This fundamental right is just as critical and sacred today as when Justice Thomas wrote those words twenty years ago and when this Court cemented that truth in 1925. Justice Thomas proceeded to the next step in the analysis by concluding: "I would apply strict scrutiny to infringements of fundamental rights." *Id.*

*Amicus Curiae* agrees that strict scrutiny is the appropriate level of review and submits that this issue alone, as presented in this case, supports this Court granting the Petition. Petitioner Kelly Routten now provides this Court with the ideal opportunity to declare the appropriate level of scrutiny for the courts of this nation to apply.

## CONCLUSION

This Petition presents the ideal opportunity for this Court to resolve the conflict among the States and articulate one test – *the fitness of the parent test* – for adjudicating natural parents' rights in the care, custody, and control of their children. The North Carolina Supreme Court, in the opinion below, declared this test irrelevant.

This Petition also presents the ideal opportunity for this Court to resolve the conflict among the States and articulate one standard of review – *strict scrutiny* – when reviewing the fundamental rights of natural parents in the care, custody, and control of their children. The North Carolina Supreme Court, in the opinion below, required no such level of review.

In today's world, family dynamics are always changing, especially in an era of ever-increase divorce rates. Even in the face of such change, however, constitutional rights remain steadfast. Therefore, *Amicus Curiae* respectfully submits that this Court should grant the Petition for review.

Respectfully submitted
This 7th day of December, 2020,

/s/ Allan E. Parker Jr.
Allan E. Parker Jr.
  *Counsel of Record*
The Justice Foundation
8023 Vantage Dr., Suite 1275
San Antonio, TX 78230
(210) 614-7157; Parker4justice@gmail.com

Matthew D. Doane
Clinton J. Elliott
Doane & Elliott, PSC
120 E. Adams St., Suite 2
La Grange, KY 40031
(502) 602-0008

# 2

## *Actus reus*

## 2.1 The elements of crime

### 2.1.1 General

The criminal law does not seek to punish people for their evil thoughts; an accused must be proved to be responsible for conduct or the existence of a state of affairs prohibited by the criminal law before liability may arise. Whether liability arises will depend further on the accused's state of mind at the time; usually intention or recklessness is required.

 **Key Point**

A Latin maxim encapsulates this principle—*actus non facit reum, nisi mens sit rea*—the act itself does not constitute guilt unless done with a guilty mind. The conduct or state of affairs which a particular offence prohibits is called the *actus reus* and the state of mind which the accused must be proved to have had at the time of the conduct or during the existence of the state of affairs is called the *mens rea*.

It is important to note that the terms *actus reus* and *mens rea*, are simply useful labels to be attributed to the constituent parts of any crime being analysed; they do not have any meaning in themselves. They have no greater meaning than, for example, the terms 'obverse' and 'reverse' used when describing coins. Just as the words and designs on coins will vary so too will the *actus reus* and *mens rea* of different crimes.

It is particularly important when analysing the *mens rea* of offences to realise that this term is not prescriptive. In some offences nothing short of intention to bring about the prohibited consequence will suffice (e.g. theft, **Chapter 11** *post*) whereas in others recklessness will suffice (e.g. assault, **Chapter 10** *post*). While the Latin maxim above is a useful tool it is not a universal truth. There are many offences, largely of a minor and regulatory nature, where *mens rea* is not required. These are called strict liability offences and are of statutory creation (see **4.2** *post*). In such cases proof by the prosecution of *mens rea* is not required in respect of at least one element of the *actus reus*.

The use of the Latin terms *actus reus* and *mens rea* has been criticised. In *Miller* [1983] 2 AC 161, 174 Lord Diplock stated that:

> it would . . . be conducive to clarity of analysis of the ingredients of a crime that is created by statute . . . if we were to avoid bad Latin and instead to think and speak . . . about the conduct of the accused and his state of mind at the time of that conduct, instead of speaking of *actus reus* and *mens rea*.

The Law Commission in its Draft Criminal Code Bill (Law Com No. 177) uses the terms 'external elements' and 'fault element'. However, the terms *actus reus* and *mens rea* are so widely used that they will be retained for the purposes of exposition in this book.

While most crimes may be analysed in terms of *actus reus* and *mens rea*, a few crimes exist where these concepts merge. In some offences the *actus reus* may only be proved by proving *mens rea*. For example, s. 1(1) of the Prevention of Crime Act 1953 makes it an offence for any person, without lawful authority or reasonable excuse, to have with him in any public place any offensive weapon. Section 1(4) defines 'offensive weapon' as 'any article made or adapted for use for causing injury to the person, or intended by the person having it with him for such use'. If, for example, the accused is found carrying a pick-axe handle in a public place, the issue whether this amounts to the *actus reus* of the offence will depend on his intention at the time as this article does not fall into either of the first two categories of articles 'made or adapted for use for causing injury'. If there is no intent to use it to cause injury then there is no offensive weapon and thus no *actus reus*. In some other offences the *actus reus* implies a mental element. For example, if the accused is charged with possession of a controlled drug such as heroin or cannabis contrary to s. 5 of the Misuse of Drugs Act 1971 it is necessary to prove that he knew he possessed the thing which turns out to be the drug even though he does not know its nature (see *DPP* v *Brooks* [1974] AC 862; *Boyesen* [1982] AC 768); it is not possible to possess something if you do not know of its existence and thus in the absence of this mental element of knowledge there can be no *actus reus*.

## 2.1.2 Defences

So far the suggestion has been that if the prosecution prove the commission of an *actus reus* by the accused with the necessary *mens rea* criminal liability will have been established. This ignores the fact that the accused may be able to rely upon some justification or excuse to avoid criminal liability. Do justifications or excuses, more commonly referred to as defences, form part of the definition of a crime or are they outside the definition, operating like a trump card in bridge? Glanville Williams in *Criminal Law: The General Part* (2nd edn, 1961) expresses the view that all the constituents of a crime are either *actus reus* or *mens rea* stating (at p. 20):

> *Actus reus* includes . . . not merely the whole objective situation that has to be proved by the prosecution, but also the absence of any ground of justification or excuse, whether such justification or excuse be stated in any statute creating the crime or implied by the courts in accordance with general principles.

An alternative view expressed by D.J. Lanham, '*Larsonneur* Revisited' [1976] Crim LR 276, is that a crime is 'made up of three ingredients, *actus reus*, *mens rea* and (a negative element) absence of a valid defence'. Which view is correct is not crucial; it can even be argued that both are partially correct if a distinction is drawn between justifications and excuses. A.T.H. Smith, 'On *Actus Reus* and *Mens Rea*' in *Reshaping the Criminal Law* (ed. Glazebrook, 1978), states (at p. 99):

> the distinction is that we excuse the actor because he is not sufficiently culpable or at fault, whereas we justify an act because we regard it as the most appropriate course of action in the circumstances, even though it may result in harm that would, in the absence of justification, amount to a crime.

---

 **Example**

An example of a justification is self-defence. If, for example, D is charged with unlawfully and maliciously wounding V contrary to s. 20 of the Offences Against the Person Act 1861 he may admit that he did wound V and that he intended to do so, but he would not be convicted if he did so only in response to V's murderous assault upon him. In such circumstances the wounding of V would not be unlawful as it would be justified by the defence of self-defence. As the wounding was not unlawful it can be said that there was no *actus reus*; similarly as D only intended to wound V in circumstances where this was justified, there was no intention to wound V unlawfully (see further **6.5.2.3** *post*). By contrast, if D wounded V because he was told to do so by X who was holding D's wife hostage threatening to kill her if he did not obey, D could plead the defence of duress. In this situation, D intended to wound V and did so unlawfully (as he had no justification for so doing) but the defence of duress would operate to excuse him from the consequences of conviction and punishment. There has been an *actus reus* and *mens rea* but the defence of duress is superimposed much as a trump card might be played in bridge (see further **6.2** *post*).

---

## 2.2 Defining an *actus reus*

Each crime must be looked at individually to determine what must be proved to establish its *actus reus*. In the case of a common law crime (such as murder) the definition of its *actus reus* is to be found in the decisions of the courts; in the case of a statutory crime (such as theft) the definition of the *actus reus* is to be found in the statute as interpreted judicially in decided cases. Generally, however, it is necessary to know which elements of the definition of an offence comprise the *actus reus*. **The term *actus reus* has a much wider meaning than the 'act' prohibited by the law which it implies. A useful working definition is that it comprises all the elements of the definition of the offence except those which relate to the mental element (*mens rea*) required on the part of the accused.** The definition of an offence may prohibit acts or omissions (conduct); it may prohibit these only in particular circumstances. In some cases the definition of the offence may require particular consequences to ensue from the conduct. **A distinction which flows**

from this is that between 'conduct crimes' and 'result crimes'. A 'conduct crime' prohibits conduct regardless of consequences whereas a 'result crime' prohibits particular consequences which ensue from conduct on the part of the accused. In a limited number of cases, offences prohibit particular states of affairs without reference to conduct or its consequences. The ambit of the criminal law may be illustrated by the following examples of offences.

 **Example**

An example of a 'conduct crime' is perjury which is committed whenever D makes a statement on oath which he does not believe to be true. The offence is committed whether or not the statement is believed. In other words, the result of D's prohibited conduct is irrelevant; it is the conduct and not the consequence which is prohibited. The relevant circumstance in the *actus reus* of this offence is that the statement is made on oath. Another conduct crime is rape, which is committed where D penetrates with his penis the vagina, anus, or mouth of another person who does not consent. The relevant circumstance in the *actus reus* is that the other person is not consenting at the time of the penetration. An example of a 'result crime' is murder where it must be proved that D's conduct caused the deceased's death. If the intended result of the death of the victim does not occur, the law of attempts, under the Criminal Attempts Act 1981, provides for a charge of attempted murder—a 'conduct crime'. An example of a 'state of affairs' offence, where the definition of the *actus reus* is concerned neither with conduct nor its consequences, is being in charge of a motor vehicle on a road or other public place while unfit to drive through drink or drugs contrary to s. 4(2) of the Road Traffic Act 1988. If D is in charge of the vehicle (a state of affairs) it matters not whether he was driving the vehicle, sitting in it or asleep in it.

## 2.3 Proving an *actus reus*

It has already been stated that the criminal law does not seek to punish people for their evil thoughts or intentions. If D has the *mens rea* for a particular offence but does not bring about the *actus reus* he is not guilty of committing that offence. This is illustrated by the case of *Deller* (1952) 36 Cr App R 184.

P was selling a car to D and accepted D's car in part exchange after D represented to him that it was 'free from all encumbrances'. D believed this representation to be false as he had previously executed a document with a finance company which purported to be a hire purchase agreement in respect of the car. If this agreement was valid the car was not free from encumbrances and D had lied to P. If, however, the agreement was in reality a loan on the security of the car it was void as it had not been registered under the Bills of Sale Act 1878 and thus D's representation would, in fact, be true. D was charged with, and convicted of, obtaining P's car by false pretences contrary to s. 32 of the Larceny Act 1916. As the jury found the agreement was a loan on the security of the car, the Court of Criminal Appeal quashed D's conviction as this agreement was void and thus the car was unencumbered. There were, accordingly, no false pretences because 'it may be quite accidentally and, strange as it may sound,

dishonestly, the appellant had told the truth' (*per* Hilbery J at p. 191). D quite clearly intended to make false representations but the representations he made were true; while he had *mens rea* there was no *actus reus*. If such facts were to recur the correct charge would be *attempted* fraud by false representation.

## 2.4 Conduct must be voluntary

### 2.4.1 General

 **Question**

D is driving his car when suddenly, without warning, he suffers a heart attack which renders him incapable of continuing to exercise control over the vehicle. D slumps over the steering wheel and his foot pushes the accelerator pedal to the floor while the car careers through a traffic light which is showing red. The vehicle continues along the road and crashes into the rear of E's car which is stopped at a zebra crossing. E's vehicle is forced on to the crossing where it hits V breaking his leg. If D was charged with failure to stop at a red traffic light, dangerous driving and criminal damage to E's car, and E was charged with failing to accord precedence to a pedestrian on a zebra crossing and causing V grievous bodily harm, could they be convicted, have they committed the *actus reus* of any of these offences?

Where the *actus reus* of an offence requires conduct on the part of the accused, whether an act or omission, liability will only accrue where the conduct is willed; it is not sufficient that the accused by his bodily movements performed the prohibited conduct or brought about the prohibited consequence defined by the *actus reus* of the offence. In *Bratty v A-G for Northern Ireland* [1963] AC 386 (at p. 409), Lord Denning stated that the 'requirement that it should be a voluntary act is essential, not only in a murder case, but also in every criminal case'. **In offences requiring *mens rea*, if the conduct is not willed there will also be an absence of *mens rea* on the part of the accused, but even if the offence is one of strict liability, requiring no proof of *mens rea*, it is still necessary to prove that the accused's conduct was voluntary. To convict and impose punishment on an accused who was not responsible for his conduct would be unjust.**

In the example above, driving through a red traffic light is a strict liability offence. There is no need to prove that D was aware that the light was red and drove through it intentionally. The only matter which the prosecution need to prove is that D was driving the vehicle when it went through the red traffic light. However, as D had been incapacitated by the heart attack, there was at the time no voluntary act of driving and thus no *actus reus*. The charge of dangerous driving would similarly fail. The charge of criminal damage would also fail as, although D's car caused damage to E's car when it crashed into it, this was not the result of a voluntary or willed act on the part of D. Had D felt warning pains before the heart attack and continued driving he might be liable, particularly if he had previously had such an attack and recognised the pains as warning symptoms.

In *Kay* v *Butterworth* (1945) 173 LT 191 (see also *Hill* v *Baxter* [1958] 1 QB 277), D was driving home after night-shift work when, overcome by sleep, he drove into a party of soldiers. He was convicted of driving without due care and attention and dangerous driving as, realising that he was becoming drowsy, he should have stopped and it was immaterial that he was not conscious of his actions when the accident happened. Humphreys J stated:

> A person, however, who through no fault of his own, becomes unconscious while driving, for example, by being struck by a stone, or by being taken ill, ought not to be liable at criminal law.

In *Bell* [1984] 3 All ER 842, further examples of involuntary conduct for which no criminal liability may attach were given by Goff LJ who stated (at p. 846):

> a motorist . . . [who] has been attacked while driving by, for example, a swarm of bees or a malevolent passenger, or because he has been affected by a sudden blinding pain, or because he has become suddenly unconscious by reason of a black-out, or because his vehicle has suffered some failure, for example, through a blow-out or through the brakes failing.

In the example above E would be acquitted as his failure to accord precedence to a pedestrian was due to the external application of force on his vehicle which was beyond his control (see *Leicester* v *Pearson* [1952] 2 QB 668). Similarly, there was no voluntary act on E's part which caused V's injury.

In the example of D and E a distinction may be drawn between the causes of their involuntary conduct. E's conduct was caused by the external application of physical force. Another example would be where A is carving the Sunday joint when B seizes his hand holding the knife and thrusts it into C killing him. If A was charged with murder he would be acquitted as there was no voluntary act on his part. In our earlier example D's involuntary conduct was due to his loss of consciousness. Where a person does physical acts while in a state of unconsciousness this is referred to as automatism. For example, a person may perform physical acts while concussed or in a state of somnambulism or while suffering a fit or seizure. Automatism will be considered further in **Chapter 5**.

### 2.4.2 State of affairs offences

While most offences require voluntary conduct on the part of the accused to establish their *actus reus*, there are some offences which prohibit the existence of a state of affairs. An example given above is s. 4(2) of the Road Traffic Act 1988, being in charge of a motor vehicle on a road or other public place while unfit to drive through drink or drugs. For as long as the accused is in charge of the vehicle while unfit the *actus reus* is committed. This is so even though the accused may not be responsible for his unfitness, as where his soft drink has been laced with alcohol, although this may constitute a special reason for not disqualifying him from driving (see *Shippam* [1971] RTR 209; *Pugsley* v *Hunter* [1973] RTR 284).

While there may be strong public policy reasons for adopting an 'absolute liability' approach to 'situational' road traffic offences because of the obvious dangers

involved to members of the public, it is questionable whether this approach should be adopted in other cases of 'state of affairs' offences. The courts, however, have not shown any reluctance to convict people of situational offences where they have not been responsible for bringing about the prohibited state of affairs.

> In *Larsonneur* (1933) 97 JP 206, L, a French citizen was required to leave the United Kingdom. She went to Eire but was deported and brought back to Holyhead by the Irish police who handed her over to British police officers. On a charge under the Aliens Order 1920 that she 'being an alien to whom leave to land in the United Kingdom has been refused, was found in the United Kingdom' L was convicted. The Court of Criminal Appeal upheld her conviction, Hewart CJ referring to the circumstances of compulsion which brought about her return to the United Kingdom as 'perfectly immaterial'.

The Court was totally unconcerned to discover whether L had caused that state of affairs. The suspicion must be that the Court would have upheld her conviction even if a group of kidnappers had removed her from Eire and had brought her to the United Kingdom; a requirement of culpability (i.e. voluntariness) on the part of the accused leading to the creation of the state of affairs would have been desirable and could easily have been implied by the Court of Criminal Appeal in its construction of the statute.

Just when it was thought that *Larsonneur* was an aberrant decision which could be shunted into a siding and forgotten, the Divisional Court revived the controversy with its decision in *Winzar v Chief Constable of Kent, The Times*, 28 March 1983.

> W had been brought to hospital on a stretcher. He was diagnosed as being merely drunk and was asked to leave. When he was later found slumped on a seat in the corridor the police were summoned. They removed him to the road, concluded he was drunk and placed him in their police car. W was charged with being found drunk on the highway contrary to s. 12 of the Licensing Act 1872. The Divisional Court construed the words 'found drunk' to mean 'perceived to be drunk' and upheld his conviction on the basis that, as the purpose of the offence was to deal with the nuisance of public drunkenness, it was sufficient to establish guilt to prove that the person was drunk while in a public place; how he came to be there was considered to be irrelevant.

The report does not indicate how W came to be taken to hospital. If he had been found lying in the street originally there might be no cause for complaint. The decision, however, is expressed in broad terms and may be criticised on two bases. First, it is arguable that the officers first perceived W's condition while he was in hospital; by taking him outside to the public highway they had procured the commission of the offence. Secondly, in the absence of express words in the statute dispensing with the need to prove voluntary conduct on the part of the accused bringing into existence the prohibited state of affairs, the requirement of voluntariness should have been implied on the basis that penal statutes should be construed strictly in favour of the accused. (This is a presumption of statutory interpretation honoured more in the breach than in the observance in recent years.)

The decision in *Winzar* may be contrasted with *Martin v State* 31 Ala. App. 334, 17 So. 2d 427 (1944) where the Alabama Court of Appeals reversed the trial court's conviction of being drunk on a public highway on the ground that a voluntary

appearance on the highway is a prerequisite of a conviction. The appellant had been in his own house drunk when police officers forcibly entered his house, carried him into the street and then arrested him. If this factual situation occurred in England the broad terms of the decisions in *Larsonneur* and *Winzar* would dictate a contrary result. It is to be hoped that courts will apply these two cases narrowly and look for culpability on the part of the accused in bringing about the prohibited state of affairs before convicting. The degree of culpability required need not be very great. An objective requirement that the creation of the state of affairs be reasonably foreseeable at the time the accused embarked on the course of conduct which ultimately led to that state of affairs would suffice. For example, if the accused is drinking in a public house it is reasonably foreseeable that he will end up on the public highway either at closing time or if he leaves or is ejected earlier. If, however, he is drinking at home, it is not reasonably foreseeable that this will happen. Thus if *Winzar* had been at home unconscious from his drinking when a third party summoned the ambulance to take him to hospital, the reasonable foreseeability test would not be satisfied. If, however, he had been drinking in a public house when he collapsed the test would be satisfied, albeit the roundabout way in which he ended up on the highway could not have been foreseen at the time he commenced his drinking.

## 2.5 Omissions

### 2.5.1 General


> **Question**
>
> A, knowing that B cannot swim, pushes him into the deep end of the swimming pool intending that he should drown. C, a swimmer using the pool, ignores B's struggles and his cries for help. D, the life-guard employed by the council to rescue anyone in difficulty, ignores B's cries, believing them to be a prank of which there have been many that day. E, B's father who is swimming in the pool, also ignores B's cries, reckoning that it is time that his wimpish son either sinks to oblivion or learns to swim. B drowns. Will A, C, D, and E be liable for unlawful homicide (i.e. either murder or manslaughter depending on their *mens rea*)? A is the only one to have performed a positive act which caused B's death. C, D, and E failed to act to save B but they did not do any positive act to cause his death. If liability is to arise it would depend on there being a duty upon them to act to prevent B's death although they are not responsible for the existence of the life-threatening situation.

Generally the common law was concerned to prohibit particular results from occurring and it punished an accused for causing the prohibited result by his positive acts. Gradually the courts came to recognise limited liability for omissions where a duty to act could be implied, the accused failed to act, and the prohibited result ensued. Not all offences, however, are capable of commission by omission. It is a question for the courts whether a particular offence is capable of commission by omission (see, for example, *Firth* (1990) 91 Cr App R 217, **12.3.2.2** *post*). Some

offences cannot be committed by omission, for example, burglary and robbery. In some offences the definition of the *actus reus* may make it clear that it may only be committed by an act.In *Ahmad* (1986) 84 Cr App R 64, A, a landlord, was charged with doing acts calculated to interfere with the peace or comfort of a residential occupier with intent to cause him to give up occupation of the premises contrary to s. 1(3) of the Protection from Eviction Act 1977. The relevant acts had been done by A without the necessary intent but he subsequently omitted to rectify the situation with the intention of causing his tenant to give up occupation of the premises. The court strictly construed the statute holding that the requirement of doing acts could not be satisfied by an omission.

Murder or manslaughter may be committed by omission. In the example above D and E could be found liable for unlawful homicide provided *mens rea* could be established as the courts have recognised a duty to arise under contract (see *Pittwood* (1902) 19 TLR 37, **2.5.2.2.1** *post*) and a duty on the part of parents to care for their children and protect them from physical harm (see *Gibbins and Proctor* (1918) 13 Cr App R 134, **2.5.2.2.2** *post*). A problem in relation to D and E, however, is that they did not actually cause B's death in the sense in which causation is generally understood (see **2.6** *post*). **The courts do not appear to have grappled with the principles of causation specifically in relation to omissions.** The Law Commission in its Draft Criminal Code Bill (Law Com No. 177) specifically addresses this issue in clause 17(1) which states: ' . . . a person causes a result . . . when . . . (b) he omits to do an act which might prevent its occurrence and which he is under a duty to do according to the law relating to the offence'.

With regard to C, he would not be liable as there is no general duty to be a 'Good Samaritan'. The position of the common law was summarised in *Lord Macaulay's Works* (ed. Lady Trevelyan), Vol. VII, p. 497:

> In general . . . the penal law must content itself with keeping men from doing positive harm, and must leave to public opinion, and to the teachers of morality and religion, the offence of furnishing men with motives for doing positive good. It is evident that to attempt to punish men by law for not rendering to others all the service which it is their [moral] duty to render to others would be preposterous. We must grant impunity to the vast majority of those omissions which a benevolent morality would pronounce reprehensible, and must content ourselves with punishing such omissions only when they are distinguished from the rest by some circumstance which marks them out as peculiarly fit objects of penal legislation.

While C's disregard of B's plight and failure to render assistance may be morally reprehensible it falls outside the ambit of the criminal law.

### 2.5.2 Classifying omissions

 **Key Point**

The analysis of offences into *conduct crimes* and *result crimes* is useful when examining liability for omissions. G. P. Fletcher in *Rethinking Criminal Law* (1978) distinguishes two forms of liability for omissions. The first type he designates 'breach of duty to act', where liability may

> be imposed for breach of a statutory obligation to act. This relates to conduct crimes where there is no requirement for the occurrence of harm to be proved. The second type of liability which relates to result crimes he designates 'commission by omission', where liability is imposed 'for failing to intervene, when necessary, to prevent the occurrence of a serious harm such as death or the destruction of property' (at p. 421). Fletcher's classification will be used to examine the situations in which the criminal law imposes liability for omissions.

### 2.5.2.1 Breach of duty to act

Various statutes impose duties to act on individuals in specified circumstances. An individual finding himself in the specified circumstances who fails to perform that duty will commit an offence. For example, a motorist who, without reasonable excuse, fails to provide a police officer with a specimen of breath when required to do so under s. 6 of the Road Traffic Act 1988, or who, when at a police station, similarly fails to provide a specimen of breath, blood, or urine when required to do so under s. 7 of the 1988 Act, is guilty of an offence. The penalty for these offences of omission is the same as the offences of commission of which the motorist was suspected. Thus a motorist suspected of driving a vehicle while unfit due to drink or drugs is liable to the same penalty whether he provides the specimen which would establish his guilt or whether he refuses to provide it. Another example of an offence of omission created by statute is failure by a motorist to stop and provide his name and address to any person reasonably requiring it where his vehicle has been involved in an accident where there has been *inter alia* injury to another person or damage to another vehicle (s. 170(4) of the Road Traffic Act 1988). A more serious offence relating to non-disclosure of information is created by s. 19 of the Terrorism Act 2000. If information comes to the attention of D in the course of his trade, profession, business, or employment giving rise to a belief or suspicion that another person has committed one of a range of offences under the Act, D commits an offence if he does not disclose his belief or suspicion and the information on which it is based to the police as soon as is reasonably practicable.

The above examples are all of statutory creation where it is specifically stated that failure to perform the duty imposed by the statute is an offence. In some situations the common law has recognised an offence where a duty imposed by common law or statute has been neglected.

In *Dytham* [1979] QB 722, D, a police constable, was on duty in uniform near a club when a man was ejected from the club and kicked to death by a 'bouncer'. D took no steps to intervene and when the incident was over he drove off having told a bystander that he was going off duty. D was charged with the common law offence of misconduct whilst acting as an officer of justice, in that he had wilfully and without reasonable excuse or justification neglected to perform his duty to preserve the Queen's Peace and to protect the person of the deceased or arrest his assailants or otherwise bring them to justice. D contended that there was no such offence known to the law and that misconduct required a positive act or an element of corruption but mere nonfeasance was not enough. The Court of Appeal, in upholding his conviction, placed

reliance on a passage in Stephen's *Digest of Criminal Law* which stated:

> Every public officer commits a misdemeanour who wilfully neglects to perform any duty
> which he is bound either by common law or by statute to perform provided that the dis-
> charge of such duty is not attended with greater danger than a man of ordinary firmness
> and activity may be expected to encounter.

Lord Widgery stipulated the requirements of the offence as being wilful neglect not
mere inadvertence, and the neglect must be culpable in the sense that it is without
reasonable excuse or justification. He stated (at p. 727):

> This . . . element of culpability . . . is not restricted to corruption or dishonesty
> but . . . must be of such a degree that the misconduct impugned is calculated to injure the
> public interest so as to call for condemnation and punishment. Whether such a situation is
> revealed by the evidence is a matter that a jury has to decide.

It is interesting that Dytham was charged with a conduct crime and not the result
crime of manslaughter. This is presumably because it was considered that causation
could not be established as it would be impossible to prove that the victim would
not have died but for Dytham's failure to perform his duty.

Misconduct in a public office would appear to be an offence applicable to all
holders of public office. The nature of the offence obviously will vary depending
upon the duties, statutory or common law, placed upon the office holder (see also
*A-G's Ref (No. 3 of 2003)* [2004] EWCA Crim 868). Another common law offence
which may be committed by omission in breach of a duty, in this case a statutory
one, is cheating the revenue (see *Mavji* [1987] 1 WLR 1388).

### 2.5.2.2 Commission by omission

The situations examined so far have involved 'conduct crimes'. Is it possible to
commit a 'result crime' by omitting to act? **Not all omissions will give rise to
liability; liability will depend on there being a duty, recognised by the law,
to act or intervene in the circumstances.** There are several situations in which the
law has recognised the existence of such duties; these are outlined below. Most of
the cases which have arisen concern murder or manslaughter. There has been some
doubt whether less serious offences against the person which require the commis-
sion of an assault (i.e. in the broader sense of that term which includes a battery)
may be committed by omission. There is no decision which states that an assault
requires an act and J. C. Smith argues that such a requirement is unnecessary (see
Smith, 'Liability for omissions in criminal law' (1984) 4 *Legal Studies* 88). The situ-
ations in which a duty may arise are not closed; new situations may give rise to the
recognition of a duty.

In *Khan and Khan* [1998] Crim LR 830 two drug dealers appealed from convictions of
manslaughter arising out of their supply of heroin to the deceased and their failure to
summon medical assistance when she went into a coma following her consumption

of the drug. In quashing their convictions Swinton Thomas LJ stated:

> To extend the duty to summon medical assistance to a drug dealer who supplies heroin to
> a person who subsequently dies on the facts of this case would undoubtedly enlarge the
> class of persons to whom, on previous authority, such a duty may be owed. It may be
> correct to hold that such a duty does arise. . . . Unfortunately, the question as to the exist-
> ence or otherwise of [such] a duty . . . was not . . . at any time considered by the Judge,
> and the jury was given no direction in relation to it.

In a future case such a duty may be recognised. A potential difficulty to which the
case gives rise relates to the way in which a duty may be recognised. Swinton
Thomas LJ said that it was for the judge to rule whether the facts were capable of
giving rise to a duty and, if so, for the jury to decide whether there was such a duty.
The danger is that the jury may be unduly influenced by the fact of death and con-
clude that there must have been a duty to prevent such a death. In a later case, *Singh
(Gurphal)* [1999] Crim LR 582 (see **9.3.3.2** *post*) the Court of Appeal affirmed the trial
judge's decision that whether a situation gave rise to a duty was a question of law
for the judge to determine which, it is submitted, is the better view.

### 2.5.2.2.1   *Duty arising out of contract*
**Where the failure to fulfil a contractual obligation is likely to endanger lives,
the criminal law will impose a duty to act. The duty will be owed not only to
other parties to the contract but also to any other person whose life may be
endangered.** In *Pittwood* (1902) 19 TLR 37 the accused was convicted of gross neg-
ligence manslaughter following the death of a road user who was hit by a train on
a level crossing. The accused was employed by the railway company to look after
the crossing and ensure that the gate was shut when a train was due to pass. When
the collision occurred the accused was away from his post having left the gate open.
His actions were regarded as grossly negligent, and his contention that his contrac-
tual obligations gave rise to no duty to the public was dismissed as he was paid to
keep the gate shut and protect the public.

### 2.5.2.2.2   *Duty arising out of relationship*
**The existence of close relationships can give rise to a duty to act. It is generally
accepted at common law (although there is little direct authority) that parents
are under a duty to their children to protect them from physical harm and
spouses are under a duty to aid each other** (see *Smith* [1979] Crim LR 251,
**2.5.2.2.3** *post*). In *Gibbins and Proctor* (1918) 13 Cr App R 134, a man and woman
with whom he was living were convicted of the murder of the man's child, it hav-
ing starved to death because they withheld food from it. In the case of the man he
had breached the duty parents owe their children. The woman, by taking money to
buy food, had assumed a duty towards the child (see **2.5.2.2.3** *post*).

### 2.5.2.2.3   *Duty arising from the assumption of care for another*
**If a person voluntarily undertakes to care for another person who is unable to
care for himself, whether from infancy, mental illness or other infirmity, a
duty will be owed to that person** (see *Nicholls* (1874) 13 Cox CC 75). The duty may
arise from an express undertaking to care for the other, as in *Nicholls* where a grand-
mother took into her home her grandchild after its mother died, or it may be

implied as in *Instan* [1893] 1 QB 450. In the latter case D, who was without independent means, lived with her aunt who became ill and for the last twelve days of her life was unable to care for herself or summon help. D did not give her any food or seek medical assistance but she continued to live with the aunt and eat her food. D was convicted of manslaughter on the basis that by remaining with the aunt a duty was imposed on her to care for the aunt, which duty she had wilfully and deliberately left unperformed.

The principle in *Instan* has been greatly extended by *Stone and Dobinson* [1977] QB 354, so that a duty to care for another may be easily incurred although onerous or difficult to execute.

> S's sister F came to live with him and his mistress D in 1972. F was suffering from anorexia nervosa and, although initially able to look after herself, her condition deteriorated until she was confined to bed by July 1975. S was 67, partially deaf, nearly blind, and of low intelligence. D was 43 but was described as 'ineffectual and inadequate'. S and D tried to find F's doctor but failed. They took F such little food as she required. D and a neighbour once gave her a bedbath. S and D were unable to use a telephone and no one was informed of F's condition. A neighbour was unsuccessful in getting a local doctor to attend. When F died S and D were convicted of manslaughter and on appeal their convictions were upheld, the Court of Appeal being satisfied that the jury were entitled to find that S and D, by the minimal attention they had given F, had assumed a duty to care for her and had been grossly negligent in the performance of this duty as a result of which F had died.

It is unclear from the judgment whether it would have been held that S and D had incurred a duty to care for F if, when she became infirm and unable to care for herself, they had simply ignored her.

> The principle in *Stone and Dobinson* was followed in *Ruffell* [2003] EWCA Crim 122, where the Court of Appeal upheld the defendant's conviction of manslaughter. On an evening in February V was at D's house at D's invitation and both partook of a mixture of heroin and cocaine. V lapsed into unconsciousness and D engaged in some efforts to revive him—placing him by a window to get some fresh air, splashing water on his face, placing him in a bath, wrapping him in towels and placing him by a radiator. The following morning D telephoned V's mother informing her that he was sick due to drinking vodka and that he was sitting on D's doorstep. V's mother asked D to take V inside and cover him with a blanket. D agreed to do so but did not, returning to bed to sleep. Three hours later V was found on the path by workmen and neighbours. He was taken to hospital but pronounced dead three hours later. The cause of death was hypothermia and opiate intoxication. The trial judge directed the jury that they could find that D had assumed a duty of care from the fact that V was a guest in D's house and a friend of D, and that D had sought to revive him following his taking of the drugs. If they considered that D had assumed this duty, they were entitled to consider whether putting V outside amounted to a breach of that duty. The jury convicted D and the Court of Appeal upheld the conviction endorsing the trial judge's direction to the jury.

**An issue which is left unresolved in the case law is whether a person who is under a duty to care for another, whether due to relationship or because the duty is imposed as a result of care rendered to a helpless or infirm person, may**

be released from that duty by the person to whom it is owed. For example, if the person wishes to die and does not want medical attention, is the 'carer' under a duty to contravene their requests and obtain medical aid? In *Smith* [1979] Crim LR 251, S was charged with manslaughter following the death of his wife. She had a marked aversion to doctors and medical treatment and would not allow her husband to seek medical attention after she had given birth to a still-born child at home. When she finally gave him permission it was too late and she died before the doctor arrived. Medical evidence was that she could have been saved had medical aid been sought originally. In summing-up to the jury Griffiths J directed them:

> to balance the weight that it is right to give to his wife's wish to avoid calling a doctor against her capacity to make rational decisions. If she does not appear too ill it may be reasonable to abide by her wishes. On the other hand, if she appeared desperately ill then whatever she may say it may be right to override.

**The suggestion seems to be that if a person is capable of making rational decisions he may release a carer from his duty of care.** In this case the jury could not agree on the charge of manslaughter and were discharged from giving a verdict. This was only a first instance decision and it left unresolved the question whether a person may release another from the duty of care in anticipation of that duty arising. **For example, could an ageing wife release her husband from his duty of care by telling him that if she falls ill at any time in the future she wants to be left to die at home without medical attention being called?**

The answer to this question was given by the House of Lords in the course of its decision in *Airedale NHS Trust v Bland* [1993] 2 WLR 316. An application was made by the Trust for a declaration whether it was lawful for doctors to withdraw life-supporting medical treatment, including artificial feeding through a nasogastric tube, from a patient in one of its hospitals who was in a persistent vegetative state with no prospect of recovery or improvement, when it was known that the discontinuance of the treatment would cause his death within a matter of weeks. The House of Lords held that the treatment could be removed and a doctor would not be acting unlawfully in so doing (see further *R (Burke)* v *GMC* [2004] EWHC 1879 (Admin)).

Lord Goff of Chieveley, giving the leading judgment, stated several principles which apply in the treatment of patients. First, there was **no absolute rule that a patient's life had to be prolonged regardless of the circumstances.** While the fundamental principle was the sanctity of human life, this principle was not absolute. His Lordship was recognising that respect for human dignity demands that the quality of the life in question must be considered. Secondly, **the principle of self-determination required that respect be given to the expressed wishes of the patient.** Thus, if an adult of sound mind refused treatment the doctors responsible for his care had to give effect to his wishes. If the patient was incapable of communicating, an earlier expression of refusal of consent to treatment in certain circumstances would be effective. **Where, however, the patient was both incapable of communicating and had given no earlier indication of his wishes there was no absolute obligation upon the doctor to prolong his life regardless of the circumstances.** The question was what was in the best interests of the patient. Where a patient is incapable of giving consent, treatment may be provided if it is in

his best interests (see *In re F (Mental Patient: Sterilisation)* [1990] 2 AC 1, **10.1.1.3.2** *post*). Likewise it may be discontinued if this is in his best interests. His Lordship considered that the question should be carefully formulated as it was not whether it was in the patient's best interests that treatment should be ended but rather whether it was in his best interests that treatment which had the effect of artificially prolonging his life should be continued. Such treatment would not be appropriate where it had no therapeutic purpose, which would be the case where it was futile because the patient was unconscious and had no prospect of any improvement in his condition.

Thirdly, **where the above conditions pertained, the treatment being futile, there was no duty on a doctor to continue life-supporting treatment as it was not in the best interests of his patient.** Accordingly, although the discontinuance of treatment would amount to an omission, it would not be unlawful as it would not be in breach of duty to the patient. Similar principles applied with regard to the decision whether to put a patient on life-supporting treatment in the first place. Finally, Lord Goff emphasised that **doctors in deciding whether to initiate or discontinue life-support treatment for a patient had to act in accordance with a responsible and competent body of relevant professional opinion on the principles set down in** *Bolam v Friern Hospital Management Committee* [1957] 1 WLR 582. In *Airedale NHS Trust v Bland* guidance was to be found in a 'Discussion Paper on Treatment of Patients in Persistent Vegetative State' issued in September 1992 by the Medical Ethics Committee of the British Medical Association which provided four safeguards which should be observed before discontinuing life-support for such patients:

(1) Every effort should be made at rehabilitation for at least six months after injury.
(2) The diagnosis of irreversible PVS should not be considered confirmed until at least 12 months after the injury.
(3) The diagnosis should be agreed by at least two other independent doctors.
(4) Generally, the wishes of the patient's immediate family would be given great weight.

In all cases where it is decided to end life-support treatment the opinion of the Family Division of the High Court should be sought. This latter requirement might subsequently be relaxed by the President of the Family Division in light of experience.

### 2.5.2.2.4 *Duty arising from creation of a dangerous situation*

**Where a person inadvertently and without the appropriate** *mens rea* **does an act which starts a chain of events which, if uninterrupted, will result in harm to another or his property (or any other interest protected by the criminal law), that person, on becoming aware that he was the cause, is under a duty to take such steps as lie within his power to prevent or minimise the risk of harm. If, before the harm occurs, he realises what he has done and with appropriate** *mens rea* **he fails to take such steps, he will be criminally liable.** The authority for this principle is *Miller* [1983] 2 AC 161.

D, a vagrant who was squatting in a house, awoke to find that a cigarette he had been smoking had set fire to the mattress on which he was lying. He did not attempt to extinguish the fire but moved to another room. The house caught fire. D was convicted of arson contrary to s. 1(1) and (3) of the Criminal Damage Act 1971. The

House of Lords dismissed his appeal against conviction holding that when D became aware of what he had done in setting the mattress on fire he was under a duty to take such steps as were within his power to prevent or minimise the damage to the property at risk. Lord Diplock stated (at p. 181):

> I see no rational ground for excluding from conduct capable of giving rise to criminal liability, conduct which consists of failing to take measures that lie within one's power to counteract a danger that one has oneself created, if at the time of such conduct one's state of mind is such as constitutes a necessary ingredient of the offence.

The steps which an accused is required to take to counteract the danger he has caused are such as are reasonable in the circumstances. Clearly he would not be expected to attempt to put out a raging inferno; all that might be required is a telephone call summoning the fire brigade. In the case of a minor fire he might reasonably be required to extinguish it himself if all that would be required was a bucket of water or that he stamp on it with his shoe.

In *DPP* v *Santana-Bermudez* [2003] EWHC Admin 2908, the Administrative Court applied the *Miller* principle in unusual circumstances. V, a police officer, sought to carry out a lawful search of D and asked him to turn out his pockets, the contents of which included some syringes. She then asked him if he was sure that he had no more needles. He lied to her and her finger was pierced by a hypodermic needle when she commenced a search of his pockets. The Administrative Court held that where someone by act or word or a combination thereof created a danger and thereby exposed another to a reasonably foreseeable risk of injury which materialised, this could amount to the *actus reus* of assault occasioning actual bodily harm. In this situation it was clearly D's duty to tell the truth. Whether a conviction would ensue would depend upon proof of intention or recklessness. This decision may appear to conflict with the Divisional Court's decision in *Fagan* v *Metropolitan Police Commissioner* [1969] 1 QB 439 (see **2.7** *post*; **10.1.1.2** *post*) where it was stated that an omission could not constitute an assault. However, the *Miller* principle is founded upon there being an initial act which creates the danger and the Court in *Fagan*, necessarily, did not address the principle as stated in *Miller*. In the instant case it would have been possible for the Administrative Court to have arrived at the same conclusion by means of the 'continuing act' analysis (see Professor Ashworth's commentary to *Santana-Bermudez* [2004] Crim LR 471).

**The incidence of this duty to act arises from the creation by the accused of the dangerous situation.** The House of Lords spoke in terms of a physical act on the part of the accused setting the train of events in motion. They did not address the question whether an initial omission which set in motion a train of events which placed a person or property in peril might found liability.

 **Question**

D parks his car on a hill and omits to apply the handbrake. He is walking up the path to his house when he remembers this and turns to see his car start to roll down the hill towards children playing in the street. D realises the danger they are in but he hates children and ➡

> ⇢
>
> decides to do nothing either to try to stop his car or warn the children of the danger. V, one of the children, is hit by his car sustaining a broken leg. If D is charged with causing grievous bodily harm with intent contrary to s. 18 of the Offences Against the Person Act 1861 would he be liable? There was no physical act on the part of D which caused the injury but rather an omission, i.e. his failure to apply the handbrake. Should the principle of *Miller* be extended?

## 2.6 Causation

### 2.6.1 General

**Where an accused is charged with a *result crime*, it is necessary for the prosecution to prove that his acts or omissions caused the prohibited consequence.** In murder or manslaughter, for example, it is necessary to prove that the accused, by his acts or omissions, caused the death of the victim. Similarly, in criminal damage, it is necessary to prove that the accused's acts or omissions caused damage to, or destruction of, property belonging to another. If the death, damage, or destruction occurred because of some other cause then the offence has not been committed even though all the other elements of the *actus reus* are present and the accused had the necessary *mens rea*. The accused, however, may be guilty of some other offence such as attempt (see *White*, **2.6.2** *post*). In the case of result crimes for which liability is strict (see **4.2.1** *post*) causation may be established even though the accused did not intend or have knowledge of the harm or was not negligent thereto (see *Southern Water Authority* v *Pegrum and Pegrum* [1989] Crim LR 442; *National Rivers Authority* v *Yorkshire Water Services* [1994] Crim LR 451; *Environment Agency* v *Empress Car Co. (Abertillery)* [1999] 2 AC 22).

**The issue of causation is for the jury to decide upon.** The cases which have given rise to problems have usually involved homicide. But, even in homicide cases, causation rarely becomes an issue, as how the victim came to die is usually not in dispute. Where there is a dispute it is the duty of the trial judge to direct the jury on the legal principles relating to causation, but it is for the jury, applying those principles, to decide if the causal link between the accused's conduct and the prohibited consequence has been established. Usually it will be sufficient to direct the jury 'simply that in law the accused's act need not be the sole cause, or even the main cause, of the victim's death, it being enough that his act [or omission] contributed significantly to that result' (*Pagett* (1983) 76 Cr App R 279, *per* Robert Goff LJ). Occasionally, when a particular problem relating to causation arises, such as whether the act of a third party has broken the chain of causation, it is (*per* Robert Goff LJ at p. 290):

> for the judge to direct the jury . . . in the most simple terms, in accordance with the legal principles which they have to apply. It would then fall to the jury to decide the relevant factual issues which, identified with reference to those legal principles, will lead to the conclusion whether or not the prosecution have established the guilt of the accused of the crime of which he is charged.

In simplifying causation for the jury, the judge may refer to the two principles of causation namely that an accused can only be convicted if they are satisfied that his conduct was both a *factual cause* and a *legal cause* of the victim's death. The discussion will centre on homicide but the principles are equally applicable to other offences where causation may be in issue.

### 2.6.2 Factual causation

The accused's conduct must be a *sine qua non* of the prohibited consequence. In other words it must be established that the consequence would not have occurred as and when it did *but for* the accused's conduct. This is sometimes referred to as the **'but for' test**. In *White* [1910] 2 KB 124 D put cyanide into his mother's drink with intent to kill her. Later his mother was found dead with the glass containing the poisoned drink beside her three parts full. Medical evidence established that she had died of heart failure and not from poisoning. D was acquitted of murder as he had not caused her death and thus there was no *actus reus*. He was, however, convicted of attempted murder.

The fact that factual causation is established, however, does not mean that legal causation can be established.

 **Example**

A shows B a job advertisement. B applies for the job and C, the employer, invites her for interview. On her way to the interview B is attacked by D while walking through a park and killed. But for A showing B the advertisement she would not have applied for the job and but for C inviting her for interview she would not have been in the park and been killed as and when she was. No one would argue, however, that A's and C's acts should be regarded as legal causes of B's death. It is D's acts which are the legal cause of B's death.

### 2.6.3 Legal causation

**Not all but-for causes are legal causes of an event. Legal causation is closely connected to ideas of responsibility and culpability.** Glanville Williams in *Textbook of Criminal Law* (2nd edn) states (at p. 381):

> When one has settled the question of but-for causation, the further test to be applied to the but-for cause in order to qualify it for legal recognition is not a test of causation but a moral reaction. The question is whether the result can fairly be said to be imputable to the defendant. . . . If the term 'cause' must be used, it can best be distinguished in this meaning as the 'imputable' or 'responsible' or 'blamable' cause, to indicate the value-judgment involved.

The discussion which follows will examine the conditions for the attribution of legal causation.

#### 2.6.3.1  Consequence must be attributable to a culpable act

**If the culpable act the accused performed did not contribute to the consequence legal causation will not be established.** Thus although D may have been

grossly negligent in performing an act he will not be held responsible for a prohibited consequence which would have occurred whether or not he was negligent. This is illustrated by the case of *Dalloway* (1847) 2 Cox 273.

> D was driving a horse and cart without holding the reins which were lying loose on the horse's back. A child ran in front of the cart and was killed. Erle J directed the jury that if the driver could have saved the child by using the reins they should convict him of manslaughter, but if they thought he could not have saved the child by pulling the reins they must acquit him. The jury acquitted him presumably satisfied that the child's death could not have been avoided and thus the child's death was not attributable to the accused's negligence. But for the cart being on the road the child would not have died, but driving a cart on the road is not itself a culpable act.

The principle in *Dalloway* would similarly apply on a charge of causing death by dangerous driving if the death would have occurred regardless of the manner of the accused's driving.

### 2.6.3.2 The culpable act must be a more than minimal cause of the consequence

In homicide the accused's act may be considered a cause of death if it has accelerated the victim's death. It is no answer to a charge of murder or manslaughter to say that the victim was dying from a fatal disease or injury and would have died within a short time had the accused not hastened his death (see *Dyson* [1908] 2 KB 454). If, however, the act of the accused produces only a very trivial acceleration of the death of the victim, it may be ignored under the *de minimis* principle (see *Hennigan* [1971] 3 All ER 133 and *Cato* [1976] 1 WLR 110). On occasions judges have stated that the accused's act must be a 'substantial' cause of the victim's death. This would tend to state the principle too favourably for the accused (see *Malcherek and Steel* [1981] 1 WLR 690). In *Pagett*, Robert Goff LJ stated that 'the accused's act need not be the sole cause, or even the main cause, of the victim's death, it being enough that his act contributed significantly to that result'. Whatever the terminology used the idea which is sought to be communicated to the jury is that **the accused's contribution to the death of the victim must be more than minimal**. The test is far from scientific as what is sought from the jury is not an exact measurement but, to use Williams' term, a 'moral reaction'; is the death of the victim morally attributable to the accused? This is, perhaps, what Devlin J had in mind when he directed the jury in *Adams* [1957] Crim LR 365.

> Dr Adams was charged with murder of one of his patients by means of administering pain-relieving drugs. Devlin J directed the jury that it did not matter that the patient's death was inevitable and that her days were numbered:

>> If her life were cut short by weeks or months it was just as much murder as if it was cut short by years. The law knows no special defence [by which doctors might be justified in administering drugs which would shorten life in cases of severe pain,] but that did not mean that a doctor who was aiding the sick and dying had to calculate in minutes, or even in hours, and perhaps not in days or weeks, the effect upon a patient's life of the medicines which he administers or else be in peril of a charge of murder. If the first purpose of medicine, the restoration of health, can no longer be achieved there is still much for a doctor to do, and he is entitled to do all that is proper and necessary to relieve pain and suffering, even if the

> measures he takes may incidentally shorten life. . . . The law is the same for all, and what I
> have said to you rests simply upon this: no act is murder which does not cause death. 'Cause'
> means nothing philosophical or technical or scientific. It means what you twelve men and
> women sitting as a jury in the jury box would regard in a common-sense way as the cause.

In such circumstances a jury would presumably not find causation, as their moral reaction would be that the doctor was seeking to relieve pain and only incidentally accelerated the patient's death. If, however, the pain-relieving drugs were administered not by a doctor but by the sole beneficiary under her will, and were administered to hasten the inheritance, one could assume that a jury would exhibit a different moral reaction and would find causation to be established.

**2.6.3.3**  The culpable act need not be the sole cause

**The act of the accused need be neither the sole nor the main cause of the prohibited consequence.** Other causes contributing to the consequence may be the acts of others or even of the deceased himself.

*2.6.3.3.1  The actions of third parties*

> In *Benge* (1865) 4 F & F 504, the actions of third parties contributed significantly to
> the deaths. D, the foreman of a track-laying crew, misread the railway time-table so
> that the track was up at a time when a train was due. D placed a signalman with a flag
> 540 yards up the line although the company regulations specified 1,000 yards. The
> driver of the engine was not keeping a good lookout and several deaths resulted from
> the ensuing accident. D argued that if the signalman had gone the correct distance
> and the driver had kept a proper lookout there would not have been an accident. D
> was convicted of manslaughter after Pigott B directed the jury that if D's conduct
> mainly or substantially caused the accident it mattered not that it might have been
> avoided if the others had not been negligent.

The facts of cases need not be as unusual as *Benge*. For example, if A and B both attack C, A stabbing him in the lung and B stabbing him in the abdomen, both would be liable for homicide if he dies as a result of the combined effect of the wounds even though neither wound was, of itself, mortal. There are other circumstances, however, where a subsequent act may supersede an antecedent act which otherwise would have caused death. For example, A poisons B with a slow acting poison. Before it takes effect C decapitates B with an axe. In this situation C's act is the sole cause of B's death. A, however, could be charged with attempted murder.

*2.6.3.3.2  The actions of the victim*

**The deceased by his negligence may contribute to his own death.** For example, if D is driving in excess of the speed limit when V, who is blind, walks across the road and is hit by D killing him, it matters not that V's negligence contributed to his death if D could have avoided hitting him had he been observing the speed limit (see *Longbottom* (1849) 3 Cox CC 439).

   **Where the victim brings about his own death this may be legally attributable to the accused** where he has caused the victim reasonably to apprehend violence to himself and he has died in seeking to escape. In such a situation D will only be

found to have caused V's injuries or death where V's response to D's violence or threat of violence was 'within the range of responses which might be expected from a victim placed in the situation which he was' (*Williams* [1992] 2 All ER 183, 191 *per* Stuart-Smith LJ). V's response must be 'proportionate to the threat, that is to say that it was within the ambit of reasonableness and not so daft as to make it his own voluntary act which amounted to a *novus actus interveniens* and consequently broke the chain of causation' (*ibid*). In deciding whether V's response was reasonably foreseeable the jury should bear in mind 'any particular characteristic of the victim and the fact that in the agony of the moment he may act without thought and deliberation' (*ibid*). (See also *Roberts* (1971) 56 Cr App R 95, *Mackie* (1973) 57 Cr App R 453, *DPP v Daley* [1979] 2 WLR 239 and *Hayward*, **2.6.3.4** *post*.)

In *Marjoram* [2000] Crim LR 372, D argued on appeal that for, the purposes of the question whether a reasonable person could have foreseen the victim's attempt to escape as a possible consequence of D's assault, the reasonable person should be the same age and sex as the defendant. In this case D was aged 16. The Court of Appeal ruled that as the issue concerned the effect of the defendant's conduct on the victim's mind, the test had to be objective to avoid the absurdity where there were two defendants of one being held not to have caused the injury because he had not foreseen the victim's flight, and the other being held to have caused it because he had foreseen the victim's flight.

### 2.6.3.4  The accused must take his victim as he finds him

**The accused cannot complain if his victim is particularly susceptible to physical injury** as where, for example, he suffers from brittle bones or haemophilia; if death ensues from an injury which would not have been fatal in a person of sound health it will still be attributable to the accused. In *Martin* (1832) 5 C & P 128 Parke J stated (at p. 130):

> It is said that the deceased was in a bad state of health; but that is perfectly immaterial, as, if the prisoner was so unfortunate as to accelerate her death, he must answer for it.

The accused will be liable, even though he does not physically assault the victim, if he so frightens the victim that a pre-existing condition is exacerbated resulting in death.

> In *Hayward* (1908) 21 Cox CC 692, D, who was in a state of violent excitement, was heard to express his intention of 'giving his wife something' when she returned home. When she did so an argument ensued and D chased her from the house using violent threats. She collapsed in the road and died. Medical evidence was given that she was suffering from an abnormal condition such that any combination of fright or strong emotion and physical exertion might cause death. Ridley J directed the jury that no proof of actual physical violence was necessary, but that death from fright alone, caused by an illegal act, such as threats or violence, would be sufficient (cf. *Watson* [1989] 2 All ER 865).

The principle that the accused must take his victim as he finds him is not limited to consequences flowing from pre-existing medical or physiological conditions; it has been extended to cover the victim's mental condition or religious beliefs.

In *Blaue* [1975] 1 WLR 1411, D stabbed a girl, the wound penetrating a lung. At hospital she was told that a blood transfusion and surgery were necessary to save her life. She died after refusing a blood transfusion as it was contrary to her beliefs as a Jehovah's Witness. Medical evidence indicated that she would not have died if she had accepted the transfusion. On appeal from his conviction for manslaughter, D argued that the deceased's refusal of a transfusion was unreasonable and broke the chain of causation. The Court of Appeal rejected this argument in categorical terms. Lawton LJ stated (at p. 1415):

> It has long been the policy of the law that those who use violence on other people must take their victims as they find them. This in our judgment means the whole man, not just the physical man. It does not lie in the mouth of the assailant to say that the victim's religious beliefs which inhibited him from accepting certain kinds of treatment were unreasonable. The question for decision is what caused her death. The answer is the stab wound. The fact that the victim refused to stop this end coming about did not break the causal connection between the act and death.

It has been argued that had the Court of Appeal adopted the 'reasonable foresight' test used in the 'flight' cases above there would have been no need for a value judgment to be made on the reasonableness of the victim's religious beliefs; the only issue would be whether such refusal of treatment was reasonably foreseeable. This is the position in the law of tort. Lawton LJ distinguished between crime and tort stating that 'the criminal law is concerned with the maintenance of law and order and the protection of the public generally'. Glanville Williams, in a casenote (1976) *Cambridge Law Journal* 15, observes that this argument ignores the fact that Blaue was in any event punishable severely for wounding with intent. The need to protect the public could be reflected in the sentence for such an offence just as much as in the sentence for manslaughter. In such a circumstance the label under which punishment is imposed would appear to be purely symbolic. Symbolism, however, may sometimes serve a purpose. Had the victim been unable to obtain medical assistance it would have been unarguable that the wound caused her death. Why should Blaue be allowed to avoid a conviction for manslaughter because of his victim's choice not to accept medical treatment? The victim's omission did nothing to interrupt the chain of causation flowing from Blaue's initiating act.

Where V commits suicide following D's attack on him, this will break the chain of causation if it is done for a reason other than the attack on him. In *Dear* [1996] Crim LR 595, the Court of Appeal accepted that if V had reopened wounds inflicted on him by D because of shame over an alleged sexual assault by V on D's daughter (which was the background to D's attack on him) rather than because of the fact of the attack (which was serious and had disfigured him), this would break the chain of causation. As the evidence to this effect was described as 'tenuous' and had been put before the jury with an adequate direction, the Court saw no grounds for overturning D's conviction for murder. The Court emphasised that death resulted from bleeding from an artery which D had severed and thus, whether or not V had reopened the wound, D's 'conduct made an operative and significant contribution to the death'. The Court, however, did not address the question whether, if the victim commits suicide because of an attack by D, it must be proved that such

suicide was a reasonably foreseeable consequence of D's acts before causation can be established. In *R v D* [2006] EWCA 1139, [2006] Crim LR 923, the Court of Appeal, in quashing a conviction for manslaughter, *obiter* left open the possibility of such a conviction where it was triggered by a physical assault which represented the culmination of a course of abusive conduct, and the final assault played a significant part in causing the victim to commit suicide where the victim was someone with a fragile and vulnerable personality. The Court of Appeal left many questions unanswered in this case. The physical assault had not left any wound which could constitute an operating cause at the time of death. It is suggested, by analogy with the *Roberts* line of cases (**2.6.3.3.2** *ante*) that reasonable foreseeability should be a requirement if suicide is not to be regarded as breaking the chain of causation. It is also not clear what the position would be if the victim of an offence commits suicide due to the distress caused by an offence (for example a rape, indecent assault, or continuous harassment) and there is no wound caused by D operating at the time of death. Such offences might just cross the threshold of dangerousness for the purposes of constructive manslaughter but whether there is causation is another matter. In the absence of any operating and substantial physical cause of death flowing from D's acts, it would seem that death in such cases flows rather from V's acts. There is a difference between physical weaknesses which make a victim more vulnerable to, or beliefs which inhibit the victim from seeking medical treatment for, injuries inflicted by D and emotional factors which prompt V to do positive acts to himself or herself which become the operating and substantial cause of death.

### 2.6.3.5 Intervening events and acts

Between the initial act or omission of the accused which sets in motion the train of events which result in the prohibited consequence occurring, other events or acts may intervene. The question will arise whether such an event or act amounts to a *novus actus interveniens*, that is a new act which intervenes to break the chain of causation. **The general principle is that an intervention by a third party will constitute a *novus actus* where it is 'free, deliberate and informed'** (*Pagett* (1983) 76 Cr App R 279, 288, per Sir Robert Goff LJ, quoting Hart and Honore, *Causation in the Law*; see also *Latif* [1996] 1 WLR 104, 115, *per* Lord Steyn). A natural event will do so where it is not reasonably foreseeable. There are several situations in which it may be argued that the chain of causation has been broken.

#### 2.6.3.5.1 *Medical treatment*

 **Question**

Where the accused inflicts an injury upon his victim which requires medical treatment, is he to be held liable if that treatment is improper or negligent? While it may be foreseeable that a person who is injured will require medical treatment, is it foreseeable that he might receive improper or negligent treatment?

In *Jordan* (1956) 40 Cr App R 152, D stabbed V who was taken to hospital and the wound was stitched. Eight days later V died. D was convicted of murder. On appeal fresh evidence was called which disclosed that at the time of death the wound was healed but D had died as a result of 1) a Terramycin injection to prevent infection,

administered after V had shown intolerance to a previous injection, and 2) the intravenous introduction of large quantities of liquid which had caused V's lungs to become waterlogged. The treatment was described as 'palpably wrong' and the Court of Appeal quashed the conviction as, if the jury had heard this evidence, they 'would have felt precluded from saying that they were satisfied that death was caused by the stab wound'. The problem with the judgment is that no clear principle was stated for determining when the chain of causation might be broken by medical treatment. Hallett J stated (at p. 157):

> We are disposed to accept it as the law that death resulting from any normal treatment employed to deal with a felonious injury may be regarded as caused by the felonious injury but we do not think it necessary . . . to formulate . . . the correct test which ought to be laid down with regard to what is necessary to be proved in order to establish causal connection between the death and the felonious injury. It is sufficient to point out here that this was not normal treatment.

Treatment which is 'not normal', however, is not necessarily 'palpably wrong'.

In *Smith* [1959] 2 QB 35, D, a soldier, stabbed V twice with a bayonet in a barrack room fight. Another soldier carrying V to the medical reception station twice dropped him. The medical staff were under pressure as others had been injured in the fight. They did not realise that one of V's wounds had pierced a lung and caused a haemorrhage and gave V treatment which, in light of this information, was described at D's trial as 'thoroughly bad and might well have affected his chances of recovery'. V died and D was convicted of murder. On appeal D's counsel sought to argue that the treatment he received was abnormal and that, if the treatment impeded the chance of V recovering, the death did not result from the wound. The appeal was dismissed, Lord Parker CJ stating (at pp. 42, 43):

> if at the time of death the original wound is still an operating cause and a substantial cause, then the death can properly be said to be the result of the wound, albeit that some other cause of death is also operating. Only if it can be said that the original wounding is merely the setting in which another cause operates can it be said that the death did not result from the wound. Putting it in another way, only if the second cause is so overwhelming as to make the original wound merely part of the history can it be said that the death does not flow from the wound.

Where the medical treatment is negligent but the wound is still operating, it would seem that both the perpetrator of the wound and the doctor treating it could be said to have caused the death. In such a situation, however, there would be little likelihood of a prosecution for manslaughter being brought against the doctor. Where, however, the wound has healed and negligent treatment independently causes death a prosecution of the doctor may ensue.

It is arguable that had the jury been in full possession of the facts in *Jordan* they legitimately could have found that the wound was simply the setting in which the palpably wrong treatment operated to cause death. An analogous example might be where a doctor administers a drug to V mistaking him for another patient and V dies as a result.

In *Cheshire* [1991] 3 All ER 670, **the Court of Appeal shifted the point of focus away from the question whether the original wound was still an operating cause at the time of death to whether death was attributable to the *acts* of the accused**.

> D had shot V in the leg and abdomen. Respiratory problems had ensued necessitating a tracheotomy. V suffered further respiratory problems and infections culminating in his death two months after the shooting due to cardio-respiratory arrest. This occurred because V's windpipe had become obstructed due to narrowing where the tracheotomy had been performed, a rare but not unknown complication. The medical staff failed to diagnose and treat this problem. Although the gunshot wounds were healed at the time of death, the Court of Appeal upheld D's conviction of murder on the basis that the respiratory complications were a direct consequence of D's *acts* which, despite medical negligence, remained a significant cause of V's death.

This is undoubtedly correct as the failure of diagnosis did not cause V to die but simply hindered measures being taken which might have kept him alive. There are similarities with *Smith* who also suffered the misfortune of misdiagnosis. The Court of Appeal was of opinion that only in the most extraordinary and unusual case would medical treatment break the chain of causation as 'treatment which falls short of the standard expected of the competent medical practitioner is unfortunately only too frequent in human experience for it to be considered abnormal in the sense of extraordinary' (*per* Beldam LJ, at p. 675). By 'extraordinary' it appears his Lordship meant 'unforeseeable'. His Lordship went on to suggest the terms in which a jury should be directed where they have to consider whether negligent medical treatment, rather than the injuries inflicted by D, were the cause of V's death (at p. 677):

> [I]t is sufficient for the judge to tell the jury that they must be satisfied that the Crown have proved that the acts of the accused caused the death of the deceased, adding that the accused's acts need not be the sole cause or even the main cause of death, it being sufficient that his acts contributed significantly to that result. Even though negligence in the treatment of the victim was the immediate cause of his death, the jury should not regard it as excluding the responsibility of the accused unless the negligent treatment was so independent of his acts, and in itself so potent in causing death, that they regard the contribution made by his acts as insignificant.

It is submitted that only in rare cases where positive treatment is given, either in terms of surgical operation or medicinal prescription, will medical negligence supervene to become an independent cause of death rendering the accused's acts 'insignificant'. Examples might be where poison is administered in mistake for a drug, or a drug is administered in an excessive quantity resulting in an overdose, or medical staff continue to administer a drug to which V has displayed intolerance and V dies as a result, or an unnecessary operation is performed in the course of which V dies. If, however, due to misdiagnosis treatment which would have been effectual if administered is not given and V dies, the death can still be linked directly to D's original act as in *Smith* and *Cheshire*. The situation is no different from that where D refuses medical treatment (**2.6.3.5.2** *post*) or where medical treatment is not available. If there is negligence in the treatment of V, for example, a doctor operating to save his life makes a mistake and V dies during the operation, D's acts will remain a cause of death as such an eventuality is not so extraordinary

as to be unforeseeable; the operation was a direct result of D wounding V and thus was not independent of D's acts. The crucial issue is whether the accused's acts contributed significantly to the victim's death and, if they did, it matters not whether the medical treatment was incompetent or mistaken (see *Mellor* [1996] 2 Cr App R 245).

Where as a result of D's acts V is prevented from undergoing treatment for a condition from which he is suffering (in this case a duodenal ulcer) and he dies as a result of not receiving that treatment, D's acts remain the cause of V's death unless the decision not to treat the pre-existing condition was an 'extraordinary and unusual' one (see *McKechnie* (1992) 94 Cr App R 51). A problem which has arisen in recent years due to advances in medical technology is that of a victim who has suffered serious injuries whose life is sustained by a life-support machine. If the machine is switched off by the doctors treating the victim, who is responsible for the death? This issue arose in two appeals heard together by the Court of Appeal: *Malcherek and Steel* [1981] 1 WLR 690. Both appellants had caused serious injuries to their victims whose lives were sustained by life-support machines. When the doctors treating the victims concluded, after extensive tests, that they were 'brain dead', they switched off the machines, whereupon the victims ceased breathing, their hearts ceased beating and their blood ceased circulating and 'conventional death' occurred. The Court of Appeal upheld the convictions for murder, Lord Lane CJ stating (at p. 696):

> There is no evidence in the present case here that at the time of conventional death, after the life-support machinery was disconnected, the original wound or injury was other than a continuing, operating and indeed substantial cause of the death of the victim.

While it was immaterial whether the doctors' actions were also causes of death, the Court of Appeal did state *obiter* that they regarded such a suggestion by counsel for the appellants as 'bizarre'. This is undoubtedly correct as when the doctors switched off the machines they merely ceased artificially to sustain lives which had been effectively ended by the initial injuries.

*Malcherek and Steel* dealt with switching off life-support machines where the victims are already 'brain dead'. It is assumed that the same principles apply where life-supporting treatment is removed from a patient in a persistent vegetative state (see *Airedale NHS Trust v Bland*, 2.5.2.2.3 *ante*). In deciding that case the House of Lords were not addressing the issue of causation, but in the course of his speech Lord Goff stated that **in discontinuing life-supporting treatment a doctor is 'simply allowing the patient to die in the sense that he [is] desisting from taking a step which might prevent his patient from dying as a result of his pre-existing condition'.** If the victim is in a persistent vegetative state as a result of the accused's act, his death after discontinuance of life-supporting treatment would also be caused by the accused's act.

### 2.6.3.5.2 *Neglect by the victim*

If the victim mistreats or neglects to treat injuries perpetrated by the accused, this will not prevent legal attribution of responsibility to the accused where death results. In *Wall* (1802) 28 State Tr 51, the governor of a colony was convicted of murder of a soldier whom he had sentenced to an illegal flogging of 800 lashes, although the soldier aggravated his condition by drinking spirits while in hospital.

MacDonald LCB directed the jury that:

> there is no apology for a man if he puts another in so dangerous and hazardous a situation by his treatment of him, that some degree of unskilfulness and mistaken treatment of himself may possibly accelerate the fatal catastrophe. One man is not at liberty to put another into such perilous circumstances as these, and to make it depend upon his own prudence, knowledge, skill or experience what may hurry on or complete that catastrophe, or on the other hand may render him service.

In *Holland* (1841) 2 Mood & R 351, D cut V severely on the finger. The wound became infected and V ignored medical advice that he should have the finger amputated or his life might be endangered. The wound caused lockjaw and V died. Maule J directed the jury that it made no difference whether the wound was instantly mortal, or whether it became so by reason of the deceased not having adopted the best mode of treatment as 'the real question is, whether in the end the wound inflicted by the prisoner was the cause of death'. The jury convicted D of murder. Medical science has advanced greatly and a refusal of treatment today in such a case might be regarded as unreasonable. The reasonableness of the victim's conduct, however, is not a relevant issue when considering causation (see *Blaue*, **2.6.3.4** *ante*). In *Dear* [1996] Crim LR 595 (**2.6.3.4** *ante*) Rose LJ stated:

> It would not, in our judgment, be helpful to juries if the law required them . . . to decide causation in a case such as the present by embarking on an analysis of whether a victim had treated himself with mere negligence or gross neglect, the latter breaking but the former not breaking the chain of causation between the defendant's wrongful act and the victim's death.

It would seem that the accused also has to accept his victim's phobias, irrationality or stupidity. These matters, however, would be pertinent when sentencing an accused convicted of manslaughter where the death could easily have been avoided had the deceased not mistreated or neglected to treat the injury but, of course, they would not be relevant on a murder conviction where the only sentence available is life imprisonment.

### 2.6.3.5.3 *Naturally occurring events*

If D renders V unconscious and leaves him lying on a beach with an incoming tide, V's drowning will be attributable to D. In such a situation, while the original injury did not, of itself, cause death, this will not avail D as the event was objectively foreseeable as likely to occur in the normal course of events. By contrast, if D renders V unconscious and leaves him in a building and thereafter the building collapses in an earthquake, V's death will not be attributable to D as V was not left in a position of obvious danger and such an event would not be expected to occur in the normal course of events.

### 2.6.3.5.4 *Intervention by a third party*

The acts of a third party may intervene to break the chain of causation as where, for example, the injured victim dies when the ambulance in which he is being taken to hospital crashes, or, while in hospital he is attacked and killed by an insane patient who has escaped from the psychiatric ward. Where the act of the third party is a reasonable act of self-defence in response to the act of the accused, or a reasonable act

done in the execution of a duty to prevent crime or arrest an offender, this will not break the chain of causation (*Pagett* (1983) 76 Cr App R 279). In *Pagett* D fired a shotgun at police officers attempting to arrest him while holding V against her will and using her body as a shield. The officers returned fire and killed V. D was convicted of manslaughter and his conviction upheld by the Court of Appeal. The same principle would apply if the police had returned fire hitting a bystander.

There are, however, two problematic cases which have arisen in this area of third party interventions. In *Environment Agency v Empress Car Co. (Abertillery)* [1999] 2 AC 22, D Co. had on its land a diesel tank which had an outlet pipe connected to it which led to a drum. The outlet pipe was controlled by a tap which was not locked. An unknown person opened the tap resulting in the contents of the tank draining into the drum, overflowing and polluting a river. D Co. was charged with causing polluting matter to enter controlled waters contrary to s. 85(1) of the Water Resources Act 1991. D Co. denied causing pollution but was convicted. The House of Lords dismissed D Co.'s appeal. Incredibly the leading judgment by Lord Hoffmann **drew no distinction between deliberate acts of third parties and interventions of nature** stating that:

> The true common sense distinction is, in my view, between acts and events which, although not necessarily foreseeable in the particular case, are in the generality a normal and familiar fact of life, and acts or events which are abnormal and extraordinary . . . There is nothing unusual about people putting unlawful substances into the sewage system and the same, regrettably, is true about ordinary vandalism. So when these things happen, one does not say: that was an extraordinary coincidence, which negatived the causal connection between the original act of accumulating the polluting substance and its escape. In the context of section 85(1), the defendant's accumulation has still caused the pollution.

There is something almost perverse about reasoning which concludes that D should be responsible for a result which he did not cause simply because the act of vandalism by which it was caused was not so extraordinary as to be unforeseeable. There is a major difference between a natural event and the action of a third party: the act of the third party is 'free, deliberate and informed'. In the instant case it was also malicious. In such a case D's liability ends up depending on the choices and actions of others rather than his own choices and actions. It is to be hoped that the *Empress* decision is confined in its ambit to pollution offences. If not it will create considerable confusion in the law relating to the liability of secondary parties where a person may be convicted for aiding or abetting another to commit an offence (see **Chapter 7**, *post*).

The second problem case is that of *Kennedy* [1999] Crim LR 65. D supplied a syringe filled with heroin to V who paid him and injected it and subsequently died. D was convicted of manslaughter. The Court of Appeal placed considerable emphasis on the fact that D's supply of the syringe amounted to encouragement to V to inject himself. A person who encourages another to commit an offence may be liable as an accessory to that offence because of the encouragement offered, not because the encouragement causes the relevant consequence—it is the principal who causes it. In the instant case, however, V, being the deceased, could not be the principal to manslaughter, only D could be that, but V's injection of himself with heroin was the immediate cause of his death (cf. *Dalby*, **9.3.3.1.2** *post*). As in the

*Empress* case D merely produced the setting in which a third party's free, deliberate and informed act intervened. D did not force, induce, or deceive V into injecting himself; his appeal should have been allowed.

In *Dias* [2001] EWCA Crim 2986, where the facts were similar to *Kennedy*, the Court of Appeal quashed the conviction of D for manslaughter as self-injection by the deceased was not unlawful and thus there was no offence which D could have encouraged. The Court, however, left unresolved whether a conviction of constructive manslaughter could have been upheld had the case been presented to the jury on the basis of unlawfully causing a noxious thing to be administered to the deceased. The Court expressed the view that the deceased's self-injection 'might well have been seen as an intervening act' which would probably have broken the chain of causation between the supply of the heroin to the deceased and his death. The Court, however, considered that this issue should have been left to the jury to determine. Unfortunately it did not enlarge on the circumstances in which self-injection would not have the effect of breaking the chain of causation. It is submitted that this should only arise where D forces V to inject himself or deceives V as to the nature of the substance in the syringe or V, by reason of his age or mental condition, is unable to understand what he is doing.

Since the decision in *Dias* the Court of Appeal has had several opportunities to clarify the uncertainties in this area. Sadly, on each occasion, it has either avoided the issue or further added to the confusion. In *Richards* [2002] EWCA Crim 3175, which was referred to the Court of Appeal by the Criminal Cases Review Commission, the Court quashed D's conviction for manslaughter following his guilty plea at trial where he had supplied a heroin-filled syringe to V who had self-injected and died. The Court followed its decision in *Dias* reasoning that self-injection, being the causative act, was not an unlawful act and thus could not found a conviction for manslaughter.

In *Rogers* [2003] EWCA 945, the Court expressed its agreement with its decision in *Dias* and with Sir John Smith's criticisms of the reasoning in *Kennedy* (see [1999] Crim LR 65) concluding that 'in so far as that reasoning was based on self-injection being an unlawful act, it was wrong'. In *Rogers*, however, the Court upheld D's conviction for manslaughter as, in this case, D had not simply supplied the heroin-filled syringe but had, in addition, applied a tourniquet to V's arm to help raise a vein into which V then self-injected the heroin. The Court came up with the novel view that it was immaterial whether or not V was committing a criminal offence as D **'was playing a part in the mechanics of the injection which caused death'**. By so doing the Court was able to conclude, almost by a conjuror's sleight of hand, that D thereby committed the *actus reus* of the offence of administering a noxious thing contrary to s. 23 of the Offences Against the Person Act 1861 by participating in the 'injection process' (see further **10.1.4** *post*). If D was the principal, then the issue of an intervening act by V could be avoided as the s. 23 offence would amount to an unlawful and dangerous act. Of course, the Court chose to ignore the fact that however much D might tighten the tourniquet, there would be no administration until V injected the syringe. As Smith and Hogan observed (*Criminal Law*, 10th edn, p. 142), **'where there are several participants in a crime the principal is the one whose act is the most immediate cause of the *actus reus*'**. The most immediate cause remains that of self-injection and that is performed by a person whose act is 'free, deliberate and informed' and thus appears, at least to ivory tower academics,

if not to Court of Appeal judges, to be an intervening act between the act of supply, or of raising a vein, and death resulting from the injection. The conjuror's trick may distract and deceive, but the reality remains unchanged.

The Court of Appeal, however, are impressed with their own magic and, indeed, sometimes appear to believe that their tricks represent the reality. Following the decisions in *Dias* and *Richards*, the Criminal Cases Review Commission referred the case of *Kennedy* back to the Court of Appeal. It appeared that the conviction could not stand following the doubts expressed in *Dias* and the quashing of a conviction in similar circumstances in *Richards*. The sleight of hand of *Rogers* did not appear to apply as Kennedy had performed no act beyond supplying the heroin-filled syringe. The Court of Appeal, however, upheld the conviction in *Kennedy* while, at the same time, expressing no doubts about the decisions in *Dias* and *Richards*. Some higher order magic was involved here! Magic, of course, is a matter of faith and not something subject to rational explanation. The Court of Appeal's second decision in *Kennedy* [2005] EWCA Crim 685, all but defies rational explanation.

The Court did declare that Lord Hoffmann's dicta in *Empress* were very much confined to their context. Thus, it appears, *Empress* does not present an authority of general application and is to be confined to its own context of a strict liability, regulatory pollution offence. When the Court of Appeal in *Finlay* [2003] EWCA Crim 3868 applied *Empress* to another heroin self-injection manslaughter case, they were engaging in **'unnecessary sophistication'**. That, however, was the end of the good news. The Court found a new spell in a dictum of Lord Steyn's in *Latif* [1996] 1 WLR 104, at 115 where he stated:

> The free, deliberate and informed intervention of a second person, who intends to exploit the situation created by the first, *but is not acting in concert with him* is held to relieve the first actor of criminal responsibility.

Prior to the latest decision in *Kennedy*, Lord Steyn's dictum had been regarded as a statement of conventional doctrine. If a person is acting in concert there is a joint enterprise and those involved are either principals or accessories. The act of the principal in bringing about the prohibited result cannot amount to an intervening act negating the liability of another party who has aided and abetted the principal in performing that act. The Court of Appeal, however, perceive 'acting in concert' to be some separate means of participation in an offence such that if it can be proved that D and V acted in concert, resulting in the s. 23 offence being committed, D could be guilty of this offence and of manslaughter (if death ensued) notwithstanding the fact that V does not commit any offence by self-injecting. In *Finlay* the Court of Appeal took *Rogers* to have been based on the concept of **joint principalship**. Buxton LJ stated at para. 14:

> *Rogers* is thus clear authority for saying that if a 'helper' is in fact a joint principal with the deceased, then he can be guilty of an offence under section 23 even though the deceased is not guilty of an offence by self-administration. That follows from the classic understanding of what is meant by joint principalship, as set out in the 10th Edition of Smith and Hogan at page 161. That work of authority says:
>
> > 'A and B are joint principals where each does an act which is a cause of the *actus reus*, eg, each stabs P who dies from the combined effect of the wounds; or A and B

together plant a bomb which goes off and kills P; but then each is liable for his own act, not because he has "participated" in the act of another, and each is liable to the extent of his own *mens rea*.'

The learned authors finish the paragraph by saying: 'there are two principals and two offences'. The test therefore is whether each of the parties has done an act which is a cause of the *actus reus* and it was that test that was applied by this court in *Rogers*. In paragraph 7 the court said this:

'. . . by applying the tourniquet, the appellant was playing a part in the mechanics of the injection which caused the death. It is therefore, as it seems to us, immaterial whether the deceased was committing a criminal offence.'

Powerful magic indeed—the magic of self-deception. Just a moment's analysis would have revealed several flaws in the reasoning. It was not immaterial to Smith and Hogan that one of the parties was not committing a criminal offence; joint principalship could only apply where (1) each party does an act which is a cause of the *actus reus*, (2) does so with the necessary *mens rea* for the offence, and (3) is liable (which in context means to conviction of a criminal offence) for his own act and not because he has participated in the act of another. In *Rogers* the Court created liability out of D's assistance in V's act of self-injection which looks remarkably like participation in the act of another. The act of V, of course, is one which V does without *mens rea* as the *mens rea* of the s. 23 offence is an intention to administer a noxious thing to another person or recklessness thereto. V, of course, is intending to administer to himself and is not acting unlawfully in doing so. Finally, joint principalship requires that each party's act be a cause of the *actus reus* of the offence. In the example of the stabbing A and B each stab P; each wound is a more than minimal cause of P's death. In the syringe cases, absent V's self-injection and there will be no administration and no death. **None of the three criteria which Smith and Hogan specified for liability as a joint principal are met.** To further emphasise this point a further quotation from Smith and Hogan immediately following the passage quoted above may have assisted the Court of Appeal:

Suppose that in the bomb case, B intends (and believes that A intends) that ample warning will be given to allow the area to be cleared, whereas A intends that no warning shall be given. The bomb goes off prematurely and kills P. A is prima facie guilty of murder, B of manslaughter. Similarly where they jointly release a gas canister which B believes to contain tear gas and A knows to contain a deadly gas. There are two principals and two offences.

This passage, and the one preceding it, must be seen in the context of a further qualifying statement made by the learned authors at p. 161 that 'where there are several participants in a crime the principal is the one whose act is the most immediate cause of the *actus reus*.' In the syringe examples there are not two offences as V commits no offence; nor is D's act the most immediate cause of the *actus reus*. The conclusion, which eluded the Court of Appeal, is that D and V cannot be joint principals. The Court of Appeal in *Kennedy* were made aware of these difficulties with the concept of joint principalship by the Criminal Cases Review Commission in their reference. Their Lordships' faith in the power of magic was not to be shaken as

they stated, with sincere conviction, at para. 42:

> If Kennedy either caused the deceased to administer the drug or was acting jointly with the deceased in administering the drug, Kennedy would be acting in concert with the deceased and there would be no breach in the chain of causation.

The criminal law, prior to this decision, did not recognise 'acting in concert' as a separate mode of participation; it talks only of principals and accessories (or secondary parties) and joint enterprises. There is no joint enterprise where one of the two participants cannot be convicted of an offence. In such a situation D may be liable to conviction as the principal if he is acting through V who is an innocent agent. Where V, however, is of the age of criminal responsibility, is not mentally incompetent, and acts voluntarily (his act being free, deliberate, and informed), he is not an innocent agent. Their Lordships clearly believe that 'acting in concert' covers both joint principalship and the situation of principal and innocent agent. But we know that V was not an innocent agent as his act was free, deliberate, and informed—he was not duped. We also know that he cannot be a joint principal. Nonetheless the Court of Appeal appear to consider that where D hands the heroin-filled syringe to V for V to self-inject, D and V are acting in concert in committing the s. 23 offence (even though V could not be convicted of this) and that that offence amounts to the unlawful and dangerous act which provides the basis for a conviction of D of manslaughter. **To talk of D and V being jointly engaged in administering the heroin where it is V who administers it, is both linguistically and legally inaccurate. To describe D's and V's actions as a ' "combined operation" for which they are jointly responsible' is similarly so. To suggest that it is really a question of fact for juries to determine whether or not D and V were acting in concert, neither cures nor excuses this error.**

Joint responsibility refers to two or more actors being jointly liable to conviction in respect of the commission by them of an offence. In *Kennedy* (and all the other cases) V is not, and cannot be, liable to conviction for the s. 23 offence. He may be guilty of possession of a Class A drug; but the offence of possession is not causative of his death. No matter how much the Court of Appeal may incant new spells, it cannot change that reality. Unfortunately, the Court of Appeal believes it has changed the reality; unless the House of Lords has opportunity to intervene, the sad prospect for others in Mr Kennedy's position is that this version of reality will result in their conviction of offences which they have not caused. The final word on this should go to Professor Glanville Williams, *Textbook of Criminal Law* (2nd edn) 1983, p. 392:

> The *novus actus* rule is of fundamental importance at common law, because it underlies the doctrine of accessoryship. If D2 incites D1 to kill V, and D1 complies, D2 has prompted (in ordinary speech, caused) D1 to perpetrate the crime, and is himself an accessory to the crime, but he has not in law caused V's death. Fletcher states the principle as follows:
>
> > 'Aiding the crime of a responsible, self-actuating perpetrator does not "cause", "control" or "determine" the latter's conduct.
> >    The accessory contributes to the crime, but the execution is not his doing.'
> > [*Rethinking Criminal Law* (Boston 1978), 582]

As we have seen, there are certain important differences between the liability of the accessory and that of the perpetrator. If it were not for the *novus actus* rule the successful

inciter would be liable as a perpetrator, which would require the law of complicity to be rewritten.

The point just made also shows that the *novus actus* principle is distinct from the requirement of reasonable foreseeability. If D2 pays an assassin D1 to kill V, of course he foresees that D1 will do the killing, so that the requirement of foreseeability is satisfied; but still D2 is not a perpetrator of the crime.

The true reality now is that the Court of Appeal's sleight of hand, used to uphold the conviction of Mr Kennedy for manslaughter, while appearing to resolve some problems relating to causation leaves the law on complicity in a state of utter confusion. Nice trick!

## 2.7    Coincidence of *actus reus* and *mens rea*

**Where an offence requires *mens rea* the prosecution must prove that the accused had *mens rea* at the time he did the act which caused the *actus reus*** (*Jakeman* (1982) 76 Cr App R 223). In this case D had booked two cases containing cannabis on a flight from Accra to Rome and from there to London. The flight was diverted from Rome to Paris. D had repented of her intention to import the cannabis into England and did not claim her cases in Paris. Officials in Paris, however, sent the cases to London where the cannabis was discovered. D was charged with being knowingly concerned in the importation of cannabis. The court rejected her defence that she had repented of her criminal intent at the time the cannabis entered England. They stated that what mattered was her 'state of mind at the time the relevant acts are done'. In this case the relevant act was booking her luggage to London, at which time she intended it to arrive in London, and it was immaterial that innocent agents at a Paris airport subsequently became instrumental in it being sent to London.

**Where an *actus reus* may be brought about by a continuing act, it is sufficient that the accused had *mens rea* during its continuance albeit that he did not have *mens rea* at its inception** (*Fagan* v *Metropolitan Police Commissioner* [1969] 1 QB 439). In *Fagan* D accidentally drove his car onto a policeman's foot. The officer asked him to move but he delayed doing so. D was convicted of assaulting the constable in the execution of his duty. It was clear that at the time of driving on to the officer's foot D did not have the necessary *mens rea* for the offence. The Divisional Court, however, held that the assault involved a battery (unlawful application of force to another person) and that this battery continued after the car came to rest, and thus there was a continuing act of assault for which D had the necessary *mens rea* at some time during its continuance. The court also stated that **if an act is complete, even though results continue to flow from it, the subsequent inception of *mens rea* cannot convert it into an offence**. For example, if D accidentally runs over V in his car and V sustains injuries from which he dies some time later, D's desire that V die, formed after the accident, will not convert V's death into murder. The act which caused death was complete prior to the formation of D's desire, even though the results of the act continued to flow up to the point of V's death.

If the facts of *Fagan* were to recur the accused could now be convicted under the 'duty' principle in *Miller* (**2.5.2.2.4** *ante*). The 'continuing act' principle remained

relevant in some circumstances. In *Kaitamaki* [1985] AC 147 (see further *Cooper and Schaub* [1994] Crim LR 531), the Privy Council affirmed the decision of the New Zealand Court of Appeal that, for the purposes of rape, sexual intercourse is a continuing act. Thus, if D penetrated V with consent (or believing he had consent), and then declined to withdraw on consent being revoked (or on realising that V did not consent), he was guilty of rape as he had formed the *mens rea* for the offence during the continuance of the *actus reus*. The Sexual Offences Act 2003 has affirmed this approach providing in s. 79(2): 'Penetration is a continuing act from entry to withdrawal'.

The cases examined so far have involved one act to which *mens rea* may be linked. In several cases the problem has arisen of a consequence ensuing from a combination of several acts but *mens rea* did not exist for the commission of each act. Is it sufficient that the accused had *mens rea* at some stage during the course of events?

In *Thabo Meli* [1954] 1 WLR 228, the appellants struck V over the head with intent to kill him. V's body was rolled over a cliff to make his death appear to be an accident. In fact V died from exposure and not from the initial blow to the head. The appellants had *mens rea* when they struck V, but V died from the act of disposal when they did not have *mens rea* as they believed they were disposing of a corpse. The appellants were undoubtedly guilty of attempted murder but the Privy Council upheld the convictions for murder because, as they stated (at p. 230) it was:

impossible to divide up what was really one series of acts in this way. There is no doubt that the accused set out to do all these acts in order to achieve their plan and as parts of their plan; and it is too refined a ground of judgment to say that, because they were under a misapprehension at one stage and thought that their guilty purpose had been achieved before in fact it was achieved, therefore they are to escape the penalties of the law.

In framing the decision in this way the Privy Council appear to have delivered a policy decision as there was no *mens rea* when the act immediately causing the death was performed. The fact that all the acts were performed in pursuance of an antecedent plan, and death ensued from the execution of that plan, appeared to be crucial to the decision of the Privy Council. In *Church* [1966] 1 QB 59, the Court of Appeal extended the *Thabo Meli* 'series of acts' doctrine to a case of manslaughter where there was no antecedent plan. In the course of a fight with V, D struck and attempted to strangle her. She fell unconscious and D, believing her to be dead, threw her into a river where she drowned. The Court of Criminal Appeal were of opinion that it was sufficient for a conviction if the conduct constituted 'a series of acts which culminated in her death'. The Court stated *obiter* that the jury could have convicted of murder 'if they regarded the appellant's behaviour from the moment he first struck her to the moment when he threw her into the river as a series of acts designed to cause death or grievous bodily harm'. As the act of disposal is for the purpose of disposing of a body, it being the accused's belief that death had occurred already, it is difficult to see how the series of acts could be described as being 'designed to cause death'. The act which caused death was designed to dispose of a corpse! The principle the Court was endeavouring to state has been clarified by another case.

In *Le Brun* [1991] 4 All ER 673, there was neither an antecedent plan nor did D believe that he was dealing with a corpse as he attempted to drag the unconscious body of his wife away from the place where he had assaulted her following an argument in the course of which she had refused to go home. In moving his wife she slipped from his grasp and hit her head on the pavement causing a fractured skull from which she died. D was convicted of manslaughter following a direction to the jury by the trial judge that they could convict of murder or manslaughter, depending on the intention with which the original blow was struck, if D had 'accidentally dropped the victim causing her death whilst either: (a) attempting to move her to her home against her wishes . . ., and/or (b) attempting to dispose of her body or otherwise cover up the previous assault'. The Court of Appeal upheld D's conviction of manslaughter applying *Church*, Lord Lane CJ stated (at pp. 678, 679):

> It seems to us that where the unlawful application of force and the eventual act causing death are parts of the same sequence of events, the same transaction, the fact that there is an appreciable interval of time between the two does not serve to exonerate the defendant from liability. That is certainly so where the appellant's subsequent actions which caused death, after the initial unlawful blow, are designed to conceal his commission of the original unlawful assault . . . In short, in circumstances such as the present, . . . the act which causes death and the necessary mental state to constitute manslaughter need not coincide in point of time.

Accordingly, the '**transaction**' **principle** applies not only where D is disposing of what he believes to be a corpse but also when he is attempting to move V to a place contrary to her will or where D is attempting to cover up his original crime. The Court of Appeal did not expressly declare that the 'transaction' principle is equally applicable to murder, but presumably it is.

An alternative approach to this problem is to express it as an issue of causation. If, for example, D by an assault (for which he has *mens rea*) renders V unconscious leaving him on a beach with an incoming tide and V drowns, D will be guilty at least of manslaughter as V's death was reasonably foreseeable. Why should it make any difference if D, believing V to be dead as a result of his assault on him, throws V into the water where he drowns? It is equally foreseeable by the reasonable person that V might not be dead and thus may die from drowning. D's second culpable act cannot be regarded as a *novus actus interveniens* as it is all part of the same transaction or series of acts (see Smith and Hogan, *Criminal Law* (9th edn) at p. 341). The Court of Appeal in *Le Brun* accepted that the problem could also be expressed as one of causation. However, the Court continued to focus on the later act which immediately caused death rather than regarding the original act, which was done with *mens rea*, as a cause of death. If the original act, performed with *mens rea*, is seen as a cause of death, with everything subsequent being regarded as an unbroken chain of causation, there is no problem of a lack of coincidence between *actus reus* and *mens rea*; there is no need to rely on a 'transaction principle'. **It is arguable that the transaction principle has arisen because the courts have failed to recognise that the** *actus reus* **of an offence comprises conduct, circumstances, and consequences.** They have treated the act which immediately led to death as the *actus reus* when it could equally be seen as the consequence flowing from the original conduct. In the South African case of *S v Masilela* 1968 (2) SA 558, Ogilvie Thompson JA came closest to this position when he described the accused's earlier acts of

strangulation as 'a direct and contributory cause' of the victim's later death which resulted from carbon monoxide poisoning when the accused set fire to his house believing him to be dead; had the victim not been unconscious he could have escaped from the house.

In *Thabo Meli*, *Church* and *Le Brun* it was clear that death ensued from the second act. Where it is not possible to determine which of the two acts caused death, the accused may be convicted only if the prosecution prove that he acted with *mens rea* on both occasions (*A-G's Reference (No. 4 of 1980)* [1981] 1 WLR 705). The facts of the *A-G's Reference* were that D had slapped V on the face causing her to fall down a flight of stairs and bang her head. D dragged her upstairs by a rope tied around her neck, placed her in the bath and drained off her blood before cutting up her body and disposing of the pieces. It was impossible to determine the cause of death. The Court of Appeal held that it is not necessary to prove which act caused death but the jury could only convict of manslaughter if they were satisfied *both* (i) that the fall downstairs was the result of an intentional act by the accused which was unlawful and dangerous (i.e. 'unlawful act' manslaughter), and (ii) that the act of cutting the victim's throat was an act of gross criminal negligence (i.e. gross negligence manslaughter). The same principle would apply on a charge of murder provided the accused had the requisite *mens rea* when he performed each act. For example, D hits V over the head intending to kill him but believing that V is not dead he slits his throat to complete the job before disposing of the body in an incinerator. In this example D has the necessary *mens rea* for murder when he hits V and when he slits his throat. The problem, however, with the principle in *A-G's Reference* is that it is too favourable to the accused as the jury must acquit if they are not satisfied that each act was performed with *mens rea*. It is submitted that if it is proved that the accused had the relevant *mens rea* when he performed the first act, he should be guilty of homicide as either this act caused death and thus there is no problem or, if the second act caused death, a conviction can be supported on the basis of the transaction principle or on the basis of causation, as the first act was a contributory cause of death.

## FURTHER READING

L. Alexander, 'Criminal Liability for Omissions: an Inventory of Issues', in Shute and Simester (eds.), *Criminal Law Theory: Doctrines of the General Part* (2002).

H. Gross, 'A Note on Omissions' (1984) 4 LS 308.

B. Hogan, 'Omissions and the Duty Myth', in *Criminal Law: Essays in Honour of J. C. Smith* (1986, ed. P. Smith).

A. C. E. Lynch, 'The Mental Element in the *Actus Reus*' (1982) 98 LQR 109.

A. Norrie, 'A Critique of Criminal Causation' (1991) 54 MLR 685.

D. Ormerod and R. Forston, 'Drug Suppliers as Manslaughterers (Again)' [2005] Crim LR 819.

J. C. Smith, 'Liability for Omissions in the Criminal Law' (1984) 4 LS 88.

J. E. Stannard, 'Medical Treatment and the Chain of Causation' (1993) 57 JCL 88.

G. Williams, 'Criminal Omissions—the Conventional View' (1991) 107 LQR 86.

## Milford Police Department
## PUBLIC RECORDS REQUEST FORM

Police records are released in accordance with the Connecticut Freedom of Information Act. The fee for copies is $.50 per page. Prepayment is required for fees estimated to be ten dollars or more.

Requester's Name _Theodora Antar_ Today's Date _10·26·23_

Contact phone number _203·273·8419_ Email address _theodoraantar@gmail.com_

☐ I would like a copy of a **motor vehicle accident** ☑ I would like a copy of an **incident report** ☐ Other*

Case or incident number(s): _Incident of 10/18/23 that you posted_
(for example 2021-001234, 1234-21, 21-1234, 2021-01-2345) _on the internet._

If you do not know the case number, please provide additional information below that will assist us in locating the correct report:

Names of involved parties (include date(s) of birth, if possible) or vehicle information (plates, make, model, etc.):
_Theodora Antar 9-7-91_
_Lodice 5·11·83    Lodice 5·21·19_

Approximate date and time of car accident or incident: _11:30 AM, preferred pediatrics_

List the location in Milford where this occurred: _88 Noble Ave 06460_

*☐ I am not looking for a motor vehicle accident or incident report. I am looking to obtain the following:

Reason _My legal right under FOIA_
(Not required, however it assists us in gathering all the records requested.)

---

When Records is closed, this completed form can be:

- Emailed to Records@MilfordCT.gov **or**
- Dropped off at the Patrol Division window for proper dissemination, or
- Mailed to Records Division, Milford Police Department, 430 Boston Post Road, Milford, CT 06460

*Requests are processed in the order in which they are received and will be assigned to the next available member of our staff. If you have questions, please contact the Records Division at (203) 874-4615.*

**AF̲PLICATION**
**FOR̲ ISSUANCE OF SUBPOENA**
JD̲-CL-136  Rev. 1-17
P.B. § 7-19; C.G.S. § 52-161b

STATE OF CONNECTICUT
**SUPERIOR COURT**
**JUDICIAL BRANCH**
www.jud.ct.gov



**Note to Applicant:**
If you submit this application and it is denied in whole or in part, you may submit a *Request for Hearing on Denied Application for Issuance of Subpoena* (form JD-CL-137).

**Instructions to Clerk:**
*If a self-represented applicant in any Civil, Family, Family Support Magistrate or Housing case has been convicted of a family violence crime or of any of the other statutes listed in the Application section and is seeking to subpoena the victim of such crime, schedule a hearing and give the applicant notice of the date, time and location of the hearing. Do not schedule such hearings for Criminal matters.*

| | | |
|---|---|---|
| *COURT USE ONLY* | | |
| AISBPPP | | |

| Judicial District [X] | Housing Session [ ] | Geographical Area [ ] | At 14 West River Street, Milford, CT, 06706 |
|---|---|---|---|
| Docket Number A22M-CR23-0124387-S | | Name of Case State of Connecticut v. Theodora Antar | |

| Type of Court Case | | | | | |
|---|---|---|---|---|---|
| [ ] Civil | [ ] Housing | [ ] Family | [ ] Family Support Magistrate | [X] Criminal/Motor Vehicle | |

## Application

I am a self-represented party in the case named above and I want to require the person or people listed below to testify in this case. I think that the testimony is necessary and ask that the judge or family support magistrate in this case review this application without notice to the other parties in this case. If this case has not been assigned to a specific judge or family support magistrate, I ask that the administrative judge or any judge or family support magistrate designated by the administrative judge review my application without notice to the other parties in this case. If the judge or family support magistrate decides that the subpoena(s) should be issued, I ask the judge or family support magistrate to cause the clerk of the court issue the subpoena(s).

I understand that I have to give any subpoena issued to a state marshal (an individual authorized to serve the person(s) being subpoenaed) or other authorized person and I must pay the state marshal or other authorized person a fee for serving the subpoena(s) unless the court determines that I am financially unable to pay for such expenses.

***To Applicant:*** **(Answer the questions below unless the case that you want to subpoena a witness for is a criminal case in which you are the defendant. If you are the defendant in a criminal case, skip to the next section.)**

*State whether you have been convicted of a family violence crime (C.G.S. § 46b-38a), risk of injury to children (C.G.S. § 53-21), sexual assault (C.G.S. §§ 53a-70, 53a-70a, 53a-70b, 53a-71, 53a-72a, 53a-72b or 53a-73a), or stalking (C.G.S. §§ 53a-181c, 53a-181d or 53a-181e.)*  [ ] Yes  [X] No

*If yes, are you asking to subpoena the victim of your crime?*  [ ] Yes  [X] No

### Name(s) and Address(es) of Person or People I am Asking to Subpoena

| 1. | Name of person Matthew Lodice | Address *(Number, street, and town)* 48 Quarry Hill Rd, Waterbury, CT, 06706 |
|---|---|---|

I believe testimony from this person is necessary because: *(Fill in this box)*

**He is the protected party of the order of protection that is being challenged. He has demanded, on numerous occasions, that I go to his home, speak to him directly on the phone, and other terms of the protective order. His testimony is crucial in this matter.**

I believe that the person will testify that (state what you believe the person will say in court):

**He will testify that there is no necessity for a full no-contact protective order to be protecting him, a 40 year old man with 2 registered firearms, from me, a female who is half his size that is no threat to him in any way.**

I want this person ordered to bring the following item(s) to Court:

**All messages from OurFamilyWizard and any and all other communications between him and myself from 1/30/23 through present**

| 2. | Name of person Diamanto Antonellis | Address *(Number, street, and town)* 21 Burma Road, Woodbridge, CT, 06525 |
|---|---|---|

I believe testimony from this person is necessary because *(Fill in this box)*

**She has witnessed the way that Matthew Lodice has exploited the protective orders in an effort to isolate me from my minor child A.L. and using it as an abuse tactic.**

I believe that the person will testify that (state what you believe the person will say in court):

**She will testify that she witnessed abusive behavior of Matthew Lodice and that it is harmful for the protective order to remain in place.**

I want this person ordered to bring the following item(s) to Court

**All messages from OurFamilyWizard and any and all other communications between her, Matthew, and myself from 1/30/23 through present**

*(Continued on next page)*

## Type of Proceeding(s) I am Requesting Subpoena(s) For *("X" appropriate box)*

| | | |
|---|---|---|
| **X** | Trial/hearing scheduled for *(Date)* 12/6/23 | Before Judge *(If known)* |
| ☐ | Pre-judgment remedy hearing scheduled for *(Date)* | |
| ☐ | Short Calendar matter scheduled for *(Date)* | Before Judge/Magistrate/Hearing Officer *(If known)* |
| ☐ | Family Support Magistrate hearing scheduled for *(Date)* | |
| ☐ | Other *(Specify)* | |

| Signed *(Self-represented Applicant)* ▶ | Print name **Theodora Antar** | Telephone Number *(Area code first)* **203-273-8419** | Date signed **11/13/23** |
|---|---|---|---|

## Order

Having conducted a review of this application pursuant to Practice Book Section 7-19, and having considered the nature of the scheduled proceeding and future opportunities for examination of witnesses, the application is:

☐ granted.

☐ denied.

Having granted the application, the clerk of this court is directed to issue the subpoena(s):

☐ As requested above.

☐ As requested above, except: _____

☐ As to the following individuals only: _____

| By the Court | Signed *(Judge or Family Support Magistrate)* | Date of Order |
|---|---|---|

JD-CL-136   Rev. 1-17

**ADA NOTICE**

The Judicial Branch of the State of Connecticut complies with the Americans with Disabilities Act (ADA). If you need a reasonable accommodation in accordance with the ADA, contact a court clerk or an ADA contact person listed at *www.jud.ct.gov/ADA.*

A22M-CR23-0124387-S     :

A22M-CR23-0191150-T     :   SUPERIOR COURT

STATE OF CONNECTICUT    :   J.D. OF ANSONIA-MILFORD

VS.             :   AT MILFORD

THEODORA ANTAR      :   FEBRUARY 22ND, 2024

## <u>DEFENDANT'S SECOND EMERGENCY EX-PARTE MOTION TO VACATE PROTECTIVE ORDER</u>

   The defendant, Theodora F. Antar, in the above-captioned matter, respectfully moves this court to vacate the protective order issued on May 17, 2023. The defendant files this as an EMERGENCY EX PARTE MOTION which is being filed for the second time in the past week and prior similar motions have been blatantly and deliberately ignored by the court in an effort to deny the plaintiff her right to due process.

   This administrative court has no jurisdiction over this case.

   The order issued on 5/17/23 is unconstitutional.

  In support of this emergency ex-parte motion, the defendant states as follows:

1. The defendant has been subjected to daily relentless harassment by the complainant, Matthew J. Lodice, since the issuance of the protective order.

2. The defendant has been subjected to Matthew J. Lodice speaking to her, yelling at her, harassing her, emotionally abusing her, and attempting to incite a response from her during phone calls, FaceTime calls, and in person, on a near daily basis.

3. The defendant has asked the complainant to cease all contact with her outside of the OurFamilyWizard application on numerous occasions, yet the complainant has stated he will not stop the harassment, and has continued to harass and have forced contact with the defendant when the defendant attempts to exercise her parental rights.

4. The complainant has engaged in over 300 recent instances of verbal harassment, as documented in recorded conversations which have been mailed to the court on 2/14/24 on a usb flash drive as evidence.

1

5. Such harassment includes yelling, berating, taunting, and psychological abuse each time the Defendant attempts to contact her minor daughter, A.L., which the complainant is court-ordered to facilitate.

6. This conduct constitutes coercion and witness tampering, causing irreparable harm to the defendant and infringing upon her constitutional rights.

7. The Defendant has no history of violent crime, abuse, neglect, and retains full parental rights.

8. The protective order unjustly restricts the Defendant's access to her minor daughter and is thus an unconstitutional infringement of her rights as affirmed by the U.S. Supreme Court in *Troxel v. Granville*.

9. The Defendant asserts that the Court is infringing upon her rights by enforcing an order that conflicts with existing contracts regarding custody/access to her minor daughter, and that the Court lacks jurisdiction to enter orders that conflict with these agreements.

10. An identical duplicative protective order in the defendant's violation of protective order docket concerning the Defendant has been terminated due to the court admitting they have no basis for it to remain in effect, further justifying the urgent need for the immediate termination of the current order.

11. The defendant has continued to suffer harm at the hands of the complainant, who has harassed the defendant without ceasing for several years, and has continued to use the criminal justice system as a weapon against the defendant.

12. The following unfinished complaint regarding criminal conduct of the complainant against the defendant serves to be incorporated into this emergency motion and to show the court that emergency relief is warrante:

13.

WHEREFORE, the Defendant respectfully requests that this Court:

a. Grant this emergency ex-parte motion to vacate the protective order issued on May 17, 2023.

b. Schedule a hearing at the earliest possible time to address this matter, as required by law.

c. Grant such other and further relief as this Court deems just and proper.

d. Issue an order that the complainant is to have no contact whatsoever with the defendant outside of the OurFamilyWizard app until the completion of a full jury trial to ensure no further witness intimidation, harassment, or tampering takes place to taint the outcome of the trial.

Respectfully submitted, The Defendant

Theodora Antar
PO Box 3554
Milford, CT, 06460
Theodoraantar@gmail.com
203-273-8419

## **CERTIFICATION**

This is to certify that on February 14TH, 2024 ., a copy of the foregoing was delivered to:

State of Connecticut

State's Attorney

14 West River Street

Milford, CT, 06460

conndcj@ct.gov

Attorney Michael Hillis

MHillis@dkh-law.com

129 Whitney Avenue

New Haven, CT, 06510

Respectfully submitted, The Defendant

_____

Theodora Antar
PO Box 3554
Milford, CT, 06460
Theodoraantar@gmail.com
203-273-8419

**DOCKET NO.: A22M-CR23-0191150-T**     :     SUPERIOR COURT

                                                  :

STATE OF CONNECTICUT             :     JUDICIAL DISTRICT OF

v.                                         :     ANSONIA/MILFORD AT

THEODORA F. ANTAR               :     MILFORD

                                                  :     **DECEMBER 22, 2023**

## <u>MOTION FOR SPEEDY TRIAL</u>

Pursuant to Connecticut General Statutes § 54-82m, the defendant, THEODORA F. ANTAR, respectfully requests her trial be commenced.

The defendant was arrested on April 30, 2023 and is not incarcerated. Defendant moves for a speedy trial within twelve months of the date of said arrest.

No similar motion has been filed or ruled upon in this case.

DEFENDANT
THEODORA F. ANTAR

By:    _/s/ Michael S. Hillis_
        **MICHAEL S. HILLIS**
        DOMBROSKI HILLIS LLC
        HER ATTORNEYS

1

## CERTIFICATION

I hereby certify that a copy of the foregoing was or will immediately be delivered in hand or via first class mail, postage prepaid to all counsel and self-represented parties of record or electronically served upon all counsel and self-represented parties of record that have given their written consent to be electronically served, on this **22nd** day of **December, 2023.**

State's Attorney
14 West River Street
Milford, Connecticut 06460
Facsimile 203-874-5233

Theodora F. Antar
In hand

By:     */s/ Michael S. Hillis*
      **MICHAEL S. HILLIS**

**DOMBROSKI HILLIS LLC**
129 Whitney Avenue, New Haven, Connecticut 06510
Phone: 203-624-9096 Facsimile: 203-624-1308 Juris Number: 409206

A22M-CR23-0124387-S
A22M-CR23-0191150-T                    :        SUPERIOR COURT
STATE OF CONNECTICUT                   :        J.D. OF ANSONIA-MILFORD
VS.                                    :        AT MILFORD
THEODORA ANTAR                         :        DECEMBER 22ND, 2023

## Motion for Clarification & Motion to Vacate Court Orders

The Defendant hereby requests the Court to clarify an order it produced on May 17th, 2023, in the above referenced Docket A22M-CR23-0191150-T and a subsequent order that it produced on October 19th, 2023 in the above referenced Docket A22M-CR23-0124387-S

The Defendant seeks clarification as both of the orders are very ambiguous and, as such, the defendant remains unclear as to what the order entails based on the language contained within it. The court has previously held that, "[t]he trial court has jurisdiction to clarify an ambiguous judgment at any time." Sosin v. Sosin, 300 Conn. 205, 218, 14 A.3d 307, 316 (2011).

Furthermore, it has also previously been noted that "[m]otions for interpretation or clarification, although not specifically described in the rules of practice, are commonly considered by trial courts and are procedurally proper." Holcombe v. Holcombe, 22 Conn. App. 363, 366, 576 A.2d 1317, 1319 (1990).

On May 17th 2023, the Court entered the following order: "You, the Respondent, must follow all the orders and conditions selected below: Surrender or transfer all firearms and ammunition, do not assault, threaten, abuse, harass, follow, interfere with, or stalk the protected person, stay away from the home of the protected person and wherever the protected person shall reside, do not contact the protected person in any manner, including by written, electronic, or telephone contact, and do not contact the protected person's home, workplace, or others with

1

whom the contact would be likely to cause annoyance or alarm to the protected person, Ms. Antar is allowed to contact the protected party, regarding visitation and affairs of their child, via Family Wizard, exchange of the minor child must be pursuant to the most recent civil family order. Ms. Antar is allowed to facilitate/initiate contact with the protected party for the purpose of contact with their child in accordance with the most recent civil family order."

The Defendant seeks for the Court to provide written clarification describing in detail what is and is not allowed based upon the terms of this ambiguous and unclear order. The language in the order is identical to language that was crafted by Judge Scott Jones in Derby, CT, on January 30, 2023 (See attached transcript) solely for the purpose of catering to the needs and wants of Matthew Lodice, who was then facing charges for harassment with the defendant as the protected party and victim in that matter.

The Orange Police Department, and officers such as officer A. Esposito, Lieutenant Anderson, and more than ten other employees of the Orange Police Department stated, on numerous occasions since 1/30/23 until the present, that the terms described above allow for contact in person, on the phone, and in any other manner as long as it is "about the child" and stated that this protective order allows me the ability to have any contact I desire with the "protected party" so long as it is on the subject of our child.

However, the Milford Police Department, and officers such as officer A. Vakos and Officer Senatore, stated that the order only allows for contact in OurFamilyWizard.

The defendant in this case attempted to ask Judge Scott Jones for clarification and was told that she needed to ask an attorney. The defendant attempted to ask her counsel for the original case for clarification and has not received any clarification that leaves the defendant in a continued state of confusion and uncertainty.

Furthermore, the defendant was told by officers at the University of Connecticut School of Law, Connecticut State Police Troop I in Bethany, Middlebury Police, and other departments that they are unable to define "interfere with" as written in the order and stated that I must seek legal advice to define said term.

The defendant, as such, needs clarification about the orders imposed upon her.

Furthermore, the "most recent civil family order" does not allow for any specific exchange schedule or any specific access schedule as that order delegates any and all judicial authority of the New Haven Superior Court directly to the "victim" in this case, which gives him the authority to dictate everything regarding "access" to the minor child A.L.

On numerous occasions, the "victim" has stated that, per the most recent order, it gives him the authority to demand that I go to his home, gives him the authority to speak to me on phone calls, Facetimes, and in person, and gives him the authority to demand that I speak to him in return.

On numerous occasions, the "victim" will repeatedly speak to me in person, on phone calls, and on FaceTime calls which are designed for me to speak to my child, yet he will continuously speak to me and demand that I respond.

The most recent order states that communication is allowed through email and text, and mentions Facetimes as well, however the orders imposed by this court contradict that by stating only in OurFamilyWizard.

Additionally, the reasoning for the language in this order are applicable to the terms that effected the "victim" on 1/30/23 and are not applicable to the defendant in this current case. Unlike the "victim", the defendant has no convictions, is not a threat, does not have any registered

firearms, and the "victim" has been relentlessly attempting to incite contact and home visits from the defendant in contrast to the terms of this order.

As such, defendant requires clarification as to what is and is not allowed, and due to the extreme unnecessary nature of the protective order and the demands of the "victim" for the defendant to visit at his home and to have contact with him, the defendant also moves this court to vacate both the order from 5/17/23 and from 10/19/23 effective immediately.

WHEREFORE, the defendant hereby prays that the court order the following:

1. A written clarification of the court's orders produced on 5/18/23 and 10/19/23
2. An order vacating the court's orders produced on 5/18/23 and 10/19/23

## CERTIFICATION

This is to certify that on December 22nd, 2023., a copy of the foregoing was delivered to:

State of Connecticut

conndcj@ct.gov

Attorney Michael Hillis

MHillis@dkh-law.com

Respectfully submitted, The Defendant

Theodora Antar
PO Box 3554
Milford, CT, 06460
Theodoraantar@gmail.com
203-273-8419

# ORDER OF PROTECTION

JD-CL-99   Rev. 10-21
C.G.S. §§ 29-28, 29-32, 29-33, 29-36i, 29-36k, 46b-15, 46b-16a,
46b-38c(d)(e), 46b-38nn, 53a-28(f), 53a-36, 53a-42, 53a-217,
53a-217c, 53a-223, 54-1k, 54-86c,
18 U.S.C. §§ 922(g)(9), 2265; P.A. 21-78 §§ 2, 6, 7

For information on ADA accommodations, contact a court clerk or go to: www.jud.ct.gov/ADA.

**STATE OF CONNECTICUT**
**SUPERIOR COURT**
www.jud.ct.gov

| Order type | Case type | Superior court location |
|---|---|---|
| Protective Order - Family Violence | Criminal | A05D Derby |

| Related court information (if applicable) | Case number |
|---|---|
| | A05DCR230190622S |

## Protected Person

| Last name | First name | Middle | Date of birth | Sex | Race |
|---|---|---|---|---|---|
| ANTAR | THEODORA | | 09 / 07 / 1991 | F | White |

| Home address | City | State | Zip |
|---|---|---|---|
| 856 Shagbark Dr | Orange | CT | 06477-1422 |

| Mailing address ☐ Same as above | City | State | Zip |
|---|---|---|---|
| 856 Shagbark Dr | Orange | CT | 06477-1422 |

| Work address | City | State | Zip |
|---|---|---|---|

## Respondent (Defendant)

### Respondent Identifiers

| Last name | First name | Middle | Date of birth | Sex | Race |
|---|---|---|---|---|---|
| LODICE | MATTHEW | J | 05 / 11 / 1983 | M | White |

| Height | Weight | Eyes | Hair | Phone |
|---|---|---|---|---|
| 5' 7" | 145 | BRO | BRO | 860-518-2388 |

| Address | Distinguishing features/other identifiers |
|---|---|
| 23 Lyman St APT 2 | |

| City | State | Zip |
|---|---|---|
| New Britain | CT | 06053-3747 |

Cautions/Weapons (if information is available):

Relationship to protected person (Present or former)
- ☐ Spouse or party to a civil union
- ☐ Protected person's parent
- ☐ Intimate cohabitant
- ☒ Parent of common child
- ☐ Other: _____

## Terms and Conditions of Protection

**You, the Respondent, must follow all the orders and conditions selected below:**

- ☒ Surrender or transfer all firearms and ammunition.
- ☒ Do not assault, threaten, abuse, harass, follow, interfere with, or stalk the protected person. (CT01)
- ☒ Stay away from the home of the protected person and wherever the protected person shall reside. (CT03)
- ☒ Do not contact the protected person in any manner, including by written, electronic or telephone contact, and do not contact the protected person's home, workplace, or others with whom the contact would be likely to cause annoyance or alarm to the protected person. (CT05)

- ☐ Other: _____

Additional terms and conditions are on the following pages:

| This order remains in effect until: | ☒ Further order of the court. | Expiration date (if applicable) / / |
|---|---|---|

- ☒ The court had jurisdiction over the parties and the subject matter, and the respondent was provided with reasonable notice and opportunity to be heard. This order shall be enforced, even without registration, by the courts of any state, the District of Columbia, any U.S. Territory, and may be enforced by Tribal Lands (18 U.S.C. § 2265). Crossing state, territorial, or tribal boundaries to violate this order may result in federal imprisonment (18 U.S.C. § 2262).

- ☒ State law provides penalties for unlawful possession of firearms, ammunition, or electronic defense weapons (General Statutes §§ 53a-217(a)(4) and 53a-217c(a)(5)). Federal law also provides penalties for possessing, transporting, shipping, or receiving any firearm or ammunition while subject to a qualifying protection order (18 U.S.C. § 922(g)(8)).

| | Signed (Judge, Assistant Clerk) | Date signed 1-30-23 |
|---|---|---|
| By the Court | | |
| Name of Judge   W Jones | | |

NOTICE: If a restraining order, protective order, or standing criminal protective order has been issued on your behalf or on behalf of your child, you may elect to give testimony or appear in a family court proceeding remotely, pursuant to 46b-15c. Notify the court in writing at least two days in advance of a proceeding if you choose to give testimony or appear remotely, and your physical presence in the courthouse will not be required in order to participate in the court proceeding. You may use the Remote Testimony Request (form JD-FM-295) to make this written request. You may use the same form with two days' advance notice to request that your testimony in any family proceeding be taken outside the presence of the respondent/subject to a restraining order, protective order, or standing criminal protective order issued on your behalf and/or a child's behalf pursuant to 46b-15c.

# ADDITIONAL ORDERS OF PROTECTION

JD-CL-100   Rev. 10-21
C.G.S. §§ 29-28, 29-32, 29-33, 29-36i, 29-36k,
46b-38c(d)(e), 46b-38nn, 53a-28(f), 53a-36,
53a-42, 53a-217, 53a-217c, 53a-223, 54-1k;
18 U.S.C. §§ 922(g)(9), 2265; P.A. 21-78 §§ 2, 6, 7

For information on ADA accommodations, contact a court clerk or go to: **www.jud.ct.gov/ADA.**

**STATE OF CONNECTICUT**
**SUPERIOR COURT**
*www.jud.ct.gov*

| This form is available in other language(s). |
|---|

| Order type | Case type | Superior court location |
|---|---|---|
| Protective Order - Family Violence | Criminal | A05D Derby |
| Related court information *(if applicable)* | | Case number |
| | | A05DCR230190622S |

## Protected Person

| Last name | First name | Middle |
|---|---|---|
| ANTAR | THEODORA | |

## Respondent *(Defendant)*

### Respondent Identifiers

| Last name | First name | Middle | Date of birth | Sex | Race |
|---|---|---|---|---|---|
| LODICE | MATTHEW | J | 05 / 11 / 1983 | M | White |

You, the Respondent, must follow all the orders and conditions selected below:

- [ ] You may return to the protected person's home one time with police to retrieve belongings. **(CT14)**
- [ ] If the protected person has moved out of the home of the respondent, the respondent shall permit the protected person to return to the respondent's home on one occasion, with police, to retrieve the protected person's belongings. **(CT15)**
- [ ] Stay 100 yards away from the protected person. **(CT16)**
- [ ] This order also protects the protected person's minor children. **(CT19)**
- [ ] This order protects animals owned or kept by the protected person. **(CT31)**
- [x] Other:

    Mr. Lodice is allowed to contact the protected party, regarding visitation and affairs of their child, via Family Wizard.
    Exchange of the minor child must be pursuant to the most recent Civil Family order.

    Mr. Lodice is allowed to text/email to confer with the protected party re the subject of visitation child in accordance with the most recent Civil Family order.

**Additional terms and conditions are on the following pages:**

JDCL100AdditionalTermsAndConditions

**NOTICE:** If a restraining order, protective order, or standing criminal protective order has been issued on your behalf or on behalf of your child, you may elect to give testimony or appear in a family court proceeding remotely, pursuant to 46b-15c. Notify the court in writing at least two days in advance of a proceeding if you choose to give testimony or appear remotely, and your physical presence in the courthouse will not be required in order to participate in the court proceeding. You may use the Remote Testimony Request (form JD-FM-295) to make this written request. You may use the same form with two days' advance notice to request that your testimony in any family proceeding be taken outside the presence of the respondent/subject to a restraining order, protective order, or standing criminal protective order issued on your behalf and/or a child's behalf pursuant to 46b-15c.

A05D-CR23-0190622-S

STATE OF CONNECTICUT

v.

MATTHEW LODICE

:   SUPERIOR COURT

:   G.A. #5

:   AT DERBY, CONNECTICUT

:   JANUARY 30, 2023


TRANSCRIPT OF PROCEEDINGS


BEFORE THE HONORABLE SCOTT M. JONES, JUDGE


<u>A P P E A R A N C E S</u> :


Representing the State:

    ATTORNEY OWEN KIVELA
    Office of the State's Attorney
    106 Elizabeth Street
    Derby, Connecticut 06418


Representing the Defendant:

    MATTHEW LODICE
    Self-Represented Party


Recorded and Transcribed By:

Jessica Reyes
Court Recording Monitor
106 Elizabeth Street
Derby, Connecticut 06418

ATTY. KIVELA:  Eight on the arraignment docket, Matthew Lodice.  This is not referrable to family services, Your Honor, and a full no contact.  Mr. Lodice has an extensive DV history.  I advised him that he might want an attorney for this.

THE DEFENDANT:  Your Honor, before you put that order in place, I do want to make it apparent that my ex, the person in this case, has filed for four restraining orders against me.  All four were denied through court.

This last one that you guys are putting on, she filed -- the same police report she filed with the police, she used to file the restraining order and the good judge threw it out and told her she wasn't credible.

THE COURT:  The good judge, huh?

THE DEFENDANT:  She -- he threw it out and he told her that she wasn't credible.  She's filed three ex parte orders.  She's called the cops 36 times on me.  And the only one who was arrested was her for filing a false report.

We have a --

THE COURT:  Does the state know any of this?

THE DEFENDANT:  We have a custody case --

THE COURT:  No?

ATTY. KIVELA:  No.

THE DEFENDANT:  -- regarding OUR daughter,

1  coming Wednesday.  And she's trying to muddy the

2  water up and trip me up before that custody case

3  comes.

4  THE COURT:  I don't know anything about this

5  case.  I haven't even read the police report.  All I

6  know is the charges that -- before the Court.  But

7  now you're causing me to want to look into that.  So,

8  is there any reports inside of the --

9  THE DEFENDANT:  And a lot of the things that I'm

10 -- that are in our court order regarding our daughter

11 get tripped up because of this protective order.

12 Like, I won't be able to follow through the Judge's

13 court order, too, because, like, I'm required to get

14 a 7:00 p.m. call -- give her a 7:00 p.m. call.  I'm

15 also required to drop her off with her mother at

16 church on Sundays.

17 THE COURT:  All right.  Just give me a second.

18 Let me just read.  I can't --

19 THE DEFENDANT:  I'm sorry, Your Honor.

20 THE COURT:  Yes.  That's a lot of information

21 coming all at once.

22 Have you -- you're representing yourself right

23 now.  Have you read the warrant?

24 THE DEFENDANT:  I have not.

25 ATTY. KIVELA:  There's -- without a pro se

26 appearance or -- does any --

27 THE COURT:  No, I mean, the -- I'm just

1   wondering how a pro se would know what the

2   allegations are, and I don't want to read this into

3   the record. But --

4        THE DEFENDANT: I mean --

5        THE COURT: Are you going to apply for -- do you

6   --

7        THE DEFENDANT: I've -- I got a copy of the

8   police report the day we went in for the restraining

9   order that she filed through court. It was the exact

10  -- the Orange Police Department police report. She

11  just photocopied it and brought it in for that.

12       So, if it's that six or seven-page whatever

13  thing that is, I have seen that. I have seen

14  everything she claims because we already went to

15  court for it.

16       THE COURT: You are entitled technically, I

17  mean, what's in the clerk's file is public

18  information. And so, perhaps the clerk can make a

19  copy of this warrant that I signed. And all I have

20  to do is find probable cause, a really low standard,

21  is there a reasonable and articulable suspicion that

22  you're committing a criminal offense.

23       THE DEFENDANT: Of course.

24       THE COURT: And to -- this case was a harassment

25  in the second degree and based on the language, I

26  don't make credibility assessments. Somebody makes

27  these allegations under oath, then I have to make a

finding, and that finding was made. But you should

probably be aware of what this says.

But based on what I see here, there is a reason

-- I mean, do you have a reason to have contact with

her?

THE DEFENDANT:  We have a daughter.

THE COURT:  I'm sorry?

THE DEFENDANT:  We have a three-year-old

daughter together.

THE COURT:  Outside of having contact with her

through the Family Wizard regarding exchange of the

child.

THE DEFENDANT:  Other than that, no.  I don't

have to.  No.

THE COURT:  So, this protective order

essentially is going to say --

THE DEFENDANT:  Well, I do have to see her to

drop off my daughter at church on Sundays, and I'm

court ordered to do that.  Otherwise, I'm in

violation --

THE COURT:  You're court ordered out of family

court?  So then --

THE DEFENDANT:  Out of family court out of New

Haven.

THE COURT:  So, then we want to make sure that

this order is compliant with -- I need to speak with

family relations just to make sure that --

THE DEFENDANT: That's fine. I -- look, I don't want to talk to her at all. I don't need to talk to her --

THE COURT: Just hear me out.

THE DEFENDANT: Okay.

THE COURT: You're not hearing me out. I just want to make sure that this order that I'm going to enter --

THE DEFENDANT: Okay.

THE COURT: -- that's going to tell you, you can't assault, threaten, abuse, harass, follow, interfere -- all that stuff --

THE COURT: -- which you're not going to have a problem with because you don't want to talk to her anyway.

But that it allows contact that is permitted in family court. So, it parallels. You have two parallel orders.

THE DEFENDANT: Okay.

THE COURT: That's the only thing.

State have any input?

Right now, it just says you're allowed to contact the protected party regarding their child through the Family Wizard only and that might need to be tweaked. And exchange of child through a third-party. So, could the church exchange -- occur through a third-party?

THE DEFENDANT: It's not a church. She wants me to find someone to bring her there and I don't have anyone to bring her there. That's the issue. She's basically -- she's trying to make it so I can't keep my end of, like, our agreement. So, this way, when we go to court, I have contempt motions against me.

So, I'm trying to avoid getting contempt motions against me. So, like, I'm court ordered to bring her to her mother's church in Orange, I live in New Britain, every Sunday.

THE COURT: So, can you do that?

THE DEFENDANT: I do that. I -- currently, yes.

THE COURT: And who do you drop the child off with?

THE DEFENDANT: With her. With her or her mother. See, the problem is she's there sometimes, she not there sometimes. So, if she's there, I'm going to be in violation.

And I know, the second she sees me there, she's going to call the cops. She's going to do anything she could to trip me up. So, I'm -- I want to avoid that as best as possible.

THE COURT: I can't -- either I have to get off the bench and call down to family relations or maybe somebody from the state can call down to family relations --

ATTY. KIVELA: Yes, Your Honor.

THE COURT: -- to tease these things out.

Because we can't enter -- we could enter an order that's inconsistent with the family -- but then it's going to -- as he's saying --

ATTY. KIVELA: Certainly, Your Honor. We just weren't aware of any of this information. So --

THE COURT: Oh, me either -- neither. So, I'm going to pass, so that maybe we can modify the protective order language that won't contradict a family court order.

THE DEFENDANT: Okay.

THE COURT: All right?

THE DEFENDANT: Thank you, Your Honor.

THE COURT: All right. But I'm going to enter the protective order.

THE DEFENDANT: Do you need me to produce a copy of the court orders? I have them probably stored in my phone. I can print it for you, if that would help.

THE COURT: I mean, what might be helpful is if that is shared with family relations, so that they could actually see it.

ATTY. KIVELA: Yes. If we're trying to mirror --

THE COURT: Yes. We're trying to mirror --

ATTY. KIVELA: -- exactly what they're doing in family court, I think that would be helpful. So --

1   THE COURT: So, family relations, who drafts

2   these, and then just come upstairs and there's a

3   request to enter this order. But this order might be

4   --

5   THE DEFENDANT: Yeah. They didn't ask me any

6   questions about that at all. They just said, this is

7   what's happening, here you go, go upstairs.

8   THE COURT: So then, I guess, is somebody going

9   to talk to --

10   ATTY. KIVELA: I'll call down to family

11   services. Of course, Your Honor. I -- he would just

12   need to share this information with them and that --

13   THE COURT: Yes. Make sure you share it again.

14   THE DEFENDANT: Okay. So, you want me to go

15   down to them? Talk to them?

16   ATTY. KIVELA: Yes, because they're going to

17   have to draft a new protection --

18   THE COURT: Yes, but the information they need

19   to hear is not going to happen for a few minutes.

20   THE DEFENDANT: Okay.

21   THE COURT: So, give them a few minutes to

22   receive the information. Then we're going to modify

23   the protective order. Hopefully, so that it

24   parallels any family or civil orders that you have in

25   place.

26   THE DEFENDANT: Okay.

27   THE COURT: And then I'm going to come -- I'm

going to enter it. I'm just going to require you

stay away from her home, and wherever she shall

reside.

THE DEFENDANT: I understand.

THE DEFENDANT: That's not a problem. You got

to stay -- you can't contact her in any manner,

including by written, electronic, telephone. Don't

contact her home, workplace, school, or others with

whom contact would likely cause annoyance or alarm.

So, if contacting her mother for dropping off

the kids is going to cause her annoyance and alarm,

bring that to their attention. I have to do that in

order to, you know --

THE DEFENDANT: Okay.

So, that contact is strictly for exchange of the

child and issues related to the child. Maybe health,

that kind of thing.

THE DEFENDANT: Okay.

THE COURT: All right?

ATTY. KIVELA: Yes.

THE DEFENDANT: Thank you, Your Honor.

THE COURT: All right. And with respect to the

-- I mean, the warrant, there is -- you could ask the

clerk for a copy --

THE DEFENDANT: Okay.

THE COURT: -- of the warrant. That's in the

clerks file because that's public information. They

1   may charge you a fee for copying.  But --

2       ATTY. KIVELA:  He would need to file an -- a pro

3   se appearance, I think, Your Honor, in order to get a

4   copy of the warrant, at least from my understanding.

5   At the end of the day, he does need an attorney.

6       THE COURT:  Really?  To get -- I can't just go

7   to the clerk's office and ask for his -- not as a

8   judge --

9       ATTY. KIVELA:  No.

10      THE COURT:  -- but as a lay person?

11      THE DEFENDANT:  I can't be in the party?

12      THE COURT:  It's not public information?  Well,

13  we can sus that I am unaware of what you're saying,

14  but --

15      ATTY. CLERK:  I mean, usually the, like,

16  defendant, I mean, they have no problem, like --

17      THE COURT:  I am -- try it.  See what happens.

18      THE DEFENDANT:  Okay.

19      THE COURT:  All right.

20      THE DEFENDANT:  Am I good for now?

21      THE COURT:  For now.

22      THE DEFENDANT:  Okay.

23      THE COURT:  We're going to recall your case.

24  You got to see family relations so we can tweak the

25  --

26      THE DEFENDANT:  Okay.  So, go downstairs to

27  family relations?

1    THE COURT:  Please.

2    THE DEFENDANT:  Thank you, Your Honor.

3  (THE COURT PASSED THE MATTER AND CONTINUED WITH THE CASE AT

4  HAND)

5    THE COURT:  And I do have that updated --

6    ATTY. KIVELA:  Yes, Your Honor.

7    THE COURT:  -- protective order on Mr. Lodice.

8    ATTY. KIVELA:  Lodice.  Matthew Lodice, eight on

9  the arraignment docket.

10    THE DEFENDANT:  Good afternoon, Your Honor.

11  THE COURT:  Afternoon.  Let's see, arraignment docket

12  -- so, with respect to the protective order.  I'm

13  going to enter a protective order in favor of T. A.

14    THE DEFENDANT:  Okay.

15    THE COURT:  Okay.  You know that person.

16    THE DEFENDANT:  What's that?  Oh, yeah.  Person

17  -- okay.

18    THE COURT:  I can't say their name in criminal

19  court.

20    THE DEFENDANT:  No, I got -- I know.  There's a

21  -- all right.  Go ahead.

22    THE COURT:  Yes.  In family court, you probably

23  could say their names.  In criminal court, their

24  names are protected.

25    This protective order requires that you

26  surrender or transfer all firearms and ammunition to

27  your local police department within 48 hours to the

1    extent you have any.  Okay?

2            THE DEFENDANT:  Okay.

3            THE COURT:  You may not assault, threaten,

4    abuse, harass, follow, interfere with, or stalk the

5    protected person.

6            You have to stay away from the home of the

7    protected person and wherever the protected person

8    shall reside.

9            You cannot contact the protected person in any

10   manner, including by written, electronic, or

11   telephone contact.  Don't contact their home,

12   workplace, school, or others with whom contact will

13   likely cause annoyance or alarm to the protected

14   person.

15           However, you are allowed to contact the

16   protected party regarding visitation and affairs of

17   your child in common via Family Wizard.  And exchange

18   of the minor child must be in accordance with -- it

19   says pursuant, but in accordance with the most recent

20   civil family order, whatever that most recent order

21   is.  Okay?

22           THE DEFENDANT:  Okay.

23           THE COURT:  I signed this protective order.

24   You're receiving a copy of it.  Were you to violate

25   it --

26   (ASIDE WITH MARSHAL)

27           -- you will be arrested and charged with a new

offense that carries up to 10 years in jail and/or a $10,000 fine. Okay?

THE DEFENDANT: Okay. So, if I call her at 7:00 p.m., like I'm court ordered allowed to do, I'm not going to have any issues calling my daughter at 7:00 p.m.? Because that's one of the things, like -- so, I'm court ordered to allow a call in at 7:00 p.m. and I'm court ordered --

THE COURT: Didn't I just send you away, so you could talk to the guy, so that you could work out all the --

THE DEFENDANT: I said that. I told the lady downstairs.

THE COURT: Look at it. Read it. Read the second page. You tell me --

THE DEFENDANT: The second page? Yeah. It just says in accordance with the court order.

THE COURT: So, does the court order in family allow you to make this 7:00 call?

THE DEFENDANT: Yes. Because I know she's going to try to call the cops if I do, and that's -- I just want to be able to protect myself.

THE COURT: It says in accordance with, and so as long as the language in the other order --

THE DEFENDANT: Says that? I'm good?

THE COURT: -- allows for that --

THE DEFENDANT: Okay.

1      THE COURT: -- then you're behaving -- let me --

2  just read it back to me what it says.

3      THE DEFENDANT: Okay. It says you may return

4  the protected -- Matthew Lodice is allowed to contact

5  the protected party regarding visitation and affairs

6  of the child via Family Wizard. Exchange of the

7  minor child must be pursuant to the most recent civil

8  family order.

9      That just says exchange of the child. It

10  doesn't say anything about the call.

11      THE COURT: It doesn't. You're right. Are

12  there any other issues that you're going to come up

13  with if I send you back?

14      THE DEFENDANT: Just that and then the pickup

15  and drop-off at the church on Sunday. I have to do

16  in-person with her mother.

17      THE COURT: Well, does that cover that? The

18  pickup and drop-off? Does that --

19      THE DEFENDANT: Yeah, because it says exchange

20  of the minor child.

21      THE COURT: Pursuant to --

22      THE DEFENDANT: So, yes. That covers that.

23      THE COURT: But this other one about the call, I

24  believe you're right, and so --

25      ATTY. KIVELA: Does Your Honor just want to

26  write it in? I have no objection, if Your Honor

27  wants to handwrite something.

1    THE DEFENDANT:  I have no objection to writing

2    it, either.

3        I can.  If you could pass that back up and you

4    can give me the other two.

5        THE DEFENDANT:  I'm sorry, Your Honor.

6        THE COURT:  Thank you.  And so, what is the

7    issue, again?

8        THE DEFENDANT:  We're required between 7:00-

9    7:15, we're required to allow and -- either call or

10   allow a call for our daughter's sake.  So, my

11   daughter can call her at 7:15.  She can call me, and

12   I can call my daughter vice versa.  But it's court

13   ordered that we have to have that call.

14       THE COURT:  So, then this is not through Family

15   Wizard.  This call --

16       THE DEFENDANT:  That's not through Family

17   Wizard.  That's why I'm -- I want to make sure that I

18   don't violate.

19       THE COURT:  So, if I put something like, in

20   accordance with the civil family order --

21       THE DEFENDANT:  Okay.

22       THE COURT:  Does the civil family order speak to

23   this call?

24       THE DEFENDANT:  Yes.

25       THE COURT:  What does it say?

26       THE DEFENDANT:  It says very specifically we're

27   allowed a call -- we have to allow a call or call at

1    between 7:00-7:15.  I think they used the word,
2    facilitate a call.
3         THE COURT:  Do you have a copy of it?
4         THE DEFENDANT:  I -- can I pull out my phone?
5         THE COURT:  Yes.
6         THE DEFENDANT:  Should -- that was an addendum.
7         THE COURT:  So, Mr. Lodice is allowed to
8    initiate contact with the protected party for the
9    purposes of communication with the child in
10   accordance with the civil family order.  How about
11   that?
12        THE DEFENDANT:  Yes.  That would be perfect
13   because then that covers --
14        THE COURT:  And you're allowed to, not only
15   initiate but receive a call from the protected party
16   --
17        THE DEFENDANT:  Yes, along with the --
18        THE COURT:  -- to facilitate communication --
19        THE DEFENDANT:  For the daughter -- for our
20   daughter.  Yup.
21        THE COURT:  -- with the child in accordance with
22   the -- let me just -- hopefully, I can remember that.
23        THE COURT:  Facilitate.  Initiate.  So, I wrote,
24   Mr. Lodice is allowed to facilitate/initiate contact
25   with the protected party for the purposes of contact
26   with their child in common -- or their child, in
27   accordance with the most recent civil family order.

1   THE DEFENDANT: Perfect. Thank you, Your Honor.

2   THE COURT: All right. And if I didn't finish

3   advising you, if you violate the terms of this

4   protective order then you will be arrested and

5   charged with a new offense that carries up to 10

6   years in jail and/or a $10,000 fine.

7   THE DEFENDANT: Yes, I understand.

8   THE COURT: I'm trying to think if there's

9   anything else. It can't be modified or terminated by

10  you or the protected party. Only the criminal court

11  can do that.

12  THE DEFENDANT: Yup. I understand.

13  THE COURT: The protective order. The civil

14  restraining orders and other orders out of other

15  courts are done elsewhere.

16  THE DEFENDANT: I understand.

17  THE COURT: So, I hope that takes care of

18  everything. Now, we need a date.

19  ATTY. KIVELA: He needs an attorney, Your Honor.

20  THE COURT: Oh, yes. Are you going to get an

21  attorney or are you going apply for a public

22  defender?

23  THE DEFENDANT: No. I don't plan on it.

24  THE COURT: Well, that was a two-part question.

25  Your answer is two parts? You don't plan on getting

26  an attorney and you don't plan --

27  THE DEFENDANT: No, I don't have an attorney,

1      and no I don't plan on getting one.

2              THE COURT:  Why?

3              THE DEFENDANT:  Because I don't believe I need

4      one.  I haven't done anything -- hurt -- to harass

5      her.  I have proof that we've been seeing each other

6      talking to each other all along.  I --

7              THE COURT:  Do you think you'd qualify for a

8      public defender, or you don't want one?

9              THE DEFENDANT:  I don't want one.

10             THE COURT:  Date?

11             THE DEFENDANT:  Early as possible would be

12     ideal.

13             THE COURT:  Okay.  How about March 1st?

14             THE DEFENDANT:  Perfect.

15             THE COURT:  See you then.

16             THE DEFENDANT:  Thank you, Your Honor.

17                   *THE MATTER IS CONCLUDED*

18

19

20

21

22

23

24

25

26

27

| A05D-CR23-0190622-S | : | SUPERIOR COURT |
| STATE OF CONNECTICUT | : | G.A. #5 |
| v. | : | AT DERBY, CONNECTICUT |
| MATTHEW LODICE | : | JANUARY 30, 2023 |

E L E C T R O N I C

C E R T I F I C A T I O N

    I hereby certify the electronic version is a true and correct transcription of the audio recording of the above-referenced case, heard in Superior Court, G.A. #5, Derby Connecticut, before the Honorable Scott M. Jones, Judge, on the 30th day of January, 2023.

    Dated this 5th day of June, 2023 in Derby, Connecticut.

_____
Jessica Reyes
Court Recording Monitor

A05D-CR23-0190622S


STATE OF CONNECTICUT         :  SUPERIOR COURT

       v.          :  G.A. #5

                    :  AT DERBY, CONNECTICUT

MATTHEW LODICE           :  APRIL 14, 2023


BEFORE THE HONORABLE SCOTT M. JONES, JUDGE


A P P E A R A N C E S :

Representing the State of Connecticut:

        ATTORNEY LAURA DELEO
           Office of the State's Attorney
           106 Elizabeth Street
           Derby, CT  06418

Representing the Defendant:

        MATTHEW LODICE,
           Self-Represented Party

Recorded By:
Pam Donnauro

Transcribed By:
Pam Donnauro
Court Recording Monitor
106 Elizabeth Street
Derby, CT  06418

| | |
|---|---|
| 1 | ATTY. DELEO: Judge, the remote is Matthew |
| 2 | Lodice, perhaps that's how it's pronounced, and I guess |
| 3 | on the T docket. |
| 4 | THE COURT: It's 20 on the F docket. |
| 5 | ATTY. DELEO: Okay, thank you so much. |
| 6 | THE DEFENDANT: Good morning, your Honor. |
| 7 | THE COURT: Good afternoon, how are you doing? |
| 8 | THE DEFENDANT: Very well, thank you. |
| 9 | THE COURT: So he's pro se. |
| 10 | THE DEFENDANT: Yes. |
| 11 | ATTY. DELEO: He is pro se, Judge. I did receive |
| 12 | information I believe from the victim advocate indicating |
| 13 | that the complainant was going to be logging on and |
| 14 | wanted to address the Court. |
| 15 | THE COURT: Oh, yeah, this is -- I remember now. |
| 16 | ATTY. DELEO: I think her initials are going to be |
| 17 | T.A. |
| 18 | THE COURT: Is T.A. on the line? |
| 19 | T.A.: Yes, your Honor, I'm here. |
| 20 | THE COURT: So what is -- to the state, what is |
| 21 | going on today? |
| 22 | ATTY. DELEO: Well, I'll just indicate, this is |
| 23 | Attorney Barry's file, but I am here today, and my |
| 24 | understanding is I believe the complainant had wanted to |
| 25 | address the Court with respect to I believe some issues |
| 26 | she feels are outstanding with respect to the protective |
| 27 | order. |

1       This is a situation, as I understand it, that

2   involves both a civil -- a pending civil case involving

3   custody and restraining orders, and then of course the

4   criminal one. I will just indicate to the Court that I

5   have a copy of the current protective order. It is a full

6   no contact protective order, and the way it currently

7   reads is, he's allowed to have contact with the protected

8   party regarding visitation and affairs of the child via

9   Family Wizard. They have to exchange pursuant to civil

10  family orders, and I believe I see your initials as well.

11  There was an addendum that just indicated he is allowed

12  to facilitate or initiate contact with the protected

13  party simply for the purpose of allowing for contact with

14  the child pursuant to civil family court orders, and I

15  think -- and I will let the complainant address it if

16  that's an issue. I think sometimes there are telephone

17  calls that are authorized to the child, who's very young,

18  and my understanding is the facilitation on the part of

19  the defendant involves at times him getting the phone to

20  the child. Again, I'll let her address it.

21      THE COURT:  Okay, two different questions before I

22  hear from T.A. for the state. One of them has to do with,

23  in summary, is there an allegation that he is not

24  complying with the order? Is that what T.A. is going to

25  be speaking to me about, because I'm going to hear a lot

26  of details, but I need to contextualize it. So that's why

27  I'm asking.

1      ATTY. DELEO:  I would say that is probably a good

2  summary of what I anticipate some of her frustration is

3  about, and I'll add as well that additional charging

4  comes from the police department ---

5      THE COURT:  Right, that's precisely where I'm going

6  in my mind.

7      ATTY. DELEO:  --- in which allegations of misconduct

8  are alleged to have occurred.

9      The only other thing I'll throw out, I know this is

10  collateral, I'm just going to throw this out, certainly

11  given the complexity of the case, perhaps initial inquiry

12  might be whether or not the defendant is intending to

13  hire counsel or perhaps apply for a public defender to

14  deal with some of the intricacies involved in this file.

15      THE COURT:  Well, he made it completely clear, but

16  I hope he changed his mind that he wants to represent

17  himself.

18      Where are you with respect to an attorney, sir?

19      THE DEFENDANT:  I still would like to represent

20  myself.

21      THE COURT:  So that second question has been

22  answered, and I said I had two questions. The other

23  question is, once I deal with what I'm about to hear from

24  T.A., are we making any movement as to a -- between the

25  state and the defendant, where we're going with this

26  harassment 2 charge or that's for another day? It could

27  simply be for another day, I just have it in my mind.

1        ATTY. DELEO:  It's another day.

2        THE COURT:  Alright, with that said, anything

3  further from the state before I hear from T.A.?

4        ATTY. DELEO:  No, Judge.

5        THE COURT:  T.A., hello.

6        T.A.:  Good afternoon, your Honor.

7        THE COURT:  Hi, what would you like to say, ma'am?

8        T.A.:  So I just wanted to speak to the Court

9  because I'm really hoping that we could possibly modify

10  this protective order today.

11        THE COURT:  In what way?

12        T.A.:  Well, I've been having several issues

13  with -- the police are saying that the second page of the

14  protective order has such ambiguous language on it that

15  they are unable to interpret it, understand it, or

16  enforce it, and they said that they don't understand what

17  it means, and therefore it stops them from being able to

18  enforce it, which to me is concerning, and so --

19        THE COURT:  Can I just stop you for a second?

20        T.A.:  Yes.

21        THE COURT:  It pretty much defers to the civil

22  family court order. So is that also an ambiguous order?

23        T.A.:  No, it's very clear.

24        THE COURT:  And so whatever the family civil court

25  order allows, then this too shall allow. No?

26        T.A.:  The police say that that's not true. The

27  police say that that makes it so that they can't enforce

1     it because you're referring to a civil order and they

2     can't get involved in civil orders. So it actually makes

3     it so that they don't do anything at that point. So I

4     just wanted to say that I was also told by the police

5     that protective orders are only designed to prevent

6     physical violence, and that emotional and verbal

7     harassment is not abuse.

8          I was told that additional orders on the second

9     page allowed for Matthew to speak freely to me on the

10    phone. I was told that he's allowed to interfere with my

11    custodial rights and axe that schedule, that he's allowed

12    to harass me, and cause me further emotional and

13    psychological abuse, and that the protective order only

14    prevents him from directly threatening me with bodily

15    harm or physically harming.

16         THE COURT: Well, I can't get into whether or not

17    that's true or not, although I have very strong opinions

18    about it, but what I will say is this: If you have a copy

19    of the protective order, on page one it lists your name,

20    but I have to refer to you by your initials, and it says

21    that you are the protected party, and that the defendant

22    may not assault, threaten, abuse, harass, follow,

23    interfere with, or stalk you. So you said something about

24    threatening and harassment. That is clearly covered by

25    the second checked box.

26         I am not law enforcement, and so that is up to them

27    to interpret, whatever acts you're claiming he engaged

1     in, rise to the level of a violation of those checked

2     boxes. So this protective order as written -- and the

3     part that I wrote, I didn't even get to that yet, but as

4     written, would address the misconduct that you label as

5     harassment or threatening, if it rose to the level of

6     harassment and threatening as defined by the general

7     statutes.

8           THE DEFENDANT: Your Honor, may I --

9           THE COURT: With respect to the part that I wrote

10    in, he is allowed to have contact with the child. Would

11    you agree?

12          T.A.: Yes, I agree.

13          THE COURT: And the child is a minor. Right?

14          T.A.: Correct, he is.

15          THE COURT: And the minor doesn't -- he or she

16   can't be called on their own. That has to be facilitated

17   or initiated through an adult, which is you. Right?

18          T.A.: Correct, and that's where the other issue

19   is, if I may --

20          THE COURT: Right, and so to say he can't have

21   contact with you would effectively deny him the right to

22   have contact with the child because how else would he do

23   it?

24          THE DEFENDANT: Exactly.

25          T.A.: Correct, and if I may speak on that, I'd

26   like to address that as well.

27          THE COURT: Yes, please, I'm sorry, go ahead.

T.A.: Okay, so when this protective order was
first issued on January 30th when he was arraigned, it
was explained to me by Barbara Bellucci that the Court
said that it's a full no contact protective order, and
that the only contact that Mr. Lodice was allowed to have
with me is through Our Family Wizard, and I was told that
all of the contact and communication between himself and
me would be in Our Family Wizard regarding the affairs of
our child, and I was told that it also was going to be
put in where it said, exchange of the minor child must be
pursuant to the most recent civil family order because I
was told that Mr. Lodice brought to your attention that
the most recent civil family order requires him -- it
states he is required to bring the child to special
religious events and Sunday school that occurs during his
parenting time on Sunday. I was told that, you know, he
must be able to do that, and so although he's not allowed
to contact me, he can exchange her during that exchange
regardless if I'm there or not, and that's allowed, you
know, so he can do that.

I was also told that, the last part where it says,
he's allowed to facilitate and initiate contact with
myself for the purpose of contact with our child in
accordance with the most recent civil family order. I was
told that that part was put in to authorize him to have
the 7:00 P.M. phone calls with our daughter when she's
with me, and for me to be able to call him to have the

phone call with her when she's with him. I was told that
if he calls me at 7:00 to talk to the child, that's not a
violation, but if he calls me any other time or speaks to
me outside of the app, or even speaks to me on the phone
during the call, that's violating the no contact term,
which is checked off on the first page. So that he can't
speak to me during the phone calls, and that he also must
adhere to the most recent civil family order, which
states, don't make disparaging statements or actions
during the calls, and that you must keep in mind the
child's age, and also that, you know, the phone calls
should be between 7:00 and 7:15, you know, to speak to
the child, not to each other.
And so, the issue that I'm having is, the police
are saying that by having that sentence in there, it
means that he may speak to me during these calls and say
whatever he wants to say to me during these calls, and
there's been three different instances where he directly
spoke to me during the calls. There's been two or three
instances where he made disparaging statements, and
there's been three incidents where he refused to exchange
the child in pursuant to the order, which then interferes
with me, because as I was saying, on the first page it
says don't interfere with, the police have a hard time
telling what is and what isn't interference, but I said,
well, it says he has to exchange my child with me
pursuant to this most recent order.

1     THE COURT:  Well, let me address that last part.

2 This order is not designed to enforce violations of the

3 exchange between the parents of the child. I mean, that's

4 why you have a family case pending, is my understanding.

5     THE DEFENDANT:  Yes.

6     THE COURT:  Secondly, I do have notes. So on 3/29

7 we had this exact same motion to modify the protective

8 order, which I denied after a protracted hearing over the

9 issue of Family Wizard, but more importantly, if he is

10 engaging in behavior that's violative of the protective

11 order, that is something that you would go see the police

12 about, and then they make a decision as to whether or not

13 it rises to the level of a violation of the general

14 statute, at which point he would be charged with

15 violation of a protective order.

16     I probably shouldn't say this, but I'm going to say

17 it, globally, you two have a -- how old is this child?

18     T.A.:  She's three.

19     THE DEFENDANT:  She's going to be three, your

20 Honor.

21     T.A.:  She is four.

22     THE COURT:  How old?

23     THE DEFENDANT:  She's four.

24     THE COURT:  Four or almost four. You have to work

25 together for the next 14 years. Is this how it's going to

26 be? You really need to figure that out.

27     Is DCF involved or have they been involved to date?

```
 1              THE DEFENDANT:  Yes.

 2              T.A.:  Yes, they have.

 3              THE DEFENDANT:  Your Honor, can I speak?

 4              THE COURT:  Well, yes, you may, but after this

 5         question. Have they been involved?

 6              T.A.:  Yes, they have, and also, I have an attorney

 7         that's --

 8              THE COURT:  And so the reason why I ask that is

 9         because that's why the criminal court put the onus on

10         family court because they had DCF, who is involved in the

11         inner workings of your relationship, in any type of

12         programatics they want you guys to deal with. All I was

13         trying to do is fashion a protective order that would not

14         invalidate any orders out of family court. If I enter an

15         order that is so Draconian here, then family might say he

16         can do various things, like contact the child through the

17         parent, through Family Wizard, but my order would prevent

18         that. So that's precisely why I put this language in here

19         to allow contact as long as family saw fit.

20              So I'm going to let you finish, T.A., and then I'm

21         going to let the defendant speak, and then I'm going to

22         rule.

23              T.A.:  Okay, so I just wanted to know from the

24         Court, does this protective order allow Matthew to speak

25         to me on the phone?

26              THE COURT:  I cannot answer that. That's asking me

27         for sort of an advisory opinion and legal advice, and I
```

1 can't give you that, but it says what it says, and I

2 would advise you to seek legal counsel to answer that

3 question. I'd be happy to answer that question, I'm

4 just -- in this role, I cannot.

5 T.A.: Okay, because I was told by the Court

6 that -- and by Barbara Bellucci, the victim advocate via

7 email, that he's only allowed to contact me via Family

8 Wizard, and it states that on there. So the issue that

9 I'm having is that he is continuing to speak to me and

10 argue with me and say things during the calls. For

11 example, the other day I called to try to speak to my

12 child. He started yelling at me on the phone directly to

13 me, saying to me, call me back at 7:20, call me back at

14 7:20, and I'm telling him, why, where is the child? I

15 want to speak to her. You're court ordered to let me

16 speak to her at 7:00. He says -- keeps yelling at me,

17 call me back at 7:20; hangs up on me.

18 THE COURT: Call me back at 7:20 is the language

19 that you're saying is violative. So two choices: Don't

20 respond to you, then it wouldn't violate, or call me back

21 at 7:20, but that's the language -- I would encourage you

22 to speak to the state's attorney on that.

23 T.A.: Well, I'm just saying, and my perspective is

24 that, like I was told that he has to allow me to speak to

25 the child because it's what our family order says he's

26 court ordered to do, and so it's like -- by him like

27 interfering with my right to speak to my daughter, I feel

```
 1          like it's interference. It also says no contact, so it's
 2          like he's already been charged with harassment. He is
 3          trying to show me that he is above the law.
 4                  THE COURT:  Right, I hear what you're saying. I
 5          have opinions. I just can't share them. Is there anything
 6          else because I have to make a decision and I need to hear
 7          from the defendant, and we're beyond the time for this
 8          remote. So I just want to hear you out, so I can make a
 9          ruling as to your request to modify the protective order.
10                  T.A.:  Yes, I just wanted to just say, you know,
11          that I feel that according to the wording on the second
12          page, that it is making it so that he is refusing to let
13          me speak to the child, he's speaking to me on the calls,
14          and I'm being told that the fact that it says he's
15          allowed to facilitate and initiate contact with me for
16          purposes of contact with child in accordance with the
17          most recent civil family order, the police have told me
18          that the word facilitate and initiate contact means that
19          he can speak to me during the calls, and I was told by
20          the Orange Police Department that he can say whatever he
21          wants to me during those calls as long as it's during the
22          7:00 time, but it was explained to me by the Court, the
23          victim advocate --
24                  THE COURT:  So --
25                  T.A.:  -- that he can't contact me outside the
26          wizard.
27                  THE COURT:  So in the best of all worlds you would
```

1   want him to call, not say a word, you see it's from him,
2   you put the child on the phone. When he's done, not say a
3   word, just hang up the phone. If you say, let me see the
4   child right now, and he can't do that for an emergency or
5   any other reason, he shouldn't respond to you, and in
6   those ways that would be more beneficial to you and him
7   engaging in this over the next 14 years. Is that what
8   you're saying?

9   T.A.:  No, ideally, I'd like him to use the app.
10  I'd like him to use Our Family Wizard. I sent him
11  messages in the app, he ignores them. He doesn't open
12  them. He purposely ignores, and when he calls on the
13  phone, he wasn't even with the child. So it's not like he
14  can just say, oh, here, call me back, I'll hand it to
15  her. The child was with her grandmother. So instead of
16  saying to me in the app, by the way, the child is with
17  grandma, give her a call at 7:00 if you want to talk to
18  her, he refused to open my messages, ignores me, he tells
19  me, I'm not going to talk to you in the app. If you want
20  to speak to me, I'll speak to you at our next court date
21  on May 25th. He tells me --

22  THE COURT:  Understood.

23  T.A.:  -- oh, I'm going to get custody from you.
24  Then we go to the court, nothing changes. I remain as the
25  primary custodial guardian, as I've been the last four
26  years. He continues to threaten. He uses the court system
27  to harass me by saying he's going to lower my child

1  support, takes me back using the family order, and now

2  it's interfering with my ability -- and also ordered, to

3  make all religious decisions for our daughter, and he's

4  court ordered to bring her to special religious events

5  and Sunday school, so when--

6  THE COURT: Alright --

7  T.A.: -- it says on the protective order he has to

8  exchange pursuant to civil order, and he doesn't, then

9  I'm being interfered with, because now I can't practice

10  my religious beliefs with my kid, and now she's missing

11  the sacraments that she's supposed to be able to get, so

12  it's interfering with my rights as her -- I'm named as

13  the one who makes all religious decisions for her, and it

14  interferes with my right to speak to her when he refuses

15  to talk to me in the app, and insists on only talking to

16  me on the phone, and for this whole time, since the

17  protective order's been here, he hands the phone right to

18  the kid, except with the exception of three times before

19  the last three calls.

20  THE COURT: Alright, I'm going to have to cut you

21  off because I only have a limited amount of time here, I

22  hear you completely.

23  ATTY. DEFEO: Judge, may I just ask one question

24  whom you're done.

25  THE COURT: Absolutely, ask it now.

26  ATTY. DEFEO: Thank you. My question is to T.A.,

27  and the defendant can clarify if this is wrong, do the

current orders out of civil court allow for the defendant
to pick up the phone when there is a 7:00 phone call? Is
that anticipated as appropriate to facilitate the
passing of the phone to the child. Is that something that
is currently acceptable under civil court orders?

THE DEFENDANT: Yes.

T.A.: Yes.

ATTY. DEIEO: Okay, so contact that occurs at 7:00
at night to facilitate the court orders, is acceptable to
civil court, and there is contact by phone that occurs no
other time between you two, is that correct?

T.A.: There's no other contact, there could be no
other contact between us except for the app.

THE DEFENDANT: Okay, thank you.

THE COURT: Okay, and just lastly before I hear
from the defendant, there was a restraining order in
Milford, a hearing or something on 4/10 and there was one
in New Haven on 4/5, did those occur?

T.A.: Yes.

THE COURT: And what happened?

T.A.: Well, so I withdrew the one from 4/10
because I was advised to because it was based on these
allegations of an investigation involving the child, and
I was told that, you know, because of the limitations in
that investigation and that being the basis to withdraw
that, so I did, but on April 5th we did have a hearing in
New Haven Superior Court. My counsel was present as was

1    the defendant, and the judge just gave us a continuance

2    for May 25th after hearing testimony.

3    THE DEFENDANT:  No.

4    T.A.:  She said that all orders remain in place,

5    and she ordered that the defendant is not to leave the

6    minor child alone with his two sons. That is an active

7    order.

8    THE COURT:  Alright. Defendant, did you want to say

9    anything?

10    THE DEFENDANT:  Yes, oh, my god, there's a lot to

11    speak on. I'll try to be as quick as I possibly can.

12    THE COURT:  Well, it's limited to I'm in agreement

13    with her request to modify or I oppose.

14    THE DEFENDANT:  I am not in agreement with request

15    to modify. This woman has been trying so hard to limit my

16    ability to facilitate any exchanges with my daughter, any

17    calls with my daughter. We are in the middle of a huge

18    custody battle, where she is going to lose custody in the

19    end, and the issue is, she's trying to keep my daughter

20    from me as much as she could. I didn't see my daughter

21    for nine weeks, and the one time I went and picked her

22    up, she tried to have me arrested again. She keeps

23    calling the cops on me. I literally, I can't -- when we

24    go to court for the actual trial for this, you'll see all

25    the things that she's been doing to me to make my life

26    crazy. She's filed for four different protective orders,

27    all four were denied. She filed for four ex parte orders,

1     all four were denied. She's filed for two different

2     contempt motions, both of those were denied. She's called

3     the cops on me over 47 times.

4           T.A.:  Your Honor, everything he's saying is a lie,

5     and I'm objecting to this because he's slandering me

6     right now in court.

7           THE COURT:  Okay, your objection is noted. Please

8     don't interrupt. Your objection is noted. Sir, continue.

9           THE DEFENDANT:  And also, speaking about what she

10    said, the only thing I said to her on the phone is when

11    she called me, I said, you have to call me back at 7:20,

12    I'm not with Angelini yet. So she kept calling my phone,

13    calling my phone. So I picked up the phone, I said, look,

14    call back in 15 minutes, and that's the only thing I

15    said. I was told I was allowed to talk and discuss about,

16    you know, pick up and drop off and exchanges and all

17    this, but the only thing I said to her --

18          THE COURT:  Okay, I'm prepared to make a decision,

19    sir, unless you have more with respect to whether I

20    should grant or deny the present request before the

21    Court.

22          THE DEFENDANT:  No, I just want to know what's

23    going to be the next step after this. I feel like we keep

24    coming back and nothing is getting resolved. We haven't

25    progressed at all from this case and --

26          THE COURT:  I think we're in agreement with that.

27          THE DEFENDANT:  -- I would like to start

1. processing.
2. THE COURT: So what I'm going to do, is I'm going
3. to rule right now. I'm going to deny the request
4. presently.
5. Ma'am, if you want the changes, I would highly
6. encourage you to—maybe -- I don't know what the state's
7. position is, were they in favor of this modification
8. or against, but if the state's in favor of this, through
9. the victim's advocate, perhaps you could talk about how
10. to capture all of the facts that you're saying,
11. synthesize it, whittle it down, and make a single cogent
12. argument instead of an argument that has a lot of
13. tangentials and ultimately get to the point of, this
14. language would be better; this is why this language is
15. unworkable.
16. With respect to the defendant's question about
17. where we are going with the case, because you're to pro se
18. there is a discovery process. I recommend you familiarize
19. yourself with the Connecticut Practice Book on discovery.
20. It might be in the 38's of the Practice Book. But in any
21. event, I hope that the defendant and the prosecutor have
22. a conversation about discovery, and where this case is
23. going, and the strength and weaknesses of the state's
24. case, and the elements that form the charge of harassment
25. 2, and what is the resolution, and victim input of
26. course, and then hopefully the case will move forward.
27. So my ruling is to deny the motion today. I've

1    given you input as to if you want to refile it, you may,

2    and what should be done to help move the case along for

3    the future. Anything else from anyone else?

4        ATTY. DELEO: Judge, I'm just going to indicate

5    that if that -- that from everything we've heard, your

6    Honor's language in that protective order comports with

7    the current status of rulings out of civil court, if

8    those civil court orders change, then I would certainly

9    encourage T.A. to bring that to the state's attention,

10    but from everything we've heard, your orders are

11    consistent with the orders in civil court with respect to

12    how contact can occur.

13        THE COURT: Okay, and to that end, I did suggest if

14    you have new language you want to insert in lieu of the

15    language, fashion that so that this Court can look at it,

16    but also let's get a copy of the most current pending

17    civil and/or family orders so that we can compare and

18    contrast. So we need a date. Do you want another remote

19    date, sir?

20        THE DEFENDANT: Actually, I'd rather it be in

21    person. This remote is very difficult. I'd rather be at

22    the courthouse so I can talk to the prosecutor and speak

23    to you directly.

24        THE COURT: So we have 5/1, 5/3, 5/5 through

25    whenever you want.

26        THE DEFENDANT: The sooner the better, so whatever

27    works for the Court, I'm fine, I'll make it work.

1          THE COURT:  5/1 then in person for you.

2          Ma'am, you're on notice that that's his court date.

3          T.A.:  I'm sorry, can you repeat the date?

4          THE COURT:  And sir, I encourage you to get here at

5     9:00, sign the sheet, talk to the prosecutor. You may

6     need a little bit more time to talk to the prosecutor

7     because you're pro se.

8          What did you say, T.A.?

9          T.A.:  I just have one question. What was the date

10    and then -- you said 5/1?

11         THE COURT:  I did, ma'am.

12         T.A.:  Okay, then I just have one question. You

13    said the most recent order, so you know, he's insisting

14    that he wants to go by an order from 2021, and I'm saying

15    I want to go by the most recent one. Does the Court agree

16    that it has to be the most recent, that we can't go by

17    ones from 2019 or 2021, it has to be the most recent?

18         THE COURT:  I can only speak intelligently about

19    motions in the file that are before me, and in the file

20    before me is a January 30th, 2023, protective order that

21    I entered that has the language that you object to, T.A.,

22    and so were there a previous order, hypothetically

23    speaking, the subsequent order would replace that

24    previous order at least in my file. I cannot speak

25    intelligently, and I'm not giving you legal advice, I'm

26    not even weighing in on which order in the civil or

27    family files is the controlling order. I would defer you

1      to the people that govern that over there, is my
2      response.
3              T.A.:  Okay, would you recommend I also send copies
4      of everything to the advocate as well?
5              THE COURT:  Recommend? No. Call the victim
6      advocate, have a conversation. Meaning, I can't give you
7      advice.
8              T.A.:  Okay, thank you.
9              THE COURT:  You're welcome, ma'am. Good day, sir.
10             THE DEFENDANT:  Thank you, your Honor, have a good
11     day.
12             THE COURT:  You as well.
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

A05D-CR23-0190622S

| STATE OF CONNECTICUT | : | SUPERIOR COURT |
|---|---|---|
| v. | : | G.A. #5 |
| | : | AT DERBY, CONNECTICUT |
| MATTHEW LODICE | : | APRIL 14, 2023 |

## CERTIFICATION

I hereby certify the foregoing pages are a true and correct transcription of the audio recording of the above-referenced case, heard in Superior Court, G.A. #5, at Derby, Connecticut, before the Honorable Scott Jones, Judge, on the 14th day of April, 2023.


Dated this 5th day of June, 2023 in Derby, Connecticut.


*Pam Donnauro*
Pam Donnauro
Court Recording Monitor

DOCKET NO.: **A05D-CR23-0191150-S** :          SUPERIOR COURT

STATE                          :          DERBY GA

V.                             :          AT DERBY

THEODORA ANTAR                 :          9/6/2023

## <u>MOTION FOR DISQUALIFICATION OF JUDICIAL AUTHORITY</u>

     The Defendant Theodora F. Antar in the above captioned matter respectfully moves that The Honorable Judge Scott Jones be disqualified from presiding over the case for the remainder of its duration.

     In accordance with Rule 2.11 of the Code of Judicial Conduct, "a judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned including, but not limited to, the following circumstances: (1) The judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of facts that are in dispute in the proceeding.

     In this case, Judge Scott Jones has shown that he is unable to display impartiality toward the Defendant due to his substantial involvement in the recent case of State v. Matthew Lodice in which the Defendant Theodora F. Antar was the victim and complainant.

     On numerous occasions in the matter of State v. Lodice, Judge Scott Jones displayed impartiality and on the record on numerous occasions he not only gave Matthew Lodice legal advice, but refused to give procedural information or other information to Ms. Antar as the victim and told her she would be required to hire her own

private attorney to explain to her what was and was not allowed on the full no-contact protective order which allegedly protected her from abuse.

Judge Jones also made it clear that he does not believe that psychological, emotional, or mental abuse constitutes domestic violence and has shown disregard and ignorance toward the law, specifically PA-2178 and has abused his discretion, authority, and power.

Honorable Judge Scott Jones has violated several state and federal judicial canons, state laws, federal laws, and constitutional laws in violation of his oath to uphold the duties of judicial office, as prescribed by Conn. Practice Book §1-22(a).

Judge Scott Jones must be disqualified in this matter for the following reasons:

Judge Scott Jones made several statements on the record in which he made it clear that he harbors negative feelings and bias against the concept of domestic violence. He also gave Matthew Lodice legal advice on several occasions on the record. Judge Scott Jones made sure to go above and beyond out of his way to accommodate Matthew John Lodice on the record, to make sure that any aspect of the criminal order of protection would cater to his needs.

On 1/30/23, Scott Jones stated that "we can't enter an order that's inconsistent with family" on the record, however on 5/17/23, he allowed the court to enter an order on my behalf that was inconsistent with family and has subsequently upheld said order which violates Ms. Antar's constitutional and federal and state rights.

Furthermore, he also has a substantial and longstanding relationship with the attorney Michael Hillis who was representing the Defendant in this matter and who has since stated that he plans to file a motion to withdraw as counsel in this case. Attorney

Michael Hillis stated that, not only did he go UConn School of Law with Judge Scott Jones, but also stated that he helped cover up an incidence of academic misconduct which occurred when Judge Jones was a student at the University of Connecticut School of Law.

Michael Hillis stated that, due to his extremely close bond and connection and affiliation with Judge Jones, that he would be able to sway and control the disposition of this case. He stated that when Scott Jones was faced with potential penalties for his prior academic misconduct while in law school, that Michael Hillis "did him a favor" and prevented the misconduct from having any negative impact on Judge Jones.

Michael Hillis cited this relationship as a reason why he felt that he could guarantee positive results for me in this matter, and sine he has now stated that he will not be providing me assistance and stated that he is going to be withdrawing his appearance, I feel that there is an extreme conflict of interest.

In addition, the law mandates that if a judge has substantial knowledge regarding facts that are in dispute in the matter that they must also recuse themselves. Not only did Judge Jones hear and learn substantial knowledge regarding the facts in dispute by listening to Ms. Antar testify about them on the record during proceedings in the State v. Lodice matter, but he also signed the warrant that was then issued for Ms. Antar's arrest, 2 weeks after hearing testimony about the facts that are now in dispute on 5/1/23.

During each of the hearings, both in the presence and absence of Ms. Antar, Judge Jones regularly provided legal advice to Matthew Lodice, stated he would be having ex-parte communications with Judge Jane Kupson Grossman in order to influence his

decisions regarding his handling of the State v Lodice matter, and showed animosity, prejudice, and bias against Ms. Antar.

Ms. Antar, the Defendant in the above captioned matter, respectfully moves that Judge Scott Jones immediately recuse himself from this matter and is putting the court on official notice that Ms. Antar intends to file a complaint against Judge Scott Jones with the Judicial Review Council, as well as a civil rights lawsuit for violations of her state, federal, and constitutional rights.

THE DEFENDANT,

_____

By:

Theodora Antar

856 Shagbark Drive, Orange, CT, 06477

ORDER

The foregoing motion having been duly heard, it is hereby ordered:

GRANTED / Denied

BY THE COURT,

_____

JUDGE / CLERK

<u>CERTIFICATION</u>

This is to certify that on 9/6/2023, a copy of the foregoing was delivered to:


DCJ.DerbyGA.Reports@ct.gov

GA5.Derby@jud.ct.gov


By, The Defendant,

_____

Theodora Antar

856 Shagbark Drive

Orange, CT, 06477

theodoraantar@gmail.com

(203)273-8419

order of protection, Mr. Lodice was never charged or prosecuted for any of his violations of said order, and only the defendant Theodora Antar was prosecuted and charged, which is in line with the clear bias and prejudicial treatment that the defendant has experienced by this court.

2. The Defendant has been denied due process of law, effective counsel, an evidentiary hearing to challenge a heavily restrictive protective order, a speedy trial, access to discovery and evidence, and the right to a trial by jury.

3. The Defendant has been denied these rights both under the Constitution of the United States and the State of Connecticut.

## LEGAL ARGUMENTS

1. **Lack of Probable Cause**: Under both the Fourth Amendment of the U.S. Constitution and the Connecticut Constitution Article First, § 7, no warrants shall issue without probable cause. In this case, the State has failed to establish probable cause for either charge.

2. **Violations of Protective Order**: Pursuant to Connecticut General Statutes §53a-223, the protected party cannot be prosecuted for violations related to the protective order. The Defendant was the protected party under the said order.

3. **Violation of Due Process**: Both the Fourteenth Amendment of the U.S. Constitution and Article First, § 8 of the Connecticut Constitution guarantee due process of law. The Defendant has been denied procedural due process rights, including but not limited to an unbiased tribunal, notice of proposed actions, and the right to present evidence.

4. **Ineffective Counsel and Denial of Rights**: The Defendant has been denied effective counsel as guaranteed by the Sixth Amendment and has not ever been informed adequately about the case against her, contrary to Rule 5.1 of the Federal Rules of Criminal Procedure and Connecticut Practice Book § 37-1.

5. **Speedy Trial**: The Defendant's right to a speedy trial as guaranteed by the Sixth Amendment and the Connecticut Constitution, Article First, § 8, has been violated, rendering the proceedings against her unconstitutional.

## CONCLUSION

In light of the above legal and factual shortcomings, the Defendant respectfully requests this Court to dismiss the charges against her.

**WHEREFORE, Defendant respectfully requests that the Court:**

1. Grant a full dismissal of all charges currently filed against the Defendant

2. Immediately vacate the current protective order that was issued on 5/17/23 that has no expiration date.

**MOTION FOR CONTINUANCE/
CASEFLOW REQUEST-
CRIMINAL MATTERS**

JD-CR-51   Rev. 7-20
C.G.S §§ 54-82c, 54-86k, 54-186, 54-199
P.B. §§ 36-20, 40-5, 43-6, 44-13, 44-18

**ADA NOTICE**
The Judicial Branch of the State of Connecticut complies with the Americans with Disabilities Act (ADA). If you need a reasonable accommodation in accordance with the ADA, contact a court clerk or an ADA contact person listed at *www.jud.ct.gov/ADA.*

STATE OF CONNECTICUT
**SUPERIOR COURT**
*www.jud.ct.gov*



**Instructions To Person Making Motion**
*Fill out all sections of this form except the Order section and file it with the Clerk of the Court at least three (3) days before the date of the scheduled event.*

| Name of case *(State v. Full name of Defendant)* | Docket number | Defendant Incarcerated |
|---|---|---|
| **State v. Theodora F. Antar** | **A05D-CR23-0191150-S** | ☐ Yes   ☒ No |

| ☐ Judicial District   ☒ Geographical Area Number | Address of court *(Number, street, town and zip code)* **106 Elizabeth st, Derby, CT, 06418** | |

| Date of motion **08/31/23** | Date of event to which Requested Action applies **09/06/2023** | Name of Judge who scheduled the event *(If known)* **Judge Scott Jones** |

| Person making motion is: | | | |
|---|---|---|---|
| ☐ State's Attorney | ☐ Defendant's Attorney | ☒ Defendant | ☐ Other |

| Firm name *(if applicable)* | Address **856 Shagbark Drive, Orange, CT, 06477** | Phone number *(with area code)* **203-273-8419** |
|---|---|---|

## Requested Action: *(Select all that apply)*

☒ Motion for continuance to: __11/2/2023__ *(date)*   or:   ☐ at the court's discretion.
☐ Request that the defendant be excused from scheduled event.
☐ Motion for dismissal of case without appearance because of successful diversionary program completion.

## Event to which Requested Action applies: *(Select all that apply)*

☐ Arraignment   ☐ Court Trial   ☐ Motion   ☒ Pretrial   ☐ Other
☐ Plea   ☐ Jury Trial   ☐ Disposition   ☐ Sentencing

## Reason(s) for Requested Action: *(Select reason(s) and explain below)*

☒ Counsel not ready   ☐ Lay witness not available *(provide name below)*   ☒ Other
☒ Discovery not complete   ☐ Expert witness not available *(provide name below)*
☒ Counsel not available   ☐ Party not available *(provide name below)*

*Explain*

**I was arraigned on 5/17/23 and Attorney Hillis promised me an opportunity to meet with him to discuss the case prior to moving forward. It is now 106 days later and I never got to meet with him once about the case. I asked on 8/23 and 8/30 when we can meet and he responded on 8/30 and stated that he would be withdrawing as counsel instead. I need time to hire new counsel.**

I have contacted all counsel and self-represented parties of record about my intention to seek this Requested Action.

All of the counsel and self-represented parties:   ☒ Consent   ☐ Do Not Consent   ☐ Have not responded

***Note:*** An agreement to this Requested Action does not mean that the court will automatically grant by the motion.

☐ I Have   ☒ I Have Not   notified the Victim's Advocate and/or the victim(s) of the Requested Action.

I agree to be responsible for notifying my client, if applicable, and all counsel of record and self-represented parties whether the Requested Action is granted or denied, and if granted, the specific ruling of the court.

## Certification

I certify that a copy of this document was or will immediately be mailed or delivered electronically or non-electronically on (date) __08/31/2023__ to all attorneys and self-represented parties of record and that written consent for electronic delivery was received from all attorneys and self-represented parties of record who received or will immediately be receiving electronic delivery.
Name and address of each party and attorney that copy was or will be mailed or delivered to*

**Michael Hillis
129 whitney avenue
New Haven, CT, 06510**

*If necessary, attach additional sheet or sheets with name and address which the copy was or will be mailed or delivered to.

| Signed *(Signature of the Connecticut Attorney)* ▶ | Print or type name of person signing **Theodora Antar** | Date signed **08/31/2023** |
|---|---|---|
| Mailing address *(Number, street, town, state and zip code)* **856 Shagbark Drive, Orange, CT, 06477** | | Telephone number **2032738419** |

| **Order** | Request is: ☐ Granted ☐ Denied | If continuance, event continued to: | Signed *(Judge)* | Date |
|---|---|---|---|---|

Print Form          Reset Form

**MOTION FOR CONTINUANCE/**
**CASEFLOW REQUEST-**
**CRIMINAL MATTERS**
JD-CR-51  Rev. 7-20
C.G.S. §§ 54-82c, 54-86k, 54-186, 54-199
P.B. §§ 36-20, 40-5, 43-6, 44-13, 44-18

**ADA NOTICE**
The Judicial Branch of the State of Connecticut complies with the Americans with Disabilities Act (ADA). If you need a reasonable accommodation in accordance with the ADA, contact a court clerk or an ADA contact person listed at *www.jud.ct.gov/ADA*.

**STATE OF CONNECTICUT**
**SUPERIOR COURT**
*www.jud.ct.gov*



**Instructions To Person Making Motion**
*Fill out all sections of this form except the Order section and file it with the Clerk of the Court at least three (3) days before the date of the scheduled event.*

| Name of case (State v. Full name of Defendant) | Docket number | Defendant Incarcerated |
|---|---|---|
| **State v. Theodora F. Antar** | **A05D-CR23-0191150-S** | ☐ Yes  ☒ No |

| | Address of court (Number, street, town and zip code) | |
|---|---|---|
| ☐ Judicial District  ☒ Geographical Area Number | **106 Elizabeth st, Derby, CT, 06418** | |

| Date of motion | Date of event to which Requested Action applies | Name of Judge who scheduled the event (If known) |
|---|---|---|
| **09/06/2023** | **09/06/2023** | **Judge Scott Jones** |

Person making motion is:
☐ State's Attorney  ☐ Defendant's Attorney  ☒ Defendant  ☐ Other

| Firm name (if applicable) | Address | Phone number (with area code) |
|---|---|---|
| | **856 Shagbark Drive, Orange, CT, 06477** | **203-273-8419** |

## Requested Action: *(Select all that apply)*

☒ Motion for continuance to: ___**11/2/2023**___ *(date)* or: ☐ at the court's discretion.

☐ Request that the defendant be excused from scheduled event.

☐ Motion for dismissal of case without appearance because of successful diversionary program completion.

## Event to which Requested Action applies: *(Select all that apply)*

☐ Arraignment  ☐ Court Trial  ☐ Motion  ☒ Pretrial  ☐ Other
☐ Plea  ☐ Jury Trial  ☐ Disposition  ☐ Sentencing

## Reason(s) for Requested Action: *(Select reason(s) and explain below)*

☒ Counsel not ready  ☐ Lay witness not available *(provide name below)*  ☒ Other
☒ Discovery not complete  ☐ Expert witness not available *(provide name below)*
☒ Counsel not available  ☐ Party not available *(provide name below)*

*Explain*

**I was arraigned on 5/17/23 and Attorney Hillis promised me an opportunity to meet with him to discuss the case prior to moving forward. It is now 106 days later and I never got to meet with him once about the case. I asked on 8/23 and 8/30 when we can meet and he responded on 8/30 and stated that he would be withdrawing from the case instead. I need time to hire new counsel.**

I have contacted all counsel and self-represented parties of record about my intention to seek this Requested Action.
All of the counsel and self-represented parties: ☒ Consent  ☐ Do Not Consent  ☐ Have not responded

***Note:** An agreement to this Requested Action does not mean that the court will automatically grant by the motion.*

☐ I Have  ☒ I Have Not  notified the Victim's Advocate and/or the victim(s) of the Requested Action.

I agree to be responsible for notifying my client, if applicable, and all counsel of record and self-represented parties whether the Requested Action is granted or denied, and if granted, the specific ruling of the court.

## Certification

I certify that a copy of this document was or will immediately be mailed or delivered electronically or non-electronically on (date) ___**08/31/2023**___ to all attorneys and self-represented parties of record and that written consent for electronic delivery was received from all attorneys and self-represented parties of record who received or will immediately be receiving electronic delivery.
Name and address of each party and attorney that copy was or will be mailed or delivered to*

**Michael Hillis**
**129 whitney avenue**
**New Haven, CT, 06510**

*If necessary, attach additional sheet or sheets with name and address which the copy was or will be mailed or delivered to.

| Signed (Signature of Pro/Connecticut Attorney) | Print or type name of person signing | Date signed |
|---|---|---|
| ▶ | **Theodora Antar** | **09/06/2026** |

| Mailing address (Number, street, town, state and zip code) | Telephone number |
|---|---|
| **856 Shagbark Drive, Orange, CT, 06477** | **2032738419** |

| **Order** | Request is: ☐ Granted ☐ Denied | If continuance, event continued to: | Signed (Judge) | Date |
|---|---|---|---|---|

**MOTION FOR CONTINUANCE/
CASEFLOW REQUEST-
CRIMINAL MATTERS**

JD-CR-51  Rev. 7-20
C.G.S §§ 54-82c, 54-86k, 54-186, 54-199
P.B. §§ 36-20, 40-5, 43-6, 44-13, 44-18

**ADA NOTICE**
The Judicial Branch of the State of Connecticut complies with the Americans with Disabilities Act (ADA). If you need a reasonable accommodation in accordance with the ADA, contact a court clerk or an ADA contact person listed at *www.jud.ct.gov/ADA*.

**STATE OF CONNECTICUT
SUPERIOR COURT**
*www.jud.ct.gov*



**Instructions To Person Making Motion**
*Fill out all sections of this form except the Order section and file it with the Clerk of the Court at least three (3) days before the date of the scheduled event.*

| Name of case *(State v. Full name of Defendant)* | Docket number | Defendant Incarcerated |
|---|---|---|
| State v. Theodora F. Antar | A05D-CR23-0191150-S | ☐ Yes  ☒ No |

| ☐ Judicial District  ☒ Geographical Area Number | Address of court *(Number, street, town and zip code)* 106 Elizabeth st, Derby, CT, 06418 | |
|---|---|---|

| Date of motion 08/31/23 | Date of event to which Requested Action applies 09/06/2023 | Name of Judge who scheduled the event *(If known)* Judge Scott Jones |
|---|---|---|

Person making motion is:
☐ State's Attorney   ☐ Defendant's Attorney   ☒ Defendant   ☐ Other _____

| Firm name *(if applicable)* | Address 856 Shagbark Drive, Orange, CT, 06477 | Phone number *(with area code)* 203-273-8419 |
|---|---|---|

## Requested Action: *(Select all that apply)*

☒ Motion for continuance to: ___11/2/2023___ *(date)*  or:  ☐ at the court's discretion.
☐ Request that the defendant be excused from scheduled event.
☐ Motion for dismissal of case without appearance because of successful diversionary program completion.

## Event to which Requested Action applies: *(Select all that apply)*

☐ Arraignment   ☐ Court Trial   ☐ Motion   ☒ Pretrial   ☐ Other
☐ Plea   ☐ Jury Trial   ☐ Disposition   ☐ Sentencing

## Reason(s) for Requested Action: *(Select reason(s) and explain below)*

☒ Counsel not ready         ☐ Lay witness not available *(provide name below)*      ☒ Other
☒ Discovery not complete     ☐ Expert witness not available *(provide name below)*
☒ Counsel not available      ☐ Party not available *(provide name below)*

*Explain*

**I was arraigned on 5/17/23 and Attorney Hillis promised me an opportunity to meet with him to discuss the case prior to moving forward. It is now 106 days later and I never got to meet with him once about the case. I asked on 8/23 and 8/30 when we can meet and he responded on 8/30 and stated that he would be withdrawing from the case instead. I need time to hire new counsel.**

I have contacted all counsel and self-represented parties of record about my intention to seek this Requested Action.

All of the counsel and self-represented parties:  ☒ Consent   ☐ Do Not Consent   ☐ Have not responded

*Note:* An agreement to this Requested Action does not mean that the court will automatically grant by the motion.

| ☐ I Have   ☒ I Have Not   notified the Victim's Advocate and/or the victim(s) of the Requested Action. |
|---|

I agree to be responsible for notifying my client, if applicable, and all counsel of record and self-represented parties whether the Requested Action is granted or denied, and if granted, the specific ruling of the court.

## Certification

I certify that a copy of this document was or will immediately be mailed or delivered electronically or non-electronically on (date) ___08/31/2023___ to all attorneys and self-represented parties of record and that written consent for electronic delivery was received from all attorneys and self-represented parties of record who received or will immediately be receiving electronic delivery.

Name and address of each party and attorney that copy was or will be mailed or delivered to*

**Michael Hillis
129 whitney avenue
New Haven, CT, 06510**

*If necessary, attach additional sheet or sheets with name and address which the copy was or will be mailed or delivered to.

| Signed *(Signature of Non-Connecticut Attorney)* ► | Print or type name of person signing Theodora Antar | Date signed 08/31/2023 |
|---|---|---|
| Mailing address *(Number, street, town, state and zip code)* 856 Shagbark Drive, Orange, CT, 06477 | | Telephone number 2032738419 |

| **Order** | Request is: ☐ Granted  ☐ Denied | If continuance, event continued to: | Signed *(Judge)* | Date |
|---|---|---|---|---|

Print Form      Reset Form

MOTION FOR CONTINUANCE/
CASEFLOW REQUEST

The Judicial Branch of the State

ADA NOTICE

STATE OF CONNECTICUT
SUPERIOR COURT



# INFORMATION
JD-CR-71 Rev. 1-17

## STATE OF CONNECTICUT
## SUPERIOR COURT

| | | | DISPOSITION DATE | |
|---|---|---|---|---|

| Police Case number 23-13466 | Agency name ORANGE POLICE DEPARTMENT | | Agency number CT0010700 |
|---|---|---|---|

## TITLE, ALLEGATION, AND COUNTS

| State of Connecticut vs. *(Name of accused)* Antar Theodora F | Residence *(Town)* of accused Orange | Docket number A0SPOCR23-19 11S0 5 |
|---|---|---|

| Address 856 Shagbark Dr Orange Ct | | Date of birth 09/07/1991 | The undersigned Prosecuting Authority of the Superior Court of the State of Connecticut charges that: |
|---|---|---|---|
| To be held at *(Town)* Derby | Geographical area number 05 | Court date | |

Count One — Did commit the offense of:
**DISORDERLY CNDT**

| At *(Town)* Orange | On or about *(Date)* 4/30/2023 | In violation of General Statute number 53a-182 | Continued to 6/29/23 | Purpose | Reason |
|---|---|---|---|---|---|

Count Two — Did commit the offense of:
**FLS STATEMENT**

| At *(Town)* Orange | On or about *(Date)* 4/30/2023 | In violation of General Statute number 53a-157b | | | |
|---|---|---|---|---|---|

Count Three — Did commit the offense of:

| At *(Town)* | On or about *(Date)* | In violation of General Statute number | | | |
|---|---|---|---|---|---|

☐ See other sheet for additional counts   Date 5/12/23   Signed *(Prosecuting Authority)*

## COURT ACTION

Defendant advised of rights before plea
(Judge) Hall J   (Date) 5-17-23

| Bond | Surety | ☐ 10% ☐ Cash | Election ☐ CT ☐ JY | *(Date)* |
|---|---|---|---|---|

☑ Attorney   ☐ Public defender   ☐ Guardian

| Bond change | | Seized property inventory number |
|---|---|---|

| Count | Plea date | Plea | Plea withdrawn | | Verdict finding | Fine | Remit | Additional disposition |
|---|---|---|---|---|---|---|---|---|
| | | | Date | New plea | | | | |
| 1 | | | | | | $ | $ | |
| 2 | | | | | | $ | $ | |
| 3 | | | | | | $ | $ | |

| Date | Other Court Action | Judge |
|---|---|---|
| 5-12-23 | P.O. issued | Hall, J |
| 8/31/23 | D filed motion for continuance and appearance, motion denied | |

| Receipt number | Cost ☐ IMP ☐ NCI | Bond information ☐ Bond forfeited | ☐ Forfeiture vacated | ☐ Forfeiture vacated and bond reinstated | |
|---|---|---|---|---|---|
| Application fee - receipt number if paid | Circle one W I Q | Program fee - receipt number if paid | Circle one W I Q | Program fee - receipt number if paid | Circle one W I Q |
| Prosecutor on original disposition | Reporter/monitor on original disposition | Signed *(Clerk)* | | Signed *(Judge)* | |

**PROMISE TO APPEAR**

JD-CR-13 Rev. 10-17
C.G.S. §§ 53a-35a, 53a-36, 53a-40b, 53a-41,53a-42, 53a-172,
53a-173, 53a-222, 53a-222a, 54-83a to 54-63g, 54-64a to 54-64g;
P.B. §§ 38-1 to 38-6, 38-18, 38-19, 38-20, 38-21, P.A. 17-31 §§ 6, 7



STATE OF CONNECTICUT
**SUPERIOR COURT**
www.jud.ct.gov

**Instructions**
Use this form only for defendants released upon a written promise who are charged with a MISDEMEANOR,
A MOTOR VEHICLE VIOLATION FOR WHICH A TERM OF IMPRISONMENT MAY BE IMPOSED, or a FELONY.

**To: Any Proper Officer of the State of Connecticut**

| From *(Name of defendant)* | Address of defendant | | | Docket number |
|---|---|---|---|---|
| THEODORA ANTAR | 856  SHAGBARK DR | ORANGE | CT | Telephone number |
| | | | | 203 273 8419 |

| Judicial District / Geographical Area Court | Address of court | Police case number |
|---|---|---|
| 05 | 106 Elizabeth Street, Derby, Ct. | 23-13466 |

| Crime(s) charged against defendant | Appearance date and time *(Initial appearance not more than 14 days after date of arrest)* 05/17/23 |
|---|---|
| 53a-182     53a-157b | 9:30 AM |

**PROMISE TO APPEAR**

I, the defendant named above, promise to appear before (come to):
1. The Superior Court at the address listed above, on the Appearance date and the time listed above;
2. The court on any other date and time that the court continues my case to;
3. Any other court where my case may be transferred (sent to); and
4. The court on any other date and time at which there is a hearing on the conditions of my release.

I also promise to follow all of the Conditions of Release listed below, which were ordered by the court, a bail commissioner, or a police officer.

I have read, or have had read to me, the Notice to Defendant below, and I understand everything in that notice.

| A. Conditions of Release | Signed *(Defendant)* | Date and Time Signed |
|---|---|---|
| 1. Do not commit a federal, state or local crime. | | 5/16/23  12:35 h-s .m. |
| | Signed *(Parent or Guardian if minor)* | Date and Time Signed |
| | | .m. |

| Subscribed to before me. Defendant was advised of the requirements listed above, and was given a copy of this Promise to Appear and the Notice below. | | |
|---|---|---|
| Signed *(Police Officer, Asst. Clerk, Bail Comm., Prob. Officer)* | Date and Time Signed 5/16/23  12:35  .m. | Job Title Patrol Ofc. | Police Department *(If applicable)* **Orange Police** |

**NOTICE TO DEFENDANT**

1. **You must come to court on the Appearance date and time listed above and at any other time and place that the court tells you.**
2. If you do not come to court as required, you will be committing the crime of Failure to Appear, and:
   a. You may be arrested immediately, or the court may issue a capias (order for your arrest); and
   b. You may be subject to the following added criminal penalties:
      i. If you were released on this Promise to Appear for one or more felonies, you may be charged with an additional Class D felony, and the court may sentence you to up to 5 years in prison, fine you up to $5,000, or both, for failing to appear.
      ii. If you were released on this Promise to Appear for one or more misdemeanors or motor vehicle violations, you may be charged with an additional Class A misdemeanor, and the court may sentence you to up to 1 year in prison, fine you up to $2,000, or both, for failing to appear.
3. If you commit another crime after you have been released on this Promise to Appear, you may be subject to added criminal penalties in addition to any sentence that the court may give you for that crime:
   a. If the new crime is a felony, the court may sentence you to up to ten (10) additional years in prison; or
   b. If the new crime is a misdemeanor, the court may sentence you to up to one (1) additional year in prison.
4. **You must follow all of the conditions of your release.**
5. If you do not follow the conditions of your release, you will be committing the crime of Violation of Conditions of Release, and:
   a. The court may change or add to the conditions of your release;
   b. The court may revoke (take away) your Promise to Appear and release; and/or
   c. You may be subject to the following additional criminal penalties:
      i. If you were released on this Promise to Appear for one or more felonies:
         • Generally, you may be charged with an additional Class D felony, and the court may sentence you to up to 5 years in prison, fine you up to $5,000, or both, for violating your conditions of release.
         • BUT, if you violate the conditions of your release by (1) putting any restraint (restriction) on a person or the liberty (freedom) of a person; or (2) threatening, harassing, assaulting, molesting, sexually assaulting or attacking a person, you may be charged with an additional Class C felony, and the court may sentence you to between 1 and 10 years in prison, fine you up to $10,000, or both, for violating your conditions of release in this way.
      ii. If you were released on this Promise to Appear for one or more misdemeanors or motor vehicle violations:
         • Generally, you may be charged with an additional Class A misdemeanor, and the court may sentence you to up to 1 year in prison, fine you up to $2,000, or both, for violating your conditions of release.
         • BUT, if you violate the conditions of your release by (1) putting any restraint (restriction) on a person or the liberty (freedom) of a person; or (2) threatening, harassing, assaulting, molesting, sexually assaulting or attacking a person, you may be charged with an additional Class D felony, and the court may sentence you to up to 5 years in prison, fine you up to $5,000, or both, for violating your conditions of release in this way.
6. Your release may be revoked (taken away) if:
   a. You have been charged with a crime for which the term of imprisonment may be more than 10 years;
   b. The court finds that you have violated any condition of your release; and
   c. The court finds that the safety of any other person is endangered (put at risk) while you are on release.

| | FOR COURT USE |
|---|---|
| | |

**ADA NOTICE**
The Judicial Branch of the State of Connecticut complies with the Americans with Disabilities Act (ADA). If you need a reasonable accommodation in accordance with the ADA, contact a court clerk or an ADA contact person listed at www.jud.ct.gov/ADA.

(Page 1 of 2)

DISTRIBUTION: Copies to Clerk of Court, Bail Commissioner, Defendant

PROMISE TO APPEAR

**PROMISE TO APPEAR**
JD-CR-13  Rev. 10-17
C.G.S. §§ 53a-35f, 53a-36, 53a-40b, 53a-41,53a-42, 53a-172,
53a-173, 53a-222, 53a-222a, 54-53e to 54-63g, 54-64a to 54-64g;
P.B. §§ 38-1 to 38-6, 38-15, 38-19, 38-20, 38-21, P.A. 17-31 §§ 6, 7



**STATE OF CONNECTICUT**
**SUPERIOR COURT**
www.jud.ct.gov

Instructions
Use this form only for defendants released upon a written promise who are charged with a MISDEMEANOR,
A MOTOR VEHICLE VIOLATION FOR WHICH A TERM OF IMPRISONMENT MAY BE IMPOSED, or a FELONY.

**To: Any Proper Officer of the State of Connecticut**

| | | | | Docket number |
|---|---|---|---|---|
| From: (Name of defendant)<br>THEODORA  ANTAR | Address of defendant<br>856  SHAGBARK DR | ORANGE | CT | Telephone number<br>203 273 8419 |
| Judicial District / Geographical Area Court<br>05 | Address of court<br>106 Elizabeth Street, Derby, Ct. | | | Police case number<br>23-13466 |
| Crime(s) charged against defendant<br>53a-182     53a-157b | | | Appearance date and time (Initial appearance not more than<br>14 days after<br>date of arrest) 05/17/23 | 9:30 AM |

**PROMISE TO APPEAR**

I, the defendant named above, promise to appear before (come to):
1. The Superior Court at the address listed above, on the **Appearance date and the time listed above;**
2. The court on any other date and time that the court continues my case to;
3. Any other court where my case may be transferred (sent to); and
4. The court on **any other date and time** at which there is a hearing on the conditions of my release.

I also promise to follow all of the **Conditions of Release** listed below, which were ordered by the court, a bail commissioner, or a police officer.

I have read, or have had read to me, the Notice to Defendant below, and I understand everything in that notice.

| A. Conditions of Release<br>1. Do not commit a federal, state or local crime. | Signed (Defendant) | Date and Time Signed<br>5 16 23  12:35 p.m. |
|---|---|---|
| | Signed (Parent or Guardian if minor) | Date and Time Signed<br>.m. |

Subscribed to before me. Defendant was advised of the requirements listed above, and was given a copy of this Promise to Appear and the Notice below.

| Signed (Police Officer, Asst. Clerk, Bail Comm., Prob. Officer) | Date and Time Signed<br>5/16/23  12:35 .m. | Job Title<br>Patrol Ofc. | Police Department (If applicable)<br>**Orange Police** |
|---|---|---|---|

**NOTICE TO DEFENDANT**

1. You must come to court on the Appearance date and time listed above and at any other time and place that the court tells you.
2. If you do not come to court as required, you will be committing the crime of Failure to Appear, and:
   a. You may be arrested immediately, or the court may issue a capias (order for your arrest); and
   b. You may be subject to the following added criminal penalties:
      i. If you were released on this Promise to Appear for one or more felonies, you may be charged with an additional Class D felony, and the court may sentence you to up to 5 years in prison, fine you up to $5,000, or both, for failing to appear.
      ii. If you were released on this Promise to Appear for one or more misdemeanors or motor vehicle violations, you may be charged with an additional Class A misdemeanor, and the court may sentence you to up to 1 year in prison, fine you up to $2,000, or both, for failing to appear.
3. If you commit another crime after you have been released on this Promise to Appear, you may be subject to added criminal penalties in addition to any sentence that the court may give you for that crime:
   a. If the new crime is a felony, the court may sentence you to up to ten (10) additional years in prison; or
   b. If the new crime is a misdemeanor, the court may sentence you to up to one (1) additional year in prison.
4. You must follow all of the conditions of your release.
5. If you do not follow the conditions of your release, you will be committing the crime of Violation of Conditions of Release, and:
   a. The court may change or add to the conditions of your release;
   b. The court may revoke (take away) your Promise to Appear and release; and/or
   c. You may be subject to the following additional criminal penalties:
      i. If you were released on this Promise to Appear for one or more felonies:
         • Generally, you may be charged with an additional Class D felony, and the court may sentence you to up to 5 years in prison, fine you up to $5,000, or both, for violating your conditions of release.
         • BUT, if you violate the conditions of your release by (1) putting any restraint (restriction) on a person or the liberty (freedom) of a person; or (2) threatening, harassing, assaulting, molesting, sexually assaulting or attacking a person, you may be charged with an additional Class C felony, and the court may sentence you to between 1 and 10 years in prison, fine you up to $10,000, or both, for violating your conditions of release in this way.
      ii. If you were released on this Promise to Appear for one or more misdemeanors or motor vehicle violations:
         • Generally, you may be charged with an additional Class A misdemeanor, and the court may sentence you to up to 1 year in prison, fine you up to $2,000, or both, for violating your conditions of release.
         • BUT, if you violate the conditions of your release by (1) putting any restraint (restriction) on a person or the liberty (freedom) of a person; or (2) threatening, harassing, assaulting, molesting, sexually assaulting or attacking a person, you may be charged with an additional Class D felony, and the court may sentence you up to 5 years in prison, fine you up to $5,000, or both, for violating your conditions of release in this way.
6. Your release may be revoked (taken away) if:
   a. You have been charged with a crime for which the term of imprisonment may be more than 10 years;
   b. The court finds that you have violated any condition of your release; and
   c. The court finds that the safety of any other person is endangered (put at risk) while you are on release.

| | FOR COURT USE |
|---|---|

**ADA NOTICE**
The Judicial Branch of the State of Connecticut complies with the Americans with Disabilities Act (ADA). If you need a reasonable accommodation in accordance with the ADA, contact a court clerk or an ADA contact person listed at www.jud.ct.gov/ADA.

(Page 1 of 2)          DISTRIBUTION: Copies to Clerk of Court, Bail Commissioner, Defendant          **PROMISE TO APPEAR**

A22M-CR23-0124387-S     :

A22M-CR23-0191150-T     :   SUPERIOR COURT

STATE OF CONNECTICUT    :   J.D. OF ANSONIA-MILFORD

VS.            :   AT MILFORD

THEODORA ANTAR      :   FEBRUARY 22ND, 2024

## **<u>DEFENDANT'S SECOND EMERGENCY EX-PARTE MOTION TO VACATE PROTECTIVE ORDER</u>**

The defendant, Theodora F. Antar, in the above-captioned matter, respectfully moves this court to vacate the protective order issued on May 17, 2023. The defendant files this as an EMERGENCY EX PARTE MOTION which is being filed for the second time in the past week and prior similar motions have been blatantly and deliberately ignored by the court in an effort to deny the plaintiff her right to due process.

This administrative court has no jurisdiction over this case.

The order issued on 5/17/23 is unconstitutional.

In support of this emergency ex-parte motion, the defendant states as follows:

1.  The defendant has been subjected to daily relentless harassment by the complainant, Matthew J. Lodice, since the issuance of the protective order.

2.  The defendant has been subjected to Matthew J. Lodice speaking to her, yelling at her, harassing her, emotionally abusing her, and attempting to incite a response from her during phone calls, FaceTime calls, and in person, on a near daily basis.

3.  The defendant has asked the complainant to cease all contact with her outside of the OurFamilyWizard application on numerous occasions, yet the complainant has stated he will not stop the harassment, and has continued to harass and have forced contact with the defendant when the defendant attempts to exercise her parental rights.

4.  The complainant has engaged in over 300 recent instances of verbal harassment, as documented in recorded conversations which have been mailed to the court on 2/14/24 on a usb flash drive as evidence.

1

5. Such harassment includes yelling, berating, taunting, and psychological abuse each time the Defendant attempts to contact her minor daughter, A.L., which the complainant is court-ordered to facilitate.

6. This conduct constitutes coercion and witness tampering, causing irreparable harm to the defendant and infringing upon her constitutional rights.

7. The Defendant has no history of violent crime, abuse, neglect, and retains full parental rights.

8. The protective order unjustly restricts the Defendant's access to her minor daughter and is thus an unconstitutional infringement of her rights as affirmed by the U.S. Supreme Court in *Troxel v. Granville*.

9. The Defendant asserts that the Court is infringing upon her rights by enforcing an order that conflicts with existing contracts regarding custody/access to her minor daughter, and that the Court lacks jurisdiction to enter orders that conflict with these agreements.

10. An identical duplicative protective order in the defendant's violation of protective order docket concerning the Defendant has been terminated due to the court admitting they have no basis for it to remain in effect, further justifying the urgent need for the immediate termination of the current order.

11. The defendant has continued to suffer harm at the hands of the complainant, who has harassed the defendant without ceasing for several years, and has continued to use the criminal justice system as a weapon against the defendant.

12. The following unfinished complaint regarding criminal conduct of the complainant against the defendant serves to be incorporated into this emergency motion and to show the court that emergency relief is warrante:

13. CRIMINAL COMPLAINT AGAINST MATTHEW JOHN LODICE

14. My name is Theodora Antar and I am seeking to press criminal charges against the following individual:

15. Matthew John Lodice

16. DOB: 05/11/1983

17. Address: 48 Quarry Hill Rd, Waterbury, CT

18. Phone Numbers: 860-518-2388; 203-919-9528;

19. Emails: matthewlodice@gmail.com; wholehouseremodeling@gmail.com

20.

21.

22.

23.

24.

25.

26.

27.

28.

29.

30.

31.

32.

33.

34.

35. TABLE OF CONTENTS

36.

37.

38.

39.

40.

41.

42. I would like for a warrant for the arrest of Matthew Lodice to be issued based on the violations of several Criminal Codes. Matthew has committed various crimes under federal, constitutional, common law, and state law. He has committed a conspiracy against rights against me and my minor children in violation of 18 U.S.C. § 241. He has intimidated me on numerous occasions to try to prevent me and my minor daughter from the free exercise of our religion, of my parental rights and constitutional and inalienable right to the access, control, care, and parenting of my minor daughter Angelina Lodice.

43. Matthew has also committed a deprivation of rights under color of law against me and my minor children in violation of 18 U.S.C. § 242. He has deprived me and my children of our rights under the color of law as he has stated that he is now the judicial authority for the rest of our lives since he was awarded temporary sole legal and sole physical custody through a fraudulently obtained court order on 5/25/23 that he obtained through bribing his friends and family members who are associated with Judge Jane Kupson Grossman to "purchase" custody of our minor child in spite of his long history of violence, domestic abuse, and child abuse and neglect.

44. He has stated, on numerous occasions, that he now has the authority under the color of the law which was given to him by the State of Connecticut Superior Court, to determine if, when, how, and under what circumstances I can see my minor daughter. He has since deprived me of my parental rights, my rights to access, my rights to visitation, and my fundamental and inalienable rights under the color of law, and those as they apply to my minor children. He has deprived us of our rights and continued to do so, and the police, courts, and the Department of Children and Families have all stated that Matthew Lodice has the power to act "under the color of the law" as he is the new "judicial authority" based on the illegal transfer of judicial authority from Judge Jane Kupson Grossman to Matthew Lodice in violation of the non-delegation doctrine and federal, state, and constitutional laws.

45. Matthew has also committed a violation of 18 U.S.C. § 250 in committing sexual assault. My four year old child has stated on numerous occasions that he has had sexual contact with her by forcing her to sleep in a bed with him and/or his almost 18 year old son, allowing his almost 18 year old son to sexually abuse her while under his care, custody, and control, and by allowing for child pornography to be filmed and selling said pornography for a profit on the dark web.

46. Matthew has also committed a violation of 18 U.S.C. § 245(b)(2) in violation of federally protected activities.

47. Matthew has also committed a violation of 18 U.S.C. §247 in violation of damage to religious real property.

48. Additionally, he has committed many other crimes, as well. I have attempted, on numerous occasions, to report many of these instances of criminal activity to various police departments, who either refused to take my statement, refused to investigate, refused to apply for an arrest warrant, or attempted to coerce me into not making a formal criminal complaint against this individual. The following existing criminal case numbers for each of the applicable law enforcement departments is as follows:

49.

50. Relevant Waterbury Police Department case numbers to this statement:

51.

52. Relevant Connecticut State Police Troop I case numbers to this statement:

53.

54. Relevant Orange Police Department case numbers to this statement:

55.

56. Relevant Middlebury Police Department case numbers to this statement:

57.

58. Relevant Hamden Police Department case numbers to this statement:

59.

60. Relevant New Britain Police Department case numbers to this statement:

61.

62. Relevant Wallingford Police Department case number to this statement:

63. 23-23360

64.

65. Affidavit for warrant for arrest of Matthew Lodice for violation of protective order in accordance with Connecticut General Statutes § 53a-223

66. By: Theodora Antar

67.

68. I am a victim of domestic violence and a crime victim. Domestic violence victims have the right, pursuant to CGS § 46b-38b(d), to file an affidavit for a warrant for arrest. My name is Theodora Antar (9/7/1991) and I am writing this statement because I would like to press formal criminal charges against the father of my

child, Matthew Lodice, for various criminal acts that have taken place from 2018 to present. Matthew was arrested on 1/27/23 for harassing me.

69. A protective order was issued upon his arrest, and I was listed as the protected person in that order. The first protective order was in effect from 1/27/23 through 7/24/23. Then, a second restraining order was in effect from 9/1/23 through 9/8/23.

70. Matthew Lodice has repeatedly violated both the criminal order of protection and the restraining order in accordance with CGS §53a-223 and this can be proven beyond a reasonable doubt as follows:

71. The criminal protective order that listed me as the protected party that was in effect from 1/27/23-7/24/23 states that Matthew must follow all the orders and conditions below:

72. Surrender or transfer all firearms and ammunition. 2. Do not assault, threaten, abuse, harass, follow, interfere with, or stalk the protected person. 3. Stay away from the home of the protected person and wherever the protected person shall reside. 4. Do not contact the protected person's home, workplace, or others with whom the contact would be likely to cause annoyance or alarm to the protected person. 5. Mr. Lodice is allowed to contact the protected party, regarding visitation and affairs of their child, via Family Wizard. 6. Exchange of the minor child must be pursuant to the most recent Civil Family order. 7. Mr. Lodice is allowed to facilitate/initiate contact with the protected party for the purpose of contact with the child in accordance with the most recent Civil Family Order. 8. This order shall be enforced, even without registration, by the courts of any state, the District of Columbia, any U.S. Territory, and may be enforced by Tribal Lands (18 U.S.C. §2265). Crossing state, territorial, or tribal boundaries to violate this order may result in federal imprisonment. (18 U.S.C. §2262).

73.

74. Matthew Lodice has violated the terms of the protective order numerous times by threatening me, abusing me, harassing me, following me, interfering with me, stalking me, contacting me outside of the OurFamilyWizard app, contacting others with whom the contact would be likely to cause annoyance or alarm to me,

contacting me in the OurFamilyWizard app for reasons other than the visitation and affairs of our child, refusing to exchange the minor child pursuant to the most recent Civil Family order, and refusing to facilitate contact for the purpose of contact with our child in accordance with the most recent Civil Family Order.

75.

76. He has continuously subjected me to coercive control psychological/emotional and financial abuse on numerous occasions since the order has been in place.

77.

78. Since 1/27/23, when the protective order was first initiated, Matthew has violated the terms of the protective order on a minimum of 100 separate occasions. These are felony offenses and the statute of limitations on a felony is five years.

79.

80. His actions in violating the order and his repeated harassment and abuse show a pattern of coercive control, other criminal activity, and abuse that has progressively escalated and worsened over time. all of which I have documented, as follows:

81.

82.

83.

84.

85.

86.

87.

88.

89. On 3/5/21, Matthew committed perjury by lying under oath on a fee waiver application submitted in the docket NNH-FA-19-5046828-S in which he misrepresented his income, assets, and finances and signed under penalty of perjury.

90.         Matthew lied under oath with zero regard for the consequences and perjury is a felony with a five year statute of limitations which has not yet expired. I am asking that he be charged with perjury for the fraudulent

misrepresentation that he committed through the filing of said document on 3/5/21.

91.

92. 2. On 9/2/22, at 7:22:08 PM, during a FaceTime call between myself and my minor daughter Angelina Lodice, Matthew continuously was posing shirtless in front of the camera during the call and repeatedly asked me to come over to his house to engage in sexual intercourse multiple times.

93.     He also continued to state repeatedly that he wanted to make me dinner and wanted me to spend the night with him.

94.     This was after he was previously told in April of 2022 to cease all communications with me outside the OurFamily Wizard app, yet he continued to harass me without any consideration for the prior warnings from the police.

95.

96. 3. On 10/9/22, at 12:57PM, Matthew was threatening me to lose custody and weaponizing the courts as a way to harass me.

97.

98. On 10/22/22, at 8:03:40PM, when Matthew was busy working during his parenting time, I had to take Angelina to the emergency room for what possibly was appendicitis. Her pediatrician said to take her to the emergency room due to an extremely high fever. I was advised by DCF and the New Britain Police Department days prior to this not to send Angelina to Matt for his parenting time because she had reported being sexually abused by his son Dominic Lodice while in Matthew's care. When I attempted to notify Matthew about the emergency situation, he did not respond in the parenting app until hours later, because he was busy working at his restaurant job. If Angelina had been with him that weekend like she was scheduled to be, he would have left her alone with Dominic again since he had work that night and lied and claimed he wasn't working when I asked days prior. He worked Friday and Saturday and wasn't able to answer during an emergency. If his son was with Angelina, he would have never taken her to the ER with a 104 fever or known to call the pediatrician or picked up on any of these signs of illness or known how to administer medications. Angelina

8

ended up having pneumonia and I got her to the emergency room just in time. Matthew also testified that he did not even know the name of the pediatrician or the information about where she goes to the doctor. (See transcript from 5/25/23 hearing)

99.

100.    4. On 1/22/23, at 7:15:37 PM, during a FaceTime call between myself and my minor daughter Angelina Lodice, Matthew continually was blowing me kisses during the call and attempting to talk to me on the call despite previously being warned to cease all contact outside of the OurFamilyWizard app by the police.

101.    Matthew then saw me drinking water and began to get enraged and accused me of drinking wine.

102.    I explained to Matthew that it was water and he then asked if he could "join me" and continued to sexually harass me during the call in the presence of my minor daughter Angelina.

103.

104.    5. On 1/29/23, Matthew interfered with me and my custodial rights by refusing to follow the court order which specified has required to bring my child to Sunday School. I was unable to exercise my parenting time with my daughter at Sunday School because Matthew refused to bring her.

105.    On 1/29/23, Matthew also interfered with me as the protected party by refusing to bring the child to church for Sunday School. He interfered with my custodial rights, since the court order stated that he is required to bring the child to Sunday School.

106.    He told Officer Jeffrey Fernandez of the Orange Police Department on 1/27/23 when he was arrested that he would have his mother Karen Bowers bring the child to her scheduled religious education class on 1/29/23.

107.    On 1/29/23, nobody showed up. I attempted to call Karen Bowers and left a voicemail on her cell phone asking where the child was and asking that she call me back. His mother never returned my call. (See recorded call from this date as evidence)

108. The child never was brought to the church. Thus, my custodial rights were interfered with, and Mr. Lodice denied me the right to exercise my scheduled parenting time with my daughter and interfered with our right to practice our religion pursuant to our constitutional rights and the court order which stated he was required to bring her there. Angelina was also denied access to her religious sacrament of Holy Communion and missed her class.

109. Matthew was trying to isolate me by keeping me away from Angelina and did this because the only way he can continue to abuse me is through the child.

110.

111. 6. On 1/30/23, Matthew had contact with others to cause me annoyance/alarm during a phone call with my child.

112. On 1/30/23, Matthew made disparaging statements to annoy/alarm me during the call with the child, in violation of both the family order and the protective order. Four hours prior to this call, Matthew appeared with me and my attorney for a court-ordered meeting with Family Relations for our custody case, during which Matthew stated that he had no intentions of reaching an agreement with us and that he wanted me to "only have the child two days a week and that he planned on taking her from me" which I felt was also done in an effort to cause me annoyance/alarm.

113. That same night, during the call, he started telling my daughter that her "home" was with him and that he misses when she is not at her true home. I wrote a statement with the Orange Police Department about this and, among other things, said that "He made it a point to emphasize and say to the child repeatedly that her home was with him. Matthew knew that I was present and listening to the conversation, since the call was on my phone. He made these statements to disparage me and attempt to cause me annoyance or alarm through communications with my daughter. He also is confusing the child since I have had primary residency of the child and have been her custodial guardian for four consecutive years."

114.

115.    7. On 2/6/23, Matthew had contact with others to cause me annoyance/alarm during a phone call with my child.

116.    On 2/6/23, Matthew was trying to have contact with others to cause me annoyance/alarm by making disparaging statements about me to our daughter during the call. He told the child that she missed a birthday party and other events that occurred over the weekend, which then caused the child to become very upset. She has special needs and is diagnosed with Adjustment Disorder, and he was trying to intentionally upset her to disparage me while he knew I was in earshot.

117.    He then told the child that it was my fault that she missed the party. He was aware of the message I sent him on 2/3/23 in which I notified him of the reason why she would not be coming.

118.    Despite this, he proceeded to make more disparaging statements and tell the child "You were supposed to come see me over the weekend, but mommy didn't let you. Mommy didn't follow the court order like she is supposed to. Don't worry, I'm going to be going back to court soon to fix this."

119.    These statements were made in front of me to cause me both annoyance and alarm, and do not fall in accordance with the terms of the family order which states that he is not to make disparaging statements and that he must recognize the limitations of the child's age.

120.    It is inappropriate for him to make statements about court and court orders to our young daughter in front of me and especially since he was aware of the reason why she wasn't going to him. The purpose of the call is to speak to the child, and not to disparage me as the mother, especially with a full no-contact order in place.

121.

122.    8. On 2/7/23, Matthew had contact with others to cause me annoyance/alarm during a phone call with my child.

123.    On 2/7/23, Matthew was trying to have contact with others to cause me annoyance/alarm by making disparaging statements about me to our daughter during the call. He told the child "I can't wait to see you on Friday." I told him

four days prior and each day since that she would not be coming Friday and asked him to please stop saying that to her during the calls. He then tried to ask for a FaceTime call and said "I would like to FaceTime my daughter please" despite it not being part of the court order. This was also causing me annoyance since he knew that FaceTime's were not part of the agreement or order. (See OurFamilyWizard messages from February 2023; See OurFamilyWizard messages from 2/3/23-2/7/23)

124.     He continued to try to get a reaction out of me, even after the child only responded by saying "ok" to his comment by saying to her "Hopefully mommy follows the rules this time and brings you home like she's supposed to. Don't worry though. I'm taking care of that soon. Soon you will be home where you belong, and you will be with daddy. You belong with daddy not mommy. Daddy is going to make sure of that and it will all be taken care of soon."

125.     I felt annoyed, alarmed, and threatened by his disparaging statements that he made in his contact to my child during the phone call. This was the second day in a row that he did this during the call, which I felt was an obvious attempt to harass me, and I feel that he was insinuating he was trying to intimidate/threaten me by telling the child that "daddy is going to make sure of that" and that "I can't wait to see you" when he knew that I told him repeatedly that she would not be coming there.

126.     I felt afraid and scared that he would try to forcibly take her from me or do something worse like try to hurt me. His words that he will "make sure" she gets to go with him, also felt like intimidation toward me intended to harass/alarm/annoy me. My daughter became very upset after hearing this and started to cry and had trouble sleeping after that during the night and came out of her bedroom multiple times that night asking to be held. Her adjustment disorder was being exacerbated by his undue stress and trauma on her by using her to try to hurt me by having contact with her that was intended to harass and disparage me. I had already told my daughter that she was going to be staying with me for a while and prepared her for that. I notified him as well, and at this point he knew for four straight days and was reminded daily that she would be staying with me

until the investigation ended upon advisement of counsel, police, and DCF. (See OurFamilyWizard messages from 2/3/23-2/7/23)

127.     The statements he was making to my daughter were inappropriate and disparaging and were outside of the context of what is allowed through the family court order. Matthew knowingly made these statements to try and harass, annoy, alarm, and threaten/intimidate me in any way he can. He knows that the only time he can speak to the child in front of me is during the 7:00PM phone call, and that day I missed over an hour of my class after the phone call was done because I was so distraught and upset and went to make a complaint regarding the incident. I was advised to make this complaint since this also interfered with my peace, mental, and emotional wellbeing, and my ability to pursue my education.

128.

129.     9. On 2/8/23, Matthew had contact with others to cause me annoyance/alarm during a phone call with my child. The call was recorded.

130.     On 2/8/23, Matthew Lodice was trying to have contact with others to cause me annoyance/alarm by continuously asking our daughter on the phone if she was coming to see him that weekend and repeatedly telling her that she would be seeing him and his son, despite me telling him in the OurFamilyWizard app that she would not be there. He also demanded that I FaceTime him for the second night in a row, even after I told him I would not be doing so. He said, "I would like to FaceTime, Angelina, you're in violation of court order and not answering the phone." (See OurFamilyWizard messages from 2/8/23)

131.     When Angelina called him on the regular call, he then to asked her "you coming over Friday? You coming to daddy's house Friday? You going to play the Elsa game when you come over? You're gonna come hang out with Sal and Dom and me? Do you want an Elsa braid or an Anna braid?"

132.     I informed him on 2/3/23, after my daughter made disclosures on 2/1/23 (See video of disclosure from 2/1/23) of being sexually abused by Matthew's son Dominic Lodice (her 16-year-old half-brother and primary caregiver during Matthew's parenting time), I notified Matthew in the OurFamilyWizard app that

the child "will not be going with you until further notice due to the ongoing police investigation." (See OurFamilyWizard communications from 2/8/23)

133.     Matthew still proceeded to then message me in the app again to harass me and ignored everything I said about Angelina and the investigation and said "Please make sure Angelina is dropped off at my mom's between 9-12 on Friday as per our agreement and court order. Thank you." (See OurFamilyWizard communications from 2/8/23)

134.

135.     10. On 2/9/23, Matthew had contact with others to cause me annoyance/alarm and repeatedly harassed me and asked me to FaceTime him and refused to speak to my daughter unless we complied with a FaceTime which also caused us both stress and anxiety since FaceTime was not part of the court order. Attempts at calls were recorded and I have all the messages from OurFamilyWizard in which he continued to demand that we FaceTime him.

136.     On 2/9/23, Matthew Lodice, for the fifth time in a row, Matthew was trying to have contact with others to cause me annoyance/alarm by intentionally causing stress and anxiety in our daughter by demanding that I have her FaceTime him. The protective order and the family order both did not allow for FaceTime calls at this time. It only allowed for him to have a regular call. I attempted to call his phone twice so that our daughter could speak to him, and he answered the call both times and then immediately hung up. He continued to try to FaceTime me during this time. (See recorded call from 2/9/23)

137.     He then messaged me again and said "I would like to FaceTime Angelina per our agreement" even though this was not part of any agreement or order. I then told him in the app "She just tried calling you twice to tell you she doesn't want to talk to you and both times you answered and didn't say anything. FaceTime is not available." He then replied and said "FaceTime is in our court order. You are required to let me talk to her. Calling and hanging up is not letting me talk to her." (See OurFamilyWizard messages from 2/9/23).

138.     He was the one who was answering and then hanging up because he was angry that I wouldn't allow a FaceTime. He then continued to try and FaceTime

her, and I messaged him again and said "Angelina just told you that she does not want to talk to you. Please do not harass us. Please be respectful of her age and attention span and that you need to respect her feelings. Do not keep messaging us and harassing us or calling back she made it very clear that doesn't want to talk to you." (See OurFamilyWizard messages from 2/9/23).

139.

140.      11. On 2/11/23, Matthew messaged me again asking for a FaceTime, even after I had repeatedly said no previously and repeatedly told him that it was not part of the court ordered agreement or the protective order terms. He said, "I would like to FaceTime my daughter please." (See OurFamilyWizard messages from 2/11/23). I feel that he did this to harass me, just like he continued to say to me and the child that he would see her Friday after I told him she wasn't coming. He would intentionally ignore what I say and continue to ask for it repeatedly to harass me further.

141.

142.      12. On 2/14/23, Matthew interfered with me and engaged in custodial interference by interfering with my custodial right to continue our daughter with her mental health treatment services. I have communications and emails from my daughter's providers and her medical records showing that her services were terminated due to the father's interference and then subsequently started again.

143.        On 2/14/23, Matthew interfered with me as the protected party and engaged in custodial interference by interfering with my custodial right to continue our daughter with her mental health treatment services. She had received multiple referrals to the Yale Child Study Center and was in the middle of her treatment for adjustment disorder with Jessica Mayo, PhD, which she began an intake for in the end of January 2023.

144.        Dr. Mayo stated that Matthew was withdrawing his consent and that Angelina's therapy services needed to be stopped until Matthew could provide consent again. He was doing this to interfere with me and my ability to parent my child and to get her the necessary mental health treatment that she desperately

needs. He was doing this to be retaliatory and vindictive toward me and was interfering with me to harass me.

145.

146.    13. On 3/10/23, Matthew interfered with me and interfered with my custodial rights and ability to take my daughter to a scheduled mental health appointment.

147.    On 3/10/23, Matthew interfered with me as the protected person by interfering with my custodial rights and ability to take my daughter to a scheduled mental health appointment. I received a call from my child's school at 2:18 PM that Matthew had, without any warning or notification, shown up unexpectedly at my child's school in the middle of her nap, woke her up, took her and all her belongings, and left.

148.    I immediately called 911 as I was fearful that he would leave her alone again with his son Dominic Lodice who was under active criminal and DCF investigation at the time for allegations of sexual abuse. My attorney, DCF, and the police all had stated that it was in my daughter's best interest to stay with me during the duration of the investigations, and Matthew told Detective Lisa Steeves on 2/18/23 that he agreed it was in her best interest. Despite this, Matthew still showed up and took Angelina without any warning. I messaged him in the app at 2:28PM, and said, "I need Angelina back. She has an appointment at 4. I need her back immediately."

149.    Matthew then, to cause me stress and alarm/annoyance, replied and said "I'm sorry it's too last-minute. You cannot tell me an hour and a half before her appointment on my day that she has an appointment. We already have plans."

150.    There was no way he could have already had plans, as he was aware of the active investigations and had no knowledge that she would be at school that day and had no knowledge of what time I was picking her up. He showed up at the school and once he saw she was there he took her. He said nothing to me in the app prior to this.

151.    He forced her to miss her therapy appointment because of interfering with my custodial rights. It was not "his day" as the only thing in the court order said

that his mother got visitation time on Friday's and that I was responsible to bring her to his mother's.

152.     Nowhere in the court order did it say that Matthew was allowed to pick up the child from school, and nowhere in the court order was Matthew ever scheduled to pick up the child from school on that day.

153.     However, he did anyway, and caused both me and the child immense stress and anxiety and interfered with my ability to bring my child to a necessary mental health appointment.

154.     This interfered with my well-being, my ability to get my child medically necessary mental health services, and caused me extreme stress and trauma, which interfered with me in violation of the protective order.

155.     At 4:25PM, I messaged Matthew in the app and said, "I'm on the phone with 911. I need her back immediately. You are violating protective order." Matthew read my messaged at 4:25PM and then never responded. (See OurFamilyWizard messages from 3/10/23) His actions constitute custodial interference.

156.

157.     14. On 3/11/23, Matthew interfered with me and my custodial rights and did not give me the right to first refusal and left my child alone with his son who was under active criminal investigation at the time. Matthew also interfered during the phone call with my child and was instructing the child what to say to me.

158.     On 3/11/23, Matthew Lodice interfered with me as the protected person again by interfering with my custodial right of first refusal and leaving the child alone with his 16-year-old son while he took his 11-year-old son with him to work for the day. He did not give me the right of first refusal, nor did he notify me in advance that he would be leaving Angelina unsupervised with Dominic Lodice for most of the day. She had a forensic interview done on 3/3/23 in which she stated that Dominic "sits on her and has her sit on him and tickles her belly" and the social worker Leah Smith, LCSW, wrote in the report that she recommends no unsupervised contact with Dominic. (See after-visit notes from Yale Child Abuse Clinic re: 3/3/23 forensic)

159.	However, Matthew still left Angelina alone with Dominic and did not give me the right of first refusal on that date. I have a witness, Maryelise Cofrancesco, who personally witnessed that Matthew's vehicle was not present outside of the home or in the driveway for most of the day. I called the New Britain Police Department and requested that a wellness check be done, and Matthew did not comply. Officer Brandon Hall stated that he "responded to the above location and was unable to make contact with anyone at the residence. I was able to make contact with Matthew Lodice (DOB 5/11/1983) via telephone. Matthew stated to me that everything was fine and his daughter, Angelina Lodice (DOB 5/21/19) was ok and in good health. Matthew declined to speak with me in person and simply stated he is tired of having the police called on him when he has done nothing wrong. Matthew has had some facet of law enforcement called on him approximately forty-three times in reference to the complainant Theodora Antar (DOB 9/07/91) making allegations against him." (See police report from 3/11/23 New Britain) The officer never laid eyes on the child, nor did he ever confirm that she was safe or in good health and not alone with Dominic. When I spoke to my child that night on the phone, she confirmed that she was left alone with Dominic, as well. Matthew then began to interfere with the phone call and was instructing the child of what to say. (See recorded call from 3/11/23)

160.

161.	15. On 3/29/23, Matthew interfered with me and my custodial rights by calling my child's school and telling them that she will no longer be attending the school, which caused her to permanently lose her spot.

162.	On 3/29/23, Matthew Lodice interfered with me as the protected person by calling my child's school and telling them that she will no longer be attending the school, which caused her to then lose her spot permanently.

163.	He interfered with my custodial rights since our court order stated that all educational decisions must be made together, and he never asked me or consulted me before withdrawing her from the program she was in.

164.

165.    16. On 3/31/23, Matthew interfered with my custodial rights and my ability to speak to my child on the phone and forced her to hang up the phone on me. The call was recorded.

166.    On 3/31/23, Matthew interfered with me by refusing to let me speak to my daughter for a full conversation. He forced her to hang up the phone only after a couple minutes of speaking to me and told her she had to leave because they were at his ex-wife's house. A soon as they were in the presence of his ex-wife, he instructed the child to "say bye." (See recorded call from 3/31/23)

167.

168.    17. On 4/1/23, Matthew violated the no-contact order and spoke to me directly on the phone. I have 3 recorded videos from him speaking to me directly on the phone on that date, in violation of the no-contact order. I have the 3 recorded videos as evidence also.

169.    On 4/1/23, Matthew Lodice violated the no-contact order by speaking to me directly on the phone.

170.    I called Matthew's phone at 7:00Pm to speak to my daughter, and he spoke to me multiple times during the call.

171.    At 6:58PM, he said "hold on one second" to me and then did not respond.

172.    I then tried to call back to speak to my daughter after hanging up when he was speaking to me.

173.    I called again at 7:03PM and he said "hello, can you hear me?"

174.    I ignored him and said "Angelina?"

175.    He then said, "Hold on one second."

176.    I said "Angelina, hello?" and did not hear anything and it seemed that he put it on mute.

177.    When I called, Matthew answered the phone himself and spoke to me directly and said, "hold on one second"

178.    He then said nothing, and I hung up. I then called back, and he spoke to me on the phone directly again and said, "hello can you hear me?" and then spoke to me again and said, "hold on one second".

179.    He then put the phone on mute and did not let me speak to my daughter.

180. Then, at 7:07PM, I called back again to try to speak to my daughter. Matthew spoke to me again on the phone and said, "hang up right now? what?" "hello? the phone just said hang up right now. hold on one second." He never let me speak to the child, never communicated with me in the app that the child wasn't with him but continued to answer the phone and speak to me directly. (See 3 recorded videos from this date as evidence)

181. Then, at 7:16PM I called again so that I could speak to my daughter, pursuant to the most recent civil-family order.

182. Matthew is ordered to have no contact with me outside of the OurFamilyWizard app. He is also ordered to allow me to have contact with my daughter while she is with him pursuant to the most recent civil order.

183. Matthew never communicated with me in the app that my daughter was not with him on that day.

184. My daughter was at his mother's house.

185. Matthew also interfered with me and refused to follow the court ordered right of first refusal. He left my child at his mother's for the entire day and night and did not give me the right of first refusal or let me talk to her and I had to call his mom just to find out where my child was and to be able to speak to her.

186. He harassed me by speaking to me repeatedly on the phone, despite him being fully aware that there is a full no-contact protective order that prevents him from having any contact with me outside of the OurFamilyWizard app.

187.

188. 18. On 4/2/23, Matthew violated the no-contact order and spoke to me directly on the phone. The call was recorded.

189. On 4/2/23, Matthew violated the no-contact order by speaking to me during my phone call with the child. During the call, I was trying to talk to my daughter, and it sounded as if Matthew had the phone far away from her. He was also trying to interfere in the conversation. I asked my child "Angelina, can you hear me?" and Matthew replied and said, "she could." (see recorded call from 4/2/23)

190.

191.    19. On 4/7/23, Matthew interfered with me as the protected party, called me twice on my phone directly outside of the parameters of the protective order, and then spoke to me directly on the phone. I have all the recorded phone calls from this date, as well as all the messages from OurFamilyWizard as evidence.

192.    On 4/7/23, Matthew was interfering with me by refusing to respond to any of my messages in the OurFamilyWizard app. The civil family court order says he is required to reply to all messages in OFW within 24 hours, and he was intentionally ignoring my messages and not replying to any of them.

193.    He then called me twice on my phone directly outside of the parameters of the civil family order, and then spoke to me directly on the phone. He did not reply to any of my messages or questions in the app during this time. I tried to call his mother's house and left her a voicemail and asked if she could call me back.

194.    I called Matthew's phone and he immediately answered and said, "Call and I will have her talk to you at 7:20." I said "Angelina?" and Matthew again said "You heard? Call back at 7:20." I said "what?" and he said again "Call back at 7:20." I said, "I need to talk to Angelina" and he says, "You can call back and talk to her at 7:20. Call back then." I said "Where is Angelina? The court order says you need to let me talk to her between 7 and 7:15."

195.    He then in a sarcastic tone, said "Oh my god, 7:20 call back and I will make her available, thank you!" He then hung up on me. (See recorded calls from 4/7/23; See also OFW messages from 4/7/23)

196.    He would not let me speak to the child or tell me where she is or who she is with. I was forced to call his mother to try to see if the child was there and after I finished speaking to the child, I received two more calls from Matt, both of which were outside of the time that he can call to talk to the child. He was not with the child and had no reason to call me during this time.

197.    At 7:14PM, I finally called Matthew's mother, and Angelina was there. Angelina said she was at Matthew's mother's house. Matthew never told me that she was there, nor did he ever reply to me in the app. (See recorded call with Angelina; See also OFW messages from 4/7/23)

198.     Matthew did not give me the court ordered right of first refusal on this day. Angelina was at his mother's house from 12:40PM all of the way through overnight.

199.

200.     20. On 4/8/23, Matthew contacted others to cause me annoyance/alarm and insulted me to my child during a phone call, interfered with my custodial rights by refusing to exchange the child pursuant to the most recent civil order, and interfered with my right to make religious decisions for my daughter, and spoke to me directly on the phone. I have the recorded calls and messages from OurFamilyWizard.

201.     On 4/8/23, Matthew tried to have contact with others to cause me annoyance/alarm by insulting me on the phone to our daughter.

202.     When I tried to speak to my child, I began by saying Angelina's name, and asked Angelina where she was.

203.     Matthew then, in a sarcastic tone, said to the child "I know she doesn't say hi or how are you first but…here…come on talk to her."

204.     I ignored his statement and said "Angelina, can you hear me?"

205.     Matthew then spoke to me directly again and said, "She can hear you."

206.     I then said "Angelina?" and told Matthew "Can you please stop talking to me?"

207.     I then told the child that we missed her at church that day, because it was a special religious event.

208.     Matthew interfered with my custodial rights by refusing to bring her to the religious event.

209.     During the call, Angelina said that she didn't get to go to the religious event because "dada did not let me."

210.     She missed Saturday of Lazarus (a major religious event in the Greek Orthodox faith) for the second year in a row because of him refusing to bring her.

211.     She also missed a special visit from the Bishop that day.

212.     He refused to bring her to the religious event and interfered with my rights to make all religious decisions for her pursuant to our agreement and caused me extreme annoyance/alarm.

213.     He likely did this to try to harass me. He interfered with me as the protected person by interfering with my conversation with my child.

214.     During the call, my daughter got upset and said that she did not want to miss church.

215.     Every time I asked her a question about what she did, he would try to say something to her and interfere. He also violated the no-contact by speaking to me directly on the phone. I hung up at this point because I did not want to have phone contact from him. I told my daughter that I hoped she would be able to be at church the next day as Matthew was required to bring her, and she was also excited to go. (See recorded call from 4/8/23)

216.     He interfered with my ability to speak to my child and was trying to intimidate and harass me by speaking to me directly on the phone despite there being a full no-contact protective order that says he can only contact me in the OurFamilyWizard app.

217.     I told him to stop speaking to me, and he continued to speak to me for months later, and still continues to speak to me directly on FaceTime calls, regular phone calls, google meet calls, and when he sees me in person.

218.

219.     On 4/9/23, Matthew violated the protective order by refusing to exchange the minor child pursuant to the most recent family order, which also interfered with my ability to practice my religion with my daughter and make all religious decisions for her. He also interfered with my custodial rights.

220.     On 4/9/23, Matthew violated the term of exchange of the minor child being pursuant to the most recent civil family order by refusing to bring my child to a special religious event and Sunday School. This was Greek Palm Sunday.

221.     The child just said the night before that she was excited to go, the court order said he had to bring her, and he had just interfered with me and my custodial rights the day before by intentionally refusing to bring her to church.

222.    The order stated he is required to bring the child to special religious events and Sunday School and that he cannot interfere with me as the protected party.

223.    He interfered with my custodial rights as well as violated the term of exchange. He did not answer numerous messages that I sent him within 24 hours, even though he is court ordered to answer. He also violated the term of no interference as this interfered with my custodial rights at the time.

224.    He refused to drop off the child and refused to exchange the child pursuant to the most recent civil family order and refused to bring her to Sunday School and refused to bring her to a special religious event that she had scheduled on that day, as well.

225.    He forced me to drive all the way to his mother's residence in Waterbury, CT to pick up the child, and then he subsequently refused to pick the child up from me afterwards, and never came back to pick her up.

226.    His refusal to pick up my daughter from church was done to harass me and inconvenience me further. This was a willful refusal for him to exchange the child pursuant to the most recent civil family order which she stated he is required to bring her to special religious events and Sunday school.

227.

228.    On 4/17/23, Matthew had contact with others to cause me annoyance/alarm, harass, and intimidate me during a call with my daughter. The call was recorded.

229.    On 4/17/23, Matthew violated the protective order by having contact with others to alarm/annoy, harass, and intimidate me. During a phone call with the child, he told her "Well, soon enough…just like we talked about, maybe you'll be seeing daddy a lot more soon." The child didn't say anything and there was a pause. She then told him she wanted to finish watching her movie. He continued to say this to try to taunt me and cause me anxiety/alarm and annoy me. (See recorded call from 4/17/23)

230.    This caused me annoyance and alarm again and prompted me to send an email to my attorney.

231.

232. On 4/21/23, Matthew interfered with me and allowed my subscription that he was court ordered to pay for OurFamilyWizard to expire, and intentionally only paid for his account for the renewal and refused to pay for mine. He also interfered with me during a call with my child and had contact with my daughter to cause me annoyance and alarm. Call was recorded, and I have all the messages from OurFamilyWizard.

233. On 4/21/23, Matthew violated the protective order by interfering with me as the protected party. He allowed my subscription that he was court ordered to pay for OurFamilyWizard to expire, and intentionally only paid for his account for the renewal. I asked him prior to the expiration to renew it as he was court ordered to do and told him he needed to since the protective order said he could only communicate with me in OurFamilyWizard. Despite this, and despite him being court ordered to maintain and pay for the app, he removed my access to the app.

234. That same day, when I tried to speak to my child on the phone, he attempted to have third party contact with me by telling her to ask me "What is the name of the school" instead of him using the app that he removed my access in to ask me that. Matthew also continued to speak to my daughter during the call to try to have contact with her to cause me annoyance/alarm when I told my child that her birthday was only a month away.

235. Matthew then interfered and spoke to her to try to alarm me and told her "we didn't know about your birthday last year until the day of" which is a lie, and the police were involved because he did not bring her to her party until he was given an ultimatum of being arrested. Him bringing this up and telling the child that "we didn't know about the party until the day of" is an attempt to disparage me because he was well aware of the party and knew about it weeks in advance.

236. Matthew then continued to try to have contact with my daughter during the call to try to cause me annoyance and alarm and continued to interfere with the call. My daughter said "When I'm 5 I'm going to be able to go to kindergarten!" and I tried to respond and Matthew immediately interfered and started to tell her "You still can do pre-school." Both her and I ignored him, and I told her that "I love you."

237.    Matthew then continued to try to have contact with her that would cause me annoyance/alarm by telling her that she would be going to pre-school in his town and that he registered her for a pre-school. He said "Daddy already got the new pre-school set up for you this summer."

238.    Our agreement said that we needed to make all educational decisions for her together, and she had just been registered for a brand new daycare that she was in a K-prep class. Matthew telling her that he registered and signed her up for a pre-school in his town was done deliberately to annoy/alarm me since he had been threatening to do anything necessary to cause me to lose custody and have her live with him. Matthew then continued to interfere during the call and intermittently tried to mute it and kept taking the phone from my daughter. She said during the call that "daddy took the phone from me." (See email from OurFamilyWizard from 4/21/23; See also police reports from New Britain Police Department 5/20/22-5/21/22; See also emails and OFW messages from 4/12/22-5/21/22; See also OFW messages from week of 4/21/23 prior to deactivation; See also recorded call from 4/21/23; See also emergency ex-parte motion from 5/20/22)

239.

240.    On 4/22/23, Matthew had third-party contact with me and had contact with others to cause me annoyance/alarm and interfered with me during a phone call with my minor child. I have the recorded call as evidence.

241.    On 4/22/23, Matthew violated the protective order by trying to have third party contact with me and by having contact with others to annoy me and interfering during a phone call with my minor child.

242.    When I was speaking to my daughter, he says to her "tell mommy to shut her voice isolation off on the phone and you'll be able to hear it." I ignored him and attempted to speak to Angelina, who then said to me "can you shut the ice off on your phone" and Matthew continued to instruct her to act as a third party to contact me and said "no, tell her voice isolation."

243.    Angelina then got frustrated as he was trying to use her as a third party to communicate with me and said, "she won't say yes or no!" and Matthew then said, "don't worry then, just keep talking to her."

244.  He then instructed the child to hang up on me and forced her to hang up. I called back and told the child it wasn't nice to hang up on me and she said, "but dada told me to hang up!" (See recorded call from this date as evidence)

245.

246.  On 4/23/23, Matthew refused to follow the order that says exchange must be pursuant to the most recent order and refused to pick up my child after he dropped her off. He then admitted to stalking and lying in wait outside of my place of worship. His actions caused both me and my child undue stress and inconvenience. I have all of the messages from OurFamilyWizard.

247.  On 4/23/23, Matthew violated the term of the protective order that states that "Exchange of the minor child must be pursuant to the most recent Civil Family order." by refusing to pick up the child.

248.  He refused to pay for my portion of the OurFamilyWizard app, in direct violation of both the protective order and the family orders that were in place at the time. This left me with no possible way to communicate with him.

249.  Matthew refuses to pay child support, as well, putting me in a difficult situation in which I can not afford to take on the additional expenses for the things he refuses to pay. I was forced to pay more than $2000.00 for my daughter to start school since he refused to pay his portion.

250.  We waited until 12:30PM at the church for him to show up and he did not show up to pick up Angelina. He made no attempt whatsoever to communicate, either.

251.  By 1:00PM, we hadn't heard from him at all and have no way to access any messages in the OurFamilyWizard app due to his noncompliance and refusal to pay for my access, despite being court ordered to pay for it.

252.  This was a direct violation of the protective order which stated he is not allowed to interfere with me as the protected party.

253.  He dropped her off at the church in the morning, and never came back to pick her up. He continued to refuse to pay for the OurFamilyWizard app so that we could communicate.

254. He demanded that I pay for it myself, even though the court order says he is required to pay for all the fees associated with the app. (See court order from 4/12/22)

255. On this date, after church, my daughter and I waited until 12:30PM, almost an hour after her Sunday School class ended, for Matthew to show up, and he never did. He never showed up to pick up Angelina from Sunday School despite it being part of his parenting schedule. He made no attempts to communicate with me either.

256. I did not hear from him and had no access to any of my messages in the app due to his non-payment of my account, despite it being court ordered for him to pay it. Matthew then, at 2:09PM, attempted to harass and interfere with me as the protected party by going to the Orange Police Department and making a false claim to the police about me. He told the police that he wanted to do a welfare check on my child to "see if she was ok" and claimed that he tried to "call me multiple times in the app."

257. When the police told me this, I informed them that not only is there no call feature in the app, but that Matthew intentionally did not renew my subscription to the app, and he knew that I had no access to it. I asked that they please relay to him the message that he needed to pay for the OurFamilyWizard app so that he could communicate with me pursuant to the terms of both the protective order and our family court order.

258. Matthew also admitted to the Orange Police that he was stalking me and lying in wait outside the church on that date. He lied to the police and claimed he arrived at the church at 11:30AM, but he was never there at that time.

259. We were there until 12:30PM. He claims to the police that he "got to the church at 11:30AM and waited in the parking lot for the child to come out of the church, that at 12:30PM he proceeded to drive around the church and did not see Antar's vehicle in the parking lot. That he attempted to contact Antar, via the court ordered app, numerous times, but she did not answer."

260. Matthew also lied to Officer Amarone of the Orange Police Department again and stated that there is "no court order that says that he has to pay for the app for

Antar." He also did not contact me numerous times in the app during that time. (See police report Orange Police 23-12734; See also court order from 4/12/22; See also transcript from 4/12/22; See also records from OurFamilyWizard from 4/23/23)

261. This caused both me and my daughter to have undue stress and inconvenience, and I was forced change my plans at the last minute and make accommodations so that I was able to keep her for the remainder of his parenting time as he did not show up.

262. The fact that he went to the police and lied and told them that he was not required to pay for the wizard and the fact that he lied and told them that he contacted me repeatedly in the app that day

263.

264. On 5/12/23, Matthew spoke to me directly on the phone. I have the recorded call as evidence.

265. On 5/12/23, Matthew answered the phone when I tried to call my daughter and had direct contact with me again and said "hello". He then tried to demand that the child come to him instead of handing her the phone and facilitating the communication like the protective order says and told the 3-year-old child to "stop being lazy" when she asked him to bring the phone into the room so she could speak to me. (See recorded phone call from 5/12/23)

266.

267. On 5/13/23, Matthew interfered with me and refused to facilitate a phone call with my daughter and had contact with my child to cause me annoyance and alarm during the call. He then had third party contact and interfered and instructed my daughter to "say bye" and interfered repeatedly with the call. I have the recorded calls as evidence.

268. On 5/13/23, Matthew was interfering with the phone call by refusing to give the child the phone during the call. He was working in the other room and the child was in another room. When the child came back in the room, Matthew began to speak to Angelina to annoy me by speaking about how he was taking his

son Sal to soccer lessons and how he paid for the soccer lessons for Sal, something he refuses to do for Angelina.

269.     Angelina then, out of nowhere, says "Daddy said that I'm going to start living him with and only going to be with you sometimes. Daddy said that I will be living with him from now on. Do you remember when we were at church and dada tried to slam the door on you? I remember the police came to the church. I remember that. He can't slam the door on you."

270.     She said that "Remember when we were are church and the officers came to church? Well I remember that day. And dada was trying to slam the door on you on that day and I remember that day. He can't slam the door on you." And I said "I know, that is not nice."

271.     She also said that "dada" told her that it was a fact that she was going to leaving her home and going to live with him.

272.     I told her that daddy shouldn't be talking about grown-up stuff with her and she said, "Well he just said I'm going to live with him and that he's just going to go with him sometimes." I told her that just like "Sal and Dom live with their mommies that you would live with your mommy"

273.     Then, Matthew began to laugh within earshot of me and kept trying to talk to the child during the call. He continued to laugh to mock and belittle me during the call when I was trying to speak to my daughter. He had told her on multiple occasions that she would be leaving her home with me and going to live with him and told her this was a fact, even before anything was even heard in court or changed in court.

274.     This leads me to believe that, since he has connections with police officers, correctional officers, marshals, and other individuals in high positions, that he may have paid off or otherwise engaged in corruption to "guarantee" that the child would go with him. There is no reason why an adult 40-year-old man should tell their 3-year-old daughter that she would only be seeing her mother "sometimes" and that she would be leaving her home to move in with him, if he didn't know it was a fact.

275. And if he didn't know it was a fact, then he shouldn't have made comments and statements like that to our young child who has adjustment disorder and is strongly bonded to me. He did this to try to annoy/alarm me and harass me further, knowing that I am a loving mother and that I cherish the bond I have with my daughter.

276. He repeatedly attempted to interfere with the call and was commenting, telling the child to say things like "daddy never went to work today, he just stayed here" when I asked who watched her when he was at work. Matthew continued to interfere during the call and repeatedly tried to have third party contact with me by telling the child to "tell mommy what we did this afternoon" and later in the call said "tell mommy what you told me today. Do you remember what you told me today? Tell mommy. Remember what you said? You told me that you wanted a kitty today."

277. At the end of the call, I was telling my child that "kitties like to eat meat and stuff" and Matthew interfered again and had contact with her to cause me annoyance by continuing to interject and interfere in my conversation with my daughter and said "They are carnivores."

278. At that point, my child said "Who touched my butt?" She then said "Dada, Dada, who touched this? Who touched right there? I felt someone touch me right there."

279. He then told her "nobody touched your back" and she said she "felt" someone touch her butt. Matthew immediately told her to "say bye to mama" and tried to interfere and tried to cause her to end the call so that I could not hear anything else that was said about her alleging someone touched her inappropriately while on the call. He then instructed her again to say bye and forced her to end the call. The entire call was recorded. He interfered with the call repeatedly. (See recorded call from 5/13/23)

280. At 7:49PM, I messaged Matthew in the app and said, "As I stated to you multiple emails times already and sent you documentation several times, just telling you again since I am Angelina's custodial parent and also designated as the one who makes all religious decisions for her. She has both a special religious

event following the service as well as Sunday school on next Sunday and it is for the celebration of Pentecost. She will be at the event until approximately 2:00PM. Since you are court-ordered by both the protective order and family order and required to bring her to Sunday School and special religious events per the MOST RECENT ORDER I'm letting you know now so that you don't try to pick her up hours earlier for no reason."

281. Matthew interfered and read my message and did not respond. He also never brought Angelina to either event, which is custodial interference.

282.

283. On 5/19/23, Matthew had third-party contact with my child to cause me annoyance/alarm during a phone call. He also interfered with the call repeatedly and caused me and my child and family undue stress and inconvenience. I have the recorded calls and messages from OurFamilyWizard as evidence.

284. On 5/19/23, Matthew violated the no-contact term of the protective order again by having third-party contact with me through our child to cause me annoyance/alarm during a phone call where I was trying to speak to my daughter. I called to speak to my daughter, and she said that she was playing with Lucas. I said, "Who is that?" Angelina said "Remember—" Matthew then immediately interfered and interrupted my daughter and tried to have third-party contact and told her to say, "Say it's my cousin."

285. Matthew continued to try to interfere with the call and have contact with my daughter to cause me annoyance and alarm by telling her that he would not be following the court order that said he is required to bring her to special religious events and Sunday School that takes place during his parenting time. During the call, Matthew then instructed Angelina to ask me "Are you going to pick me up on my birthday?" I responded to her and said "What do you mean? It's your Sunday School graduation and you have Sunday School."

286. She then said "Okay." Matthew then immediately began to interfere and try to have third-party contact with me through the child and interfere and cause me undue stress by indicating he would not be taking her to the events that he is

required by court order to take her to. Matthew said "Well, that's not what's happening, because you have your birthday in the morning with dada."

287.     The child then repeated "I have my birthday in the morning with dada." I told her "Dada is supposed to take you to Sunday School and you have your Sunday School graduation that dada has to bring you to and is required to bring you to so…" Matthew then spoke to me directly on the call and said to me "Well, she is not going to be there this week." My child then said, "I am not going to be there this week."

288.     The protective order says that he must exchange pursuant to the family order which states that he is "required to bring her to all special religious events and Sunday School that occurs during his parenting time" and also said that "Mother makes all religious decisions for the child."

289.     The protective order says he can not interfere with me, cannot speak to me outside the OurFamilyWizard app, and that he must exchange her pursuant to the most recent order. During this call, he did or threatened to violate all of those terms, violating 3 different terms of the. He also never did anything with the child on her birthday, did not even get her a cake or have a party or anything, and intentionally forced her to sit there in his apartment all morning until 3:00PM doing nothing while he kept her from me and withheld her from the religious events he was required by court order to bring her to.

290.     He then stated that if I wanted to see the child, that I had to drive all the way to New Britain to get her, which is almost an hour drive. Per the court order and protective order, he was required to bring her to me, and per the birthday arrangement, the first half of the day was scheduled to be with me for my Sunday parenting time with my child during church. He interfered with all these things and caused me, my daughter, and the rest of my family severe undue stress and inconvenience as a result. (See recorded phone call from 5/19/23; See also OurFamilyWizard messages from 5/19/23)

291.     Matthew took the phone from Angelina repeatedly during the call and interfered with my ability to speak to her. He spoke to me repeatedly during the call in violation of the no contact order and said "were allowed to discuss our

arrangements with Angelina" even though the court order says full no contact. (See recordings from 5/19/23)

292.

293. On 5/20/23, Matthew had third-party contact with me during a phone call with my child to cause me annoyance and alarm. He also interfered with the call repeatedly. I have the recorded calls as evidence along with the messages from OurFamilyWizard.

294. On 5/20/23, Matthew violated the no-contact term of the protective order by trying to have third party contact with me during a phone call with my child. This also caused me annoyance and alarm. Rather than messaging me in the OurFamilyWizard app, he instead said to my daughter during the call "Angelina, Ask mommy what time she is picking you up tomorrow."

295. I told him repeatedly in the app that I would not be picking her up since he was required to drop her off to me. He ignored everything I said, and still tried to have third party contact with me and instructed the child to ask me to relay a message.

296. He also began the call by telling the child "remember you said you would talk to her?" to annoy me. He also continued to tell her to hang up during the call and told her that she would not be allowed to come to church the next day for her Sunday School graduation, Sunday school, and special religious event.

297. He said these things to her to annoy/alarm me, since I repeatedly asked him in the app to bring her to the religious events pursuant to the most recent civil family order like the protective order said. He also knows that it hurts me when he intentionally withholds my daughter from being able to receive religious sacraments and be with us as a family to practice our religion.

298. He also spoke to me during the phone call, as well. When I called my child, I told my daughter that her graduation was the next day and that she was supposed to be coming there to receive her diploma. She was anticipating coming to see us and be with us, pursuant to the court order. (See court order from 6/29/22; See also recorded call from 5/20/23; See also OurFamilyWizard messages from 5/20/23)

299. At 7:26PM, I messaged him and said, "This is the second day in a row where you attempted to speak directly to me during the call with Angelina, and where you tried to use our three-year-old daughter as a third-party to communicate with me. She became very upset when you did this and it is unacceptable for you to be involving her in any communications regarding visitation or exchange and you are court ordered and ordered by the protective order to discuss that with me solely in this app. You keep saying that things are allegedly outlined yet you are refusing to acknowledge the fact that that is false. The orders state that you must follow the MOST RECENT order. The most recent order outlines that you ARE REQUIRED TO bring her to Sunday School AND special religious events. Tomorrow she has Sunday School, and a special religious event and her graduation. You're court ordered to bring her there and refusal to do so is custodial interference as well as violation of the protective order. You say "it very clearly states…" and refer to "it" as an old order that is no longer in effect, due to the fact that you are under both civil and criminal orders to abide by the MOST RECENT orders only. Due to the fact that the most recent order states that you are required and not given the option to bring her to Sunday school, since it is a requirement and not optional, that means that means that you must ensure that she is there tomorrow. Please ensure that she is outside the church no later than 9:40 AM tomorrow morning as you are required per court order to do. You are welcome to have the second half of the day with her to spend her birthday with her if you would like because she needs to go to Sunday School and is required to do that. You can have the second half of the day with her once her religious obligations have been fulfilled. As the custodial guardian, you have no right to interfere with my custody. I also have the court ordered right to make all religious decisions for her. You are withholding her from her religion and preventing her from her worship. Her birthday does not give you the right to disobey the court order that states you are required to bring her to Sunday School and special, religious events, of which she has both tomorrow. She also has the Pentecostal celebration after the liturgy. Please stop with holding her from her religious sacraments. The most recent order makes it extremely clear that it is a

requirement for you to bring her. The agreement says nothing about there being an exception for special holidays and birthdays. Please stop lying in this app. You have attached no documentation to confirm any of this because everything you said is a lie. If she's not there by 10 AM at the latest tomorrow morning, a police report will be filed. You have no right to go against the court orders like this. Also, you are consistently involving her in the custody dispute by instructing her to ask me what time I am picking her up when you know very clearly that the court order states you are required to bring her to church on Sundays. Therefore, per the most recent order, it states you are required to provide the transportation and bring her there and therefore there's no reason why you should be instructing her to ask me what time I am picking her up tomorrow since clearly, there will be no reason for me to need to pick her up at all since she will be at church the entire time. Please do not attempt to use our three-year-old daughter as a third-party to communicate with me during the calls when I call to speak with her directly. This is the second day in a row you did this and she becomes very upset and I do not wish to speak with you through our daughter as a third-party. You can communicate with me in this app, if you have questions. I also had a witness who observes the entire thing, and heard what you said. So you are telling me that if I have an issue with the fact that you are refusing to bring her tomorrow that I can bring it up on Thursday? You are telling me to bring up the issue five days after it occurs? Rather than doing the right thing as a parent and trying to do what's best for Angelina, instead, you just tell me that if I don't like the fact that you're not going to follow the court order that you can just have Me deal with it a week later? I have been trying to communicate with you about this issue for weeks now. You did the same thing last year and refused to follow the court order regarding her birthday, and only after you were threatened by the New Britain Police and Orange Police to be arrested for custodial interference if you did not comply with the court order did you comply at the last minute and end up bringing her. If you were going to be doing the same thing tomorrow, then please let me know. So is that you saying that you are willfully just going to disobey the court order that states you are required to bring her to Sunday School and the special religious

event that occurs tomorrow? The protective order states that exchanges between us must be pursuant to the most recent order. Therefore, I am not going to allow you to bait me into violating orders by you demanding me to drive to your home at 2 PM tomorrow when the most recent order states that you are required to be dropping her off to me tomorrow morning by 9:40 AM at church for Sunday school and her special religious events which are her graduation and then the subsequent Pentecostal celebration which occurs after the service. I will be waiting with a police officer outside of the church tomorrow at 9:40 AM to facilitate the exchange. Please be mindful of the fact that there are criminal and civil and family orders which are Ordering you to be required to bring her there. I'm not allowed to come to your house and you are not allowed to come to mine. The exchange must take place pursuant to the most RECENT order. I will not be going by old orders from 2021 as they are no longer in effect. Please make sure she is dressed properly as there will be many people there and she needs to walk and receive her diploma. I gave you ample notice about this. Once she is done with all of her religious obligations, you can pick her up after and have her for the remainder of the afternoon and evening. This is with the most recent order says. We cannot go by the old orders from 2019 or 2021 anymore. Also, I want to reiterate that I do not feel comfortable with you having contact with her as a third-party and asking her and instructing her to ask me things while I am on a phone call with her. You are court ordered not to make disparaging statements or actions, and I feel that involving her in the custody dispute on a regular basis like this, and upsetting her is a disparaging act. Please begin to follow the court orders, including the Financial ones which state that you are required to pay child support in childcare payments as well. Currently you provide zero financial and zero emotional support to our daughter and I believe that this is further evidence of the fact that she should have less time with you." (See OurFamilyWizard messages from 5/20/23)

300.    Matthew never responded to my message and never brought my daughter to the church like he was required to do.

301.

302.   On 5/21/23, Matthew violated the protective order by refusing to exchange the child pursuant to the family order. He also spoke to me directly on the phone, interfered with my custodial rights, and interfered with my phone call with my daughter. I have the recordings and messages as evidence.

303.   On 5/21/23, Matthew violated the term of exchange being pursuant to the most recent civil family order by refusing to bring my child to church for her required Sunday School class, special religious event, and Sunday School graduation.

304.   He spoke to me on the call as well, in violation of the no-contact clause. He also violated the term of no interference as this interfered with my custodial rights at the time. He refused to drop off the child and refused to exchange the child pursuant to the most recent civil family order, and refused to bring her to Sunday School, Sunday School graduation, and refused to bring her to a special religious event which was a Pentecostal event that she had scheduled on that day, as well.

305.   I sent him several messages in OurFamilyWizard on this date asking him to bring the child pursuant to the court order, and he refused to do so. (See court order from 6/29/22; See also recorded call from 5/21/23; See also OurFamilyWizard messages from 5/21/23)

306.   At 9:39AM, I messaged him and said, "Where is Angelina? She's not here like you are court ordered to bring her. We have been waiting out front for the last 10 minutes. How much longer until she gets here for her Sunday school and special religious events that you were court ordered and required to bring her to? Please bring her now per court order."

307.   Matthew interfered with me by reading my message and then refusing to respond.

308.   At 11:52AM, I messaged him in the app and said, "Angelina missed Sunday School and now is missing her special religious event. You are court ordered to bring her to these. Where is she? You can not withhold her from me like this."

309.   Matthew continued to interfere with my ability to have Angelina present with me for her religious event and my parenting time and read my message and did not immediately respond.

310.	At 11:52AM, Matthew then messaged me in a new, separate thread and ignored all of my prior messages in all of the other threads, and said, "You are allowed to pick up Angelina for half of her birthday today at 2pm please let me know if you will be doing so, so that I may have her ready for you."

311.	His actions were harassment as I told him repeatedly and notified him 7 days in advance on the 13th that she had 2 events that day that he was required to bring her to.

312.	He engaged in custodial interference and harassment to try to abuse me further and refused to return Angelina to my custody.

313.	At 11:53AM, I responded and said, "You were court ordered to bring her to church today. We have been here since 9:30 waiting for the court ordered exchange pursuant to the MOST RECENT civil order. Where is Angelina??? Bring her here now."

314.	Matthew continued to interfere with my ability to have Angelina present with me for her religious event and my parenting time and read my message and did not respond. (See OurFamilyWizard messages from today)

315.	At 11:53AM, Matthew continue to harass me and interfere me and messaged me with lies about the court orders and what the orders say. He messaged me and said, "Relationship today is her birthday, per our agreement the day is to be split evenly with me taking the morning slot. You may take the evening half of her birthday from 2:00PM to 8:30PM. Please let me know if you will be picking her up today for the second half of her birthday."

316.	Nothing in the order or agreement stated that "the day is to be split evenly with me taking the morning slot" and in fact, it stated that he was required to bring her to Sunday school and the special religious event, and the first half of the day was supposed to be my parenting time with her.

317.	At 11:54AM, I messaged him and said "The protective order states EXCHANGE MUST BE PURSUANT TO THE MOST RECENT ORDER. You are obligated and required to bring her to church. How long until you get here? Please stop referencing old orders and interfering with my custodial rights."

318. At 11:55AM, Matthew continued to harass me and refuse to acknowledge what I was saying about him referencing an old order and refused to bring Angelina to church as he was required to do for her to go with me for her Sunday time.

319. He messaged me and said, "She is with me celebrating her birthday. As I mentioned earlier you are welcome to pick her up at 2:00PM as per our current agreement. Our agreement is still fully active even with the added on addendum. The addendum did not negate the original agreement. Angelina goes to her Sunday School every week as I bring her every week. Special holidays are outlined separate from regular weekly visits. Her birthday is clearly outlined in line 8 and in line 18 of our agreement."

320. Matthew was referencing an old order from 2021. The new order was modified in 2022 and then temporary orders were placed in June 2022. At this time, he was bound by the most recent orders that stated that "father is required to bring child to Sunday school and special religious events."

321. At 11:55AM, I messaged Matthew again and said, "Where is Angelina??? Stop interfering with my custodial rights."

322. At 11:56AM, Matthew continued to harass me and refuse to follow the order and said, "This question is already been answered multiple times, please stop asking the same question over and over again. Please let me know if you're picking up Angelina at 2:00PM."

323. At 11:56AM, Matthew continued to harass me and refuse to follow the order and said, "Please stop saying the same thing over and over again. I already answered this question and I'm not going to keep reiterating. Just let me know if you are coming to get her at 2:00pm or not."

324. At 12:08PM, I responded and said, "Coming to get her? You did not say any location. You are court ordered and mandated to bring her to me at the church. How long until you are here?"

325. Matthew continued to interfere with my ability to have Angelina present with me for her religious event and my parenting time and read my message and did not immediately respond.

326.   At 12:09PM, I messaged him again and said, "You never ONCE answered where she is. Where is she and why are you withholding her from me? Why are you violating the criminal order of protection?" (See OurFamilyWizard messages from 5/21/23)

327.   At 12:10PM, Matthew continued to harass me and refuse to follow the order and tried to bait me into violating the protective order by demanding that I go to his house and said, "We will be at 23 Lyman street, New Britain, Connecticut, 06053 at 2:00PM sharp. You can message me when you are outside and she will be walked out to you. She has to be brought back at 8:30 according to our agreement. Please make sure you follow."

328.   At 12:12PM, I messaged Matthew and said, "I am not coming to your house. You are mandated to bring her to me on sundays per the court ordered exchange schedule. Please have your mother bring her to the church now like the protective order says. Stop trying to bait me into coming to your house. The New Britain police said you will be arrested if you do not bring her to me. You are interfering with my custodial rights and you are violating the protective order which orders you to follow the most recent order. The most recent order specifies that you are required to bring her to Sunday school as well as special religious events. She missed Sunday School and two special religious events today. Again, the previous order says we work out visitation week by week, and that is no longer in effect. Also not only that, but I also make all religious decisions for her and you are interfering with that right now."

329.   Matthew then continued to try to interfere with me and harass me and at 12:15PM, he said, "Ok Theo. Well like I said. Angelina will be walked out to you when you park out front of the house and message You have all the information you need."

330.   He intentionally ignored the court order that said that he was required to bring her to me for Sunday school and special religious events.

331.   He intentionally ignored all of my messages in which I asked where she was and why he wasn't exchanging her pursuant to the most recent civil order like the

protective order indicates. He intentionally ignored everything and continued to demand that I go to his house, despite there being a protective order.

332.   At 12:15PM, I replied and said, "No. Stop trying to bait me to go to your house. The protective order says that we can not go to one another's house. I am going to the New Britain police now. Please bring Angelina there now."

333.   At 12:17PM, Matthew continued to try to harass me by refusing to follow the order and said, "I'm not going to the police station, nor do I have a means to get there. The protective order that I have against you has allocations for us to do exchanges. You are allowed to come here to pick up Angelina, on top of the fact I'm giving you permission to come pick up Angelina. You are the one who causes the problems during exchanges. Bring a police officer with you if need be. But we're not leaving our house to go anywhere at that point, so you can come pick her up here waiting outside for us to bring her out or not at all."

334.   Matthew's comments were harassment and interference. Matthew refusing to exchange the child pursuant to the most recent civil order and then refusing to meet at the police station is interference. He then said he has "no means to get there" when he has a vehicle, which is him harassing and interfering with me more.

335.   He also lied and continued to harass me by saying that the protective order "has allocations for us to do exchanges" when I spent hours referencing the language which states that "Exchange must be pursuant to the most recent civil family order." Nothing in the family order stated anything about any exchanges taking place at his house. It stated he was required to bring her to me for Sunday School and the religious event. His attempts to gaslight and lie about what the orders said were causing me more interference and were harassment.

336.   Matthew's statements that I am "allowed to come here to pick up Angelina, on top of the fact that I'm giving you permissions to come pick up Angelina" were also attempts to harass, interfere, and bait me into violating the residential stay-away order. He has no authority to demand or dictate that I can violate the order. Him saying that they are "not leaving our house to go anywhere so you can come pick her up were here waiting outside for us to bring her out or not at all"

was also an ultimatum that unless I violated the protective order that I would not be able to see my child on her birthday.

337.     At 12:31PM, I messaged him again and said, "So to be clear, you are refusing to meet me at the police department to give me angelina and are refusing to comply with the protective order saying you are required to bring her to me ?"

338.     Matthew continued to interfere with my ability to have Angelina present with me for her religious event and my parenting time.

339.     At 12:32PM, I messaged him again and said, "That is false. It says "exchange must be pursuant to the most recent order" most recent order says you are required to bring her to me. Why arent you following it ?"

340.     Matthew continued to interfere with me and harass me and lie about the order. He then, at 12:47PM, said, "Nowhere in our most recent order does it say I am to bring her to you. Lines eight and line 18 clearly state that the days to be split. You can come pick her up at 2:00 p.m. per our agreement. It's very clear, there should be no confusion."

341.     At 12:47PM, he responded and said, "There is no order that says I have to bring her to you. The order states that for her birthday, it is to be split and the person whose day it is gets to choose whether they want the morning or the evening. I chose the morning. Therefore you can come get her at 2:00 p.m. per our agreement. It's very straightforward there should be no confusion."

342.     The order said that he is "required to exchange the child pursuant to the most recent civil family order." The most recent order said he is "required to bring the child to Sunday School and special religious events that occur during his parenting time." Both orders stated that he is required to bring her to me on Sundays for my custodial time with my child for us to practice our religion together. I am also her Sunday School teacher. Matthew's comments about what the order "states" were referencing an old order that was no longer in effect. He says he "chose the morning" and said that it's "his day" but the first half of the day was designated as my time with Angelina for Sunday School and the special religious event that he is required to bring her to. Him refusing to bring her violated both the protective order and the civil family order. After speaking to my

attorney who advised me to go get her and call the police to escort me, I messaged Matthew at 12:53PM and said, "Where will Angelina be at 2?"

343.    At 12:54PM, I messaged him again and said, "Where is Angelina????" (See OurFamilyWizard messages from 5/21/23)

344.    At 1:00PM, Matthew messaged me and said, "Please let me know if you're coming to pick her up, because if you are not I'm going to put her down for a nap. Are you coming to pick her up yes or no?"

345.    I responded at 1:13PM and said, "Yes." After speaking to my attorney and the police I was advised to just comply with Matthew's demands as to not ruin my child's birthday.

346.    At 1:21PM, I messaged Matthew in the app and said "Please have the police there by 2."

347.

348.    On 5/26/23, Matthew interfered with me and refused to allow me to speak to my child, instructed my child to end the call after only a few minutes, and tried to speak to me on the phone.

349.    On 5/26/23, Matthew was interfering with me by refusing to allow me to speak to my child. He did not allow me to speak to her for over 24 hours, and I asked him repeatedly in the app to allow me to do so. He then demanded that I wait until 7:00PM to speak to her, despite the order changing in family court the day before and there no longer being a set time for the call.

350.    When I tried to speak to the child, he then instructed her to end the call after only a few minutes once they arrived at his ex-wife's house. He also tried to speak to me on the phone.

351.    He also interfered with my ability to exercise my right in accompanying my child to her mental health treatment services.

352.    At 8:15AM, I messaged him in the app and said, "How can you possibly think its okay to not allow me to speak to or see Angelina for a minimum of three weeks? Angelina has therapy and a doctor appt next week. I want to see and speak to her. You can't just alienate me from her and refuse to let me see or speak to her."

353.    At 8:32 AM, he replied and said, " I would never keep you from her. You are under supervised parenting only. You are free to call at 7 PM as was in our original order everyday. Let me know what days and times you are available for the supervised visits and I will see what I have available to oblige."

354.    At 9:33AM, I responded and said, "I want to see her all day today and asap. Where is she ???."

355.    Matthew continued to interfere with my ability to see and speak to my child pursuant to the most recent civil family order.

356.    At 11:10AM, he replied and said, "Angelina is with me today. I'm sorry but today doesn't work It's too last-minute. You're not allowed to be with Angelina unsupervised. You need me to set a date and time of when you're going to see her. And someone else has to be there that I approve of. You're not to take Angelina, nor be alone with her at any point. This is going to be very structured. Right now Angelina's gonna need to see structured visitation so she feels comfortable. Please let me know what ideas you have for who can supervise your parenting time. Please let me know when you're available."

357.    At 1:06PM, I replied and said, "So are you saying you're not going to let me see Angelina or talk to her at all for this entire weekend? Please let me know when I can see Angelina. I want to see her as soon as possible. Why can't I see her today?"

358.    At 1:06PM, I messaged him in the app and said, "Angelina has a required therapy appointment next week as well as another required pediatrician appointment. Are you going to be meeting me there for those?"

359.    At 1:08PM, I messaged him in the app again and said, "I want to see angelina today. What time can i see her? I am available any day any time today, tomorrow, sunday, monday, etc. let me know the next available time i can see her. I would like to see her today. What time can that be done? Where is she now? I also want to speak to her."

360.    At 1:11PM, I messaged him and said, "Angelina has a required therapy appointment next week as well as another required pediatrician appointment. Are you going to be meeting me there for those?" I also messaged him again in the

app and said, "This is the second day in a row you denied me a visit or the opportunity to speak to angelina. I want to see her immediately. You are damaging her emotionally. When can i see her? She needs her mother." Matthew interfered and did not answer my question. At 1:12PM, he messaged and said, "Please send me info."

361.     m. Matthew then continued to try to harass me and interfere with me by limiting my ability to speak to my child despite the court order saying I can call her any time.

362.     n. At 1:13PM, he said, "You can speak to her at 7pm for the 7pm phone call. Your visits need to be supervised. How do you want to navigate that part?"

363.     o. At 1:13PM, I repeated my question and said, "are you going to meet me there for those??"

364.     p. Matthew again interfered, did not answer my question, and tried to harass me by intentionally ignoring me.

365.     q. At 1:14PM, I responded to Matthew's prior message and said, "You are court order to make the arrangements. I would like to see Angelina today. What time can I do that? Since you are not working right now, you should have all day and I told you I have complete open availability every single day with zero commitments. Please let me know the next available time when I can see my child. I would like to speak to her now. Why do I have to wait until seven?" At 1:22PM, he messaged me again in the app and said, "Please send me info"

366.     n. At 1:23PM, Matthew messaged me again and said, "7 PM was always our normal phone call time I'm going to stick to that for consistency for Angelina. As far as your visitation is concerned and needs to be supervised, do you have someone in mind?" Matthew limiting me to only speaking to Angelina at 7PM was interference and his attempt to harass me and alienate me further.

367.     o. At 3:02PM, after feeling extremely harassed and interfered with by him, I responded and said, "Are you meeting me there yes or no? I need to know. I plan on filing to have her temporarily returned to me due to the current pending test results and new investigation."

368.    p. At 3:05PM, I messaged Matthew to respond to his other message and said, "Angelina is used to speaking to me every day and living with me. It is extremely traumatic for her to not see me for three entire weeks in a row. If you are worried about consistency for Angelina, why are you keeping her from me and alienating me from her? I want to see angelina. It has been more than 48 hours since you allowed me to see or speak to her. You are court ordered to make the arrangements and allow me access. What day and time can I see her next? Please let me know ASAP."

369.    q. At 4:02, in an attempt to annoy/harass me, Matthew continued to interfere and replied and said, "Please send info"

370.    r. At 4:03PM, Matthew continued to try to interfere with me and said, "You can come see her Sunday for a few hours."

371.    s. At this point, I had not seen her in 2 days, and Sunday was 3 days away. I felt that he was interfering and harassing me and isolating my child from me to try to psychologically abuse me and use coercion against me.

372.    t. At 4:03PM, Matthew responded to me and said, "Who will you have supervising?"

373.    u. At 6:02PM, Matthew again messaged me in the app to try to cause me annoyance/alarm and harass me with his messages. He said, "I don't quite think you understand the severity of what has happened. You lost all custodial rights to our daughter. You only get supervised visitation for now. You no longer have any rights to say what happens to her. I want her to see you Theo. I'm also very concerned about your behavior though. If you want to see her too, it needs to be supervised and under my discretion. So, again I reiterate, do you have someone in mind you would like to be there to supervise your visitation, if so, who? Please let me know when you know and stop, asking the same questions over and over again. As far as any appointments, go, you may relay the information to me and I will take care of it from there. Please do what is in Angelina's best interest this time around."

374.    v. Matthew's claims that I "no longer have any rights to say what happens to her" is not based on fact.

375.   w. At 6:41 PM, I responded to him in the app and said, "What time and place and with who? Why cant i see her today or tomorrow ? So you're saying i can only see her for 3 hours over the next 3 weeks? Why are you doing this to her?"

376.   x. At 6:42 PM, I messaged Matthew back in the app and replied to his other message and said, "Are you not going to make the arrangements for me to see Angelina per the court order ??"

377.   y. At 6:45 PM, I messaged Matthew in response to his prior message and said, "Excuse me ? Do you understand that Angelina had a rape kit done and accused your son of rape? Is there a reason you say she is lying? There's an open investigation and you are ordered not to leave her alone with your sons. That order remains in effect and i will have a private investigator confirm that you abide by it. These temporary orders will be reversed and i already have my new attorney working on that. Court order says YOU make arrangements. Are you going to arrange a visit? If so let me know time, place, dates, and details of your arrangements. I need to know now."

378.   z. Matthew continued to interfere with my ability to see and speak to my child and at 7:15 PM he read my message in the app and then did not respond. (See OurFamilyWizard messages from 5/26/23).

379.   aa. At 7:01 PM, Matthew continued to send me messages in which he was insulting me and harassing me and interfering with me in the app. He messaged me and said, "This is your 4th attempt at trying to set up my son. Angelina and Dominic love each other. Dominic never has, and never will do anything inappropriate to her. This is your fourth false accusation. That is not doing what is Angelina's best interest. Things like this are why she is no longer in your custody. There is no order not allowing Dominic to be with her. As far as a visitation, there is a park near my house called Washington park. I will allow Angelina to visit you for an hour there under my supervision, on Sunday. The whole interaction will be recorded."

380.   bb. His statement that "this is your 4th attempt at trying to set up my son" was not based on truth. Angelina stated repeatedly that she was sexually abused by his son and I have her statements and disclosures recorded. There is an active

48

investigation currently taking place, as well. Matthew telling me that "this is your fourth false accusation" was meant to taunt/harass me. His comments like "things like this are why she is no longer in your custody" were also meant to harass/taunt/intimidate me. His comments that I can only see my daughter for "one hour" and that the "whole interaction will be recorded" were also coercive and meant to interfere with my right to have reasonable access to my daughter. Also his statements that he would "be the supervisor" were also against the court orders and meant to also coerce and intimidate and harass me.

381.    cc. At 7:02PM, I responded to him and said, "No its not. Why are you refusing to believe our child?"

382.    dd. At 7:04PM, I messaged him again and said, "You are not allowed to be supervisor. I dont know where any of that is and im not meeting you alone. You need a third party. Are you going to arrange this?"

383.    ee. After finally speaking to Angelina on the phone, she indicated that she was being left at Matthew's ex-wife Monica's house for the night. I felt it was interference that rather than allow me to see my daughter, he left her with his ex-wife as a babysitter.

384.    ff. At 7:06PM, I messaged him and asked, "Why are you having Monica watch Angelina?"

385.    gg. Matthew continued to interfere with my ability to see and speak to my child and at 7:15PM he read my message in the app and then did not respond. (See OurFamilyWizard messages from 5/26/23)

386.    hh. At 7:06PM, I messaged him again and said, "Why are you leaving her with Sal and Dom?"

387.    Matthew continued to interfere with my ability to see and speak to my child and at 7:15PM he read my message in the app and then did not respond. (See OurFamilyWizard messages from 5/26/23)

388.    jj. At 7:15PM, I sent Matthew another message in the app and said, "Why are you having Monica watch Angelina??? You say you want her and then leave her with Dominic and his mother? You are ordered not to leave her with them by the

judge during active police investigation into your son. Is there a reason you aren't watching Angelina yourself?"

389.    kk. Matthew continued to interfere with my ability to see and speak to my child and at 7:17PM he read my message in the app and then did not respond. (See OurFamilyWizard messages from 5/26/23)

390.    ll. At 7:23 PM, Matthew messages me again and used language in which he was degrading me and trying to cause me annoyance and alarm. He messaged me and said, "I'll have to find someone who is willing to be around you. All my family and friends don't want you near them. I would be willing to let you take Angelina with your mother's supervision. Does that work?"

391.    mm. Matthew's comments that "all my family and friends don't want you near them" were meant to harass me and interfere with me and prevent me from being able to see my child.

392.    nn. At 10:40PM, after an entire day of his harassing messages, I responded and said, "My mother stated she wants nothing to do with you after you threatened her continuously and repeatedly and brought the police to her house on multiple occasions. She doesn't want you at the house with the police harassing her. Can you please bring Angelina to church on Sunday so that she can spend some time with me and receive her religious sacraments since I am still under our orders the one who makes all religious decisions for her? Only one thing was temporary modified. Please keep in mind that all the other things are still in affect and including the X parte, which states you are not to leave her alone with Dominic. I noticed that you keep accusing me of lying so I'm going to start sending you all of the evidence so that I can tell the court and the judge and the lawyers that, I showed it to you, so when you still accuse me of lying, you can see that this is our daughter saying this. Regardless of how you feel about your son or not, Angelina is your daughter, and she deserves you to not silence her when she is disclosing something. Angelina deserves to be validated and she is not a liar, and I'm not going to hear you call our child a liar again. Attached is a video of her saying in her own words what your son did to her. I want you to watch it and I'm going to be making sure that the court is able to also see these videos as well

because now that I have proper council, everything will be changing very soon as I stated, keep in mind that under the law, you are not allowed to alienate me from Angelina. Having her go from seeing me every day to you telling me, I can only see her for one hour is outrageous. You said you want consistency for her and she needs me. On the call tonight which my friend witnessed, she was very distraught. Please let me know if you can drop her off at church on Sunday so that she can receive communion, and the priest can supervise as he is willing to and so is his wife and other family members of mine who are there. Please confirm. I do not want her to miss out on religious aspects and don't want to disrupt her routine and she now hasn't seen me in 3 days."

393.    oo. Matthew replied to me at 10:54PM and said, in an effort to harass and abuse me further, "Our old orders are no longer in effect. The new order is that I have full custody, and you are only to have supervised visitation. She will not be in church on Sunday. As of right now you do not get to make religious decisions for her, you don't get to make any decisions for her anymore. No ex parte order was ever granted. I will protect my children from you. Please do what is in our daughter's best interest. I do not have anybody here willing to supervise you with Angelina as of right now. I'm trying to figure out someone, if you have any ideas, please let me know. As far as the false accusations you're making, you have been coaching Angelina all along trying to get her to say these things. They've already done three investigations and found out that nothing is ever happened. This is the fourth time you are doing this. The judge has warned you to stop doing things like this. You need to do what's in Angelina's best interest now and you are still constantly choosing not to. Please let me know if you have anyone willing to supervise a visit."

394.    pp. The court ordered agreement said that I make all religious decisions for Angelina. His comments that she will not be at church were further interference. His comments that I "do not make religious decisions for her, you don't get to make any decisions for her anymore" were also abusive and coercive and nature and not based on fact.

395. qq. Matthew's comments that "I will protect my children from you" and "As far as the false accusations you're making, you have been coaching Angelina all along trying to get her to say these things" were also meant to harass and intimidate me.

396.

397. On 5/27/23, Matthew interfered with me by refusing to allow me to speak to my child, having contact with my child to cause me annoyance/alarm, and refusing to let me speak to my child during the call. He then had direct contact with me, threatened me, and harassed/intimidated me. I have all the recordings and messages from OurFamilyWizard.

398. On 5/27/23, Matthew violated the protective order again by refusing to allow me to speak to my child for most of the day. I called multiple times to try to speak to her, pursuant to the most recent civil/family order, and he stated that I could call her at "7:00 or nothing". The order said that I could speak to her any time and have Facetimes with her while she was temporarily staying with him.

399. At 11:15AM, I messaged him I the app and said, "Please see attached. This is just one of many disturbing videos in which Angelina disclosed that you son abused her. I have many more which she uses graphic language as well. There is a DNA sample waiting for review. Please start taking this seriously and stop accusing me of making false accusations when I am simply sharing what our daughter is disclosing to me. Everyone who watched this including lawyers said it is disturbing. If you can watch the attached and still not be concerned, then that will be the first thing I have my new attorney address at the next court date. You need to stop threatening Angelina also as she stated that you hit her on her back and that you told her not to tell me anything. Stop threatening her. She was so sad today on the phone and you are doing irreversible damage to her and you will be held accountable."

400. Matthew continued to harass me and interfere with me by reading my message and saying nothing.

401. At 11:19AM, I messaged him again and said, "You are court ordered to allow me a phone call. Please abide by the order."

402. Matthew continued to harass me and interfere with me by reading my message and saying nothing.

403. At 11:21AM, I messaged him again regarding his prior message about the treatment for our daughter's mental health and said, "You consented to the treatment and it is ongoing. Once you confirm that we will be there together, I will share details. I am part of the treatment with her."

404. Matthew continued to harass me and interfere with me by reading my message and saying nothing.

405. At 11:23AM, I messaged him again and said, "Please have your attorney explain to you how to properly read court orders. Only one motion was modified, and it is only temporary basis. Everything is still in affect with the exception of the one thing that was modified, which does not change any of the other things. For example, I have sole legal and physical custody of Julianna, but that doesn't mean that I don't have to also go by the court approved agreements that are between me and her father. Again, I know it's hard for somebody that never went to college to understand. However, I would advise you to have your counsel explain to you because you need to make sure you are abiding by it and my ne cousel has already explained to me what is and is not allowed. Also, the ex parte is still in effect which says you are not allowed to leave Dominic alone or Sal alone with Angelina due to the open investigation."

406. Matthew continued to harass me and interfere with me by reading my message and saying nothing.

407. At 11:25AM, I messaged him again and said, "It has been three days since I have seen Angelina. I would like to see her Sunday. What time can I see her then and where? Please let me know. It's my second day in a row asking and you refusing to allow me access to her. This is grounds for losing custody."

408. At 11:41AM, Matthew replied and said, "I never confirmed and please send me info."

409. At 11:43Am, Matthew messaged me again and said, "I picked her up Thursday, she's always with me Friday, Saturday, Sunday anyway even before

you lost custody. I told you we need to find someone who's willing to supervise your visits. No one in my family or friend circle is willing to."

410.   At 11:59AM Matthew messaged me again and said, "I'm really not going to keep repeating myself. I don't think you understand what has happened here. You lose your custody. I have sole legal and physical custody of Angelina. Therefore, I make all decisions for her at this time. All of our agreements and arrangements prior to Thursday's court date are no longer in effect. The only way for you to see Angelina at this point is under supervision by a third-party. I am trying very hard to work with you here. I've asked you multiple times if you have someone that you can use to supervise your visitation. Everyone I have asked to do it has said no they do not want to be near you. As far as you speaking to her, I am going to continue allowing the 7pm phone call for now. If the 7pm phone call goes like you did yesterday where you keep interrogating Angelina, then I will be terminating those phone calls. I will talk to my father and see if he is willing to supervise your visits with Angelina. You can keep saying what you want as much as you want, but the facts of the matter are facts. You don't get to decide anything for Angelina anymore. I make all decisions until court says otherwise. If there's any appointments that you've already made for Angelina, please send me the information. I will follow up with you as far as who can supervise your visitation but please see if you can find someone since most of the people I know do not want to be near you. You are still showing signs of behavior that is not good for Angelina. That makes me very uncomfortable. It is my obligation to do what's best for Angelina. Please consider these things thank you."

411.   At 12:01PM, I replied and said, "You did and I have that documented. Let me know by end of today if you will be bringing her there for our scheduled therapy meeting or if I will need to reschedule once we get this temporary order reversed."

412.   At 12:02PM, I messaged him again and said, "I have 10-15 different people who I can provide to supervise since you claim not to have anyone. I have ample people available today. What time can I see her? I really want to see her today. Please let me know time and place today and I will be there with a third party."

413.    At 12:10PM, Matthew replied and said, "where and when?"

414.    At 12:12PM, Matthew messaged me again and said, "Tomorrow evening will work at 4pm I will need this person's name and information so I can discuss the parameters of the visit."

415.    At 12:14PM, I replied and said, "You are mistaken and my attorney stated you are incorrect. I have 10-15 different people who I can provide to supervise since you claim not to have anyone. I have ample people available today. What time can I see her? I really want to see her today. Please let me know time and place today and I will be there with a third party."

416.    Matthew continued to harass me and interfere with me by reading my message and saying nothing.

417.    At 12:16PM, I messaged him again and said, "Let me know if you will allow me access to Angelina during the appointment. If so I will provide details. If not then I will reschedule for after the next hearing. Thank you."

418.    Matthew continued to harass me and interfere with me by reading my message and saying nothing.

419.    At 12:18PM, I messaged him again and said, "I messaged you about seeing my daughter today. I want to see Angelina today. What time today can I see her? I have many third parties and if you are giving me the option to provide my own supervisor then I will do that or you can provide your own. Let me know what time today I can see her."

420.    Matthew continued to harass me and interfere with me by reading my message and saying nothing.

421.    At 12:20PM, I messaged him again and said, "What time and place can I see Angelina today? Is she still at Monica's? What time can I go there to see her? Let me know. I can bring my third party. What location will you be meeting me at tomorrow at 4pm so I can be sure to put it in my schedule? What location and time will I be able to see her each day next week? I want a schedule for the next 3 weeks so I can make arrangements. Can you please tell me now so you don't say it's 'last minute'? What days and times can I see her over the next 21 days? Let

me know asap about times, locations, and dates, and I already said I can provide a third party if you are unwilling to do that."

422.   At 12:21PM, Matthew replied and said, "My last message was very clear. I told you tomorrow at 4pm. You said you have open availability for tomorrow. I need this person's information so that I may know who it is, and I may speak to them about the parameters of the visit."

423.   At 12:30PM, Matthew messaged me again and said, "Please send me third party's name and information so that I may discuss the parameters of the visitation."

424.   At 12:33PM, I replied and said, "I started off by asking what time I could see her today and you claimed that you needed a supervisor. I then stated that I would provide the supervisor and you are now telling me I have to wait until tomorrow at 4PM? Why can't I see her today? I have supervisors and can come there anytime. Is there a reason why you were denying me access to Angelina today? Is there a reason why you also didn't allow me to access her yesterday and Thursday? Angelina sounded very distraught in the phone call yesterday, and even my witness is ready to testify to that. Please let me know why you are refusing to let me see her today."

425.   At 12:34PM, Matthew replied and said, "She sounded distraught because you were interrogating her. Who will be there to supervise?"

426.   At 12:38PM, I replied and said, "Okay. Angelina know and loves him and his name is Pete. He will text you now and you met him before. He is willing to supervise today and tomorrow. Please let me know what time today works."

427.   Matthew continued to harass me and interfere with me by reading my message and saying nothing.

428.   At 12:40PM I messaged him again and said, "Pete will be there. He just texted you. Please let me know what time and what place. Do you want do to the park you said?"

429.   At 12:42PM, Matthew replied and said, "I need full information. First name and last name, phone number, and picture of license."

430.    At 12:44PM, I replied and said, "The judge did not say that you get to dictate things like that. Either provide your own supervisor like the order says, or you can have the person I provide. Please text him back with the details and parameters that you stated you wanted to discuss prior to the visit. I just want to see Angelina. She said she misses me and I want to see her. Please stop alienating me from her."

431.    At 1:27PM, Matthew replied and said, "I'm sorry Theo but I'm not leaving Angelina with some guy I've never met that you're just giving me a first name of when you are under supervised visitation. I will need all of his details. Is this the guy that was int eh court room with you? If that is the guy, I am not comfortable with him. He looked really strung out like he does a lot of drugs. You said you have 10 to 15 people, then you should have someone willing to send their contact info so that I can make sure Angelina remains safe."

432.    At 2:51PM, I replied and said, "He does not do drugs. So I am asking for the third day in a row for a visit and the court order says you are ordered to arrange the supervisor. You said you had no supervisor and told me to provide one. You will be there during the visit also and claimed that the entire interaction would be recorded. In that case, why would you be concerned if it is being recorded and you are also there to watch? He doesn't do any drugs and has a clean record. You also did met him. He is about to be a lawyer and is an excellent person. Can we meet at the police station right now so that I can see Angelina? Please let me know. I want to see her today."

433.    Matthew continued to harass me and interfere with me by reading my message and saying nothing.

434.    At 3:04PM, I messaged him again and said, "Which police station can we meet at today for Angelina?"

435.    Matthew continued to harass me and interfere with me by reading my message and saying nothing.

436.    At 4:23PM, I messaged him again and said, "Hello?"

437.    Matthew continued to harass me and interfere with me by reading my message and saying nothing.

438.    At 4:24PM, I messaged him again and said, "Please provide me with the times that I can see Angelina each day for the next three weeks. I have asked you repeatedly and you keep ignoring me. Since you are refusing to arrange a supervisor, I suggested I can bring my own and you refused. I suggested we do that at the police department then so that there are no issues. Please let me know what time you can meet me there. I need to see Angelina. I want to see her. Stop alienating me from her."

439.    At 5:58PM, after ignoring all of my other questions, Matthew messaged me again and said, "Angelina did not get a good nap today, so she will be going to bed early. Please call as soon as possible."

440.    At 7:06PM, I replied and said, "The court order states you must let me speak to her between 7-715. The protective order says the same."

441.    Matthew continued to harass me and interfere with me by reading my message and saying nothing.

442.    At 7:07PM, I messaged him again and said, "Please send me the times. I want to see Angelina. Stop isolating me from her."

443.    Matthew continued to harass me and interfere with me by reading my message and saying nothing.

444.    At 7:08PM, I messaged him again and said, "I have been tyring to call Angelina. I need to speak to her."

445.    Matthew continued to harass me and interfere with me by reading my message and saying nothing.

446.    At 7:10PM, I messaged him again and said, "You are court ordered to respond. Let me know. Stop isolating me from her."

447.    Matthew continued to harass me and interfere with me by reading my message and saying nothing.

448.    At 7:25PM, I messaged him again and said, "???"

449.    At 7:30PM, Matthew replied and said, "That order is no longer in effect. You may call now the ringer was off."

450.    At 7:31PM, I replied and said, "The order is in effect. Please stop violating the orders. You are refusing to let me see and speak to Angelina. When will I be able

to see Angelina? I have asked you repeatedly for the last three days straight and you keep reading my messages and ignoring them."

451.    Matthew continued to harass me and interfere with me by reading my message and saying nothing.

452.    At 7:33PM, I messaged him again and said, "Why aren't you letting me speak to Angelina?"

453.    Matthew continued to harass me and interfere with me by reading my message and saying nothing.

454.    At 7:36PM, I messaged him again and said, "I called 6 times to speak to Angelina and you ignored them all. Why are you refusing to allow me to speak to her?"

455.    Matthew continued to harass me and interfere with me by reading my message and saying nothing.

456.    After initially telling me that my only chance to speak to her would be 6:00PM, he then messaged me in the app and demanded that I call her at 6:00pm. I also asked that he exchange the child and allow me to see her pursuant to the most recent civil family order, multiple times, and he ignored all my requests.

457.    He intentionally withheld her from me to try to cause me stress and anxiety. (See recorded call from 5/27/23; See also court order from 5/25/23; See also OFW communications from 5/27/23)

458.    He then finally let me talk to her at 7:40PM. He started the call off by trying to have contact with my daughter to cause me annoyance/alarm by saying to her as soon as he answered the phone, "Yes you have to talk to mama. I know you don't want to, but you have to talk to mama. Be nice to mama. Say hi. She misses you."

459.    He then hung up. He starts almost every single call this way, instead of just giving Angelina the phone. My daughter never says "I don't want to talk to mama" at all during any of these instances. Matthew just says this to her as soon as he answers my call every time so that he can annoy me and try to harass me further.

460. He then tried to refuse to let me have contact with her at all. I tried to call 6 times to speak to her throughout the day, and he refused to let me speak to her until that time. Then, when he finally allowed me to speak to her, he interfered with the phone call.

461. During the call, my child sounded very upset. At the 9-minute mark during the call, she said "ow" and I asked why she said ow and she didn't say anything. I said, "is something bothering you?" and she started saying "no, no, no, no, no" repeatedly and seemed scared to talk. She sounded very upset, and I could tell that something seemed wrong. She previously stated to me days prior that daddy told her "don't tell mommy anything" and that daddy "hit her on her back because she didn't want to go to bed."

462. My daughter also sounded very distraught while she was on the phone with me. After I asked if she was ok and if something was bothering her, Matthew then started to speak to me directly on the phone, in direct violation of the protective order, and said in an angry tone "Theo, if you keep saying things like that to her, I'm going to hang up." He threatened to hang up the call with my daughter because I asked her if she was okay and if something was bothering her. I didn't say anything wrong to my daughter other than ask her if she was okay after I heard her say "ow".

463. Matthew then spoke to me again during the call when I asked if she had the phone, and Matthew said "She has the phone. Stop acting like that Theo." He continued to interfere with the phone call and repeatedly tried to speak to me during the call in violation of the protective order. He then said to me, "These calls are not an interrogation. Please talk to your daughter properly." He spoke to me in an angry, demeaning tone. Then, even my child pointed out that dada was "just talking to you."

464. I feel harassed by the fact that he has violated the protective order repeatedly by speaking to me multiple times on the phone almost every time that I try to talk to my child. This is not allowed and is a violation of the no-contact. It is also causing me to feel annoyance/alarm each time when he does this and speaks to me

to intimidate me. (See recorded call from 5/27/23; See also court order from 5/25/23; See also OFW communications from 5/27/23)

465.    I called and asked the New Britain Police Department to do a wellness check earlier that day when Matthew demanded I call at a specific time and then did not answer, and when they arrived at his house to do the wellness check, he called me minutes later so that I could speak to her.

466.    At 7:48PM, I messaged him again and said, "Angelina said she wants to see me tomorrow. You said 4:00. Which police station will we be meeting at?"

467.    At 7:51PM, Matthew replied and said, "In regards to you talking to Angelina on the phone. Our old court order is no longer in effect. The new court order is I have sole physical and legal custody. That means I make all decisions for her including who she talks to. I told you I would allow the 7:00PM call everyday still so you can stay in communication with her. Yesterday and today you used the conversation to interrogate her. This is your last warning to stop doing that or I will terminate the calls until we go back to court. When you call she has the phone. I don't have the phone. Stop asking her over and over again the same questions about if she's holding the phone or not. Consider her age and her well-being. Every time she's talking to you now she's getting visibly upset because of the way you are having conversations with her. I am serious about this. The same behavior is why you lost custody of her. The same behavior is why you are on supervised visit. I will not allow this behavior to happen on the phone. This is the last time I'm telling you about that. Have a normal conversation with her like a mother daughter should. It's not interrogation to find out things about met. Thank you for your understanding."

468.    At 7:56PM, Matthew messaged me again and denied me access to Angelina after already saying I could see her and said, "We have plans most of the day tomorrow. I don't know if I" be able to oblige tomorrow. Who do you plan on using for supervising. I need to feel comfortable with this person to make sure you are not saying things that you are not supposed to be. Just like you were doing on the phone. I'm really concerned on the damage you are causing Angelina. You've been nothing but erratic these past 3 days. It makes me nervous

to have you around Angelina when you are like this. We just want to see you get better and do what's right for Angelina so that you can get back on to a regular weekly schedule with her when we go back to court. If things do not change, I will recommend that you stay on supervised visitation for a while. Please show that you can do what's right for Angelina and maintain proper conversations on the phone and in person. We still need to figure out someone who will supervise the visit wince you do not want me to supervise them myself. Please let me know with detail who you have in mind. I will talk to my father tomorrow, he is retired and maybe willing to help."

469.  At 8:36PM, I replied and said, "Everything you said is false. If you do not follow the court order, then I will have my lawyer file motions to take the proper legal action. Please keep in mind that refusing to allow facilitation to allow the child to be with me is grounds for losing custody. She also said 'ow' and complained of pain during the call and you silenced her. I had a witness as well Please stop trying to talk to me during these calls."

470.  Matthew continued to harass me and interfere with me by reading my message and saying nothing.

471.  At 8:55PM, I messaged Matthew again and said, "You said I could see her tomorrow at 4pm. Are you now denying me access?"

472.  Matthew continued to harass me and interfere with me by reading my message and saying nothing.

473.  At 9:42PM, I messaged him again and said, "Hello? You're ordered not to interfere with me as a protected party. You told me that I could see Angelina tomorrow at 4PM. You would not allow me to choose anyone to supervise and you did not offer any one of your own to supervise, even despite telling my choice that you would find your own person. Will you be meeting me at the police station tomorrow at 4? You are court ordered to respond to these messages. You have no right to interfere with my right to see Angelina and talk to Angelina."

474.  Matthew continued to harass me and interfere with me by reading my message and saying nothing.

475.

476. On 5/28/23, Matthew harassed me, caused me annoyance and alarm, and threatened me. He also had contact with me in the OurFamilyWizard app which was outside of the scope of visitation/affairs of our child. I have all the messages from OurFamilyWizard.

477. On 5/28/23, Matthew attempted to harass me and cause me annoyance and alarm by threatening me with arrest. I asked in the OurFamilyWizard app if he could meet me and my sister at the park where we were in Cheshire so that we could have more time with my daughter. Matthew refused to meet us and sent me a message and said "you are still sending the police to my house harassing me, you have more charges coming in this week because of it. We could plan something for next weekend for you to see Angelina with Julianna as long as you're not in jail." (See OurFamilyWizard messages from 5/28/23)

478. He also violated the no-contact order which says that conversations in the app must be limited to those regarding the affairs and visitation of our child. He contacted me in the app and stated that he was initiating criminal charges against me and stated that I had pending warrants for my arrest from New Britain Police Department.

479. All I did was call for a wellness check on two separate occasions that I was concerned for my child, and the police never said that it was harassment. I then called the New Britain Police Department to ask about these "charges coming in this week" that Matthew was referencing and spoke to Sergeant Strzalka who confirmed that Matthew was lying to intimidate/scare and cause me annoyance and alarm by making up fake warrants that did not exist. He confirmed that no such charges were pending.

480. I also noticed on this date that my daughter Angelina Lodice had several scrapes and bruises on her knees. She stated these injuries occurred while under the care of Monica Perez on one instance and while under the care of Matthew on another instance. I photographed these injuries. (See pics/videos of Angelina injuries from 5/28/23; See also OurFamilyWizard messages from 5/28/23)

481.

482.  On 5/29/23, Matthew spoke to me directly on a phone call and interfered with my ability to speak to my child. He also had third-party contact with my child and intentionally withheld my child from me to harass and interfere with me. I have the recorded call and messages from OurFamilyWizard as evidence.

483.  On 5/29/23, Matthew violated the protective order by interfering with my ability to speak to my daughter.

484.  I attempted to call several times to try to speak to my child, and he did not answer any of my calls. (see recording of me trying to call with no response)

485.  Later in the evening, he violated the order by speaking to me during a phone call and interfering with my ability to see my daughter.

486.  I spoke to my daughter on the phone at 7:20PM, and my daughter was saying she was upset and that she wanted to see me but "dada did not let me." He then tried to have third party contact and said, "Tell mommy next weekend."

487.  Angelina asked him repeatedly to be able to see him. Angelina got upset because he was saying he would not let her see me for at least another week. When she asked why, he would not give her an answer. My daughter then told me that "daddy is not letting me see you" and I said, "daddy is not letting you go to school either." I said this, because on 5/25/23, Matthew withdrew her from her school. Matthew then immediately started speaking to me on the phone again, in violation of the protective order. He also threatened to terminate my call with my child.

488.  Matthew spoke to me directly on the phone again and said, "Theo stop telling her things like that or I'm going to disconnect the call." I then said to my daughter later in the call "So you're not going to go to school?" Matthew then spoke to me again and said, "She doesn't go to school, she goes to daycare."

489.  My child then told me how much she wants to see me, see her home, and how much she misses us. Matthew is intentionally withholding her as much as possible to try to harass and interfere with me as much as he can. (See recorded call from 5/29/23)

490.  At 10:23 PM, Matthew messaged me to try to use coercion, threaten to keep my daughter away from me, harass and mock me and said, "I'm really concerned

about your behaviors and the things you say to Angelina on the phone. Your conversations with Angelina are supposed to not be toxic. You spent the whole time saying to our daughter that "Daddy is keeping you from Mommy" "why aren't you in school" "why is daddy keeping you from going to doctors". These behaviors hurt Angelina psychologically. They only confuse her. I'm not keeping her from you. You lost custody of her because of behaviors similar to this. I told you next weekend you will be able to see her. You should be telling her things about that and say you are excited about that. Angelina doesn't go to school. She was in a daycare in orange that you had her in so she can work. She no longer goes to that day care, since she is no longer in your custody. I asked you multiple times to send me the information regarding any medical appointments and you refused. I'm being very lenient with allowing these conversations to continue. I'm begging you to stop saying things like this to our daughter and do what's best for HER. Please. I don't want to keep her from you but if this continues I have no choice."

491.  Matthew threatened me that if I didn't stop pointing out that he was using child abuse and coercion to neglect my daughter's medical care, isolate her from me, and other family/support systems, keeps her away from her school that she thrived at, and then accuse me of "behaviors" and tries to mock me by saying "do what's best for her" while he keeps her from me and neglects her medical, mental health, and physical needs. (See OurFamilyWizard messages from 5/29/23)

492.

493.  On 5/30/23, Matthew contacted me directly on my cell phone, had contact with others to cause me annoyance/alarm, interfered with me when I tried to speak to my daughter on the phone, and spoke to me directly during a phone call. I have the recorded call as evidence. He also interfered with my ability to see my child and used coercion to remove her from therapy, doctors, and her school to try to isolate her from all of her support systems.

494.  At 9:23AM, I messaged Matthew and said, "Where is Angelina? Are you not planning to send her to school anymore? Are you not planning to send her to her medical and therapy appointments this week? I need to know. Where is she today?

Who will be with her while you were in court today for your contempt hearing?"
(See OurFamilyWizard messages from 5/30/23)

495.    At 7:14PM, I messaged him and said, "Why do I need to wait for the weekend? She asked to see me and was crying for me. Her therapist says she needs to see me. This is harming her."

496.    Matthew continued to try to interfere with my ability to see my child, continued to deny her medical and mental health treatment, and continued to try to insist on isolating me from Angelina.

497.    At 8:09PM, he responded and said, "You saw her Sunday. This weekend is the next availability. Do you have availability this weekend? She was not crying for you not even a little bit. She has been very happy since the transition. Please send me the therapist's information so that I may coordinate with her. All medical decisions were supposed to be made together prior to this order and I never agreed to this therapy."

498.    Matthew already agreed to the therapy and Angelina had been going since January 2023. The statements he made were meant to harass me and annoy me and interfere with me.

499.    Matthew also contacted me on the phone and attempted to have contact with others to cause me annoyance/alarm by telling the child while I was on the phone with her that I "don't go to class anymore" and told her that I was no longer a student at UConn Law School.

500.    My daughter said "Mommy, are you in class?" Matthew then immediately interfered and said, "Mommy doesn't go to class anymore." I asked the child to repeat what she said and then told her that I was, in fact, still going to class, and was at the school at that very moment. Matthew then interfered again and said to my daughter for the second time, to try to alarm/annoy me "Mommy doesn't go to class anymore." My daughter said, "dada said you don't go to class anymore."

501.    I feel that Matthew was doing this to try to cause me alarm/annoyance because he has actively been trying to get me kicked out of school and has threatened to do this repeatedly over the last year since he became aware that I would be starting law school. The child also told me during the call that they were

on the side of the road walking to Matthew's mother's house during the call because "dada's car broke down" and during the call Matthew was getting angry with the child for not wanting to walk. She stated they were walking from the park, which is at least a mile away. Matthew then spoke to me directly on the phone when I asked Angelina what she was doing. He said, "Hold on, she's fixing her shoe." (See video recording from 5/30/23)

502.

503. On 6/1/23, Matthew used coercion and risked Angelina's welfare by refusing to allow her to attend therapy.

504. At 7:14AM, I replied to his message from the night before about him allegedly "never agreeing to this therapy" for our daughter and said, "You did agree and the therapist spoke to you. The calls are all recorded and I always have a witness too. Stop alienating me from Angelina. You have no right to do this. I want to see Angelina. How do you go from asking me to be with you in January to making it so that I can never see Angelina again? She keeps asking to come to the house. Why are you refusing to let her? I want to see and speak to Angelina."

505. Matthew continued to try to interfere and use coercion and harassment and interference by restricting Angelina's ability to maintain a mother-daughter relationship with me.

506. At 7:17AM, he replied and said, "You didn't make the 7pm phone call yesterday. Coming to your house is not an option. What is your availability on Sunday to see Angelina?"

507. Matthew's reference to the "7pm phone call" was part of an old, defunct order that was no longer in effect. He previously would refer to old orders as a way to harass and interfere with my custodial rights.

508. At 7:44AM, I replied to him and said, "There's no more 7 PM phone call. I'm allowed to call Angelina anytime I want. Please have her call me now. I would like to be able to take Angelina this weekend so she can spend time with me and her sister."

509. Matthew's refusals to allow Angelina to go to her house are abuse. His refusal to let her attend therapy is abuse. His refusal to let me have regular/consistent access to her are abuse. (See OurFamilyWizard messages from 6/1/23)

510. At 7:46AM, he responded and said, "What time are you available Sunday to meet and who will be supervising the visit. The 7pm call is good for consistency."

511. At 2:40PM, I replied and said, "The court order says you need to designate who the third party will be. I am open to anyone. I can do all day on sunday. Where and when?"

512. At 3:42PM, Matthew continued to try to interfere with my right to see my child and tried to use coercion to mandate that only 2 people could act as supervisors whether they wanted to or not. He also tried to make disparaging statements to me and use harassing language toward me and try to control and dictate what happens.

513. He messaged me and said, "I get what it says Theo, but you have burned so many bridges with my circle. No one wants anything to do with you and could care less about helping you. Everyone I asked said no. That's why I've been ok with you using your mom or sister for that."

514. Both my mom and sister are not available to supervise. My sister is a busy optometrist who lives close to 45 minutes away and has no availability to supervise. She did it once as a favor for 2 hours.

515. My mom had multiple surgeries in the last few months and has stated she is unwilling to supervise at all unless Matthew brings Angelina to her. Matthew has stated he is unwilling to do any transportation related to the facilitation of the visitation, thus making it impossible for either one of them to act as supervisors.

516. Matthew has also said threatening and harassing things to my mother to try to cause me annoyance/alarm and she has then said she will no longer be involved with him.

517. At 3:58PM, I responded and said, "My mom can't travel to New Britain and my sister is not always available. You know my mom is unable to travel long distances due to her anxiety. Would you be willing to drop her off at my mother's house to help? Or can I just come with someone else?"

518. At 4:07PM, Matthew replied and said, "Who will the other party be and where do you plan on taking her and for how long would you like to have her?"

519. At 4:55PM, I responded and said, "I am not sure if I can do Sunday. Would it be possible for us to go see a movie Friday with Julianna?"

520. At 5:00PM, he replied and said, "Julianna your friend?"

521. At 5:07PM, I said, "Our daughter sister. You can come too. Why not try to do something nice for once."

522. Matthew then tried to harass me and interfered with my ability to see my child and read my message and did not respond.

523. At 5:08PM, I messaged him and said, "I havent been able to speak to angelina in 2 days. The court says i can video call her. I will be unavailable until 11pm due to class. Please have her facetime me back."

524. Matthew then continued to interfere and deny me the right to have a Facetime with my child.

525. At 5:11PM, he responded and said, "FaceTime is not an option. I told you I will allow a 7 PM call. Now it's not a good time."

526. At 5:13PM, I replied and said, "You are court ordered to allow me to have FaceTime in video calls with her. I just told you I'm unavailable at seven. The 7 o'clock Collin is no longer in the court order. It says I can get a video call with her anytime. Who is she with right now? I can call them since you were still at work. Please let me know. I really want to speak to her and I just told you i have class i cant call later"

527. At 5:14PM, I messaged Matthew again in the other thread regarding the movie that he ignored and said, "So can I take her to the movie friday? She hasnt seen her sister in going on 2 weeks."

528. Matthew then continued to interfere and refuse to facilitate contact with the child pursuant to the most recent civil order.

529. The order stated that my access can include FaceTime access with the child.

530. At 5:15PM, Matthew messaged me and said, "The only thing the order says is that I have sole custody, and you are to have supervised visitation. Our old orders are no longer in effect."

531.    At 5:16PM, he responded to my message about my daughter not seeing her sister in going on 2 weeks, and tried to interfere and harass and justify the fact that he was isolating and alienating Angelina from us.

532.    He said, "It's only been a week as of today as she hasn't seen her. Any visit you have needs to be supervised."

533.    He ignored my question about if I could take her to the movie and only responded with his justification for the parental alienation.

534.    At 5:22PM, I responded to his message where he said he is not ordered to let me FaceTime her and said, "That is not true. The judge issued another order and it states that mother is allowed to have video calls with Angelina. It also says that you have to arrange it supervise third-party for me. Are you doing with your order says? This order is new as of yesterday. So please have her FaceTime me. We are allowed to facilitate the call for her the order according to the protective order and I want to FaceTime her. I told you I can't keep missing class and I'm going to be in class soon I just want to talk to her please FaceTime me."

535.    At 5:25PM, I sent him another message and said, "The court order states that you are to allow me to have a video call with my daughter. Please see item E on the court order. I tried calling multiple times. you have to let me speak to her. I also would like to see her tonight."

536.    At 5:26PM, I replied to his message about his justifying keeping Angelina away and said, "It has been over a week already, and it's been going on for weeks that you have not allowed my mom to see her. I told you that I have supervisors since you are refusing to follow the court order that says you have to provide it. We're going to need to change this order if you are not going to follow it and you are not going to provide the supervisor. I would like to see Angelina tonight. Can I come meet you? I have a third-party. I would also like to see her tomorrow as I promised her we can see the movie. Would that be OK? I have a supervisor."

537.    Matthew then continued to interfere with me by refusing to allow me to FaceTime or call Angelina.

538.    At 5:29PM, he messaged me and said, "Angelina is with a sitter right now. Calls are not an option at this moment. We can call you around 7 PM."

539.   There is no reason why calls should "not be an option" if she was "with a sitter right now."

540.   Matthew has been alienating me from her while leaving her with babysitters and friends and family of his for the majority of the time.

541.   Matthew then sent another message at 5:29PM and continued to harass me and interfere with me by acting as if the court order didn't exist. He messaged me and said, "I know nothing about a new order nor did I receive any copies. Do you have a copy you can send me?"

542.   At 5:34PM, I responded to his message where he said I couldn't talk to her because she was with a sitter and said, "Why are you being so unreasonable? I am in class at 7 and cant talk then. Have the sitter facetime me per the order."

543.   At 5:35PM, I replied to his message about the order not being in effect and said, "You can log online and see it. I already sent you a copy. Please let me FaceTime her. Why is she with a sitter every day if you're not working right now? Can I just come see her right now? The sitter is a third-party."

544.   At 5:48PM, I messaged Matthew again and said, "Please stop withholding access to angelina. I want a face time and to see her. I have one of her toys for her."

545.   Matthew continued to interfere and harass me by using coercion and isolating me further from my daughter.

546.   At 6:15PM, he said, "I'm not withholding Angelina. You were just under supervised visitation. We have to coordinate that. I told you I have the weekend available for you to see her on Sunday. During the week is very challenging. The sitter she is with doesn't want you anywhere near her or her home. You said you have someone who can supervise, who do you have that will be supervising?"

547.   Matthew then continued to harass me and interfere with my ability to see and speak to my child.

548.   At 6:20PM, he messaged me and said, "Please show me in order where it says I have to allow you to FaceTime Angelina. And I will be happy to oblige. The whole last year you have never allowed me to FaceTime Angelina. Even though you were supposed to. I don't feel very comfortable with you, knowing where I

am and who I'm with and seeing all the surroundings due to the constant harassment. I would prefer to not have video calls at this time. If it is court ordered, and you have a copy that you can show me, then I will. But I have not received anything from the court."

549.    There was nothing that said I was "supposed to" let him FaceTime Angelina over the past year. His allegations that it is not court ordered were also interference as he clearly was able to see from the order from 5/31/23 that it stated that I could have video calls. (See Court order from 5/31/23)

550.    At 6:21PM, I messaged him again and said, "I have someone who can supervise Friday for the movie. Would you be willing to meet us at the mall?"

551.    At 6:23PM, I responded and said, "It was never a court order until now. I wanted to ask you, since the judge also put in the new court order that our communications could be in writing via text or email would you be willing to agree to us getting rid of the app? Because honestly, it's so hard to even send attachments every time it just never works, and this app is just annoying. If you feel the same and want to both of us agree on changing it to email or text, then we could make that change in the protective order. If we both agree on it, then they will allow it. Let me know what you think, or we could maybe use a different app because the other one I use is so much better and I just would really prefer to have text or email since that's what the judge put."

552.    Matthew viewed my message and said nothing.

553.    At 6:25PM, I sent Matthew another message and said, "Angelina has a $200 gift card for build a bear as well as we had planned to see the little mermaid movie. Is that something that we could do on Friday or Saturday? I can provide a supervisor if you don't have anyone. Let me know, and even if you wanted to also be there with her that's fine as long as you just be normal."

554.    At 7:09PM, I sent him a message and said, "I just tried to FaceTime her because you said I had to wait until seven. Please have her call me. I have not been able to talk to her in two days and I only saw her for one hour and the last eight days."

555.    At 7:34PM, Matthew responded to my message about build-a-bear and said, "Who would the supervisor be?"

556.    At 8:45PM, I replied and said, "Probably my sister or mom or another person i can let you know tomorrow. Is that ok?"

557.    At 8:47PM, I messaged Matthew and said, "Angelina was supposed to have a follow up appointment with her doctor and they said they wanted her to come back for the 31st. That was yesterday. I can call tomorrow and try to schedule it for you if you want and tell you when they can get her in if that works. They recommended she be seen by the 31st. Do you want me to call tomorrow and book it for the next available one they have?"

558.    Matthew continued to interfere with my ability to take Angelina to her medical follow-up appointment.

559.    At 8:59PM, Matthew responded and said, "Mom and sister are ok, depends who other person is. Saturday is best. We have plans Friday."

560.    He never provided me with the days and times that he has plans and is busy and unable to facilitate visitation for Angelina. He only tells me about his alleged "plans" after I expressly ask to see her on said days and times.

561.    Matthew's coercively restricting who the supervisor can be and refusing to provide his own supervisor per the court order also interferes with me and restricts me from being able to see my child.

562.    This is his way of subjecting me to parental alienation, coercion, and his way of psychologically abusing Angelina.

563.    At 9:23PM, Matthew responded to my question about if I should book Angelina for the medical follow-up, and he said, "You can but I'm probably going to be changing her pediatrician to someone closer to where I live. It doesn't make sense for her doctor to be so far from where she will mainly be." (See OurFamilyWizard messages from 6/1/23)

564.    I booked the appointment and he subsequently canceled it and told them Angelina would no longer be coming there. As of 7/16/23, Angelina still have not been seen her for her post-ER medical follow up with her pediatrician that was supposed to be done by 5/31/23.

565. It has been almost 2 months since Angelina was due for the appointment, and Matthew has continued to neglect her medical needs by refusing to allow her to be seen.

566. It has also been almost 2 months since Angelina was due to go to her therapy, and Matthew has since withdrawn her from therapy and refused to allow her to get mental health treatment services for her adjustment disorder diagnosis.

567. Angelina was due for a 4-year-old physical appointment by 5/21/23. It has been almost 2 months since she was due for her physical and she still has not been seen by a doctor.

568. Matthew has continued to try to lie to DCF and say that he is "looking for a therapist" even though he told her therapist that he would not be sending her anymore. (See transcript from court hearing 6/15/23)

569.

570. On 6/2/23, Matthew used coercion and risked Angelina's welfare by refusing to comply with the orders from the emergency room that stated that she needed to be seen for a medical follow-up.

571. At 9:31AM, I responded to Matthew's prior message about me seeing Angelina on Saturday and said, "What time saturday? You previously stated any of the people i listed were fine. Let me know what time saturday. I have some plans for her."

572. At 9:32AM, I responded to Matthew's prior message about him changing Angelina to a new pediatrician and said, "She is not going to be staying with you permanently. Also, you complained about her changing doctors and lied under oath and said she had four doctors when she has only had two. You also complain that she changes schools and she has adjustment disorder and you keep ripping her away from things after she adjusted to them. I will be calling the doctor now and making the appointment for the next soonest available. she has an excellent provider and there's no reason why you should take her away from that doctor. I have no problem bringing her to appointments moving forward. She's also on hold at school because she loves at school. It's an excellent program and there's no reason for you to take her away from that. I will let you know what the doctor

says for the next available since she was supposed to be seen by the doctor two days ago.

573. At 9:39AM, Matthew replied to my first message and said, "During the day would be best, please stop avoiding telling me who will be supervising."

574. At 9:40AM, I messaged him in the app and said, "I need to know a time so I can then find someone since you are forcing me to do what the court ordered you to. What time on Saturday can I see her? You keep withholding her. Tell me a time so I can make arrangements."

575. At 9:53AM, Matthew continued to harass me and intimidate me and use coercion and said, "She will be staying with me permanently. I'm sorry to disappoint you but I will be taking over as primary parent. When we go back on the 15th we will hash out the details with the judge. Do you have any plans as far as how you want your parenting schedule to be? All things will be changing and will be fixed. So she will have her last and permanent daycare until school. And she will have a new doctor then that will not change. All of these will be closer to where we are to make it easier to facilitate. Please send me doctor info so that I may coordinate a new appointment for now."

576. Matthew's comments saying "sorry to disappoint you" and him stating that "All things will be changing and will be fixed" were done to intimidate and harass me and interfere with my well-being.

577. Nothing in the court order stated that Angelina would be staying with him "permanently" and the order can be modified at any time, and it went in as a temporary order.

578. Him stating that we will "hash out details with the judge" also implied that he was in communication with the judge outside of court, and is a way to intimidate me and harass me and cause me fear.

579. Matthew saying that "all things will be changing and will be fixed" and saying that he will put her in her "last and permanent daycare until school" and that she will have a "new doctor" were all also statements that were made to harass and interfere with me.

580. At 9:54AM, Matthew responded to my other message and said, "Stop saying I'm withholding her from you because I'm not. You didn't let me see her for 9 weeks at one time and then didn't let me see her for 6 weeks at another time. I am letting you see her every week. So just stop saying I'm not letting you see her. You may pick her up at noon. I want you to pick a theater that's near us because I do not want her going far."

581. Matthew's comments were made to interfere with me and harass me and gaslight me.

582. I never once "didn't let him see her for 9 weeks at a time" and never once didn't let him see her for "6 weeks at a time" either.

583. Matthew is not, nor has he ever, allowed me to see her "every week" since he was given temporary sole legal and sole physical custody of Angelina.

584. Him telling me to "stop saying I'm not letting you see her" was done to harass me since he has not been allowing me to see her.

585. At 9:54 AM, I messaged him in response to him saying that Angelina would be with him permanently and said, "No she wont. Why is it your goal to isolate me from my child who loves me? You are withholding medical care. I am making the appointment. Stop being abusive."

586. At 9:55AM, I messaged Matthew again and said, "Can i see angelina today while you are at work?"

587. At 9:57AM, I messaged Matthew in response to his prior message and said, "The hospital said she needed to be seen by her doctor on 5/31. I am making the appt. If you refuse to bring her that is withholding medical care. You have no right to ignore doctors orders."

588. At 9:59AM, I responded to his prior message in which he lied about me seeing her regularly and said, "Thats a lie. I cant do all the transportation both ways and provide a babysitter. Those are your responsibility per the order. She wants to see her toys and room and come home and play with her birthday gifts. Can you meet me at orange pd tomorrow at 10? I will have a supervisor."

589.    At 10:18AM, Matthew continued to harass me and interfere with me by continuing to twist the reality of the situation and try to insult me, degrade me, lie and gaslight me in the messages.

590.    He messaged me and said, "Theo. No one is being abusive. I'm asking you to give her doctors info so I can coordinate an appointment and you won't. I'm not isolating her from you. You lost custody because of your behavior, instead of taking the time to get better so that you may get more time with her, you are doubling down on poor behavior that will hurt Angelina. We all just want you to get the help you need so that you can have a more active role in Angelina's life again. So please coparent with me so that she gets what she needs. Please pass me the information I need for her doctors and such or I will have no choice but to make different appointments elsewhere. I want you to see her. I told you you can take her to the movies on Saturday afternoon as long as you have someone I approve of to supervise. I would supervise myself but until the protective order is lifted I don't want to risk that. When we go back to court the judge is going to ask how have you been and how has your behavior been. I'm going to give an honest analysis so please do what's in Angelina's best interest. Thank you."

591.    Matthew sent these messages to intimidate, harass, and interfere with me further.

592.    He was being extremely psychologically and emotionally abusive, and always has been to me.

593.    He only asked for the doctor's info so that he could cancel the appointment because he wants to neglect her medical care and interfere with her ability to be seen for a follow-up.

594.    He has been isolating me and had been at the time that he said that. His comments about me "losing custody because of my behavior" and "instead of taking the time to get better so that you may get more time with her" and "we all just want you to get the help you need" were all done so that he can insult, degrade, mock, and sarcastically insult me with backhanded comments.

595.    I don't need to "get better" because I don't have anything wrong with me. Matthew was trying to degrade me with these statements. His comments that he

"would supervise himself but until the protective order is lifted I don't want to risk that" were also made to degrade and harass me.

596.    The court order says that the supervisor MUST be a third party. So even if there was no protective order, Matthew has no say in being the supervisor, as he is court-ordered to designate a third party to do it.

597.    Matthew's statements when he said "when we go back to court the judge is going to ask how have you been and how has your behavior been. I'm going to give an honest analysis" were also made with the intent to harass, intimidate, and coerce me into doing what he wants and complying with his unreasonable and abusive demands.

598.    At 10:20AM, Matthew continued to interfere with my ability to see or speak to my child. In response to me asking if he could meet me at the Orange Police Station the next day for an exchange, he said, "No. I have to work on the truck and get it fixed. You can come pick her up at my house if you would like for a few hours. Once the truck is running good again I will be willing to meet you half way. You still haven't told me who will supervise. Please let me know."

599.    Matthew's truck was fully functional and working fine at the time. His demands for me to meet at his house are a violation of the residential stay-away orders that say that we cannot be near each other's homes or wherever we reside. I already asked him not to ask for a supervisor until we could confirm details of time/location and he continued to harass me by asking repeatedly again.

600.    I messaged him at 10:27AM and said, "First of all this is abuse. Second of all the ER doctor ordered her to be evaluated at her provider and not someone else and she needed to be seen by 5/31/23. I informed you many times and you refused to bring her. Yesterday at 9:23PM you told me to make this appointment. I will be making it now and have been waiting on hold for 45 minutes so far to reach them. Are you planning to sign the release for the therapist you saw on Connolly Parkway in Hamden in 2020 or the other one you saw in Prospect in 2021 or are you going to continue to refuse to follow the order that the judge made 7 months ago stating you were required to sign it? If not, I will have no choice but to subpoena the providers to get it myself. Also, in documentation submitted by

Stephanie Janes it states she stated you need mental health individual treatment. The DCF record said they also want you to engage in mental health. Are you going to comply? (See OurFamilyWizard messages from 6/2/23) Matthew never responded to the message. Matthew's actions are equivalent to child abuse since he is neglecting the medical care of our daughter Angelina.

601.    At 10:30AM, I sent Matthew another message and said, "The court order says i cant go to your house and my attorney advised me not to go there for any reason. I can meet you at the New Britain police station at 10am tomorrow to pick her up. Let me know if that works and i will spend the rest of the day searching for a supervisor since you are refusing to provide one. Also, it says it must be a third party so you will never be allowed to supervise even if the protective order doesn't become a standing order." (See OurFamilyWizard messages from 6/2/23)

602.    Matthew continued to interfere with me by waiting more than 10 hours to respond to me.

603.    At 8:03PM, he continued to harass me, interfere with me, and use degrading language to denigrate me in the app and messaged me and said, "Who is the third party that will be supervising tomorrow. You are still exhibiting the same behaviors as before you lost custody and that makes me nervous. I've asked you countless times to send me the info for all medical and you have refused. According to the new order you are no longer allowed to make any medical decisions for Angelina. Please forward any information over to me."

604.    I already asked him repeatedly to tell me the details before I could get a third-party to commit, and he continued to harass me by asking repeatedly who the third party is.

605.    His comments that I am "still exhibiting the same behaviors as before you lost custody and that makes me nervous" were also stated to harass me as I haven't exhibited any alleged "behaviors" and there was no legal or factual reason for him to get custody in the first place due to his substantial record of abuse with DCF and his criminal convictions.

606. Matthew's claims that "according to the new order you are no longer allowed to make any medical decisions for Angelina" is also a lie that was said to try to harass and interfere with me and intimidate me.

607. Nothing in the order states that I am not allowed to make medical decisions for Angelina.

608. In Connecticut, even the non-custodial parent retains the right to their child's medical records and ability to be involved in the making of medical decisions for their child.

609. Matthew said that his car broke down but when we Face Timed the car was functioning fine, and she was in his car. His constant psychological abuse constitutes harassment.

610.

611. On 6/3/23, Matthew interfered with me and my ability to see or speak to my child, had contact with others to cause me annoyance/alarm, and tried to abuse me by isolating me from my child. I have all the recorded calls, messages from OurFamilyWizard, and texts as evidence, along with the transcripts and court orders.

612. On 6/3/23, Matthew interfered with me by lying to both me and my mother and telling us that his car was broken down when we asked him to bring Angelina to see us. He said his car was broken down and then allowed us to FaceTime the child the night before, and during the call she was in his car driving around.

613. He then said that we could see the child on Saturday and said we could get her after 12pm on Saturday. Matthew then had contact with others to alarm/annoy me and sent my mother several intimidating messages to try to alarm and stress her. She became so stressed and alarmed by his repeated messages and the content of what he was saying to her that she then told him she didn't want to be around him any longer.

614. Matthew also was refusing to allow me to FaceTime, even though the new order said I was allowed to FaceTime. He was also interfering with me by refusing to allow me to see my daughter pursuant to the family order. I asked him to let me see and speak to my daughter on this day, and he did not allow me to do

either, despite me asking him for 9 straight hours in the OurFamilyWizard app and asking every day before that for over a week. During that time, he only allowed me to see my daughter for 1.2 hours. (See recorded call from 6/3/23; See also OurFamilyWizard messages from 6/3/23; See also texts from Diamanto Antonellis from 6/3/23; See also court order from 5/31/23; See also transcript from 5/25/23)

615.    He also interfered with the custody case by refusing to respond when I asked him if he would comply with the court orders.

616.    At 10:46AM I messaged him in response to his prior message and said, "My mom is supervising. Are you bringing her to us now that your vehicle is fixed ?"

617.    At 10:48AM, I messaged him and said, "In the last 9 days you have only allowed me to see Angelina for 1.5 hours. You said I could see her today at 10. Its 10:47 now. My mom asked you to bring her there. Can you please bring her ? She hasnt seen her sister in almost 2 weeks or her grandma in over 4 weeks."

618.    At 11:21AM, I messaged him in the app and said, "Are you going to reply or should I just issue the subpoenas?"

619.    He read my message and said nothing, which continued to harass and interfere with my ability to move forward in the case.

620.    I continued to try to arrange a visit with my child, and Matthew continued to try to interfere by not communicating with me efficiently and making it difficult for me to see her.

621.    At 11:55AM, I messaged Matthew again and said, "Why are you alienating me from angelina? You told me i could take her to build a bear and movies today with my mom. Why are you now refusing to allow me to see her ? Only allowing me to see her for one hour in 9 days is coercive control and emotional abuse and parental alienation. I want to see my child."

622.    Matthew continued to ignore my messages.

623.    At 11:55AM, I messaged him again and said, "???"

624.    At 11:56AM, I messaged him again and said, "OK I will take your refusal to respond as confirmation of your willful contempt of the court order, and I will

move forward with issuing subpoenas to get all of the things that you are refusing to supply."

625. Matthew continued interfere with and harass me and isolate me from being able to see my child.

626. At 12:04PM, he replied and said, "My vehicle is not fixed, I will be spending all day today working on the vehicle to get it back in working order. If you want to visit with Angelina, you may come up here with a third-party that I approve of such as your mother or sister. if I can get the vehicle working by tomorrow, I would be willing to come down to your mothers house and drop Angelina off for an hour or two. I told you yesterday that you can come visit with Angelina at noon. I never mentioned anything about 10 AM. Do you have someone willing to supervise your visit today? If so, let me know who and what time do you want to pick her up and approximately how long you would like to be spending with her."

627. His vehicle was fully functional and on multiple FaceTime calls Angelina was on the phone with me while in the car driving around and said his car was fixed.

628. At 12:08PM, I responded and said, "Your vehicle was working yesterday when we FaceTimed her, and the entire interaction was recorded. She stated your vehicle was fixed. I'm concerned of how you are going to be able to take care of Angelina when you do not even have a functioning vehicle. I'm on my way right now to come get her. I will be calling the police to Assist since you are once again asking me to come to your house when you know I'm not allowed to. Please make sure that the purple sandals that Angelina was wearing on Thursday, May 25 that I purchased for her for her birthday are returned to me when I arrive since I bought those for her specifically for her birthday present and she said that your mom bought her new shoes already."

629. At 12:15PM, Matthew messaged me and said, "Angelina will not be going with you unless you tell me who will be supervising the visit. I've asked multiple times who you will be using and you have not responded."

630. I had already told Matthew who the supervisor was repeatedly and she had contacted him directly. His repeated messages of asking who the supervisor is and demanding who it is after I already told him are a form of harassment.

631.    At 12:16PM, I messaged him and said, "I said my mom and she also texted you. We are on the way. Police will be notified upon arrival since you cant contact me or have me at your house and you are insisting that i do that."

632.    Matthew continued to try to use coercion, interfere with me, demand that I violate the protective order, lie about what is and is not allowed in the protective order, and harass and intimidate me by telling me that he has the authority to dictate the terms of the protective order.

633.    At 12:56PM, he said, "We are allowed ability to facilitate pick ups and drop offs. The only thing that's not allowed are things outside of that."

634.    Nothing in the protective order says that we are allowed to do pick-ups and drop-offs at the opposite person's house. Nothing in the protective order says that "the only thing that's not allowed are things outside of that." His statements were blatant lies and he knows they are, and continued to harass me by demanding that I follow his orders and not the protective order.

635.    At 12:56PM, he send me another message and said, "Where will you be taking Angelina? How long do you want Angelina for?"

636.    At 1:02PM, I responded to his messages about his lies about the protective order and said, "No we are not. Where does it say that you liar??"

637.    Matthew read my message and said nothing.

638.    At 1:03PM, I responded to his message about the visit and said, "The entire day since you only allowed me 1.5 hours with her in the past 10 days and have been alienating me. Im taking her to build a bear and movies."

639.    Matthew then continued to try to interfere with me, harass me, and intimidate me by using coercion.

640.    At 1:14PM, he responded and said, "Ok let me make this very clear to you. You are only allowed to pick up Angelina with a Third party that I approve of. I'm not trying to keep you from Angelina. I've asked you multiple times who you plan on using as a third-party. I said I would approve of your mother doing it but she is not coming. You also need to tell me how long you plan on taking her and what the game plan is exactly. If you do not, give me these details, then you will not be taking Angelina today. Please follow up with a proper response regarding

these details. Last week you took Angelina from 4:05 PM and then dropped her off at 6:47 PM just for clarification. Thank you for your understanding."

641.     Matthew had called my mother and stressed her out to the point where she didn't want to supervise the visit anymore. This is having contact with others to cause me annoyance and alarm and interfering with me especially since everything is court ordered that it needs to be done in writing and not over the phone. Matthew harasses me by insisting on calling my friends and family to try to stress them out and intimidate them and try to isolate me from everyone.

642.     At 1:40PM, I responded to him and said, "I am trying to find someone else since you told my mom not to come. You are withholding angelina. If you just drove her to my moms, she could see us all. Your car is fixed and you keep lying about it. Ill be there with my friend courtney in a couple hours."

643.     Matthew continued to try to harass me and use coercion by demanding that I have the supervisor call him when the court order says all arrangements "must be made in writing."

644.     At 1:46PM, he said, "Please have this Courtney person contact me so I may discuss the parameters of the visit with her directly. Thank you."

645.     At 4:30PM, I responded and said, "What do you mean? You don't get to dictate things to my friends. I am almost there. Is Angelina ready? We drove over an hour."

646.     Matthew continued to try to harass me and use coercion by demanding that I have the supervisor call him when the court order says all arrangements "must be made in writing."

647.     At 4:30PM, he replied and said, "I'm sorry, but I will need to speak to the third-party before I let her go with you. Parameters are very clear. Please have said person call me."

648.     At 4:36PM, he messaged me and said, "She still napping, I'm going to have to wake her, how long until you get here? I need to speak with the person who is supervising."

649. At 4:40PM, I said, "No you can talk to them when we get there. Stop withholding angelina. You said i could take her at 12. Can you send her outside soon?"

650. At 4:42PM, I messaged him again and said, "You are court ordered to arrange a supervisor and its your obligation to foster the relationship between angelina and me. You cant keep alienating me. This is emotional abuse. Please stop keeping her away. Its getting so late."

651. At 4:46PM, he messaged me and said, "How far away are you?"

652. At 5:10PM, he messaged me and said, "Before I will allow Angelina to go with you, I need to know 1 what time you plan on taking her and dropping her back 2 I need the person you are with number and her information 3 All the places you plan on going 4 she must be in a proper car seat with a five point harness

653. At 5:32PM, I said, "I'm still far away. Can you bring her to me since I did all the driving last time?"

654. At 5:35PM, I responded and said, "It says you need to provide the third party. Can you provide that tonight so that i can see her per the order? Its not my job to get the supervisor. It says "third party designated by the father". Please let me know what time i can see angelina with your designated third party per the order. Judge was clear in saying you have to arrange that and not put that burden on me."

655. Matthew continued to interfere by refusing to provide a supervisor so that I could have a visit with Angelina.

656. At 5:39PM, he messaged me and said, "I'm sorry I do not have anyone for tonight."

657. Matthew continued to interfere by lying and stating that he has no vehicle.

658. At 6:28PM, he messaged me and said, "Having trouble. There is a bolt stuck so I'm not able to drive. I'm going to try to finish it tomorrow. It's getting late now. Do you plan on seeing her tomorrow at all?"

659. At 6:41PM, after having spent all day trying to arrange to see my child and going through 3 separate supervisors to try to accommodate his refusal to provide

me one, I messaged him and said, "I have somebody who is willing to do it. Bob's wife Beth. Can we come now? We could have dinner with her."

660.    At 6:42PM, I replied to his other message and said, "I want to come get her now. Ive been asking all day. Can we come get her? I promised her we would go to the movies and build a bear. Please let me know because I am in the area and waiting all day. The picture that you just sent wasn't even from today." (See OurFamilyWizard messages from 6/3/23)

661.    Matthew continued to interfere by claiming that our child goes to bed earlier than she does so that I would be unable to see her.

662.    At 6:43PM, he messaged me and said, "It's very late. She goes to bed at 730 or 8 the latest."

663.    At 6:45PM, I responded and said, "No, she doesn't. She never goes to bed at 7:30 or eight. I would like to see her and I have not been able to see her in almost 2 weeks. In the past two weeks, you only let me see her for an hour and a half. We are in New Britain now. Can I come get her and see her? She's been expecting to see me and I told her I would. Why are you keeping her away? You told me if I found somebody to come I could I then tell you I found someone and now you're saying no because you're claiming she needs to go to bed so early for no reason on a weekend? She usually stays up until 10 sometimes and every time I call you she's never sleeping at that time. Please stop with holding her and isolating me. This constitutes abuse in Connecticut and I have so much documentation of you doing this legal action will be taken if you keep with holding her. We are in New Britain. Can I just come see my kid I have a supervisor I paid all this money to come here today and you're refusing to let me see her."

664.    Matthew continued to try to harass me and use coercion by demanding that I have the supervisor call him when the court order says all arrangements "must be made in writing."

665.    At 6:46PM, he responded and said, "The picture is from an hour ago, my car is still in the drive like that you can see it. You said in the area. What does that mean. Who will be there to supervise. I would need to speak to them and go over

the parameters. Can you please stop jumping from thread to thread and keep it to one thread so the conversation is easier to follow."

666.    At 6:47PM, I responded and said, "Beth is. I told you that repeatedly. You keep starting multiple threads. I want to see angelina. Why are you refusing???"

667.    At 6:49PM, Matthew said, "Where are you planning on going?"

668.    Matthew then continued to demand that I provide him with information of the details even though he is the one who needs to give that information to me.

669.    At 6:55PM, he messaged me again and said, "As I mentioned before, I need to know the exact times you're picking up and plan on dropping off, where you were going, and who you were going with. Along with contact info for the person who will be supervising."

670.    At 7:18PM, I said, "I said it 4 times. Why do you keep asking again?"

671.    At 7:19PM, I said, "You never said yes. You keep making excuses and denying every person i offer and nobody will sit around for 8 hours waiting on you. I want to take her to the movies. Can we go?"

672.    He ended up letting us take Angelina to a movie and we picked her up at 9:30PM and had her back after 12:30AM. It took almost 12 full hours of going back and forth of him interfering until he actually allowed me to see my child for three hours.

673.

674.    On 6/4/23, Matthew interfered with me by refusing to allow me the ability to see or speak to my child by intentionally ignoring me. He also had contact with others to cause me annoyance/alarm and harassed my friend, interfered with my ability to enjoy any time with my child, and harassed and threatened me and my friend. He also tried to call me repeatedly on my cell phone. I have all the phone records, text messages, and OurFamilyWizard messages. Matthew also told my mother that he would be cancelling a planned visit and claimed his car was not functioning. (See text messages between Matthew and Diamanto Antonellis) Matthew also made several disparaging and alarming statements about me to my mother that were not true and that were designed in an effort to harass me. He had contact with others (My mother) that was likely to cause me annoyance and alarm

and interfered with my ability to see my child, both of which are direct violations of the protective order. (See all texts from Diamanto to Matt from 6/4/23)

675.　On 6/4/23, Matthew Lodice was trying to interfere with me by ignoring all of my messages in the OurFamilyWizard app for the majority of the day. He previously told me that I could see my daughter on this day, but intentionally ignored my messages in the app all morning and afternoon. He threatened that he would suspend all future visits and interfered with my court ordered right to see and speak to my child. He threatened me and said that I could never see my child again out of anger.

676.　He also did not allow me to FaceTime or see my daughter for most of the day until the late afternoon when he finally told me at the last minute that I could see her. He finally allowed us to pick her up, and my friend Juliana called him at 4:21PM to tell him that we were minutes from his house ready to pick her up in New Britain. (See recording from 6/5/23)

677.　At 9:17AM, I messaged him and said, " I will be seeing Angelina today at 1 PM. I'll be taking her to build a bear like I promised her and my friend Juliana is going to supervise. Can you meet us at the Orange Police station at 1 o'clock. I have done a two hour round-trip to New Britain the last two times and you have not done any transportation for Angelina. Can you please meet halfway or come bring her to us today since you have done absolutely nothing to help facilitate her seeing me and because you are already refusing to follow the court order by not providing me any supervision? Let me know. Angelina is really upset that she didn't get to use her card yet."

678.　Matthew interfered with me by reading my message one minute later and then saying nothing.

679.　At 9:24AM, I messaged him again and said, "In the last 11 days I have only been allowed to see Angelina for a few hours. I messaged you a little while ago stating that I would be planning to see her today at 1 o'clock and I told you where I was going and who would be supervising. You read my message and ignored it. Are you going to meet me at the Orange police station? I gave you all the details and you just keep ignoring my messages. You have no right to continue alienating

and isolating me from Angelina and refusing to allow me to see her. You told me last week I could see her on Sunday. I went out of my way to find arrangements since you refuse to provide me any supervision. I need to know now because I can't sit around for nine hours waiting for you to answer like you did yesterday."

680.　Matthew interfered with me by reading my message one minute later and then saying nothing.

681.　At 9:26AM, I messaged him again and said, "Today's the third day in a row that you refuse to allow me to speak to Angelina on FaceTime. I just tried calling again and you ignored it. I'd like to speak to Angelina. Also, somebody here wants to speak to her so please have her answer. You have no right to withhold her from me and continue isolating. Legal action will be taken at an immediate speed if you continue this abuse, and I've already spoken to my attorney. Not only will I take legal action in that but I have no problem, filing a lawsuit against you for all of the abuse that you were doing."

682.　Matthew interfered with me by reading my message one minute later and then saying nothing.

683.　Matthew constantly ignores all of my messages and refuses to allow me Facetimes with my child or visitation access to my child. He told me that I could see her on Sunday, and then refused even after I went out my way to make arrangements to facilitate and make the visit possible.

684.　At 9:30AM, I messaged him again and said, "I have some serious concerns about your mental health and substance abuse issues that are untreated. I know that you refused to sign releases, and you intentionally withheld all of that information from the court but I'm in the process of preparing subpoenas for the two therapists that you saw in Prospect and Hamden and I do have their information. I just want to know if you would be willing to go forward with providing the court those releases yourself or do I need to forcibly receive those by issuing subpoenas on those people? I have the ability to issue a subpoena, on anybody that I want as somebody who is a commissioner of the state of Connecticut, so let me know by Monday morning, or I will be preparing the subpoenas myself. I'm also going to be doing the same for Dominic mental health

provider since she is going to be with him as a primary guardian over the summer per your court statements. Thanks."

685. Matthew interfered with me by reading my message one minute later and then saying nothing.

686. At 9:31AM, I sent another message and said, "Why are you refusing to answer? I want to see Angelina. I want to FaceTime Angelina. Please get back to me within the next 15 minutes so that I can have my supervisor make arrangements to change her schedule so that we can see Angelina. If I don't hear back by 10 AM, I will be calling the police and making a report since you are once again interfering with me as the protected party for refusing to allow me access to Angelina even though I met all of the ridiculous demands that you threw at me, due to your refusal to follow the court order by not providing me with supervision."

687. Matthew interfered with me by reading my message one minute later and then saying nothing.

688. At 9:33AM, I messaged Matthew again and said, "This is my 12th time asking you in the last two days to see Angelina. He told me I could see her seven days ago. You said I could see her today on Sunday. I asked you if you could meet us at the Orange Police station at 1 PM. Can you do that? She wants to see us and use the gift card she got for her birthday. It's bad enough that you couldn't even get her a cake or anything for her birthday and you kept her hostage in your house for the entire time. Also, I'm concerned of the fact that you occupy two apartments on the second floor of your rental unit. You need to make sure that the police are aware of that."

689. Matthew interfered with me by reading my message one minute later and then saying nothing.

690. At 9:38AM, I messaged Matthew again and said, "Why are you refusing to allow me to see or speak to my child??"

691. Matthew interfered with me by reading my message one minute later and then saying nothing.

692. At 10:45 AM, I messaged Matthew again and said, "??? This is abuse."

693.    Matthew interfered with me by reading my message one minute later and then saying nothing.

694.    After ignoring me for several hours for the entire morning, Matthew finally decided to respond by using coercion and intimidation. He also demanded that I have the supervisor call him even though the court order says that all arrangements need to be made in writing. He also continued to harass me by lying and saying that his truck wasn't working.

695.    At 11:33AM, he responded and said, "You don't dictate when you get to see her, you can ask. I would be ok with you coming to get her at 1pm to bring her to build a bear. She needs to be back at 4pm. I don't have a working truck yet. Every Sunday I brought Angelina all the way to you for church waited two hours and then drove all the way back. So I don't feel bad about you driving to see her. Please have Juliana reach out to me before so I can discuss the parameters."

696.    There was no reason for Matthew to restrict the visit and say that Angelina needed to be back by 4 when we hadn't even established what time we would be picking her up yet. He did this to try to control me and isolate me from my daughter. This is harassment and parental alienation.

697.    At 11:39AM, I responded and said, "We want her at bobs funeral dinner too. Why are you dictating that i can only have a few hours per week??"

698.    Matthew then responded and tried to intimidate me and use harassment and coercion to try to insult and degrade me by implying that I have mental health issues and saying that I'm wrong for telling my child that she will be home with me soon.

699.    There is no legal reason why Matthew, who has been convicted of many violent crimes and is on the DCF abuse and neglect registry should have been given sole legal and sole physical custody of our daughter and my access changed to supervised visitation.

700.    This was done with no factual or legal reasoning and the decision is being appealed and there are motions for disqualification of judicial authority pending in the court.

701. I have hired an attorney and am actively working toward getting Angelina back and she has stated repeatedly that she wants to be with me.

702. I also have sole legal and sole physical custody of my almost 9-year-old daughter and have had that for her whole life.

703. I have never been convicted of any abuse or neglect nor have I ever been on the DCF abuse and neglect registry like Matthew has.

704. Prior to 5/25/23, Angelina lived with me full-time for four years. Her being taken away is traumatic to everyone involved and Matthew is trying to make things worse by sending harassing and coercive texts.

705. At 11:45AM, in an effort to harass me and intimidate me further, Matthew replied and said, "Because that's what is best right now until you start to exhibit behaviors that coincide with what's in Angelina's best interest. You still show the same erratic behaviors going back and forth, sending a million messages about all different things, making all these false accusations, making threats to us, telling Angelina things that aren't true such as I'm keeping her from you and that she'll be living back with mama real soon. Interrogating her on the phone, constantly confusing her. We want to see you act like a normal person and just be a good mom and do what's in Angelina's best interest. Then at that point the amount of time she will be able to spend with you will expand accordingly."

706. Nothing in the court order stated that Matthew was to heavily restrict my access to Angelina.

707. Nothing in the court order states that I need to "act like a normal person" in order to be able to have court-ordered parenting time with my child.

708. Nothing in the court order says that Matthew has the right to expand the amount of time she spends with me based on if I'm a "good mom."

709. Matthew has had no problem with me taking full care of Angelina for the last four years, and now that he was given custody, he has had his mother Karen Bowers raising Angelina and watching her the majority of the time.

710. At 12:21PM, Matthew messaged me again and said, "I need to know if you're definitely coming at 1 PM if not, I'm going to put her down for a nap. Please let me know in the next few minutes.

711.     At 2:06PM, I responded to Matthew's previous message in which he tried to slander and degrade me and said, "Please stop sending me defamatory messages here. This is considered a violation of the protective order as well as harassment."

712.     Matthew then continued to use coercion and harass me by saying that he was justified in both his defamatory statements and his parental alienation and psychological abuse of our daughter.

713.     At 2:07PM, he responded and said, "They are not defamatory. I'm explaining why Angelina is having limited exposure to you. She's napping now, are you still planning to see her today?"

714.     I had messaged him for hours trying to arrange a visit with her and he had ignored all of the messages, only to then harass me by asking the same questions again.

715.     At 2:07PM, I replied and said, "I sent you over 17 different messages since this morning, asking you about the plans and you opened each of them almost immediately upon receipt and then ignored me. You then send me a message three hours later asking me if I'm coming at one? What are the circumstances for today. Did you find me a supervisor like you're court ordered to do? I want to take her to build a bear and they close at six. Can you please meet me there?

716.     Matthew interfered with me by reading my message one minute later and then saying nothing.

717.     At 2:09PM, I messaged him in response to him saying he was in the right for making disparaging statements about me and that he was in the right in isolating my daughter from me and said, "If the harassment continues, I will be taking legal action. Please respond to the other 10 different threads where I asked you about seeing and speaking to my child today that you immediately upon receipt opened the messages and refused to answer. Can you and your court ordered Supervisor come to the mall at 3 o'clock? Build a bear closes at six. We promised Angelina we would go."

718.     Matthew interfered with me by reading my message one minute later and then saying nothing.

719. At 2:10PM, I messaged him again and said, "I sent you multiple messages today asking to see Angelina and talk to Angelina. John Casanova did the same. Are you planning to let us see her today? I want to take her to build a bear so she can do the thing that her grandmother got her for her birthday and so that she can spend some time with me and julianna and also go to the dinner tonight for Uncle Bob. Please stop alienating her and isolating her from our family and from me."

720. Matthew interfered with me by reading my message one minute later and then saying nothing.

721. At 2:46PM, I messaged him again and said, "????"

722. Matthew interfered with me by reading my message one minute later and then saying nothing.

723. At 2:46PM, I sent him another message in the other thread that he ignored and said, "??????"

724. Matthew interfered with me by lying and saying that he doesn't have a vehicle when he does and uses it daily for work and personal purposes. He also refused to follow the court order that says he needs to designate a supervisor.

725. At 2:51PM, he responded and said, "As I stated multiple times, I currently do not have a vehicle. Nor do I have anyone willing to be near you to supervise your visit. You are welcomed to come get her with a person I approve of. Please let me know."

726. At 2:54PM, I responded and said, "Juliana and i will be there at 3:45 in front of your neighbors house."

727. At 3:25PM, I messaged again to let him know we were going to be running late and said, "4:10 eta dress her in nice clothes with the new sandals cuz she's going to a formal dinner."

728. Matthew interfered with me by refusing to return the special sandals or allow Angelina to wear the special sandals that were a birthday gift from me to her. He also interfered and tried to harass me and demand that the supervisor call him even though all arrangements are court ordered to be in writing.

729. At 3:32PM, he responded and said, "You want her in sandals for a formal dinner? She's in her regular shoes. We are at the fair Street over from my house.

Call me when you get there. You might have trouble getting to my street. Ask Juliana call me if you can't get to it because of the fair."

730. At 3:42PM, I messaged him and said, "Please have her dressed in nice clothes and the sandals that I bought her. I have no idea what fare street over from my house means. I cannot call you. Everything must be in writing. Please tell me the address where we are meeting so I don't drive in circles."

731. Matthew interfered by never reading the message until 7:00PM.

732. At 4:26PM, we were still waiting for Matthew to walk Angelina over to us to allow her to go with us for the visit. He knew the plans were that we said we would take her to Build-a-Bear and then a funeral dinner. (See 4:26PM recording from 6/5/23)

733. We left with Angelina at approximately 4:30PM from New Britain to head to the West Farms mall in Farmington. We arrived to the dinner around 6:40PM.

734. Within minutes of sitting down, Matthew started to harass my friend Juliana with phone contact to try to cause me annoyance and alarm.

735. He called her phone at 6:47PM, and she did not answer as she had her phone on silent mode in the restaurant at the dinner. At 6:48PM (only a little over 2 hours after we picked up Angelina)

736. Matthew tried to have additional contact with Juliana Notarino to cause me annoyance and alarm and texted her and said "Hey Julie, I'm a little concerned I thought Angelina was going to be home by seven and I have not heard back from anyone yet?" (See screenshots of Juliana Notarino texts 6/4/23)

737. At 6:59PM, he tried to call Juliana again on her phone. She missed his call as her phone was on silent and in her purse. (See screenshots of Juliana Notarino call logs 6/4/23)

738. Matthew then sent Juliana over 10 messages in a row containing all the pages of the court order that was issued on 5/31/23 that said he had temporary sole legal and physical custody of the child. He did this to try to intimidate and scare my friend.

739. At 7:00PM, Matthew then continued to message her and threaten her and intimidate her to try to alarm/annoy me and interfere with my ability to enjoy time

with my child and said "I don't want to have to call the police, please respond."
(See screenshots of Juliana Notarino texts 6/4/23)

740.    He also tried to call her repeatedly while he knew we were at dinner, and even after I told him in the OFW app to "stop threatening her. We are on our way and will be back soon. If you don't like that you can come get her yourself. Don't message her again or she will call the police and have you arrested for harassing and threatening her." (See screenshots and OFW messages from Juliana Notarino from 6/4/23)

741.    He then continued to call and text her repeatedly. Matthew then tried to call my cellphone directly three times in a row, in direct violation of the no contact order. Nowhere in the protective order does it say he is allowed to directly call me on my phone for any reason and nothing in the civil order says so either.

742.    He did this to harass me. I did not answer. Matthew also violated the protective order and threatened me, stating that he would suspend all visitation between me and my daughter and told me that I can never see her again because we were at a dinner until 8:00PM.

743.    He stated we could stay there until 8:00PM, and then proceeded to threaten me with suspension of all future visitation and stated he was going to "press kidnapping charges on me."

744.    At 7:04PM, he messaged me in the app again and said "Angelina was supposed to be home at 7PM. It's 7:05PM she is still not home. If I do not get a response in the next five minutes, I will be calling the police and filing a kidnap charge. The parameters of your pickup were very clear what." (See OurFamilyWizard messages from 6/4/23)

745.    Matthew then immediately tried to call Juliana on her cell phone for a third time in a row at 7:04PM, immediately after he sent me the message in OurFamilyWizard. Then, one minute later, at 7:05PM, Matthew then tried to call me directly on my cell phone, in violation of the no-contact order. He called me directly a total of three times during the dinner at 7:05PM, 7:09PM, and again at 7:09PM. (See screenshot of call record from 6/4/23; See also Verizon wireless call records)

746. He also sent Juliana multiple text messages at the same time he was messaging and calling me and used coercion and had harassing contact with her to cause me annoyance/alarm by calling her five times in a row and texting her and threatening to press charges on her for kidnapping.

747. The protective order says he must communicate in OurFamilyWizard, and rather than do that, he was harassing her repeatedly and caused her and me extreme stress and alarm and annoyance. He then told me in the app after I told him we were in West Haven (45 minutes away from New Britain) that if I "didn't respond in five minutes that he would be filing a kidnap charge and would have me and Juliana arrested for kidnapping." At 7:09PM, he called Juliana on her phone for the fourth time in a row. She missed his call. (See Juliana Notarino call log 6/4/23)

748. At 7:10PM, he called Juliana for the fifth time in a row. She missed his call. He continued to send us harassing texts and messages to try to interfere with our ability to eat and enjoy the meal.

749. At 7:16PM, I replied to his message and said "You have serious psychological issues. You told Juliana you were fine with us staying at the dinner if it went to 7/8 and that you didn't mind. We did Build-a-Bear and then drove 50 minutes from Farmington to West Haven and arrived to the dinner 2 hours late. We're here with everyone showing respects for Bob and we just sat down minutes ago. We're here with John, Mark, and everyone. Nobody kidnapped anyone. Stop acting like an insensitive tyrant. You don't care that we lost someone close to us. We will be coming back when we finish our food. All of us just started to eat and everyone waited for us."

750. At 7:21PM he messaged me and said, "She needs to be at my house by 8PM no later."

751. At 7:25PM, I replied to him and said "I'm sorry but you never told me that she had to be back by 8PM. You told Juliana that it was fine if the dinner ran to 7/8 and you knew the dinner is one hour away from your house. The dinner started at five and we didn't get there until seven. We just sat down minutes ago after you made us drive all the way to your house and don't forget I had to drive

and pick up my own supervisor because you refuse to allow your own. Since you refuse to communicate with me about any alleged curfew, please feel free to come get her from us here in West Haven if you need her home earlier. Otherwise as soon as we're done eating we will head back like you told Juliana before we came when you said if dinner runs til 7-8 that's fine. Angelina wants to eat and stop being psycho and telling us we have to leave and we just got here five minutes ago and she's with everybody that we know. We just lost someone we care about and you are acting so insensitive. You can come get her anytime you want. Otherwise, you have to wait for us to come back and it takes at least an hour to drive back to New Britain so since you make me do all the driving and you didn't communicate any of that, please stop harassing us. We will be back when we're done with dinner." (See OurFamilyWizard messages from 6/4/23; See also text messages from Juliana's phone from 6/4/23)

752.    At 7:27PM, John Casanova, our former boss, who was also at the restaurant and dinner with approximately 15 other people we all knew, sent a photograph of us eating our food to show Matthew that we were all safe and at the dinner eating. (See photo of us taken by John Casanova)

753.    We sent it to Matthew and he became even more enraged, presumably out of jealousy that he was not included at the dinner.

754.    Our intent was to show him we are eating and safe and that Angelina was not being "kidnapped."

755.    He also knew our exact location and we told him the name of the restaurant in the app. Matthew then called the New Britain Police Department and lid to them and told them that he "hadn't heard from me and was worried" while simultaneously telling me and my friend that the police were waiting for us to arrest us for kidnapping charges. (See OurFamilyWizard messages from 6/4/23)

756.    Matthew demanded that we immediately return the child to him and threatened us with kidnapping charges.

757.    At 7:36PM, after he was informed multiple times that we were in West Haven (one hour away from New Britain) he messaged me again in the app and said "You need to come back to New Britain right now and bring her back to me. You

have until 8PM. I was very clear on what time I wanted you home. I think I'm going to suspend your visits until our next court date because of this. You have no right to keep her. From now on supervised visits will be limited to one hour with a person of my choosing. I gave you the benefit of the doubt. At 8PM my next call is to the New Britain Police Department. I will be pressing charges for kidnapping and the parameters of the visits will now change." (See OurFamilyWizard messages from 6/4/23).

758. Then, 2 minutes later, at 7:38 PM, Matthew texted Juliana again to cause me annoyance/alarm and said, "I don't want to have to call the police, please respond. Please bring Angelina back. You are a good person I would hate to see you get tripped up because of Theo's behavior. I need you tell me your exact ETA or I will be calling the New Britain Police and filing charges." (See Juliana Notarino screenshots 6/4/23)

759. Matthew never made it clear what time he wanted her back, and his threats to suspend and limit visitation and press false kidnapping charges on me and my friend were a form of harassment. His constant messaging of us was also a form of harassment.

760. I replied to him and said "You have no right to suspend visits. Show me where you said she needed to be back by 8. You told Juliana if dinner went to 7/8 that would be fine and you knew it was in West Haven. We can't be there at 8, West Haven is an hour away. This isn't kidnapping. You can come get her. She's eating. Show some respect." (See OurFamilyWizard messages from 6/4/23)

761. Matthew continued to threaten and harass Juliana and continued to use coercion and contact her to try to cause me annoyance/alarm.

762. At 7:44PM, he texted her again and said "I'm sorry, but due to your lack of response, I will be pressing charges on you and Theodora for not bringing by daughter back at the times we discussed. I was very clear on the parameters of this exchange. I trusted you to follow them."

763. At this point, Juliana felt threatened, harassed, scared, and interfered with and also felt that he was only doing this to try to have contact with her that would likely cause me annoyance/alarm.

764.   At 7:47PM, after telling her husband about what had occurred and expressing that she was being threatened with criminal charges, Juliana called Matthew directly on his cell phone and left him a voicemail telling him to stop harassing and threatening her. (See Juliana Notarino call logs from 6/4/23)

765.   Matthew then continued to harass her and have contact with her to cause me annoyance and alarm and, even after being warned repeatedly to stop, he texted Juliana again, 8 minutes later at 7:52PM and said "Are you on your way back with my daughter"

766.   Juliana replied to him at 7:54PM and said "Yes we are. I am doing you guys a favor. Do not threaten me." (See Juliana Notarino texts from 6/4/23)

767.   Almost immediately, Matthew replied back to her with two more texts at 7:54PM and said "You are doing her a favor. You will no longer be allowed to supervise her visits, I am sorry. The police will be waiting here upon your arrival." Then, one minute later, at 7:55PM he texted her again and said "I have to protect my daughter from that monster." (See Juliana Notarino texts from 6/4/23)

768.   Matthew knows that Juliana is one of my closest friends who I have known for over a decade, and by him saying that I am a "monster" and disparaging me and denigrating me to one of my best friends, it was likely to cause me annoyance/alarm. He was doing this to harass me and her, and used coercion and threatened us both continuously for almost two straight hours.

769.   Then, at 8:06PM, Matthew continued to threaten, harass, and intimidate me and said "The Police have been called and will be here upon your arrival. What is your ETA." I replied and said "be here upon our arrival for what? I've been in communication with you this entire time, told you where I was, and told you that we were coming back. You have serious issues and I will be discussing this with my attorney tomorrow and legal action will be taken. Juliana is also going to take legal action against you as well since you continue to text her after I warned you to stop harassing her and threatening her. She will be showing the police the messages you sent her as well and would be pressing charges on you for continuing to contact her and threaten her and try to scare her and causing her stress when she did nothing wrong and you were just angry because you want to

make us drive four hours round-trip and make me jump through hoops just to spend some time with Angelina." (See OurFamilyWizard messages from 6/4/23)

770. At 8:22PM, Matthew continued to have contact with others to cause me annoyance/alarm and messaged Juliana again and said to her via text "The police just left, I told them there were no issues as long as you are bringing my daughter back and I'm not looking to press charges. I got nervous because I didn't hear from you." (See screenshots from Juliana texts 6/4/23)

771. 3 minutes later, he messaged me in the app and said "I'm not going to be pressing charges, but the parameters of your visitation are now going to have to change. Juliana can no longer be the one who supervises the visit. We are going to start having to put in place a specific place on where you see her and that Angelina is not to leave that area. I try to give you the benefit of the doubt and hoped that you would stay within the parameters of what we agreed on. Please have my daughter back to me ASAP." (See OurFamilyWizard messages from 6/4/23)

772. After he continued to harass and threaten both me and Juliana Notarino via phone, text, and OurFamilyWizard, we hurriedly tried to rush and finish our dinner and drive the hour back to Britain. At 8:41PM I informed Matthew we would go to the New Britain Police Department to wait for him. I said "you can meet me at the police station now for her. I no longer feel comfortable coming to your house since my attorney said not to since there's a protective order. We are at New Britain PD. How long til you're here?" (See OurFamilyWizard messages from 6/27/23)

773. He viewed my message in the OurFamilyWizard app immediately upon receipt at 8:41PM in which I stated we were at the police department and asked what his ETA was. He then did not respond, and refused to answer any of my subsequent messages and did not show up to get the child. He did this to harass, inconvenience, interfere with, and cause undue stress and trauma on me, my children, and my friend Juliana Notarino after he had already interfered with us and caused us stress and aggravation with threats and harassment during the dinner. (See OurFamilyWizard messages from 6/4/23)

774.    At 8:45PM, I messaged him again in the app and said "How much longer until you get to the police station to pick up Angelina? We can't wait all night." Matthew did not respond. At 8:50PM, I messaged him again in the app and said "Are you coming to get Angelina or not? I need to take my friend and daughter home. If you aren't here by 9 we will be filing a report that you didn't show up." At 9:00PM, after we waited in the lobby of the New Britain Police Department with my 8-year-old, 4-year-old, and friend for 20 minutes, I messaged Matthew again in the app and said "So are you abandoning Angelina?" (See OurFamilyWizard messages from 6/4/23)

775.    Matthew continued to ignore all my messages in the app. Then, after being told repeatedly to stop texting Juliana, and after having read my message in the app at 8:41 stating we were at the police station waiting for him, Matthew texted Juliana again at 9:04PM and said "I'm getting really concerned, how long until you get here?" (See screenshots from Juliana phone 6/4/23)

776.    At 9:29PM, after having waited at the police station for almost an hour, I messaged Matthew again in the app and said "We have been waiting at the police department for almost an hour for you. You viewed my message at 8:41PM that we were at the police station and I asked you how long until you get here. It's now been almost an hour and you still have not responded. I told the officer that if you are not here by 9:40PM, we will unfortunately need to leave and we are going to go spend the night at Juliana's house and we can make arrangements for you to get her tomorrow. If I don't hear from you or see you by 9:40 we will be leaving after making the report." (See OurFamilyWizard messages from 6/4/23)

777.    At 9:52 PM, Officer Ryan of the New Britain Police Department contacted Matthew and Matthew stated that he could not come get the child because he "did not have a functioning vehicle." Matthew typically uses the excuse of not having a vehicle whenever he wants to intentionally interfere with me or inconvenience me, however he always conveniently has a vehicle whenever he needs to or wants to do something.

778.    I told Officer Ryan of the New Britain Police Department that if Matthew did not come within 10 minutes that we would be leaving and going to sleep at my

102

friend's house since he had abandoned the child. I also told Officer Ryan that Matthew told both Juliana and I that he had called him to his house after 8:00PM for kidnapping charges and that Matthew said he told Officer Ryan that he decided not to "press charges for".

779.     Officer Ryan stated that this was a lie, that Matthew never said called or said anything about kidnapping charges, and that he just told them he was worried because he "hadn't heard from us." However, the cell phone, text messages, and OurFamilyWizard messages prove that Matthew made a false statement to the police when he said that he hadn't heard from us, and in fact, he had heard from us and been in constant communication with us the entire time and it was all documented. Officer Ryan did not penalize Matthew for interfering with me, threatening me, calling me outside of the app, having contact with others to cause me annoyance/alarm, or for harassing me. He also did not penalize Matthew for making a false statement to police when Matthew called the police to his home and claimed he was worried after not having heard from us. (See phone records from Theodora Antar and Juliana Notarino for 6/4/23; See also OurFamilyWizard messages from 6/4/23) (See report 23-015936 New Britain Police Department 6/4/23)

780.     Officer Ryan then said he would try to call Matthew again and try to see if he was interested in getting the child.

781.     Officer Ryan then called Matthew back again, and after Matthew forced us all to wait in the lobby of the police department from 8:40PM-10:00PM, Matthew finally showed up in his vehicle (that somehow was functioning) to retrieve the child.

782.     He told Officer Ryan that he had no car, but then drove there in the car.

783.     This was interference and caused all of us emotional harm and stress for no reason.

784.

785.     On 6/5/23, Matthew interfered with me and refused to allow me to speak to my child and had contact with others to cause me annoyance and alarm. I have all the screenshots and messages from OurFamilyWizard as evidence.

786. On 6/5/23, Matthew violated the order by interfering with my ability to speak to my child. He did not allow me to speak to my daughter at all on that day. He also told me that I was able to see her on that day and then refused to allow me to see her.

787. He then called my mother and told my mother and had contact with her to cause me annoyance/alarm by lying to her and telling her that his truck is not functioning and stating he would bring her to church the next day. He then sent my mother dozens of text messages, many of them long paragraphs at a time, that were all intimidating and inappropriate texts in which he attempted to denigrate and disparage me to my mother.

788. My mother experienced severe stress and her panic disorder/anxiety was exacerbated by Matthew's excessive and inappropriate contact with him because of his intimidation. He did not bring her to church the next day as he promised. (See screenshots from Matt messages to Diamanto Antonellis from 6/4/23-6/6/23; See also OurFamilyWizard messages from 6/5/23)

789. Matthew is not allowed to call my phone outside of the 7pm window per the protective order, yet he called my phone directly 3 times on this night. (See screen shots and phone records)

790.

791. On 6/6/23, Matthew spoke to me directly on the phone during a FaceTime call with my daughter and contacted me in the app to financially abuse me outside of the scope of visitation/affairs of our child. I have all the messages and other evidence. I have all the recordings and messages as evidence. He repeatedly kept trying to look at me during the FaceTime call in an effort to try to intimidate me.

792. At 4:06PM, I messaged Matthew in the app and said, "I haven't seen or spoken to Angelina in 2 days. Where is she? Why are you alienating her from us this way?"

793. Matthew immediately viewed my message and then did not respond.

794. At 6:16PM, he messaged me in the app in a separate thread and said, "Have you thought about a visitation schedule for you. What days of the week would be best for weekly visits. The judge may ask when we go back next week."

795.     At 7:00PM, I responded and said, "Monday-Friday is best for me 5 days a week to maintain continuity for Angelina due to her adjustment disorder. She has a doctor's appointment Friday. Will you be meeting me there with her or do you need us to bring her?"

796.     At 7:09PM, Matthew then tried to harass me by saying defamatory things about me in the messages, interfere with my ability to see and speak to my child, and cause me annoyance and alarm by threatening to severely restrict and limit my ability to see my child and harass me by demanding that I engage in psychological evaluations in order to see my child which was not part of any court order.

797.     Matthew replied and said, "What doctor appointment does she have, what is it for? Now that I have full custody, we will be changing doctors to someone more close to me. Send me doctor information and I will be happy to coordinate with them. I'm sorry but 5 days a week is not going to be conducive to the changes that have been made. I will be requesting that you remain under supervised visitation for a little while, until a complete psychological evaluation is done, and behavioral changes have been made. I think two days a week would be best for now. For a few hours each day. I have been working towards finding someone willing to supervise those visits every week."

798.     He also messaged me to financially abuse me and mock me and give me false hope and said "I would like to start reimbursing you for daycare expenses. How would you like payment?" I told him "Zelle or Venmo" and he said "Ok. Starting next week, I will start making weekly payments."

799.     He also denied me access to seeing my daughter and neglected her by refusing to allow her to go to a mandatory follow-up doctor's appointment.

800.     He never made a single payment toward any of the daycare expenses, and it has been three weeks since he said he would start paying.

801.     When I questioned him about this in the app afterwards, on numerous occasions over the last 3 weeks, he has read each of my messages, timestamped that he read it, and ignores me. He has not given me a single dollar of what he owes in unpaid child support, childcare, or arrears.

802.  This is financial abuse, and he makes substantial income with little to no bills as he now lives with his mother who supports him financially and his children. (See OurFamilyWizard messages from 6/6/23; See also Matthew financial discovery)

803.  As of 7/14/23, he has not paid any of what he owes in child support or childcare and currently owes me over $15,000.00 in unpaid arrears.

804.  On 6/6/23, Matthew also violated the order when during a FaceTime call with my daughter, Matthew Lodice spoke to me directly on the phone again in violation of the no-contact order.

805.  I called to FaceTime my daughter, and he immediately picked up the phone and was holding the phone so I could see him. I then said "Angelina" and he continued to look at me and then said to me "hold on one sec".

806.  I had previously asked him repeatedly not to speak to me during the calls that are for the sole purpose of me speaking to my child. He has been continuing to speak to me on almost every call with the child to cause me alarm, annoyance, harass me, and intimidate me.

807.  He has stated that he is above the law and that he can violate the no-contact order and that nothing will ever happen to me, which has caused me fear and alarm and caused me to be very intimidated and scared.

808.  He has tried to exert power and control over me for the past five years and has intimidated me in many ways by using coercive control. After he already spoke to me once, I again ignored him and attempted to say my daughter's name again by saying "Angelina?" Matthew then spoke to me directly again for the second time and said, "Hold on one sec I said." I then, again, tried to say "Angelina, where are you, I can't see you?"

809.  Matthew then continued to speak to me directly and said, "I just said hold on one second." He attempted to cause me annoyance and alarm by taking the phone and staring at me repeatedly during the call to intimidate me.

810.  He then spoke to me multiple times directly on the phone while I was attempting to speak to my daughter. I again said "Angelina?" and he said again "Hold on one second." I ignored him again and said "Angelina, I can't hear you,

where are you?" Later during the call, at around the 5-minute mark, I said, "Angelina, I can't see you, where did you go?" and Matthew speaks directly to me again and says "She's putting on her dress. Give her ten seconds."

811.    During the FaceTime call, Matthew continued to take the phone and look at me and not let the child be shown on the screen. I said, "Angelina can you take the phone because I can't see you." Then, at the end of the call I told the child I could not see her again and Matthew spoke to me directly again and said "Hold on. I'm trying to see if it's the wi-fi." (See video recording from 6/6/23)

812.    Matthew repeatedly spoke to me during the call and was trying to look at me during the call to try to intimidate me as a form of coercion.

813.

814.    On 6/7/23, Matthew spoke to me repeatedly during a phone call with my child and intimidated me during the call. I have the recorded call as evidence. He also continued to interfere with my ability to take my child to get medical attention. He also Matthew interfered with my ability to see and speak to my child and engaged in coercion by isolating my child from me.

815.    Matthew was extremely abusive and violated many parts of the protective order.

816.    Matthew also told my daughter that she is "not allowed to come to my house anymore" and made her extremely upset. He also told her that she isn't allowed to go to my mother's house anymore either, which further upset both of us. This is having contact with others likely to cause me annoyance and alarm and coercion.

817.    When I attempted to FaceTime with Angelina, Matthew was staring at me the entire time during the FaceTime call and was holding the phone and refusing to let Angelina hold the phone. He was doing this to harass me and intimidate me as he knows I do not want him looking at me, speaking to me, or communicating with me at all and he sexually harasses me by forcing me to have to look at him in order to speak to my child.

818.    At 7:59AM, I messaged Matthew to attempt to discuss the fact that our daughter was 8 days late for a post-ER medical follow-up appointment that he was refusing to take her to. I messaged him in the app and said, "Hospital said

that she is required to be seen by May 31 and I told you this multiple times. I told you I scheduled it last week and she is not allowed to change doctors. You have no right to change her doctor and nothing I the order gives you that right you actually are neglecting her by not bringing her."

819.    At 8:00AM, Matthew continued to try to harass me and interfere with me by responding and saying, "Hospital? What hospital? What doctor? I keep asking you to details and you keep not telling me."

820.    Matthew was fully aware that Angelina was seen at Hartford Children's Hospital on 5/23/23, and that a sexual assault evidence collection kit was done on that date. The hospital discharge paperwork stated that she needed a follow-up appointment with her pediatrician Renee Casey by 5/31/23.

821.    Matthew was fully aware of where Angelina's pediatrician is located and stated in court that he has a "great relationship" with her pediatrician. (See transcript and audio from 5/25/23 hearing)

822.    Matthew pretending that he didn't know where the doctor was and playing dumb was done with the intent to harass me and interfere with my ability to get my child the medical attention that the emergency room stated she needed.

823.    Matthew has serious issues with both substance abuse and alcoholism and has stated several times that he has memory issues. (See Matthew Lodice deposition from March 2023)

824.    At 8:00AM, I messaged him in the app and said, "I answered all of this last week. I don't have time to keep going back-and-forth with you because maybe you're too high to understand. If she is not at this appointment, it will be considered neglect."

825.    At 8:02AM, Matthew tried to sarcastically mock me and said, "Theo. We need to coparent. This is what the judge was talking about. I'm asking what is the name of the doctor and what appointment she has or why she needs to see the doctor at a hospital and you are not telling me. I cannot bring her to a doctor that I know nothing about."

826.    Matthew testified on 5/25/23 that he had a great relationship with the doctor and that he thought that her pediatrician's office was a great practice to be part of and that he had no intentions of leaving that practice.

827.    Matthew also heard in court that Angelina was seen in the hospital and that she had a follow-up appointment. He tried to harass me and interfere with me and neglect her medical needs by pretending he didn't know what I was talking about.

828.    At 8:02AM, I messaged Matthew in the app and said, "I would like to see Angelina today and Friday and Sunday. She has things that are going on with Julianna such as art show and piano recital and you stopped her from going to those last time. I'd like to see her today. Can I go to your mom's and see her since she will be watching her the entire day while you're at work? Can I see her on Friday? Can I also see her on Sunday? This is not right that you only let me see her for five hours in the last three weeks. Please have her FaceTime me I'd like to talk to her now."

829.    Matthew interfered with my ability to see my child and read my message at 8:03AM and said nothing.

830.    At 8:03AM, I messaged Matthew in the app and said, "No it's not. Every time I ask you something you told me we will discuss it in front of the judge. When can I see Angelina? You don't even know where our daughter's doctor is??"

831.    At 8:04AM, I messaged Matthew in the app again and said, "If you don't allow me to see or speak to Angelina in the next two hours, I will be taking legal action because this is abuse and you've kept her away from my entire family this whole time and me."

832.    At 8:12AM, Matthew replied and said, "What doctor? What hospital? What's the appointment for?"

833.    At 8:13AM, Matthew messaged me about seeing Angelina and said, "Your family is welcome to come see her anytime they want. Sunday is available for you to have your supervised visit."

834.    At 8:15AM, I messaged him and said, "Why are you limiting me to only one hour a week? You just said I could see her three times a week. I asked to see her today, Friday, and Sunday. How can my family come see her anytime they want if

you refuse to tell us where she is or who she is with while you work 16 hours a day? Where will you be meeting me on Sunday and with who during what times?"

835.    At 8:17AM, I responded to Matthew's message about the doctor's appointment and said, "I explained this to you last week. I don't have time to keep explaining it to you because you're in a drug induced state of euphoria. Please have Angelina call me now I want to come see her right now."

836.    At 8:18AM, Matthew continued to harass and psychologically abuse me by saying that my family was allowed to come see my child while he was not allowing me to see her.

837.    He messaged me and said, "Your mother knows that she is welcome to come see her anytime she wants. Anyone else in your family is more than welcome to come see her. No one is reached out to me. Do you have a person who can supervise a visit Sunday I am struggling to find someone willing to be around you."

838.    Matthew continued to try to interfere by acting as if I had not repeatedly told him in writing about the appointment.

839.    At 8:22AM, he responded in the app and said, "You never told me. You say you don't have time to explain to me now but you have the time to send false texts? Please inform me of medical information."

840.    At 9:54 AM, Matthew messaged me in the app and said, "Angelina request to talk to you. If you're available, please FaceTime."

841.    At 9:56AM, Matthew messaged me again in the app and said, "I think you had trouble hearing her because the voice isolation was on. I put it on standard mode call back and see if you can hear her better."

842.    At 2:53PM, I messaged him in the app and said, "y=You told my mother that you would not bring her to her at all and not to bring her to church. She told you she cannot travel to New Britain and you told her that you will then not allow her to see Angelina. Can you bring her to my mother's today? You told me last week that you are going to be making the arrangements like the court order said. I would like to see her on Friday like I said. Can you bring her to my mom's?"

843. Matthew interfered with my ability to see and speak to my child and engaged in coercion by isolating my child from me. He read my message at 2:57PM and said nothing.

844. At 2:56PM, I messaged Matthew and said, "In court you stated under oath that you were making child support payments to me in 2019 and you stated that you paid them to me directly in the form of Venmo and checks. When I asked you if John Casanova was making the payments to me directly, you said no. I spoke to John Casanova and he confirmed that you were lying and I also have the records that show that he made each of those payments from 2019 until 2021. You lied under oath and committed perjury when you stated that you pay these yourself. You stated that you paid me with checks and Venmo from 2019 to 2021 and stated that these came directly from you and were not written by John Casanova. I asked you if you have any proof and you said yes you did. Please make sure that you bring those with you to the contempt hearing for child support. I never received any direct child support payments from you in any of those years and every single payment I received came directly from John Casanova until it started getting taken out of your unemployment. I'm also going to be making sure that the IRS and the state is aware that you were working the entire time while receiving unemployment."

845. At 2:57PM, I messaged him back about the medical appointment and said, "I told you that it's on Friday. Will you be meeting me there?"

846. Matthew continued to try to interfere and harass me by pretending he did not know where the pediatrician's office that our child has been going to for over three years is located.

847. Matthew also violated the no-contact order by speaking directly to me repeatedly during the phone call with my daughter again. He also stared at me in an intimidating way during the FaceTime call again and was trying to look at me the entire time and kept holding the phone and looking at me and not letting the child hold the phone. He did this to intimidate me further.

848. I said, "Angelina, I can't hear you." I then hung up and called back to try to FaceTime her again. Matthew answered and looked at me on the FaceTime, stared

at me, and said directly to me on the call "She's napping." I ignored him and again said "Angelina?" Matthew spoke to me directly again and said again "She's napping."

849.    I said, "Angelina where are you?" Matthew then spoke to me directly again and said, "Call back after…I'll text you after her nap." I then said, "Angelina are you there?" and he said again "She is napping."

850.    He spoke to me directly on a FaceTime call five times in a row and sent no messages in the OurFamilyWizard app to tell me any of the things he said on the call. He intentionally answered the call when the child was not with him and used it as an opportunity to speak to me on a FaceTime call directly, knowing this would annoy/alarm me since the protective order says he can only contact me in OurFamilyWizard. I then sent him a message in OurFamilyWizard and spoke. (See video recording from 6/7/23)

851.    At 2:59PM, I messaged Matthew and said, "I just called to speak to Angelina and you spoke to me repeatedly on a FaceTime call in violation of a protective order. Every time I called you have been speaking to me in violation of the order. I want to speak to Angelina. Please stop harassing me by talking to me on the calls."

852.    At 3:01PM, I messaged Matthew in the app and said, "I just tried to speak to Angelina on a FaceTime call and you refuse to let me speak to her and spoke to me repeatedly during the call. Every day consecutively you have spoken to me during the calls. I have asked you to stop repeatedly and you have refused. I will be reporting this to the police."

853.    At 3:02PM, Matthew responded to my message about the doctor and said, "Will you be giving me the name of the place and the time?" (See OurFamilyWizard messages from 6/7/23)

854.    At 3:03PM, After he already spoke to me directly on the phone, Matthew then messaged me in the app and said, "Angelina is napping as I stated."

855.    Matthew allowed me to speak to Angelina on the phone and read a book to her over FaceTime.

856. At 10:01PM, after I finished speaking to Angelina, Matthew messaged me and said, "That was a nice conversation. The only thing I ask is that you do not confuse her with saying things like that "daddy refusing to bring you to my house". I'm trying to keep things real simple for. I explained to her that we just cannot go to Mommy's house for a little while. And that she's going to be living with Daddy more and will see Mama sometimes. Real simple. Saying things like daddy is keeping you from me will only hurt and confuse her. Please keep that in mind when you were talking to her. Thank you."

857. Nothing in the order says that Angelina can not go to my house. Nothing in the order says that Angelina can only see me "sometimes". Nothing in the order states that she is limited as to how frequently she can see me.

858. Matthew has been interfering with me by making it so my daughter can not go to my house, so that she is further alienated and isolated from her home, bedroom, toys, items, and me and the rest of my family, including her 8.5 year old sister who I have sole legal and sole physical custody of.

859.

860. On 6/8/23, Matthew spoke to me directly on the phone during a phone call with my child and interfered with me and my ability to see/speak to my child. He also had contact with others to cause me annoyance/alarm. I have all the recordings and messages as evidence. He spoke to me on the phone repeatedly while at the same time ignoring all of my messages in the app.

861. On 6/8/23, Matthew violated the no-contact term of the protective order by speaking to me directly on the phone. He also ignored all my messages in OurFamilyWizard while he spoke to me directly on the phone, in direct violation of the protective order. I tried to Facetime my child multiple times, and Matthew interfered with my ability to speak to my child and continued to answer the call, show his face, and not say anything and just look at me.

862. Matthew repeatedly spoke to me directly on the phone in violation of the protective order.

863. At 6:15AM, Matthew I responded to Matthew's message from the day before about the doctor and said, "How do you not know where our child goes to the

doctor? You've brought her to appointments several times but you are still asking me the name of the place?? You can bring her to my moms at 9AM that day because she will also be coming."

864. At 6:37AM, I responded to Matthew's message from the night before and said, "The entire conversation was recorded. Also, Julianna witnessed everything. She said she wanted to come to my house today, and you told her she's not allowed to come to my house anymore. She then got very upset. You then told her that she can't come here ever again, and she got even more upset. So you think that's OK?"

865. Matthew then tried to harass me and lied about what was said, and then threatened that he would interfere with my right to have phone access with my child.

866. At 6:41AM, he said, "That's not what was said. It was very clear. Theo this is not a battle. We have to do what's best for Angelina. Please just stop saying I'm keeping her from you on the phone or I'm going to have to start limiting the calls."

867. At 7:03AM, I messaged him and said, "If you refuse to bring her to the doctor tomorrow, like you refused to bring her on the 31st and like you refused to bring her to therapy in the last two weeks, I will be filing for a restraining order today. Please confirm that you will be bringing her to my mother's tomorrow at 9AM."

868. At 7:05AM, Matthew continued to interfere with me and harass me and said, "We will not be there. I asked you multiple times to send me doctors info and you have refused."

869. At 1:55PM, I messaged him and said, "So you are refusing her medical care again?"

870. Matthew read my message and said nothing.

871. At 1:55PM, I messaged him and said, "Angelina begged to see me today. Can you bring her to my mom's so we can see her? It's been almost 5 weeks since she saw her."

872. Matthew continued to interfere and use coercion by isolating and alienating Angelina from me, the rest of my family, and other support systems.

873.    At 1:57PM, he viewed my messaged and said nothing.

874.    At 1:56PM, I messaged Matthew back and replied to his message about the appointment and said, "Tomorrow at her pediatrician. You have been there multiple times and said you have a great relationship with the doctor in your testimony. She needs to be at my mom's by 9:30. Are you refusing her medical care in addition to parental alienation?"

875.    Matthew continued to try to interfere with me and read my message and said nothing.

876.    I tried to call again, and he did not answer. I called again to try to FaceTime with my daughter, and Matthew again answered and spoke to me directly on the FaceTime call. He looked at me and said to me "Hello?" I did not answer. He then said "Oh...Hello." I said nothing. He then said "She's sleeping already. Call back tomorrow."

877.    I then hung up. I feel harassed that he keeps contacting me repeatedly outside of the OurFamilyWizard app and he states that nothing will happen to him and that he will never get arrested for violating the protective order due to the connections that he has. He is not allowed to have any phone contact with me and is not allowed to have FaceTime contact with me. The only contact he can have with me directly is limited to the OurFamilyWizard app. The only time he is permitted to "ring my line" or dial my number, is if it is being done so that I can speak to my daughter.  (See video recording from 6/8/23; See also OurFamilyWizard communications from 6/8/23)

878.    Then, that night Matthew allowed us to FaceTime Angelina when she was going to bed. During the call, Angelina said that she wanted to come to my house today, and Matthew told her that she was "not allowed to come to my house anymore" Angelina then became very upset. This contact that he had with Angelina caused me annoyance and alarm because he caused my child to be upset and lied to her and told her she isn't allowed to come to the only home she has ever known for the last four years.

879.    He also said this in front of my 8-year-old child which also caused her to be upset. Matthew then told Angelina on the call that she can never come to my

house ever again, and she got even more upset. I asked Matthew in the OurFamilyWizard app if he thought that was okay and he threatened to not let me speak to her anymore and said if I didn't stop saying that he was keeping her from me on the phone that he would "have to start limiting the calls." (See OurFamilyWizard communications from 6/8/23)

880. At 7:12PM, I messaged him and said, "Hello??? Are you gonna let her go to the medical follow up or not??"

881. At 8:00PM, Matthew responded and said, "All you have to do is tell me the name of the place the date and the time, instead, you sit here, refusing. So no she will not be."

882. I already told him repeatedly that it was on 6/9/23 and that it was at her pediatrician's office and asked that he bring her to my mother's by 9:30AM so that we could all go together and so that she could be the supervisor.

883. His continued harassment and claims that I was "not telling him where it is" was just an attempt to harass and interfere with me further.

884. At 8:36PM, I responded and said, "I told you tomorrow at her pediatrician's office. (The one she's been going to for 3+ years now that you testified that you have an amazing relationship with) for 3PM. Can you bring her to my mom's in the AM and my mom can bring her to appt and then I can have a chance to see her? I haven't seen her all week. Will you be driving her there?"

885. Matthew read my message and never responded.

886. At 8:47PM, I messaged him again and said, "I want to speak to Angelina. Why won't you answer?"

887. Matthew continued to interfere with me and harass me and did not respond. (See OurFamilyWizard messages from 6/8/23)

888.

889. On 6/9/23, Matthew interfered with me during a phone call with my minor child, had contact with my child to cause me annoyance/alarm, and interfered with my ability to speak to the child. I have the recordings and messages as evidence. He also interfered with my ability to take my child to the doctor for a post-ER medical follow-up and neglected our daughter's medical needs by

116

canceling her appointment and telling the doctor that she would no longer be coming there as a patient. He also interfered with my ability to speak to my daughter and instructed my child to "shush" during the call when she was attempting to tell me that she would be moving back in to his mother's basement. (See recordings from 6/9/23)

890.    At 10:21AM, I messaged Matthew in the app and said, "Are you bringing her to her medical appointment today???? Why are you denying her access to medical care?"

891.    At 10:24AM, Matthew continued to harass me by asking me things that he already knew and messaged me in the app and said, "No one is denying her medical care. What medical care does she need? What's the doctor's office name and number?

892.    At 1:17PM, Matthew messaged me in the app, and said, "Angelina is asking to talk to you are you available for a phone call?"

893.    At 1:27PM, I messaged Matthew in the app and said, "The emergency room stated she needed a follow up by 5/31. You refused to allow her that. I rescheduled it for today. Are you going to bring her or will you just keep denying her access to medical care like you did with your son? I don't want to have to file for emergency motions to get you to comply like Monica had to. Let me know in the next 10 min if you will be meeting us at her pediatrician's office. You have the information. You testified under oath that you love her pediatrician and that you have an excellent relationship with the providers. Are you under the influence of drugs or alcohol? Why are you acting as if you don't know where Angelina attends the doctor?? Please let me know by 1:40 if you will be bringing her for the medical follow up or if you are refusing."

894.    At 1:28PM, I responded and said, "No I'm not. She can speak to me at the medical appointment. Are you going to bring her??"

895.    At 1:30PM, in order to harass and interfere with me, Matthew said, "She will not be there."

896. At 1:31PM, Matthew continued to interfere and said, "Emergency room? Follow up? Location? You have not given me any information except varying parts at sporadic intervals."

897. I had been asking him for over a week to bring her and he interfered with me and neglected my child by refusing to allow her to get the medical attention that she needs.

898. At 2:21PM, I said, "I told you her pediatrician. You need to bring her to my moms asap. How long??"

899. At 2:21PM, I messaged him again and said, "Why are you refusing to bring her???"

900. At 2:48PM, I messaged him and said, "Her appointment is at 4:30 at Preferred Pediatrics in Milford. Where is she?? She needs to be seen."

901. At 2:51PM, Matthew messaged me to try to harass me and interfere with me and said, "I'm sorry, you waited too long to tell me. I will touch base with them and figure it out."

902. Matthew did not "figure anything out" and instead called and canceled the appointment and told the doctor that Angelina would no longer be coming there as a patient. The doctor requested that he send in verification that he has sole custody before they can officially withdraw her as a patient and Matthew still has not done so.

903. Matthew has still not allowed Angelina to go to the doctor and it has been over a month.

904. At 2:50PM, I messaged him in the app and said, "I told you I was scheduling this a week ago and I've been asking you every day about this. I can come get her right now with a supervisor. Where is she? She needs medical attention and you cannot neglect her medical needs like you did with your sons."

905. At 2:51PM, Matthew messaged me and continued to interfere with my ability to see my child and take her to receive medical attention and said, "No you cannot come get her."

906. At 2:52PM, I messaged him again and said, "So, to be clear, you are refusing to let her see me, refusing to allow her to get medical attention that the provider

stated she needed as of 5/31/23, and refusing to allow anyone else to bring her for the medical attention while you are working? Where is she now? Who is she with? You have no right to neglect her this way. You did this to your sons and only after you had a court force you did you allow them to get medical attention. This is abuse. Please let her go to the doctor. You already refused to let her attend therapy for the last two weeks."

907.    At 3:04PM, Matthew messaged me and said, "No one is neglecting her at all. You made this appointment on June 2nd defying a court order. I spoke with her pediatrician today and already canceled the appointment. You are no longer permitted to make appointments for Angelina.

908.    Matthew interfered with me, medically neglected Angelina by canceling her appointment, and harassed me by telling me that I am no longer permitted to make appointments when he does not have the legal authority to demand that.

909.    At 4:44PM, I messaged him and said, "You have no right to deny me the right to make appointments that we had scheduled for weeks now. This is abuse. Legal action will be taken."

910.    At 7:23PM, Matthew messaged me and said, "She's going to bed soon. Will you be calling. She is waiting."

911.    At 7:37PM, I responded and said, "Why is she going to bed early? You're not leaving her alone with Dom again are you?"

912.    At 7:38PM, I messaged Matthew in the app and said, "You haven't allowed me to speak to her all day and have not allowed me to see her in six days."

913.    Matthew then tried to interfere with my ability to see and speak to her further and stated that I would have to wait until the next day to talk to her if I didn't call within a short window of time. At 7:39PM, he said, "We called you multiple times today and asked you to call her. You still are not calling. She will be going to bed in 15 minutes. If you do not call before then you will have to wait until tomorrow to talk to her."

914.    He was saying Angelina would be in bed by 7:55PM when it doesn't even get dark out until after 9:00PM. Angelina never goes to bed that early. He was doing this to interfere with me.

915.  At 7:40PM, I messaged him and said, "Is there a reason you're refusing to let me speak to her?"

916.  At 7:41PM, I messaged him and said, "Please don't harass me and call me nonstop at random times. You need to communicate in the app and request a call."

917.  Matthew then continued to interfere with me, threaten me, and harass me and threatened that I would only be allowed to speak to my child once per day at a scheduled time for only 15 minutes that he strictly limited.

918.  At 7:43PM, Matthew messaged me to intimidate me and said, "Since you want to make threats. We will no longer be calling you and will revert back to the 7pm phone call only. You may call at between 7-715 only from now on." (See OurFamilyWizard messages from 6/9/23)

919.  At 7:57PM, I responded and said, "What threat did I make? You have delusions. Are you going to allow Angelina to attend Julianna's recital? You refused to let her go last time."

920.  At 8:04PM, Matthew replied and said, "Where and when is the recital. How will she be getting there and who will be there to supervise"

921.  Matthew also violated the no-contact term of the protective order by interfering during the phone call with my minor child.

922.  He hung up the call at first when I was trying to speak to my daughter. I then messaged in in the app and asked, "Is there a reason you are refusing to let me speak to her?" I then called back. Matthew then told my daughter that he couldn't go make her something to eat and said, "I need to sit here and supervise the call."

923.  He said this to cause me annoyance and alarm, and it was also not appropriate to say to our four-year-old daughter and was an attempt for him to involved her in the custody dispute. Matthew then tried to interfere with the call again. I asked my daughter what she did today and she said, "We just stayed here." Matthew immediately said, "We didn't stay here." Matthew continued to interfere and try to be involved in the conversation. My daughter said she wanted to see me and wanted to see her sister (my other child) and asked if she could talk to her sister.

924.  I told her that she was with her daddy, and Matthew immediately started to interfere and tell Angelina that he would call her father himself. Angelina told me

that she "wants to call Gerald" and Matthew again interfered and tried to have contact with Angelina to cause me annoyance/alarm and said, "We'll call Gerald after."

925. He knows that he does not have a relationship with Gerald and knows that it would annoy/alarm me to hear that he is going to call my ex unsolicited and ask to speak to my minor daughter. I told Angelina that "Gerald is just busy. He is not answering." Matthew continued to try to interfere and cause me annoyance/alarm with his communications with Angelina and insist on contacting my ex and father of my minor child unsolicited by saying "We will call him when we are done. He will answer our call." My daughter was then attempting to tell me something and said "I live with dada and now I'm going to start living with…"

926. At that point, Matthew muted the phone and then continued to mute the phone intermittently and he was instructing her to "shush" and telling her not to tell me what she was trying to say. He continued to interfere with the call and prevent me from speaking to the child or hearing what she was trying to say. When he put the phone back on being unmuted, Angelina asked him why he was telling her to be quiet and "shushing her". I said, "what? And now what? Now what?"

927. She said "dada, why do I have to be quiet?" He told her "You don't. Keep talking." She said, "Then, why did you do that?" and put her finger up to her mouth to make a "shush" motion. Matthew said, "Keep talking." She said, "But why did you do that?" He said, "because I love you" and then the child got upset that she was being involved as a third party and told not to tell me something and said "Mommy I'm done talking to you." I said, "Did daddy tell you to not talk to me?"

928. Angelina said "I just don't wanna keep talking." She sounded upset after he told her to be quiet and not to tell me what she was trying to say. He regularly silences her and interferes and tells her what to say and not to say during the calls. Only after Matthew told her she was allowed to continue talking to me did she continue the conversation. She seemed afraid that she would be in trouble. She then started lifting up her shirt and exposing her chest and stomach and saying

"princess belly" and when I asked why she said she did it because her brother Sal "does it and looks at the princesses."

929.    I told her that "girls don't [lift their shirts up like that] and she said "yes they do." Matthew did not tell her not to lift her shirt up or expose herself like that and allowed her to do it without saying anything to her. I then asked her "What did you say about Mema's before?" She said, "I'm going to live there and somebody else is going to live at our house." Matthew immediately started laughing in the background. I said, "you are going to live at Mema's and someone else is going to live at your house?" She said, "yeah and I'm going to bring all of my toys!"

930.    I said, "why are you going to do that?" and she then said "ow" as if she was in pain and when I asked what was wrong, she said "I fell." Matthew immediately then interfered and said "You did not fall. You just layed down." eventually told me that he was getting evicted from his apartment in New Britain and moving back into his mother's basement in Waterbury. He interfered during the call and tried to silence her and tell her not to say anything. (See recorded calls from 6/9/23; See also OurFamilyWizard messages from 6/9/23)

931.

932.    On 6/10/23, Matthew interfered with my ability to see and speak to my child and engaged in coercion by isolating my child from me.

933.    At 5:55PM, I responded to his message from the night before asking about details for the recital and said, "My whole family will be there and it's tomorrow. There's also a special ceremony at the church that I am part of that I'd like her to go to in the morning and the recital is at four. It's in Fairfield. I'd like to see Angelina. I would like to speak to her also. Are you going to allow her to see us and spend time with us or continue alienating her?"

934.    Matthew interfered with me by viewing my message and then saying nothing. He viewed my message at 6:37PM and did not respond.

935.    At 7:14PM, I messaged him in the app and said, "Hello???" (See OurFamilyWizard messages from 6/10/23)

936.    At 7:15PM, I messaged him in response to a separate message that he ignored and said, "Hello??"

937. Matthew continued to interfere with my ability to see or speak to my child by opening my messages and saying nothing.

938.

939. On 6/11/23, Matthew interfered with my ability to see and speak to my child and engaged in coercion by isolating my child from me.

940. At 7:38PM, I messaged him and said, "Is there a reason why. You have not let me see or speak to Angelina in days and why you haven't let me see her in a week? You told me to give you the details about today and I did and you ignored them. Where is Angelina? Why are you refusing to let me see or speak to her? Why are you withholding her from us?"

941. Matthew continued to interfere with my ability to see and speak to my child and read my message instantly and did not ever respond. (See OurFamilyWizard messages from 6/11/23)

942. The fact that he constantly interferes with me, withholds my child, and goes to such great lengths to try to isolate me from my daughter constitutes psychological abuse, coercion, harassment, stalking, and disorderly conduct. Matthew is also depriving both me and my daughter of our legal rights to access with one another.

943. Matthew is trying hard to keep me away from Angelina in an effort to try to psychologically manipulate and brainwash her and to try to cover up the ongoing sexual abuse by his son.

944. On 6/12/23, Matthew interfered with me during a phone call with my child, had third-party contact with my daughter when I was trying to speak to her, and had contact with my child to cause me annoyance/alarm during the call. I have the recordings and messages as evidence.

945. Matthew was interfering with me by not allowing me to see or speak to my child.

946. At 10:22AM, I messaged Matthew in the app and said, "I want to see Angelina. Where is she?? Why are you withholding her from me??? Why are you refusing to let me see or speak to her???"

947. Matthew waited almost three hours to respond and interfered with my ability to see my child.

948. At 12:39PM, Matthew messaged me and said, "You can call at 7:00PM to talk to her. Let me know when you want to see her next or when you are available."

949. I had already told him three hours prior that I was available and wanted to see her. His continued ignoring of my questions and constant repeating of the same thing while ignoring what I say is harassment.

950. At 5:39PM, I messaged him and said, "Why didn't you allow me to see her yesterday like you said??? I want to see her now. Have her call me."

951. Mathew continued to harass and interfere with me by ignoring my question about why he didn't allow me to see her.

952. At 6:27PM, Matthew responded and said, "Angelina tried to call you. Please feel free to Facetime her."

953. At 6:51PM, I messaged him and said, "Why didn't you allow me to see her yesterday like you said? Why haven't you allowed me to see her in a week and a half? I want to see her. Why do you keep withholding her from me?"

954. At 6:52PM, Matthew messaged me and said, "You never made plans to see her. Let me know when you are available and who will be supervising."

955. Matthew violated the no-contact term of the protective order by interfering with the call, and trying again to have third-party contact with my daughter when I was trying to speak to her, and interjecting and trying to be part of the conversation when I was trying to speak to her.

956. My daughter told me she was going to have a sandwich and I asked what kind. Matthew told her to "say you had a vegetable grinder." Angelina then asked him, "what?" Matthew then again said "It was a vegetable grinder."

957. He interferes with the conversation and speaks to her during the call and tells her what to say to me in an effort to annoy/alarm me since he knows that the protective order is a full no-contact protective order that only allows for contact inside of the OurFamilyWizard app. (See recorded call from 6/12/23)

958.

959. On 6/13/23, Matthew spoke to me directly in front of his mother's house at 48 Quarry Hill Rd, Waterbury, CT, when I went to pick up my child. I recorded this

contact. I have all the recordings and messages as evidence. This was a direct violation of the no contact order in the protective order.

960. Matthew interfered with me by making it very difficult for me to be able to see my child.

961. At 12:45PM, I messaged him and said, "I want to see Angelina. You told me I could come Sunday and then I asked you repeatedly when I could get her and you read all of my messages and then ignored me. I want to see her now. Is she at your mother's? If so, why can't I just go there like I do every other time? You told the judge that you're unemployed and looking for work. If that's the case, why are you leaving her with other people every single day? Where is she? And where is she now I want to talk to her and I want to see her. I'm available now."

962. Matthew continued to interfere by waiting 2 hours to read my message and then saying nothing.

963. At 6:32PM, I messaged Matthew and said, "I want to see her."

964. At 6:33PM, he responded and said, "When are you available to see her? And who will you be having supervisor?"

965. At 6:34PM, I responded and said, "I am available now and didn't get a chance to eat yet. Can she come out to dinner with us?"

966. At 6:34PM, Matthew replied and said, "Who will be with you and who will be supervising?"

967. At 7:47PM, I responded and said, "My mom. Can we go get icecream?"

968. At 7:48PM, I sent him another message in reply to another of his messages and said, "Can we come get icecream??? She asked for it."

969. At 7:52PM, I messaged him in the app, and said, "We want to come get her now. Is she ready?"

970. At 7:55PM, Matthew replied and said, "Who are you coming with? And who will be supervising the visit?"

971. When we arrived to pick up Angelina, Matthew violated the no-contact term of the protective order by speaking to me directly when I went to pick up my child. When I attempted to get my child at 9:06PM, Matthew looked at me and

said to me directly to my face "please make sure she is back here in 30 minutes. She just went around the other side. 30 minutes she needs to be back."

972. I messaged him in the app afterwards and said "I don't appreciate you once again violating the protective order by speaking to me directly. It was recorded and I will be reporting this to law enforcement. STOP talking to me outside this app. This is harassment."

973. At 9:34PM, Matthew continued to harass me and intimidate me by saying that he is allowed to violate the protective order and contact me.

974. Matthew replied and said, "We are allowed to talk to for the purpose of exchanges for Angelina. Stop trying to get revenge and focus on being a good mom for her. She needs that." (See video recording from 6/13/23; See also OurFamilyWizard messages from 6/13/23)

975. I responded and said, "No we are not. It says No Contact full no contact except the wizard. This is a felony charge and you will be prosecuted for your continued abuse." (See OurFamilyWizard message from 6/14/23)

976. At 10:26PM, Matthew messaged me and tried to interfere with my ability to have a reasonably timed visit with Angelina and said, "You had a half hour. It's been almost two hours. It's 10:30 at night. She needs to be back home now."

977. Matthew has let me pick her up on other times at 9:30 and bring her back at 12:30AM. Matthew limited me to a 30 minute visit and it took 15 minutes to get to McDonalds and 15 minutes to get back. He allotted us a total of 0 minutes to actually spend not driving in the car.

978. His unreasonable and controlling demands are child abuse, coercion, harassment, and interference.

979.

980. On 6/14/23, Matthew interfered with me and did not let me see or speak to my child.

981. At 7:48PM, I replied to his message from the night before in which he claimed he was allowed to contact me in violation of the protective order outside the app and said, "No we are not. It says no contact. Full no contact except the

wizard. This is a felony charge and you will be prosecuted for your continued abuse.

982.     8:00PM, I messaged Matthew and said, "Why are you refusing to let me speak to Angelina?"

983.     At 8:04PM, I messaged Matthew and said, "I just tried to FaceTime and call you per the court order. You denied all of my calls. I see that you've been reading all of my messages, so I'm very concerned that you are not allowing me to speak to Angelina and I'm not sure where she is or who she's with or if she's safe and I haven't heard from her in over 24 hours. I just left a message on your mother's voicemail because I know you were evicted and Angelina's been living with your mom. I know your stepfather has issues with alcoholism and often has trouble waking up. I'm concerned that Angelina is not being cared for. Nobody answered the phone and you aren't answering either. I left a message and I told your mother if I don't hear back from Angelina by 8:30PM I'll be requesting a wellness check."

984.     At 10:27PM, I messaged him about the Zelle payments he said he would start paying that week and said, "I never got the Zelle. Can you send the $7000 you said you would start paying last week?" (See OurFamilyWizard messages from 6/14/23)

985.     As of 7/16/23, over a month since he sent the message, he has sent me a total of $0.00 on Zelle and paid a total of $0.00 toward his court ordered child support and/or childcare arrears that he owes me which is excess of $15,000.00.

986.     (See recorded videos from tonight)

987.

988.     On 6/15/23, Matthew spoke to me directly on the phone during a call with my child, interfered with the call, and interfered with my ability to speak to my child. He also tried to FaceTime me twice directly on my phone when I did not ask him to. I have all of the screenshots, phone records, messages, and recordings as evidence.

989.     Matthew violated the no-contact order by speaking to me directly on the phone.

990.   The constant pattern of him contacting me every chance he gets has been causing me immense stress and is a way form him to psychologically abuse me.

991.   We had a court hearing on this day from 2PM-420PM at New Haven Superior Court.

992.   Judge Jane Grossman said in court that Matthew needs to provide me with a regular schedule to see Angelina. She also said he needs to let me see her regularly. (See transcript from 6/15/23)

993.   At 4:28PM, right after we left court, I messaged Matthew and said, "The judge just said that you need to let me see Angelina. I would like to see her now. Is there any way that my mom can go get her from your mother's house?"

994.   Matthew continued to interfere with my ability to see or speak to my child by reading my message and saying nothing in response.

995.   At 7:13PM, I messaged him again and said, "Hello??? Why are you ignoring me???"

996.   I then tried to call Angelina multiple times, and Matthew did not answer the phone.

997.   At 7:16PM, I messaged him and said, "Why are you refusing to let me speak to Angelina?"

998.   At 8:07PM, when I tried to FaceTime my child, Matthew picked up the phone and spoke to me directly on the phone and said "She's going to get her toys, one second." (See Recorded call)

999.   The constant pattern of him contacting me every chance he gets has been causing me immense stress and is a way form him to psychologically abuse me.

1000.   At 8:26PM, I messaged him and said, "I have asked daily to see Angelina. She also has an appointment at the clinic next week. You taking her out of therapy and isolating her from us is abuse and you have no right to keep her from me. Me and my mom and child want to see Angelina tomorrow. Why are you denying us that right?"

1001.   He also interfered with the call by abruptly ending the call without giving me an opportunity to say bye at 8:29PM.

1002.  At 8:29PM, I messaged him and said, "You just abruptly ended the call. I didn't even get to say bye. Why are you refusing to let me speak to her?"

1003.  I messaged him in the OurFamilyWizard app at 8:44PM and said "You just spoke to me again during the phone call. Every single time I call, you speak to me repeatedly. I will be reporting this to the police. Furthermore, you were just told today that you need to take Angelina to see me. If I don't get to see Angelina tomorrow, I will be filing for a restraining order. You have no right to isolate her from us like this."

1004.  He also tried to FaceTime me twice directly on my phone when I did not ask him to. (See video recording from 6/15/23; See also OurFamilyWizard messages from 6/15/23; See also phone records.)

1005.  Matthew directly violated the protective order by speaking to me directly on the phone in direct violation of the no-contact order. (See videos from 6/15/23)

1006.

1007.  On 6/16/23, Matthew spoke to me directly on the phone during a call with my child, interfered with me and denied me the right to see or speak to my child and refused to exchange the child pursuant to the most recent order. He also harassed me, interfered with me, and threatened me. I have all the screenshots, phone records, messages, and recordings as evidence.

1008.  On 6/16/23, Matthew violated the protective order by interfering with me and denying me access to see or speak to my daughter, despite it being in the family order that he is ordered to allow it. In the two weeks before 6/16/23, he only allowed me to see my child for a total of one hour.

1009.  He violated the court order and the protective order by refusing to let me see or reasonably speak to my child. He also spoke to me directly on the phone, despite the protective order stating he is not allowed to do so.

1010.  He then also tried to encourage Angelina not to speak to me and had contact with her to cause me annoyance and alarm by telling her that he "knows that she doesn't wanna talk to mommy" and other disparaging statements during the call.

1011.  At 8:38AM, I messaged him and said, "In the last 2 weeks you only allowed Angelina to see me for one hour. If I dont get to see her today I will be filing for a

restraining order and it will NOT be heard in front of new haven. I want to see angelina now."

1012.  I said this, because in Connecticut, and under PA21-78, the law states that coercive control and isolating someone from their family members is domestic violence and abuse. Matthew's response to me was that if I filed a restraining order on him that it would be "harassment".

1013.  Matthew interfered with my ability to see my child by refusing to respond.

1014.  At 10:04AM, I messaged him again and said, "I want to see angelina today. She asked to see us already. What time can we get her ???"

1015.  Matthew then continued to harass me and interfere with me and use coercion to try to prevent me from filing for emergency relief from his abuse.

1016.  At 11:01AM, he messaged me and said, "I don't think you quite understand what has happened. You lost custody. You no longer dictate when you do or do not see her. You ask me if she is available to see you and I let you know yes or no. You keep filing needless restraining orders is harassment. What times are you available today to pick her up and drop her off and who will supervise the entire visit."

1017.  He was told in court the day before that he needs to give me a schedule and let me see her regularly.

1018.  Him asking me to ask on a daily basis and see if he says "yes or no" is not giving me a schedule.

1019.  Him asking me to tell him who will supervise the entire visit without first telling me if the times/dates are okay is also harassment and interference.

1020.  At 12:10PM, I responded to him and said, "My friend Carrie is available we can come now and bring her back by dinner time. Is she ready now?"

1021.  He then harassed me by repeatedly demanded that he needed to call my friend on the phone prior to letting us see my daughter, even though the court order says all communications need to be in writing.

1022.  When he demanded a call with my other friend on a past occasion, he stated the call was to "discuss the parameters of the visit" but ended up asking her about her relationship/marital status and about how many pregnancies she has had,

130

which caused her to be very uncomfortable and annoyed, and annoyed/alarmed me, since he had previously slept with several of my friends behind my back.

1023. He continued to demand in the app that she call him, even though it said in the order it must be in writing.

1024. At 12:13PM, he messaged me and said, "Carrie who? I would like her to call me and speak to her before I agree."

1025. At 12:56PM, I responded and said, "Shes my friend and youve met her before. Is angelina ready??"

1026. At 1:00PM, he replied and said, "No, Angelina is napping obviously. She naps between 12:00 and 3:00. I don't know who Carrie is and as I said stated before please have Carrie call me so I can discuss parameters with her before I release Angelina to her."

1027. At 1:53PM, I messaged him and said, "You can tell her when we get there. Theres no parameters to discuss and the order says ALL ARRANGEMENTS MUST BE IN WRITING so you can say the parameters here. We will be there at 3."

1028. At 3:29PM, I messaged him and said, "Were on way. Is she ready?"

1029. He then finally allowed me a phone call after 3:30PM, after I asked repeatedly all day, and he answered the phone and spoke to me on the phone and said "hello" and then had contact with her to try to cause me annoyance/alarm and said, "I know you don't wanna talk to her." (See recorded phone call from 6/16/23)

1030. Matthew continued to try to harass me and use coercion by demanding that I have the supervisor call him when the court order says all arrangements "must be made in writing."

1031. At 3:41PM, Matthew responded and said, "If I do not talk to Carrie before you get here I will not be releasing Angelina to you. I told you to have her call me first."

1032. At 5:19PM, I said to him "The court order stays that all arrangements need to be made in writing. She can text you. We are 10. Minutes away. Is Angelina ready?"

1033. Matthew then interfered with me by reading my message and ignoring me.

1034.   I messaged him again at 5:28PM and said, "????"

1035.   At 5:47PM, Matthew then messaged me and said, "You said you were gonna be here over an hour ago, then you said you were 10 minutes away 30 minutes ago. I asked you repeatedly to have the supervisor call me. If you want to see Angelina, please other supervisor, call me and then pick a time and actually show up. It's getting very late now and she hast to go to bed in the next two hours.

1036.   Matthew had previously let Angelina go out later than 8PM and was trying to interfere with me and harass me by reverting to saying that she goes to bed by 7:30PM.

1037.   Matthew was also trying to harass me and use coercion by demanding that I have the supervisor call him when the court order says all arrangements "must be made in writing."

1038.   At 5:48PM, I replied and said, "We are stuck in traffic. Why do you keep asking me to have her call you when the court order says it must be in writing? We are on the way."

1039.   Matthew continued to try to harass me and use coercion by demanding that I have the supervisor call him when the court order says all arrangements "must be made in writing."

1040.   He continued to claim that he "doesn't know who she is" and demanded that she "call him so she can discuss parameters with her before I release Angelina to her" despite having known her for over five years and having met her several times at several major events in the past.

1041.   At 5:53PM, he messaged me again and said, "The arrangement is supposed to be in writing. But I'm not comfortable with leaving Angelina alone with you without knowing the person who you are with. Please have her call me before you arrive."

1042.   He continued to demand that she call him and claim that he didn't know her.

1043.   At 5:54PM, I replied and said, "You know her. You can see her when we get there. You are acting so psycho."

1044.    At 5:59PM, Matthew then replied and said "No. I'm being protective of my daughter. If she does not call to verify with me Angelina will not be going with you."

1045.    At 6:00PM, I then said to him "Why does she need to call if she will be at your house?

1046.    At 6:01PM, I messaged him again and said, "Last time you told Juliana to call and asked her marital status and then threatened her."

1047.    Matthew viewed the messages and did not reply. (See OurFamilyWizard messages from 6/16/23; See also transcript from 6/15/23)

1048.    Matthew then tried to harass and interfere with me by demanding that I leave a restaurant before our food arrived during the one visit he allowed me to have with my child in a 2 week period.

1049.    At 8:06PM I said, "We're at the restaurant. Food didn't come yet. Just letting you know."

1050.    At 8:27PM, Matthew replied and said, "You should have went somewhere closer. Angelina needs to be home."

1051.    The restaurant that we were at was only a ten-minute drive from his mother's house.

1052.    At 8:45PM, I messaged in the app again and I told Matthew "We are close. We are at a place 10 minutes away. Finishing up now. Be back in a bit."

1053.    Matthew continued to try to harass me and demand that we rush our meal and then threatened to deny me future access to my daughter

1054.    At 8:51PM, he messaged me and said, "Please hurry. I may have to terminate late visits."

1055.    He had previously allowed on a separate occasion for us to pick her up at 9:30PM and take her to a movie and bring her back at 12:30AM, but on this day he threatened to terminate visits if we did not "hurry" when it was only 8:45PM on a weekend night and I had not seen my child for more than an hour in the 2-week period before that.

1056.    I feel that he was doing this to interfere with my right to see her and right to enjoy the visitation time without being harassed, threatened, and rushed.

133

1057. I messaged him the next day and said "You have only been offering me to get her super late. The judge said you need to make a schedule. I would like to take her early. Can I get her Monday at 8AM for a beach day and have her back before dinner time?" (See OurFamilyWizard messages from 6/16/23-6/17/23)

1058.

1059. On 6/17/23, Matthew spoke to me directly on the phone during a call with my child, interfered with my ability to see or speak to my child, and interfered with my ability to see my child. I have all the screenshots, phone records, messages, and recordings as evidence.

1060. Matthew Iodice violated the no-contact order by speaking to me directly on the phone. He spoke to me repeatedly in violation of the no contact order. I called Matthew's phone at 7:33PM so that I could speak to my daughter, pursuant to the most recent civil-family order. He also ignored all my messages in OurFamilyWizard while he spoke to me directly on the phone, in direct violation of the protective order. Matthew is ordered to have no contact with me outside of the OurFamilyWizard app. He is also ordered to allow me to have contact with my daughter while she is with him pursuant to the most recent civil order. Matthew never communicated with me in the app that my daughter was asleep.

1061. When I called, rather than hand my daughter the phone, Matthew answered the phone himself. He said hello to me twice during the call and spoke to me repeatedly when I spoke to my daughter at 3:16PM, and spoke to me directly and said "I don't think you understand how cold it's gonna be. I don't think you understand how cold. It's gonna be like 50 degrees....um, she's in bed already. Do you know how cold it is?" I did not say anything at this time. I then hung up. He did not message me in the app, and instead spoke to me directly, in direct violation of the no-contact order. (See video recording from 6/17/23 at 7:33PM; See also recording from 3:16PM.)

1062. He also told me on this date that it would be okay for me to take Angelina to the beach on 6/19/23. I told him at 2:12PM in the app, when he asked who would be with us, that "It's going to be with Beth (Bob's wife) and also with Casey (Bob's son), Beth hurt her ankle and had asked if Casey can do her the favor and

take the ride with me in the AM with me to come pick her up from your moms for 8am and then we will meet up with Bethan after. Both of them can speak to you ahead of time to discuss anything. And then we can have her back at a reasonable time like around dinner or we can feed her if you want. Let me know. It's a 'holiday' so like a day off for everyone cuz of work and I promised Angelina we can use her new bathing suit I got her for her birthday and new Elsa towel."

1063.   Matthew responded at 2:14PM and said, "I would be okay with that." I then said "Ok. So I will let them know it's confirmed and you can just send her in normal clothes and I'll pack all of her beach things. Do you want us to do dinner?" Matthew responded at 2:17PM and said "It's up to you." I responded and said "okay." (See OurFamilyWizard messages from 6/17/23)

1064.

1065.   On 6/18/23, Matthew interfered with me and refused to allow me to speak to my daughter. I have all the screenshots, phone records, messages, and recordings as evidence.

1066.   On 6/18/23, Matthew violated the protective order by interfering with my right to speak to my daughter. I tried to call his phone several times to speak to my daughter and he did not answer. I also tried to call his mother and left her a message saying I was concerned as I had not heard from my daughter in almost two days and was worried about her.

1067.   At 12:00PM, I messaged him and said, "I want to speak to Angelina."

1068.   At 12:01PM, I messaged him and said, "Why won't you let me talk to her ???"

1069.   At 12:01PM, Matthew responded and said, "She's napping. Will call later. What time are you planning to pick her up in the AM. I have a lot to do tomorrow and need to know if I should be taking her with me?"

1070.   At 12:02PM, I responded and said, "I told you the plans and you confirmed."

1071.   At 12:03PM, Matthew replied and said, "So you will be there by 8 am with supervision. If you are not there by 830 I will assume you are not coming to get her and take her with me."

1072. At 12:04PM, I responded and said, "I told you im coming. I will be there at 8. Have her call me ASAP."

1073. At 12:05PM, Matthew replied and said, "OK"

1074. Matthew then did not let me speak to Angelina for the entire afternoon.

1075. At 3:28PM, I responded and said, "Why wont you let me talk to angelina ???"

1076. Matthew continued to interfere with my ability to see and speak to my child and read my message and did not respond.

1077. I then messaged him again at 4:10PM and said "Hello??"

1078. Matthew continued to interfere with my ability to see and speak to my child and read my message and did not respond.

1079. I then messaged him again at 6:27PM and said "I'm very concerned that it has been well over 25 hours since I heard from her and nobody is answering."

1080. This was interfering with my right to speak to my daughter pursuant to the most recent family order. (See OurFamilyWizard messages from 6/18/23)

1081. At 6:54PM, I messaged him again and said, "Hello??????"

1082. Matthew continued to interfere with my ability to see and speak to my child and read my message and did not respond.

1083. Matthew never let me speak to Angelina and denied me the right to see and speak to her that day. (See our family wizard messages and video recordings from 6/18/23)

1084.

1085. On 6/19/23, Matthew tried to call me directly on my cell phone several times and tried to FaceTime me directly on my cell phone, harassed me, and interfered with my ability to have time with my child. He also threatened me and harassed me for hours. I have all the screenshots, phone records, messages, and recordings as evidence.

1086. On 6/19/23, I picked up Angelina at the morning from Matthew's mother's residence at approximately 8:30AM with Casey Wallace and my 8-year-old daughter. We picked up Angelina from there and had plans to spend most of the day together. I discussed these plans and made the arrangements with Matthew 2

days prior. I also notified Matthew that Angelina had a doctor's appointment at the clinic previously, which he ignored.

1087.   Matthew previously stated to me on 6/16/23 and 6/17/23 that it was "up to me" if I wanted to keep her through dinner or not. There was never a set time for her to be back.

1088.   At 2:07PM, Matthew tried to FaceTime me twice. I did not answer the phone as nothing in the order says he is allowed to FaceTime me. It only says I am allowed to FaceTime Angelina when she is with him.

1089.   Then, at 2:07PM, Matthew messaged me in the OurFamilyWizard app and said "Please have Angelina call me."

1090.   I then replied to him 2 minutes later and said, "She's napping."

1091.    Matthew then tried to harass me and interfere with my ability to enjoy the visit with my daughter.

1092.   This was my first time seeing her in over a week, as he had been interfering with my rights and withholding her from me for no reason.

1093.   At 3:14PM, he messaged me again in the app and said "What is Beth's number, where is she napping, what time are you coming home. I don't feel comfortable with this visit." (See OurFamilyWizard messages from 6/19/23)

1094.   I didn't view his message right away because I was either driving or the phone was in my purse. Matthew then tried to call me directly on my cell phone 2 times at 3:51PM, and I did not answer. (See phone records from 6/19/23)

1095.   Matthew then continued to harass me and messaged me in the app again at 5:35PM and said, "Where is Angelina, and what time are you coming back. You said you would be back around dinner time. It's now 5:48 and you're still not back. I want Angelina home now."

1096.   I never said I would be back at a certain time and he said it was up to me if I wanted her to eat dinner with me or not. He was saying this to try to interfere with my day and cause me alarm and annoyance and harass me.

1097.   Matthew then tried to call me directly on my phone at 6:20PM two times back-to-back. (See phone records from 6/19/23)

1098. We were trying to enjoy our time at the beach, and my phone was in the bag. Matthew is not allowed phone contact with me. He called twice and then I did not answer. (See phone records from 6/19/23)

1099. I then messaged him in the app at 6:21PM and said "I told you on Saturday that we would be feeding her dinner. We are just leaving beach heading to get dinner now. Stop harassing me and calling me 100 times."

1100. 1 minute later, at 6:22PM, Matthew sent me another message to try to harass and intimidate me and use coercion and said, "No. She needs to be home now or I'm calling the cops and pressing charges. Have Beth call me now."

1101. I responded to him and said "You need help. I have the messages saying it's up to me about dinner. Stop harassing me."

1102. At 6:22PM, I messaged him and said, "We spoke about this on Saturday. I asked if we should keep her for dinner and you said it's up to me. You can't just now demand that I bring her back. We are heading to get dinner now."

1103. At 6:22PM, Matthew immediately messaged me and tried to harass me and interfere and said, "No."

1104. I then responded and said, "Stop harassing me. I have the messages where you said it's up to me. Stop trying to harass us. You won't even provide a schedule."

1105. Matthew then continued to harass me in the app by sending me paragraphs at a time.

1106. He messaged me again at 6:43 and threatened to restrict my access to my child further and said, "you said you would have her back around dinner time, you asked me if I wanted you to feed her and I said sure it's now almost 7:00 and you're just going out to dinner now. That's not having her back at dinner time as we discussed. From this point forward the visits are going to be more strict, and on a set time limit to 2 to 4 hours. Tell Beth to call me asap. I don't think Beth is good for supervising. I haven't heard from you, Beth, nor my daughter all day."

1107. At 6:45PM, I replied to him and said "this is harassment."

1108. Matthew was in communication with us the entire day and we were only gone for a matter of hours before he started harassing us and calling and messaging non-stop.

1109.  At 7:29PM, Beth Wallace FaceTimed Matthew from my phone and spoke to him on the phone. She asked if it would be okay if Matthew allowed us to get dinner with Angelina before dropping her off, and Matthew said yes.

1110.  I then messaged him again at 7:32PM in the app to confirm this and said "Angelina said she wants to eat with us. We were going to get dinner now." (See OurFamilyWizard messages from 6/19/23)

1111.  At 9:04PM, Matthew messaged me again in the OurFamilyWizard app and said, "What is your ETA?"

1112.  We arrived at his mother's house at 9:21PM, and Matthew was not there. (See recorded video from 6/19/23)

1113.  After Matthew demanded that I return Angelina immediately, harassed me for four hours straight about bringing her back, and continued to harass me about what my ETA was, I was shocked to see that he wasn't even there at the location where he stated he would be meeting me to get Angelina.

1114.  I then messaged Matthew in the app at 9:22PM and said "You are not even there. Where are you???"

1115.  Matthew then continued to interfere with me and harass me and did not respond to my message in the app.

1116.  Matthew then tried to call me directly on my cellphone two times in a row at 9:23PM. (See phone records from 6/19/23)

1117.  I did not answer. The protective order says he cannot have contact with me outside of the app.

1118.  I messaged him in the app at 9:27PM and said, "She's crying and saying she wants to stay with me. She doesn't wanna go with your mom. You can pick her up from me from my house."

1119.  I then sent him another message at 9:28PM and said, "Your mother just gave me an attitude and stated that she is demanding that I go home and get the sneakers so you can come all the way there and get Angelina in that case."

1120.  Then, after his mother got into an argument with me over some shoes she was demanding I go get, I messaged Matt again at 9:35PM and said, "Your mom was just acting very hostile toward me. I am not going to speak to her. You can come

get Angelina now or she will sleep over with us at Beth's. Your mom doesn't have custody and Angelina's address is in New Britain. If you aren't taking her she can stay with us. She just threatened and disrespected me."

1121. At 9:36PM, Matthew messaged me in the app and said, "Angelina needs to be at my house."

1122. Matthew then called me twice in a row, two times, at 9:37PM.

1123. He also tried to FaceTime me a third time at 9:37PM.

1124. After receiving 2 calls and one FaceTime from him in the span of one minute, at 9:37PM, I messaged Matthew in the app again and said, "Stop calling me. There is a protective order. This will be reported to the police. You keep calling me nonstop. If you don't meet me now for Angelina, we will be going to sleep at Beth's."

1125. Then, in an attempt to intimidate, harass, and coerce me further, Matthew continued to try to call me even more.

1126. He FaceTimed me again at 9:38PM after I told him to stop calling me.

1127. At 9:40PM, I replied to Matthew's message from 9:36 and said, "Your house in New Britain right? I'm not bringing her to your mother because your mother gave me an attitude and threatened me over some shoes and demanded that I leave her house to go get the shoes that are 40 minutes away. So you can either come meet us now and get Angelina or else we will be spending the night at Beth's house. If you are out drinking right now and that's the reason you can't get Angelina, then I don't think it's good for her to go with you since you're drinking and driving. Let me know if I don't get a message from you where to meet you in Waterbury in the next five minutes then we will assume that you were once again abandoning her. You told me that you would call the police if I didn't bring her back to you immediately and when I arrived you're not there. I'm not giving her to your mother, your mother does not have custody, nor does she have visitation rights." (See OurFamilyWizard messages from 6/19/23; See also phone record from 6/19/23)

1128. Matthew continued to open up each of my messages that I sent him in the app, read them all, but did not reply to any of them.

1129.   At 9:46PM, , I messaged him again, and said "Okay, since you're not answering I'm assuming you will just get her from us in the morning?"

1130.   Matthew continued to harass me and interfere with me and he read my message and did not respond.

1131.   At this point, we all had been waiting in the car for a long time and it was getting late. I sent Matthew another message at 9:48PM and said "Okay we can't sit around waiting like this. I will wait until 9:50PM for a response from you of where you are meeting us to get Angelina. If not, then we will go crash at her house and you can meet us in the morning. Let me know now."

1132.   Matthew then continued to harass me and interfere with me and read my message and did not respond.

1133.   I then messaged him again at 9:52PM and said "Okay it's 9:50 and we didn't hear from you. We are all exhausted and will be going to bed soon. You can let me know where you would like us to meet you in the AM to get Angelina or you can pick her up from us. We waited almost an hour and you keep reading my messages and ignoring me. Clearly you are not picking her up."

1134.   Matthew continued to open up each of my messages that I sent him in the app, read them all, but did not reply to any of them to interfere with me and harass me. (See OurFamilyWizard messages from 6/19/23; See also phone record from 6/19/23)

1135.   After waiting for a while and Matthew not answering any of my messages or showing up, we left and decided to just go back to the house and sleep there and wait until the morning to try to arrange the drop off of Angelina with Matthew.

1136.   Then, At 10:33PM, 40 minutes after I messaged Matthew about meeting us to get Angelina, Matthew finally decided to message me back. He messaged me and started to threaten me with kidnapping charges again and said "Waiting on Waterbury police I will be pressing charges for kidnapping. Where are you and my daughter. I want her back now"

1137.   We already waited an hour for him earlier and he did not show up and we were already going to bed at this point.

1138.   I messaged him at 10:35PM and said, "This is not kidnapping. We waited for you and you did not show up nor did you read any of my messages. I have all of the timestamps and screenshots showing that you read each of my messages over the last hour and ignored them all. Please let the police know that you also called me 10 times directly on my phone in direct violation of the protective order. You've been harassing me all day and we made it clear to you that if you did not tell us where to meet you by 9:50 that we would just be going back and wait until the morning because all of us are exhausted and it's not fair to Angelina to have us waiting around like this. Your mom demanded that I leave so I did that. I asked you an hour ago where you wanted to meet and you read my message and ignored me. Feel free to let me know where you would like to meet in the morning and we would be happy to do that. However, I would prefer since I used all of my gas driving around in circles and you have not done any of the transportation at all in over a month and I would prefer if you would just pick her up in the morning. Let me know what time works for you and what place and I'd be happy to do that." (See OurFamilyWizard messages from 6/19/23; See also phone record from 6/19/23)

1139.   Matthew then messaged me back at 10:39PM and threatened that he would press charges on me and that he would not let me see my daughter anymore, and said, "My mother's house where I live. All visitation is suspended until our next court date. As I stated before I will be pressing charges. Bring Angelina back now."

1140.   I replied to him at 10:41PM and said "Due to your threats, I don't feel comfortable with that. Your mother threatened me and demanded that I go drive 40 minutes to get some shoes. I asked you over an hour ago where we wanted to meet and you read my messages and ignored me. You have no right to suspend visitation, nor do you have the right to threaten me or demand me to go to your residence when there is a protective order. Also, this is the first that you have stated that your residence is at your mothers house. Now that I know that your residence is with your mother, I will not be able to go there because the protective order says I cannot go to your house. Please let me know where you will be

meeting us in the morning to pick her up. Now that your car is fixed, you should have no problem covering the transportation since I used all my gas driving around and going to Waterbury only for you not to be there and stop answering and refused to pick her up or meet us." (See OurFamilyWizard messages from 6/19/23; See also phone record from 6/19/23)

1141.   Matthew then messaged me again to continue to harass me and threaten me with arrest at 10:44PM and said "As I stated before waiting on law enforcement. We will be communicating with Orange PD making an arrest and coming to get her tonight. Where is my daughter?"

1142.   At 11:10PM, Matthew messaged me in the app and the title of the message was "Amber Alert" The message said, "Where is my daughter...I want her now. What is her location."

1143.   I believe that he put the heading and subject of the message as "Amber alert" to try to harass me and intimidate me and scare me into thinking that I was being charged with kidnapping. I was sleeping by the time he sent this message.

1144.   Then, at 11:27PM, Matthew sent me another message that was titled "Emergency" in this message he said "I don't know where Angelina is. I don't know who she's with. I have no way to contact her. I have no idea who is supervising at this point and no contact with a supervisor."

1145.   I was sleeping when he sent this message. (See OurFamilyWizard messages from 6/19/23; See also phone record from 6/19/23)

1146.

1147.   On 6/20/23, Matthew spoke to me directly on the phone during a phone call, interfered with me, harassed me, and threatened me in the app. I have all the screenshots, phone records, messages, and recordings as evidence.

1148.   On 6/20/23, Matthew continued to try to harass and threaten me in the app.

1149.   At 5:29AM, he messaged me again in and accused me of kidnapping and endangering our daughter and titled the message "Kidnapped." The message said, "Why have you kidnapped Angelina. Please don't hurt her. We just want her home safely. Please bring Angelina back home."

1150.    Matthew then messaged me again and accused me of possibly hurting my daughter again at 6:53AM and said "Please bring Angelina back. Please don't hurt her. She's just a child." (See OurFamilyWizard messages from 6/20/23)

1151.    I woke up and replied to all of the harassing messages that he sent me over the course of seven hours from the night before. (See OurFamilyWizard messages from 6/20/23).

1152.    At 7:41AM, I replied to his message that he sent at 10:44PM the night before that said he was waiting for law enforcement to come arrest me and said, "That's interesting. Not one law enforcement officer contacted me. You have contacted me over 15 times and threatened me multiple times in the last 24 hours and since you keep threatening me with arrest I will be making sure that I report each and every POV for the last 6 months. You are NOT going to threaten and harass me anymore." (See OurFamilyWizard messages from 6/20/23).

1153.    At 7:43AM, I replied to his message that was about the "Amber Alert" and said, "Amber alert? I have major concerns regarding your substance abuse and mental health. An amber alert is a serious alert. This will be reported to the police as well. This is a direct protective order violation. I just spoke to my lawyer. STOP messaging me with harassing language and captions in an effort to cause alarm." (See OurFamilyWizard messages from 6/20/23).

1154.    Then, at 7:47AM, I replied to his message that was titled "Emergency" that he sent to me at 11:27PM the night before and said, "Another fake emergency and misuse of police? If you weren't so drunk, maybe you would have actually shown up when you demanded that we bring her back to you and not have us sit for an hour waiting, ignore all of my messages, and continue at a bar. I will be sure all of this is brought up as well on Thursday and will be printing each of the messages in which I clearly states where she was and you ignored us and refused to show up. You did the same last time and made us sit in a police station for almost 2 hours. Then you keep lying about not being homeless. I need to see proof of residency to confirm you aren't homeless." (See OurFamilyWizard messages from 6/20/23).

1155.   At 7:50AM, I replied to his message where he said I kidnapped my child and said, "Kidnapped? You must still be drunk from last night. Please see all the messages in which we tried to meet you last night and you read each of them and ignored them. Your mother threatened me and said not to come near her again and to immediately leave which we did. Home? Aren't you homeless and evicted? My lawyer said I am not allowed to go to your home due to protective order. So no, I will not violate the order because you are demanding that. I also know you are homeless. You can come to the police department in Meriden and we can meet you there. Let me know what time. I have no gas to drive to Waterbury or New Britain or wherever you live this week." (See OurFamilyWizard messages from 6/20/23).

1156.   Then, at 7:53AM, I replied to his message where he demanded I bring Angelina back and said, "Bring her back? Do you not remember last night when we waited for over an hour and you didn't show up for her? I never have and never would hurt my daughter. The only person who hurts her is you. Let me know by 8:30AM what time you will be at Meriden PD to meet us to pick her up. I have no gas to travel to Waterbury or New Britain and now that your car is fixed, you can meet us there. I will not be sitting in a car or parking lot for hours waiting nor will I be handing her over to your unstable mom or her unstable alcoholic boyfriend. If you don't show up by 9AM to get her then I will file saying you abandoned her." (See OurFamilyWizard messages from 6/20/23).

1157.   I continued to feel that he was harassing me, and after almost 50 consecutive instances of Matthew violating the terms of the protective order and the family orders.

1158.   I sent Matthew a message in the app at 7:56AM and said, "This is your final warning. You have threatened, harassed, contacted me outside this app, and have alarmed and annoyed others in an effort to harass me. You have made serious threats and allegations and I have asked you repeatedly to stop. Per advice of counsel this is your final warning and if you violate the terms of the protection order again I will be moving forward and taking legal action in both civil and criminal court against you and each of the other individuals involved. This is your

last warning. Stop the harassment and threats." (See OurFamilyWizard messages from 6/20/23).

1159.  At 7:58AM, Matthew messaged me and threatened to have me arrested and threatened to not let me see my daughter until we "go back to court" and said "Leaving police station now, I made the report last night and still have not talked to the officer yet. I want Angelina home ASAP. You were supposed to drop her off yesterday evening and refused to. I will be pressing charges for custodial interference. Beth can no longer be the supervisor for your visits. I will be suspending visits until we go back to court." (See OurFamilyWizard messages from 6/20/23).

1160.  I messaged him back at 8:10AM and said "Please see my prior messages in which I addressed this multiple times. Let me know by 8:30AM what time you will meet us at the Meriden PD or else I will assume you're refusing to pick her up just like you did last night. You can continue to make false statements to the police, and I will make sure that you are arrested for the false statements as well since I have all of these text messages and evidence here to prove that you read each message and ignored us as we waited there for you to pick her up and you did not show up. Your mother also stated you were at the bar." (See OurFamilyWizard messages from 6/20/23).

1161.  I then replied to another of his messages at 8:11AM and said, "You allegedly made a report and there was an amber alert in effect and you made a report stating Angelina was kidnapped and abducted but no officer called you back yet? That's a major concern. By the way, where do you live? Last I heard, you were evicted and homeless per your landlord. Let us know by 8:30AM what time you wanna meet us at Meriden Police Department otherwise I will assume you're abandoning her once again like you did last night. I'm not going to have Angelina sitting there for hours waiting for you while you were out drinking and refused to pick her up. My attorney stated to give you until 8:30 to give me an answer." (See OurFamilyWizard messages from 6/20/23).

1162.  Matthew then messaged me again at 8:15AM and ignored everything I said in my prior messages and demanded that I "Bring Angelina home now."

1163.   Matthew continued to interfere with me, harass me, and use coercion to try to compel me to violate the protective order and violate the residential stay-away order by demanding that I bring Angelina to his house or face charges for custodial interference and kidnapping.

1164.   I responded to him at 8:46AM and said, "My attorney said I can not go to your house. What time will you be at Waterbury PD??"

1165.   At 8:46AM, I messaged him again and said, "What time will you be at Meriden PD?"

1166.   At 8:46AM, I messaged him again and said, "We are in Meriden. How long until you arrive at Meriden PD?" (See OurFamilyWizard messages from 6/20/23).

1167.   Matthew continued to harass me and interfere with me and proceeded to ignore my messages.

1168.   I then messaged him again at 8:48AM and said, "Let me know what time you will be at Meriden PD to get Angelina from me and the supervisor and we will be there. Thank you."

1169.   Matthew then continued to interfere with me and harass me by once again lying and telling me that he has no vehicle, despite him driving around in his vehicle on a daily basis.

1170.   At 8:55AM, he messaged me and said, "I have no way to get to Meriden PD. You were supposed to bring her to my mother's last night. You need to bring her home."

1171.   I replied to him at 8:58AM and said, "My attorney stated I can not go to your home. What time can you go to Meriden PD? Officer stated you drove to Waterbury PD. I have no gas to go to Waterbury."

1172.   At 8:59AM, Matthew replied and said, "The parameters of the visit were you were supposed to pick up Angelina from my home in Waterbury with Beth and then bring her home around dinner time with Beth. You need to bring Angelina back to my house immediately."

1173.   Those "parameters were not specified that way based on our messages. Matthew was trying to harass, interfere with, and use coercion against me and

Angelina and demanding that I violate the protective order by coming to his house.

1174.   At 9:09AM, I messaged Matthew again and said, "You told me yesterday to meet you at your mother's house. When I arrived, your mother threatened me and stated you were out drinking at the bar with friends and stated you were not there. She became angry and hostile when I told her Angelina needed a bath from being in a wet bathing suit and then she demanded that I drive 40 minutes to go get a $10 pair of sneakers that she bought from target. I then drove away upon advisements of counsel who stated that now that you admitted that that is your residence that I'm no longer allowed to go there. There is an active protective order that states I cannot go to your house. This will be the last time that I tell you in this app to stop asking me to come to your house. I will ignore all future requests from you to go to your house. After we waited in a gas station for almost an hour, I messaged you repeatedly and I have screenshots showing each timestamp of you viewing the message and then ignoring it. Even stated that there was an amber alert, that there was an emergency, and that I was being arrested for kidnapping and abducting Angelina. My attorney advised me that since you are threatening to make false claims to the police to do all exchanges at the police department for my own protection. You had no problem driving your vehicle to the bar last night nor did you have any issue driving your vehicle to court the other day nor did you have any issue driving your vehicle to the police station today. You did the same thing on the day of Bob's funeral and stated you had no vehicle and only after the police told you that we would be leaving, did you magically come with a vehicle. I never once stated that I would bring Angelina back at dinner time and you spoke to Beth on FaceTime in front of multiple witnesses and she told you that we would be going to Pepe's in Waterbury and feeding Angelina dinner and bring her back to you after that. You stated that was fine. Furthermore, last Saturday when I asked you if you wanted me to take care of dinner for her, you said it was up to me. You never once said that she needed to be back by a specific time nor did you ever show up to actually get her when you demanded we return. Please let me know what time you will meet us at Meriden

148

Police Department today and any requests for me to bring her to your house will be ignored as I stated my attorney advised me due to the protective order that I cannot do that. Also, you called me over 10 times directly o my phone last night and harassed me by lying and saying there was an emergency, and stating that there was an amber alert. I will be pressing criminal and civil legal action against you for what you were doing. Please let me know what time you are meeting us at the Meriden Police Department or else I will assume you are just going to abandon her again today." (See OurFamilyWizard messages from 6/20/23).

1175.   Matthew continued to interfere with me and harass me by reading my message and not responding.

1176.   At 9:35AM, I messaged him again and said, "So you aren't going to get Angelina?"

1177.   Matthew continued to interfere with me and harass me by reading my message and not responding.

1178.   I was forced to have to drive all the way to Waterbury and meet 2 officers outside of Matthew's residence that day after they spoke to my attorney Lizelle Martin and told her that I needed to bring my child to the house even though there was a residential stay-away order.

1179.   Matthew's behavior in which he refused to meet us the night before and then harassing and threatening us all day the following day and then lying about not having a vehicle to inconvenience and interfere with us more is harassment and coercion. He did not care about getting Angelina, only about inconveniencing me.

1180.   Then, at 7:23PM, Matthew picked up the call when I tried to call Angelina and then immediately hung up.

1181.   At 7:23PM, I messaged him in the app, and said, "Is there a reason you just picked up the call and hung up and denied me the right to speak to Angelina just now?"

1182.   I then tried to call back to speak to Angelina, and then Matthew spoke to me directly on the phone and said "Hold on a second, I'll get her." (See recorded call from 6/20/23)

1183.   Matthew's constant speaking to me on the phone is a form of harassment because he sends the message and intimidates me that he can do what he wants and that he is above the law and that the laws do not apply to him.

1184.   He then continued to have third-party contact and instruct Angelina what to say during the call. I asked her what she was watching and he told her to "say Doc McStuffins."

1185.   He continuously interferes in every call and tries to insert himself into the conversation by speaking to me, having third-party contact with me, and instructing Angelina what she can and cannot say during the call.

1186.   At the end of the call, Angelina said, "I just wanna see you. I wanna see you now."

1187.   I said, "aww." And she said "I can't"

1188.   I said, "It's okay. Do you wanna try to see mommy tomorrow?"

1189.   Angelina said, "yeah!"

1190.

1191.   On 6/21/23, Matthew had third party contact with me, interfered with me and my ability to see/speak to my child, had contact in the app to cause me annoyance/alarm, and then threatened me. I have all the screenshots, phone records, messages, and recordings as evidence. (See all videos from 6/21/23)

1192.   Matthew violated the protective order by interfering with me. I was asking for FaceTime with my daughter pursuant to the most recent civil family order and told him how much I wanted to see my child on FaceTime and speak to her. Both Angelina and I begged Matthew to allow us to Facetime per the court order, and Matthew vehemently refused to do so. He stated that he would not allow me to FaceTime my child and said he will no longer allow me to have any further Facetime contact with her or visitation with her.

1193.   Matthew's attempts to unlawfully and unreasonably deny me access to my child in violation of a court order and protective order shows his coercion, harassment, and psychological abuse of both me and my child.

1194.   At 7:16PM, I messaged Matthew and said, "Is there a reason why you're refusing to let me FaceTime Angelina?"

1195.  Matthew continued to try to harass me and use coercion against me and isolate me from my child and read my message and said nothing.

1196.  At 7:19PM, I messaged him again and said, "Why are you refusing to let me FaceTime or see Angelina?"

1197.  Angelina repeatedly begged to facetime me and Matthew told her no. He told her that he can not let her facetime me when they are "there" and said that he is allowed to say no when I ask to Facetime and Angelina cried and begged and he still interfered with my custodial right to speak to her and refused to allow me to have reasonable access with her free from interference. ( See recorded call from 6/21/23)

1198.  Matthew then replied and said, "I told Angelina she could FT even though I do not want her to. I'm not comfortable with the things you've been saying to her during the FaceTime plus I don't like the idea of you seeing in our house. I will allow it but please do not say inappropriate things to her or I will terminate the call."

1199.  Matthew has no right to threaten to terminate the call. I have the right to speak to my child and him threatening to terminate and remove that right is custodial interference and harassment.

1200.  The court order states that he has to allow me phone calls and FaceTimes. He has no right to deny me that right and to then make it seem like he's doing me some type of favor by saying that he's letting her FaceTime even though he "does not want her to" and threatening to terminate the call is also threatening to interfere with my custodial rights as Angelina's mother and lawful legal guardian.

1201.  At 7:20PM, I replied and said, "Court order says you need to allow me to FaceTime. The protective order says you need to follow that. If I don't get a FaceTime call in the next five minutes I will be calling the police."

1202.  Matthew continued to try to harass me and use coercion against me and isolate me from my child and read my message and said nothing.

1203.  At 7:21PM, I messaged him again and said, "If I don't get a FaceTime call in the next five minutes, I will be calling the police and reporting that you're violating the protective order and the family order and you are refusing to let me

see or speak to my daughter. You have not allowed me to see, or speak to her in days and you are refusing to allow me to see her or speak to her. You have no right to deny me those rights."

1204. Matthew continued to try to harass me and use coercion against me and isolate me from my child and read my message and said nothing.

1205. At 7:23PM, Matthew denied me access to FaceTime and then contacted me and threatened to interfere with my ability to see my daughter and told me that "You will not be seeing her again until after our next court date." (See OurFamilyWizard messages from 6/21/23 at 7:23PM)

1206. Matthew said in the app, "You will not be seeing her again until after our next court date. You violated the parameters of your supervised visit, kept her over night at your house.. refused to bring her back and had to call the cops who argued with you for 2 hours until you brought her back a day later. I do not trust that she will be safe with you on top of the fact that you potentially met with a caseworker/doctor in direct violation of the court order. I want to explain to the judge the situation and that stricter parameters need to be set."

1207. Matthew has no right to deny me visitation indefinitely and tell me that he is not allowing me access to Angelina. He claimed I violated parameters when the court orders simply states that visits must be "in the presence of a third party" and nothing more or less.

1208. Nothing in the visit states that he can dictate her not being allowed to go to our house and nothing in the court order states that Angelina is unable to see doctors or caseworkers. There is nothing in the court order that is a "direct violation" and him saying he wants to explain to the judge and that he has the power to mandate that "stricter parameters need to be set" when the current parameters are him denying me all visitation and access, shows that his sole goal is to isolate me completely from my child as a form of psychological abuse.

1209. Matthew abuses and neglects Angelina by getting angry and refusing to allow her to see doctors, refusing to allow her to go to her home, church, school, and isolating her from any and all sources of support.

1210.   When he said this, there was no set "next court date" in place where anything was designated to be heard regarding custody/visitation/access of the child. This caused me extreme anxiety, annoyance, and alarm and was Matthew insinuating that I would not be seeing my daughter indefinitely. I then requested that he have my child FaceTime me immediately pursuant to the most recent Civil Family Order which allows me FaceTime contact with her. I told Matthew that I would be requesting that a wellness check be done if I was not able to lay eyes on Angelina via FaceTime.

1211.   At 7:25PM, I responded and said, "You have no right to deny me access to her. I will be pressing charges on you for this. I want a facetime call now or i will have a wellness check done."

1212.   At 7:28PM, Matthew replied and said, "None of that makes any sense. You just had her on Monday and illegally kept her into yesterday. You talked to her last night and just a few minutes ago. Please seek the help you need so that you may get back onto a regular visitation schedule for Angelina. We don't want you to not see her, we want you to see her. You just need to get better before that can happen ."

1213.   Matthew saying "we" implies him and the Judge, who he openly has admitting to "paying off" through his connections with his family member Attorney Greg Gallo, State Marshal Jamie Lambo, Correctional Officer Josh Lambo, and State Marshal Brian Hobart, all of which have an excellent relationship with Judge Jane Kupson Grossman who has been violating my state, federal, and constitutional rights and who Matthew states that he has paid off in order to ensure that he would get sole legal and physical custody of our four-year-old daughter Angelina.

1214.   I have never abused Angelina. I have never neglected Angelina. I have zero convictions on my record. I am a loving mother and have never harmed and would never harm either of my children.

1215.   Matthew saying that I "illegally kept her into yesterday" implies that he is trying to harass me and intimidate me by saying that it is illegal for me to spend time with my child, when no order of any court says anything of that sort.

1216.   Matthew telling me to "seek the help that I need" and that I need to "get better" before I can see my child, is an insult in which he is implying that I have psychological issues and telling me that I need to get better when I am not sick.

1217.   Matthew does this to try to insult me, denigrate, psychologically abuse, and harass me.

1218.   He has also been tracking me and put a tracking device in my vehicle and has been tracking me for over two years now.

1219.   He is obsessed with me and stalks me regularly. He has given me multiple ultimatums stating that if I did not have sexual intercourse with him that he would "use his money, power, influence, and connections to destroy me" and he has worked hard to accomplish that goal.

1220.   At 7:29PM, I responded and said, "If angelina doesn't face time me by 7:30 i will be calling the police. She begged to facetime me. Have her facetime me NOW."

1221.   At 7:31PM, Matthew then threatened me again and said that he would have the police "press charges on me for harassment" if I called for a wellness check and said that "constant wellness checks are harassment" to try to intimidate and coerce me not to request that an officer check on the welfare of my daughter. (See OurFamilyWizard messages from 6/21/23 at 7:23PM)

1222.   At 7:31PM, he said, "Constant wellness checks are harassment. You have no custodial rights to her and only supervised visitation based on my discretion. It is not in Angelina's best interest to have the police show up every time you are upset. If this continues it effects angelina and I will have them press charges for harassment. please keep her in mind while making your decisions."

1223.   Matthew's claim that "wellness checks are harassment" is an attempt to scare and intimidate me against calling for a check into the welfare of my child who he has been both abusing and neglecting.

1224.   At 7:33PM, I replied to him and said, "Youre a liar and will be put in prison for this. You have no right to deny me access to Angelina."

1225.   Matthew continued to try to harass me and use coercion against me and isolate me from my child and read my message and said nothing.

1226.   At 7:47PM, I sent him another message and said, "As I have stated several times, in the past, all of these calls are recorded, including the FaceTime. Is there a reason why you took the phone kept turning the camera off and pausing it and holding in front of your face and are not letting me talk to her?"

1227.   Matthew continued to try to harass me and use coercion against me and isolate me from my child and read my message and said nothing.

1228.   I eventually spoke to my daughter on a regular call, during which she was begging repeatedly to FaceTime me. Matthew repeatedly told her no and told her that he can't let her FaceTime me when they are at his mother's house because he "didn't want me to see what their house looks like."

1229.   Matthew continued to interfere with my right to Facetime my child.

1230.   Angelina continued to beg to FaceTime and Matthew told her that he was allowed to say no to my request for FaceTime. The court order specifically states that I am allowed to have FaceTime contact with my child when she is with her father.

1231.   He then tried to contact me in the app to scare me and cause me alarm/annoyance. I told Matthew that he has no right to deny me access to my daughter since the court order says I can see her and have FaceTime and regular calls with her.

1232.   I told him I wanted a FaceTime and was concerned that he was not allowing me to lay eyes on my child. Matthew read my message and ignored me.

1233.   Matthew continued to interfere with my right to Facetime my child. I continued to ask for a FaceTime call with Angelina, and Matthew then threatened that if I said "inappropriate things" that he would terminate the call.

1234.   Matthew continued to interfere with my right to Facetime my child once he finally allowed the call, during which he kept trying to take the phone from her and put it near him so that he was looking directly at me. I feel that he did this to intimidate me.

1235.   Matthew then had third-party contact with me and contact with my child to annoy me by instructing her during the call to "Say I get it from my daddy" when I told her she looked beautiful.

1236. Matthew continued to interfere with me during the call. I then turned my camera off for a minute, and Matthew immediately turned off Angelina's camera and paused it.

1237. He refused to allow me to see Angelina on camera unless I allowed for him to see me on the camera. He was angered by the fact that I turned off my camera temporarily.

1238. I tried to call back again and FaceTime her again, and every time that I did, Matthew would answer the call and then immediately cover the camera with his finger, and as soon as he saw that my video was turned off, he would pause and turn off his camera completely.

1239. Matthew continued to interfere further. He continued to force the camera to be off while I was trying to see my child on the screen and did this repeatedly and would not allow me to see my daughter on the call. He kept putting his hand over the phone and would not allow me to do the call. Matthew then pretended that he did not know what was happening, and continued to have contact with Angelina to try to annoy me by telling her that that the FaceTime was on, and not acknowledging that he was turning the camera off himself.

1240. Matthew continued to interfere during the call. He finally allowed me to see my child, and then he paused her video again. He continued to turn off the camera repeatedly and continued to upset my daughter. My daughter kept asking for a normal FaceTime, and Matthew continued to annoy and alarm us through his interference and harassment by refusing to allow me to see my child on camera unless Matthew could also see me on the camera.

1241. Matthew's behavior toward me was interference and harassment. I then sent him a message in OurFamilyWizard and told him that what he was doing was unacceptable. At the end of the call, he forced my child to hang up without saying bye to me, despite her begging to continue talking to me. I tried to call back to say bye and goodnight and Matthew interfered again and ignored my call. I then messaged him in the app and said "Why are you ignoring the call? She begged to keep talking to me and it was recorded. I didn't even get to say goodbye."

1242.   Matthew continued to ignore me. (See recorded call from 6/21/23; See also OurFamilyWizard communications from 6/21/23)

1243.   At 7:49PM, he replied to me and said, "You camera was paused and she wanted you to unpause yours. It's getting late now and she's going to bed. You can call again tomorrow."

1244.   At 7:50PM, I replied and said, "If you don't let her, FaceTime me back to say good night like she was begging to do I will have the police going there for a wellness check and I will assume that you're going out drinking again. Have her call me back now to say good night. Just because you're obsessed with looking at me on camera doesn't mean you can denied me the right to talk to my kid."

1245.   Matthew then became enraged and stated that he hoped he would never see me again.

1246.   At 7:52PM, he responded and said, "I have no interest in seeing you ever again. My only interest is Angelina's well being. You may call again for a quick goodnight 8605182388."

1247.   At 7:59PM, I replied and said, "You are court ordered to allow me to FaceTime. I will be taking legal action if you do not let me FaceTime my child."

1248.   Matthew then continued to deny me the right to speak to my child.

1249.   At 8:05PM, he messaged me again and said, "As stated before, your calls "may" include FaceTime and are not a requirement. You did FaceTime her and multiple times tonight. She is in bed now for the night. Please call her again again tomorrow. Thank you."

1250.   Matthew interfered with any and all attempts that I tried to make to speak to my child, and denied me the right to speak to my child via FaceTime despite it being specifically spelled out in the court order that I am allowed to have FaceTimes.

1251.   Matthew has no legal right to deny me contact with my child.

1252.   At 8:14PM, I messaged him again and said, "Why are you ignoring the call? She begged to keep talking to me and it was recorded. I didnt even get to say goodbye."

1253.  At 8:44PM, Matthew replied and said, "Please do not call the company line anymore to talk to Angelina. Call my personal line, 8605182388 in case you forget."

1254.  Matthew's demand that I not call his "company line anymore" was an attempt for him to deny me FaceTime contact with my child in direct violation of the family court order.

1255.  Matthew picks and chooses when he wants to allow me to have Facetime and when he wants to deny me the right, and stated on numerous occasions that he has the power to deny me contact with my child at his sole discretion, despite this not being part of the court order in any way and despite this being clear coercion, harassment, stalking, and abuse.

1256.

1257.  On 6/22/23, Matthew interfered with me and my ability to speak to my child, threatened me, and refused to let me see my child. I have all the screenshots, phone records, messages, and recordings as evidence.

1258.  On 6/22/23, Matthew violated the protective order by interfering with me. He refused to allow me to FaceTime my child, despite it saying in the court order that I am allowed to FaceTime her. He demanded that I only call his regular line, even though the order specifically says I can FaceTime her. He then threatened that if I asked for a wellness check for my child that it would be "harassment".

1259.  He had stated on previous occasions on 6/1/22, 9/12/22, 3/27/23, 4/5/23, 5/25/23, and 6/15/23 that he has "no job, no income, is not working right now, and is struggling" and used that as an excuse as to why he has still not paid me for the excess of $15,000 he owes me in unpaid child support, arrears, and childcare payments.

1260.  This is financial abuse, as his financial discovery and financial records all prove that he has substantial income and employment. I tried to FaceTime my daughter per the court order, and Matthew continued to ignore my calls. I messaged him in the app and said "Why are you ignoring the call? She begged to keep talking to me and it was recorded. I didn't even get to say goodbye."

1261.  Matthew then said "Please do not call the company line anymore to talk to Angelina. Call my personal line, 8605182388 in case you forget." I replied and said "Why are you refusing to let me speak to Angelina? I want to FaceTime her. And what company? You said under oath you have no job."

1262.  He then continued to try to interfere with my right to FaceTime my child pursuant to the court order and continued to try to cause me annoyance and ignored what I said and instead replied again and said "Are you calling the right number 860-518-2388 I don't have any missed calls from you."

1263.  His 860 number is an android, and he knows that I was trying to FaceTime him on the 203 number which is the iPhone.

1264.  Him saying "I don't have any missed calls from you" is him intentionally trying to cause me undue stress and deny me access to my daughter. I told him that "I just left your parents a voicemail indicating that if I don't get my court ordered FaceTime by 7:15 I will be requesting a wellness check."

1265.  Matthew then attempted to intimidate me and said, "Wellness checks are harassment." I then said "Only a child abuser withholds a child and then refers to a wellness check as harassment. If she wasn't alone, you would FaceTime. If I don't get my court ordered FaceTime in 5 minutes, I am calling the police. Court order says FaceTime. This is interfering." (See OurFamilyWizard messages from 6/22/23)

1266.  Matthew never let me speak to her or FaceTime her at all on that night. After he continuously refused to allow me to FaceTime her and nobody else answered or got back to me, I called the Waterbury Police Department and asked for a wellness check to be done. The Waterbury Police Department responded to his mother's address for a wellness check and stated that Matthew was "less than cooperative and wouldn't speak with the police." A report was made. (See Waterbury Police report from 6/22/23 23-55988) (See OurFamilyWizard messages from 6/22/23; See also transcripts from 6/1/22, 9/12/22, 3/27/23, 4/5/23, 5/25/23, 6/15/23; See also Matthew financial discovery; See also Matthew financial filings in New Haven Superior Court)

1267.

1268.  On 6/23/23, Matthew spoke to me directly on the phone during the call, interfered with me and refused to allow me court ordered visitation/access with my child, and had contact with others to cause me annoyance/alarm. He also abused me by isolating and alienating my child from me and forcing her to sit in the dark during a Facetime call so that I could not see her face. I have all the screenshots, phone records, messages, and recordings as evidence.

1269.  The case number associated with the incident from this day is 23-56315 and the officer was M. DiGiovancarlo Jr. who responded. The officer sent me a link via text to submit evidence, as well. I told the officer I wanted to press charges for the violations of protective order as well as the child abuse, unlawful restraint, and coercion that Matthew used against Angelina on this day.

1270.  Matthew violated the protective order by speaking to me directly on the phone in violation of the no-contact order, interfering with me and refusing to allow me court ordered access/visitation with my daughter. He also had contact with my daughter to try to cause me annoyance/alarm.

1271.  I messaged him in the OurFamilyWizard app at 8:27AM and said "What time can I see Angelina today?"

1272.  At 8:37AM, Matthew then said, "You can't. We are busy."

1273.  He also repeatedly harassed and contacted my mother again and continued to contact her to try to cause me annoyance/alarm. (See OurFamilyWizard messages from 6/23/23)

1274.  At 1:32 PM, he tried to again harass me by saying I violated the court order when I didn't.

1275.  He said, "During the last visit, you refused to bring Angelina back, kept her over night against my decision. Then on top of that, you brought Angelina to a doctor in direct violation of a court order. I don't feel comfortable with you taking her again. The things you have been saying and doing are hurting Angelina. It's my responsibility to watch for her best interest right now. At your mother's house with your mother supervising is all I feel comfortable with at this time. With that said. Do you have a plan for a consistent schedule that will work for all parties."

1276.  Nothing in the court order says that I can't take my child to the doctor.

1277.   Nothing in the court order says that I can't keep my child overnight.

1278.   I never once refused to bring Angelina back, and in fact, Matthew actually stopped answering and wouldn't meet us to get her.

1279.   I never did anything or said anything to hurt Angelina. Matthew dictating that I could only have visits at my mother's house when she stated that she wanted no part in it due to him harassing her weeks prior was just another way for him to harass me.

1280.   At 2:34PM, I replied and said, "That is simply untrue. I never once refused to bring her back. You refused to pick her up on Monday night, and did not answer any of my messages for hours while you were out drinking. I notified you that if you did not show up to pick her up by 10pm that we would be spending the night with her, and you never responded or showed up. Furthermore, there is no court order stating that I can't bring Angelina to the doctor. It is not about your comfort level. You are court ordered to allow me facetimes and visits. You have only allowed me to see her once in the last week and a half. This is unacceptable and considered coercive control and abuse. I have never said or done anything to hurt Angelina. You need to follow court orders and the protective order. Unfortunately, Angelina is unable to have visits with my mother and is unable to visit at her son's home. My mother is not a supervisor option. Are you going to follow the court order and provide a supervisor? I can not make a schedule without you providing a supervisor."

1281.   I messaged him later in the evening and said "I want to spend the day with Angelina tomorrow." He ignored my message. He continued to refuse to allow me to FaceTime my child for most of the day. I tried to FaceTime my daughter repeatedly throughout the day, and Matthew ignored all of my calls, even though the order says that I am allowed to have FaceTime with my child. (See recorded calls from 6/23/23)

1282.   I also sent him a message at 2:50PM in the app and said, "I would like to see Angelina today. Can I go see her?" He ignored me. I then finally called to speak to my daughter on a regular call after being denied the right to FaceTime all day, and Matthew again had contact with her to try to annoy/alarm me by saying as

soon as he answered, "No Ani, that's not being very nice. You got to be nice to mama. Come on we talked about this. Come on."

1283.   My child did not say anything prior to him saying this. When she heard him say that, she said "what?" and sounded confused. He says this almost every time to make it seem like she doesn't want to talk to me when, in reality, she begs to see and speak to me almost daily.

1284.   Matthew then tried to grab Angelina by the stomach when she told him she wanted to go play while she was on the call and she screamed and said "ow!" Matthew told her "We are not going to play. Listen Listen Listen."

1285.   Angelina then kept yelling and saying ow, and Matthew grabbed her again and she said "Ow!" Matthew then got angry and said to her "Okay, excuse me, excuse me." Angelina then screams and says "ow!' again as Matthew continued to grab/hurt her to try to force her to stay inside.

1286.   After hearing her say "ow!", Matthew then said "It's time, it's time to talk to mama." Angelina continued to yell in the background. It sounded like Matthew hit her and was restraining her. Angelina continued to yell and say "ow!" in the background and said "Ow! That hurts my tummy!"

1287.   It then sounded like he slapped her. She continued to say "ow! Ow! That hurts my tummy!" Matthew then said, "It doesn't hurt your tummy." Angelina yelled in the background and said "Stop!" I tried to say "Angelina, what hurts your tummy?" Matthew continued to tell her in the background, "It's time to talk to mommy. It's time to talk to mommy. Stop trying to run outside."

1288.   She continued to yell in the background. I then was concerned and said, "Angelina, how come you said that hurts your tummy? What hurts your tummy?" Angelina sounded distressed and in pain in the background. I then said again, "What hurts your tummy?" I could hear Matthew in the background speaking to her.

1289.   She did not respond and it seemed like Matthew was trying to silence/scare/intimidate her in the background. I then heard him speak to her again in the background. His contact with her was causing me both alarm and annoyance.

1290.  I then said again "Angelina, what was hurting your tummy? You can tell mommy." She then sounded distressed and yelled "I am talking to dada!" This was after he was trying to speak to her during the call and interfere and instruct her not to tell me why she was in pain.

1291.  I then said, "what?" and she said again, in a distressed tone, "I'm talking to dada." I said, "I know, but what was daddy doing that was hurting your tummy? Was he pushing your tummy?" She said "No, he was trying to make me not go outside."

1292.  He was forcibly holding her back and restraining her from going outside and caused her physical pain while I was on the call, which was very alarming and distressing to me. I then tried to ask her what she did today, and she was about to tell me, when Matthew immediately interfered again in the background and instructed her not to answer.

1293.  She said "I did…." And then once Matthew spoke to her, she said "I did nothing." She then said "I was just joking" which she often says after being told what to say by Matthew. He then continued to interfere and, in the background, said "Why don't you tell her what we did. Why don't you tell her some of the things that we did."

1294.  Angelina continued to get distressed and said, "I just wanna tell her some." Matthew then said "Okay, then tell her." He was telling her what she was and was not allowed to say during the entirety of the call and continued to interfere. (See recorded calls from 6/23/23)

1295.  I then said "Angelina, I want to FaceTime you." Matthew immediately said "No." Then, Angelina, in a sad tone, said "But dada won't let me FaceTime." I said "what?" She said, "dada doesn't like FaceTiming."

1296.  I told her that "Daddy has to let you FaceTime me. Can we FaceTime on Google?" Angelina then said "I wanna FaceTime you too." I said, "You want to Facetime me too?" and she said "Yeah, but daddy doesn't wanna FaceTime."

1297.  I then said, "Angelina do you want to do FaceTime together before you go to bed, and I can read a book to you on Facetime tonight?" Angelina was happy and

excited and said yes and said she wanted to read one of the books she got for her birthday.

1298.   I said, "Do you want daddy to FaceTime mommy before you go to bed so I can read you the book?" She said yes and I told her I would message daddy about it. She then asked him directly if he would allow her to FaceTime me before bed, and rather than doing what is in her best interest and what is in the court order, he continued to try to interfere and said "I don't know. We will see." I told her I would message daddy about it.

1299.   I said "Do you want me to call you at about 8:00?" Angelina said "yeah!" Matthew then continued to have contact with her to try to cause me annoyance/alarm and continued to try to interfere and said "No. You will be in bed by then."

1300.   I said, "What time are you going to bed tonight Angelina?" Matthew then tried to have third-party contact with me again and said "tell her 7:15." Angelina then said "7:15." I said "You're going to bed at 7:15? Did you start doing your pajamas or bath or any of that? When will you start that because it's almost 7:15 already."

1301.   Matthew then told her she could play outside for only 10 minutes and then we could do the call. I told Angelina "Okay, by the time you are done getting ready it is going to be around 7:20 or 7:30 so mommy will FaceTime you at 7:30, okay?" Angelina said "Okay." Matthew then tried to have third-party contact again and said "No. Tell her 7:15." Angelina then said "No. 7:15!"

1302.   I said "I thought daddy just said you were going to get to go play for 10 minutes, though?" Matthew then continued to interfere and said "7:15." Angelina repeated "7:15." I said "Well, then how are you going to play then?" Matthew spoke to me and said "There is time. There is plenty of time."

1303.   Angelina then repeated what he said. He then said "tell her you will talk to her later." I told her to make sure she gets her teeth brushed and pajamas on and ready before I FaceTime her so she would be ready for bed and she said "But we don't have our toothbrush!" Matthew then immediately interfered again and said "Yes you do."

1304.   He then instructed her to say "we do. I just forgot we did." It sounded as if she was being intimidated and instructed to lie again by Matthew and told her not to lie and asked if she had a toothbrush yes or no and she said yes after hesitating for a second. She then got upset and Matthew ended the call.

1305.   I tried to call back, and Matthew answered the phone and immediately spoke to me directly on the phone and said, "She's playing outside. Can you call back at 7:15?" I did not say anything back to him and hung up. (See recorded calls from 6/23/23) Then, when he finally did allow me to FaceTime her, he forced her to sit in a room with all the lights turned off and the darkening blinds pulled down so that she was in complete darkness, which interfered with my right to have a FaceTime call and interfered with my ability to see her face. I asked her to turn the light on multiple times, and she stated that he would not allow her to. I said "What is that, I can't see it. Why is it so dark?" I then said, "turn the light on" and Matthew immediately told her "No. We are not turning the light on."

1306.   Angelina then said "We are not doing the light on." I said "I can't see you. I want to see your pretty face. I haven't even got to see you. Turn it on for a second. You can turn it off when we are done talking, I want to read you a story." Matthew then continued to interfere and told Angelina "She will read you the story with the lights off." Angelina got upset and said "No! Lights on!" Matthew continued to have contact with her to try to cause me annoyance and alarm and interfere with my ability to have a FaceTime call with her and see her face during the call. Matthew then said "No. We are not turning the light on. It's nighttime."

1307.   Angelina, who at this point was getting upset due to Matthew's interference, told him "No. I am going to turn the light on." I then said "Angelina, it is not even dark out yet." Angelina tried to get up to try turn the light on and Matthew immediately started to say "Hey, Hey, Hey, what did I just say? Keep the lights off." I then said, "Can you turn the light on Angelina?" and she said "Yeah, mommy. You know what I am starting to do? I am going to turn the light on for you."

1308.   Matthew continued to tell her no and say "hey hey hey leave the lights off" in the background to try and stop her. I said "okay" Matthew then got angry and said

to Angelina, "Hello? What did daddy just say to you?" Angelina seemed upset, scared, and intimidated by him. He has used physical violence as discipline on his children several times in the past and I believe he has recently been using physical violence against Angelina, as well. Angelina then sounded distressed, and Matthew said to her "You have to listen to daddy Angelina." She then said "ow! Stop!" and it sounded as if he tried to hurt or restrain her. I said "It's okay Angelina, you can turn the light on."

1309.   She said "what?" I said, "you can turn it on so we can read our story and then I'm going to get the book." Matthew then said "No. You don't need the light on for her to read the story." I then said to Angelina, "I'm trying to see you, Angelina." Angelina then was very upset and said "He said I don't need the light on!" Matthew continued to try to speak to Angelina and intimidate her in the background. He said "you need to listen to daddy. Mommy is not in charge."

1310.   There was no reason why he should have the light off when the sun was still out and when I am allowed to FaceTime her per the court order in family court. He was intentionally trying to interfere with me and being physically and psychologically abusive toward my daughter during the call in an effort to try to cause me annoyance/alarm and intimidate and harass and interfere with me. Matthew then told her "You need to listen to me" and Angelina was getting very upset. She started to again say in a distressed voice "He's not letting me turn it on!"

1311.   Matthew then started to say "It's night night time soon. He's still not letting me!" Angelina then tried to get up again to turn the light on and Matthew continued to get angry with her and said "Where are you going?! Ani! Ani! What did daddy say? About being a good girl? Okay? You stay in bed now and mommy is going to read you the story."

1312.   He continued to try to terrorize my child and force her to sit in the dark with all the blinds shut and the lights off while the sun was shining outside and watched her beg to be able to turn the light on. I said "Angelina, can you please turn the light on so that I can see your pretty face? I can't see you."

166

1313.   Angelina then started to get very upset and said, "He's not letting me!" I said, "He's not letting you turn the light on so I can see you?" She then said "No" and sounded like she was going to cry. Matthew then told her "She can see you fine." Angelina said to him "She can't see me!" I told her, "Angelina I can't see you. I want you to turn the light on so that we can read together."

1314.   She continued to get upset and sounded like she was going to cry. She has special needs a diagnosis of adjustment disorder and her therapist stated that she is having a hard time and needs to be seeing and speaking to me as much as possible. Matthew actively continued to try to psychologically abuse my daughter to try to hurt/intimidate/harass me and use coercive control to try to isolate me from my family member and interfere with my right to speak to her pursuant to the most recent civil family order. Angelina then sounded like she was crying.

1315.   Matthew then tried to rush Angelina off the phone and then spoke to me directly again on the phone and said, "She only has a couple more minutes left so she needs to hurry up and start reading." Angelina then again repeated what he said and said "dada said you need to hurry up and start reading." I said "Angelina, I want to see you. That's why I was trying to FaceTime you. That's why I'm trying to FaceTime you. I was trying to see you. I haven't FaceTimed or seen your pretty face in all of these days and I can't see you. It's just a shadow." I then said "Angelina, can you please turn the light on?"

1316.   I then told her I would call her back. I then tried to call Angelina back again on FaceTime. I said "Angelina, are you going to turn the light on?" she was already upset and saying that the book I was holding was the wrong book, and Matthew continued to try to speak to her in the background and interfere in the call.

1317.   I said "Turn the light on so I can see you. Can you please turn the light on so I can see your pretty face, I haven't seen you in all these days." I said "Angelina, can you please turn the light on? I want to see your pretty face." Angelina then continued to get upset and almost cry and said "He, He is not going to let me!" I said "Why not? He's not letting you turn the light on so mommy can see you? Please turn the light on so I can see you." She sounded distressed and in pain and

said "I can't!" Matthew immediately interfered again and said "Nope! You know the rules. No lights. It's night night time." I then said "Angelina, it is not even dark out yet."

1318.    She said to Matthew "Yeah, it's not even dark out yet!" Matthew then said to her "Ani bear, what did I say!? Get back in this bed now! You need to be a good girl. We are ready for bed." Angelina sounded distressed as if he was trying to restrain her. I said "Angelina, you can turn the light on, it's fine." She then said "he's not letting me!" and continued to get more upset.

1319.    I said "just turn it on, it's fine, I'm gonna talk to you and see your face and see your beautiful face." She then said "Okay, I will try one more time." Matthew then immediately stopped her again from turning the light on and started to threaten her and said "You are going to get in trouble if you do that." I said to her "You are not going to get in trouble." Angelina then almost started crying and said "I don't want to get in trouble."

1320.    She sounded scared and terrified of Matthew. I said "You're not gonna get in trouble. Just turn the light on so I can see you. Daddy has to let me see you." Angelina then tried to get up again to turn on the light, and Matthew again restrained her, held her down, and said "Ani, what did daddy say?" Angelina continued to get upset.

1321.    He then said to her again "What did daddy say?" Angelina seemed terrified at this point and I said to her, "It's okay. You don't have to be scared of daddy Angelina. You can turn the light on." Angelina then tried to get up again to turn on the light and Matthew yelled at her and said, "Hello?! Ani?! In this bed now!" I said "Don't be scared of daddy. It's okay." She then said "He tried to—" and Matthew immediately interrupted her and cut her off and started talking about me to her and said "I don't know why she is trying to confuse you." Angelina then started to cry and said to him, "No you are making me cry!" She became very upset. Matthew then said "I know. Well, because she is trying to confuse you. When daddy tells you to leave the light off, you need to leave the light off." I said, "Angelina, just turn the light on so mommy can see your face. There is nothing wrong with mommy seeing you."

1322. Matthew continued to tell her "no" in the background and interfere with my ability to see my daughter's face on the FaceTime. Angelina then started crying and sounded distraught and in pain and said "Ow! He is holding me!" He was holding her back and physically restraining her so that she was unable to get up and turn the light on. I said "He's holding you? Is he hurting you?"

1323. She then said "I am just trying to turn the light on." I then said, "Angelina, please turn the light on so that I can see you. I want to see your pretty face." Matthew then continued to restrain and hold Angelina back as she continued to make sounds as if she was in pain. Matthew then said "Okay she is either going to read you a story or we are just going to bed." Angelina sounded extremely distraught. I then said "Okay, mommy is going to call a police man to come and check on you."

1324. At that point, I hung up and called the Waterbury Police department and requested that they conduct a wellness check as I was concerned that Matthew was unlawfully restraining Angelina and causing her physical and psychological abuse by his actions.

1325. A police report was made. I was concerned that Matthew was trying to also conceal potential signs of abuse by refusing to allow me to see my daughter on camera and refusing to allow me to see her face. (See recorded calls from 6/23/23; See also OurFamilyWizard messages from 6/23/23; Sec also police report Waterbury Police Department from 6/23/23)

1326. At 7:44PM, after having called the Waterbury Police Department and asked for a wellness check on Angelina, I tried to call again with another FaceTime to see if I could see Angelina and speak to her. Matthew answered the call, but he still would not turn the light on. I asked Angelina again if she could turn the light on so that I could see her, and she said "No dada. It's not staying open."

1327. I said "Angelina can you turn the light on so I can see you?" Angelina then says, "he is trying to take the window open" referring to Matthew who was attempting to move the blinds slightly a tiny bit so that the smallest amount of light came in through the window. When the smallest sliver of light came in from the window, Matthew then said "Okay that's good."

1328. He refused to turn the light on in the bedroom and insisted on letting just a tiny bit of light come in through the shade and forced Angelina to remain in the dark throughout the duration of the call. (See video of FaceTime call from 6/23/23; See also live photos taken during FaceTime call; See also OurFamilyWizard messages from 6/23/23)

1329. I then said, "Why can't you turn the light on? Is there a light there? I can't see you like that, it's too dark." Matthew then began to immediately interfere again and says to Angelina after she tried to ask him to turn the light on, "Just let her read you a book. I gotta leave in five minutes." Angelina then said that Matthew had to "go pick up Dom from work." I said, "Well mommy is trying to see you. Can you turn the light on?"

1330. She then looked at Matthew again and he tried to have third-party contact with me again and tried to interfere with my ability to have a FaceTime call and speak to my child, and he instructed her to say, "Tell her it's late, it's night time, and you're not turning on the light." Angelina then sounded upset again as she sat there in the dark. She said "It's late and it's nighttime now and I'm not turning the light off."

1331. She sounded distressed and upset. At this point I felt that he was clearly trying to have contact with others to try to alarm/annoy me and third-party contact with my child, so I said to Angelina, "Daddy should not be telling you to tell me things. Daddy can't tell you to tell me things." Matthew then spoke to me directly on the phone again and said, "Why do you keep doing this? Like, just read her the story."

1332. I said, "Angelina, can you please turn the light on? I really want to see you." Angelina said "Okay." Matthew then tried to interfere, have third-party contact, and speak to others to cause me annoyance and alarm, after I just said he can not use her as a third-party, he not only spoke to me directly seconds after, but then had third-party contact again. He then said to Angelina, "Ask her if she is going to read you the story or not. Otherwise, I gotta hang up." I then showed Angelina one of her toys that was in the room. I said "Are you going to turn the light on so that I can see your pretty face? I miss you!"

1333.  She then looked at Matthew again who was in the bed next to her in the room. She then looked at him, then looked at me, then said "Okay, I'll try to turn it on." and tried to get up. I said, "Try to turn it on." Matthew then turned the camera so that it was facing him and looked directly at me, held her down and said "Just…" and put his hand on her stomach to stop her from getting up. (See live videos taken from FaceTime on 6/23/23; See also video taken from FaceTime call on 6/23/23; See also WPD report from 6/23/23; See also OFW communications from 6/23/23)

1334.  Angelina then looked at him, the smile faded off her face, she looked uncomfortable, and then he said "…read a story." Angelina then was distracted because she noticed I took live photos and after posing for a few photos, she said "Can I see the picture you took?" I told Angelina that she looked so beautiful and asked her what kind of dress she was wearing. Matthew then tried to tell her what to say again and said, "It's a seashell dress."

1335.  I then started reading a story to Angelina for a few minutes that she said that she was looking forward to us reading together. It was one of the books that I got her for her birthday. I started to read the story to her, and Angelina was enjoying the story and laughing and smiling. Matthew then interfered with me during the call. Angelina and I didn't even get to finish reading the short "5-minute story" because Matthew then tried to end the call after only a few minutes and said to her "Tell her that you have to read the rest of the story tomorrow."

1336.  Angelina then, after Matthew tried to have third-party contact with me through her, said to. Me "I'm gonna have to read it tomorrow." I said, "Why?" Angelina said "Because, he has to go now!" I said "I wanna the story so can somebody else read it with you? Who is with you?" Angelina then said "There's no time." I said, "No time for what? Are you going to be by yourself?" She then said "Um, no. Mema and Sal and Dom and grandpa are going to be with me." I then said, "okay, so then why can't one of them just hold the phone for you?" Matthew then told her "say because daddy has to take his phone" She then said, "Because daddy has to take his phone."

1337. I then said, "Why? He has 2 phones." Matthew then continued to have third-party phone contact with me through Angelina and said "Okay Just say goodnight.You have to say goodnight now, ok? Tell her she can call again tomorrow." Angelina then said "You can call again tomorrow." See live videos taken from FaceTime on 6/23/23; See also video taken from FaceTime call on 6/23/23; See also WPD report from 6/23/23; See also OFW communications from 6/23/23)

1338. Matthew's behavior was extremely abusive and alarming. He repeatedly spoke to me on the phone in direct violation of the protective order, was abusive toward my daughter, and was abusive and harassing toward me. The fact that he didn't allow me to reasonably speak to my child on the Facetime call is harassment and interference.

1339. Matthew was very upset that I had turned my camera off the night before because he is obsessed with staring at me on camera. It sounded like he was hitting/restraining Angelina during the call and she complained about abdominal/stomach pain, as well.

1340. Matthew's restraining/holding back of Angelina is unlawful and he was being forceful and abusive with her. She wanted to have a normal Facetime and he didn't allow it and he caused her to become very upset. He also instructed her to lie when she told me that she didn't have a toothbrush there. Matthew does not have his children brush their teeth, he does not take care of her hygiene needs either. (See videos from 6/23/23)

1341.

1342. On 6/24/23, Matthew interfered with me and refused to allow me access/visitation with my child, intimidated me, and had third-party contact during the call. He also threatened and harassed me. I have all the screenshots, phone records, messages, and recordings as evidence.

1343. On 6/24/23, Matthew violated the protective order by interfering with me and refusing to allow me court ordered access/visitation with my daughter. After having messaged him in the app 12 hours prior and receiving no response, I messaged him again at 8:29AM and said "I told you 12 hours ago that I want to

spend the day with Angelina today and you read my message and ignored it. What time can you bring her?"

1344. He ignored my message after reading it. 7 hours later, at 3:04PM, I messaged him again and said "Hello??? Are you denying me access to her again???" He did not respond. This was 9 days after the judge told him that he was required to make a schedule and could not prevent me from seeing my child. He did not allow me to see the child for the entire day. Then, he finally allowed me to FaceTime my daughter at 8:00PM.

1345. During the call, my child stated that she was begging Matthew to see me all day. She brought up that she asked him repeatedly to see me that day and said that he did not allow her to see me.

1346. This is interfering with my right to see my child, and causing both me and her undue stress and inconvenience, and proof that he is isolating me from her when both her and I want to see each other, and the court order says Matthew needs to allow it. During the FaceTime call, Matthew also sat directly behind Angelina and was looking at me and giving me dirty looks to try to intimidate me during the call. He then tried to end the call very fast and told the child that she had to "say bye."

1347. At 7:12PM, Matthew messaged me and said, "See attached."

1348. Matthew then tried to harass me and threaten me and messaged me immediately after the call at 8:13PM and said "Please stop telling Angelina that you are seeing her tomorrow when we haven't discussed any terms of that. Please stop telling Angelina that you were trying to see her all day but I kept her from you. It only confuses her. If you say those things again on the phone to her I'm going to have to terminate the call. Thank you for your understanding."

1349. I then messaged him in the app at 8:14PM and said "Angelina just said that she begged to see me all day today. I also messaged you all day asking to see her. You did not open any of my messages. I want to see her. Why are you not allowing me to see her? What time can I see her tomorrow?"

1350. Matthew viewed my message, read it, and said nothing. I then replied to his message at 8:16PM and said "You are violating the protective order and violating

the orders that state that you need to allow me to see her and that you need to be making a schedule for me to see her. I messaged you repeatedly today asking to see her and you ignored all of my messages. I have this all documented as a violation. You are now threatening to interfere with my right to speak to Angelina and see her. This is intimidation, harassment, and you are also psychologically damaging our child and traumatizing her. Please let me know what time I can see her tomorrow. You heard her state that she begged you to see me today repeatedly and you told her no. That is wrong, and only a cruel person and sociopath could work this hard to keep a little girl away from her mother."

1351.   Matthew did not respond. I then sent Matthew another message in the app at 8:21PM and said "I am warning you now that if you do not stop threatening to keep Angelina away, and if you don't stop threatening to terminate visitation and phone calls with Angelina, then I will be making a complaint against you."

1352.   He did this to interfere with my right to see my daughter pursuant to the most recent civil family order. (See OurFamilyWizard messages from 6/24/23; See also recorded FaceTime call from 6/24/23)

1353.

1354.   On 6/25/23, Matthew interfered with me and my ability to see my child or speak to my child pursuant to the most recent family orders. He also harassed me and abused me with parental alienation. I have all the screenshots, phone records, messages, and recordings as evidence.

1355.   Matthew violated the protective order by interfering with my ability to see my daughter pursuant to the most recent family order. He did not answer any of my messages from the night before when I was trying to see the child.

1356.   I messaged him at 7:19AM and said "What time can I see Angelina today????"

1357.   Matthew continued to harass me and interfere with me and read my message and did not respond.

1358.   At 10:15AM, after three hours without a response, I messaged Matthew again in the app and said "Angelina has been begging to see me and I've asked you

every day to let me see her. She said she wanted to see me today. Why are you denying me access to her? You are ordered to let me see her."

1359.  Matthew responded to me at 10:38AM and said, "No one is keeping her from you…see attached. Let me know what your intentions and plan is and I will see if I can accommodate."

1360.  I replied to him at 12:17PM and said, "I asked to see Angelina every day this week and you refused to let me. I would like to come get her now. Where is she? Can you bring her to me?"

1361.  Matthew continued to harass me and interfere with me and read my message and did not respond. (See OurFamilyWizard messages from 6/25/23)

1362.  I then messaged him again at 2:27PM, after he read my messages and then ignored me for several hours, and said "Hello???? Why aren't you responding? You read my messages 2 hours ago and now aren't replying?? This is harassment and interference."

1363.  Then, at 2:51, Matthew replied and lied in the app and said "I have responded to every message. I told you. The parameters of the visit need to be discussed with the supervisor and myself, and we need to plan for exact times for when pick up and drop off will be. Due to the issues we had last time of you not returning her, kept her overnight, until the police were called and you brought her to the doctors office against the court order. I also would like plans to be made ahead of time and not last minute. I'm not going to keep responding to the messages over and over again with the same response. Let me know when you have the supervisor and their availability and then have them call me."

1364.  Everything he said was said to try to gaslight and harass me further and was all based on lies. He did not respond to every message. Nothing in the court order says that "parameters of the visit need to be discussed with the supervisor and myself" and there were no issues of me not returning her, in fact he actually refused to pick her up.

1365.  We waited over an hour and messaged him repeatedly to pick her up and he refused. He also told the police that he was unwilling to go get the child and

demanded that I bring her to his house the next day and claimed he would not be "willing" to pick her up.

1366. There is also nothing in the order that says that she is not allowed to go to a doctor's office with me. I tried to make messages ahead of time on multiple occasions, and he keeps not answering and reading my messages and not responding.

1367. Rather than communicating with me in the OurFamilyWizard app to discuss visitation and affairs of our child, he instead uses it to harass me, threaten me, interfere with me, cause me undue stress, and gaslight me.

1368. I replied to him at 3:51PM and said "I have asked every day to see her and you didn't reply to a single message. Can I see her now? You are supposed to provide a supervisor. If you are refusing to do that I can provide one. What time can you drop her off to us?"

1369. At 4:19PM, Matthew then said "My mother and or stepfather would be willing to supervise a visit maybe at the park. Today it's a little late now. Potentially tomorrow or Tuesday as long as you schedule with me. I have no one else around willing to supervise your visit."

1370. At 7:11PM, I replied and said "Can they bring her to us then since you never did any transportation in over a month? And I want to speak to Angelina. What days and times can I see her this week? You say you don't want to let things know last minute but you're telling me maybe the next day. I need to know which five days I would be able to see her this coming week."

1371. Matthew continued to try to interfere with my ability to see my child and make it virtually impossible for me to see her and at 7:19PM he said "No. Tell me your availability and I will check with them."

1372. When Matthew finally allowed me to speak to Angelina that night, he forced her to end the call early and told her to "say bye" and then hung up. (See recorded call from 6/25/23; See also OurFamilyWizard messages from 6/25/23)

1373.

1374. On 6/26/23, Matthew interfered with my ability to see or speak to my child pursuant to the most recent civil family order, interfered during my phone call

with my daughter, and had third-party contact with my child. He also repeatedly tried to FaceTime me when it was unsolicited and had contact with others to cause me annoyance/alarm. I have all the screenshots, phone records, messages, and recordings as evidence.

1375.   Matthew violated the protective order by continuing to interfere with my ability to see my daughter. He also tried to interfere with the phone calls again.

1376.   He messaged me in the app at 9:23AM and said "Angelina wants to call you."

1377.   I did not get the message right away.

1378.   At 9:44AM, I messaged him back and said, "I have told you i was available every single day. So youre refusing to give me access to angelina? I hope you know that legal action has been initiated and you are going to suffer repercussions for this as will anyone else involved."

1379.   Matthew continued to interfere with me and harass me by reading my messages and saying nothing.

1380.   At 9:44AM, I messaged him again and said, "I want to see my daughter. It has been a week of her and me begging you to let me see her. What time can i see her today????"

1381.   Matthew continued to interfere with me and harass me by reading my messages and saying nothing.

1382.   At 9:45AM, I messaged him again and said, "So then have her call me. Not sure why you havent purchased her a phone yet. Maybe you can buy her one like you did for both of your sons."

1383.   He then FaceTimed me at 9:46AM and I did not answer the call as I was unable to take a FaceTime at that moment.

1384.   I called back as a regular call at 9:48AM, 2 minutes later, and tried to speak to my daughter.

1385.   During the call, Matthew kept trying to interfere in the conversation. I called and he started by having direct contact with me and speaking to me directly and saying "What?" I then tried to talk to my daughter and said "Angelina, you said you wanted to call me?" and she said "yeah." She said she was playing a game

177

and when I asked her what game it was she said "I showed you last time, remember?" I said "yeah?"

1386.   Matthew then immediately tried to interfere and have third-party contact and said "Say it's your Frozen game." I asked her what she said and she said "It's like frozen."

1387.   Then Matthew continued to have third-party contact and instruct her what to say and interfere and said, "Say it's like CandyLand but it's a Frozen game." At this point, I got upset that Matthew kept doing this every time I tried to speak to my daughter and I told Angelina to call me back later when she could actually talk without him interfering. (See recorded call from 6/26/23)

1388.   Matthew then continued to interfere with my ability to see my child and refused to allow me to exchange the child with him pursuant to the most recent order.

1389.   Matthew continued to interfere with my ability to see my child and refused to allow me to exchange the child with him pursuant to the most recent order and ignored me after reading all my messages.

1390.   I then messaged Matthew again at 9:51AM, after he tried to interfere with the call, and said, "You keep trying to FaceTime me every day and then during the call you interfere and try to talk to me and use Angelina as a third party and say "tell mommy this." STOP doing that. I want to talk to Angelina. Have HER call me when you aren't going to interfere with the whole conversation when there's a full no contact. I want to talk to her not you. You don't even let her answer me and you speak directly to me and hijack the conversation. She can call me back to speak to me and everyone else who wants to see her right now."

1391.   Matthew interfered again and ignored my message.

1392.   Then, at 9:52AM, after seeing he interfered and viewed my message about visiting Angelina and ignored me, I messaged him in the app and said "So, you're just going to open each message, time stamp that you read it, and then ignore me??"

1393.   Matthew continued to harass me through his interference and continued to open, read, and then ignore my messages.

1394.  Matthew continued to interfere with me. I then said "So, you're not going to answer me???" He ignored my messages for the entire day in the app.

1395.  At 9:52AM, I messaged him again in the app and said, "So youre just going to open each message, time stamp that you read it, and then ignore me ???"

1396.  Matthew interfered again and ignored my message.

1397.  Matthew violated the no-contact order by calling me directly on my phone on 2 different occasions with an unsolicited FaceTime call without me requesting one.

1398.  I messaged him in the OurFamilyWizard app at 5:41PM and said "Is there a reason why you keep reading all of my messages in the app and ignoring them but you keep randomly trying to FaceTime me all day? This is harassment. You keep speaking to me on all of the FaceTime calls as well. You are court ordered to solely communicate to me in this app. You read every one of my messages, but you keep FaceTiming me and you don't communicate with me at all on the app. Why do you keep harassing me like this? Anything you need to say needs to be said in the app. I asked repeatedly to see Angelina today and you ignored all of my requests. Is there a reason why you're refusing to allow me to see her today?"

1399.  Matthew interfered again and ignored my message.

1400.  At 5:42PM, I also sent him another message and said "I received two unsolicited FaceTime calls from you today. I told you previously not to FaceTime me when it is unsolicited. I never requested for you to FaceTime me, and in fact, the order states that you must only contact me in this app. I will be reporting this to the police."

1401.  Matthew interfered again and ignored my message.

1402.  At 5:43PM, I messaged him again and said, "???? I want to see my daughter. You've not allowed me to see her in over a week. You are in violation of multiple court orders by doing this. I want to see her now. Stop withholding her from me. This is domestic violence and abuse."

1403.  Matthew then tried to blame the 2 FaceTime calls on Angelina, and said "Angelina called you. She was asking to FT you. FT her if you are available."

1404. At 5:45PM, I replied by saying, "Nowhere in the protective order do you have the right to FaceTime me unsolicited. Angelina is four years old and she does not have a phone. She is restricted to what you allow. You are the one who FaceTimed me both times today. Angelina does not have an iPhone and does not have the ability to initiate FaceTimes. This is harassment. I am not available to FaceTime her. I'm available to come see her and would like to do so. Are you going to keep denying me that access? Because refusing to exchange her with me, is also in violation of the protective order. If I do not get to see her today, I will be making a police report."

1405. Then, I messaged him again at 5:46PM and said "This is the sixth day in a row that I asked to see Angelina that you refused to allow me access to her. Why are you denying me access to my child? This is psychological abuse."

1406. At 6:21PM, he still had not replied to me regarding allowing me to see my child, and I messaged him again saying "Hello??"

1407. He read each of my messages and did not reply. This is interfering with me and refusing to allow me to see and speak to my child as the order allows. Matthew then had additional contact with others to cause me annoyance/alarm by contacting my ex-boyfriend and father of my 8.5-year-old child Gerald Viglione and telling him that I lost custody of Angelina.

1408. Gerald then proceeded to harass me and sent me several harassing messages on 6/26/23 in which he said "Don't fucking call my phone again this is why there's a court app right Monday Wednesday Friday I will not pick up the phone. Do what you need to Theo let's see how far you get with that one you already lost one kid wanna go to 2 loser."

1409. Matthew called my ex Gerald Viglione and communicated with him that I lost custody of Angelina in an effort to cause me alarm and annoyance and to try to denigrate and disparage me to my ex who has a long history of violence. I feel that Matthew intentionally did this to try to harm me and to create more issues for me.

1410. Gerald then insinuated that, based on his conversation with Matthew, that he felt that he could do whatever he wanted with no penalty and continue to abuse me.

1411. He said "Do what you need to do Theo, I'm sure the judges would love to see you in court again."

1412. This is him insinuating that he is aware that Matthew has a connection to the judge and that he feels he can now be abusive and threaten me with legal abuse after being called by Matthew and informed to do so by Matthew. (See Talking parents messages with Gerald Viglione from 6/26/23) See OurFamilyWizard communications from 6/26/23; See also call logs from 6/26/23)

1413. Matthew finally allowed me to speak to my daughter that evening, and during the call, had contact with my daughter to try to cause me annoyance/alarm by telling her that he "couldn't say his password out lout because he doesn't want to say it when mommy is on the phone." (See recorded call from 6/26/23)

1414.

1415. On 6/27/23, Matthew interfered with me and refused to allow me access to see or speak to my child. I have all the screenshots, phone records, messages, and recordings as evidence. (See phone call from today)

1416. Matthew refused to exchange the child pursuant to the most recent civil family order and interfered with my right to see my daughter. He did not allow me to see my child for 8 days prior to this day, despite both of us asking daily to see each other. The judge told him on 6/15/23 that he needs to let me see Angelina regularly and with a schedule. He has refused to do this.

1417. Matthew continued to interfere with my ability to see my daughter.

1418. I messaged him at 9:25AM, after he read all my messages from the night before and never replied, and said, "Hello?? I've asked repeatedly to see Angelina for the last 8 days and you have denied me access. I want to see her today with my cousin. Can we see her now?"

1419. Matthew replied and said, "Who is the cousin who will be supervising. Please have them contact me so that I may make arrangements for the parameters of the visit due to the issues we had last time."

1420.  Matthew comments were a form of harassment and interference. The comments in which he claimed that there were "issues last time" were further interference with my ability to see my child.

1421.  At 12:10PM, I replied and said "There were no issues. Anything needs to be in writing per court order and per my attorney. They have a copy of the order and there is nothing more that you need to say. You can say it here and I can share it with them. What time can I see my daughter?"

1422.  Matthew continued to interfere by refusing to give me an answer to my question about what time I could see my child. At 1:56PM, he replied and said "As I said I'm not just going to let some person I don't know, haven't talked to nor ever met supervise your visit. If you want to see her you need to meet my parameters. We can discuss the plan on here so everything is recorded, but I will want to speak to this person before."

1423.  Matthew intentionally refused to answer my question about what time I could see Angelina and did so to harass me by refusing to answer me. This resulted in me being unable to see my daughter. He also intentionally waits hours to respond and sometimes does not respond at all.

1424.  At 4:19PM, I responded and said "You said the same thing last time and it was somebody that you knew. You also know her as well. You met her several times. You keep saying these lies to try to gaslight me. You can speak to everybody in writing, and you will not be speaking to anybody on the phone anymore as you sexually harass them and threaten them every time. When can I see Angelina? Me and my supervisor have been waiting al day for you to respond. Let me know now. I want to see Angelina. You have not allowed me to see her for eight days." (See OurFamilyWizard messages from 6/27/23)

1425.  Matthew then interfered and read my message and did not respond.

1426.  At 7:00PM, I messaged him in the app again and said "Why are you not allowing me to Facetime or see Angelina? You ignored my call." Matthew then interfered and read my message and did not respond.

1427.  At 7:06PM, I messaged him again and said "I just tried to FaceTime Angelina 3 times and tried to call twice. You ignored all of my calls. You also ignored all of

my requests to see her today, as well. I want to speak to Angelina and see her. If I don't get a call by 8pm I will be calling for a wellness check." Matthew continued to interfere and read the message and did not respond.

1428.   At 7:27PM, I messaged him again and said "????"

1429.   Matthew continued to interfere and read the message and did not respond. He then did not allow me to see her or talk to her all day until almost 8:00PM when he finally allowed me to FaceTime her.

1430.   During the call, she stated that they were going to Target. It was difficult to talk to her while she was in the store. I asked her to "Please call me back when you get back home from Target so we can finish talking." She said she would, and I told her "Don't forget." She promised that she would not forget.

1431.   Matthew then interfered with my right to speak to my child and never allowed Angelina to call me back that night and did not respond to any of my messages in the app in which I asked him to let me speak to her. Matthew read all of the messages and ignored them all. (See recorded call from 6/27/23 & See OurFamilyWizard communications from 6/27/23)

1432.   Matthew finally called back at 8:00PM and let me speak to Angelina after refusing to let me see or speak to her for the entire day. My daughter stated she was left alone at his ex-wife Monica Perez's house for the entire day. He intentionally withheld her from me and did not allow me to have visitation with her or to speak to her for the entire day while she was at his ex-wife's house, and thus interfered with my ability to see my child per the agreement.

1433.

1434.   On 6/28/23, Matthew interfered with me and refused to allow me access to see or speak to my child. I have all the screenshots, phone records, messages, and recordings as evidence. Matthew also was not with Angelina for the majority of the day and left her with other people while simultaneously denying me any access with her.

1435.   At 8:38Am, I messaged him in the app and said, "It is now been nine days since you've allowed me access to Angelina. If you do not let me see her today I will be filing an emergency relief application TODAY and filing a restraining

order against you and your mother and alcoholic addict boyfriend that lives with her. Let me know no later than 12 PM what time I can get Angelina today. If I don't get a time that I can see my daughter, I will be filing that immediately today and I will also be taking legal action against you and your company and your ex-wife and her children as well for all of the pain and suffering you've caused us.

1436.  Matthew continued to interfere with me and harass me by reading my message and saying nothing.

1437.  At 11:48AM, I messaged him again and said, "It has been 3 hours and you have not responded. I assume the only way you will follow the order to let me see and speak to angina is if we push with further legal action. I am very disappointed that you are neglecting and abusing our child and isolating her."

1438.  Matthew interfered again and ignored my message.

1439.  At 7:00PM, I messaged him in the app and said, "You have not let me see Angelina in 10 days and you have not let me speak to her in 24 hours. I'm extremely concerned because I was promised that she would call me when she got home last night and I never heard back from her and you haven't responded to any of my messages or calls all day so I'm afraid that maybe something happened to her. If I don't get a phone call in the next 20 minutes I will be calling the police to do a wellness check. I'm concerned that maybe Angelina never even made it back last night."

1440.  Matthew continued to interfere with my ability to see and speak to my child and did not respond.

1441.  At 7:33PM, I messaged him again and said, "Why are you ignoring all of my messages in the app and refusing to let me see or speak to Angelina?"

1442.  Matthew interfered again and ignored my message.

1443.

1444.  On 6/29/23, Matthew interfered with me and refused to allow me access to see or speak to my child. He then let me speak to the child later in the day, and interfered with the call, had third party contact, and had contact with others to cause me annoyance and alarm. I have all the screenshots, phone records, messages, and recordings as evidence.

1445.   Matthew did not allow me to speak to or see my child for the entire day. The police were called after several hours of him reading my messages and ignoring them. The case number is 23-58486. The officer who responded was T. Gonzalez. He sent a link for evidence but the link expired before I had a chance to upload everything. He told me to follow up with the detective bureau about getting a warrant issued.

1446.   At 8:53AM, I messaged him in the app and said, "It has been 10 days since i saw angelina. This is intentional infliction of emotional distress, violation of court order and protection order. My cousin keti and i want to see angelina today. She wants to see us. What time can you drop her off to us ? Please dont view the message and ignore it like you have done as this is abuse and you are going to be penalized if you keep doing this."

1447.   Matthew interfered again and ignored my message.

1448.   At 12:03PM, I messaged him in the app and said "I have sent you hundreds of messages asking to see Angelina and you ignored all of them. I tried to FaceTime and call and you ignored my calls as well. I'm extremely concerned for Angelina and will be calling for a wellness check if I don't get a phone call or get the ability to see her today. I need a phone call from her in the next 10 minutes."

1449.   Matthew continued to interfere with my ability to see and speak to my child and did not respond.

1450.   At 5:04PM, I messaged him and said "You have not responded to any of my messages in the app in over two days. Nobody in your family is allowing me to speak to Angelina either even though the protective order says you need to allow that and the family order says that you need to let me Facetime and call her and see her. I don't know where Angelina is, who she is with, or if she's safe. Why are you ignoring all of my messages after you open them and read them? I want to see Angelina. It has been 11 days. What kind of an evil person works this hard to keep away a little girl from a loving mother? Angelina needs her mother. What you are doing is abuse and harassment and a violation of the protective order and the family order." (See OurFamilyWizard messages from 6/29/23)

1451.   Matthew continued to interfere with my ability to see and speak to my child and did not respond.

1452.   After not hearing back from Matthew all day, I called my former boss John Casanova who also used to be Matthew's boss to ask if he could help assist me try to see my child since Matthew was ignoring me for days.

1453.   John reached out to Matthew via text and Matthew began to have contact with him that would likely cause me annoyance/alarm by lying to him and telling him things that were untrue.

1454.   At 6:28PM, I messaged him again and said, "Hello why are you ignoring me ??? This is parental alienation and abuse."

1455.   Matthew continued to interfere with my ability to see and speak to my child and did not respond.

1456.   At 7:36PM, I messaged him again and said, "I called 4x today and never got a reply. Nobody knows where you or angelina is. I am very concerned and if she doesnt call me by 8 ill be caling the police."

1457.   Matthew continued to interfere with my ability to see and speak to my child and did not respond.

1458.   At 8:05PM, Matthew messaged John and said "She messed up on the last visit and broke all the rules of the court order. So now she has to follow strict guidelines and she doesn't want to."

1459.   This caused me annoyance and alarm because I did not break any "rules of the court order" whatsoever. There is also nothing that states that I need to follow any "strict guidelines" and this is just him trying to exert control over me and cause me annoyance.

1460.   Matthew then continued to have contact with him that would likely cause me annoyance/alarm by saying to John "She knows this, I already told her plenty of times in the app. I told her she needs to make exact plans based on her availability, and she needs to have the person who will be supervising the visit talk to me before the visit starts so we can discuss strict parameters."

1461. This caused me annoyance and alarm because I had been attempting to contact him every day to set up visitation for days and he had ignored all of my messages in the app.

1462. After refusing to let me speak to Angelina, Matthew finally allowed me to Facetime her that night. Angelina sounded upset and distraught during the call. Shortly after the call began, Matthew interfered with my right to speak to my daughter and abruptly ended the call.

1463. At 8:16PM, I messaged him again and said, "You say we can discuss the plan on here, but when I message you every day, you read my messages and ignore me ? The court order says you have to let me see and speak to her. Why are you trying to keep Angelina away?"

1464. Matthew continued to interfere with my ability to see and speak to my child and did not respond.

1465. At 8:35PM, I messaged Matthew in the OurFamilyWizard app and said "You have no right to hang up on me and not let me see or speak to Angelina. I'll be calling the police and asking them to do a wellness check since she was just distraught." (See OurFamilyWizard messages from 6/29/23)

1466. Matthew continued to interfere with my ability to see and speak to my child and did not respond.

1467. At 8:45PM, I messaged him again and said, "I just tried to speak to Angelina and you took the phone from her when she said that she wants to see me you put it so that it was facing you, stared at me, put it on mute and told her that I was not following the rules and that that's why she's not allowed to see me? You are not allowed to say things like that to Angelina and this is child abuse. I'm calling the police and this is unacceptable. I want to see Angelina. I have all the screenshots of me, asking to see her every day and you ignoring my requests. I want to see her now. You just said on the phone that I could see her anytime I want then why is it that every time I ask you you're not allowing it? And what rules did I not follow? What type of rules are you referring to because There's no rules that you set for me. You are required to let me see Angelina and give me a schedule and you refuse to do that. You left her with your ex-wife all day and you didn't even let me

see her in almost 2 weeks. I want to see Angelina. This is abuse. I want to see her tomorrow. Why are you keeping her from me? You said I could see her anytime I want I ask every day and you keep refusing. Does Monica know that you took all of these videos of her while you were having sex and she was unaware? Does she know you filmed her having sex in a car in front of sal? Do any of the women who you secretly recorded having sex in your old room know that you did? You are a sex offender and an abuser."

1468.   Matthew continued to interfere with my ability to see and speak to my child and did not respond.

1469.   At 8:46PM, I messaged him again and said, "If I don't get a FaceTime from Angelina in the next 10 minutes, I will be calling the police."

1470.   Matthew continued to interfere with my ability to see and speak to my child and did not respond.

1471.   At 8:59PM, I messaged him again and said, "Angelina said she wants to see me and courtney and alex and julianna tomorrow. We havent seen her in almost 2 weeks. You told her i could see her "any time i want". I want to come get her at 9am. Where will she be ? If i dont get a reply i will be calling the police for interference."

1472.   Matthew continued to interfere with my ability to see and speak to my child and did not respond.

1473.   Matthew's interference was in direct violation of the protective order. I attempted to Facetime him and call him multiple times throughout the day in order to speak to my child and all of my attempts went unanswered. (See videos from 6/29/23)

1474.   The police went to his mother's house to conduct a wellness check and stated that Karen Bowers opened the door and was extremely rude to the officer. Matthew also did not answer the phone for the officer and the officer said Karen was extremely rude to him. (See Waterbury pd case # 23-58486)

1475.

1476.   On 6/30/23, Matthew interfered with me and refused to allow me access to see or speak to my child. He also had contact with others to cause me annoyance and

alarm. I have all the screenshots, phone records, messages, and recordings as evidence.

1477.  Matthew was interfering by refusing to allow me to speak to my child.

1478.  At 8:57AM, I messaged him in the app and said, "I messaged you multiple times stating that I had multiple different people willing to come with me and that I wanted to see Angelina today. What time can you drop her off? If I don't get a response by 9:30AM I'll be going down to the Waterbury Police Department. What you are doing is abuse. You cannot keep her away from me. What time can I see her?"

1479.  Matthew continued to interfere with my ability to see and speak to my child and did not respond.

1480.  At 9:52AM, after attempting to make plans and arrangements with a supervisor to see my child, I messaged Matthew again in the app and said "I am on my way now to get Angelina. Please make sure she is ready."

1481.  At 10:17AM, Matthew then tried to interfere with my ability to see and speak to my child and harass me and responded and said "I will allow a two hour visit and you will stay in this area. A two hour visit will be from when you pick her up. You need to discuss a specific time with me. Also, please have the supervisor call me before arriving. You are not to come to the house, unless these parameters are met."

1482.  Matthew's statements that I could only have 2 hours with my child including the transportation and travel time was unacceptable, abusive, and an attempt to isolate me further from my daughter.

1483.  Matthew's demands that "You will stay in this area" are also more evidence of his coercive control and attempts to regulate my movements.

1484.  At 10:48AM, I responded and said "Two hours including time for us to pick her up and drop her back off if you are refusing to do any of the transportation does not give me enough time. You were ordered by a judge to give me a schedule. When we go to court on Monday, this will not look good for you. You were told to give me a regular schedule and you heard Angelina's doctor saying she has special needs and needs to see me as much as possible. Courtney will text

you now. If you continue to be abusive like this, the courts will not look favorably upon you." (See OurFamilyWizard messages from 6/30/23)

1485.   My friend Courtney Clay then started to text him directly to try to discuss the arrangements since he was demanding that they "call before arriving" and told me that we are "not to come to the house unless these parameters are met."

1486.   At 11:10AM, Courtney texted him and said, "Hi Matt, my name is Courtney Clay. My daughter is a classmate of Theodora's daughter Juliana and my children have known Angelina and Juliana for 3-4 years. Theodora is asking me to help supervise a visit today between her and Angelina and I am available from 1 PM forward after I finish my work. Would it be possible to do such a visit this afternoon? I am a mother of 2 children and understand the sensitivity of this issue and respect your agreement and custody so feel free to call if it is better. I am on a work a work call at 11:30 am."

1487.   Matthew then continued to interfere with my ability to see and speak to my child and have contact with others to cause me annoyance/alarm and replied with a long paragraph in which he made several untrue and disparaging statements to my friend to try to degrade and disparage me and cause me annoyance and alarm.

1488.   Matthew texted Courtney and said, "Ok Angelina usually naps between 12 and 3 I can put her in a little earlier and wake her up earlier. I am allowing a 2hour visit from 3pm to 5pm. There are strict parameters that Theodora must follow. She's not allowed to be alone with her for any reason at all, she also is not allowed to bring her to any doctor or appointments at all for any reason. Barring emergencies. Theodora is not allowed to say any disparaging comments to Angelina. Including disparaging comments about me. Angelina is to stay within this area so she's not too far away from the house. These parameters have to be met exactly. I would also like a call from you prior to arriving. Theodora is having a lot of issues right now so if you see those issues spilling over towards Angelina it is imperative that you step in to protect Angelina. She needs to be picked up from my house at 48 Corey Hill Rd., Waterbury, CT 06706. She also needs to be dropped off at the same address. I have full custody of Angelina, so whatever

Theodore says, contrary to what I say is not accurate. I have a proper documentation explaining so that I can forward to you."

1489.   Matthew's statements were made to cause me annoyance and alarm as he was attempted to embarrass, denigrate/disparage me to a close friend to try to turn them against me.

1490.   Matthew's statement that "there are strict parameters that Theodora must follow" are untrue. Him being given temporary sole legal and temporary sole physical custody did not grant him the right to impose any "strict parameters that I must follow".

1491.   Matthew's statements that I am "not allowed to be alone with her for any reason at all, not allowed to bring her to any doctor or appointments at all for any reason" are also false. Nothing in the order states anything about me not being able to take Angelina to appointments or doctors.

1492.   Matthew stating that "these parameters have to be met exactly. I would also like a call from you prior to arriving" are also indicative or his coercion and intimidation and attempt to cause me annoyance and alarm through his excessive contact with Courtney. Nowhere in the orders does it say anything about "strict parameters that have to be met exactly" and the order specifically states that "all arrangements must be made in writing" yet Matthew continued to ask for a call even after I told him repeatedly that things needed to be in writing per the court order.

1493.   Courtney responded to him and said, "Yes I will follow all of the parameters and put the safety of Angelina as a priority. We can pick her up at 3 PM and take Angelina to a park nearby if that is okay for you. She will not be left alone with Theodora. Theodora has forwarded me the court order and I will fully respect the parameters at all time. I can be available anytime after 12:30 for a phone call."

1494.   Matthew said "Okay." At 1:06PM, Courtney texted him again and said, "I'm all done with my work calls if you would like to talk by phone or I can plan on calling before arrival but would be with Theodora around 2 PM if we are arriving to pick up Angelina at 3 PM"

1495.   Matthew responded and said "Call on the way is fine."

1496. At 2:15PM, Courtney texted Matthew and said, "I am leaving shortly. I agreed to pick Angelina up and bring her to the park to see Theodora. Are you okay with that or do you prefer Theodora ride in the car with us? Is it Quarry Hill or Corey Hill?"

1497. Matthew allowed us to have a 2 hour visit in which we were only allowed to go to a park that was within 5 minutes of his mother's house. The park had no bathrooms and was littered with trash, yet we were forced to stay there because Matthew insisted that we needed to stay in the area and only gave us 2 hours including travel time, which did was extremely restrictive for no reason. Prior to the 2 hours he allowed on this day, I had not seen Angelina for a total of 11 days.

1498. When we went to bring Angelina back, Matthew wasn't even there. Angelina was brought back to Matthew's mother, who is the one who usually watches her 90% of the time while Matthew is too busy working and going out for social events.

1499. Angelina cried when we dropped her off and begged to stay with us longer and Matthew was not even there.

1500. Later that evening, at 7:38PM, I messaged him in the app and said, "I want to speak to Angelina on FaceTime."

1501. Matthew continued to interfere with my ability to see and speak to my child and read my message and did not respond. (See OurFamilyWizard messages from 6/30/23)

1502. At 8:27PM, I messaged him in the app again and said, "Can you have her FaceTime me please."

1503. Matthew intentionally waited an hour after my first request for Facetime to respond, thus interfering with my ability to speak to my daughter.

1504. At 8:49PM, Matthew answered me and said "She's asleep."

1505. At 8:54PM, I responded and said, "How is she asleep? I asked to FaceTime 30 min ago. You're not even with her. This is abuse. What time can I get her tomorrow???"

1506. Matthew continued to interfere with my ability to see and speak to my child and intentionally ignored my question about what time I could see her tomorrow.

1507.  At 8:55PM, he replied and said "She was sleep then too. Call in the morning."

1508.  At 9:18PM, I responded and said, "I asked you a question. Can you please answer it??"

1509.  At 9:20PM, Matthew responded and said, "What time are you available tomorrow. Who will be supervising?"

1510.  This was an attempt to cause me annoyance because he knows that I can not provide him the supervisor without first seeing what time he is going to allow me access to my child so that I can then try to find someone who is available during that time.

1511.

1512.  On 7/1/23, Matthew contacted me and spoke to me directly on the phone, interfered with me, had contact with others to cause me annoyance/alarm, and had third party contact with me and harassed me. I have all the screenshots, phone records, messages, and recordings as evidence. He ignored almost all of my messages in the app and then spoke to me directly on Facetime during my attempt to call Angelina. He was extremely disrespectful in the presence of both of my minor children and another witness Kasdyn Click. He interfered with my ability to see and facetime my child.

1513.  Matthew continued to interfere with my ability to see my child and use coercion to isolate me from her as a form of abuse. He stated that I was allowed to "pick the supervisor" for the visits, but he would deny every single supervisor option that I offered, in an effort to harass me and interfere with my ability to see my child.

1514.  At 9:10AM, I messaged Matthew in the app and said, "I need to know what time you can drop her off before I can speak to somebody and arrange for that. I can't just tell people to sit around all day waiting for a response from you. Yesterday I had to drive over an hour round-trip only to spend one hour with her at a dirty park with no bathroom that had trash everywhere. I would like to take her for the majority of the day today so she can play on the waterslide and bounce house and do all that fun stuff. What time can I get her? You said I can see her anytime I want. I can come around 10:30AM and if she will be ready by then I

can try to find somebody to come. Let me know. She has only got to see her sister for one day in the last month and a half." (See OurFamilyWizard messages from 7/1/23)

1515.   Matthew continued to interfere with my ability to see and speak to my child and read my message and did not respond.

1516.   At 9:12AM, I messaged Matthew in the app and said, "You are under a court order to provide me with a regular consistent schedule for Angelina. Two hours of access every five weeks is unacceptable. Are you going to comply with the court orders and allow me to see my child regularly like the court and her psychologist said she needs? Or will you only do that if you get forced to do it by a judge? I told you that I want to have her five days a week and since she is usually with your mother or your ex-girlfriend, there's no reason why I can't see her five days a week."

1517.   Matthew continued to interfere with my ability to see and speak to my child and read my message and did not respond.

1518.   At 10:22AM, I messaged him again and said, "Hello???"

1519.   Matthew continued to interfere with my ability to see and speak to my child and read my message and did not respond.

1520.   At 12:18PM, I messaged him again, and said, "Can you drop her off in Orange to us today at Bob's pool?"

1521.   Matthew continued to interfere with my ability to see and speak to my child and read my message and did not respond.

1522.   At 1:41PM, I messaged him again, and said, "Hello???"

1523.   At 1:42PM, Matthew finally responded and then continued to interfere with my ability to have reasonable access to my daughter and said, "You can take her for a few hours at 5pm. I will need to know who will be supervising the visit before you come."

1524.   At 1:48PM, I responded and said, "5PM is too late. Why do I have to wait until five? Can't you bring her to me now? We can come get her if not. Why are you only restricting me to such a small window of time? This is not in her best interest. Please let me know if you're gonna drop her off. Otherwise we will be on

our way now. You told me the other day in front of her that I could take her anytime I want and I want to spend the day with her and take her to fireworks after. Stop isolating me and alienating her from me."

1525. Matthew continued to interfere with my ability to see and speak to my child and read my message and did not respond.

1526. At 1:52PM, I messaged him again and said, "Why is it that when Angelina begs on the calls to see me and talk to me and you tell her that she can see me anytime she wants but then you wait until the day of to respond to me and tell me that I can't take her until 5PM? Why wouldn't you tell me that days ago??? You said I can see her any time I want. I only got to see her in one hour in 2 weeks. I'm coming now to get her. If you don't allow me to take her, I will be calling the police for you interfering with my right to see my child whenever I want like you said on the recorded call." (See OurFamilyWizard messages from 7/1/23)

1527. At 1:54PM, Matthew then messaged me again, and said, "Do not show up at my house. She is napping and you can come see her at 5PM. Please inform me about supervisor. I need to approve them before you take her."

1528. At 1:56PM, I then responded and said, "Why 5??? That is too late." I wanted to pick her up earlier than 5.

1529. Matthew continued to interfere with my ability to see and speak to my child and read my message and did not respond.

1530. At 2:04PM, my friend Casey Wallace who previously acted as a supervisor on 6/19/23 and 6/20/23 sent Matthew a text message and said, "Hi Matt this is Casey, Bob's son. Im going to be coming with Theo today to supervise the visit for Angelina and we were going to go to my grandparent's pool in Orange with the rest of my family and then the fireworks. We can be there around 4pm and be back after the fireworks are over. And my mom and the rest of my family will be there too."

1531. Matthew continued to interfere with my ability to see and speak to my child and responded and said, "I'm sorry but due to the incident that happened last time that you guys supervised Angelina, you can no longer supervise Theo's visits. Thank you for your understanding."

1532. This also caused me annoyance and alarm because he had allowed Casey and/or his mother to supervise on a minimum of 5 separate occasions prior to that, and he knew that I was trying for days and hours to try to be able to arrange the visit for Angelina.

1533. I then tried to spend time and energy looking for an alternative supervisor after Matthew denied both Casey Wallace and Beth Wallace or anyone in their family as supervisors. I asked my friend Connor Lepensky if he would be willing to supervise and asked him to reach out to Matthew to see if Matthew would allow him to do so.

1534. At 2:15PM, I messaged Matthew in the app and said, "I got someone to supervise it's one of my friends I have known for 20+ years they will be texting you now."

1535. At 2:18PM, my friend Connor Lepensky texted Matthew and said, "Hey Matt this is Theo's friend Connor. I have known her for more than 20 years since we went to school together in Woodbridge. I would be willing to supervise the visit tonight so she can see Angelina so she can go to the fireworks if that's okay." (See texts between Matt and Connor from 7/1/23)

1536. Matthew continued to interfere with my ability to see and speak to my child and replied and said "Can you send a picture of your license"

1537. Nothing in the court order said that Matthew needed to obtain personal identifying information from people such as their driver license for them to be able to supervise the visit. This was Matthew interfering and causing issues to try to prevent me from seeing my child.

1538. Connor sent Matthew a picture of his driver's license and said "I'm about to get out of work at 3pm, I can do anytime after 4pm."

1539. Matthew continued to interfere with my ability to see and speak to my child and did not reply.

1540. Connor then texted again and said "Does that work?"

1541. Matthew continued to interfere with my ability to see and speak to my child and replied and said "Time?"

1542. Matthew continued to interfere with my ability to see and speak to my child and replied and said "Are you the guy who was with Theodora at court in May?"

1543. Connor responded and said "4pm-10pm and yes"

1544. Matthew continued to interfere with my ability to see and speak to my child and replied and said "I'm sorry but I don't really feel comfortable with you."

1545. Matthew had previously allowed other people who he claimed that he never met or spoke to before to act as supervisors because they were women. He wasted both Connor's and my time by acting as if he was going to allow him to supervise, asking for his license, asking for details of the location of where we would be going, and then telling him he "doesn't really feel comfortable" with him supervising the visit with no explanation as to why.

1546. Connor then texted Matthew again and said "If you want you can call me before we get there, I know Angelina was looking forward to this. And I'm just trying to help her see her daughter. I know she hasn't seen her more than a couple hours in the past few weeks."

1547. Matthew continued to interfere with my ability to see and speak to my child and did not respond.

1548. Connor then texted Matthew again and said "Is there anyway we can just come? I never did anything to disrespect you or anything."

1549. Matthew continued to interfere with my ability to see and speak to my child and did not respond.

1550. At 3:17PM, Matthew messaged me again to try to interfere with my ability to see my daughter and said, "As I stated before, I don't like the idea of that guy supervising your visits."

1551. Matthew never directly said anything to me about "not liking the idea" of Connor supervising the visit, and he was just acting out of jealousy since he was perfectly fine with strangers supervising so long as they were females and so long as he was able to get their phone number and harass them.

1552. At 3:23PM, I messaged him in the app and said "You can't withhold Angelina from me just because you are jealous of a guy. I want to see Angelina. I will be there in an hour to get her."

1553.   Matthew continued to interfere with my ability to see and speak to my child and read my message and did not respond.

1554.   I messaged him again at 3:28PM and said "If I don't get a phone call from Angelina in the next five minutes, I will be calling the police. You have no right to keep her from me. I have been messaging you for the last two days straight, begging to see her and you have refused to allow me to see her. You just keep playing all these games and making it impossible for me to see her. I will be pressing charges on you for interfering with my rights to see and speak to my child if you do not allow me to get her today. This is a violation of a protective order. I want to see Angelina. You trying to keep her away from me as much as you can is not in her best interest."

1555.   Matthew continued to interfere with my ability to see and speak to my child and read my message and did not respond.

1556.   I messaged him again at 4:40PM and said "I want to see Angelina. Why are you refusing to let me see or speak to her? My next call will be to the police."

1557.   Matthew continued to interfere with my ability to see and speak to my child and read my message and did not respond. (See OurFamilyWizard messages from 7/1/23)

1558.   By this time, I had spent over 8 hours of my time, as well as contacted three separate supervisors, all of which Matthew denied as being supervisors for me in an attempt to interfere with my ability to see my child.

1559.   At 5:17PM, I messaged him in the app and said, "Can Kasdyn supervise so I can see Angelina? Let me know we are waiting to see her." I had asked my friend/business associate Kasdyn Click if he would be willing to supervise after he asked how I was doing and I said I was having a hard time because of the supervisor issue. Kasdyn said he would gladly supervise if Matthew would allow it.

1560.   Matthew continued to harass me and interfere with me by reading my messages and saying nothing.

1561.   Kasdyn tried to text Matthew directly to try to help set up a supervised visit as well.

1562. Kasdyn texted Matthew and said, "How do we get an 'approved supervisor'"

1563. Matthew responded and said, "We have Court, Monday. I think it's best to wait and discuss everything that's been happening with the judge and go from there."

1564. There was no court date on Monday. Matthew was saying this to try to intimidate Kasdyn and his comment about how he wants to "discuss everything that's been happening with the judge and go from there" were also meant to intimidate since the judge already told him to provide a schedule and since he knows that complaints, lawsuits, and recusal motions have already been filed against the judge due to corruption and bias. He was trying to use the judge as a scare tactic.

1565. Kasdyn then replied and said, "Okay thank you. I will see if I can get the link to sign in on Monday."

1566. Matthew then continued to try to interfere and intimidate and have contact with others to cause me annoyance and alarm.

1567. Matthew texted Kasdyn back and said, "If you're that bored and want to be a witness you need to be subpoenaed in."

1568. Matthew was trying to harass and intimidate and have contact with Kasdyn to cause me annoyance and alarm. His statement about a witness needing to be subpoenacd are false, and he was told by the judge on 4/5/23 that witnesses are not required to be subpoenaed in if they willingly choose to show up as a witness. Matthew was clearly trying to intimidate, scare, and harass us with his statements.

1569. Kasdyn responded and said, "This is what I do. Please don't message me again."

1570. Matthew then continued to harass and have contact with Kasdyn to cause me annoyance and alarm and began to send him the court order page by page in an attempt to disparage me and paint me out in a negative light to one of my business associates.

1571. Kasdyn responded and said, "Please do not send me anymore pictures."

1572.  Matthew ignored him and continued to send pictures page by page in an attempt to have contact with him to cause me annoyance/alarm and an attempt to try to disparage me and harass me and interfere with me further.

1573.  At 6:00PM, I messaged him again and said, "You are court ordered to let me speak to Angelina. You are court ordered to let me see her. I'm on my way and police are being called."

1574.  Matthew continued to harass me and interfere with me by reading my messages and saying nothing.

1575.  At 9:56PM, I messaged him and said, "You didn't let me bring Angelina to the fireworks today. I want to pick her up tomorrow morning with my friend Lindsay at 9am.

1576.  Matthew continued to harass me and interfere with me by reading my messages and saying nothing.

1577.  Matthew spoke to me during the Facetime call repeatedly when the protective order says he can not contact me outside of the app. I Facetimed to speak to Angelina, and rather than communicate to me in the app that Angelina was in bed, Matthew answered the Facetime and spoke to me directly in violation of the protective order. He said "Angelina went to bed an hour ago" (See videos from 7/1/23)

1578.  (See all our family wizard messages, texts from Connor, texts from Casey, texts from Kasdyn, and recordings from 7/1/23 as evidence)

1579.

1580.  On 7/2/23, Matthew interfered with me by refusing to allow me to see or speak to my child, interfering during the call, and having third-party contact with my child during the call. I have all the screenshots, phone records, messages, and recordings as evidence.

1581.  Matthew interfered with my ability to see and speak to my child. I asked him repeatedly to be able to see Angelina, and he ignored all of my messages intentionally after reading them.

1582.  At 9:48AM, I messaged him in the app in response to the fact that he did not reply to my message from 12 hours prior and said, "I sent you a message 12 hours

ago, asking to see Angelina, you read it, and then ignored me. Are you going to allow me to see her or not? I will be going to the police department if I don't get to see her today. You also have not allowed me to FaceTime her and last night I said I would call her back and then you ignored my calls the entire night and didn't let us take her. You have been refusing to give me a schedule like you're court ordered to do. I've been asking every day. You told me and Angelina that I could see her anytime I want and you have not let me see or speak to her now in days. Stop withholding my daughter. This is abuse. You said i can see her any time i want. Please bring her to us now."

1583.   Matthew continued to harass me and interfere with me by reading my messages and saying nothing.

1584.   At 3:50PM, after he ignored my message for six hours,  I messaged him in the app and said, "Hello????"

1585.   Matthew continued to harass me and interfere with me by reading my messages and saying nothing.

1586.   At 4:17PM, I messaged him in the app and said "I have repeatedly tried to FaceTime and speak to Angelina and make arrangements to see her and you keep ignoring all my messages and calls. I will be reporting this to the police. I want to see and speak to Angelina. You haven't allowed me to see or speak to her. You have no right to isolate her from me this way. You told me I could get her at 5 yesterday and told her she could go to the fireworks and then you stopped responding. I want to see her tonight. Why aren't you letting me see or speak to her? This is parental alienation and domestic violence and abuse and violation of protective order by interfering. You only let me see her 36 hours total in the last 6 weeks and haven't heard from her in over 24 hours. This is abuse. I want to see and speak to my daughter now."

1587.   Matthew continued to interfere with my ability to see and speak to my child and read my message and did not respond.

1588.   At 6:03PM, I messaged him in the app and said "Why are you ignoring all of my messages asking to see Angelina? She just said she really wanted to see me and Julianna and is sad that you didn't let her see me yesterday and asked if we

could go tonight to the fireworks. Why are you refusing to let me? This is isolating and alienating her from me. Can I come get her now with a supervisor? I have 3 different people who can."

1589.   At 6:06PM, Matthew continued to try to interfere with my ability to see my child and harass me and responded by saying, "I'm sorry we have plans today. Try to come up with a regular schedule to bring to court to tomorrow so it can be consistent."

1590.   Matthew never mentioned his alleged "plans" at any point prior to that. There was no court date tomorrow that would address any type of schedule or custody issue.

1591.   I had been asking to see her daily and said I was available to see her daily and he had refused every attempt I made. His statements caused me further annoyance since he was insinuating that any schedule needed to be addressed in court. He did not allow me to see Angelina at all and interfered with my ability to see her.

1592.   Matthew's actions constituted coercion and domestic abuse, along with interference. This was also a refusal for him to follow the protective order clause which states that exchange must occur pursuant to the most recent order.

1593.   Matthew's parental alienation and isolation of me from Angelina is abuse. At 6:08PM, I responded and said "I said I wanted to see her every day. I asked you to give me a schedule every day and you ignored me. You have no plans. I only got to see her 1.5 days in 6 weeks. She asked to see me. This is abuse. The protective order says you can't abuse me. There is no reason why she can't come. You promised her I could take her yesterday and then interfered and refused to let me see or speak to her. Stop abusing me. I want to see my child. If I don't get to see her or speak to her I will be going to Waterbury Police." (See OurFamilyWizard messages from 7/2/23)

1594.   At 6:22PM, Matthew then continued to interfere with my ability to see and speak to my child and said "You already talked to her. As I stated before we have prior engagements. Please stop harassing us and let us be."

1595. At 8:44PM, I replied and said "So you are refusing to let me see or speak to Angelina or provide me daily access to her? This is abuse. I am going to the police." (See OurFamilyWizard messages from 7/2/23)

1596. At 8:59PM, Matthew responded and said, "Not refusing to let you speak to her nor see her. You spoke to her earlier today. And you saw her 2 days ago. We had plans today. I'm sorry."

1597. Matthew had only allowed me to see Angelina for 2 hours in a 2 week period, and hadn't let me speak to her for the majority of the day. He never disclosed any alleged plans and his comments that he was "not refusing to let me speak to her nor see her" were made to harass and taunt me further since he was actively refusing to let me see her and refusing to provide me with a schedule to see her, thus forcing me to spend every day wondering if or when I will see my child again.

1598. (See all recorded videos from 7/2/23)

1599.

1600. On 7/3/23, Matthew continued to harass me and interfere with me by refusing to allow me access to my child.

1601. At 9:09AM, I texted Matthew's brother Scott Lodice who had previously stated that he was available on 7/3 after 2pm. I texted him and said, "Can you do it at 2?"

1602. Scott Lodice then ignored my message and said nothing.

1603. 9:17AM, I messaged him after he told me that he didn't let me see my daughter because he had plans the night before and said, "Why didn't you disclose the 'plans' when I asked you if I could see her every day? I want to see her every day this week. Why are you denying me access? I saw her for one hour the other day. You are neglecting her medical and mental health needs. And this is parental alienation and abuse."

1604. Matthew continued to try to harass me and interfere with my ability to see and speak to my child and read my message and said nothing.

1605. At 10:12AM, I sent him another message and said, "I have only been able to see angelina for 1.5 days in the last 6 weeks. This is abuse and parental alienation.

You were ordered to give me regular access and a schedule. When can I see her? I asked to see her daily. Why are you refusing to allow me a schedule? I told you i want to see her every day."

1606.   Matthew continued to try to harass me and interfere with my ability to see and speak to my child and read my message and said nothing.

1607.   At 2:04PM, I sent him another message and said, "Hello? Why do you keep reading my messages and ignoring them?"

1608.   Matthew continued to try to harass me and interfere with my ability to see and speak to my child and read my message and said nothing.

1609.   At 3:24PM, Matthew finally responded after ignoring me for almost 7 hours and said, "What time are you available for a visit?"

1610.   He failed to tell me where, when, and how the visit would take place so that I could arrange a proper time, and also failed to give any details. He harasses me and interferes with me by forcing me to sit around all day for hours on end waiting for him to respond and tell me if or how I can see my child. He never gives me a schedule which prevents me from ever knowing when I will see her.

1611.   At 4:15PM, I replied and said, "Right now. Can you bring her to me at the police department?

1612.   Matthew continued to try to harass me and interfere with me by making it close to impossible for me to see the child and refusing to cooperate with any of my attempts to see her. He continued to make vague statements without giving me any actual avenue to see the child per the court order, thus interfering and using coercion to prevent me from seeing my child. He strategically does this to alienate and isolate me from her.

1613.   At 4:19PM, he responded and said, "No. Who do you have to supervise. You can come pick her up at the house for a couple hours if you would like."

1614.   Matthew knows that there is a residential stay-away order that specifies that I cannot go anywhere near his house or wherever he resides. He also is required to designate a supervisor and has denied almost each person I suggest. Him asking me who I have to supervise without first giving me any details or information about what a supervisor is defined as and what requirements they need is another

way for him to use coercion to isolate and alienate me from the child and to try to harass me and subject me to further psychological abuse and harm.

1615.   At 4:25PM, I sent another message to Scott Lodice and said, "?"

1616.   Scott Lodice continued to ignore me and said nothing.

1617.   At 4:27PM, I responded to him and said, "Both of my attorneys and the police stated I am not allowed near your house due to protective order. I have multiple different options for supervisors. What time can you meet me at the police department for the exchange?"

1618.   Matthew then continued to try to harass me and continued to insist that I violate the protective order and continued to demand that I go to his house, despite me and the police telling him repeatedly that it is not allowed. The fact that he continues to ask me over and over to go to his house and demand I go to his house and the fact that he continues to fabricate terms of the protective order that simply do not exist is done intentionally and strategically as a manipulation tactic to try to psychologically abuse me.

1619.   At 4:35PM, he said, "We've done every exchange at my house. There's an allowance for purposes of exchanging Angelina."

1620.   Matthew was trying to bait me into violating the protective order and trying to harass me by ignoring my repeated statements about not meeting at the house that I had told him for several weeks.

1621.   At 4:35PM, I responded to him and said, "No there is not. Its a full residential stay away. You are trying to set me up for a felony charge. What time can we meet at the waterbury police department?"

1622.   Matthew continued to try to use coercion and harass me and interfere with my ability to see my child by isolating her from me and refusing to acknowledge my repeated attempts to tell him that I can not meet at his residence.

1623.   At 4:58PM, Matthew responded and said, "I'm not going to the police station. You've done every exchange at this house. Have I tried to have you arrested for it no. The order allows contact for purpose of visitation. Are you coming to get her yes or no?"

1624. Matthew was attempting to harass me by making these statements. He has threatened to have me arrested on numerous occasions. The order also does not allow "contact for purpose of visitation" and these were an attempt to get me to violate the protective order and to try to taunt and harass me. The fact that he would constantly and repeatedly try to make false statements in the app about what is and isn't allowed by the protective order was done deliberately to cause me stress and to try to bait me.

1625. Matthew basically gave me an ultimatum that I either commit a felony or do not see my child but saying "Are you coming to get her yes or no?" He also was trying to get me to commit a felony by demanding that I accept his fabrication of what the protective order says. Nowhere in the protective order does it say that there is "contact for the purpose of visitation" and nowhere in the protective order does it permit exchanges at Matthew's home.

1626. At 5:11PM, I messaged him again and said, "After I was informed by you that you now reside at that house, and after I spoke to the Waterbury Police Department and both of my attorneys, and they stated I am no longer allowed to go there at all for any reason or anywhere near your residence due to the full residential stay away that is not possible. You have tried to get me arrested every day for the last six weeks and have made multiple reports stating that I have abducted and kidnapped Angelina and threatened me with jail time arrests and felony charges. I have over 20 different messages of you threatening to press charges on me. Nowhere in the order does it say that there is Contact allowed for purposes of visitation. This is you trying to set me up to commit a felony and this is going to all be brought up in court when we go there. I cannot go to your house. I was instructed by the police and two attorneys that that is not allowed. You are making up a lie saying that the protective order allows contact for visitation. No we're on the protective order. Does it say that now nor has it ever said that. Stop lying. I need to see Angelina. What time can you meet me at the police station? Is it that you don't want to go there because you're under the influence of drugs and alcohol again? I want to see Angelina. Where will you be meeting me? It cannot be your house."

1627.   Matthew continued to harass me and interfere with me by reading my messages and saying nothing.

1628.   At 5:40PM, I sent him another message and said, "Where will you be meeting me ? It can not be your house."

1629.   Matthew then continued to harass me and interfere with my ability to see and speak to my child and tried to coerce me into committing a felony offense and continued to give me an ultimatum.

1630.   At 5:55PM, he replied and said, "The house was the only option. You had no problem every other time meeting there. It's getting to late now. Let me know your Wednesday availability."

1631.   Matthew intentionally waited 7+ hours to respond to me on this day and then stated that I could either violate the protective order or not see my child for an additional 48 hours at the minimum. This is harassment, coercion, and psychological abuse and interference.

1632.   I then attempted to speak to my daughter on the phone and Matthew was harassing me, interfering with me, having third-party contact with my child to try to contact me, instructing my child what to say, and using psychological abuse and coercion against her during the call. (See recorded call from 7/3/23)

1633.   Matthew yelled at my child during the phone call and interfered repeatedly. (See all videos from 7/3/23)

1634.   At 5:56PM, I sent another message to him since he read my prior messages and didn't reply to them and said, "Are you going to respond? What you just did during the call was abuse. You have no right to speak to me using Angelina as a third-party, no right to interfere with a call and instruct her what to say, and control her movements and words during the call. You also have no right to lie to her and tell her that I am confusing her when I told her I'm trying to see her and that you're not answering when you are in fact, not answering, and I am in fact trying to see her. You also put your hand on the phone, took the phone away multiple times, and it's all recorded as well I'm just letting you know that every and all interaction and phone call between myself and Angelina will be recorded and has been recorded as I've told you many times in the past. I also have my

daughter and friend to witnessed that entire interaction in which you instructed Angelina to lie and controlled and isolated her."

1635.  Matthew continued to harass me and interfere with me by reading my messages and saying nothing.

1636.  At 5:58PM, I sent him another message and said, "Why can't I meet you at your sisters house where you just instructed Angelina to get ready to go to? I asked you repeatedly where we could me and you were saying we can only meet at a place that is not allowed to meet at the Waterbury Police Department stated that and Lawyers said it as well. So you are telling me that the only way I can see my daughter is if I violate the terms of a protective order? So you are instructing me to commit a felony and violate the residential stay away order that is in place in order to see my daughter? I'm just letting you know that I am on my way to the Waterbury Police Department as we speak and will be having prospect pd conduct a wellness check at your sister's address and I'm going to be pressing charges against you for once again, interfering with my ability to see and speak to my child. There's no reason why I can't meet you at the Prospect Police, Department, or at your sisters address in Prospect."

1637.  Matthew continued to harass me and interfere with me by reading my messages and saying nothing.

1638.  I then attempted to FaceTime my child several times to try to show her that there was a rainbow, and Matthew interfered with my ability to speak to my child and refused to answer the FaceTime.

1639.  I messaged him at 6:53PM and said, "Hello? Why wont you answer my message or let me facetime her ? Im trying to show her something."

1640.  Matthew then tried to harass me and interfere with my ability to see my child and tried to intimidate me and told me to stop calling and said that I could not have any phone contact with my child until the next day, despite the court order saying that I am allowed to speak to her.

1641.  At 6:59PM, he messaged me and said, "You already FaceTimed today and we are busy now. Please stop calling until tomorrow."

1642.  I wasn't even able to show my daughter a rainbow and I wasn't even able to have a normal FaceTime call with her due to his interference during the call.  This is psychological abuse and coercive control and harassment and interference.

1643.  Matthew refuses to comply with the court order that says that I can FaceTime my child and refuses to comply with the Judge's orders to provide me with a regular and consistent access schedule to see my child.

1644.  As of the 3rd of July, he had only allowed me to see my child for less than 2 days in a period of 6.5 weeks. This is parental alienation, coercion, harassment, and interference.

1645.

1646.  On 7/4/23, Matthew continued to psychologically abuse me, use coercion, stalking, and harassment. He also continued to violate the protective order.

1647.  At 9:17AM, I messaged him in the app and said, "You can't only allow me a 5 minute call per day when I have only seen her for 1.5 days in the last 6.5 weeks. Even prisoners get longer visits than that. I want to see her today. What time can you bring her to me ? This is abuse and you can't keep abusing and neglecting her this way."

1648.  Matthew continued to abuse me, use coercion, harass me, and stalk me by reading my message and saying nothing in response.

1649.  At 12:32PM, I messaged him again in the app and said, "Why are you ignoring me ? I want to see and speak to Angelina. When can you bring her to us ?"

1650.  Matthew continued to abuse me, use coercion, harass me, and stalk me by reading my message and saying nothing in response.

1651.  5 hours later, at 5:13PM, Matthew finally responded with another denial of my right to see Angelina, and him saying he had alleged plans that he never mentioned at all prior. He messaged me and said, "I told you we have plans today for the 4th. Let me know when you're available is tomorrow to pick her up? Let me know who you have to supervise your visit."

1652.  At 6:41PM, I replied to him and said, "No you didnt. You never said that. Stop lying and using coercion against me. I can not come to your house. Every time

you continue to ask it is harassment. I want to see and speak to my daughter. Why are you alienating me this way? If i dont get a Facetime by 7 i will be requesting a wellness check. I am very concerned that you wont let me see or speak to angelina and that you keep demanding that I commit felonies to be able to see her."

1653. Matthew continued to abuse me, use coercion, interfere with me, harass me, and stalk me by reading my message and saying nothing in response. All of this was in violation of the protective order.

1654. At 7:28PM, I messaged him again and said, "If you don't have Angelina call me back before 7:30 pm i will have the police conduct a wellness check at Josh's house. You have NO RIGHT to hang up and interfere with my right to see and speak to Angelina."

1655. Matthew continued to abuse me, use coercion, interfere with me, harass me, and stalk me by reading my message and saying nothing in response. All of this was in violation of the protective order.

1656. Matthew never let me see or speak to Angelina at all on the fourth of July and intentionally withheld her to psychologically use coercion against me and harm me further. (See OurFamilyWizard messages from 7/4/23) (See video and audio evidence from 7/4/23)

1657.

1658. On 7/5/23, Matthew continued to psychologically abuse me, use coercion, stalking, and harassment. He also continued to violate the protective order.

1659. At 10:14AM, I messaged him in the app and said, "I want to see Angelina. Why are you withholding her from me? What time can you meet me at the police station today for an exchange? Don't ask me who the supervisor is until you first answer my question because I cannot tell you who it is until you confirm a time and location of the exchange first. Let me know asap. I am filing for am emergency order today due to you isolating her and neglecting her also. Hopefully you will let me see her without being forced by a judge."

1660. Matthew continued to abuse me, use coercion, interfere with me, harass me, and stalk me by reading my message and saying nothing in response. All of this was in violation of the protective order.

1661.   At 10:37AM, I messaged him again and said, "Hello????"

1662.   Matthew continued to abuse me, use coercion, interfere with me, harass me, and stalk me by reading my message and saying nothing in response. All of this was in violation of the protective order.

1663.   At 10:39AM, I messaged him again and said, "Just tried to facetime. Why aren't you letting me see or speak to Angelina?"

1664.   At 10:58AM, Matthew replied and said, "If you would like to see Angelina today, please let me know what time you are available for a pickup and who you have to supervise your visit."

1665.   He intentionally ignored each and every one of my prior messages in which I told him not to ask who the supervisor was before providing me details of the schedule. This is harassment and abuse. This is torture.

1666.   At 2:48PM, I replied and said, "I want to see Angelina. Why are you withholding her from me? What time can you meet me at the police station today for an exchange? Don't ask me who the supervisor is until you first answer my question because I cannot tell you who it is until you confirm a time and location of the exchange first. Let me know asap. I am filing for am emergency order today due to you isolating her and neglecting her also. Hopefully you will let me see her without being forced by a judge. I have multiple supervisor options. I want to see her now. When and where can you meet me ? Stop demanding I go to your house. That's a violation of the protective order and the more you ask the more its harassment and alienation. Why aren't you allowing me facetime?"

1667.   At 2:53PM, Matthew replied and said, "She's napping right now. Should be up in about a half hour. Just need to know who the supervisor is before I agree to let you take her. Maybe you can do a 4-6 at the park again."

1668.   At 5:45PM, I replied and said, "I need more than two hours with my child. I have seen her for less than two days in the past 6 1/2 weeks. This is abuse and parental alienation. I will be taking legal action if you do not let me see Angelina. I asked you repeatedly to tell me where you will be meeting me. Can you meet me at the Prospect Police Department in an hour?"

1669.    Matthew continued to abuse me, use coercion, interfere with me, harass me, and stalk me by reading my message and saying nothing in response. All of this was in violation of the protective order.

1670.    At 5:46PM, I messaged him again and said, "I want to see Angelina. Why are you withholding her from me? What time can you meet me at the police station today for an exchange? Don't ask me who the supervisor is until you first answer my question because I cannot tell you who it is until you confirm a time and location of the exchange first. Let me know asap. I am filing for am emergency order today due to you isolating her and neglecting her also. Hopefully you will let me see her without being forced by a judge. I have multiple supervisor options. I want to see her now. When and where can you meet me ? Stop demanding I go to your house. That's a violation of the protective order and the more you ask the more its harassment and alienation. Why aren't you allowing me facetime?"

1671.    Matthew continued to abuse me, use coercion, interfere with me, harass me, and stalk me by reading my message and saying nothing in response. All of this was in violation of the protective order.

1672.    At 5:51PM, I messaged him again and said, "Angelina said she wants to come home and play in the water slide and with all her toys. Can you bring her to orange pd?"

1673.    At 5:59PM, Matthew responded and said, "Ok, I'm not going to keep repeating myself. Here is how this is going to go. I have not been very comfortable with the things that you've been saying around Angelina on the phone. I'm also not comfortable with the fact that you cannot always follow the parameters of your visit. Therefore, all future visits are going to be under strict guidelines. Starting with, you telling me who the available supervisor is that you were going to have, me talking to that supervisor, and explaining the parameters of the visit. I'm also going to be limiting the amount of time she's going to spend with you at one time. I feel like two hours is a good amount of time. I also want you to stay locally with her due to you, bringing her to the doctors against the court order. You keep going back-and-forth saying I'm not letting you talk to her nor am I letting you see her. I have been doing both, letting her see

1674.   you regularly and letting her talk to you every day. You have been sending the police to my house and to my whereabouts harassing me constantly, even when you talked to her. This is not good for Angelina. You need to display normal parent behavior for me to be comfortable with her being with you regularly. I'm not going to keep answering the same questions over and over again.. So here's what you were going to do. You're going to message me on days you want to see her and tell me what time you have available for a two hour block visit, and who the supervisor is. I will also be speaking to the supervisor before every visit. It will also have to be prior to 5:00 PM because I like her in bed by 7:30. Every time you ask me the question of when can I see her over and over again, and not explain the parameters that you are looking for to see her that I requested, I'm just no longer going to be answering those texts anymore. I'm not doing this back-and-forth with you anymore. Keep it very simple about your visit with Angelina and nothing more. Thank you for your understanding."

1675.   At 6:00PM, I replied and said, "This is abuse and you will be facing legal consequences. What time will you be bringing Angelina to me?"

1676.   Matthew continued to abuse me, use coercion, interfere with me, harass me, and stalk me by reading my message and saying nothing in response. All of this was in violation of the protective order.

1677.   At 6:07PM, I messaged him again and said, "I want to see Angelina. Why are you withholding her from me? What time can you meet me at the police station today for an exchange? Don't ask me who the supervisor is until you first answer my question because I cannot tell you who it is until you confirm a time and location of the exchange first. Let me know asap. I am filing for am emergency order today due to you isolating her and neglecting her also. Hopefully you will let me see her without being forced by a judge. I have multiple supervisor options. I want to see her now. When and where can you meet me ? Stop demanding Igo to your house. That's a violation of the protective order and the more you ask the more its harassment and alienation. Why aren't you allowing me facetime?"

1678.  Matthew continued to abuse me, use coercion, interfere with me, harass me, and stalk me by reading my message and saying nothing in response. All of this was in violation of the protective order.

1679.  At 6:08PM, I messaged him again and said, "Why do you keep saying that Angelina can't go to the doctor? There is not now, nor has there ever been any court order that says that. You are neglecting her medically and you are abusing her and parental alienation is a crime. You need to let me see her regularly. Seeing her for 1.5 days in a 6.5-week period if Not regular. You haven't let me see her at all and you don't answer any calls. I have everything recorded documented and witnesses for everything. You and your family will face legal consequences for this abuse."

1680.  Matthew continued to abuse me, use coercion, interfere with me, harass me, and stalk me by reading my message and saying nothing in response. All of this was in violation of the protective order.

1681.  At 6:26PM, I messaged him again and said, "Hello? I know you struggle with alcoholism, memory loss, and substance abuse. Why are you falsely claiming that our child is unable to see a doctor? She needs medical attention. Why are you neglecting her ? She needs to see her therapist, pediatrician, and dentist. She also needs and wants to see me for more than once every 6.5 weeks. Why are you abusing us this way? Just because i denied being with you romantically and sexually doesn't give you the right to abuse us."

1682.  Matthew continued to abuse me, use coercion, interfere with me, harass me, and stalk me by reading my message and saying nothing in response. All of this was in violation of the protective order.

1683.  At 6:43PM, I messaged him again and said, "Your court ordered to let me have a schedule and let me see Angelina regularly. You claimed that I can see her anytime I want to, but I've asked you daily in this app and you refuse. I've offered 5 to 6 different people at Supervisors and you denied all of them. I tried to ask your brother to supervise and he stated that he would only do it if I sent him naked pictures. I'm going to be calling the police right now. You and your drug addict junkie brother both should not be anywhere near Children."

1684.  At 6:44PM, Matthew replied and said, "I terminated the phone call because of the things you were saying to Angelina. You need to stop telling Angelina that daddy is keeping her from you. That's simply not true. Your behavior is keeping her from you. You are not to say that to Angelina on the phone anymore. From now on every time you say that to Angelina, I will be terminating the phone call. She is four years old. It's not fair to her for you to be saying that. all you are doing is confusing and hurting her. Please make better choices and do what's best for Angelina when you were on the phone with her. Thank you for your understanding."

1685.  At 6:47PM, I replied and said, "Why did you abruptly end the call with Angelina? Why do you keep lying to her and telling her that I can see her anytime I want? I have asked you repeatedly and you ignore every attempt I make to see her."

1686.  Matthew continued to abuse me, use coercion, interfere with me, harass me, and stalk me by reading my message and saying nothing in response. All of this was in violation of the protective order.

1687.  At 6:50PM, I messaged him again in response to his prior message and said, "What things? The entire call was recorded and I'm sending it to the police as we speak. You and your family will be held accountable. You and your brother have sexually harassed me long enough and you have no right to tell him to tell me that I have to send him naked photos in order to get a visit with Angelina. This is abuse. Only a domestic abuser isolates a little girl from her mother. Angelina told me that she's been asking you every day to see me and that you keep saying no. It's all been recorded and everything will be brought up in court and you and your family will be held accountable for this and what you are doing. I want a phone call from Angelina now. I want to see her now. She said you're taking her to your friends house, so why can't I meet you there so I can get her for a visit? You told her it's too late but you have her out until 11 o'clock at night while you're drinking last night? Just because your friends are correctional officers and marshals, you think you're above the law? Don't worry. Everything will be changing very soon."

1688.  Matthew continued to abuse me, use coercion, interfere with me, harass me, and stalk me by reading my message and saying nothing in response. All of this was in violation of the protective order.

1689.  At 6:51PM, I messaged him again and said, "If I do not get a phone call back from Angelina within the next 10 minutes and if I do not get an address of where I can meet her in the next 10 minutes so that I can see her, I will be calling the police and having a wellness check done for her. You have no right to isolate her from me like this and abuse her this way in the neglect her this way."

1690.  Matthew continued to abuse me, use coercion, interfere with me, harass me, and stalk me by reading my message and saying nothing in response. All of this was in violation of the protective order.

1691.  Matthew's brother Scott Lodice was also messaging me on this day and told me that he wanted to see naked photos of me in exchange for him supervising a visit. I reported this to the police as this is sexual harassment. (See messages from Scott Lodice)

1692.  Matthew was extremely abuse toward me during the call at 6:41PM when I attempted to speak to my child. (See recorded calls from 7/5/23)

1693.  On this day, Scott Lodice sent several messages that ended up turning into sexual harassment. (See all messages)

1694.  Matthew and his entire family have been harassing me nonstop. This is all a violation of the protective order, as well.

1695.

1696.  On 7/6/23, Matthew violated the protective order by harassing me and interfering with my ability to see my child. He told me that I could only get my daughter if I went to his home, even though there is a residential stay-away stating I cannot go there. A report was made with the Waterbury Police Department on 7/6/23 with Officer Padro under case# 23-60789. Matthew insisted that I either go to his home to get my daughter or that I don't see her at all. He also demanded that I designate my own supervisor for the visit and demanded that the supervisor contact him directly. In the past, he has harassed, threatened, and otherwise caused annoyance to the supervisors when given their contact info.

1697. I repeatedly attempted to contact him throughout the day to ask that he allow me to see Angelina.

1698. At 11:45AM, I messaged him in the app after he ignored my message from the night before, and said, "Hello???? I want to see angelina. What time can you drop her off to me ?"

1699. At 11:46AM, he responded and said, "If you would like to schedule a time for you to pick her up for your supervise visit. Please let me know the details of what you are looking for."

1700. I asked him what time he would let me see her and his response was not even a complete sentence and just a vague response to make it seem as if he was actually going to give me a real time. He intentionally does this to isolate, stalk, harass, and abuse me further because the only way he can continue to abuse me is through my daughter.

1701. At 12:17PM, I responded to him and said, "As I stated to you over 20 times in the last week, I cannot pick her up from your house. Can you bring her to us at the pool club so she can enjoy the day with us at the pool club? Carrie invited us and if you can bring her there now that would be great. Carrie will supervise. I'm looking to have you bring her to the pool club so she can spend the day with us since I've only spent a total of 1.5 days with her in the last 6.5 weeks. Can you do that?"

1702. Matthew then denied me access to my child.

1703. At 12:18PM, he replied and said, "No. She went down for a nap a little while ago."

1704. Despite me asking less than 30 minutes prior, he did not communicate with me anything about her going down for a nap or being napping, and never informed me of such when he asked me what time I wanted to see her. He intentionally will not give me any information at all about what times were actually available and then end up denying me access.

1705. At 1:03PM, I replied to him and said, "No what? Youre denying me a visit with her again today? Why???"

1706. Matthew then continued to harass me by asking me to come to his house again even after knowing that the protective order states that I can not.

1707. At 3:10PM, he messaged me and said, "Do you want to come pick her up for a few hours for a supervised visit?"

1708. At 3:13PM, I replied and said, "Why do you keep harassing me and asking me to come to your house? I want to see Angelina. Can you meet me at the nearest police station?"

1709. Matthew then read my message and said nothing in response. He does this to abuse, harass, and isolate me from my child as form of coercion, psychological abuse, harassment, and control.

1710. At 3:15PM, I messaged him again and said, "You have only let me see Angelina for the equivalent of a day and a half in the last 6.5 weeks. This is abuse. You are well aware that there is a protective order and I sent you dozens of messages asking you to stop telling me to go to your house because there's a residential stay away. I want to see Angelina now. Where can you meet me?"

1711. At 3:16PM, Matthew replied and said, "No one is harassing you. Every visit you had you picked her up at the house here. Nothing has changed. Let me know if you want to schedule a visit."

1712. The fact that he keeps demanding that I go to the house is abuse. Once he made it clear that he moved back there and it was his "home", I never went there again.

1713. Matthew then continued to try to message me again demanding that I come to his house to try to bait me into violating the residential stay away order.

1714. At 3:24PM, he messaged me again and said, "That protective order was there for all the other visits and you came here and picked her up. What changed? I'm not going to meet you anywhere. There are adjustments to allow for facilitating visits for purposes of Angelina. You are allowed to come get to pick up Angelina. Let me know."

1715. At 3:24PM, I replied and said, "You are harassing me. I asked you repeatedly to stop demanding that I can only get Angelina at your house. You keep harassing me and demanding that I go to your house. The Waterbury Police Department

stated that I can not go there. That is what changed. My attorneys stated I can not go there. That is what changed. There is a residential stay away. Therefore you need to meet me somewhere that is not near your house or wherever you reside. The fact that you keep ignoring that and demanding me an ultimatum of violation of protection order or not seeing Angelina, that's abuse. I want to see Angelina now. You haven't let me facetime her for more than 1.5 days in 6 weeks. She needs me and I want to see her. Why are you doing this? You begged for me to be with you for years and when I said no you punished me by using coercive control and parental alienation? This is not in Angelina's best interest. I am waiting for you to tell me where you will meet me that isn't your house."

1716. Matthew continued to abuse me, use coercion, interfere with me, harass me, and stalk me by reading my message and saying nothing in response. All of this was in violation of the protective order.

1717. At 3:30PM, I messaged him again and said, "You stated on 6/20/23 that this is your address and where you reside. Prior to that, you stated you resided in New Britain at the address on the order. I have since spoken to Waterbury Police and both of my lawyers. I told you this repeatedly that all 3 told me not to go there now that you made it clear it's your house. The day you called and lied and said I kidnapped her, the police talked to my lawyer. I repeated this dozens of times. Please let me know where you will be meeting me and at what time so I can make arrangements to get someone to be there as I need to be mindful of people's schedules and time. I want to see Angelina. Stop using parental alienation and coercive control as a weapon against me."

1718. Matthew continued to abuse me, use coercion, interfere with me, harass me, and stalk me by reading my message and saying nothing in response. All of this was in violation of the protective order.

1719. At 3:32PM, I messaged him again and said, "Please stop harassing me and lying about the protection order. You are not a police officer or a lawyer. My lawyers and the police in your city instructed me never to go back there. If you don't tell me another location where we can do the exchange, I will be reporting this as custodial interference."

1720.  At 3:33PM, Matthew then replied and said, "As I stated before I only feel comfortable doing the exchanges here at the house. I'm afraid you won't show up to drop her off and will lie and say I didn't show up. You still haven't told me who will be the supervisor."

1721.  This is harassment. He is again giving me an ultimatum saying I violate the protective order or go another week without seeing my child that he is isolating me from as a form of torture and abuse.

1722.  At 3:33PM, I replied to him and said, "What time can you drop Angelina off and where? I want to see her. The derby court said NO going to your home. I just asked. They said you can NOT talk to me outside this app and NO going near your home."

1723.  Matthew continued to abuse me, use coercion, interfere with me, harass me, and stalk me by reading my message and saying nothing in response. All of this was in violation of the protective order.

1724.  At 3:36PM, I messaged him again and said, "Why does it matter if it's at the house or not? If you testified that you wear a body camera everywhere you go? I don't feel comfortable with you recording footage of me and my body when you have a history of recording girls without their knowledge. Please meet at the police station, which is a safe neutral location."

1725.  Matthew continued to abuse me, use coercion, interfere with me, harass me, and stalk me by reading my message and saying nothing in response. All of this was in violation of the protective order.

1726.  At 3:50PM, I messaged him again and said, "What time can I get Angelina? The police will need to be present if it occurs near your home. I just spoke to them. Can I come now?"

1727.  At 3:51PM, Matthew then replied and said, "Who do you have to supervise the visit?"

1728.  The court order says that Matthew is obligated to designate the third party that we would be in the presence of, and he has refused to do that.

1729.  At 3:55PM, I replied and said, "The fact that you keep asking me like this is harassment. Look back at all the other dozens of messages where I told you that I

220

don't just have people sitting around on standby. You are supposed to provide the supervisor. Since you won't, I have to find somebody. However, if it's a guy you get jealous and won't allow it. You only allow it if it's a female so that you then try to call and sexually harass them. I tried asking your brother to do it and he stated he would only do it if I sent him naked pictures and stated that you instructed him to tell him that. So I am going to be pressing charges about that."

1730.   Matthew continued to abuse me, use coercion, interfere with me, harass me, and stalk me by reading my message and saying nothing in response. All of this was in violation of the protective order.

1731.   At 3:56PM, I messaged him again and said, "You stated on June 15th under oath in court on the record that I can pick the supervisor and that you 'let me pick the supervisor.' However, I offered four different supervisors in the last week and you denied all of them. You then told me that it can't be a male supervisor because you were jealous of other guys and that it can only be a female and that you need to call them directly on the phone when the order says everything must be done in writing. What time can I get Angelina? Can I come now? I need to know what time before I can start asking people. I tried asking you earlier to meet us at the pool club with Carrie and you said no."

1732.   At 3:56PM, Matthew replied and said, "I have no one willing to be anywhere near you. Please let me know when you have someone. Angelina wants to call you, please make sure you don't say any disparaging comments to her."

1733.   At 3:57PM, Matthew sent another message and said, "I have no problem with Carrie supervising."

1734.   At 3:59PM, I replied and said, "It's interesting that you say that. I have all the screenshots from your brother in which he said that you never even asking him once and he said he wants to do it. He stated that he would do it, but that you would not allow it unless he extorted me for pornography. Additionally, I have multiple messages in which you stated that your mother and/or stepfather would do it. However, you then repeatedly stated that nobody will do it. This is mind games and coercive control. Please let me know what time I can come get Angelina. I also want to know why you keep harassing me with Facetime calls?

You won't respond to me in the app but you will call me repeatedly on Facetime? If you are with Angelina and then she is ready for me to get her, let me know and I can come right now. If she wants to Facetime you can request it in the app. You're not allowed to call me without asking please confirm because the police will be on their way there and I need time to be able to find a supervisor. Is it OK if I come now as long as the police are there?"

1735.   Matthew continued to abuse me, use coercion, interfere with me, harass me, and stalk me by reading my message and saying nothing in response. All of this was in violation of the protective order.

1736.   At 4:00PM, I messaged him again and said, ""I asked you if she could supervise earlier this morning. You refused and said no. She offered to have us come to the pool club for the day and even offered to have you and your kids join but you said no. So now, she's no longer available. As I stated, I don't have people who are willing to sit around on standby waiting for you to decide if you want to respond to the messages in this app. Please confirm that you want me to come to your house to get her in violation of the protective order so I can make sure the police are there to escort me so that everything is on the record per my attorney. Please confirm ASAP because I don't have time to keep sitting around. I've been going back-and-forth with you for days about this. Don't respond with anything other than a confirmation of what time I can come. I can't just keep sitting around here waiting for you."

1737.   At 4:03PM, Matthew replied and said, "This is why I say it is imperative that we make plans for visits ahead of time. I said I wouldn't be bringing her down to Orange, I never said she couldn't supervise. Let me know once you know."

1738.   At 4:12PM, I said, "You never said that. What time can I come?"

1739.   Matthew continued to abuse me, use coercion, interfere with me, harass me, and stalk me by reading my message and saying nothing in response. All of this was in violation of the protective order.

1740.   At 4:13PM, I messaged him again and said, "What time can we go???"

1741.   At 4:14PM, Matthew replied and said, "Anytime after you tell me who the supervisor is and I speak to the supervisor. Please don't wait too late."

1742. At 4:14PM, I replied and said, "Was that Angelina who Facetimed me?"

1743. Matthew continued to abuse me, use coercion, interfere with me, harass me, and stalk me by reading my message and saying nothing in response. All of this was in violation of the protective order.

1744. At 4:56PM, I messaged him again and said, "My friend Lindsay is supervising. I am going to get her now then she will walk over to get Angelina from your house if police aren't there by then."

1745. At 4:57PM, Matthew replied and said, "yes obviously"

1746. At 4:57PM, I messaged him again and said, "How is it obvious? She can Facetime now but I'm going to pick up Lindsay and we're on the way. Don't feed her cuz we wanna eat with her."

1747. At 4:58PM, Matthew replied and said, "Lindsay who? You can't just give some random person's first name and no other details and expect to be able to come get Angelina with this person. I told you the parameters that need to be met before you come get her."

1748. At 5:07PM, Matthew messaged me again and said, "You need to have Lindsay call me and send me a pic of her license."

1749. Nothing in the court order says that Matthew can dictate and demand that people call him. The court order specifies that all communications MUST be in writing. Matthew demands that we violate the protective order and court order in order to see her as way to coercively harass and abuse me.

1750. At 5:08PM, I responded and said, "She's a friend of mine and knows John really well. She will text you. We're on the way."

1751. Matthew continued to abuse me, use coercion, interfere with me, harass me, and stalk me by reading my message and saying nothing in response. All of this was in violation of the protective order.

1752. At 5:10PM, I messaged him again and said, "No calls. Everything must be in writing per the order of 5/31/23. She will text you. Have Angelina ready. Police have been notified."

1753. At 5:24PM, Matthew said, "We can discuss details here in writing but I also want to speak with this person prior to letting my daughter go with her."

1754. At 5:30PM, I replied and said, "The police are calling you now. She will be the one that you were exchanging Angelina with."

1755. At 5:52PM, Matthew replied and said, "ETA?"

1756. At 5:54PM, I replied and said, "I'm on my way to get Lindsay. Why didn't you let me Facetime Angelina?"

1757. At 5:59PM, Matthew replied and said, "I was on the phone with the police dealing with your headache."

1758. At 6:02PM, I replied and said, "Excuse me? What headache is that? Police told you you cannot have me to go to your house. Why do you keep demanding that I go? They confirmed that that is harassment. Please have Angelina call me back"

1759. At 6:22PM, Matthew replied and said, "Well it's getting very late, Angelina goes to bed at 7:30. I want her back by 8pm no later."

1760. Angelina never goes to bed at 7:30 and he regularly has her out all hours of the night to fit his convenience, but uses the "curfew" as a way to unreasonably control me and use coercion and harass me and isolate me from her.

1761. At 6:23PM, I replied and said, "That's unreasonable. I spoke to her yesterday and you were bringing her to your friends house at 8:30PM in the car. The day before you had a ride to party until midnight. Other times you allowed her to come back at 1AM. Angelina does not now, nor has she ever gone to bed at 7:30PM in her life."

1762. Matthew continued to abuse me, use coercion, interfere with me, harass me, and stalk me by reading my message and saying nothing in response. All of this was in violation of the protective order.

1763. At 6:27PM, I messaged him again and said, "You're trying to restrict me to a 25 minute visit including travel time when I'm driving over an hour just to be able to see her? Do you not see how abusive this is?"

1764. At 6:36PM, Matthew replied and said, "You need to stay local. I told you I'm not comfortable with you leaving the area. It's not my fault you chose to come so late. I told you the other day the visits need to be before 5pm for this reason."

1765.   At 6:42PM, I replied and said, "I had to drive 45 min to get my supervisor. I told her we are having dinner. Stop being abusive. This is not okay. I been asking since early this AM and you said no. I'm coming now. Stop harassing me and abusing me and interfering with my ability to be with my child. You made me jump through hoops instead of bringing her to me. You do NONE of the transportation or providing of supervision. You don't help at all. You actively try to isolate her."

1766.   Matthew continued to abuse me, use coercion, interfere with me, harass me, and stalk me by reading my message and saying nothing in response. All of this was in violation of the protective order.

1767.   At 6:46PM, when I was on the way to get Angelina with my friend Lindsay Fitzgerald, I FaceTimed Angelina. (See recording)

1768.   Matthew also had contact with others to cause me annoyance and alarm.

1769.   At 6:58PM, my friend Lindsay Fitzgerald texted Matthew and said "Hi Matt, this is Lindsay Fitzgerald. Theo and I will be there to get Angelina in 15 minutes."

1770.   Matthew responded at 7:05PM and said "Ok. I need a copy of your license please. Also, Theo is not to leave this area with Angelina, she's not allowed to bring her to her house. I also would like Angelina to be back by 8pm. There are more rules I'd like to discuss with you when you get here."

1771.   Nothing in the court order says that I am confined to staying within the Waterbury area. Nothing in the court order says that I am not allowed to bring Angelina to my house. Matthew stated he wanted Angelina back by 8PM when Lindsay told him we would be there at 7:15, which means he only was allowing us a total of 45 minutes for a visit, when we stated we planned to go out to dinner.

1772.   Matthew was interfering with my rights to reasonably see and have time with my child pursuant to the most recent civil family order. Lindsay then responded to Matthew as 7:10PM, and said "Theo said the court order says everything has to be in writing. We were going to get dinner with Angelina. We're 10 minutes away. What other details do. You have to say, you can text them. Theo already read the court orders."

1773.   Matthew then continued to message Lindsay and insult me and responded to Lindsay with a long paragraph in which he made several disparaging statements about me that were untrue in a clear attempt to have contact with others to cause me annoyance and alarm.

1774.   At 7:14PM Mathew responded to her and said "Theo has been saying a lot of things to hurt Angelina lately. It's very important that you stay with her at all times. Please do not leave Angelina alone with Theo for any reason. I know Theo seems like she's put together and a good person, but she's not. There's a reason she lost custody of Angelina and is only on supervise visits contrary to what she tells you. I need Angelina home by 8:30PM. She's not allowed to go to Theo's house for any reason. She's not allowed to bring her to the doctor nor the police station for any reason, please stay in this area out here and eat somewhere close to the house. You are responsible for protecting my daughter from her. Please do your best. Theo is going to say things different than what I am saying here, but I have the Deciding say on what happens with Angelina so please do not go against what I am asking."

1775.   I never said anything to hurt Angelina. Nothing in the court order states that the supervisor needs to be with me "at all times" nor does it state that I "can not be alone with Angelina for any reason."

1776.   Matthew telling my friend that "I know she seems like she's put together and a good person, but she's not" are disparaging statements that caused me annoyance and alarm. Matthew attempted to use more coercion and try to control all of our movements and made unreasonable demands, trying to control everything down to the restaurant he was allowing us to eat at.

1777.   Nothing in the court order states that I am confined to visits of an hour or less. Nothing in the court order says that Angelina is not allowed to go to my house for any reason.

1778.   Nothing in the court order says that we can not bring her to the doctor or police station for any reason. Nothing in the court order confines us to visiting and eating within the area of Waterbury. Nothing in the court order states we need to stay close to his house.

1779.   His statements that he is "protecting my daughter from her" are also degrading and caused me annoyance and alarm, since I never did anything to harm my child nor does my child need protection from me. This is having contact with others to cause me annoyance/alarm.

1780.   Matthew's demands for her to "not go against what I am asking" are also coercion and intimidation. She had the court orders printed out and had every order in her hand, and all of his statements were in direct conflict with what the orders said.

1781.   At 7:20PM, Lindsay texted Matthew and said "Hi we're on Deering lane."

1782.   We were advised to park on the street next to Matthew's street where his house was not visible from the street by the Waterbury Police department since Matthew demanded that we go to his house despite there being an active residential stay-away order. We were told to record everything and to have Lindsay walk to the house, retrieve Angelina, and meet me back on the other street. (See screenshots of text message exchanges between Lindsay and Matthew)

1783.   Lindsay walked to the house and retrieved Angelina and then walked back to my car. Within minutes of us driving away, Matthew immediately started to have contact with others to cause me annoyance and alarm and texted Lindsay again at 7:33PM and said "Please do not allow Theo to say things like Daddy is keeping you from me, soon you will be living back with mama. It only confuses Angelina and isn't fair to her."

1784.   Matthew's text to Lindsay caused me annoyance and alarm because he has been keeping her from me, and it is my intent for her to be back living with me like she was her whole life up until now. His comments were alarming because he claimed that me telling Angelina that she will be back home and that he is keeping her from me were "confusing" to her and "not fair to her" even though the only thing that is unfair is Matthew isolating and alienating her from me for no reason.

1785.   At 8:53PM, I messaged him in the app and said, "We are just getting our food now. I'll let you know when we are on our way back. Angelina is having a great time and happy to be with us."

1786.   At 8:53PM, after receiving several missed calls from Matthew, Lindsay responded and said "Ok no worries we are having dinner now." Matthew responded at 8:54PM and said "How long until you get here?"

1787.   At this point, Matthew was harassing us by asking how long until we get here and continuing to message Lindsay after I had previously asked him to stop in the OurFamilyWizard app. I told Lindsay that I would message him in the app to discuss Angelina and Lindsay attempted to ask Matthew to message me in the app. Matthew then continued to have contact with others to cause me annoyance and alarm and texted Lindsay again at 8:56PM in an attempt to intimidate her and said "We talked about the parameters being that you would be back at 9. Now she and you are saying you are just getting dinner now. Where are you?"

1788.   At 8:55PM, Matthew replied to my prior message and said, "You were not supposed to leave the area. You said you would be back at 9."

1789.   At 8:59PM, I replied and said, "You are acting like a tyrant. Angelina has not been able to see me for more than a day and a half in the last 6.5 weeks. She has been begging to spend more time with us. There's no reason why we need to stay in the area. Last time we did that we went to the park and it was dirty and disgusting with trash everywhere and I don't want to stay in a dirty dangerous city because you want to restrict my time with her so much. This is literally harassment and now you keep trying to harass my friend as well. If you have something to say it needs to be said in the app I told you we are eating stop trying to bother us. I'll let you know when we are on the way you don't have to keep harassing my friend and trying to blow up her phone because you can't communicate with me here you cannot tell me that I have to stay in the area you don't control my life and you're not going to keep acting this way and control and abuse me like this."

1790.  At 9:02PM, Matthew then replied and said, "The parameters of the visit were that you are supposed to have my daughter back at 9. You are under strict supervision and have to follow the rules. Bring her back now."

1791.  At 9:04PM, I replied and said, "You never said anywhere in here that she had to be back at nine. You stated she had to be back at 7:30 and we picked her up at 7:30. Stop restricting it like this. She's having a great time. We're trying to enjoy our meal stop harassing us."

1792.  Matthew then continued to harass us and have contact with others to cause me annoyance and alarm and texted Lindsay again at 9:03PM and said "you were not supposed to leave the area nor were you supposed to be out past 9. Please bring Angelina back." Lindsay then responded at 9:04PM and said "Hi Theo said she's messaging you in the app. We just got served dinner. I will make sure when we're done she will come home."

1793.  Matthew then continued to text Lindsay and have contact with others to cause me annoyance and alarm and texted Lindsay again at 9:06PM and said "Please. How far are you from the house" Matthew then continued to have contact with others to cause me annoyance and alarm and texted Lindsay again at 9:10PM and said "Is there a reason you are not answering me?"

1794.  Lindsay responded, and he continued to interfere with our ability to enjoy our dinner in peace, and she told him "Hi were at this restaurant. Eating and then I will make sure Angelina goes home. We are safe."

1795.  At 9:10PM, Matthew continued to harass us and texted me and said, "Bring my daughter home."

1796.  At 9:11PM, I replied and said, "Stop harassing us. We are trying to enjoy our meal. We will be back soon. We will let you know when we are ready to have Lindsay meet you in front of your house."

1797.  Matthew continued to abuse me, use coercion, interfere with me, harass me, and stalk me by reading my message and saying nothing in response. All of this was in violation of the protective order.

1798. At 9:11PM, I messaged him again and said, "Please stop texting Lindsay repeatedly when you were supposed to be communicating with me we are trying to eat and you keep texting nonstop please stop harassing us."

1799. Matthew continued to abuse me, use coercion, interfere with me, harass me, and stalk me by reading my message and saying nothing in response. All of this was in violation of the protective order.

1800. Matthew then continued to have contact with others to cause me annoyance and alarm and texted Lindsay again at 9:14PM and said "I don't even know if you're with them, and you are not telling me where you are. You were supposed to stay in the area and be back at 9." Lindsay responded at 9:19PM and said "Hi done eating we're leaving 5 minutes."

1801. At 9:20PM, I messaged him again in the app and said, "Please stop harassing Lindsay and ignoring my messages at the same time. I told you to stop harassing us. You cannot keep doing this it's been less than two hours. You did not let me see her for all of this time stop it you have no right to abuse us like this and try to control every single second of the day. This is not in Angelina's best interest."

1802. Matthew continued to have contact with others to cause me annoyance and alarm and texted Lindsay again at 9:21PM and said "Where are you". Lindsay replied and said "Wasabi".

1803. Matthew then continued to try to harass, intimidate, and have contact with others to cause me annoyance and alarm and texted Lindsay again at 9:24PM with three texts back-to-back and said "Wasabi is in Orange. You were supposed to stay in this area. I'm calling the police, it's 9:30 and you haven't even left Orange." Lindsay responded and said "Hi I don't want to get in middle. We picked up her sis at the neighbors and we came here for dinner. Angelina really wanted to see her sister."

1804. Matthew then continued to try to harass, intimidate, and have contact with others to cause me annoyance and alarm and texted Lindsay again at 9:26PM and said "Then you should have picked her up 1st. Bring Angelina home now." Matthew then continued to try to harass, intimidate, and have contact with others to cause me annoyance and alarm and texted Lindsay again at 9:27PM and said

"You are 45 mins away and you haven't even left yet." Lindsay responded and said "Yes I understand leaving now."

1805.   Matthew then continued to try to harass, intimidate, and have contact with others to cause me annoyance and alarm and texted Lindsay again at 9:27PM with four more back-to-back texts and said "I told you to stay in this area and not to listen to Theo."

1806.   At 9:29PM, Matthew then messaged me in the app and said, "Bring Angelina home now. All of your visits have had problems. The structure of the visits are going to change and start being location specific. I told you to stay in this area."

1807.   At 9:36PM, I replied to him and said, "There are no problems. You have no right to control my movements. Due to your threats and the fact that you told Lindsay you were having us arrested and calling the police because you were angry that we didn't stay in Waterbury when nobody has any reason to stay in Waterbury this is out of control. I was advised not to go to your house. Let me know which police station you will meet at. You haven't allowed me more than an hour a time. Let me know which police department you will be meeting us at and I already called the Waterbury police to report that you were harassing my friend and harassing me and having contact with her to cause me annoyance and alarm and that you will not stop even though I told you repeatedly, you keep making disparaging comments to her about me to try to scare her and intimidate her. You also are interfering with my ability to enjoy time with my daughter peacefully without being harassed. It has been less than 2 hours since we got her. This is not in the best interest of Angelina, who has been desperately begging to see me for weeks and you keep denying her the right to see me. The Waterbury police told me not to go there so if you want her to go back with you, you need to meet me somewhere else. I'm not playing the same game anymore with you trying to bait me and threaten to get me arrested. The officer told you exchange can't take place there. Since you are insisting on calling the police and trying to make false allegations on me again I don't feel comfortable doing something which the police already told you today is not allowed. Please let me know soon because I'm not going to play this game where you don't respond and you don't answer."

1808.  Matthew continued to abuse me, use coercion, interfere with me, harass me, and stalk me by reading my message and saying nothing in response. All of this was in violation of the protective order.

1809.  At 9:42, I messaged him again and said, "I repeatedly asked you to stop harassing my friend. This contact you're having with her it causing me annoyance and alarm. You are ordered by a protective order not to abuse me this way. Stop harassing my friend. We have been in constant communication with you for the entire two hours that it's been since we've had Angelina. Angelina is crying and doesn't wanna go back with you. Which police station are you meeting us at? You keep threatening with the police so for my own protection, I'd like to meet you at the police station. Let me know which one you're meeting us at and stop demanding we go to your house."

1810.  Matthew continued to abuse me, use coercion, interfere with me, harass me, and stalk me by reading my message and saying nothing in response. All of this was in violation of the protective order.

1811.  Matthew then continued to try to harass, intimidate, and have contact with others to cause me annoyance and alarm and texted Lindsay again at 9:40PM and said "I'm getting nowhere talking with Theo, these are the issues I was talking about. What time will you be here."

1812.  At 9:43PM, I messaged him again and said, "I just asked you which police station we're meeting at. You were told by the police that we can't go to your house and you keep threatening us. Are you going to meet us at the police station?"

1813.  Matthew continued to abuse me, use coercion, interfere with me, harass me, and stalk me by reading my message and saying nothing in response. All of this was in violation of the protective order.

1814.  Matthew then continued to try to harass, intimidate, and have contact with others to cause me annoyance and alarm and texted Lindsay again at 9:46PM and said "Look, I left Angelina in your care, you picked her up from the house and took my daughter with you. What is your eta." Lindsay responded at 9:49PM and said "20 mins"

1815.  At 9:47PM, I messaged him again in the app and said, "?????"

1816.  Matthew then continued to try to harass, intimidate, and have contact with others to cause me annoyance and alarm and texted Lindsay again at 10:19PM and said "??"

1817.  Matthew then messaged me at 10:37PM in the app and said, "From now on I will be picking the supervisor and the location of your visits. All plans must be made 24 hours prior."

1818.  At 10:38PM, I messaged him back and said, "Why would you tell Angelina that she's not going to see me for a while? This is psychological abuse. You are court ordered to give me a schedule with her. I would like to see her tomorrow. There's no reason why you should be withholding her from me like this, and this is parental alienation."

1819.  Both my daughter Julianna Viglione and my friend Lindsay Fitzgerald witnessed that Matthew told my daughter when they dropped her off that she would be "not seeing mommy for a very very long time" and my daughter got upset and cried.

1820.  At 10:42PM, Matthew responded and said, "No this is protecting her from your abuse. You are under supervised visitation. We can schedule your next visit for sometime next week. My mother will start supervising small visits for you at the park until I feel comfortable letting her go with you again."

1821.  Matthew then continued to try to harass, intimidate, and have contact with others to cause me annoyance and alarm and texted Lindsay again at 10:44PM immediately after we left and said "Thank you for your help tonight. Unfortunately, you will no longer be allowed to supervise her visits for showing up an hour and a half and going outside the area after I asked you not to. I will no longer be contacting you and ask that you do the same."

1822.  Matthew's contact caused me annoyance and alarm because he eliminated my friend Lindsay as a supervisor when she did nothing wrong and harassed us the entire time while we only were allowed to spend a short amount of time with Angelina.

1823.  When we tried to drop off Angelina, she begged and cried and said that she didn't want to go with Matthew. She repeatedly stated she wanted to stay with us and he forced her to return to him after only allowing us a few hours with her for the entire month.

1824.  His actions on this day were all clear violations of the protective order, in addition to coercion, harassment, and abuse.

1825.  Matthew was extremely emotionally abusive, harsh, and cruel when he told Angelina that she won't be seeing me anymore for a "long time" She told him "mommy said she can see me tomorrow" and she asked repeatedly why she can't see me, and he continued to tell her no. She asked repeatedly and told him repeatedly saying "I want to see mommy" and he kept repeating "no, no, no, no" and my friend Lindsay Fitzgerald and my daughter Julianna Viglione both witnessed this.

1826.  Angelina said to Matthew, "Why do you keep saying no when I'm trying to talk to you?" and Matthew just ignored her and demanded she go into the house and slammed the door.

1827.  This is all very alarming, and abusive toward both me and my children. (See OFW, recordings, messages, and phone records from 7/6/23)

1828.

1829.  On 7/7/23, Matthew interfered with my ability to speak to my child and did not allow me to see or speak to her. He also spoke to me directly during the call in violation of the protective order.

1830.  At 11:15AM, I messaged him in response to his prior message and said, "Why would you say that? I dont abuse angelina. What time can i see her today? I promised her i would see her today and she was begging for it."

1831.  Matthew continued to abuse me, use coercion, interfere with me, harass me, and stalk me by reading my message and saying nothing in response. All of this was in violation of the protective order.

1832.  At 4:39PM, I messaged him again and said, "Hello?? This is an example of you refusing to let me see and speak to my child and ignoring my attempts to do that."

1833.   At 4:41PM, Matthew replied and said, "This is not an example of that, you just saw Angelina last night. You showed up an hour and a half late. You also went all the way down the Orange when I told you to stay in to the area. You can call and talk to Angelina anytime you feel like. There is no visitation available today tomorrow or Sunday. Check back with me again Monday evening."

1834.   At 6:46PM, I replied to him and said, "Showed up late? There is no schedule. I tried to call multiple times and you rejected them all. I want a call from her now. You never said to stay in the area. You controlling my movements is abuse and coercive control. Why is there no visitation available today tomorrow or Sunday? Why are you denying me the access to see and speak to my child ?"

1835.   Matthew continued to abuse me, use coercion, interfere with me, harass me, and stalk me by reading my message and saying nothing in response. All of this was in violation of the protective order.

1836.   At 7:12PM, I messaged him again and said, "I have been trying to FaceTime and call Angelina all day. You have not responded at all. I requested for you to have me call her and you did not answer. I want to speak to her."

1837.   Matthew continued to abuse me, use coercion, interfere with me, harass me, and stalk me by reading my message and saying nothing in response. All of this was in violation of the protective order.

1838.

1839.   On 7/8/23, Matthew interfered with my ability to speak to my child and did not allow me to see or speak to her. He also spoke to me directly during the call in violation of the protective order.

1840.   I messaged Matthew in the app at 12:58PM and said, "It has been 7 weeks of you ignoring Angelina's medical and mental health needs, and only allowed me the equivalent of 1.5 days with her in the last 7 weeks. This is criminal and interference and abuse and harassment. I want to see my daughter. You keep hitting her and holding her and restraining her and using force on her. She's a little girl. She needs her mother. Why do you keep abusing us this way? I haven't seen or heard from her in days. I need a call now or police will be called. I will also be reporting about your mother." (See OurFamilyWizard messages from 7/8/23)

1841.  Matthew continued to interfere with my ability to speak to my child and read my message and ignored me.

1842.  At 7:20PM, I messaged Matthew again in the app and said "Why aren't you letting me FaceTime Angelina?"

1843.  Matthew continued to interfere with my ability to see and speak to my child and never replied and ignored me.

1844.  At 7:27PM, I sent him another message in the app and said, "Hello???"

1845.  Matthew continued to interfere with my ability to speak to my child and read my message and ignored me. Matthew also spoke to me during the phone call that I attempted to have with my child. This is a direct violation of the no-contact order. (See videos from 7/8/23)

1846.

1847.  On 7/9/23, Matthew interfered with my ability to speak to my child and did not allow me to see or speak to her.

1848.  I messaged Matthew in the app at 8:46AM because he never replied to my message from the day before. I said "Hello??? Why do you keep ignoring me and isolating me from Angelina?? I want to see and speak to my child. This is abuse. She needs medical and mental health service and needs regular time with me. Why are you trying so hard to keep her away from me?"

1849.  Matthew continued to interfere with my ability to speak to my child and read my message and ignored me.

1850.  At 10:26AM, I messaged him again and said "Please respond. Reading my messages and ignoring them is abuse. Where is Angelina??? I want to see and speak to her now."

1851.  Matthew continued to interfere with my ability to see to my child and harassed me by responding with gaslighting and lies.

1852.  At 10:49AM, he messaged me and said, "I already responded to the messages, I'm not gonna keep repeating myself. She's not available to hang out today. You can call anytime you would like."

1853.  Matthew's statements caused me annoyance and alarm because he never responded to the messages. Him saying "I already responded" when he did not

respond and the messages prove that, was an attempt to harass and interfere with me further.

1854. Matthew saying that Angelina is "not available to hang out today" was also interfering with my custodial right to see and have visitation with my child. (See OurFamilyWizard messages from 7/9/23)

1855. Matthew was psychologically abusing me and using coercive control to isolate me from my child. He then said I can call anytime I would like, but when I attempted to call, both of his phones were going straight to voicemail.

1856. At 7:48PM, I replied to him and said, "You didn't respond to any of them. I called and you ignored me. How was she unavailable? You withheld her from me. I want to see her now. Why are you withholding her?"

1857. Matthew continued to harass me and interfere with me and read the message and did not respond.

1858. Angelina got very upset around 7:54PM because Matthew started to immediately interfere with my ability to speak to her and said "tell mama it's time to go" and Angelina got very upset. She started crying saying that she didn't want to say bye to me. It was heartbreaking that he was telling her that she had to go and making her cry and getting her all upset and he didn't even care. (See recording from 7/9/23)

1859. Matthew continued to interfere with my call with Angelina in violation of the protective order, and then abruptly hung up and terminated the call and said he would not allow me to speak to my child further because he "had to go pick up his son Dom" and would not allow me to speak to Angelina on either of his phones or on his mother's phone, and forcibly ended the call in an effort to interfere with my ability to speak to my child. He also upset Angelina in the process. (See recorded call from 7/9/23)

1860. At 7:58PM, I messaged him and said, "You denied me the ability to see Angelina for the entire weekend, refused to let me speak to her all day, and then only allowed me a 3-minute FaceTime call that you interfered with and then abruptly ended and made her cry and get upset? She said she wanted to talk to me more and you said, "No I have to go. Say bye. I need to go pick up Dom you can't

talk to her anymore I need to pick up Dom" and she was upset and about to cry and said she didn't wanna stop talking. Instead of allowing her to use your mom's phone to keep talking, you upset her, hung up in my face, and didn't even let her say bye. I will be reporting this to the police. This is abuse. You have no right to only allow me 3 minutes of contact with Angelina in a 3-day period."

1861.   At 8:02PM, Matthew continued to interfere with my ability to see and speak to my child and sent me messages using derogatory language toward me and said, "I'm not sure what's going on with you, but I'm very concerned. You talk to Angelina last night? You didn't call her all day until she's going to bed to talk to her. This is not my fault. This is your own doing. You could've called all day today and you didn't. You've been talking to her every day. I've been very fair with letting you talk to her. You keep saying you haven't talk to her in days yet you talk to her every day. I'm very confused. Please let me know when you're available to schedule your next visit and I will work with the supervisors to accommodate."

1862.   Matthew's statements were meant to be harassing and derogatory. Him saying "I'm not sure what's going on with you, but I'm very concerned" is him insulting me and belittling me in the app.

1863.   He then tells me that "I keep saying I haven't talked to her in days" but I said that I have not seen her in days. Every statement he made was a further attempt to harass me and interfere with my ability to see/speak to my child, as well as to use coercion and gaslight me with lies. (See OurFamilyWizard messages from 7/9/23)

1864.

1865.   On 7/10/23, Matthew interfered with my ability to speak to my child and did not allow me to see or speak to her. I attempted to contact his phone via Facetime at 7:05PM twice in a row, and he did not answer. (See screenshot of call log; See OurFamilyWizard messages; see recording of attempting to call)

1866.   At 1:30PM, I messaged him in the app and said, "I want to see her now. Can you meet me at the park in Woodbridge ? I have done all the driving every time."

1867.   Matthew continued to try to psychologically abuse me, harass me, and use coercion by reading my messages and saying nothing.

1868. At 1:32PM, I messaged him again and said, "I'm available now. How long until we can meet at the park in Woodbridge?"

1869. Matthew continued to try to psychologically abuse me, harass me, and use coercion by reading my messages and saying nothing.

1870. At 3:46PM, I messaged him again and said, "Hello???? Its been 2 hours since you read my message without responding. Are you going to keep alienating me ??"

1871. Matthew continued to try to psychologically abuse me, harass me, and use coercion by reading my messages and saying nothing.

1872. At 3:46PM, I messaged him again and said, "Hello???? Its been 2 hours since you read my message without responding. Are you going to keep alienating me ??"

1873. Matthew continued to try to psychologically abuse me, harass me, and use coercion by reading my messages and saying nothing.

1874. During the day, I also tried to Facetime twice, and got no response.

1875. At 7:07 PM I attempted to call twice, and both times it went straight to voicemail. (See call log screenshots)

1876. I tried to call his other phone on Google Meet. He did not answer. At 7:07PM I attempted to call his regular line twice, and both times it went straight to voicemail. (See call log screenshots)

1877. I tried to Facetime to speak to Angelina per court order and tried to message Matthew in the app and he did not respond to any of my messages regarding me trying to see Angelina, who he is actively isolating from me.

1878. Matthew did not allow me to Facetime, speak to, or see Angelina for the entirety of the day. The fact that he continues to interfere with my ability to see her is a direct violation of the protective order, as well.

1879. At 7:08PM, after getting no response from Matthew on any of his lines or in the app, I attempted to contact Karen Bowers, Matthew's mother.

1880. Matthew regularly will leave Angelina with Karen Bowers for 16-18 hours daily, sometimes even overnight, while he works, goes out drinking, and spends time with sexual partners at their house.

1881.   Matthew rarely is with Angelina, and he has instructed Karen Bowers not to allow me any access to Angelina while she spends 90% of her time with her.

1882.   She was with Angelina and allowed me to Facetime with her for 35 minutes.

1883.   She did not interfere with the call, did not have third-party contact with Angelina during the call, and did not instruct Angelina to end the call or mute the phone during the call.

1884.   She allowed me to speak to my child, unlike how Matthew typically acts. (See Recorded call from 7/10/23) (See ourfamily wizard messages from 7/10/23)

1885.   When I finally was able to speak to Angelina, she stated that Matthew was not even with her for the entire day, despite him withholding her from me. Angelina told me at 7:20PM that Matthew worked the whole entire day and that she wasn't even with him as early as 7:20PM.

1886.   Ultimately, Matthew abruptly ended the call and terminated the call with Angelina and didn't allow me a reasonable amount of time to speak to her. (See recordings from 7/10/23)

1887.

1888.   On 7/11/23, Matthew interfered with my ability to speak to my child and also had third-party contact and contact with others likely to cause me annoyance and alarm. He also contacted me in the OurFamilyWizard app and insulted me and made disparaging statements and tried to harass and intimidate me.

1889.   At 8:17AM, I messaged him in the app and said, "Day two of me, asking you when I can see Angelina and you ignoring me in the app. Yesterday you left her with your mother for the entire day and entire night. She stated that you are working and you're working 20 hours a day. I want to see Angelina, why is she with your mom all the time? You're not even available to parent her and you just dump her off with your mother who is too old and senile to function. 1. What time can you bring Angelina to me today? 2. I never got any of the money you said you were sending me a month ago. Can you send it? 3. Why is Angelina spending 90% of the time with your mother while you work but you keep saying you're jobless? I want to see Angelina NOW."

1890.   At 8:19AM, I messaged him in the app and said, "Given your unwillingness to accommodate reasonable requests, I am left with no choice but to focus my efforts on seeking a modification of our custody/visitation order to ensure that I am able to spend as much time as possible with our child."

1891.   At 9:14AM, Matthew responded to my earlier message and said, "1. No one is bringing Angelina to you. As I stated multiple times you need to discuss with me and schedule a supervised visit. Let me know when you want to do that and I will let you know if we are available. Today we are busy all day. 2. I never got to send any extra money because I have been paying the child support I owe. I also have not received any child support from you yet. 3. Angelina did not spend 90% of any time with my mother, I left yesterday evening for a bit and my mother put her to bed for me, not that it's any of your business."

1892.   Matthew's statements were made to try to cause me annoyance and alarm. His statement that "No one is bringing her to you" shows that he is unwilling to exchange the child pursuant to the most recent family order that says he needs to allow me access and give me a schedule.

1893.   His statement that "I never got to send any extra money because I have been paying child support I owe" was also meant to harass/annoy me, since he has only been paying it toward his ex-wife, and none of what he pays has gone to me.

1894.   His statement that "I have not received any child support from you yet" is also meant to harass me, as he owes me more than $15,000 in unpaid child support and child care payments from 2021-present, and has not paid a single penny toward it. I do not owe him anything until his balance is cleared, which he makes no effort in paying.

1895.   Matthew also lied to try to annoy/harass me by saying that he "left for a bit" and that its "not my business" because Angelina said on a recorded call the night before that she spent the whole day with his mother and that he was not there and that he was "working".

1896.   At 9:54AM, Matthew continued to interfere with my ability to see and speak to my child and messaged me back with a thumbs up emoji, showing that he does not care about what I said.

1897. At 10:01AM, I sent Matthew another message and said, "1. Why not? You can't be reasonable and help facilitate the mother/daughter relationship? This is parental alienation. 2. I said to you every day I want a visit. You read my message and ignore them. 3. You haven't paid me any of the child support you owe. I received $0 from you and $0 in childcare. 4. You said you were busy every single day since Thursday. You told me I could see her on Monday and now it is Tuesday and you are still refusing to let me see her. You said you were busy yesterday, but she was with your mother the whole day. This is parental alienation. 5. Angelina stated that you were gone the entire day, and she was with your mother the whole entire day. Stop, accusing my child of lying. You were not even with her. I messaged you and called you yesterday and you ignored me the entire day. If she was with you, why weren't you answering? 6. The fact that you are too unstable to handle parenting, Angelina, and that you have your mother doing it is my business. Your mother is going to be taken into court and made a formal party to the case."

1898. At 10:18AM, I responded and said, "So just to confirm, you are refusing to provide me access to Angelina unless we go back to court? I asked daily to see her for the last 47 days and you only allowed me the equivalent of 1.5 days total. This is parental alienation and custodial interference. Your actions also violate the criminal order of protection. Can you please allow me to see Angelina? She and I miss each other terribly and this is causing her permanent trauma."

1899. Matthew continued to interfere with my ability to see and speak to my child and read my message and did not respond.

1900. At 11:53 AM, I messaged Matthew again after he ignored me and said, "Hello???"

1901. Matthew continued to interfere with my ability to see and speak to my child and read my message and did not respond.

1902. At 11:534AM, I messaged Matthew again in the separate thread that he also ignored and said, "Hello???"

1903. At 12:27PM, Matthew responded and said, "Are you available tomorrow for a visit"

1904. He intentionally ignored my repeated requests for a schedule and continued to try to use harassment and coercion by ignoring what I asked and instead expecting me to respond to his last-minute unplanned sporadic attempt to make it seem as if he was going to allow me access to my child when he had no real intention of doing so. He also made it clear by this response that he would not allow me to see Angelina at all on this day since he was suggesting the following day.

1905. At 7:06PM, I responded to him and said, "What do you mean? Tomorrow when? I asked to see her today."

1906. Matthew continued to ignore my requests to see my child, continued to interfere with and prevent me from being able to see her, and continued to harass me and coerce me to have no contact with my child as a form of abuse.

1907. At 7:11PM, I tried to FaceTime Angelina, and Matthew finally allowed me to speak to her. She spoke to me on the phone and she said she was "putting her dolls to bed at Amber's house."

1908. I asked her who Amber is and said Amber is "dada's friend" and she told me that she spent time there with her and Matthew.

1909. Matthew continued to interfere during the call and when I asked Angelina, "Daddy said you had plans all day today, what did you do?" Angelina said "I don't remember."

1910. I said, "were you with daddy and Amber all day?" Angelina said "No."

1911. I said, "No?" "What were you doing then?"

1912. Matthew then immediately started to interfere and started telling Angelina what to say in the background.

1913. I said, "Angelina, is daddy telling you what to say again? I can hear him in the background telling you what to say." Angelina said "Well, he always talks during the phone."

1914. I said "I know he shouldn't be doing that though."

1915. Even my four-year-old daughter is able to say that she sees that Matthew "always" interferes and harasses us during the calls.

1916. Matthew was then forcing Angelina to stay in a room and would not let her leave the room if she was still on the phone with me.

1917.  Matthew refused to let Angelina out of the room. He said "I'll let you out as soon as you're done talking to mama."

1918.  I then said to my daughter, "I'm so sad that daddy didn't let me see you again today. I'm really sad I didn't get to see you again. I tried asking daddy, he didn't let me."

1919.  Matthew did not let me see her again. I did try asking him and he didn't let me.

1920.  Matthew has been telling my child that I abandoned her and telling her that I don't want to see her and that if I wanted to see her I could see her "anytime I want" however in reality I beg daily for him to provide me with a schedule and beg daily to see her and he refuses.

1921.  I want my daughter to know that I am asking daily to see her and that I want to see her and that I love and miss her terribly.

1922.  Matthew then immediately told her he was going to terminate the call and interfered with my ability to speak to my child and used coercion to isolate her from me further.

1923.  Matthew then said to Angelina, "Mommy is saying bad things again. Say bye to mama."

1924.  I said, "Angelina, what do you mean say bye im still talking to you."

1925.  Angelina then said "daddy said that I didn't say that."

1926.  I said to Angelina "I'm really sad and I really wanted to see you. I was asking to see you again today and daddy didn't let me and I'm very sad about that. I really miss you a lot."

1927.  Matthew then immediately told her he was going to terminate the call and interfered with my ability to speak to my child and used coercion to isolate her from me further.

1928.  Matthew said, "say bye to mama because she's not supposed to be saying that."

1929.  Angelina said, "I'm not saying bye." I said, "Angelina, is daddy trying to tell you to say bye again?"

1930. Matthew then took the phone and said, "Listen, mommy is saying a lot…" He then hung up.

1931. I tried to call back Angelina again and she answered. I asked her "Angelina, why did daddy hang up again?"

1932. Angelina then said, "He thought…he said you were saying bad things but you're not."

1933. I said, "Oh, well that's not very nice. He shouldn't be hanging up when I'm trying to talk to you."

1934. Angelina then said, "And I said why would you do that and then he said cuz…"

1935. At that point Matthew tried to interfere and stop Angelina from talking again.

1936. Matthew then tried to brainwash Angelina and said, "I know you're very confused."

1937. I said to Angelina, "It's okay Angelina you can tell mommy. Daddy shouldn't be stopping you from talking. He said what?"

1938. Matthew then continued to try to use coercion and intimidate and harass both Angelina and I further.

1939. Matthew continued to try to interfere and tell Angelina not to answer.

1940. I then said, "he said what? It's okay you can tell me. Don't let daddy scare you."

1941. Angelina then said, "yeah, I'm not gonna let daddy scare me." I said, "So what were you saying?"

1942. Matthew then continued to try and interfere and tell her what to say and intimidate and coerce her into not answering me.

1943. Angelina then said, "Um, I was saying…um…I don't remember. What was I saying?"

1944. Matthew kept trying to talk to her.

1945. I said, "You said daddy was saying I was saying bad things but I'm not right?"

1946. Angelina said "yup"

1947. I said, "And why did he keep hanging up the phone? Because he was trying to talk to you?"

1948.   Angelina said, "Yeah. He wants to talk to me during the phone."

1949.   I said, "Alright well I'm trying to talk to you so can you take the phone please?"

1950.   I said "Angelina I really want to see you." Angelina said "And I really wanna see you too!" I said "And I wanna see you right now." Angelina said "And I wanna see you right now too!" I said, "I'm really sad that daddy didn't let us see eachother today." Angelina said "Yeah. And where is Julianna at?" I said, "Julianna is at swimming at the pool."

1951.   Angelina asks for me and her sister Julianna every time she speaks to us and asks to see us daily and Matthew denies her access to us.

1952.   At 7:32 PM, during the FaceTime call, Beth Wallace and Casey Wallace came to the house to stop by and drop off some homemade lasagna for us unexpectedly. Angelina said hi during the call.

1953.   Matthew then spoke to me during the call again.

1954.   I said to my daughter, "We can't hear you." I then said to Beth, "I don't know what's wrong with the phone."

1955.   Matthew then immediately interfered with the conversation, spoke to me directly on the phone in violation of the no-contact order, and said, "Maybe it's the voice. Hold on let me see. Here. Let me take it off voice isolation. Try it now. Maybe you can hear better now."

1956.   Angelina then spoke to Beth and me for a minute. Casey was also there as well and witnessed the conversation. The call was on FaceTime.

1957.   Beth said to Angelina, "Are you playing?" Angelina said, "Yup"

1958.   During the call, Angelina then started to hit her dolls. She repeatedly started to hit her doll in the back and slap her dolls repeatedly and said "Go to sleep. Go to sleep!" as she hit them repeatedly.

1959.   I said, "Did you just hit your doll?"

1960.   Angelina said, "No, I'm trying to get her to sleep."

1961.   I then said, "So why did you hit her then?"

1962.   Angelina then said, "Because, she's not going to sleep!"

1963.   I then said, "You don't hit people for not going to sleep."

1964.   Angelina then said, "Well, she likes that. She says it doesn't hurt!"

1965.   I said, "She likes getting hit and says it doesn't hurt?"

1966.   Angelina then said, "yeah, she said it doesn't hurt."

1967.   Angelina previously stated that Matthew hit her on her back because she "didn't want to go to sleep." The fact that she was playing this out while she was on the FaceTime call shows that she is acting out the things that are happening to her through play, which is typical for children her age.

1968.   Beth, Casey, and I all felt that this was inappropriate. I said "Hm, that's interesting."

1969.   Angelina then started to get wild and tried to kick Matthew in the face repeatedly.

1970.   At 7:35PM, he responded to my prior message in the app and said, "Are you available for a visit tomorrow, yes or no. If yes, what time."

1971.   At 7:46PM, after he terminated the call, in an effort to harass me and intimidate me further, Matthew messaged me again in the app and said, "I asked you multiple times not to say those things to Angelina. From now on, during your supervised phone call, if you say anything derogatory towards her, for example (daddy is keeping you from me. I don't know why daddy won't let you see me, etc) then I will be terminating the phone call instantly until the next day. You are confusing her. She should not be interrogated by you. The phone call is supposed to support and help maintain your relationship with her in hopes that one day you will get better enough to start having regular visits again. You heard her say "why are you trying to make me cry mama" that's not ok. Please I'm asking you to do what's in Angelina's best interest. I can't idly sit back and let you confuse her like that. I've been very lenient with the calls but this needs to stop. Please do not say any more bad things to our daughter that confuse or hurt her. Thank you for your understanding."

1972.   Nothing that I said to my child was confusing, derogatory, or outside of my child's best interest.

1973. Matthew threatening to terminate the calls and threatening to withhold contact with my child is harassment, coercion, and abuse. His actions are to intimidate me, scare, me, and hurt me.

1974. Matthew's statements that "in hopes that one day you will get better enough to start having regular visits again" is an insulting and disparaging statement that he made in order to degrade me and insult me.

1975. Nothing in the court order states that I need to "get better enough to start having regular visits."

1976. Nothing in the court order states that Matthew can terminate my right to visitation and contact with my daughter.

1977. Nothing in the court order states that anything needs to be done for me to be able to have regular visits with my child.

1978. Matthew was court ordered to provide me with a schedule as well as with regular visits and has refused to do so.

1979. At 7:56PM, in response to Matthew's question about if I wanted to see Angelina the next day, I replied and said, "Are you able to bring her to me since i have done all of the transportation in the last 2 months?"

1980. Matthew continued to interfere with my ability to see and speak to my child and read my message and did not respond.

1981. At 7:57PM, in response to Matthew's disparaging paragraph in which he intimidated, threatened, and insulted me, I said, "Say what things? Saying i dont know why you wont let me see her is not derogatory. You alienating her and using coercion is a crime and your girlfriend Amber is an accessory. Charges are being filed."

1982. Matthew continued to interfere with my ability to see and speak to my child and read my message and did not respond.

1983. At 7:59PM, I sent Matthew another message and said, "Please do not interfere with me and have contact with her to cause me annoyance and alarm. You refusing to allow me access is criminal. The statements you said in the paragraph you sent are harassment. Get better? What does that mean? I am calling the police now. You have no right to contact me with harassing language like this."

1984.   Matthew continued to interfere with my ability to see and speak to my child and read my message and did not respond.

1985.   At 8:01PM, I sent Matthew another message and said, "I noticed during the call that Angelina was acting out, her dolls being hit for not going to bed. Angelina stated that you hit her before several times for not going to bed. I witnessed you hitting your children as well, and you threatened that you would beat up Angelina on several occasions. I'm reporting this to Dcf. You have no right to abuse and neglect our daughter. Please let me know when you will be bringing her to her medical follow up and therapy. You have no right to continue neglecting her this way. Also, the fact that you have her around different women every other week. This just shows that you're unstable. You bring her around different women all the time and just a few weeks ago she stated that you were with someone else. This is not healthy. You need to stop doing things that are detrimental to her mental health."

1986.   Matthew continued to interfere with my ability to see and speak to my child and read my message and did not respond.

1987.   At 8:03PM, I messaged Matthew again and said, "It has now been a month since you were told in Court that you are required to provide me with a schedule for seeing Angelina. I told you several times I wanted to see her 5 to 7 times a week, and that I could make myself available daily for her. I would like at the bare minimum to see her Monday through Friday. I would also like to have some overnights in there and to plan our vacation that we were supposed to do for her birthday. Please confirm that the schedule will be OK and we need to also work out visitation and transportation since I cannot be the only one doing all the driving. Are you going to discuss the schedule with me or are you going to keep alienating me from her?"

1988.   Matthew continued to interfere with my ability to see and speak to my child and read my message and did not respond.

1989.   At 8:10PM, I messaged Matthew again in the app and said, "Hello? Why do you keep reading my messages and then ignoring them? Our family wizard shows a timestamp for when you first viewed the message. You opened and read all of

my messages and ignored them all. Can you please respond? Only allowing me to see Angelina for 1.5 days in 46 days is child abuse and neglect, coercion and parental alienation. This is also a violation of the protective order that says you cannot interfere with me as a protected party. Why do you keep doing this? This is not right. Please respond. I need to see Angelina. Telling me that she's unavailable for days on end and refusing to give me a schedule is abuse and alienation."

1990.  Matthew continued to interfere with my ability to see and speak to my child and read my message and did not respond.

1991.  At 8:10PM, in response to Matthew's other message that he read and ignored, I said, "Hello? Why do you keep reading my messages and then ignoring them? Our family wizard shows a timestamp for when you first viewed the message. You opened and read all of my messages and ignored them all. Can you please respond? Only allowing me to see Angelina for 1.5 days in 46 days is child abuse and neglect, coercion and parental alienation. This is also a violation of the protective order that says you cannot interfere with me as a protected party. Why do you keep doing this? This is not right. Please respond. I need to see Angelina. Telling me that she's unavailable for days on end and refusing to give me a schedule is abuse and alienation."

1992.  Matthew continued to interfere with my ability to see and speak to my child and read my message and did not respond.

1993.  At 8:11PM, I wrote in the other thread that Matthew also ignored and said, "Hello? Why do you keep reading my messages and then ignoring them? Our family wizard shows a timestamp for when you first viewed the message. You opened and read all of my messages and ignored them all. Can you please respond? Only allowing me to see Angelina for 1.5 days in 46 days is child abuse and neglect, coercion and parental alienation. This is also a violation of the protective order that says you cannot interfere with me as a protected party. Why do you keep doing this? This is not right. Please respond. I need to see Angelina. Telling me that she's unavailable for days on end and refusing to give me a schedule is abuse and alienation."

1994.  Matthew continued to interfere with my ability to see and speak to my child and read my message and did not respond.

1995.  At 8:11PM, in the other thread that Matthew also ignored, I messaged him again and said, "Hello? Why do you keep reading my messages and then ignoring them? Our family wizard shows a timestamp for when you first viewed the message. You opened and read all of my messages and ignored them all. Can you please respond? Only allowing me to see Angelina for 1.5 days in 46 days is child abuse and neglect, coercion and parental alienation. This is also a violation of the protective order that says you cannot interfere with me as a protected party. Why do you keep doing this? This is not right. Please respond. I need to see Angelina. Telling me that she's unavailable for days on end and refusing to give me a schedule is abuse and alienation."

1996.  Matthew continued to interfere with my ability to see and speak to my child and read my message and did not respond.

1997.  At 8:11PM, I wrote in one of the other threads that Matthew ignored as well and said, "Hello? Why do you keep reading my messages and then ignoring them? Our family wizard shows a timestamp for when you first viewed the message. You opened and read all of my messages and ignored them all. Can you please respond? Only allowing me to see Angelina for 1.5 days in 46 days is child abuse and neglect, coercion and parental alienation. This is also a violation of the protective order that says you cannot interfere with me as a protected party. Why do you keep doing this? This is not right. Please respond. I need to see Angelina. Telling me that she's unavailable for days on end and refusing to give me a schedule is abuse and alienation."

1998.  At 8:16PM, Matthew responded and said, "Are you available tomorrow for a supervised visit. I'm sorry but overnights are not going to happen. Not until you are ready to get regular visitation again. Right now, your behavior towards her shows me that you aren't ready for that yet. After the issues we had with the last couple supervised visits, they will now be location specific and on a strict time line. So let me know if you are available for an hour or two tomorrow to spend with her and I will coordinate a supervisor."

1999.   Nothing in the court order states that I am not "ready to get regular visitation again."

2000.   Matthew was instructed and ordered by the court to provide me with regular visitation and was warned on 6/15/23 that he needed to do so, yet has continued to defy court orders and withhold my daughter from me.

2001.   Nothing in my "behavior towards her" shows anything about being "not ready" for visitation, and Matthew has no legal right to determine that.

2002.   There were no "issues the last couple supervised visits" and this is simply lies and gaslighting, because each of the few visits had zero issues, and I documented, photographed, and videotaped every minute of them and can prove that with evidence.

2003.   Nothing in the court order gives him the right to harass me, abuse me, and use coercive control by dictating that there must be "location specific" and a "strict time line" to be able to see my child.

2004.   Matthew is psychologically abusing me and isolating my from my child which is child abuse.

2005.   Matthew also has tested positive for HSV1 and HSV2 and regularly and recklessly spreads the virus to others deliberately.

2006.   I noticed that he was kissing my child on the mouth during a call and felt that it was both inappropriate and a health risk.

2007.   At 8:24PM, I messaged him in the app and said, "I noticed you kissed Angelina directly on the mouth tonight during the call. I noticed you photographed yourself doing this to your other children, as well. Please do not kiss Angelina on the mouth again. You are hsv-2 positive and you know that this is a risk to her. The hospital records even show you told the doctor you were positive when in the ER. Please don't do this again. You are endangering her and exposing her to an std."

2008.   Matthew read my message and said nothing.

2009.

2010.   On 7/12/23, Matthew used coercion and was trying to also use parental alienation and psychologically abuse my child by making disparaging statements about me to her after the call.

2011.   At 8:34AM, I messaged him in the app and said, "Are you able to bring her to me? I asked repeatedly."

2012.   Matthew continued to interfere with me and emotionally abuse me by reading my message and saying nothing.

2013.   At 8:36AM, I messaged him again and said, "I need you to give me a schedule to see angelina 5-6 times a week like the judge said. What are the 5-6 days you are giving me ??"

2014.   At 8:48AM, Matthew replied and said, "No judge ever said 5 to 6 times a week, not only did she not say that, when you said you wanted to have Angelina five days a week she said no not happening. I told you that we can plan a scheduled visit based on your availability. And no, we are not driving down to you. we can do a supervise visit at the park near my house. When will you be available for that visit?"

2015.   At 9:19AM, I replied and said, "She never said that. I have the transcript. Stop lying. I don't understand, if youre able to drive to the restaurant with your new girlfriend and Angelina, drive to your new girlfriend's house, and drive everywhere else and pay for going out to eat, why cant you and your girlfriend meet me somewhere? Youre being so unreasonable. I want to see Angelina. I want more than an hour. This is unreasonable. Can your girlfriend drop her off to me ?"

2016.   Matthew continued to interfere with me and emotionally abuse me by reading my message and saying nothing.

2017.   At 9:20AM, I messaged him again and said, "I asked you repeatedly not to speak to me during the phone calls, not to interfere during the phone calls, and not to instruct Angelina what to say, and control the conversation during the phone calls. While you were out at a Restaurant, just now, you repeatedly instructed Angelina what to say and tried to have third-party Contact telling her to tell me things please stop doing that. I will be reporting this to the police."

2018.  Matthew continued to interfere with me and emotionally abuse me by reading my message and saying nothing.

2019.  At 9:23AM, I messaged him again and said, "Where are you alienating Angelina from me? I have not been able to see her for more than a day and a half in the last 46 days. This is parental alienation and abuse. If I don't get to see her for more than two hours today then I will be going to the police. I'm not going to keep taking this abuse from you. If you can drive all around town and go out to eat and spend all this money on your girlfriend all day then you can take the time to facilitate the mother daughter relationship and be willing to allow me to see Angelina. You have no right to withhold her from me. You have no right to restrict access like this. I'd like to have a regular schedule like the judge said. This is intentional infliction of emotional abuse, and there will be legal repercussions for your actions along with everybody who is helping you. Please let me know what time you can meet me with Angelina and I'm not going to a dirty park in Waterbury with no bathroom again. That is not in the best interest of Angelina. She has a beautiful home that she wants to go to and play with all of her toys. I would like her to spend some time with us at the house. My neighbors are there and there's several other people who would be willing to supervise. You withholding Angelina is not in her best interest. Please let me know what time you can meet me in when you can give me a reasonable regular schedule for her. Seeing her one or two hours a month is not regular or reasonable."

2020.  At 9:35AM, Matthew replied and said, "None of what you are saying in these messages are accurate. I'm out to breakfast with my Neice and Angelina. You keep saying you want a regular schedule yet you haven't proposed one. She's not going to your house. Not for a while. I have not seen you correct any behaviors regarding your interactions with Angelina. You said you would like to see Angelina today, what is your availability. If you are looking for a regular schedule please send in this app including suggested days of the week, times, location and potential supervisors."

2021.  At 10:44AM, I replied and said, "It is accurate. How are you able to afford taking everyone out to breakfast but can't pay the money you owe me in child

support and child care that is in excess of $15,000? How can you afford breakfast if you are unemployed? You keep financially abusing me. I did propose a regular schedule various times. I stated I wanted to see her monday-friday, and you refused to agree. Why can't I see her mon-friday? That is what she is used to. She has adjustment disorder. She needs therapy. She needs a medical follow-up from her ER visit that was due on 5/31/23. You are neglecting her medical needs. You are refusing to give me a schedule. I asked for monday-friday. There is no reason why you can't allow that, and I have asked repeatedly. I would like to start doing that starting tomorrow. Please let me know. Why is she not allowed to go to my house? Why can't she go to my house for a while? You have no right to alienate and isolate her like this. She has asked repeatedly to go to my house. Is there a reason why you think you have the right to deny her access to her home? I would like to see Angelina today, however have asked you repeatedly to meet me somewhere closer to you. I told you there is a residential stay away and I can't go to your house. Last time we went to a dirty park in waterbury that you demanded we go to and there was trash, dirty needles, and litter everywhere and no bathroom. Angelina asked to go potty and had nowhere to go. She is comfortable being at the house. My suggested times are monday-friday and i can't provide a regular supervisor until i get a schedule. I will then be hiring a paid supervisor and billing you for half the costs. Please let me know what time you can bring her to me today. I really want to see her. This is not in her best interest to be isolated from me, her home, her providers, her church, her family, and everyone else who misses her terribly. I know your only goal is to try to alienate and isolate me from her but this is not right. This is not in her best interest. Please let me know what time you can bring her to me today. I would like more than one or two hours. One or two hours a week is completely unreasonable."

2022. Matthew continued to interfere with me and emotionally abuse me by reading my message and saying nothing.

2023. At 10:45AM, I messaged him again and said, "Is there a reason you didnt respond?"

2024. Matthew continued to interfere with me and emotionally abuse me by reading my message and saying nothing.

2025. At 10:45AM, I sent him another message in response to one of the ones he ignored and said, ""Is there a reason you didnt respond?"

2026. Matthew continued to interfere with me and emotionally abuse me by reading my message and saying nothing.

2027. At 10:45AM, I sent him another message in reply to one he ignored and said, "Is there a reason you didnt respond?"

2028. Matthew continued to interfere with me and emotionally abuse me by reading my message and saying nothing.

2029. At 10:45AM, I sent him a message in response to another ignored message and said, "Is there a reason you didn't respond?"

2030. Matthew continued to interfere with me and emotionally abuse me by reading my message and saying nothing.

2031. At 10:46AM, I messaged him again and said, "I really want to see Angelina. This is coercive control and abuse and interference. In the past 46 days you only allowed me 1.5 days with her. I would like to see her today for a minimum of 6 hours. Please let me know what police station you can meet me at so I can have enough time to make arrangements for someone to be there as a supervisor."

2032. At 11:37AM, Matthew replied and said, "Please stop sending so many messages in so many threads. Let's keep it to one thread. The only thing that needs to be discussed in this app is just your visitation and phone calls with Angelina. Please refrain from speaking about other things. Monday thru Friday? That doesn't work. We can do a few days a week or weekend. I also need to know what times work for which days. Do you have a supervisor or do you need me to provide one. If you do have one I will need to know who it is and discuss the visit with them personally prior. You said you are available today, what time today are you available, and do you have a supervisor for the visit?"

2033. At 11:55AM, Matthew messaged me again and said, "Maybe you didn't understand the message, maybe you don't understand the court order. I'm not going to keep repeating this. You tell me what your availability is today. I will let

you know if I can accommodate. It will be Location specific where you will be with her. It'll also be very time specific and on a limited time due to past issues. If you are providing the supervisor, I will need to know who they are, and be in communication with them before we start the visit."

2034.   At 5:19PM, I replied and said, "Please stop telling me what to do. You do not control my life."

2035.   At 5:20PM, I replied to his other message and said, "Why doesnt monday to friday work??? You had no problem with that being the schedule for the last 4 years. Why is it not not working ???????"

2036.   Matthew continued to interfere with me and emotionally abuse me by reading my message and saying nothing.

2037.   At 5:21PM, I messaged him again and said, "Im available now. can you bring her to elizabeth park ??? I dont wanna be in dangerous inner cities like waterbury with trash and needles on the ground."

2038.   Matthew continued to interfere with me and emotionally abuse me by reading my message and saying nothing.

2039.   At 5:23PM, I messaged him again and said, "The court order says i can see angelina 24/7 if you say yes. The ONLY reason im not able to is because of YOU withholding her. YOU are court ordered to arrange. You could even say no supervisor and it would be allowed. You CHOOSE to withhold her. Where is Angelina ??? I want to take her for dinner with Julianna. Please stop withholding her. Im her mother and she needs me."

2040.   Matthew continued to interfere with me and emotionally abuse me by reading my message and saying nothing.

2041.   I finally was able to Facetime Angelina, and Matthew interfered with my ability to speak to my child by abruptly terminating the call when I was trying to speak to my child. (See recordings from 7/12/23)

2042.   At 5:28PM, I messaged him again and said, "Why did you just denying me access to angelina, speak to me during the call, interfere with a call, and it takes her phone and denied me the ability to see or speak to my daughter? I'm calling the police right now. You have no right to abuse me this way. I want to see

Angelina. You have no right to keep her away from me like this. This is harassment. I'm calling the police. I need a call from my child now."

2043.   Matthew continued to interfere with my ability to speak to my child by abruptly terminating the call when I was trying to speak to my child, and reading my message and saying nothing.. (See recordings from 7/12/23)

2044.   At 5:29PM, I messaged him again and said, "I'm documenting that you are texting while you were driving with my daughter in the car as well."

2045.   At 5:30PM, Matthew messaged me and said, "I told you yesterday, that if you keep saying these things to Angelina, that I will be terminating the phone call. We will call you back for one more chance to talk to her. If you say something like daddy is trying to keep you from me again, I will be hanging up the phone for the rest of the night. As far as visiting her today, I've been asking you all day yesterday and today if you were available today, what time, and who is the supervisor you wait until after 5 PM to tell me that you want to come pick her up and take her out for dinner. do you have a supervisor? I do not have anyone I can call at this time. You waited too long to respond to me about your visit."

2046.   At 5:38PM, I responded and said, "This is parental alienation, abuse, coercion, harassment, and domestic violence. You have no right to tell me that I can not tell my child that you are not allowing me a visit with her. I have asked every day for the last 47 days straight. You are now not only drinking and smoking while driving and while around Angelina, but you are also driving while texting huge paragraphs to me in which you try to harass me, cause me annoyance and alarm, and custodial interference. You have no right to deny me visitation nor do you have right to deny contact. I told you repeatedly i want to see my child and take her to dinner. why did you tell her no? why do you keep alienating me? what do you gain by keeping her away? why not let me see her every day like its always been? you had no problem with that when you were trying to be in a relationship with me. but all the times you said if i didnt sleep with you or date you you would "take her away" and "come after me for child support" shows the type of person you are. I want to see my daughter. You are court ordered to provide supervisor and you said last time that you would be providing the supervisor. now you are

turning around and now saying that I need to take on that responsibility? this is why i will be hiring someone and you will be paying half. Why can't the supervisor be a male? You have no problem having a woman that i never met watch angelina while you work, but won't allow a man to supervise? you make it impossible to see her. the court order doesn't say the person can't be male. the court order doesnt allow abuse or violations of protective order. i want to see angelina. where is she? why are you withholding her? i want to see her. please stop doing this. this is abuse. this is traumatizing her. you are mentally traumatizing my child. please let me see her. this is not right. this is abuse."

2047.   Matthew continued to interfere with me and emotionally abuse me by reading my message and saying nothing.

2048.   At 5:40PM, I messaged him again and said, "????? hello? why dont you answer??"

2049.   At 6:15PM, Matthew then responded with a harassingly long paragraph and said, "Because all you keep doing is saying and doing the same things over and over again. As I stated before I'm not going to keep repeating myself. You need to plan ahead of time preferably the day before. I am not bringing her down to you you will be up this way for your supervised visits. I need you to tell me when you are available, if you have a supervisor, if not I will need to provide one. If you are using your supervisor I will need to know who that person is, and Converse with them prior to the visit so that they understand the parameters of the visit due to the issues we've had in the past. All you keep saying is I am alienating you and keeping her from you. Never once have I done that and never once will I. I keep asking you to follow the same parameters that I keep saying over and over again. But instead of you following those parameters you keep saying you're going to do and want to do what you want to. Your visitation is based on my discretion. I set the parameters forward, you know what they are, and if you want to see her you need to follow these parameters. Please please, stop telling her I'm trying to keep her from you. You are only upsetting her. I get that you are trying to turn her against me and want her to blame me for you not getting to see her as much as you used to. But the fact of the matter is, that you are not doing what you need to

be doing to be able to see her. All you have to do is say for example, "hey Matt, tomorrow I get out at 5:00 p.m. I'd like to spend time with Angelina. I have such and such to do and I could be there at 6pm. I have such and such person to supervise here is their name, and number. Or do you have someone who could supervise for me" and I would say yes and I would accommodate. It's that easy. You keep playing this back and forth game trying to turn Angelina on me and all you are doing is alienating her yourself. You are limiting your own time you get to see her because instead of just following the parameters that are set for your visit you just keep circling around it saying you want to do things your way. You don't have that luxury anymore. You lost that. For now I set the parameters to protect Angelina. This is not a very hard concept to grasp. I know you don't like this situation nor do you like the setup but this is what it is right now. This is the way it has to be for a while. If you can show that you can be a good mother, and a good co-parent, then over time you will regain regular visitation unsupervised. Please try to understand that I am not trying to keep Angelina from you, I want you to see Angelina I want you to be able to talk to her. I am just protecting her from you saying and doing things that are not in her best interest. So let me know when you're next available time is for a visit, and potential supervisors or if you need one. And I will try my best to accommodate. Thank you for your understanding."

2050. At 6:49PM, I responded and said, "Please stop harassing me with mile long paragraph messages. Why are you withholding Angelina? I want to see her now. Can you meet me at the police station now for an exchange?"

2051. At 6:50PM, Matthew responded and said, "Please read last message for answer for that question."

2052. At 6:52PM, I responded and said, "It has been a month since the judge ordered you to provide me a schedule for Angelina. I need a schedule to see her. I am available monday-friday each week. I am also available weekends. I am available 24/7 if it is for seeing Angelina. Please let me know what days and times I can see her. I am requesting to see her 5-6 times a week minimum. In 7.5 weeks I have only seen her 1.5 days total. PLEASE stop alienating me. This is abuse. I

shouldn't have to go to the police to get to see and talk to my child. please let me see her and stop wtithholding her. i want to see her now. why wont you let me see or talk to her? this is abuse. coercion is a crime and your behavior is criminal. stop abusing me this way im begging you. i want to see my daughter. why wont you let me see her? i have asked daily. I want to see and talk to her now."

2053.  Matthew continued to interfere with me and emotionally abuse me by reading my message and saying nothing.

2054.  At 6:55PM, I messaged him again and said, "You didnt answer that. Can you meet me now yes or no? We are going for dinner and want her with us."

2055.  Matthew continued to interfere with me and emotionally abuse me by reading my message and saying nothing.

2056.  At 6:55PM, I messaged him again said "Hello?????? I need to know."

2057.  Matthew continued to interfere with me and emotionally abuse me by reading my message and saying nothing.

2058.  At 6:58PM, I messaged him again and said, "Why are you ignoring my messages ? I want to see and speak to Angelina now."

2059.  Matthew continued to interfere with me and emotionally abuse me by reading my message and saying nothing.

2060.  At 6:59PM, I messaged him again and said, "Why are you ignoring my messages ? I want to see and speak to Angelina now."

2061.  At 7:17PM, Matthew finally responded and said, "Who is we, when and where?"

2062.  At 7:25PM, I responded and said, "Stop deleting my lawyer from here. She is cc'd on all communications. I want to get her Now. Where is angelina ??? Can you exchange at police station?"

2063.  At 7:28PM, rather than communicate properly, Matthew replied and said, "See previous messages for answer to that question."

2064.  At 7:30PM, I replied and said, "The previous message was not an answer. Where is angelina? If she doesnt call me in the next 5 min im calling police."

2065.  Matthew continued to interfere with me and emotionally abuse me by reading my message and saying nothing.

2066.   At 7:33PM, I messaged him again and said, "I haven't been able to speak to Angelina on FaceTime today without you taking the phone and ending the call and not allowing me to speak to her. I haven't been able to see her in a week and I am very concerned about her welfare right now. Since you are ignoring my messages and refusing to let me see her refusing to answer the FaceTime or let me talk to her and refusing to let me call her. I am going to be calling the police right now and having them conduct a wellness check."

2067.   At 7:36PM, Matthew responded and said, "You talked to Angelina today. We hung up on you because you were saying disparaging comments to her. I am willing to let you call her one more time tonight if you can keep the conversation proper and not say inappropriate things to her. We will FT you shortly."

2068.   At 8:25PM, I replied and said, "What disparaging statements did i allegedly say? Also you never facetimed me."

2069.   Matthew continued to interfere with me and emotionally abuse me by reading my message and saying nothing.

2070.   Casey Wallace witnessed him make statements on the call as well and he is willing to write a statement under oath regarding what he witnessed.

2071.   After we hung up on the FaceTime call, Matthew said to Angelina, "Mommy's not gonna be seeing you soon. She doesn't wanna see you. You are with me now. You will always be with me."

2072.   Matthew said these things to Angelina right after I said bye and told her I would hopefully be seeing her tomorrow.

2073.   We were on a threeway FaceTime call with myself, Matthew's phone, and Casey Wallace's phone as I wanted Casey to be a witness incase Matthew did or said anything during the call that would violate the protective order.

2074.   Casey and Matthew's phones were still connected when I hung up, and he heard Matthew make these abusive statements to Angelina.

2075.   When Matthew told these things to Angelina, she responded and said, "I want to see my mommy."

2076.   Casey stated that Matthew continued to tell her no. Casey is willing to testify and to write a statement about what he witnessed and provide phone records as

documentation. His phone number is (203)379-7587. (See recordings from 7/12/23)

2077.

2078.   On 7/13/23, Matthew violated the protective order by harassing me, contacting me directly on the phone outside of the app, having contact with others to cause me annoyance and alarm, interfered with me, and stalked me.

2079.   After isolating me from my daughter for the entire day, Matthew then interfered with me during the Facetime call, directly spoke to me on the phone, and harassed me. He repeatedly spoke to me on the phone in violation of the protective order, interfered with my ability to speak to Angelina, covered the screen with his hand, and refused to allow Angelina to hold the phone during the call. (See recorded calls from 7/13/23)

2080.   Angelina also was repeatedly putting her hand in her mouth in a sexual manner and said she likes to do that, and Matthew then tried to shame her about it and she got upset. (See recording from 7/13/23)

2081.   This only heightens my suspicions that she is continuing to receive exposure to sexual abuse by her brother Dominic Lodice who she has repeatedly stated has abused her sexually.

2082.   Angelina was then putting her dolls in her mouth in a sexual manner, Matthew shamed her, she got upset, then Matthew started to tell her to say bye to me and tried to tell her it was "time for her to go to bed" to try to interfere with me. (See recorded call)

2083.   Matthew spoke to me over and over on the phone, interfered, and harassed me, all in direct violation of the protective order.

2084.   Angelina then got upset and said she didn't want to ever see Julianna and then got upset and said she felt like she was going to cry. This is evidence of the psychological abuse and mental abuse that Matthew is putting her through for no reason. He has been keeping her away from us for no reason. He could allow us to see her daily, but only lets us see her for 2 days in a period of 6 months.

2085.   Then, I asked Angelina if she wanted to come to our house tomorrow and Matthew then immediately started to interfere, told her she "isn't allowed to go to

our house" and told her she can't see me tomorrow and can't go to my house. Matthew then put the phone on mute and began to try to tell Angelina things without me being able to hear.

2086.   I asked what he said and she said he said "I can't go to your house for a while" and Angelina said "last time when I was with your friend I told daddy that when I was with your friend that we went to your house" and mentioned that the last time that we were together that we went to the house.

2087.   Matthew then got angry and instructed her to say bye to us so he could continue to brainwash her and tell her that she's "not allowed" to come to our house. (See recorded call from 7/13/23)

2088.   At 11:18AM, I messaged Matthew in the OurFamilyWizard app and said, "I haven't been able to see Angelina in a week. In the last week, I only got to spend 2 hours with her. I want to see her today. What time can you meet me at the police station for an exchange? Let me know so I can make arrangements and find someone to supervise since you never provide a supervisor for me."

2089.   Matthew then used coercion to try to harass me and interfere with me further. He also was trying to control all my movements by demanding that he needed to pick the location of where the visit would take place and how long it would be. He also threatened me and said that he would not let me see my child if I didn't meet his unrealistic impossible and coercive demands which were not part of the court order in any way.

2090.   Nothing in the court order gives Matthew the right to isolate me from my daughter to the point where he only allows me 1.5 days of contact with my child in a 7.5 week period. This is traumatic for my 4-year-old daughter who lived with me and my 8-year-old daughter her entire life. I have sole custody of my 8 year old and I am a good mother to my children. Nothing in the court order gives Matthew the right to interfere with my ability to see my child.

2091.   Matthew then tried to gaslight me and use manipulation to try to lie about the situation and at 11:26AM, he said, "I don't know why you are ignoring everything I keep saying over and over again and giving me these bogus instructions. You have not seen Angelina because you have not followed the parameters I've set

forward. I guess I will tell them to you again since you cannot grasp the concept. You let me know what availability you have today to see her(though I keep telling you to let me know at least a day before)including the exact time. Let me know who you are planning to use for your supervisor. I will pick the location on where the supervised visit will take place. I will pick how long the visit will be for. If you cannot find a supervisor then I will provide the specific supervisor. If you are picking a supervisor you need to let me know who it is, and they will need to contact me prior to making any arrangements for visitation. This is the only way that you will be able to spend time with her. If you keep deflecting my instructions and trying to assert things the way you want to, then you will not be able to see her."

2092.   Mathew's claims that I haven't seen my child because I haven't "followed the parameters I've set forward" are evidence of his obsession with trying to isolate the child from me. I previously told him I had open availability to see my daughter and that I wanted to see her as much and as frequently as he would allow. He says to let me know the day before every day, but there is no way to go back in the past, which means he effectively makes it so I can never see her, since each day when I ask, he says he needs 24 hours notice, but then doesn't respond until the next day when I ask about the following day.

2093.   He says to let him know who I plan on using for the supervisor, but he has eliminated 10+ different people as supervisors and eliminates all of the people that supervise if they do not "follow his orders"

2094.   Him saying he will pick the location of the visit is controlling my movements and Angelina's movements and is coercion.

2095.   The court order says the location is not specified and that the supervisor is not specified. It does not say that the supervisor must be female, does not say that the visit can only take place at the location designated by Matthew, and does not say that I need to be strictly regulated as if I was a prisoner or dangerous criminal.

2096.   Matthew says he will pick the location, time, etc, but then asks me to tell him the time and supervisor. There is no way I can do that if he does not provide me a schedule. I asked repeatedly for a schedule and he ignores me.

2097.   When he says "If you keep deflecting my instructions and trying to assert things the way you want to, then you will not be able to see her" it is a threat that if I don't do exactly what he wants and let him control every single thing of my every move, then he will continue to isolate and alienate me from my daughter.

2098.   The court order allows for me to have access with her daily if Matthew did not choose to isolate me. He has no reason to keep her from me. He has no reason to let me see her every day or as much as she and I both want. He regularly leaves her with other people and spends barely any time with her while I beg to see her and he withholds her from me. Both my child and I miss eachother and want to see eachother.

2099.   At 5:46PM, I messaged Matthew and said, "The statements that you made last night after the FaceTime or unacceptable. This is brainwashing. Why are you with holding her?"

2100.   At 5:48PM, I messaged Matthew and said, "I told you repeatedly to stop asking me to go to your house. The fact that you keep demanding that I go to your house is harassment. The fact that you were trying to control my movements and try to dictate everything regarding the location, activity supervisor, and everything else is coercion which is also a crime. Also child abuse. The police and Dcf have been notified. I'm not going to keep going back-and-forth with you. I got you repeatedly to let me know what time you can meet me at the police station. I told you my availability is 24 seven. Therefore you need to provide me a schedule since I have open availability. What time can you meet me at the police station tonight? I've been asking you for the last week daily to see her. This is parental alienation and child abuse."

2101.   Matthew continued to interfere and read my messages and did respond.

2102.   At 5:55PM, I messaged him again and said, "Hello???" Matthew continued to interfere and read my messages and did respond.

2103.   At 5:57PM, I messaged him again and said, "Hello??? I want to see my daughter. What time can you meet me at the pd for an exchange? Officer Padro from the Waterbury Police Department already explain to you that I'm not allowed to go to your house. Can you please let me know what time you can meet

me and where? I already told you I have open availability my availability is 24 seven and I can be able to get a supervisor anytime I need a schedule. Where is Angelina? I want to see and speak to her. You can't keep keeping her away from me like this. This is abuse."

2104.   At 6:11PM, Matthew messaged me and interfered with my ability to see Angelina and said, "I asked you all day yesterday what time you were available today for your supervised visit. You waited until 5:40 to message me and tell me that I need to go to Waterbury Police station. I'm not going to Waterbury Police station it is now after 6:00 p.m. and it is too late in the day for your visit. What is your availability tomorrow? Please let me know today what your availability is tomorrow and I can block out a 1 to 2 hour time where you can see Angelina and spend time with her at the park down the road from home."

2105.   Matthew was trying to use coercion and harass and abuse me and interfere with me by severely limiting my access to my child. He is mandating that the only way I can see her is if it is at a park near his house and he states that I must go to his house to pick her up. He says that I can see her 1-2 hours per week and that it can only be at a park near his house that has no bathroom. He will not allow my child to do anything else in a visit, and is dictating that it can only be done at the location, time, place, and with supervisor that he demands, despite him allowing me to pick my own supervisor in the past and despite him allowing me to choose the location of the visit and him let us go without him being there on each of the other times.

2106.   The fact that is now trying to severely restrict my access even more is evidence of the fact that he is trying to isolate me and psychologically abuse my child.

2107.   Nothing in the court order says that I can only do visits at a park. Nothing in the court order says I can only see my child 1-2 hours a week. Nothing in the court order says that I can only see my child for 1.5 days in 8 weeks.

2108.   On 6/15/23, the Judge told Matthew he needs to let me see Angelina regularly and that he needs to make a regular schedule for me to see her. I have asked repeatedly for him to do this, and he has refused. (See transcript from 6/15/23)

2109.   Matthew lies and says that he asks me to see her and that I don't respond. I have responded to every single message he sends, and he is the one who ignores my messages and continues to isolate and alienate me from my daughter. He tells my daughter he can do whatever he wants and that he is in charge and went into an angry rage when the police were called in front of my child.

2110.   At 6:19PM, I messaged him back and said, "I told you im always available for her and want to see her desperately. Why do you keep asking for my availability? That is harassment."

2111.   At 6:20PM, I messaged him again and said, "How is it too late for a visit?? U let me do all the other visits later than this. Why are you withholding her? This is abuse. I want more than 1-2 hours. Especially since i need to drive 1-2 hour round trip. I want more than 1-2 hours a week. That's not in her best interest. She needs to see me daily."

2112.   At 6:20PM, I messaged him again and said, "Please stop interfering and harassing me."

2113.   At 6:21PM, I tried to call my daughter on FaceTime. Matthew answered the phone and immediately started making disparaging statements about me to his mother.

2114.   Matthew started off the call by taking the phone and making statements to Angelina to cause me annoyance and alarm and insinuating that it's a "chore" or "obligation" for my daughter to talk to me. He starts by saying "Talk to mama. You gotta talk to mama." Angelina did not say anything. He does this frequently in order to cause me annoyance.

2115.   He then starts, in an antagonizing and mocking tone starts making statements about me to his mother to cause me annoyance and alarm. He looked at his mother and started to mock me for trying to record the call for my own protection. I was previously advised by the police to record all calls for evidence. He then started to try to antagonize me and looked at his mother and said, "Look, you can see her recording. See how she's recording the call? Even though it's ILLEGAL to record a call in Connecticut without both parties consenting?" His mom then

says something back to him and he then starts laughing and making fun of me to his mother.

2116. I ignored his statements and tried to speak to my daughter and said, "Angelina, are you there?" Matthew then takes the phone and reluctantly gave it to my child and had contact with her to cause me annoyance and alarm and said, "Here, if she says anything she's not supposed to then daddy is going to hang up okay?"

2117. I then said to my child, "Angelina are you there? I can't see or hear you all I hear is daddy just talking in the background."

2118. He constantly tries to interfere every time when I try to call my child and does not allow me to speak to her without his interference, commentary, and third-party contact.

2119. My child said, "I'm right here." I said, "What are you doing?" She said, "Im eating a burger." I said, "I miss you so much!" She said, "I miss you so much too."

2120. It should be noted that as of now, in the past 49 days, I have only been allowed to see Angelina for a total of 1.5 days (approximately 36-37 hours total in 49 days spread out in very small increments), since Matthew has been interfering with my right to see and speak to her and has been withholding her from me. He has stated he will only allow me to see her for 1-2 hours a week, and as of this week I have seen her for a grand total of 0 hours. Last week I was only able to see her for a total of 1.5 hours. This is despite me asking daily and practically begging to see my daughter, who has also begged for me repeatedly to him and he tells her no.

2121. I have multiple witnesses who have seen and witnessed this including Casey Wallace, Juliana Notarino, Julianna Viglione, Beth Wallace, Courtney Clay, Connor Lepensky, and Kasdyn Click.

2122. I have asked daily and repeatedly to see her in the app, and Matthew does not cooperate. He demands that I meet unreasonable expectations such as going to his house when there is an active residential stay-away order. He interferes with the

visits as well and harasses me and the supervisor and then tells my child she will not be seeing me again for a "long time"

2123.   I said to my child, "I'm so sad I didn't get to see you today." Angelina then said, "And I'm so sad I didn't see you today too." I then said, "mommy is really sad that daddy still isn't letting me see you again."

2124.   Matthew has been telling Angelina that "Mommy doesn't want to see you" "you aren't going to be seeing mommy for a very long time" "you're with me now you're not going to be going back to mommy" "you're never going to your house again" etc. and Angelina cries and says "I want to see mommy." This has been going on for 7.5 weeks now. It is not right for him to alienate and isolate her from me like this.

2125.   Matthew then forcibly took the phone from her, interfered with my ability to speak to my child, and terminated the phone call. I tried to call back and he did not answer. I tried to call his mother's line and she did not answer either. (See recorded video from 6:21:22PM on 7/13/23)

2126.   I messaged him in the app at 6:23PM, and said, "You have no right to end the call. Im calling the police. This is interference. Im allowed to tell angelina you didnt let me see her."

2127.   I messaged him in the app again at 6:25PM and said, "And why did you make all of those disparaging statements on the phone again? You have no right to interfere with my right to speak to you and see Angelina. You and your mother are both engaging in coercion, which is a crime in Connecticut. I'm calling the police since you are not allowing me to exercise my custodial rights. This is abuse and harassment and your order not to do this by the protective order. You have no right to end the call like that and you have no right to make disparaging statements about me and neither does your mother."

2128.   At 6:32PM, I messaged Matthew again in the app and said, "I told you since february that any and all calls made to your devices or to anybody's devices to speak to Angelina are all recorded and I do this based on the advisement of the police for my own protection. You have violated the protective order over 70 times in the last nine months and I am calling the police. You have no right to

continue to abuse me like this. This is coercive control and psychological abuse, and you have no right to act like this. Just because you have a lot of money doesn't give you the right to abuse people. The fact that you won't pay the child support you owe or the huge back balance, but that you will go to such great lengths to keep Angelina away from me shows the type of person you are. You are a sociopath, and you are also a narcissist, and you have psychological issues that you refuse to get treatment for. Both of our therapists told you you needed to do treatment as well as the one that you went to and the second one you went to. You need to stop acting so abusive like this. I want to see and speak to Angelina. You and your mother have no right to conspire to use coercion and harassment against me and interference in this way."

2129.   At 6:34PM, Matthew messaged me in the app and said, "I told you that you are not allowed to say those things to Angelina. It is my responsibility to protect Angelina at this point. You don't have custodial rights to Angelina. You only have supervised visits. This is part of the reason. Your actions and things you say to our daughter are not ok. I'm willing to give you another chance to speak to her today but if you continue to say things like that to her I will terminate the call immediately until tomorrow."

2130.   Matthew was trying to use coercion intimidation and harassment by threatening to terminate the call and deny me access to speak to my child until the next day if I told her the truth about him not allowing me to see her.

2131.   At 7:13PM, I responded and said, "You have no right to tell me what i can and cant say to angelina. I told her you didnt let me see her today. You are being so abusive."

2132.   At 7:22PM, Matthew then continued to try to use coercion and sarcasm in the messages in an effort to interfere with me and harass me and said, "Theo. I am trying so hard to help facilitate a relationship between you and Angelina. No one is being abusive towards you. You telling her daddy isn't letting mommy see you, is the abuse. You lost custody and are on supervised visits only. Please Theo, try your best to think of Angelina first when you are speaking to her. I'm not stopping you from seeing her. I'm allowing visits based on the court order and at my

discretion of what's best for her. I keep telling you over and over again to tell me the day before what time you would like to see Angelina and that I would arrange a visit. Instead of doing that, you just keep going on and on how everyone is against you, that I'm abusing you, that you want to see her on your parameters. That's now how it works. I know this is hard, I get it, I really do. There was times you kept Angelina from me for 9 weeks and I didn't talk to her for 7 of those. I'm not doing that to you. I'm allowing calls every day. I'm allowing regular visits at least weekly and or more. So please, just plan your visits the way I am asking you to. So again I ask. What time would you like to come this way for a visit tomorrow. Please think of Angelina as you answer that. Thank you."

2133. At 7:33PM, I responded to him and said, "No youre not. If that was the case you wouldn't be alienating her. Why arent you offering to drop her off to me ? Why arent you offering her to facetime? You demand i go to your house. The police and lawyers said i cant go to your house. I want to see her as much as possibly can. I told you I HAVE 24/7 availability. Im writing this so the police can see evidence that you continue to harass me and ask me my availability when i told you not to ask and that it is open and that i need a schedule like the judge ordered. You have no right to hang up. You have no right to brainwash her or tell her that she wont be seeing me anymore or say im "confusing her ". You are not letting me see her. I ask daily. You say no. You refuse to give me a schedule. You say i can only see her if i go to your house. You say i see her weekly thats a lie. I dont see her weekly. I saw her for 1.5 days in 7.5 weeks. The only time you didnt see her was when dcf, the police, and my lawyer said it was in her best interest to remain with me while your son was being investigated for sexually abusing her. Stop harassing me and interfering with my custodial rights. You saying that i need to meet your demands is abuse. You have to follow the protective order. I have sole custody of my daughter and never abuse her the way you abuse angelina. Please let me see her. She wants to come home and see her toys at the house. You tell her she isnt allowed to ever go to the house again and tell her that she is not going to be seeing me for a long time. That is child abuse. Dcf is investigating you for abuse and neglect. You are already on the abuse and neglect registry.

Please stop withholding her. I want to see her every day as many hours as i can to make up for only seeing her for 1.5 days in the last 7 weeks."

2134.   At 7:35PM, I tried to call Angelina back again. I said "Angelina, can you take the phone so I can talk to you on FaceTime?" She said, "You are on FaceTime!" I said, "I know, can you grab the phone?" She said, "why?" I said, "Because, I can't see you like that. All I see is daddy on his computer." She then said, "do you see me?"

2135.   I said, "Are you there?" and asked her "what are you doing?" She said "I'm just practicing my words and eating icecream." I then said, "I'm so sad, I really wanted you to come here with us. Look at all this cool stuff there is." She then said, "yeah." I said, "do you see it?" She then said "Me too."

2136.   I said, "do you see it, look" and showed her that there was an event going on.

2137.   Matthew tried to interfere and talk to her in the background, he kept holding the phone, holding it up toward the ceiling, putting his hand in front of the phone, and interfering during the call.

2138.   I saw that a hand was covering the screen and I said, "Angelina why is your hand on the phone like that?" She replied and said, "It's not." I said, "who's hand is that?" she said "dada's"

2139.   I said "why is he putting his hand on that while I'm trying to FaceTime?" She said, "He was just turning the phone up."

2140.   Matthew was controlling Angelina's movements during the call and would not allow her to exit the room and be on FaceTime at the same time.

2141.   Matthew continued to try to interfere and insert himself into my conversation with my daughter. He had been isolating her for me for weeks and still is actively isolating her from me. I said "Where are you?" and she said "At mema's house." I said, "I miss you so much!" She said "I miss you so much too." We continued to talk for a minute and she says "Can I see in the mirror?" I said, "huh?" and she said, "I'm talking to dada." I said, "what did you say?" She said, "I said I want to see in the mirror." I said "you wanna see in the mirror?" she said "yeah, but there's no mirror downstairs." I said, "there's not?" She said "no." I said, "Well that's not good."

2142.   Matthew then immediately interfered and said "yeah there is, there's one in daddy's room." Angelina then repeated him and said, "Oh. I mean there's one in dada's room." I then said, "what did you say?" I didn't hear her say anything and said, "Angelina, are you still there?"

2143.   Matthew then started to speak to me directly on the FaceTime call, even though there is a full no-contact protective order that says that he cannot contact me outside of the OurFamilyWizard app.

2144.   Matthew then spoke directly to me during the call and said, "Hold on, she'll be right back." I ignored him and said, "Angelina, are you still there?"

2145.   Matthew then spoke directly to me again during the call and said, "Hold on, she went to go look in the mirror."

2146.   I continued to ignore him and felt very annoyed and harassed by the fact that he was contacting me on the phone. He was arrested in January for harassing me and is currently facing charges for that case. Even with the protective order, he has spoken to me more on the phone with the protective order than without. He has stated many times that he knows he is above the law and that the "police and courts wont do anything" and tells me to "go ahead" and says "call the cops go ahead" etc. I continued to try to speak to Angelina as I could not see or hear her and she wasn't holding the phone. I then said, "Angelina, I can't hear you. Are you still there on the call?"

2147.   Matthew then spoke directly to me for the third time during the call and said, "Hold on, she went to go look in the mirror." I said, "What did you say Angelina?" as I still could not hear or see her.

2148.   Matthew then spoke directly to me for the fourth time during the call and said, "Hold on, she went to go look in the mirror."

2149.   I then said, "Angelina are you still there? I don't hear you." All I heard was silence. I said, "Angelina, are you there?" She then said "mhmm" I said, "what were you saying?" and she says "I was saying I want to give you a hug and kiss too." I told her that I loved her and missed her so much and then she saw my daughter Julianna who I have sole legal and physical custody of. Julianna

Viglione, Connor Lepensky, and Casey Wallace all witnessed the call in its entirety.

2150. During the call Angelina was also sitting on top of a glass table while under Matthew's supervision. Matthew was interfering with the call repeatedly, and he also was holding the phone and not allowing me to see her throughout.

2151. During the call, at one point, Angelina was also putting her doll in mouth and moving it up and down in a sexual motion, said "I'm licking it" and said "I love to lick it" etc. Matthew became nervous and immediately took away the phone so that I could not see her. He then told her she could not do that and she became very upset. She has previously done sexual behaviors in the past and I reported these behaviors to DCF. She now did this behavior while on the phone in front of Matthew and in front of Casey Wallace, Julianna Viglione, and Connor Lepensky.

2152. Matthew then continued to use coercion and refused to allow Angelina to leave the room again unless she left the phone behind with the Facetime behind. He said to Angelina, "Talk to mama. I'll get you water. Well tell mama you'll be right back then."

2153. As soon as Angelina walked away and said, "I will be right back mommy!" I said, "Angelina, why don't you just take the phone with you?" I then said "Angelina?"

2154. Matthew then spoke directly to me for the fifth time during the call and said, "She'll be right back."

2155. Matthew then spoke directly to me for the sixth time during the call and said, "Give her a minute she'll be right back." I was very annoyed that he continued to speak to me on the phone once Angelina walked away. I said, "Angelina? I still can't see you or hear you. Hello, are you still there?"

2156. Matthew then spoke directly to me for the seventh time during the call and said, "No. She'll be right back." I then said, "Angelina, are you still there? Angelina? Hello?"

2157. Matthew then spoke directly to me for the eighth time during the call and said, "She's coming back now."

2158.   At 8:28PM, Matthew messaged me in the app and said, "I heard you say that you would like to take Angelina bowling tomorrow. Do you have a plan of what time you would like to go and who you have to supervise?"

2159.   At 9:05PM, I responded and said, "What do you mean? I've been asking you every day to provide me with a schedule of when I can see her. I've been asking to see her every single day and I wanna be able to see her 5 to 6 times a week if not daily. I told you repeatedly that I cannot and will not be able to go to your house. Are you going to bring her to the bowling alley?"

2160.   At 9:07PM, Matthew interfered and ignored what I said and replied and said, "Please answer the questions that were asked so that we may schedule your visit properly."

2161.   I responded and said, "Who is "We" ? I asked you a question. Are you able to bring her to the bowling alley yes or no? I told you REPEATEDLY that I can not go to your house. you keep DEMANDING that I go to your house to do the exchange. I have told you that going to your house for an exchange is impossible. You keep ignoring this. I have asked daily for you to give me a WEEKLY SCHEDULE for Angelina. She was with me 5-7 days a week for the past 4 years. Now in the past 7.5 weeks, shes been with me for a total of 1.5 days total. 1. Why wont you provide me with a schedule to see Angelina like the court told you? You were told to do this on 6/15/23 and still have not done so. I told you that I wanted to see her 5-7 times per week. Why are you refusing to provide me with a schedule? 2. why do you keep asking me if I know who will supervise? I have offered you 5-6 different supervisors so far that you refused to allow supervise for me. You tell me I can "pick" the supervisor but then harass and interfere with me and use coercion by refusing to agree to any of the supervisors I offer and instead you say no to all of them. I have to be able to know what the schedule is and know what is required of a "supervisor" for me to be able to "pick" someone. I can't just have people standing by on standby waiting. You are court ordered to provide the supervisor. You stated that your mom and stepdad would do it. You then instructed them not to. Your brother Scott Lodice stated he would. He then asked you and you told him to tell me that he would not do it unless I send him

naked pictures. Why do you keep harassing me this way? You have been only trying to inconvenience me. Every time, you are not present for any of these visits. None of them take place in your presence. So you pretending that you calling them and harassing them and threatening them and using coercion against them means that you are somehow concerned about Angelina is a joke. You also did not offer anybody, nor do you approve of anyone I suggest. Therefore you INTERFERE with my custodial rights. And yes I have custodial rights, my parental rights have not been terminated and I have many rights, so please educate yourself and stop harassing me by messaging me with false claims and accusations in this app. 3. I never once even told you about bowling. I said it to Angelina as a suggestion. You can't just sit there and stalk the conversation and then message me here after eavesdropping and harass me by asking me about time and person to supervise when i sent you many messages in the past in which i asked you please not ask who the supervisor is until you provide me with a schedule. I need a weekly schedule so that I can hire a supervisor to work those hours and bill you for half the costs since you are unwilling and/or unable to facilitate the mother-daughter relationship by isolating and alienating my child from me. Since theres a residential stay away, and since you have done NONE of the transportation of Angelina in the last 7.5 weeks, and forced me to drive thousands of miles just for 1-2 hour visits, would you be able to meet me at the bowling alley? If so, what time? If so, who would the supervisor be? If you don't have one, then what characteristics do the individual i hire need to have? you previously denied individuals who are male with no explanation but allowed women who were strangers to do it so long as you got their number and then proceeded to harass, intimidate, and threaten them. I want a schedule. I am not going to keep trying to beg daily for Angelina. I want and need a schedule. Since you work 7 days a week running Whole House Remodeling Company, LLC and have a crew of people working for you, why don't you let me have Angelina during that time? Since you leave her with your mom, Amber, Monica, Sal, Dom, Roy, Scott, and everyone else most of the time, why don't you allow me to have her during the time when you're out drinking, partying, working, and spending

time with your girlfriend? I want to see my child. Please let me know what schedule you can provide me. She needs a CONSISTENT schedule so she knows when she will be seeing me. You can not keep doing this. Please give me a schedule. Once you do that I can work on hiring a permanent supervisor if you are unwilling or unable to do so yourself despite the court order indicating such. This is parental alienation, interference, stalking, harassment, abuse, coercion, child abuse, etc. Please stop doing this. Angelina told you she wants to see mommy. I have witnesses that see you abusing her. This is not ok." (See OurFamilyWizard messages from 7/13/23)

2162.   The case number for the incident from this day is 23-63060.

2163.

2164.   On 7/14/23, Matthew had contact with others to cause me annoyance and alarm, interfered with my ability to see and speak to my child, harassed me, stalked me, and used coercion and child abuse against my daughter. He also used intimidation.

2165.   Matthew answered the phone and immediately started to have contact with others to cause me annoyance and alarm in violation of the protective order. He started saying to Stan Strusky, "look she has that mad look on her face" and started making comments regarding my appearance to others.

2166.   Matthew then started laughing and mocking me with his family and friends and continued to say "oh, the police don't even come anymore when she calls. I think they got sick of her" and continued to brag about how he can break the law without police intervention. (See recorded call from 7/14/23)

2167.   Matthew denied me visitation of my child and physically restrained her during the call and told her that he can do anything that he wants. He also told her that she can't see me on this day or the next day and told my four-year-old daughter that he "controls the location of your visitation" and several other abusive and coercive things during the call.

2168.   This is having contact with others to cause me annoyance and alarm, harassment, child abuse, and unlawful restraint.

2169.   At 1:31AM, I messaged him in response to his message from the night before and said, "Who is "We" ? I asked you a question. Are you able to bring her to the bowling alley yes or no? I told you REPEATEDLY that I can not go to your house. you keep DEMANDING that I go to your house to do the exchange. I have told you that going to your house for an exchange is impossible. You keep ignoring this. I have asked daily for you to give me a WEEKLY SCHEDULE for Angelina. She was with me 5-7 days a week for the past 4 years. Now in the past 7.5 weeks, shes been with me for a total of 1.5 days total. 1. Why wont you provide me with a schedule to see Angelina like the court told you? You were told to do this on 6/15/23 and still have not done so. I told you that I wanted to see her 5-7 times per week. Why are you refusing to provide me with a schedule? 2. why do you keep asking me if I know who will supervise? I have offered you 5-6 different supervisors so far that you refused to allow supervise for me. You tell me I can "pick" the supervisor but then harass and interfere with me and use coercion by refusing to agree to any of the supervisors I offer and instead you say no to all of them. I have to be able to know what the schedule is and know what is required of a "supervisor" for me to be able to "pick" someone. I can't just have people standing by on standby waiting. You are court ordered to provide the supervisor. You stated that your mom and stepdad would do it. You then instructed them not to. Your brother Scott Lodice stated he would. He then asked you and you told him to tell me hat he would not do it unless I send him naked pictures. Why do you keep harassing me this way? You have been only trying to inconvenience me. Every time, you are not present for any of these visits. None of them take place in your presence. So you pretending that you calling them and harassing them and threatening them and using coercion against them means that you are somehow concerned about Angelina is a joke. You also did not offer anybody, nor do you approve of anyone I suggest. Therefore you INTERFERE with my custodial rights. And yes I have custodial rights, my parental rights have not been terminated and I have many rights, so please educate yourself and stop harassing me by messaging me with false claims and accusations in this app. 3. I never once even told you about bowling. I said it to Angelina as a suggestion. You can't just

sit there and stalk the conversation and then message me here after eavesdropping and harass me by asking me about time and person to supervise when i sent you many messages in the past in which I asked you please not ask who the supervisor is until you provide me with a schedule. I need a weekly schedule so that I can hire a supervisor to work those hours and bill you for half the costs since you are unwilling and/or unable to facilitate the mother-daughter relationship by isolating and alienating my child from me. Since theres a residential stay away, and since you have done NONE of the transportation of Angelina in the last 7.5 weeks, and forced me to drive thousands of miles just for 1-2 hour visits, would you be able to meet me at the bowling alley? If so, what time? If so, who would the supervisor be? If you don't have one, then what characteristics do the individual i hire need to have? you previously denied individuals who are male with no explanation but allowed women who were strangers to do it so long as you got their number and then proceeded to harass, intimidate, and threaten them. I want a schedule. I am not going to keep trying to beg daily for Angelina. I want and need a schedule. Since you work 7 days a week running Whole House Remodeling Company, LLC and have a crew of people working for you, why don't you let me have Angelina during that time? Since you leave her with your mom, Amber, Monica, Sal, Dom, Roy, Scott, and everyone else most of the time, why don't you allow me to have her during the time when you're out drinking, partying, working, and spending time with your girlfriend? I want to see my child. Please let me know what schedule you can provide me. She needs a CONSISTENT schedule so she knows when she will be seeing me. You can not keep doing this. Please give me a schedule. Once you do that I can work on hiring a permanent supervisor if you are unwilling or unable to do so yourself despite the court order indicating such. This is parental alienation, interference, stalking, harassment, abuse, coercion, child abuse, etc. Please stop doing this. Angelina told you she wants to see mommy. I have witnesses that see you abusing her. This is not ok.

2170.  Matthew continued to interfere with me and harass me and read my message and said nothing.

2171.  At 10:55AM, I messaged him again and said, "Why did you read my message and ignore me? This is parental alienation. I havent seen Angelina for more than a couple hours in weeks."

2172.  Matthew continued to interfere with me and harass me and read my message and said nothing.

2173.  At 3:03PM, I messaged him again and said, "Hello??? Its been 14+ hours and you havent replied. This is what i mean by you isolating me. I want to see Angelina. Why are you withholding her?"

2174.  Matthew then continued to harass me by claiming that he responded when he did not.

2175.  At 3:09PM, he said, "I did reply multiple times. You just keep saying something else. I told you you need to tell me what time you want to do your supervise visit, who we will be having supervise. Letting me know if you need me to provide the supervisor or not. I and that the supervise visit will be location specific. That means we will decide what the location is, Angelina will get dropped off to you there and picked up to you there in a certain amount of time. So if it's a bowling alley, then we will pick a bowling alley that is local for us."

2176.  At 4:11PM, I responded and said, "You havent replied at all. You can see that you havent by the screen shots. We have plans to go to milford. Can you bring her there? Why did you ignore all my prior concerns and questions?"

2177.  Matthew continued to interfere with me and harass me and read my message and said nothing.

2178.  At 5:00PM, I messaged him again and said, "I want to see angelina. Can you bring her to me with a supervisor right now?"

2179.  At 5:35PM, he responded and said, "As I stated before, all your visits will be local near our home. Stop asking me to bring her down to you. That's not happening. If you want to come this way for a supervisor visit, you are welcome to. You need to plan your visit better. Ideally, it would be best if you would tell me the day before you want to visit her exactly what time you want to visit her. This way I can make arrangements for a supervisor and pick a proper location. I was willing to bring her to the bowling alley in Waterbery for you today. I asked you

over and over again what time you would be available today to set up a proper visit. You kept insisting that I bring her down to you and that you were available 24 seven. As I explained earlier, the parameters of the visit need to be exact and specific.. please follow up with these guidelines."

2180. At 5:59PM, I responded and said, "Local where? What time you be at the waterbury one and whats the address?"

2181. At 6:01PM, I messaged him and said, "Lmk asap."

2182. Matthew continued to interfere with me and harass me by asking me who my supervisor would be after he said repeatedly that he would provide one.

2183. At 6:04PM, he messaged me and said, "Who is the supervisor, it's very last minute now."

2184. At 6:04PM, I replied and said, "You said you would provide one. Whats the address ??"

2185. At 6:06PM, I said, "How is it last minute? I answered you 20 min after you said you would meet at the alley. Im ready now. Whats the address?"

2186. Matthew continued to interfere with me and harass me and read my message and said nothing.

2187. At 6:37PM, I messaged him again and said, "Hello?? you constantly say that you do not withhold her from me, but it's been 30 minutes since you viewed my message and you said nothing. This is interference."

2188. Matthew continued to interfere with me and harass me and read my message and said nothing.

2189. At 6:59PM, I messaged him again and said, "So youre not going to let me see her again? Why are you doing this? I agreed to what you demanded and you stopped responding per usual. This is child abuse."

2190. At 7:13PM, Matthew replied and said, "You agreed? Who is the supervisor? Did you tell me the day before? Did you give me a time? No you didn't, you stall and give responses that are not in conjunction with the convo."

2191. At 7:16PM, I responded to him and said, "At 6:04PM, I stated,"You said you would provide one. Whats the address ??" 2 minutes later at 6:06PM, you viewed my message and said nothing. I sent several subsequent messages which you also

intentionally ignored. So again, since you stated previously that you would "provide my supervisor if i don't have one", i'm asking now for the second time, "You said you would provide one. Whats the address ??" Day before? You asked me the day before so yes. Scroll down and see. I didn't stall. You read my message one hour and 10 min ago, and then said nothing and ignored me. Where is angelina ? I want to see her."

2192. Matthew then tried to harass me and interfere with me and lie and say our daughter goes to bed at 7:30 when she doesn't and when he allowed me to take her out way past that time and he regularly has her up way past that time daily.

2193. At 7:17PM, he messaged me and said, "She's goes to bed at 730. You know this we've had this conversation before. Let's plan a visit for you tomorrow what time are you available for a visit tomorrow?"

2194. I then tried to call my child and Matthew abruptly ended the call and interefered with my ability to speak to my child and see my child.

2195. At 7:36PM, he messaged me and said, "I told you not to say those things to her. I terminated the call. Tomorrow you will have another chance to talk to her." (See recorded call from 7/14/23) (See OurFamilyWizard messages from 7/14/23)

2196.

2197. On 7/15/23, Matthew interfered with me by refusing to allow me to have access to my child pursuant to the most recent civil family order.

2198. Despite being told for almost 2 straight months that he needed to allow me access with my daughter, he has been actively continuing to isolate her from me relentlessly and keeping her away from me as a means of harassment and psychological abuse.

2199. At 2:01PM, I responded to a prior message in which he said that Angelina goes to bed at 7:30 and said, "That is a blatant lie. She does not, nor has she ever, gone to bed at 7:30. There were multiple occasions in which you had her out past midnight, and never once does she go bed that early. It is summer and doesn't even get dark out until 9:00PM. We never "had this conversation before". You lying does not make it a "conversation." I repeatedly told you that i have open, unlimited 24/7 availability to see Angelina. You have withheld her from me and

used parental alienation to try to brainwash and psychologically abuse her over the last 8 weeks. You have only allowed me to see her for a total of 36 hours over the course of 8 weeks. This is child abuse. I want to see Angelina now. When and where are you going to meet me so that I can see her? You are court ordered to provide a supervisor and stated repeatedly that you have supervisors available for you 24/7. Let me know now so I can plan my day. I want to see and speak to Angelina. you denied me access to her for 2 weeks now.

2200. At 2:08PM, I responded to Matthew's message from the night before in which he referenced the fact that he terminated my call with Angelina and claimed that I was saying "things" to her that he didn't like, and said, "I'm sorry, what things did I say that you are referring to? You have no right to terminate the call. That is interfering with my custodial rights."

2201. At 2:11PM, Matthew responded and tried to harass, interfere with, and intimidate me, and said, "I have all the right to terminate the call. Your call is under my supervision. You keep saying to her that I'm keeping her from you after I told you repeatedly not to say things like that for that confuses her."

2202. Matthew is telling me that it confuses our daughter to tell her that he is keeping her from me, but he has been actively and relentlessly keeping her from me.

2203. The confusion is that Matthew tells Angelina that I can see her any time that I want and tells her that I am choosing not to see her, when in reality I am begging to see her daily and being denied access by Matthew due to him interfering with my ability to see her and isolating her from me as a form of coercion.

2204. At 2:13PM, Matthew messaged me again and said, "I messaged you at 7:30 PM last night about your visit today. Can you wait until 2 PM today to message me telling me you demand to see her. I told you we need to plan these things ahead of time. At what time today would you like to see her. She went down for a nap at 1 PM and probably will not be up until close to 4 PM, let me know what time you would like to see her, and I'll see if I could arrange that to happen. Do you have a supervisor for today or will you need me to provide one for today?"

2205.  Matthew saying "I told you we need to plan these things ahead of time" is a form of harassment since I have been begging daily for him to allow me to see her and for him to provide me with a regular and consistent schedule for our child.

2206.  At 5:11PM, I responded to his message in which he said that he has the right to interfere with and terminate my calls with my daughter and said, "You do not have that right. I have the right per the court order to speak to Angelina on both phone calls and facetime as well as see her. Every time you terminate a call, don't let me see her, interfere with the call, and don't let me talk to her, it is a violation of the protective order which states that I am allowed to contact my daughter. I am confused. Why are you telling me not to tell her that you are keeping her from me? You are keeping her from me. I ask daily to see her and in the past 8 weeks you only allowed me to see her for a total of 36 hours. That is parental alienation, child abuse, coercion, etc. When can I see and speak to Angelina? The only thing that confuses her is when I tell her that I want to see her and can't wait to see her and then you tell her "Mommy doesn't want to see you, You're with me now, You're not gonna see mommy for a long time, You're never going to mommy's house again, Mommy doesn't care about seeing you, You're not going to see mommy." etc. That is child abuse and you have no right to abuse our child that way. Why did you tell DCF that you were looking for a therapist for her when she had a therapist and you removed her from there? You have been removing her from therapy for over a year now. This is unacceptable. Why are you refusing to allow her the medical follow up appointment and therapy that she needs for her diagnosis of adjustment disorder? Why aren't you letting me speak to her? Why aren't you letting me see her?"

2207.  At 5:15PM, I responded to Matthew's message in which he dictated that I needed to plan things ahead of time and said, "Plan things ahead of time? I have been asking you DAILY for 8 WEEKS NOW to see her. I have asked REPEATEDLY for you to give me a regular schedule so that both I and Angelina know when we can see each other. I want to see her now. I told you this at 2:01PM. I asked to see her at 2 and you ask me what time I want to see her. Why do you keep isolating me from her? I want to see her now. What do you mean you

will "see if you can arrange that to happen"? Every other time you had no issue with it. Why are you now all of a sudden isolating me? It has been almost 2 weeks since I saw my child. 2 weeks ago I only saw her for a couple of hours. A couple of hours of time with Angelina every 2 weeks is not "1-2 days for a few hours each day" like you said you would give me. Why are you refusing to allow me to see Angelina? I want to see her now. When and where can I see her?

2208. Matthew then continued to try to interfere with me and harass me by immediately reading my message and then saying nothing in response.

2209. He then continued to try to harass, intimidate, and use coercive control to try to further isolate me from my child, and tried to continue to lie in the app to try to gaslight me further.

2210. At 5:17PM, he replied and said, "Again none of what you said is accurate. I told you multiple times the parameters that need to be met prior to a supervised visit. I would never tell Angelina that you don't want to see her. I've been trying so hard to encourage and facilitate a good relationship between you two. You have been the only one preventing it from happening. Everything I am doing is in Angelina's best interest, and within the parameters of the court order and the law."

2211. Everything that I said was accurate. Matthew never gave clear, straightforward, or unambiguous "parameters that need to be met prior to a supervised visit" and he has told Angelina repeatedly that I do not want to see her and has done so and Casey Wallace was one witness who witnessed that.

2212. Matthew has done nothing to try to encourage or facilitate a good relationship between Angelina and me and instead has done the opposite.

2213. I have done nothing to prevent myself from seeing my child and have begged daily to see her and gone above and beyond and made every effort possible to try to work around the unreasonable demands that he sets to try to isolate me from my child and harass me and to try to control me through coercion.

2214. Nothing that he is doing is in Angelina's best interest. Only allowing a 4-year-old little girl to see her mother for a total of 36 hours in 9+ weeks is not in her best interest.

2215.  He has not been following the parameters of any court order nor has he followed the parameters of the protective order or of the law.

2216.  At 5:41PM, I responded and said, "How is it not accurate? That is a blatant lie. You did tell her, and I have witnesses, and the police have already been notified. Please stop telling her you can do "whatever you want" and please stop violating the protective order and saying that you are above the law. You have done nothing to encourage or facilitate any relationship between us. I have already given all the evidence to the police as well as to DCF. This is child abuse and neglect. I am asking again, since you ignored me when I asked at 5:11PM, this is my second time asking, 1.When can I see and speak to Angelina? 2.Why did you tell DCF that you were looking for a therapist for her when she had a therapist and you removed her from there? 3.Why are you refusing to allow her the medical follow up appointment and therapy that she needs for her diagnosis of adjustment disorder? 4. Why arent you letting me speak to her? 5. Why arent you letting me see her? Please stop harassing me and stalking me by reading these messages and refusing to answer. I need an answer to the above 5 questions now please. This is harassment and abuse and parental alienation. Please answer my questions."

2217.  At 5:46PM, I messaged him again regarding him ignorning my prior message and said, "When you read my messages and do not respond, this is parental alienation, interference, and abuse. This is my second time asking since you read my questions at 5:15PM and said nothing. I asked at 2:00PM, almost 4 hours ago to see her and you have been ignoring my requests to see her all day. This is my second time asking the following: 1. Why do you keep isolating me from her? I want to see her now. 2. What do you mean you will "see if you can arrange that to happen"? 3. Every other time you had no issue with it. Why are you now all of a sudden isolating me? Why are you now all of a sudden isolating me? 4. It has been almost 2 weeks since I saw my child. 2 weeks ago I only saw her for a couple of hours. A couple of hours of time with Angelina every 2 weeks is not "1-2 days for a few hours each day" like you said you would give me. Why are you refusing to allow me to see Angelina? I want to see her now. 5. When and

where can I see her? You said you would provide the supervisor. Every supervisor I have suggested you say no to. You refuse to provide me with criteria of what a supervisor needs to have in order for them to be able to do it, and continuously deny each and every person I suggest. 6. When can I see Angelina? 7. Where can I see Angelina? 8. When can I talk to Angelina? 9. Why are you isolating me this way? Please respond. Reading my messages and then not responding and isolating me and alienating me is abuse. This is interference and violates the order that says you must exchange the child and allow me to have contact with her."

2218.   At 5:52PM, Matthew continued to interfere with me and harass me by continuously ignoring my questions and statements and trying to use coercive control to isolate me from my daughter. He tried to use intimidation and also threatened that I would not be allowed to speak to my child for an entire day and threatened to interfere with my court-ordered ability to speak to my daughter.

2219.   He responded to my other message and said, "What is your availability for tomorrow for a visit. You can come to East mountain park for your visit with her. Do you have a supervisor to come with you or will I need to provide one? If you have one, who is your supervisor. I will need their information, I will need to speak with them prior to planning and I will need to approve. You can call and speak to her anytime you want as long as she's not napping. She usually naps a few hours in the 12pm-4pm block. We start preparing for bed at 7pm and we shoot for 730-8pm bedtime. All of this has been said to you multiple times even though you keep acting like you haven't been told. During your call or FT with Angelina you will be respectful to Angelina or the call will be terminated until the next day."

2220.   Matthew was trying to use coercion to dictate that the visit could only take place at a park in Waterbury. He continued to ask me if I had a supervisor and who it was, despite me telling him repeatedly that I first needed the scheduled time/location/details of the visit before I could then try to find a supervisor. He also told me that he would only be picking the supervisor, but then would pick and choose when he felt like asking me if I could pick one.

2221. He has denied all of the supervisors that I suggest. He continues to lie and say that Angelina goes to bed between 7 and 8 when she regularly is still awake and not even being picked up from the babysitter until after 8pm on a typical night.

2222. The fact that he kept saying things like "all of this has been said to you multiple times" is also harassment and interference because he ignores my responses to everything.

2223. At 6:41PM, I messaged him in the app and said, "Third time asking: 1. When can I see and speak to Angelina? 2. Why did you tell DCF that you were looking for a. therapist for her when she had a therapist and you removed her from there? 3. Why are you refusing to allow her the medical follow up appointment and therapy that she needs for her diagnosis of adjustment disorder? 3. Why are you refusing to allow her the medical follow up appointment and therapy that she needs for her diagnosis of adjustment disorder? Why aren't you letting me speak to her? Why aren't you letting me see her?"

2224. Matthew continued to interfere with me, isolate me, psychologically abuse me, harass me, and use coercion against me to interfere with my ability to see or speak to my child by reading my message and saying nothing.

2225. I sent another messaged at 6:41PM in response to a prior thread and said, " Third time asking: 1. Why do you keep isolating me from her? I want to see her now. 2. What do you mean you will 'see if you can arrange that to happen'? 3. Every other time you had no issue with it. Why are you now all of a sudden isolating me? Why are you now all of a sudden isolating me? 4. It has been almost two weeks since I saw my child. 2 weeks ago I only saw her for a couple of hours. A couple of hours of time with Angelina every 2 weeks is not '1-2 days for a few hours each day' like you said you would give me. Why are you refusing to allow me to see Angelina? I want to see her now. 5. When and where can I see her? You said you would provide the supervisor. Every supervisor I have suggested you say no to. You refuse to provide me with criteria of what a supervisor needs to have in order for them to be able to do it, and continuously deny each and every person I suggest. 6. When can I see Angelina? 7. Where can I see Angelina? 8. When can I talk to Angelina? 9. Why are you isolating me this way?"

2226. Matthew continued to interfere with me, isolate me, psychologically abuse me, harass me, and use coercion against me to interfere with my ability to see or speak to my child by reading my message and saying nothing.

2227. At 7:13PM, I messaged Matthew again and said, "Hello? Why are you reading my messages and ignoring me?"

2228. Matthew continued to interfere with me, isolate me, psychologically abuse me, harass me, and use coercion against me to interfere with my ability to see or speak to my child by reading my message and saying nothing.

2229. At 7:36PM, I messaged him and said, "So to be clear, you are once again denying me the right to see or speak to her today?"

2230. Matthew continued to interfere with me, isolate me, psychologically abuse me, harass me, and use coercion against me to interfere with my ability to see or speak to my child by reading my message and saying nothing.

2231. Matthew did not allow me to see Angelina at all and ultimately stopped responding to all of my messages. He also told my daughter that she would not be allowed to attend church the following day and told her that she would not be allowed to talk to me the following day either. (See video evidence from 7/15/23)

2232. Matthew has also been exposing my child to several different sexual partners. At 7:57PM, while I was on the phone with my child, she said that someone was calling Matthew's phone and asked, "Is that Ashley?" A few days prior, she stated she spent the entire day with someone named Amber and that it was "daddy's friend". In the past 4 years, he has had dozens of sexual partners around my child, even having some move in with them only to then move out months later.

2233.

2234. On 7/16/23, Matthew interfered with me by refusing to allow me to see my child, speak to my child, or allow my child to attend church. He also violated the no-contact order and spoke to me directly on the phone when I tried to speak to my child.

2235. Matthew refused to allow me access to my daughter today. He did not allow me to see her or speak to her for the majority of the day. He did not allow me to

see her for the last 10 days. I asked repeatedly for a schedule and he ignores my questions.

2236. At 10:23AM, I messaged Matthew after he ignored my questions and said, "You didn't answer any of the questions. So you're saying that me asking to see Angelina and asking about when I can see her is something you're not required to answer? This is parental alienation. Why did you tell her she can't go to church today? Why are you refusing to allow me to see her? Why did you say she goes to bed at 7:30 but she was starting a movie at 8:30PM? Why do you keep keeping her away from me? I haven't seen her in two weeks. Two weeks ago, I saw her for a couple hours and that's it. You said you would let me see her three times a week for a few hours each time. I've seen her for a total of 36 hours in eight weeks. Why are you keeping her away from me? Why can't you bring her to church? She wants to go and it's her constitutional right to do so."

2237. Matthew continued to try to harass me and abuse my and interfere with me by reading my message and saying nothing.

2238. At 1:31PM, I messaged him and said, "It has been almost four hours since I messaged you asking about seeing and speaking to my child and you ignored me. You read my message and ignored me. This is what you do every time. I have not been able to see Angelina now in almost two weeks. This is parental alienation. The last time I saw her was 2 weeks ago for less than 3 hours. Why are you ignoring me?"

2239. Matthew continued to try to harass me by reading my message me and ignoring me to interfere with my ability to see my child and said nothing.

2240. At 1:32PM, I messaged him again in the app and said, "Is there a reason that you do not respond or allow me to see Angelina?"

2241. Matthew continued to try to harass me by reading my message me and ignoring me to interfere with my ability to see my child and said nothing.

2242. At 1:32PM, I sent Matthew another message and said, "Hello? Please stop abusing me this way. This is parental alienation. I want to see her. Why won't you respond?"

2243.  At 1:36PM, Matthew replied and said, "I told you to suggest a time and to let me know about the supervisor."

2244.  At 3:41PM, I replied and said, "You never once said that. Stop harassing me like this. I asked you this repeatedly. Please answer. Stop isolating me from my child. When and where can I see her? You said you would provide the supervisor. Every supervisor I have suggested you say no to. You refuse to provide me with criteria of what a supervisor needs to have in order for them to be able to do it, and continuously deny each and every person I suggest."

2245.  Matthew continued to try to harass me by reading my message me and ignoring me to interfere with my ability to see my child and said nothing.

2246.  At 3:41PM, I sent him another message and said, "Please stop reading my messages and ignoring them. This is abuse."

2247.  At 4:11PM, Matthew then demanded that I travel to Waterbury and said, "What time can you come to Waterbury today?"

2248.  At 5:15PM, I responded and said, "I asked you what time i can see her. Come to Waterbury where?? It takes an hour to get there. Where would i have to go and what time ?? I want more than 2 hours."

2249.  Matthew continued to try to harass me by reading my message me and ignoring me to interfere with my ability to see my child and said nothing.

2250.  At 5:15PM, I sent him another message and said, "Hello? Why do you keep ignoring me ?"

2251.  Matthew continued to try to harass me by reading my message me and ignoring me to interfere with my ability to see my child and said nothing.

2252.  At 5:15PM, I sent him another message and said, "I don't appreciate you reading each message and ignoring it."

2253.  Matthew continued to try to harass me by reading my message me and ignoring me to interfere with my ability to see my child and said nothing.

2254.  At 5:27PM, I sent Matthew another message and said, "Hello?? why are you ignoring me? I want to see Angelina. When and where can I see her? Me and Julianna want to see her now. Please stop withholding her. When and where can I see her?"

2255.   Matthew continued to try to harass me by reading my message me and ignoring me to interfere with my ability to see my child and said nothing.

2256.   At 5:38PM, I sent him another message and said, "Why do you keep reading all of my messages and ignoring them? Why are you interfering with my right to see my daughter? This is abuse. It has been 2 weeks since I saw her."

2257.   Matthew then acted as if I had not asked repeatedly to see my child since early that day.

2258.   He then acted as if I had the power to dictate the time after he made it clear that only he would tell me the time that I was "allowed" to see my child.

2259.   At 5:49PM, Matthew messaged me and said, "You spent all day back and forth with me and never once said a time."

2260.   At 6:01PM, I replied and said, "Are you serious? I have been telling you daily that I want to see her any and all times that you will allow. I asked repeatedly what time you would allow a visit, and you read each message and ignored it. I want to see her now. Where can we meet for a visit?"

2261.   Matthew continued to try to harass me by reading my message me and ignoring me to interfere with my ability to see my child and said nothing.

2262.   At 6:03PM, I sent Matthew another message and said, "I have been asking every day for weeks now to see Angelina and you have ignored me. I want to see her now. Can you meet right now at the Waterbury police station for an exchange? You stated you will dictate the time, location, supervisor, and activity for each of the visits against my will. I have asked repeatedly for access to her today. You keep ignoring me. I want to see her now. Please tell me where we are meeting."

2263.   Matthew then denied me the right to see my child.

2264.   At 6:04PM, Matthew responded and said, "It's too late for a visit today, let's plan for something tomorrow for you guys."

2265.   Matthew spent the entire day acting as if it was possible for me to see my child, only to wait until 6:00PM to deny me access to her.

2266.   He never intended to allow me access to her in the first place, and his ongoing messages are just his attempt to make it appear as if he is trying to facilitate the visitation he is actively working to interfere with.

2267.   At 6:06PM, I replied and said, "How is it too late for a visit? You let her go to visits until 1am before. I have been messaging you all day and you have ignored my messages. Now you finally respond and say it's too late? this is abuse. I want a schedule like the judge told you you were ordered to do. Why can't I see Angelina now? She was starting a movie at 8:30PM last night. There's no reason why I can't meet her for dinner or for a visit at the mall. Why are you denying me access? This is parental alienation. I have begged all day to see and speak to her and you have denied me access. Why do you keep doing this? It has been 2 weeks. I waited all day to hear back from you for you to tell me it's too late. What do you mean plan something tomorrow? Can I get her at 8AM tomorrow and bring her back at 9pm? I need more than 1 hour every month with her."

2268.   Matthew continued to try to harass me by reading my message me and ignoring me to interfere with my ability to see my child and said nothing.

2269.   At 6:06PM, I sent him another message and said, "If I don't get to see or speak to Angelina by 6:30PM I will be calling the police."

2270.   Matthew then messaged me and tried to use coercion, harassment, and intimidation and abuse me further.

2271.   Matthew denied me access to my child and stated he would not let me see her at all, despite the court order saying that he must allow me access and despite the protective order saying he is not allowed to interfere with me.

2272.   At 6:10PM, Matthew messaged me and said, "No. You are not taking her. If you want to do a visit you tell me what time you are available. I will arrange a 1-2 hour visit at a specified location."

2273.   Matthew then attempted to deter me from calling the police and reporting his abuse.

2274.   At 6:10PM, Matthew message me again and said, "How about instead of calling the police you actually call your daughter."

2275.   At 6:35PM, I replied and said, "Why can't I take her? I told you I need a schedule. I am available 24/7. I told you this repeatedly. What schedule can I see her this week?? Why can't I take her for the day? Why are you doing this? THIS

is parental alienation and abuse. You were told to give me a schedule. I need the schedule now."

2276.   Matthew then refused to answer the phone or allow me to speak to my child.

2277.   At 6:37PM, I replied and said, "I tried to call repeatedly and you ignored each of my calls. I tried to message repeatedly and you ignored all of my messages. Why are you withholding her from me? I am in Waterbury right now, yet you won't meet me so I can see her? Why are you so abusive? You told me you would call off all the motions and give me anything i want if I decided to sleep with you, but if I say no then this is how you treat me? This is sick and wrong. Why do you keep withholding her? I havent seen her in weeks. This isn't okay. Why are you doing this? This is abuse. If you don't let me see or speak to her I will be pressing charges. I can't take this abuse from you anymore. This harassment has gone on long enough. Please stop. You said I could see her 3x a week for 3 hours each time. Which days and times are you going to do that and where? I need to know so I can make arrangements for my child who I have sole custody of. Please let me know now. If you don't, then it's more evidence of your alienation."

2278.   At 6:39PM, Matthew said, "What is a good time for you tomorrow to do a two hour visit"

2279.   At 6:43PM, Matthew then sent me another message in which he ignored the fact that I tried to call him repeatedly on his iPhone and tried to Facetime repeatedly. He messaged me and said, "I have no calls 8605182388"

2280.   At 7:44PM, I replied and said, "Why does it have to be 2 hours?? And where will it be and who will supervise ?? What time are you going to offer ??"

2281.   Matthew continued to try to harass me by reading my message me and ignoring me to interfere with my ability to see my child and said nothing.

2282.   At 7:45PM, I sent him another message and said, "If you're offering 2 hours tomorrow why cant i have her and the dcf can supervise ?"

2283.   Matthew continued to try to harass me by reading my message me and ignoring me to interfere with my ability to see my child and said nothing.

2284.   At 7:45PM, I sent another message and said, "I tried to facetime repeatedly and you ignored them all."

295

2285.  Matthew continued to try to harass me by reading my message me and ignoring me to interfere with my ability to see my child and said nothing.

2286.  At 7:50PM, I sent him another message and said, "Is there a reason you arent allowing me to see or speak to Angelina today?"

2287.  Matthew continued to try to harass me by reading my message me and ignoring me to interfere with my ability to see my child and said nothing.

2288.  At 7:51PM, I sent him another message and said, "Hello? Please provide me with the schedule for the 3 days this week that youre giving me 3 hours each for. Please give me schedule with dates, times, supervisor, location, activity, and exchange location asap. I need this now."

2289.  Matthew continued to try to harass me by reading my message me and ignoring me to interfere with my ability to see my child and said nothing.

2290.  At 7:51PM, I sent him another message and said, "Hello? Please provide me with the schedule for the 3 days this week that youre giving me 3 hours each for. Please give me schedule with dates, times, supervisor, location, activity, and exchange location asap. I need this now."

2291.  Matthew continued to try to harass me by reading my message me and ignoring me to interfere with my ability to see my child and said nothing.

2292.  At 7:51PM, I sent him another message and said, "Hello? Please provide me with the schedule for the 3 days this week that youre giving me 3 hours each for. Please give me schedule with dates, times, supervisor, location, activity, and exchange location asap. I need this now."

2293.  Matthew continued to try to harass me by reading my message me and ignoring me to interfere with my ability to see my child and said nothing.

2294.  At 7:58PM, I sent him another message and said, "Is there a reason you arent answering ??? Is there a reason youre not providing a schedule??"

2295.  Matthew continued to try to harass me by reading my message me and ignoring me to interfere with my ability to see my child and said nothing.

2296.  Matthew then finally allowed me to have a phone call with my child (See recorded calls from 7/16/23)

2297.   During the call Angelina was also exhibiting sexual behaviors again and licking things while in the bath. He told her to stop and pushed her away.

2298.   Matthew also spoke to me repeatedly during the call in order to harass me since he knows that there is a full no-contact protective order that says he is not to have any contact with me outside of the OurFamilyWizard app.

2299.   Matthew also sent me video messages directly on google meet, even though the protective order states that he can only contact me in the OurFamilyWizard app, as well.

2300.   He does this and constantly violates the order so that he can intimidate me.

2301.   At 7:59PM, I sent him another message and said, "Is there a reason why you keep speaking to me on the calls? its a no contact order."

2302.   Matthew continued to try to harass me by reading my message me and ignoring me to interfere with my ability to see my child and said nothing.

2303.   At 7:59PM, I sent him another message and said, "Please stop harassing me by speaking to me when i try to talk to my daughter."

2304.   At 7:59PM, Matthew ignored everything I said about his violations of the protective order and instead pretended that he would allow me access to my child. He said "Ok let me see who I can get to supervise, I will get back to you."

2305.   At 8:34PM, I responded to him and said, "What do you mean??? I need a schedule. If you dont have a supervisor i will hire one. What days can i see her this week?? Why wont you provide me a normal regular schedule??"

2306.   Matthew continued to try to harass me by reading my message me and ignoring me to interfere with my ability to see my child and said nothing.

2307.   I then tried again to call back and speak to my child and Matthew denied me the right to speak to my child.

2308.   At 8:37PM, I sent him another message and said, "Why are you refusing to let me speak to Angelina?"

2309.   Matthew continued to try to harass me by reading my message me and ignoring me to interfere with my ability to see my child and said nothing.

2310. At 8:44PM, I sent him another message and said, "You have refused to provide me with a regular access schedule for Angelina for the past 8 weeks. I need a schedule. Why are you refusing to do that?"

2311. Matthew continued to try to harass me by reading my message me and ignoring me to interfere with my ability to see my child and said nothing.

2312. Matthew then refused to allow me to have any Facetime contact with my child.

2313. At 8:34PM, I messaged him and said, "You have no right to refuse to let me FaceTime my child."

2314. Matthew then spoke to me repeatedly during the phone call in direct violation of the no contact order of protection.

2315. At 9:22PM, I messaged him again and said, "I asked you repeatedly to STOP talking to me on the phone. This is HARASSMENT. stop. I asked you to stop repeatedly and you wont. You even went so far as to message me on google meet ? You have NO RIGHT to contact me outside this app. Im calling the police. You also refused to let me say goodnight to Angelina."

2316. (See all recorded phone calls and recordings from 7/16/23)

2317. Matthew continued to try to harass me by reading my message me and ignoring me to interfere with my ability to see my child and said nothing.

2318. At 9:23PM, I messaged him again and said, "Why do you keep harassing me by speaking to me in person and on phone calls, texting me directly and sending me messages outside of this app???"

2319. Matthew continued to try to harass me by reading my message me and ignoring me to interfere with my ability to see my child and said nothing.

2320. At 9:24PM, I sent him another message and said, "Hello? Why are you refusing?"

2321. Matthew continued to try to harass me by reading my message me and ignoring me to interfere with my ability to see my child and said nothing.

2322. At 9:24PM, I messaged him again and said, "Why are u refusing to let me say goodnight to angelina ???"

2323. At 9:29PM, Matthew replied in an effort to annoy me further and minimize his abuse and said, "Omg. Theo, you talked to Angelina before bed. Julianna read her a story then you guys hung up. We called back multiple times. You called back too late. I said she's in bed call back tomorrow. We are allowed to communicate for purposes of our daughter. I will let you know if i can facilitate a visit tomorrow. Is there a specific time that works best or does anytime work. If I'm telling a supervisor a specific time, that means you are going to have to be there on time. If you are late that doesn't mean you get to stay late with Angelina because the supervisor is not going to be able to stay late."

2324. At 9:33PM, I messaged him again and said, "I called back one minute after you disconnected the call without allowing us to say goodnight. You never called back mulitple times. Why don't you show the alleged call log then if you did? You never called back. Instead, you send me multiple direct messages to my phone in violation of the protective order. We are NOT allowed to communicate outside this app for ANY PURPOSE. I am reporting this to the police for you violating the order again. I need a SCHEDULE for the entire week so I can plan the week. I can not just sit around all day waiting for a response from you that never comes. Tell me the 3 DAYS MINIMUM that you promised you would give me weekly so that i can make accommodations. Are you going to provide me a schedule before the night ends yes or no? If not, I will be taking legal action in the morning. I am tired of your abuse and parental alienation. Are you going to provide me a schedule yes or no? Are you going to allow Angelina to attend therapy yes or no? Are you going to allow Angelina to attend the 3 appointments that are past due for her medically yes or no? Are you going to stop harassing me and contacting me outside the app in violation of the order yes or no? I DO NOT WANT ANY CONTACT FROM YOU. STOP HARASSING ME. ANY CONTACT IS LIMITED TO THIS APP ONLY ABOUT Visitation AND AFFAIRS OF ANGELINA I NEED A VISITATION SCHEDULE TELL ME THE SCHEDULE NOW"

2325. Matthew continued to try to harass me by reading my message me and ignoring me to interfere with my ability to see my child and said nothing.

2326.  At 9:33PM, I sent him another message and said, "Is there a reason why you keep reading my messages, and ignoring me and not saying anything back? This is harassment and interference."

2327.  Matthew continued to try to harass me by reading my message me and ignoring me to interfere with my ability to see my child and said nothing.

2328.  At 9:33PM, I messaged him again and said, "hello? why do you keep violating the protective order?? do you think you're above the law?"

2329.  Matthew continued to try to harass me by reading my message me and ignoring me to interfere with my ability to see my child and said nothing.

2330.  At 9:34PM, I messaged him again and said, "Please stop harassing me. I told the police to tell you not to contact me outside the app almost 2 years ago. Theres been a protective order mandating that for 7 months now. you violated it 76 times in the last 7 months. are you going to stop or not?? i do not want any contact you outside this app for any reason whatsoever. stop the harassment. you spoke to me 10-12 times today outside the app."

2331.  Matthew continued to try to harass me by reading my message me and ignoring me to interfere with my ability to see my child and said nothing.  (See all recordings and OFW messages from 7/16/23)

2332.  Matthew made several disparaging and inappropriate statements during the call and had contact with my daughter Angelina that caused me annoyance and alarm, in violation of the protective order.

2333.  He told my daughter "these calls are not supposed to be recorded" and continued to try to use her as a third party to speak to me (see recorded calls from 7/16/23)

2334.

2335.  On 7/17/23, Matthew interfered with me, harassed me, and used coercion to psychologically abuse me and my child by isolating me from her.

2336.  At 10:59AM, I messaged him again due to him reading and ignoring my message from the night before and said, "Hello? I asked repeatedly for you to provide me a schedule for seeing Angelina. What is the schedule?"

2337. Matthew continued to harass me and use coercive control to force me to stay away from Angelina and isolate us from each other by reading my message and saying nothing.

2338. At 11:00AM, I messaged him again in response to another ignored message from the night before and said, "Are you going to answer?"

2339. Matthew continued to harass me and use coercive control to force me to stay away from Angelina and isolate us from each other by reading my message and saying nothing.

2340. At 11:00AM, I responded to another one of my ignored messaged from the previous night and said, "So you're just going to keep reading each message and ignoring me? Why wont you allow me to have a schedule to see Angelina regularly like you were court ordered to do? This is parental alienation and abuse."

2341. Matthew continued to harass me and use coercive control to force me to stay away from Angelina and isolate us from each other by reading my message and saying nothing.

2342. At 11:00AM, I responded to another ignored message from the night before and said, "hello? Are you just going to ignore me?"

2343. Matthew continued to harass me and use coercive control to force me to stay away from Angelina and isolate us from each other by reading my message and saying nothing.

2344. At 11:01AM, I replied to yet another ignored message from the night before and said, "This is my fifth time asking. Are you going to provide me a schedule yes or no? Are you going to allow Angelina to attend therapy yes or no? Are you going to allow Angelina to attend the 3 appointments that are past due for her medically yes or no? Are you going to stop harassing me and contacting me outside the app in violation of the order yes or no?"

2345. At 11:04AM, Matthew continued to harass me by ignoring the majority of what I said and responded and said, "You can do a visit at East mountain park today. I have a supervisor for the visit. What time will you be available for the visit so I can set it up with the supervisor."

2346.   At 11:34AM, Matthew then continued to harass me by demanding that I answer him immediately despite me asking daily for a schedule and him refusing to provide one. He expected me to answer him right away when he typically doesn't respond at all and makes it virtually impossible for me to see Angelina.

2347.   At 11:34AM, Matthew said, "Please let me know in a timely fashion so that I can plan accordingly. You cannot respond last minute."

2348.   Him saying that I "cannot respond last minute" is him mocking me and trying to harass me because he typically does not respond at all, and if he does respond, it is sometimes hours or days later.

2349.   At 12:15PM, I responded and said, "So you're not going to give me a schedule?"

2350.   Matthew then continued to harass me, interfere with me, coerce me to stay away from my child, psychologically abuse me, and intimidate me by continuing to deny me the right to a reasonable access schedule with my child.

2351.   At 12:16PM, he said, "I don't have a consistent schedule with a supervisor at this time. We will see how today's supervised visit goes and see if they would be willing to do every week."

2352.   I repeatedly told Matthew that I would be able to provide a "supervisor" if he would be able to give me the schedule first. The fact that he continued to play games and try to put unreasonable and unlawful barriers to me seeing my child is harassment, abuse, and interference.

2353.   At 12:17PM, I responded and said, "I have been asking daily for you to provide me with a weekly schedule so that I can see Angelina. You have not provided me with any schedule or any specified dates or times or locations or supervisors. Please give me that information now so I can plan my week accordingly. You also stated that we would be allowed to go to the pool club and Carrie could be a supervisor. Why are you now refusing to allow us to go anywhere other than East Mountain Park? Last time there was trash and dirty needles on the ground. I don't feel comfortable with our daughter being in that dangerous environment. Why can't she come to our house where she has all of her toys? She keeps begging to come home. Or the pool club. Why are you denying

her to go anywhere other than a dirty dangerous park in one of the most dangerous cities in the state? Please let me know when I could see. Angelina and I would rather bring her somewhere other than East Mountain Park since there are no bathrooms there and last time we saw dirty needles and trash everywhere Angelina asked to go to the bathroom and was unable to go because there's no bathrooms. That is not in her best interest."

2354.  Matthew continued to harass me and use coercive control to force me to stay away from Angelina and isolate us from each other by reading my message and saying nothing.

2355.  At 12:18PM, I responded to Matthew's other message about not having a supervisor and said, "What does that mean? I said that if you are not going to be willing or able to provide the supervisor that I will do it myself. Please provide me with a schedule now. I would rather have somebody who is a neutral, third-party rather than one of your family members who consistently harasses me during phone calls."

2356.  Matthew continued to interfere with me and harass me and ignored everything that I said and responded with a vague and intentionally ambiguous response.

2357.  At 12:23PM, he messaged me and said, "Please let me know about the visit today if you are willing to abide."

2358.  At 12:29PM, I responded and said, "Abide? What does that mean? I am not going to east mountain park. They have no bathrooms and there were dirty heroin needles and trash everywhere last time. Last time our child asked to use the bathroom and couldn't. Who is the supervisor that you were planning on using today? What time are you giving me? And what other location can we meet at other than East Rock park since I am not comfortable with that place?"

2359.  Matthew continued to harass me and use coercive control to force me to stay away from Angelina and isolate us from each other by reading my message and saying nothing.

2360.  At 12:30PM, I sent him another message and said, "At the bare minimum there needs to at least be a bathroom available in case our child needs to use the bathroom. Can we meet at the pool club? It's not far from your mother's house at

all. Carrie even said that you could come too. Please let me know. I don't want to visit to be in some place where there's no amenities for our child."

2361.   At 12:31PM, Matthew continued to try to interfere with me and harass me and said, "The supervisor will not go that far. There are no needles or Garbage at that park, please stop making things up. These are the parameters of today's visit. Please let me know soon so I can plan accordingly."

2362.   At 12:32PM, Matthew responded to my message in which I said that my friend offered him to come to the pool club as well if he would agree to a visit there and said, "I will never be anyplace with you ever. Angelina is not going down there. You know the parameters of today's visit. Please let me know soon."

2363.   The fact that he was restricting saying that both Angelina and I would be forced to only see each other at a park where there were no bathrooms that had trash and drug paraphernalia the last time we were there shows that he would rather emotionally and psychologically abuse Angelina and me than do what is in her best interest.

2364.   At 1:32PM, I replied and said, "I photographed and video taped it all. Nothing is made up. What are the parameters? I need to know the date time and length of the visits for this week and where each will be taking place and who the supervisor is for each so I can plan accordingly. Please give me that information now for each of my three visits for this week. I have asked repeatedly for days."

2365.   Matthew continued to harass me and use coercive control to force me to stay away from Angelina and isolate us from each other by reading my message and saying nothing.

2366.   At 1:51PM, I replied to another of Matthew's messages and said, "I do not know the parameters. You have not answered a single one of my questions. Why are you being unreasonable? I photographed and video taped it all. Nothing is made up. What are the parameters? I need to know the date time and length of the visits for this week and where each will be taking place and who the supervisor is for each so I can plan accordingly. Please give me that information now for each of my three visits for this week. I have asked repeatedly for days."

2367. At 2:29PM, Matthew replied and said, "I said over and over again that you can do a visit at the park near my mother's house today. I asked you multiple times what time you will be available and you keep stalling and not answering the question. If you don't answer soon I will have to assume that you do not want to see her today. Please let me know ASAP so I can arrange the supervisor."

2368. Matthew ignored everything that I said about needing the schedule and needing to know in advance the details before I could commit. His continued repeated statements in complete disregard of my replies are his intentional attempts to harass me and coerce me further.

2369. At 2:35PM, Matthew send me a message saying, "Angelina wanted to send this" in which he included an attachment that he made it so that I was not allowed to view. He intentionally did this to try to cause me more annoyance and harass and inconvenience me.

2370. At 2:57PM, I replied to Matthew's prior messages and said, "You did not give me a time, nor did you tell me who the Supervisor is that is meeting me. How will I know where to go and when if you don't give me this information? Is there a reason why you're still refusing to give me a schedule for the week? You cannot just message me every day like this. I need a weekly schedule for consistency. Who is the supervisor? Why can't I use my supervisor like every other time? Why are you making it so difficult? Why are you refusing to go anywhere Other than that park? Please answer my questions. It's harassment when you intentionally ignore what I ask."

2371. Matthew continued to harass me and use coercive control to force me to stay away from Angelina and isolate us from each other by reading my message and saying nothing.

2372. At 2:59PM, I messaged Matthew again and said, "I would like to have her tonight from 730pm-10pm so we can do dinner. Is that ok?"

2373. Matthew then denied me the ability to have access to my child in an effort to coerce, harass, and abuse me further.

2374. At 3:18PM, he replied and said, "No that is not okay. And no we are not using your supervisors. I told you you can meet her at the park for a couple hours with

the supervisor who was going to be my mother. It's getting kind of late now. I've been asking you for the last 4 hours what time you would be able to do today and you still just keep beating around the bush making suggestions about how to control the situation. You don't get to choose. I choose the place, I choose the amount of time, I choose the supervisor. I don't know how many times I need to say the same things to you over and over again."

2375. None of Matthew's claims are actually based on fact. The court order states that visitation will be "in the presence of a third party" and does not state that Matthew has the right to deny me access or infringe upon my right to visitation with my child.

2376. Matthew's statements were made with the sole purpose of harassing, abusing, and interfering with my custodial rights and the relationship between my child and myself.

2377. At 3:19PM, Matthew, in an attempt to harass me further, sent me another identical message in which he denied me access to my child and said, "No that is not okay. And no we are not using your supervisors. I told you you can meet her at the park for a couple hours with the supervisor who was going to be my mother. It's getting kind of late now. I've been asking you for the last 4 hours what time you would be able to do today and you still just keep beating around the bush making suggestions about how to control the situation. You don't get to choose. I choose the place, I choose the amount of time, I choose the supervisor. I don't know how many times I need to say the same things to you over and over again."

2378. Matthew telling me that it is too late at 3:19PM when I started asking him as early as 9:00AM that day for access to my child is another one of his attempts to unlawfully and unreasonably interfere with my right to visitation and access of my child.

2379. Matthew then continued to harass me and send me several messages in which he attempted to cause me annoyance, alarm, and distress.

2380. At 4:32PM, he sent me another message in which he said, "I'm very confused on why you would ask to take Angelina for dinner from 7:30 to 10:00 p.m. when you have a meeting with DCF at 8:00 p.m.? It's this kind of behavior like that

makes me untrusting of using your supervisors. We've had nothing but issues with your supervisors and I said from now on we will be using mine or will be using very specific supervisors of yours that I approve and talk to. One time you never even brought Angelina back and I had to call the police to make you bring her back the next day. Then another time you showed up over 2 hours late at 10:30 p.m. It's also why it needs to be location specific. It's now 4:30 and getting too late to arrange a visit. Let me know if you're available tomorrow for a visit and what time if you are."

2381. Matthew telling me that me asking him if I can take my child for dinner is a "behavior that makes him untrusting of using my supervisors" is another form of coercion and abuse intended to harass me.

2382. Matthew never had to call the police to get Angelina back, and instead he actually refused to pick her up and stopped responding due to him being out getting intoxicated at the time she was supposed to be going back in his care. Matthew's repeated denial of allowing me to see my child is abuse, isolation, and coercion.

2383. Matthew also claims that he would provide the supervisor, yet he has refused to ever actually provide anyone as a supervisor, and instead demands each time that I find one or not see my child at all.

2384. At 4:50PM, I responded and said, "So you're not okay with the DCF worker supervising tonight? So to be clear, you will no longer allow me to provide a supervisor? This is the first I am hearing from you that the supervisor is your mother. Your mother usually makes fun of me and speaks poorly of me with you during phone calls to cause me annoyance and alarm and has said things like "i know mommy is the worst" etc. I'm not sure if I feel comfortable with her supervising since she has been very hostile with me in the past. I mentioned to you that the park you offered has no bathroom. So you don't care that our child might need to use the restroom and there isn't one available? I asked if I could do dinner with her. I don't want to go in that park, it's dirty and dangerous. Why are you insisting that that is the only place that visits can take place? This is not in Angelina's best interest. I don't know why you try to use coercion and control

Angelina and my movements and isolate her from her home, friends, church, family, etc. Why can't she come to the house? Where in the court order does it say that I don't get to choose? Why was it okay for me to choose every other time? Did you speak to the judge outside of court again?"

2385.   Matthew continued to harass me and use coercive control to force me to stay away from Angelina and isolate us from each other by reading my message and saying nothing.

2386.   At 4:52PM, I sent him another message and said, "I'm confused. You asked repeatedly yesterday who my supervisor was, and said that I could provide several of them that you already approved of. Since when are you now not allowing that anymore? I will need a schedule immediately. Please provide the schedule immediately. This is harassment. I will be going to the waterbury police department shortly."

2387.   Matthew continued to harass me and use coercive control to force me to stay away from Angelina and isolate us from each other by reading my message and saying nothing.

2388.   At 4:54PM, I sent Matthew another message and said, "What do you mean? So she can have dinner with us, come to the house, be there for the visit, and be with someone who you can't unreasonably deny as a supervisor? I will make sure to let the DCF worker know that you are untrusting of him. I am highly concerned with the fact that you went crazy, screamed, said "fuck you pig" repeatedly, and had a melt down in front of Angelina the other day when the police were there. I need a schedule now. If you do not give me one, I will be going to the police to press charges on you for interference. I need a schedule. What is my schedule for seeing Angelina for this week? I need to know now."

2389.   Matthew continued to harass me and use coercive control to force me to stay away from Angelina and isolate us from each other by reading my message and saying nothing.

2390.   At 7:45PM, Matthew sent a separate message and said, "We called you. Angelina's going to bed soon. Please call soon if you want to talk to her."

2391.  Matthew intentionally called me when he knew that the DCF worker would be coming to try to interfere with my ability to speak to my child after he already denied me access to seeing her for a visit.

2392.  At 9:32PM, I replied and said, "Why would you call when you knew that I was with Dcf?"

2393.  At 9:33PM, he replied and said, "I thought your appointment wasn't till 8 PM so I tried to have her call before. She's asleep."

2394.  When I attempted to speak to my child, Matthew spoke to me directly on the phone in direct violation of the no contact order of the protective order. (See recordings from 7/17/23)

2395.  At 9:34PM, I messaged him and said, "Why did you speak to me on the phone again in violation of a protective order?"

2396.  Matthew then admitted to speaking to me outside of the protective order and admitted to a violation of protective order.

2397.  At 9:34PM, Matthew messaged me and said, "I said she's in bed. We are allowed communications for our daughter."

2398.  Matthew's statement that he claims we are allowed communications for our daughter is proof that he believes that the laws do not apply to him. He stated that he is allowed to violate the protective order if he wants due to the fact that his delusions tell him that it is "allowed" and he dangerously ignores all orders of protection and continues to abuse me further.

2399.  At 9:35PM, I messaged him and said, "I have asked you every day to provide me with a schedule for Angelina. Please provide me with a schedule now. I cannot just keep spending every single day wondering if you're going to let me see her or not. You were ordered to give me a schedule. Please provide it to me now. What is the schedule for this week? You stated that you are not going to let me see her unless you pick the schedule, supervisor, details of the visit, and every single other part of it. Please provide me with that now, so I can plan the rest of my week."

2400.  Matthew then continued to deny me access and visitation to my child.

2401.   At 9:36PM, he said, "I'm sorry I cannot give a full schedule right now. Would you like to see her tomorrow for a bit. I could probably arrange a visit for an hour and a half to two hours. Let me know."

2402.   At 9:37PM, I replied and said, "The protective order says that you are not allowed to contact me at all. It is a full no contact. You are not allowed to speak to me on the phone. You can only communicate with me in the app and only about visitation and affairs of Angelina. What makes you think that you have the right to speak to me on the phone in violation of the order on a daily basis? This is harassment. I ask you daily not to speak to me on the phone and you keep doing it. Please stop. I ask you not to every time and you keep doing it. This is harassment. Stop making up lies about what the protective order says."

2403.   Matthew continued to harass me and use coercive control to force me to stay away from Angelina and isolate us from each other by reading my message and saying nothing.

2404.   At 9:50PM, I messaged him again and said, "So you're just going to keep harassing me?"

2405.   Matthew continued to harass me and use coercive control to force me to stay away from Angelina and isolate us from each other by reading my message and saying nothing.

2406.   At 9:51PM, I sent him another message and said, "Why can't you give me a schedule? Dcf said you need to give me a schedule. The judge said you need to give me a schedule. Why are you refusing to do that? I need a schedule with all of the details for the complete week. I cannot keep doing this every day like this. This is a Parental Alienation and abuse. You have not let me see or speak to my daughter in days and I have not been able to see her in Weeks."

2407.   Matthew then attempted to harass me further by telling me not to speak about his violations of the protective order.

2408.   At 9:52PM, he responded and said, "Please keep the conversations about Angelina only."

2409.   At 9:52PM, I responded to him and said, "I keep asking you to give me a weekly schedule to see Angelina. Why not just let me see her every day? She

asked to see me daily. Why are you refusing to give me a schedule? Why are you refusing to let me see her? I need to schedule. I have asked you every day for the last eight weeks for your schedule."

2410.   Matthew continued to harass me and use coercive control to force me to stay away from Angelina and isolate us from each other by reading my message and saying nothing.

2411.   At 9:53PM, I messaged him again and said, "I called to speak to Angelina, and you spoke to me directly on the phone again. I am messaging you again for the third day in a row to ask that you stop having contact with me on the phone. You are not allowed to communicate with me on the phone. It is a violation of the protective order and a felony. I will be calling the police now. You have no right to keep harassing me this way. Please stop talking to me on the phone. It is harassment and a felony."

2412.   At 9:58PM, Matthew responded and said, "I cannot give you a schedule because I do not have anyone willing to commit to be around you every week for your supervise visit. Nobody wants to be anywhere near you. All you try to do is to get people in trouble over nothing because you're so angry inside. I am trying so hard to facilitate visits between you and Angelina, and yet you are still trying to do everything but follow through and see your daughter. My mother is willing to supervise your visit one time on a trial basis to see how it goes. She was willing to do that today yet instead of actually picking a time and coming to see her you just kept sending messages demanding different things. Tomorrow is another day. we are willing to set up another visit tomorrow as stated earlier. Are you willing to do that tomorrow? Do you want to see Angelina tomorrow? Please let me know what time you are available if you do."

2413.   Matthew's statements that I am "so angry inside" and telling me that I "try to get people in trouble over nothing" constitute harassment and intimidation and his effort to deter me from reporting his felony violations of protective order to the police.

2414.   At 11:07PM, I replied to him and said, "If you provide me the schedule I will get a professional supervisor. What is the schedule?"

2415. Matthew continued to harass me and use coercive control to force me to stay away from Angelina and isolate us from each other by reading my message and saying nothing.

2416. At 11:10PM, I sent him another message and said, "The judge said you need to give me a schedule and she stated that my family members can supervise. Please tell me the weekly schedule now so that I can work on finding a permanent supervisor to do the schedule. I am not interested in doing any "trials" with your mother. I need a consistent, permanent schedule. I have asked daily for almost 9 weeks straight and been denied access to my child for more than 1.5 days. 1.5 days in 9 weeks is torture, child abuse, parental alienation. Is Monday Wednesday Friday Sunday a schedule that works for you? If so, tell me the times so I can work on finding a professional supervisor since you are refusing to designate one."

2417. Matthew then denied my request for a schedule and denied my request that we hire a professional supervisor for the visits.

2418. At 11:17PM, he replied and said, "Professional supervisor? What does that even mean. You keep saying that you're not seeing her and that you want to see her, yet every opportunity, I give you to see her you just don't. I'm not sure what exactly it is You are looking for here. Do you want to see Angelina tomorrow for a supervised visit, yes or no. If yes, what time."

2419. Matthew was asking me if I wanted to see her the next day and what time, however he did not actually provide me with a location, details of the visit, length of the visit, supervisor, or any other acceptable times.

2420. Matthew makes it seem as if any time that I say will suffice, however he then denies me any and all attempts to access and see my child.

2421.

2422.

2423. On 7/18/23, Matthew continued to harass me and abuse me and my child by refusing to allow me any access to my child.

2424. At 9:19AM, I messaged him and said, "Matthew, my main concern will always be Angelina. i miss my child. I would just like to have some structure in

seeing my child. So 1. Yes, i want to see Angelina today either before 3 or after 7:30. I can hire a professional supervisor and it will be consistent and there are professionals who do that. There are agencies that hire out supervisors. There needs to be structure somehow for Angelina please do it for our daughter."

2425. At 9:37AM, he responded and said, "How soon would you be able to meet her at East mountain park?"

2426. Matthew asking me how soon I could meet at a park that is 40 minutes away from my house at the last second without any prior notice is more evidence of the fact that he tries to harass me, interfere with me, and coerce me into doing what he wants to try to inconvenience and torment me. Rather than complying with court orders and giving me a schedule so that my daughter and I can both know when we will see another, he tries to give me no access to her by expecting me to jump at the drop of a second when he says jump.

2427. At 10:25AM, I replied and said, "I would prefer to do the visit somewhere that has a bathroom in case our child needs to use the restroom. What is your plan if she has to go potty?"

2428. Matthew continued to try to harass me and read my message and said nothing.

2429. At 10:26AM, I sent another message and said, "So to be clear, you are refusing to provide me a schedule and structured, consistent predictable structure for our child? Can your mother just come to my house?"

2430. Matthew continued to try to interfere with my custodial right to visits with my child and continued to try to coerce and harass me by insisting that we do something not in the best interest of our child just so it can be something controlled by him.

2431. At 10:40AM, Matthew replied and said, "They have Porta potty's there. It is also a half a mile from our home. The visit can be for an hour and a half to two hours. She will go before she leaves the house. I'm sure she will be fine. Worst case scenario is my mother can run her home to use the bathroom if she does not want to use the Porta potty. Are you going to meet her yes or no need to know soon."

2432. Matthew was trying to harass and abuse us by demanding that the visitation be restricted to only at the park that has no appropriate bathroom facilities for our child. He was also trying to use coercion by demanding that I jump and go where he says to go on a moment's notice without giving me any schedule or structure like he was court ordered to do.

2433. At 11:00AM, he sent me another message trying to pressure me to be able to immediately respond to him and said, "Would need to know soon please. It's been an hour and a half now and you still are not giving me a definitive answer. We cannot sit around all day waiting. Please let us know soon so we can have Angelina ready. I can put her down for a late nap today if you want to meet up with her soon. If you do not let me know before noon, I will be putting her down for a nap."

2434. I repeatedly asked Matthew for a schedule on multiple occasions so that both I, Angelina, and whatever supervisor that would be designated could be able to know and be aware of when we would be doing the visitation and to be able to plan our lives accordingly.

2435. Matthew typically ignores me and does not give me any information about how or when I can see Angelina, and then when he responds and demands that I go to a park that both I and Angelina said we didn't want to go to, he then harasses me and messages me again asking me to let him know immediately and expecting me to drop everything and just do what he says to try to coerce me further.

2436. At 11:25AM, I responded and said, "Its not right to end the visit due to her needing the bathroom. Those porta potties are dirty. Why can't she meet me somewhere else ? Theres more parks in bethany and prospect that are clean and nice. Can she meet at bethany west?"

2437. Matthew continued to try to interfere with my ability to see and speak to my child and read my message and said nothing.

2438. At 11:26AM, I sent him another message and said, "My daughter really misses her sister and wants to see her too. Can your mom come to my house tonight at 6:30 pm for a visit ??"

2439.  Matthew continued to try to interfere with me and harass me by insisting that we go to the park that has no proper clean bathrooms for the child.

2440.  At 11:26AM, he replied and said, "I told you where the meeting place was. Are you Able to meet, yes or no. Let me know soon."

2441.  At 11:28AM, I responded and said, "Why are you only allowing me to see her at that specific outdoor place that doesnt have bathrooms and is not clean or safe? She asked to go to the house. Can you mom come here with her for dinner later so she can see me and her sister? We really miss her. She wont be out of camp until 530."

2442.  Matthew continued to try to harass me and interfere with my ability to see and speak to my child and read my message and said nothing.

2443.  At 11:32AM, I messaged him again and said, "Hello? You read my message and said nothing. Please reply. I have been begging you for a visit for 2 weeks now. This is not healthy or in the best interest of our child."

2444.  Matthew then tried to harass me and disparage me by making negative statements to me in the app.

2445.  At 11:34AM, he responded and said, "My mother really does not want to be around you. She's doing it for Angelina sake so that Angelina could see you. Are you coming up to meet her at the park? Yes or no. Stop saying other things and tell me yes or no and what time you were going."

2446.  Matthew continued to ignore the fact that Angelina asked to come to our house and that I said that the park was not proper due to the issue of there not being clean bathrooms. Him saying that his mother didn't want to be around me was an attempt to try to upset me and harass me.

2447.  At 11:35AM, I responded and said, "If she doesnt wanna be around me then how is she going to supervise? Please answer my question about her coming over for dinner so that Angelina can be in the comfort of her home and see me and Julianna. I told you the time already. Please answer. We miss her alot. I can also text your mom directly and ask. Please let me know. Its been 2 weeks."

2448.  At 11:40AM, he messaged back and said, "No Theo. She is not driving to orange. No Angelina is not going to your house. People do things they don't want

to sometimes for the sake of other people. For Angelina she's willing to meet you at the park.. you have 20 minutes to let us know. It's been 2 hours and instead of accepting that this is the way it has to be you keep deflecting and trying to narcissistically control the parameters of the visit. We told you the option for the visit. Are you meeting her, yes or no."

2449. Matthew was ignoring everything I said to try to control everything about the situation, down to the location of where I could see my child. Every other time he allowed me to take her where I wanted. There is nothing in the court order about her not being allowed to go to my house. He was doing this to upset me and inconvenience me and harass me and force me to be isolated from my child since he said I had 20 minutes to reply when he told me at the last minute after I begged daily for a schedule for months.

2450. At 11:48AM, I responded and said, "You told me in previous messages that you make Angelina nap from 12-4pm. I asked you if I could see Angelina for dinner so she could see me and her sister. I told you we arent available until after 530pm. That is after the time you block off for visits due to her nap, as well. Can she meet us at a restaurant in Waterbury then? I can also pick her up if shes unwilling to drive or i can schedule an uber for them. Let me know please. I asked you daily for the last 9 weeks now for a regular consistent schedule and you keep refusing. I cant just sit around every day on standby waiting for you to tell me if or when I can see her and demanding that I drop everything and go at the moment's notice. Angelina has no knowledge of if or when she will see me either. Please stop trying to isolate us from her. We miss her alot. Its not right to restrict her this way. Please let me know asap about the permanent schedule and also about what restaurant we can meet your mom at tonight for dinner in waterbury and at what time."

2451. At 11:57AM, Matthew sent me another message and said, "Our previous message you said that you were available before three or after 730. After 730 does not work because it's way too late for Angelina. I planned before three. I've been talking to you all morning about you meeting her before three and you just keep deflecting talking about different times trying to manipulate the parameters of the

316

visit. They were very clear. Let me know if you are available to see her tomorrow at any point during the day. Clearly you are not seeing her today."

2452. Matthew never made any clear parameters at all. He denied me the ability to see my child and claimed that after 7:30 was too late, despite allowing me to keep her as late as 1:00AM on other occasions when it was convenient for him.

2453. At 3:46PM, I responded and said, "You told me that she naps from 12-3. You said this in 10-20 different messages. I told you I want her for dinner. I told you Julianna is in camp until 5:30. Stop acting like I didn't say this repeatedly. I'm not sure how you "planned before three" when you never gave me a time and I never said yes to that. I told you I want my children to see eachother. It is important that she see me and her sister. You are actively trying to isolate her from us. You haven't been talking to me all morning. I asked for a schedule. You keep refusing to and laughing and smiling thinking its all some big funny game or joke to you. So to be clear, you are refusing to let me see her today again?? And to be clear, you are refusing to provide me a schedule again??"

2454. Matthew continued to try to harass me and psychologically abuse me and coerce me and interfere with my ability to see my child and read my message and said nothing.

2455. At 5:21PM, I sent another message and said, "????"

2456. At 5:23PM, Matthew then denied me access to my child. He said, "I already told you no. Let me know if you want me to arrange a supervised visit for tomorrow during the day."

2457. Matthew never said that after 7:30 wasn't an option when I initially asked. He also never said that visits were limited to during the day. Not only was he restricting my access so much by denying every supervisor, denying every potential location, and even denying my child the ability to go to my house, but he also unreasonably and unlawfully isolates me from my child by making the "options" for visitation options that are unfeasible or impossible.

2458. At 5:33PM, I messaged him and said, "Why is it no? You asked me what time, I provided you a time. Now you ate denying me access for no reason? Can you

explain why? Julianna and I want to come get ice cream with her or dinner. Why are you refusing to let us? This is alienation."

2459.  At 5:40PM, Matthew continued to try to harass me by sending me a long paragraph that contained several inaccuracies.

2460.  He messaged me and said, "Please stop calling it all these different names. It is not abuse, it is not parental alienation, it is not custodial interference. It is my job to protect my daughter from you. It's very clear in the order. It's very clear to everyone but you. You lost custody of Angelina. You are on supervised visits only and at my discretion. I understand this is a huge change for you. I understand this is very difficult to accept. I have been trying very hard to work with you so that you can see Angelina. She wants to see you. I am not just going to let you pick up Angelina when you want to. I tried using your supervisors a few times and I had nothing but problems with getting my daughter returned back to me. Therefore I decided moving forward I would be picking all the supervisors. The supervisors I have do not have an open schedule at your disposal. You told me today this morning that you would be available anytime before 3:00. I spent all morning trying to get you to do a visit before 3:00 p.m., telling you I had a supervisor set up. You spent the whole time debating me and trying to command where and how the visit was going to be. You do not have that luxury anymore. You lost that privilege. Your visits with Angelina are based on what I decide. I will give you another opportunity tomorrow to plan for a visit. Are you available to visit tomorrow afternoon for a few hours. I can have my mother meet you at East mountain park with Angelina. I will need to know ahead of time and I will need a definitive answer so that I can plan accordingly. I'm not going to keep responding to your messages of you asking me if you can take Angelina tonight, or if you can have different parameters for the visit. The answer is no. The only thing I will respond to from this point on will be about the visit tomorrow if you want to see her. Please let me know soon so I can let my mother know and we can plan your visit. Thank you for your understanding."

2461.  Matthew was trying to gaslight me and tell me that its not abuse when it is. He has been denying me visitation and access to my child and he is court ordered to

allow that access, which means it is custodial interference and parental alienation as he has been actively withholding my child. His sarcastic comments about "I understand this is very difficult to accept" and that he was trying "hard to work with me" are also sarcastic and harassing and gaslighting statements as he has done nothing to facilitate me seeing my child, and has instead chosen to isolate me from her completely. His extreme and unreasonable obsession with trying to control the "parameters" of my visitation when none of those extreme restrictions are part of the court order is proof of his obsession with coercion and harassment and abusing me and my child.

2462.   At 5:49PM, I messaged him back and said, "Why won't you let me see her right now?"

2463.   Matthew continued to try to harass me and psychologically abuse me and coerce me and interfere with my ability to see my child and read my message and said nothing.

2464.   At 5:55PM, I messaged him again and said, "I asked repeatedly for a schedule. You have no right to isolate her from me like this. The order does not say you get to isolate her. There were never issues with any supervisors. You are breaking the law and court order and protective order. Who is "everyone but me" that "gets it"? You wont let angelina go to doctor, dentist, therapist, church, havent let her see me or my family in weeks, wont let me see or talk to her, this is abuse. You cant withhold her. I offered to get a professional supervisor and you say no but then use you not having a supervisor as an excuse? I told you today I wanted her for dinner. I said that this AM. I said i want julianna there. Julianna is only with me after camp. We want to see her now. This is abuse. Why are you trying to keep her away? She could see me daily if it wasn't for your alienation."

2465.   Matthew continued to try to harass me and psychologically abuse me and coerce me and interfere with my ability to see my child and read my message and said nothing.

2466.   At 6:03PM, after I spoke to my child on the phone, I learned that Matthew's mother wasn't even there, and that she wouldn't have been able to supervise a visit at all, meaning that his attempts to schedule something were all just for show.

2467.  I messaged him again and said, "Why would you act like you were gonna do a visit today with your mom as a supervisor if Angelina said she wasn't even there the entire day???"

2468.  Matthew then tried to interfere with my ability to speak to my child per the court order and abruptly ended the call after interfering with the call repeatedly. (See recordings from 7/18/23)

2469.  At 6:05PM, I messaged him again and said, "Why did you just abruptly hang up when I told Angelina I was sad that youre still not letting me see her alot ? You lied and said your mom was there today, denied me visit, denied me facetime and phone calls and now brainwashing my child after she expressed how sad she is over your alienation? Why do you keep doing this? Why do you keep abusing me? You laugh and say go call the cops and laugh and say go to court and taunt me, why do you try to hard to keep me from seeing and speaking to her?"

2470.  Matthew continued to try to harass me and psychologically abuse me and coerce me and interfere with my ability to see my child and read my message and said nothing.

2471.  At 6:09PM, I replied to a message he sent on June 6, 2023 asking me if I thought about a schedule for Angelina and said, "Right now i can do monday tuesday saturday sunday days, and any evenings. Please give me the schedule. Those are my preferred days and times."

2472.  Matthew continued to try to harass me and psychologically abuse me and coerce me and interfere with my ability to see my child and read my message and said nothing.

2473.  At 7:53PM, after I attempted to call to speak to my child and was ignored and denied phone access, I messaged him again and said, "Why arent you answering ? Why wont you let me see or speak to Angelina?" (See recordings from 7/18/23)

2474.  Matthew then attempted to intimidate me, harass me, coerce me, and abuse me by telling me that I couldn't see my child for a minimum of one week when he already withheld her from me for two entire weeks.

2475.   At 9:01PM, he responded and said, "You spoke to her on FaceTime, twice today. I'll talk to my mother and see if we could set up a weekly schedule for you. She's going away this week until Tuesday so we may have to start the week after."

2476.   Angelina was doing sexual motions with her finger during the facetime call and when I asked her what she was doing, she stated that she was "just licking it" which makes me suspect that she is still being exposed to sexual behaviors since she has been left alone regularly with Dominic Lodice on a near daily basis. (See recorded call from 7/18/23)

2477.

2478.   On 7/19/23, Matthew interfered with my custodial rights by refusing to allow me to see or speak to my child and refusing to exchange the child with me pursuant to the most recent civil family order.

2479.   Both Matthew and Karen Bowers withheld Angelina from me and interfered with my ability to speak and see my child. Karen Bowers withheld Angelina from me for the entire day and did not allow me to go see her at all. She used the excuse of "needing to be up at 5am" and withheld Angelia with Jessica Strusky and Roy Bowers and Stan Strusky and they all refused to let me see Angelina, even though Matthew stated that it was up to them if I could see her. (see OFW messages and recordings from 7/19/23)

2480.   At 9:34AM, I messaged him in the app and said, "You would not answer and refused to let me speak to her multiple times. I said i will be hiring a professional supervisor to remedy the excuse you use of having nobody to do it. I need the schedule now. I have 3 different professional supervisors ready and also 4 different supervisors approved by you recently that never had any issues. Please give me a schedule immediately. I want to see Angelina tonight. What time can i do that? I have my own supervision."

2481.   Matthew continued to try to harass me and psychologically abuse me and coerce me and interfere with my ability to see my child and read my message and said nothing.

2482.   At 11:07AM, I messaged him again and said, "Hello??? Where is angelina. ??? Why arent you answering ? You read my message and said nothing."

2483.  At 11:13AM, Matthew replied and said, "I told you the parameters of the visit."

2484.  At 11:20AM, I replied and said, "No you didnt. What time can I see her today?"

2485.  Matthew continued to try to harass me and psychologically abuse me and coerce me and interfere with my ability to see my child and read my message and said nothing.

2486.  At 11:57AM, I messaged him again and said, "I just tried to call you on both of your phones and I tried to FaceTime as well as Google Meet. You did not answer any of my calls. I then called your mother and she answered my FaceTime and I was able to speak to Angelina on her phone. Angelina confirmed that your mother is not on vacation and that she is with her and that you are working at the moment. Since you are working today and leaving her with your mother, Angelina wants me to ask you if you would let us go get ice cream later with Juliana. She asked me repeatedly if I could message you and I told her I would as soon as I hung up. She is hoping that you will let her go. She was upset and nervous that you would say no. Please stop disappointing our child. Let me know what time works and I can meet your mother, even if it is just down the street from your house for a walk around the block."

2487.  At 1:16PM, Matthew replied and said, "Hey, I'm sorry I'm not with Angelina right now. She's with a sitter. I'm working. I told you that taking Angelina somewhere is not possible. You keep saying the same thing over and over again but I keep telling you that I will set the location and the parameters of the visit. Please let me know your next time slot that you are available to see Angelina."

2488.  At 1:32PM, Matthew messaged me again and said, "I just talked to my mother, she said she would be willing to meet you at the Big Dipper ice cream place near her house today and let you have a visit with Angelina. What time would you be available for that?"

2489.  At 4:49PM, I replied and said, "So since youre no longer unemployed, does that mean youre gonna start paying the money you owe me ? You said you would start zelling me 2 months ago and I havent gotten a single dollar. She isnt with a